UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| LONESTAR AIRPORT HOLDINGS, LLC, | Civil Action No. 1:22-cv-00770-RP |
| Plaintiff, | |
| v. | |
| CITY OF AUSTIN, TEXAS, | |
| Defendant. | |

**LONESTAR AIRPORT HOLDINGS, LLC'S MOTION FOR PRELIMINARY
INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT**

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   FACTUAL BACKGROUND ................................................................................2

    A.    The City and Lonestar Enter the Lease and Concession Agreement.......................2

    B.    Lonestar Invests Heavily and Builds a Thriving Terminal and Operation .............4

    C.    The Parties Begin to Discuss Expansion of the South Terminal ...........................4

    D.    The City Abruptly Changes Course ....................................................................5

    E.    The City Proceeds with Plans to Expand the Airport Without Lonestar ................5

    F.    The City Embarks on a Plan to "Condemn" Lonestar's Entire Business ...............6

III.  ARGUMENT .......................................................................................................7

    A.    The Court Should Enjoin the City from Excluding Lonestar from
          Development and Construction of Any New Facilities .........................................8

          1.    Lonestar Is Likely to Succeed on Its Breach of Contract Claim.................8

          2.    Lonestar Will Be Irreparably Injured if the City Is Not Enjoined .............9

    B.    The Court Should Enjoin the City from Taking Lonestar's Business ..................10

          1.    Lonestar Is Likely to Establish that the City's Conduct Violates
              Article 2 of the Agreement and the U.S. Constitution ............................10

              (a)    The City's Effort to Take Lonestar's Business Violates
                    Article 2.03 ...................................................................10

              (b)    The City's Effort to Take Lonestar's Business Also
                    Threatens an Unconstitutional and Unlawful Taking ...................10

              (c)    The City Cannot Use Eminent Domain to Avoid Its Own
                    Contract ........................................................................14

          2.    Lonestar Will Be Irreparably Injured if an Injunction Does Not
              Issue to Prevent the Unconstitutional and Unlawful Taking ...................16

    C.    The Balance of Equities and Public Interest Weigh in Favor of an
          Injunction .....................................................................................................18

IV.   CONCLUSION..................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page**

**FEDERAL CASES**

*Allied Home Mortg. Corp. v. Donovan*,
 830 F. Supp. 2d 223 (S.D. Tex. 2011) ....................................................17

*Associated Builders & Contractors of Se. Texas v. Rung*,
 2016 WL 8188655 (E.D. Tex. Oct. 24, 2016) .......................................20

*Bluefield Water Ass'n v. City of Starkville*,
 577 F.3d 250 (5th Cir. 2009) .....................................................................7

*Bond Pharmacy, Inc. v. AnazaoHealth Corp.*,
 815 F. Supp. 2d 966 (S.D. Miss. 2011) ....................................................8

*Cartograf, S.A. de C.V. v. Titus Cargo LLC*,
 2020 WL 3513253 (S.D. Tex. Apr. 27, 2020) ........................................17

*Cho v. Itco, Inc.*,
 782 F. Supp. 1183 (E.D. Tex. 1991) ...........................................8, 18, 19

*Church v. Biden*,
 573 F. Supp. 3d 118 (D.D.C. 2021) .........................................................18

*Emery v. Sun Cupid Tech. (HK) Ltd.*,
 2020 WL 10181571 (N.D. Tex. Dec. 1, 2020) .......................................19

*EQT Gathering, LLC v. Tract of Prop. Situated in Knott Cnty.*,
 2012 WL 6049691 (E.D. Ky. Dec. 5, 2012) ...........................................20

*Jiao v. Xu*,
 28 F. 4th 591 (5th Cir. 2022) .....................................................................8

*Kimball Laundry Co. v. United States*,
 338 U.S. 1 (1949) ................................................................................11, 13

*Lakedreams v. Taylor*,
 932 F.2d 1103 (5th Cir. 1991) ...................................................................8

*M-I LLC v. FPUSA, LLC*,
 2015 WL 6738823 (W.D. Tex. Nov. 4, 2015) ........................................17

*Mach 1 Air Servs., Inc. v. Bustillos*,
 2013 WL 12108595 (W.D. Tex. May 10, 2013) .....................................20

*McKissock, LLC v. Martin*,
 267 F. Supp. 3d 841 (W.D. Tex. 2016)....................................................20

*Monongahela Navigation Co. v. United States*,
148 U.S. 312 (1893)................................................................................13

*National Screen Service Corp. v. Poster Exchange, Inc.*,
305 F.2d 647 (5th Cir. 1962) ...................................................................19

*O'Connor v. Smith*,
2010 WL 4366914 (S.D. Tex. Oct. 28, 2010), *aff'd*, 427 F. App'x 359 (5th
Cir. 2011) ...............................................................................................16

*Teladoc, Inc. v. Texas Med. Bd.*,
112 F. Supp. 3d 529 (W.D. Tex. 2015) .................................................7, 8

*Terex Corp. v. Cubex Ltd.*,
2006 WL 3542706 (N.D. Tex. Dec. 7, 2006) ..........................................17

*Texas v. Biden*,
2022 WL 658579 (N.D. Tex. Mar. 4, 2022)............................................18

*Transwestern Pipeline Co. v. 17.19 Acres of Property Located in Maricopa
County*,
550 F.3d 770 (9th Cir. 2009) ...................................................................13

*U.S. Tr. Co. of N.Y. v. New Jersey*,
431 U.S. 1 (1977)....................................................................................13

*United States v. Pewee Coal Co.*,
341 U.S. 114 (1951).................................................................................14

**STATE CASES**

*Borough of Essex Fells v. Kessler Inst. for Rehab., Inc.*,
673 A.2d 856 (N.J. Super. Ct., Law Div. 1995) .....................................15

*City of Blue Mound v. Sw. Water Co.*,
449 S.W.3d 678 (Tex. App.—Forth Worth 2014, no pet.)................11, 13

*City of Miami v. Wolfe*,
150 So.2d 489 (Fla. 1963).......................................................................15

*City of New Braunfels v. Carowest Land, Ltd.*,
432 S.W.3d 501 (Tex. App.—Austin 2014, no pet.) ..............................14

*Craft v. Freeport Oil Co.*,
563 S.W.2d 866 (Tex. Civ. App.—Amarillo 1978, no writ)..................10

*Dep't of Pub. Works & Bldgs. v. Vogt*,
366 N.E.2d 310 (Ill. App. 1977) .............................................................13

*Earth Management, Inc. v. Heard County*,
    248 Ga. 442 (1981) .................................................................................15

*Goldman v. Alkek*,
    850 S.W.2d 568 (Tex. App.—Corpus Christi 1993, no writ), *amended* (Mar.
    11, 1993) ...............................................................................................10

*In re Inc. Vill. of Hewlett Bay Park*,
    48 Misc.2d 833 (N.Y. Sup. Ct. 1966) ....................................................15

*McCalla v. Baker's Campground, Inc.*,
    416 S.W.3d 416 (Tex. 2013).......................................................................9

*New England Estates, LLC v. Town of Branford*,
    988 A.2d 229 (Conn. 2010) ....................................................................15

*Rhode Island Economic Development Corp. v. The Parking Co., L.P.*,
    892 A.2d 87 (R.I. 2006)......................................................................15, 16

*Startex First Equip., Ltd. v. Aelina Enters., Inc.*,
    208 S.W.3d 596 (Tex. App.—Austin 2006, pet. denied)...........................9

*Tex. Rice Land Partners v. Denbury Green Pipeline-Tex., LLC*,
    363 S.W.3d 192 (Tex. 2012).....................................................................11

*Union Station Assocs. v. Rossi*,
    862 A.2d 185 (R.I. 2005)...................................................................14, 15

*Weber v. Domel*,
    48 S.W.3d 435 (Tex. App.—Waco 2001, no pet.)..................................11

STATE STATUTES

Tex. Prop. Code § 21.018 ...............................................................................7

Tex. Prop. Code § 21.02 ...............................................................................12

Tex. Prop. Code § 21.021 ..........................................................................7, 12

CONSTITUTIONAL PROVISIONS

U.S. Const. Amendment V ...........................................................................13

U.S. Const. Amendment XIV ........................................................................13

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Lonestar Airport Holdings, LLC moves, pursuant to Federal Rule of Civil Procedure 65, for a preliminary injunction to stop the City of Austin from breaching its contractual obligations and violating Lonestar's constitutional rights.  Lonestar respectfully requests a hearing on or before November 4, 2022, and that after the hearing, the Court enjoin City officials from (1) excluding Lonestar from the development and construction of "New Facilities" at the Airport; or (2) attempting to take possession of Lonestar's business at the South Terminal, or interfering with Lonestar's relationships with its vendors and tenants, until Lonestar's legal challenges are decided in accordance with the parties' Agreement that all disputes will be heard in this Court.

## I.   INTRODUCTION

The City entered a 40-year Lease and Concession Agreement with Lonestar in 2016.  That Agreement required Lonestar to invest significantly in the Austin-Bergstrom International Airport, literally rebuilding the South Terminal.  In return, the City granted Lonestar the right to operate the South Terminal and an exclusive first right to develop, construct, and operate any expansion of the South Terminal or any other new facility at the Airport.

Lonestar continues to uphold its end of the bargain:  It has invested tens of millions of dollars and built a thriving business.  The City, on the other hand, is in obvious breach.  After benefiting from Lonestar's substantial investment and experience, the City initially worked with Lonestar on a new, larger version of the South Terminal.  But after a change in administration, it reversed course and embarked on a plan to expand the Airport without honoring Lonestar's exclusive rights.  The City is now invoking its purported power to condemn to avoid the contractual obligations it voluntarily undertook just a few years ago.

Neither the Agreement nor the law allow this maneuver.  In addition to breaching the Agreement, the City's attempt to take the rights it granted to induce Lonestar to rebuild the South

Terminal, and to appropriate for its own benefit Lonestar's business, runs afoul of both Texas law and basic constitutional protections.  The harm caused by these breaches of contractual and constitutional rights—which will destroy Lonestar's business—is imminent and irreparable.  The City is well into planning demolition of the South Terminal and construction of new airport facilities.  The City is entering into financing, planning, development and construction agreements for new airport facilities—all without Lonestar—and is meeting with Lonestar's airline tenants, in an effort to terminate their business with Lonestar and transition that business to the City.

If not enjoined, the City intends to take Lonestar's property, terminate the Agreement, eliminate Lonestar's business, and redevelop the airport without Lonestar's participation—all well before Lonestar can challenge the unlawfulness of those actions.  The City has not and cannot show a need to proceed unilaterally, in violation of its contractual commitments.  Lonestar has extensive experience building and operating airports, and Lonestar's executives have played a part in improving major airports throughout the world.  Even if Lonestar ultimately demonstrates the illegality of the City's actions, Lonestar's business will have been destroyed and it will have been excluded from the planning and development of the new facilities at the Airport.  Damages will be an insufficient remedy.  This imminent and irreparable injury and must be enjoined.

## II.    FACTUAL BACKGROUND[1]

### A.    The City and Lonestar Enter the Lease and Concession Agreement

In 2015, the City began exploring ways to increase capacity at the Airport.  (Declaration of J. Burchetta ("Burchetta Decl."), attached as Ex. A, ¶ 4.)  At the time, what is now known as the South Terminal sat as an abandoned building.  (*Id.*)  The City's Department of Aviation (DOA)

---

[1] The facts set forth demonstrate that Lonestar is entitled to injunctive relief.  Lonestar reserves the right to seek expedited discovery to supplement the factual record.

decided that reopening the South Terminal would help the Airport keep up with Austin's population growth. (*Id.*)  The DOA also believed that a public-private partnership would minimize financial risk for the City. (*Id.*)  A private party could provide the capital and expertise to expand the Airport's capacity quickly without significant outlay of public funds. (*Id.*)

The City and Lonestar spent countless hours negotiating the Lease and Concession Agreement and signed it in March 2016. (Burchetta Decl., Ex. 1.)[2]  Under the Agreement:

- Lonestar invested millions of dollars into the South Terminal and undertook a "Rehabilitation Project" at Lonestar's "sole cost and expense." (*Id.*, pp. 20–25, ¶¶ 9.01–9.14.)

- The City granted Lonestar the 40-year right to operate the South Terminal to "expand the air carrier service options available in the City of Austin." (*Id.*, p. 1.)

- The City covenanted that Lonestar "may peaceably and quietly have, hold, occupy, use and enjoy the Premises during the Term, and may exercise all of its rights hereunder, without ejection or interference by Owner." (*Id.*, p. 11, ¶ 2.03.)

- The City granted Lonestar an exclusive first right to "develop, construct, and operate" any "Expansion" of the South Terminal or any "New Facility" at the Airport. (*Id.*, p. 31, ¶ 15; *see* ¶ 41.14 (confirming that Article 15 grants exclusive right).)

- The City agreed "not [to] take any action … the primary purpose of which is to avoid honoring any of its commitments or obligations under this Lease." (*Id.*, p. 31, ¶ 41.13.)

- If the City exercised its condemnation power (for some purpose other than the forbidden purpose of avoiding its contractual obligations), it agreed to pay fair market value for interests taken. (*Id.*, pp. 60–61, ¶ 34.03.)[3]

The City also agreed to "injunctive relief from a court of competent jurisdiction," (*id.*, ¶ 29.02(g)), and to "[v]enue for any action … concerning this Lease [lying] exclusively in the

---

[2] The Agreement originally was signed by the City and Highstar Capital IV LP on March 24, 2016 but was assigned that same day by Highstar to Lonestar with the City's express consent.

[3] Article 34 recognizes the authority of government entities, including the City, to exercise eminent domain.  Article 34 does not allow the City to take possession of Lonestar's going-concern business before paying just compensation.  To the contrary, Article 34 states that Lonestar "shall be entitled to compensation for the Fair Market Value of Tenant's Interest so taken," including all interests under the Agreement. (Agreement, p. 9, ¶ 34.03.)

Austin Division of the United States District Court for the Western District of Texas" (*id.*, ¶ 41.03).

The City Council approved the Agreement unanimously with the Mayor's support. (Burchetta Decl., ¶ 5.)  The City touted the Agreement as cutting edge.  (Declaration of J. Pearse ("Pearse Decl."), attached as Ex. B, ¶ 24.)

### B.    Lonestar Invests Heavily and Builds a Thriving Terminal and Operation

Lonestar immediately invested $12.5 million to rebuild the South Terminal.  (*Id.*, ¶ 13.) The resulting retro-themed building contains three gates and passenger amenities—food trucks, kiosks, an indoor and outdoor waiting area with a bar—and more than 1,000 new parking spaces. (*Id.*, ¶ 9.)  Lonestar invested heavily in infrastructure; recruited exemplary personnel; and negotiated the vendor and tenant deals needed for a successful terminal, including agreements with airlines, concessionaires, media entities, and ride-share companies.  (*Id.*, ¶¶ 10–11, 15–20.)

Lonestar re-opened the South Terminal on April 13, 2017, less than a year after beginning construction.  (*Id.*, ¶ 14.)  Allegiant Air was the first tenant.  (*Id.*, ¶ 15.)  In November 2018, Frontier Airlines moved to the South Terminal, freeing up space at the Main Terminal.  (*Id.*, ¶ 17.)

Since April 2017, more than 10,000 ultra-low-cost carrier flights have departed from the South Terminal.  (*Id.*, ¶ 23.)  In the first six months of 2022 alone, Lonestar's airline tenants accommodated more than 257,000 passengers at the South Terminal—over 1,400 daily.  (*Id.*)

Lonestar has continued to invest heavily in the South Terminal, spending nearly $20 million to date.  (*Id.*, ¶ 22.)  Lonestar made these investments in reliance on the City's long-term grant of rights to operate the terminal and develop, construct, and operate any new facility.  (*Id.*)

### C.    The Parties Begin to Discuss Expansion of the South Terminal

In the fall of 2018, the City and Lonestar began discussing an expansion of the South Terminal in a new location ("South Terminal 2.0" or "ST 2.0").  (Pearse Decl., ¶ 26.)  The plan was for South Terminal 2.0 to have six to ten new gates, with additional expansion possible.  (*Id.*)

Lonestar solicited and received credible proposals from potential development partners. (Burchetta Decl., ¶ 6.)  Those bids valued Lonestar's interests under the Agreement between $135,000,000 to $305,000,000—reflecting the greatly enhanced value of the South Terminal business based on Lonestar's investment.  (*Id.*)  Discussions between Lonestar and the City continued on an almost monthly basis until February 2019, when the long-time executive director of the DOA announced his intention to retire.  (Pearse Decl., ¶¶ 27–28.)

> ### D.    The City Abruptly Changes Course

With the arrival of a new administration in June 2019, the DOA's posture toward Lonestar and the Agreement changed drastically.  (*Id.*, ¶ 29.)  The DOA ceased all good faith negotiations for South Terminal 2.0 and instead, affirmatively interfered with Lonestar's rights.  (*Id.*, ¶ 31.)

As Lonestar was fielding final bids to raise funds for ST 2.0, the City publicly offered to buy Lonestar out for $10 million—less than Lonestar had invested and far less than the value of Lonestar's business and expansion rights, as shown by the bids Lonestar had recently received. (*Id.*)  The City stated that it "wishe[d] to acquire the leasehold interest of the South Terminal facility *to regain local control.*"  (Burchetta Decl., Ex. 3 (emphasis added).)  The City released to the press a memo discussing its buy-out offer, which killed Lonestar's discussions with potential investors in ST 2.0 and destroyed the opportunity to increase airport capacity.  (Pearse Decl., ¶ 34.)

Lonestar responded that it was not interested in selling its interest, and Lonestar reiterated its commitment to continuing operations and to exercising its exclusive first right in any future expansion of the South Terminal or new facility at the Airport.  (Burchetta Decl., Ex. 4.)

> ### E.    The City Proceeds with Plans to Expand the Airport Without Lonestar

The City ignored Lonestar's efforts to abide by the Agreement, and in March 2020, informed Lonestar that it would demolish the South Terminal as part of an expansion program.

(Burchetta Decl., Ex. 8.)  Lonestar objected.  Discussions between Lonestar and the City then stalled, as the City re-evaluated whether to expand in the light of COVID-19.  (Pearse Decl., ¶ 37.)

Then, in July 2021, the City unilaterally announced its intention to demolish the South Terminal and construct a new facility.  (*Id.*, ¶ 38.)  It called its plan the "Airport Expansion Development Program" or "AEDP."  (*Id.*)  The City threatened that, if Lonestar did not accept its $10 million buy-out offer, the City would "pursue all other available legal remedies, including condemnation proceedings."  (Burchetta Decl., Ex. 10.)

The City never discussed the AEDP with Lonestar before announcing it—nor has the City provided Lonestar its exclusive first right to develop and construct the AEDP.  (Pearse Decl., ¶ 39.) Lonestar repeatedly has asked that its contractual rights be honored.  (*Id.*, ¶ 40.)  Those requests have been rebuffed.  (*Id.*, ¶¶ 41, 46.)  The City has begun to discuss "demolition" and recently scheduled a meeting regarding demolition of 30 buildings near the South Terminal to make way for a cross-field taxiway and a new facility.  (*Id.*, ¶ 50.)  The City also informed both of Lonestar's airline tenants that Lonestar will not be operating the South Terminal after November.  (*Id.*, ¶ 48.)

### F.    The City Embarks on a Plan to "Condemn" Lonestar's Entire Business

In March 2022, the City told Lonestar that the South Terminal was "under the imminence of condemnation."  (Pearse Decl., ¶ 42.)  Ignoring its prior, grossly inadequate $10 million offer, the City now purported to value Lonestar's interest in the South Terminal at $1,954,000.  (*Id.*)

On June 17, 2022, the City filed its condemnation petition.  (Declaration of C. Clough ("Clough Decl."), attached as Ex. C, at Ex. 3.)  The City's appraisal covers only "the fair market value for the acquisition of the real property interest of the South Terminal Leasehold [valued at 1.3 million] and the 'unamortized cost' of the Trade Fixtures [valued at $647,000]."  (Pearse Decl., Ex. 4.)  The appraisal did not value Lonestar's business operations or its rights to participate in future expansion.  The City erroneously claims that Lonestar's "lost business income, profits,

capital investments and any alleged return on those investments are … not compensable" in the condemnation process.  (Clough Decl., Ex. 2.)

Nevertheless, the City intends to take Lonestar's entire interest, i.e., the real property, Lonestar's business, and the expansion rights.  The City recently asked Lonestar to discuss "transitioning" its business to the City.  (Pearse Declaration, ¶ 48.)  The City also met with Lonestar's airline tenants, Allegiant and Frontier, to discuss transferring each airline's operations and told them that the City will begin operating the South Terminal later this year.  (*Id.*)

Under Texas law, the special commissioners in the condemnation proceeding do not consider the lawfulness of the supposed condemnation; they merely value the interest to be taken. The special commissioners typically issue an award on the day of the hearing, currently anticipated in November.  (Clough Decl., ¶ 8.)  The City would then be entitled to pay the amount awarded and take possession immediately.  (*Id.*)[4]  Under color of its limited condemnation power, the City is threatening to take over Lonestar's going concern operations, oust Lonestar altogether from the Airport, and exclude Lonestar from the development and construction of New Facilities.

## III.    ARGUMENT

Lonestar is entitled to a preliminary injunction because (1) there is a substantial likelihood it will prevail on the merits; (2) there is a substantial threat of irreparable injury; (3) the threatened harm to Lonestar outweighs the threatened harm to the City; and (4) an injunction serves the public interest.  *Bluefield Water Ass'n v. City of Starkville*, 577 F.3d 250, 252–53 (5th Cir. 2009).

"To show a substantial likelihood of success, 'the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment.'"  *Teladoc, Inc. v. Texas Med. Bd.*,

---

[4] The City has discretion in appropriate cases to exercise its eminent domain authority through a "quick take" procedure.  Tex. Prop. Code § 21.021.  Under that procedure, a condemning authority can take possession of property after the special commissioner's hearing, *id.*, with legal challenges to the taking's validity occurring afterwards, *id.* § 21.018.

112 F. Supp. 3d 529, 535 (W.D. Tex. 2015) (Pitman, J.).   "All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win."   *Id.*

A "harm is irreparable when there is no adequate remedy at law, such as monetary damages." *Jiao v. Xu*, 28 F. 4th 591, 598 (5th Cir. 2022).   "However, the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'"   *Id.*   Thus, for example, "an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business."   *Id.*   "The threat that a party will be driven out of business or lose customer goodwill if a preliminary injunction is not granted may constitute irreparable harm," because the injury "cannot be undone through monetary remedies."   *Cho v. Itco, Inc*., 782 F. Supp. 1183, 1185 (E.D. Tex. 1991).   Courts routinely issue injunctions to prevent destruction of ongoing business relationships.   *See Teladoc*, 112 F. Supp. 3d at 541 ("[D]estruction of a business model may constitute irreparable injury."); *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 (5th Cir. 1991) (finding irreparable harm where defendant's actions would leave plaintiff "without any business to conduct"); *Bond Pharmacy, Inc. v. AnazaoHealth Corp.*, 815 F. Supp. 2d 966, 974 (S.D. Miss. 2011) (finding irreparable harm "where an act threatens an ongoing business with destruction").

### A.   The Court Should Enjoin the City from Excluding Lonestar from Development and Construction of Any New Facilities

#### 1.   Lonestar Is Likely to Succeed on Its Breach of Contract Claim

Article 15 grants Lonestar an exclusive first right to develop, construct, and/or operate any Expansion[5] of the South Terminal or New Facility[6] at the Airport.   (Agreement, ¶ 15.)   The City

---

[5] The Agreement defines "Expansion" as "any expansion of the South Terminal for the Authorized Use … to accommodate the growth of operations of Airlines (or other air carriers) at the Airport."

[6] The Agreement defines "New Facility" as "the construction of any new passenger terminal or concourse … or other facilities at the Airport … to accommodate the growth of operations of Airlines … at the Airport."

has engaged in significant development of new facilities, in breach of the Agreement, including by seeking bond financing, plotting runway locations, putting out RFPs for engineering, architecture, and other contractors, and engaging a project manager.  (Pearse Decl., ¶ 46.)  It now is actively planning demolition and construction.  (*Id.*, ¶¶ 50, 54.)  It is taking these actions without affording Lonestar its contractually guaranteed right to develop and construct the new facilities. (*Id.*)  The City therefore has breached, and continues to breach, the Agreement.  *Startex First Equip., Ltd. v. Aelina Enters., Inc.*, 208 S.W.3d 596, 602 (Tex. App.—Austin 2006, pet. denied) (enforcing right of first refusal); *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013) (enforcing agreement stating party "will agree" and "agree[s] to enter an agreement").

### 2.     Lonestar Will Be Irreparably Injured if the City Is Not Enjoined

The City's exclusion of Lonestar from the development and construction of New Facilities robs Lonestar of the right to participate in the development of those facilities.  (Pearse Decl., ¶ 46.) Lonestar is led—both at the management and Board levels—by seasoned and capable aviation experts, whose work resulted in the South Terminal being opened within a year of beginning construction.  (*Id.*, ¶ 54.)  Lonestar bargained for the right to develop any new facilities so those individuals could help plan the facility Lonestar would eventually operate, and oversee the construction process to ensure that it was done safely, efficiently, and properly.  The harms caused by Lonestar's exclusion cannot be remedied after new facilities have been planned and built.

Similarly, the City now apparently intends to proceed with demolition and construction without Lonestar, directly in contravention of Article 15.  (Pearse Decl., ¶ 54.)  The destruction of physical buildings cannot be remedied with money damages.  *Craft v. Freeport Oil Co.*, 563 S.W.2d 866, 868 (Tex. Civ. App.—Amarillo 1978, no writ) (holding "conduct which results in the destruction of property causes an irreparable injury which justifies interlocutory injunctive relief").

**B.**     **The Court Should Enjoin the City from Taking Lonestar's Business**

    **1.**     **Lonestar Is Likely to Establish that the City's Conduct Violates Article 2 of the Agreement and the U.S. Constitution**

        *(a)     The City's Effort to Take Lonestar's Business Violates Article 2.03*

The City's scheme to take over Lonestar's business threatens an imminent violation of Article 2.03 of the Agreement.  Article 2.03 includes the right to "quiet enjoyment," pursuant to which Lonestar was granted the right to "peaceably and quietly have, hold, occupy, use and enjoy the Premises during the Term … without ejection or interference *by Owner*."

The City has threatened to breach Article 2.03 by embarking on a plan to oust Lonestar from the South Terminal and take Lonestar's business.  This outcome would breach the covenant of quiet enjoyment: "[A] tenant establishes breach of the warranty of quiet enjoyment by showing: (1) an intention of the landlord that the tenant no longer enjoy the premises; (2) a material act by the landlord that substantially interferes with the intended use and enjoyment of the premises; (3) permanent deprivation of the tenant's use and enjoyment of the premises; and (4) abandonment of the premises within a reasonable time after the commission of the act." *Goldman v. Alkek*, 850 S.W.2d 568, 571–72 (Tex. App.—Corpus Christi 1993, no writ), *amended* (Mar. 11, 1993). Absent this Court's intervention, each of those elements will be met.  The City has made clear that it intends to kick Lonestar out of and demolish the South Terminal.  (Pearse Decl., ¶ 47.)  In doing so, the City will permanently prevent Lonestar from operating its business and force Lonestar to abandon the premises.  *Weber v. Domel*, 48 S.W.3d 435, 437 (Tex. App.—Waco 2001, no pet.) ("destruction of the subject of the contract by the landowner would be a breach of the lease").

        *(b)     The City's Effort to Take Lonestar's Business Also Threatens an Unconstitutional and Unlawful Taking*

The City's contractual breach is part of a larger scheme to get out of the Agreement while claiming Lonestar's business for itself.  Rather than engaging fairly with Lonestar, the City has

opted to use its eminent domain power to avoid its contractual obligations.  In addition to breaching Article 2 of the Agreement, that conduct violates Texas law and the U.S. Constitution.

The power of eminent domain is limited and delegated by the state legislature.  *City of Blue Mound v. Sw. Water Co.*, 449 S.W.3d 678, 685–86 (Tex. App.—Forth Worth 2014, no pet.).  The City's eminent domain power is "strictly construed in two regards."  *Id.*  First, the City "must show strict compliance with the law authorizing private property to be taken for public use."  *Id.*  Second, "in instances of doubt as to the scope of the power, the statute granting such power is 'strictly construed in favor of the landowner and against those … arms of the State vested therewith.'"  *Id.*; *Tex. Rice Land Partners v. Denbury Green Pipeline-Tex., LLC*, 363 S.W.3d 192, 198 (Tex. 2012).

Here, the City's effort to take Lonestar's going-concern business exceeds its narrow eminent domain authority.  Under Texas law, the City is not authorized to take a going-concern business that cannot be relocated.  In *City of Blue Mound*, the Court of Appeals held "as a matter of law Texas's general condemnation statutes do not authorize the City's condemnation" of "a going concern to transfer ownership and operation … to the City."  449 S.W.3d at 692–93.  The court held that the contemplated taking was illegal and affirmed summary judgment for the property owner.  *Id.*  In so holding, the court made clear that the government cannot use Texas's general condemnation statutes to condemn and take over a going-concern business.

A taking of a going concern occurs when the condemnor takes real estate tied to the operation of a business and the business cannot be operated elsewhere after the taking.  *See Kimball Laundry Co. v. United States*, 338 U.S. 1, 11–13 (1949).  That is particularly the case where the condemnor seeks to operate the business itself after the taking.  *Id.*  A taking of going-concern value also occurs where an owner cannot relocate its business because the government has stepped into its shoes, such that after the taking the owner "retains nothing of the going-concern value that

it formerly possessed." *Id.* at 13.  Texas law gives the City no right to engage in such a taking.

Yet that is precisely what the City is now attempting.  Lonestar's business cannot be relocated, and the City intends to take over Lonestar's business.  (Pearse Decl., ¶ 51.)  The City explicitly requested a meeting to "transition" operations from Lonestar to the City.  (Clough Decl., ¶ 11.)  The City informed stakeholders that South Terminal tenants and their employees—in other words, Lonestar's airline customers—will be relocated to the Main Terminal.  In the City's words, "[t]he department of aviation looks forward to working with each tenant on a customized transition plan."  (Pearse Decl., ¶ 48.)  The City is attempting to oust Lonestar from the Airport, take Lonestar's going-concern business, step into Lonestar's shoes, and operate the South Terminal business—all while refusing to pay Lonestar for the value of that business.

The City also intends to eject Lonestar from the premises and take Lonestar's business before Lonestar can contest the taking's validity.  Texas Property Code Section 21.021 sets forth a procedure—known as "quick take"—under which the condemnor "***may*** take possession of the condemned property pending the results of further litigation" subject to certain requirements, including depositing the amount awarded by the special commissioners in the court registry.  Tex. Prop. Code § 21.02.  The procedure is expressly limited to "real property," is not mandatory (i.e., it is only discretionary), and should only be used in lawful circumstances.  Even though the taking of a going-concern business is not lawful, the City is employing the "quick take" procedure here.

The City's stated rationale for employing "quick take" is to allow construction pursuant to the AEDP, which involves razing the South Terminal.  But the City has been simultaneously telling its bondholders that it intends to operate the South Terminal until 2024, and only in 2024 will the

Terminal be demolished.[7]  By the City's own admission, then, there is no emergency requiring immediate possession of the South Terminal.  The City's manufactured urgency is by design: immediate possession of the Terminal allows the City to oust Lonestar from the Airport and take over its business.  That is an impermissible exercise of the City's eminent domain power.  Courts have previously expressed concern about similar efforts to abuse quick-take authority.  *E.g.*, *Dep't of Pub. Works & Bldgs. v. Vogt*, 366 N.E.2d 310, 316 (Ill. App. 1977) ("[I]t is an abuse of power for a condemning authority to 'quick take' property under the pretense of imminent necessity when there exists only some possibility of need at an indefinite future date."); *Transwestern Pipeline Co. v. 17.19 Acres of Property Located in Maricopa County*, 550 F.3d 770, 774 (9th Cir. 2009) (recognizing that quick take procedures are an exception to the usual rule that government takes possession only after a determination of just compensation).  Here, the City's weaponization of this procedure will immediately and permanently appropriate Lonestar's business before the validity of just compensation can be adjudicated.

This conduct—attempting to take a going-concern business without seeking to provide value for that business—is a clear violation of Texas and federal law.  As *Blue Mound* held, the City cannot take a going concern business.  Moreover, the U.S. Constitution provides that private property shall not "be taken for public use, without just compensation."  U.S. Const. amends.  V & XIV.  "Just compensation" requires "a full and perfect equivalent for the property taken."  *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 326 (1893).  Just compensation includes the going-concern value of a business, *see Kimball Laundry*, 338 U.S. at 11–13, and the value of contract rights abrogated by the taking, *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19

---

[7] Pearse Decl., Ex. 8 at pp. 32, A-74 (stating that "terminating the South Terminal Agreement and razing the South Terminal will be necessary" but stating assumption that "the South Terminal would continue operating until the end of FY 2023").

n.16 (1977).  The City's attempt to take the business—without paying for it—is unconstitutional.

        (c)       *The City Cannot Use Eminent Domain to Avoid Its Own Contract*

The City's taking scheme also should be enjoined for an independent reason: the City cannot constitutionally use condemnation—and certainly not the discretionary quick-take procedure—to avoid its own contract.  It is well-settled that a government entity cannot use its eminent domain authority to avoid its contractual obligations.  *See City of New Braunfels v. Carowest Land, Ltd.*, 432 S.W.3d 501, 516 (Tex. App.—Austin 2014, no pet.).  To properly invoke the power of eminent domain, "the City must have been acting in its capacity as sovereign—i.e., exercising eminent domain or police powers—as opposed to acting 'akin to a private citizen.'"  *Id.*  Texas courts have thus "long recognized that the State wears two hats: the State as a party to the contract and the State as sovereign."  *Id.*  "The State, in acting within a color of right to take or withhold property in a contractual situation, is acting akin to a private citizen and not under any sovereign powers.  In this situation, the State does not have the intent to take under its eminent domain powers; the State only has an intent to act within the scope of the contract."  *Id.*  If a private citizen were to breach contractual obligations, as the City has here, it would be liable for breach of contract and subject to the remedies for such breach, including injunctive relief.  The City cannot escape that result by invoking its power of eminent domain.  *Cf. United States v. Pewee Coal Co.*, 341 U.S. 114, 117 (1951) ("Like any private person or corporation, the United States normally is entitled to the profits from, and must bear the losses of, business operations which it conducts.").

Similarly, courts have rejected attempts by government entities to abuse eminent domain through what one court has labeled "municipal thuggery."  *Union Station Assocs. v. Rossi*, 862 A.2d 185, 187 (R.I. 2005); *see City of Miami v. Wolfe*, 150 So.2d 489 (Fla. 1963) (condemnation suit was not for purpose of extending roadway, but instead to acquire valuable riparian rights); *Earth Management, Inc. v. Heard County*, 248 Ga. 442 (1981) (condemnation of land for a public

park was subterfuge to veil real purpose of preventing waste disposal site); *In re Inc. Vill. of Hewlett Bay Park*, 48 Misc.2d 833 (N.Y. Sup. Ct. 1966) (real purpose of condemnation proceeding was not to provide village storage area but to prevent construction of undesirable parking facility). Courts have also consistently rejected bad faith efforts to exercise eminent domain.  *See New England Estates, LLC v. Town of Branford*, 988 A.2d 229, 252 (Conn. 2010) (noting that "many state courts have found a violation of the takings clause on the basis of a bad faith exercise of the power of eminent domain"); *Borough of Essex Fells v. Kessler Inst. for Rehab., Inc.*, 673 A.2d 856, 861 (N.J. Super. Ct., Law Div. 1995) (collecting bad faith cases).

In *Rhode Island Economic Development Corp. v. The Parking Co., L.P.*, 892 A.2d 87, 107 (R.I. 2006), a state entity entered a concession and lease agreement granting a private business the right to operate a parking structure at an airport for twenty years.  After twenty years, the garage would revert to the state; if the state wanted to end the lease early, it could buy out the lease interest in accordance with a fee schedule.  When the parties could not agree on the required buy-out fee, the state condemned a so-called temporary easement over the parking structure and had it appraised at a fraction of the required buy-out fee.  The court rejected this maneuvering, finding that "by resorting to the quick-take statute, [the state] was able to gain control over Garage B before the [agreement] expired but without complying with [the fee schedule]." *Id.* at 105.  The court rejected the state's attempt to "achieve … through an exercise of the state's eminent domain authority" what it "could not achieve at the bargaining table." *Id.* at 106.

The City's maneuvering in this case is even more flagrant.  The City is attempting to pay orders of magnitude less than the true value of Lonestar's business and rights under the Agreement (and, indeed, less than 20% of the low-ball offer it made Lonestar one year ago).  In *Rhode Island Economic Development*, the court inferred that the condemnation was a mere pretext "to achieve

in Superior Court the concessions it was unable to obtain from [the lessee]." *Id.* at 106.  Here, no inference is necessary:  The City explicitly stated that it "does not wish for another private entity to be fully or partially responsible for the operation and maintenance of the South Terminal" and therefore believes "it is in the best interest of the City … to regain control of the facility."  (Pearse Decl., Ex. 2.)  As in *Rhode Island Economic Development*, the purpose of the City's condemnation is to get out of a contract it now finds inconvenient.  That is the precisely the sort of "municipal thuggery" that courts have rejected: unable to reach a satisfactory result at the bargaining table, the City is using eminent domain to avoid its contractual obligations, oust Lonestar from the South Terminal, and seize its business.  The City's threatened taking is invalid.

The City's breach of Article 2 through its unlawful taking will result in a taking of Lonestar's business without the compensation required by the U.S. Constitution.  Regardless of whether the City now wishes to "regain control of the facility," the City entered into a binding contract, with the unanimous approval of its City Council, in which it agreed it would not take any action to avoid its contractual obligations.  The City agreed that jurisdiction over any such breach would lie with this Court and that this Court could enjoin it.

## 2.  Lonestar Will Be Irreparably Injured if an Injunction Does Not Issue to Prevent the Unconstitutional and Unlawful Taking

The City's imminent takeover of Lonestar's business, and its denial of Lonestar's constitutional right to just compensation, is irreparable.  If the City is not enjoined, Texas's quick-take procedure—described above, *supra* 12–13—will allow the City to take Lonestar's property, terminate the Agreement, eliminate Lonestar's entire business, and potentially demolish the South Terminal—all before Lonestar has the ability to present its challenge regarding the unlawfulness of the taking under Texas law and the Agreement.  *See O'Connor v. Smith*, 2010 WL 4366914, at *7 (S.D. Tex. Oct. 28, 2010), *aff'd*, 427 F. App'x 359 (5th Cir. 2011) (observing that where an

individual is "wrongfully attempt[ing] to invade … possession or to destroy the use and enjoyment of … premises," the wronged party may "secure an injunction restraining the wrongdoer'"). Resolution of Lonestar's challenge to the condemnation may conclude only *after* the City has demolished the South Terminal, irrevocably eliminating Lonestar's ability to operate its business.

The City's taking of Lonestar's ongoing business would have other wide-ranging and irreparable consequences.  Where government actions "actually and imminently threaten[] the very existence of [the plaintiff's] business" that "satisf[ies] the irreparable injury prong." *Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 234 (S.D. Tex. 2011).  That is the case here.

Immediately upon taking possession of the South Terminal, the City will either terminate or take over Lonestar's contracts with its tenants, vendors, and contractors.  Lonestar has at least seven primary contracts that are critical to its business.  (Pearse Decl., ¶¶ 15–20.)  Lonestar expended significant time and resources negotiating these contracts and others.  (*Id.*)  "The loss of long-term customers cannot be adequately calculated in simple economic damages" and therefore establishes irreparable harm, *Cartograf, S.A. de C.V. v. Titus Cargo LLC*, 2020 WL 3513253, at *1 (S.D. Tex. Apr. 27, 2020), as does "loss of good will, damages to reputation, and loss of business opportunities," *M-I LLC v. FPUSA, LLC*, 2015 WL 6738823, at *11 (W.D. Tex. Nov. 4, 2015).  Those contracts and relationship will not be easily repaired after a taking.

Lonestar also will lose staff and employees—including individuals who are key to the success of the South Terminal—if the taking is allowed to proceed.  These individuals are likely to obtain employment elsewhere if the City takes possession of the South Terminal.  Attracting similar talent to operate the South Terminal after the City's temporary possession would be nearly impossible.  (Pearse Decl., ¶ 53); *see also Terex Corp. v. Cubex Ltd.*, 2006 WL 3542706, at *9 (N.D. Tex. Dec. 7, 2006) ("Thus, in the Fifth Circuit, an injury is generally considered to be

irreparable if the injury cannot be undone through monetary relief.").

This type of business damage and interruption is precisely the type of harm that courts have concluded is irreparable, warranting injunctive relief.  *See e.g.*, *Cho*, 782 F. Supp. at 1185.  For example, in *Cho*, a district court in the Eastern District of Texas granted a preliminary injunction to prevent the sale of property on which plaintiffs operated their business, in part because "[t]he disruption which would be caused by loss of possession of the premises would constitute irreparable harm to the plaintiffs." *Id*.  The court noted that absent an injunction, "the plaintiffs will be forced to vacate the space in which they have conducted their business for seven years." *Id*.  Moreover, any countervailing harm to the non-movants did not outweigh the potential harm to plaintiffs.  Although the injunction would prevent the non-movants from doing what they wished with their property, "the non-movants are not faced with the imminent demise or debilitation of a business in which they have invested seven years of their lives." *Id*. at 1186.  This harm, the court found, favored preventing the non-movants from interfering with plaintiffs' possession "until adjudication of the matter on the merits." *Id*.  The same result is appropriate here.

### C.      The Balance of Equities and Public Interest Weigh in Favor of an Injunction

The balance of equities and public interest also favor an injunction.  "To weigh the equities, the Court balances 'the competing claims of injury and considers the effect on each party of the granting or withholding of the requested relief.'" *Texas v. Biden*, 2022 WL 658579, at *19 (N.D. Tex. Mar. 4, 2022) (cleaned up).  "To determine whether an injunction would undermine the public interest, a court considers the public interests that may be injured and those that may be served by granting or denying the injunction." *Id.*  "Where, as here, the government is a party to the litigation, these two factors merge and are 'one and the same, because the government's interest is the public interest.'" *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021).

18

The balance of the harms and public interest favor allowing Lonestar to challenge the legality of the City's conduct before the City takes over Lonestar's business. The City will suffer no harm in being prevented from taking over Lonestar's business at the South Terminal. The City itself has stated that it does not plan to demolish the South Terminal until 2024 (Pearse Decl., ¶ 49), and Lonestar has successfully operated the South Terminal for years, without any complaint by the City (and, in fact, to significant acclaim from both the City and third parties) (*id.*, ¶ 24). An injunction would merely "continue a relationship [that has] existed voluntarily between the parties for years" while preventing "destruction of" Lonestar's business. *See National Screen Service Corp. v. Poster Exchange, Inc.*, 305 F.2d 647, 650 (5th Cir. 1962); *Cho*, 782 F. Supp. at 1185–86.

The balance of the harms and public interest also favor requiring the City to honor its obligations and grant Lonestar its "exclusive first right" to develop, construct, and operate the new facilities contemplated by the AEDP. The City agreed to partner with Lonestar on any new development and will not be harmed if forced to honor that agreement. *See Emery v. Sun Cupid Tech. (HK) Ltd.*, 2020 WL 10181571, at *2 (N.D. Tex. Dec. 1, 2020) (balance of harms favored injunction where defendants would "simply be required to comply with their contractual obligations"). Lonestar has an exemplary roster of professionals at the management and Board levels. Those professionals stand ready to assist in expanding capacity at the Airport. Indeed, if the City had not changed direction, Austin residents and visitors would already have expanded Airport facilities. To be clear, Lonestar is not attempting to slow development at the Airport; it is asking only that it be afforded its contractual rights to participate in that development.

Lonestar's outstanding success in rehabilitating and running the South Terminal—turning it from a vacant building to a bustling terminal in about a year—demonstrates Lonestar's capabilities. The public interest favors requiring the City to comply with its contractual agreement

both as a matter of public policy and sheer efficiency. *Mach 1 Air Servs., Inc. v. Bustillos*, 2013 WL 12108595, at *11 (W.D. Tex. May 10, 2013) ("[I]t is in the public interest to uphold contracts and to enforce a remedy to which the parties have expressly agreed.").

Finally, the public interest also favors subjecting to review the City's improper and precipitous use of its eminent domain power to get out of a contract it freely entered. Protecting private property from legally unjustified and forcible takings is a public interest of the highest order under the federal Constitution. *Cf. EQT Gathering, LLC v. Tract of Prop. Situated in Knott Cnty., Ky.*, 2012 WL 6049691, at *3 (E.D. Ky. Dec. 5, 2012) (noting that Fed. R. Civ. P. 71.1 "requires a district court to address the validity of a taking before addressing compensation"). It is also "in the public interest to uphold contracts," *McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 860 (W.D. Tex. 2016), and in the public interest to prevent "governmental agencies … from acting in a manner contrary to the law," *Associated Builders & Contractors of Se. Texas v. Rung*, 2016 WL 8188655, at *15 (E.D. Tex. Oct. 24, 2016).

## IV.   <u>CONCLUSION</u>

Lonestar respectfully requests that the Court stop City officials from continuing to breach their contractual obligations, and violating Lonestar's constitutional rights, including an injunction to prevent City officials from (1) excluding Lonestar from the development and construction of "New Facilities" at the Airport; or (2) attempting to take possession of Lonestar's business at the South Terminal, or interfering with Lonestar's relationships with its vendors and tenants, until Lonestar's legal challenges are decided in accordance with the parties' Agreement that all disputes will be heard in this Court.

Dated: September 1, 2022                    Respectfully submitted,


*/s/ Edward F. Fernandes*
**KING & SPALDING LLP**

20

Edward F. Fernandes (SBN 06932700)
Julia C. Barrett (SBN 24116075)
500 W 2nd St #1800
Austin, TX 78701
T: 512 457 2000
efernandes@kslaw.com
jbarrett@kslaw.com

Lawrence A. Slovensky (*pro hac vice*)
Mandi Goodman (*pro hac vice*)
1180 Peachtree St NE
Atlanta, GA 30309
T: 404 572 4600
lslovensky@kslaw.com

**MUNGER, TOLLES & OLSON LLP**
Bethany Kristovich (*pro hac vice*)
Michael Doyen (*pro hac vice*)
John Major (*pro hac vice*)
350 South Grand Avenue
Los Angeles, CA 90071
T: 213 683 9292
Michael.doyen@mto.com
Bethany.kristovich@mto.com
John.major@mto.com

**BARRON, ADLER, CLOUGH & ODDO, LLP**
Christopher M. Clough (SBN 24044802)
Christopher J. Oddo (SBN 24013257)
808 Nueces Street
Austin, TX 78701
T: 512 478 4995
clough@barronadler.com
oddo@barronadler.com

*Attorneys for Plaintiff*
*Lonestar Airport Holdings, LLC*

21

## **<u>CERTIFICATE OF CONFERENCE</u>**

I certify that I conferred by telephone with counsel for the City regarding the relief requested in this motion.  Counsel for the City indicated that the City opposes the requested relief.

<u>/s/ Bethany Kristovich</u>
Bethany Kristovich (*pro hac vice*)