# EXHIBIT A-1

U.S. Department of Transportation
Federal Aviation Administration
Southwest Region

**Finding of No Significant Impact (FONSI) and Record of Decision (ROD)**

Airport Expansion and Development Program
Austin Bergstrom International Airport
Travis County, Texas

July 2022

## 1.   INTRODUCTION

This Environmental Assessment (EA) identifies and evaluates potential environmental effects related to the proposed construction and operation of a Midfield Concourse, Taxiway D, Runway 18R-36L high speed exits, and related improvements at Austin-Bergstrom International Airport (Airport or AUS).

The Federal Aviation Administration (FAA) is responsible for the approval of the Proposed Action analyzed in the EA, attached hereto. The FAA must comply with the Council on Environmental Quality's (CEQ) National Environmental Policy Act of 1969 (NEPA), other applicable statutes, and the NEPA implementing regulations (40 Code of Regulations (CFR) Parts 1500-1508)[1] before taking any actions that are necessary prior to implementation of the project. After completing an EA, federal agencies must decide whether to issue a Finding of No Significant Impacts (FONSI)/Record of Decision (ROD) and approve the proposed project or prepare an Environmental Impact Statement prior to rendering a final decision on approval of a proposed project. The FAA has completed the EA, considered its analysis, and determined that no further environmental review is required and has determined that the Proposed Action will have no significant impact to the human environment. Therefore, the FAA is issuing this FONSI/ROD accompanied and supported by the attached EA, completing environmental review requirements for the project.

## 2.   BACKGROUND

Austin Bergstrom International Airport (Airport or AUS) is owned and operated by the City of Austin. The Airport is located in the City of Austin, which is in Travis County, Texas. The Airport is the largest commercial service airport in Central Texas and serves residents and businesses throughout the region.

---

[1] Amended Council on Environmental Quality's NEPA regulations were released in July 2020 and subsequently placed under review in January 2021 until April 2022. This project's NEPA process began in October 2021 and therefore falls under the 2020 regulations. The revised regulations stated that they applied to any NEPA process begun after September 14, 2020. See Revised 40 C.F.R. §1506.13.

The Airport covers about 4,242 acres and is located about five miles southeast of downtown Austin. The Airport is bounded by State Highway 71 (S.H. 71) to the north, Farm-to-Market Road 973 (F.M. 973) to the east, Burleson Road to the south, and U.S. 183 to the west. Primary access to the north side of the Airport is from S.H. 71 via Presidential Boulevard and Spirit of Texas Drive. Primary access to the south side of the Airport is from Burleson Road via Emma Browning Avenue.

Aviation Activity

The FAA publishes the annual Terminal Area Forecast (TAF) for each airport in the federal system. The TAF is the official FAA forecast of aviation activity for U.S. airports. It contains active airports in the National Plan of Integrated Airport Systems (NPIAS) including FAA-towered airports, Federal contract-towered airports, non-federal towered airports, and non-towered airports. TAF data is reported based on the FAA fiscal year, which is October through September. Table 1-3 of the attached EA provides the 2020 TAF historical aircraft operations data for years 2001 through 2020 and the forecast aircraft operations for years 2021 through 2032. Exhibit 1-6 of the attached EA illustrates the historical and forecast TAF aircraft operations data for the Airport. Because of the COVID-19 Pandemic, aircraft operations in 2021 are forecast to be at the lowest level. However, the 2020 TAF forecasts operations to increase and exceed pre-Pandemic levels by 2024. Aircraft operations are forecast to increase from 149,850 operations in 2021 to 246,076 in 2027 (the year of the proposed opening year of the midfield concourse) and to 277,056 in 2032 (five years after the proposed opening of the midfield concourse).

Table 1-4 of the attached EA provides the 2021 TAF historical enplanement[2] data for years 2001 through 2020 and the forecast enplanements for years 2021 through 2032. Because of the Pandemic, enplanements in 2021 are forecast to be at the same level that occurred in 2011. However, the 2021 TAF forecasts enplanements to increase and exceed pre-Pandemic levels by 2024. Enplanements are forecast to increase from 4,392,879 enplanements in 2021 to about 10,800,000 in 2027 (the year of the proposed opening year of the midfield concourse) and to about 12,600,000 in 2032 (five years after the proposed opening of the midfield concourse)

3. **REQUESTED FEDERAL ACTION**

Section 163 of the FAA Reauthorization Act of 2018, H. R. 302, (P.L. 115-254) limits FAA's approval authority to portions of Airport Layout Plans (ALPs) that meet certain statutorily defined criteria, and further, prohibited the FAA from directly or indirectly regulating airport land use unless certain exceptions exist. While the Proposed Project details the City of Austin's intended development at AUS, only some of these development components now are subject to federal approval and/or funding. However, the entire Proposed Project is analyzed in this EA. The Federal actions necessary for implementation of the Proposed Action are:

1. Determinations under 49 U.S.C. §§ 47106 and 47107 relating to the eligibility of the Proposed Action for federal funding under the Airport Improvement Program;

---

[2] An enplanement is defined as a person boarding in the United States in scheduled or nonscheduled service on aircraft in intrastate, interstate, or foreign air transportation.

2. Determinations under 49 U.S.C. § 40117, as implemented by 14 CFR 158.25, to impose and use passenger facility charges (PFC) collected at the airport to assist with construction of potentially eligible items shown on the ALP;

3. Unconditional approval of the portion of the ALP depicting the Proposed Action as described in Chapter 1 of the EA, including the all proposed project components listed in Chapter 1.4 of the attached EA to 49 U.S.C. §§ 40103(b) and 47107(a)(16);

## 4. PURPOSE AND NEED

Pursuant to NEPA, CEQ's Regulations Implementing NEPA, and FAA Orders 1050.1F, *Environmental Impacts: Policies and Procedures*, and 5050.4B, *National Environmental Policy Act (NEPA) Implementing Instructions for Airport Actions*, an EA must include a description of the purpose of a Proposed Action and the reasons it is needed.

The purpose and need of the Proposed Project is to provide facilities that will accommodate forecast increases in enplanements at an adequate level of service and enhance the operational efficiency of the airfield.

The Proposed Project addresses four independent needs that affect the future ability of AUS to maintain its essential function as the primary commercial service airport in Central Texas. The four needs are:

- insufficient passenger processing facilities and gates to accommodate forecast enplanements at an adequate level of service;
- inefficient taxiways on the west airfield;
- achieve Airport Design Group (ADG) VI design standards for designated taxiways; and
- maintain efficient movement area access between the east and west airfields.

Based on the needs described above, the purposes of the Proposed Project are to:

- provide passenger processing facilities and gates to accommodate forecast enplanements at an adequate level of service;
- provide high-speed exit taxiways on the west airfield;
- achieve ADG VI design standards to better support diversion aircraft; and
- maintain efficient access between the east and west airfields.

## 5. ALTERNATIVES

This section provides a brief description of potential alternatives that are subject to the screening process described in Chapter 2.3 of the attached EA. The focus of these alternatives is on the terminal and concourses. The other components of the project, such as landside access, employee and public parking, support facilities, utilities, and airfield improvements (i.e., taxiways and taxiway connectors [runway high speed exits]) can be accommodated with each of the terminal and concourse alternatives. The following potential alternatives were included in the Airport's Master Plan and are evaluated in this EA.

## 5.1    Alternatives

### 5.1.1 Alternative 1: Maximum Capacity of Barbara Jordan Terminal

Alternative 1 maximizes the capacity of the Barbara Jordan Terminal (BJT) by expanding to passenger processor (e.g., ticketing, baggage drop-off, and security screening) to the northwest, converting Parking Garage 1 to a Ground Transportation Center (GTC) and parking, developing two pier concourses to the south, developing one pier concourse to the northwest, and extend the existing BJT to the west. The two pier concourses developed to the south would extend up to the taxiway Object Free Area (OFA) for Taxiway G, with the necessary space for aircraft parking. However, this would require converting existing Taxiways G and H to taxilanes. This would reduce airfield efficiencies for aircraft taxiing between the east and west airfields. The northwest and western concourse extensions would be developed as far west as possible, while preserving space for airfield improvements on the west side of the Airport. Alternative 1 would provide a total of 67 aircraft gates and provide for 74 remain overnight (RON) aircraft parking spaces south of Taxiway H. Assuming a similar number of enplaned passengers per gate that existed in 2019, this alternative would accommodate the forecast increase in operations and enplanements in 2032.

### 5.1.2    Alternative 2: Expanded Barbara Jordan Terminal

This alternative would include expanding the BJT by developing a new western concourse oriented in a north-south configuration (see Exhibit 2-2). The existing parking garage located adjacent to the BJT would be converted to a GTC. The South Terminal would be demolished in order to accommodate the new crossfield taxiways. Alternative 2 would provide a total of 64 aircraft gates and provide for 74 RON aircraft parking spaces. Assuming a similar number of enplaned passengers per gate that existed in 2019, this alternative would accommodate the forecast increase in operations and enplanements in 2032.

### 5.1.3    Alternative 3: New/Expanded Arrival/Departure Hall with New Pier Concourse and New Concourse B

This alternative would include converting the existing BJT to a concourse and constructing a new pier concourse oriented in a north-south configuration that would connect to a new Concourse B oriented in an east-west configuration. The existing parking garage adjacent to the BJT would be replaced by the new/expanded arrival/departure hall. The South Terminal would be demolished in order to accommodate the new crossfield taxiways. Alternative 3 would provide a total of 64 aircraft gates and provide for 74 RON aircraft parking spaces. Assuming a similar number of enplaned passengers per gate that existed in 2019, this alternative would accommodate the forecast increase in operations and enplanements in 2032.

### 5.1.4    Alternative 4: New/Expanded Arrival/Departure Hall with New Concourse B (Proposed Action)

This alternative would include converting the existing BJT to a concourse and constructing a midfield satellite Concourse B oriented in an east-west configuration and connected to the BJT

via a tunnel (see Exhibit 2-4 of the attached EA). The existing parking garage adjacent to the BJT would be replaced by the new/expanded arrival/departure hall. The South Terminal would be demolished in order to accommodate the new crossfield taxiways. Alternative 4 would provide a total of 57 aircraft gates and provide for 82 RON aircraft parking spaces. Assuming a similar number of enplaned passengers per gate that existed in 2019, this alternative would accommodate the forecast increase in operations and enplanements in 2032.

### 5.1.5   No Action Alternative

The City of Austin would not develop a replacement passenger terminal building and no physical changes to the BJT would occur. This alternative would result in the use of up to 20 hardstands for remote passenger operations (remote gates). These remote gates would be located southeast of the BJT, southwest of the BJT, and north of the South Terminal. Passengers on aircraft using the remote gates would be processed through the BJT and access the remote gates via a bus operation.

For 2027, it was assumed that each contact gate at BJT would have the same number of enplanements as that which occurred in 2019. It also was assumed that each remote gate associated with BJT would have two departures per day. In addition, it was assumed that the number of departures from the South Terminal would be 18 per day, which is the number of departures authorized in the agreement between the City and the operator of the South Terminal. Table 2-1 of the attached EA provides the number of enplanements that could be accommodated under the No Action Alternative in 2027, which is slightly greater than the 10,784,200 enplanements forecast for 2027.

### 5.2   Alternatives Screening and Proposed Project

Based on the detailed two-step screening process described in Chapter 2.3, the No Action Alternative and Alternative 4 (New/Expanded Arrival/Departure Hall with Concourse B) have been retained for detailed evaluation in the attached EA.

The Proposed Project shown on Exhibit 1-8 of the attached EA includes 32 project components. These project components are associated with demolition, airfield, terminal, support, and utility projects. In addition to the specific utility improvement project components, each airfield, terminal, and support project component would have improvements to the utilities that provide service to that project component. All of these project components were included in the Master Plan. Project component numbers have been changed from those presented in the Master Plan. For reference purposes, Appendix B of the attached EA provides a listing of each project component of the Proposed Project compared to the numbering from the Master Plan.

## 6.   ENVIRONMENTAL CONSEQUENCES

The environmental impacts, if any, of the proposed alternatives were examined in the attached EA according to the FAA Orders 5050.4B and 1050.1F. The environmental impacts of the No Action and the Proposed Action alternatives are summarized in this section.

Chapter 3 of the EA indicates that the following resource categories were not evaluated further in the EA because the resources were not located in proximity to the proposed project area: Coastal Resources, Farmlands, and Wild and Scenic Resources. In addition, other resource categories will not be discussed in detail in this FONSI/ROD because, as documented in Chapter 3 of the EA, there is not the potential for significant adverse impact (see FAA Order 1050.1F, Paragraph 4-3.3 and Exhibit 4-1 for information on significance thresholds and factors to consider in evaluating significance for an environmental impact category). These categories include: Biological Resources, including Fish, Wildlife, and Plants; Climate; Water Resources, including, Floodplains, Surface Waters, and Groundwater; Hazardous Materials, Solid Waste, and Pollution Prevention; Natural Resources and Energy Supply; and Visual Effects.

Implementation of the proposed action has the potential to impact the following resource categories therefore, they are discussed in future detail.

## 6.1   Air Quality

The U.S. Environmental Protection Agency (EPA) sets National Ambient Air Quality Standards (NAAQS) for certain air pollutants to protect public health and welfare. The EPA has identified the following six criteria pollutants and set NAAQS for them: ozone ($O_3$), carbon monoxide (CO), nitrogen dioxide ($NO_2$), sulfur dioxide ($SO_2$), particulate matter (PM), and lead (Pb). Particulate matter is divided into two particle size categories: coarse particles with a diameter less than 10 micrometers ($PM_{10}$) and fine particles with a diameter of less than 2.5 micrometers ($PM_{2.5}$). Areas found to be in violation of one or more NAAQS are classified as "nonattainment areas." States with nonattainment areas must develop a State Implementation Plan (SIP) demonstrating how the areas will be brought back into attainment of the NAAQS within designated timeframes. Areas where concentrations of the criteria pollutants are below (i.e., within) these threshold levels are classified as "attainment areas." Areas with prior nonattainment status that have since transitioned to attainment are known as "maintenance areas."

The General Study Area, located in Travis County, is in attainment for all criteria pollutants. Construction emissions include emissions from construction and demolition activities. Operational emissions include emissions from aircraft, electricity generation facilities, and airport vehicles like ground service equipment.

### 6.1.1   No-Action Alternative

#### 6.1.1.1   Construction Emissions

No construction-related air quality impacts would occur under the No Action Alternative in 2027 or 2032.

#### 6.1.1.2   Operational Emissions

Under the No Action Alternative, aircraft operations and enplanements would increase in 2027 and 2032 because of natural growth in demand. However, the No Action Alternative would

accommodate the forecast number of aircraft operations in 2027 but would not accommodate the forecast number of aircraft operations in 2032. The emissions inventory for the No Action Alternative in 2027 and 2032 is summarized in Table 3.4-2 of the attached EA.

### 6.1.2    Proposed Action

#### 6.1.2.1    Construction Emissions

The demolition and construction associated with the Proposed Project would result in short-term changes in air emissions from sources such as exhaust from nonroad construction equipment, on road vehicles, and fugitive dust activities. For every construction year, the pollutant emissions would be below *de minimis* levels, which is 100 tons per year of criteria pollutants. Construction-related emissions of criteria pollutants during the construction period 2022 to 2030 are summarized in Table 3.4-3 of the attached EA. Therefore, no significant construction-related air quality impacts would occur with the Proposed Project.

#### 6.1.2.2    Operational Emissions

Both direct and indirect operational emissions were evaluated for the Proposed Project. Direct emissions included additional aircraft operations and new Central Utility Plant combustion emissions, while indirect emissions included new emissions associated with ground access vehicles and new parking facilities associated with the Proposed Project. Operational emissions were estimated for the Proposed Project for 2027 and 2032 and the net change in emissions from the Proposed Project compared to the No Action Alternative were compared to the EPA *de minimis* thresholds for significance.

The number of aircraft operations in 2027 under the Proposed Project would be the same as that for the No Action Alternative. Because the Proposed Project would accommodate the forecast number of aircraft operations in 2032, the Proposed Project would have more aircraft operations than the No Action Alternative. As a result, the Proposed Project would have greater air pollutant emissions compared to the No Action Alternative.

Table 3.4-8 of the attached EA presents the net change in operational emissions (aircraft operations, new central utility plant, vehicles, and new parking facilities) from the implementation of the Proposed Project compared to the No Action Alternative and compares those emissions changes to the appropriate *de minimis* thresholds for significance determination for 2027 and 2032. As stated by the Texas Commission on Environmental Quality (TCEQ) in a letter dated March 4, 2022, "(t)he proposed action is located in Travis County, which is currently designated as attainment/unclassified for the National Ambient Air Quality Standards for all six criteria air pollutants. General Conformity requirements do not apply." Thus, the total net change in pollutants is disclosed for informational purposes only. As shown in Table 3.4-8 of the attached EA, the net change in 2027 would be below *de minimis* thresholds for all pollutants. The net change in 2032 would be below *de minimis* thresholds for all pollutants except nitrogen oxide ($NO_x$). The increase in $NO_x$ of 106.7 tons per year represents about 0.8% of the $NO_x$ emitted on an annual basis within Travis County and about 0.4% of the $NO_x$ emitted on an annual basis within the Austin-Round Rock Metropolitan Statistical Area.

Mitigation is not required, however, air quality initiatives are being implemented at the Airport as outlined in the Austin-Round Rock 1997 Eight-Hour Ozone Flex Plan that was approved by the TCEQ on June 18, 2008. Measures being implemented at the Airport to reduce air pollutant emissions include, but are not limited to, a shuttle bus fleet that uses alternative fuels, airline equipment electrification, preconditioned air and ground power units on each electric-powered jet bridge, public vehicle charging stations, Airport vehicle electrification, and the development of light rail from downtown Austin to the Airport.

### 6.2   Historical, Architectural, Archaeological, and Cultural Resources

An historic cultural resource is defined by FAA as an historical, architectural, archeological, or cultural resource listed or eligible for listing on the National Register of Historic Places (NRHP). Historic cultural resources discussed in this section may include prehistoric and historic districts, sites, buildings, structures, or objects listed on or eligible for listing on the NRHP.

As required by Section 106 of the National Historic Preservation Act (NHPA), the FAA and Texas Historical Commission (THC) have consulted to identify areas of direct and indirect effect according to the nature and extent of the Proposed Project. The direct Area of Potential Effect (APE) is the same as the Project Study Area. The indirect APEs considered for the Proposed Project include two zones surrounding the direct APE: the Visual APE (½ mile beyond the direct APE) and the Noise APE (within the projected 65 DNL noise contour for the Proposed Project).

FAA consultation with THC resulted in their concurrence under Section 106 that no above-ground historic architectural resources would be affected by the Proposed Project.

One recorded archeological site (41TV1641) is located within the direct APE. According to the THC's Archeological Sites Atlas (Atlas), 41TV1641 has not been evaluated for listing on the NRHP. This site was not detected during archeological investigations and is presumed to have been destroyed during previous phases of Airport development.

FAA and THC concurred that an intensive archeological survey would be required to identify possible unrecorded archeological resources within the direct APE. Specific archeological survey locations and methods were recommended in an archeological Scope of Work that was approved by FAA and the THC's archeological review staff. No archeological resources were recorded during the archeological surveys completed to date. Due to ongoing Airport operations in the West Runway area, THC approved a construction monitoring strategy for that safety-restricted area. Any archeological resources discovered during construction will be reported to the FAA and THC, evaluated for NRHP-eligibility, and assessed for possible effects under Section 106.

### 6.2.1   No-Action Alternative

There are no NRHP-listed historical, architectural, archeological, or cultural resources within the direct APE. The No Action Alternative would not result in any development at the Airport and, therefore, would not adversely affect NRHP-listed or eligible resources.

### 6.2.2   Proposed Action

There are no NRHP-listed historical, architectural, archeological, or cultural resources within or near the Project Study Area. The THC concurred that no above-ground historic architectural resources are present within the direct or indirect APEs. Therefore, the Proposed Project alternative would not adversely affect known NRHP-listed or eligible architectural resources.

Archeological investigations conducted to date indicate that one previously recorded archeological site was likely destroyed during prior phases of Airport development and is no longer present in the direct APE. Archeological investigations to date also indicate that no archeological sites are present within the surveyed portions of the direct APE. As stated above, any archeological resources discovered during construction will be reported to the FAA and THC, evaluated for NRHP-eligibility, and assessed for possible effects under Section 106.

### 6.3   Noise and Compatible Land Use

The compatibility of existing and planned land uses with proposed aviation actions is usually determined in relation to the level of aircraft noise. Federal compatible land use guidelines for a variety of land uses are provided in Table 1 in Appendix A of 14 Code of Federal Regulations (CFR) part 150, *Land Use Compatibility with Yearly Day-Night Average Sound Levels*. The Air Quality and Noise Technical Report located in Appendix D of the attached EA identifies the noise metrics used in this analysis. Exhibit 3.12-1 of the attached EA shows the Day-Night Average Sound Level (DNL) 65 – 75 dB (decibel) noise contours for the 2019 Existing Conditions in the General Study Area. According to Table 1 of Appendix A of 14 CFR Part 150, all land uses are generally compatible with aircraft noise below DNL 65 dB. The DNL 65 dB noise contour for Runway 18R-36L extends into mostly vacant land to the north and south. The DNL 65 dB noise contour for Runway 18L-36R extends to the north and south into commercial, industrial, recreation, and public land uses.

FAA Order 1050.1F identifies the threshold of "significant impact" based on the yearly DNL and compatible land-use standards found at Table 1 in Appendix A of 14 CFR Part 150. FAA Order 1050.1F, Exhibit 4-1 states that there is a significant noise impact with respect to aircraft noise if a location fulfills all three of the following conditions:

- Has an incompatible land use as identified in 14 CFR Part 150, Appendix A
- Experiences a project-related noise level increase of DNL 1.5 dB or more.
- Is located within the DNL 65 dB noise contour upon implementation of the action.

For example, an increase from DNL 65.5 dB to 67 dB is considered a significant impact, as is an increase from DNL 63.5 dB to 65 dB. The determination of significance must be obtained using noise contours and/or grid point analysis along with local land use information and general guidance contained in Appendix A of 14 CFR Part 150.

### 6.3.1   No-Action Alternative

Under the 2027 No Action Alternative, the Airport would not implement the Proposed Action but would continue to operate and serve forecast aviation demands.

### 6.3.2   Proposed Action

The year 2027 represents the opening year for the Proposed Project. Given that the Proposed Project would accommodate the same number of enplanements and aircraft operations as the No Action Alternative in 2027, the noise contours associated with the 2027 Proposed Project would be the same as those presented in Exhibit 3.12-1 of the attached EA for the 2027 No Action Alternative. Similarly, the population exposure, housing unit count, and acreage associated with DNL 65+ dB noise contours for the 2027 Proposed Project would be the same as those presented in Table 3.12-3 of the attached EA for the 2027 No Action Alternative. No schools or houses of worship are within the DNL 65+ dB noise contours for the 2027 Proposed Project.

The year 2032 represents five years after opening year for the Proposed Project. Exhibit 3.12-5 of the attached EA shows the 2032 Proposed Project noise contours. The DNL 65 dB noise contour for Runway 18R-36L extends into mostly vacant land to the north and south. The DNL 65 dB noise contour for Runway 18L-36R extends to the north and south into commercial, industrial, recreation, and public land uses. No schools or houses of worship lie within the DNL 65+ dB noise contours for the 2032 Proposed Project.

Exhibit 3.12-6 of the attached EA shows the modeling results for the 2032 Proposed Project compared to the No Action Alternative. With the implementation of the 2032 Proposed Project, there are no noise sensitive, non-compatible sites that experience a significant (greater than 1.5 dB increase) noise impact. The analysis also shows a less than 1.5 dB increase in DNL as a result of the 2032 Proposed Project compared to the No Action Alternative.

## 6.4   Socioeconomic, Environmental Justice, and Children's Environmental Health and Safety Risks

This section evaluates the proposed projects potential impacts to socioeconomics, surface traffic, environmental justice, and children's environmental health and safety risks.

### 6.4.1   Socioeconomics

The socioeconomic section includes Population, Housing and Employment. The Project Study Area is within two census tracts: Census Tract 9800 and Census Tract 23.10 Block Group 1. The General Study area is made up of multiple Census Tract Block Groups: Census Tract 24.35 Block Group 2, Census Tract 24.31 Block Group 2, Census Tract 24.32 Block Group 1, Census Tract 23.12 Block Group 3, Census Tract 23.12 Block Group 2, Census Tract 23.10 Block Group 2, Census Tract 22.07 Block Group 2, Census Tract 24.33 Block Group 2, Census Tract 24.33 Block Group 1.39 The Proposed Project would not relocate residents or housing units within either the Project Study Area or the General Study Area.

The Project Study Area has an unemployment rate of 1.2 percent and the General Study Area has an unemployment rate of 3.4 percent. This is compared to a 2.8 percent unemployment rate in Travis County and a 3.3 percent unemployment rate in the State of Texas.

### 6.4.1.1  No-Action Alternative

Under the No Action Alternative, the City would not implement the Proposed Project. The City would continue to operate the Airport, perform maintenance and serve forecast aviation demands.

### 6.4.1.2  Proposed Action

The Proposed Project would not relocate residents or housing units within either the Project Study Area or the General Study Area. The Proposed Project would create a temporary increase in construction-related employment and would create a permanent increase in employment to serve the increase in passengers at the Airport.

### 6.4.2  Surface Traffic

State Highway (SH) 71 is a principal east-west arterial as designated by the Texas Department of Transportation (TxDOT) on the north side of the Airport. SH 71 eastbound and westbound frontage roads each have a signalized intersection with Presidential Boulevard, which is the primary roadway providing access to the BJT at AUS. Spirit of Texas Drive also provides connections from SH 71 to the cell phone lot, cargo facilities, surface parking lots, and rental car facilities, as well as provides an indirect route to the BJT.

For purposes of this traffic analysis, the following intersections were studied:

- SH 71 Westbound Frontage Road (WBFR) and Spirit of Texas Drive
- SH 71 Eastbound Frontage Road (EBFR) and Spirit of Texas Drive
- SH 71 Westbound Frontage Road (WBFR) and Presidential Boulevard
- SH 71 Eastbound Frontage Road (EBFR) and Presidential Boulevard
- Burleson Road and Emma Browning Avenue

Traffic volume data was increased using two scenarios dependent on whether a traffic movement was determined to be airport-related or background traffic related. For airport-related traffic, it was determined that traffic would grow at a similar rate as that of the TAF. Thus, growth rates for traffic movements of airport-related traffic were based on a comparison of existing AUS passenger data with 2019 collected traffic volume data. Growth rates for the remaining background traffic related movements were based on a comparison of existing background traffic. For the intersection of Burleson Road and Emma Browning Avenue an additional step was required to normalize traffic counts from 2017 to 2019. In 2017, the intersection was serving as a construction access site for multiple projects within AUS. Due to the unique operations of the south terminal at AUS, traffic was not grown using passenger data from 2017 to 2019. Instead, the background traffic factor was used to bring the traffic volumes to 2019 which is the base year for the study. Once all intersections were using 2019 data, the methodology for

developing traffic growth was followed. The applicable growth factors were then applied to future year TAF data to develop traffic volumes at the study intersections.

### 6.4.2.1  No-Action Alternative

Three intersections would operate at Level of Service (LOS) F during the midday peak hour in 2027 (SH 71 WBFR and Presidential Boulevard, SH 71 EBFR and Presidential Boulevard, and Burleson Road and Emma Browning Avenue). For the afternoon peak hour in 2027, three intersections would operate at LOS F (SH 71 WBFR and Spirit of Texas Drive, SH 71 WBFR and Presidential Boulevard, and SH 71 EBFR and Presidential Boulevard).

### 6.4.2.2  Proposed Action

In both 2027 and 2032, the Proposed Project would result in a slight degradation of LOS compared to the No Action Alternative at the SH 71 WBFR and Presidential Boulevard intersection and the SH 71 EBFR and Presidential Boulevard intersection for both the midday and the afternoon peak hours. The SH 71 WBFR and Spirit of Texas Drive intersection would experience a slight degradation under the Proposed Project compared to the No Action Alternative in the afternoon peak hour in both 2027 and 2032. The Burleson Road and Emma Browning Avenue intersection would be significantly improved under the Proposed Project compared to the No Action Alternative in both the midday and afternoon peak hours in both 2027 and 2032.

It is envisioned that surface traffic would improve based on the Airport working with the City of Austin and TxDOT to identify future roadway and/or signalization improvements at the SH 71 intersections with Spirit of Texas Drive and Presidential Boulevard and the provision of light rail to the Airport, which was approved by City of Austin voters and is currently undergoing environmental evaluation.

### 6.4.3  Environmental Justice

According to the U.S. Environmental Protection Agency (EPA), Environmental Justice is the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies. EPA defines *fair treatment* to mean that no group of people should bear a disproportionate share of the negative environmental consequences resulting from industrial, governmental, and commercial operations or policies.

Table 3.13-6 of the attached EA shows the total minority presence in the Project Study Area (51%), the General Study Area (43%), the City of Austin (24%), and Travis County (24%), based on the U.S. Census Bureau 2012-2016 American Community Survey 5-Year Estimates. The General Study Area, City of Austin, and Travis County are predominantly white with the highest minority population, 51 percent, located in the two census tracts that are within the Project Study Area. Table 3.13-6 of the attached EA also shows that the Project Study Area has the highest percent of the population living below the poverty line (36.3%) when compared to the General Study Area (25.7%), City of Austin (13.2%) and Travis County (10.2%).

FAA Order 1050.1F provides guidance for the preparation of environmental justice analysis. Although the FAA does not provide a significance threshold for environmental justice, factors that indicate a significant impact may occur if the action would have the potential to lead to a disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations due to:

- Significant impacts in other environmental impact categories; and
- Impacts on the physical or natural environment that affect an environmental justice population in a way that the FAA determines are unique to the environmental justice population and significant to that population.

Disproportionately high and adverse human health or environmental effect on minority and low-income populations means an adverse effect that:

- Is predominately borne by a minority population and/or a low-income population; or
- Will be suffered by the minority population and/or low-income population and is appreciably more severe or greater in magnitude than the adverse effect that will be suffered by the non-minority population and/or non-low-income population.

### 6.4.3.1   No-Action Alternative

Under the No Action Alternative, the City would not implement the Proposed Project. The City would continue to operate the Airport, perform maintenance, and serve forecast aviation demands. Because no development would occur, no impacts to minority and/or low-income populations would occur.

### 6.4.3.2   Proposed Action

The Proposed Project would not result in the acquisition of land, relocation of residences or businesses, involve off-airport construction, or cause significant environmental impacts that would affect minority and/or low-income populations. Because no significant impacts would occur as a result of the Proposed Project compared to the No Action Alternative, there are no disproportionately high and adverse effects to environmental justice populations.

### 6.4.4   Children's Health

Pursuant to Executive Order 13045, *Protection of Children from Environmental Health Risks and Safety Risks* 62 *Federal Register* 19885, (April 21, 1997), federal agencies are directed, as appropriate and consistent with the agency's mission, to make it a high priority to identify and assess environmental health risks and safety risks that may disproportionately affect children. The FAA is encouraged to identify and assess environmental health risks and safety risks that the agency has reason to believe could disproportionately affect children.

Areas of particular concern for children's environmental health risks and safety include schools, day cares, children's health clinics, and child friendly recreational facilities. There are two schools within the General Study Area: Allison Elementary School and Popham Elementary

School. Additionally, Smith Elementary School is located about 0.5 miles west of the General Study Area, and Del Valle Elementary, Middle, and High Schools is located about 1.5 miles northeast of the General Study Area.

### 6.4.4.1  No-Action Alternative

Under the No Action Alternative, the City would not implement the Proposed Project. The City would continue to operate the Airport, perform maintenance, and serve forecast aviation demands. Because no development would occur, no impacts to children's environmental health and safety risks would occur.

### 6.4.4.2  Proposed Action

The Proposed Project would not result in the relocation, acquisition, or alteration of schools, residences, daycares, parks, or any other establishments associated with children or childcare. Construction of the Proposed Project would be temporary and would observe regulations regarding use, transportation, and disposal of hazardous waste and materials. Construction noise would not affect children or disrupt learning activities at nearby schools because the closest school is far enough away that the noise level would be at or below 60 dB, which is considered compatible with educational land uses.

None of the locations where children are likely to congregate within the General Study Area would have a significant noise impact. Therefore, no disproportionate effect on children's environmental health and safety risks would occur. Therefore, the Proposed Project would not adversely affect children's environmental health and safety risks when compared to the No Action Alternative.

## 6.5   Wetlands

For regulatory purposes under the Clean Water Act (CWA), the term wetlands means areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.

The U.S Fish and Wildlife Service (USFWS) National Wetlands Inventory (NWI) mapper shows a variety of wetland features in the vicinity of the Airport. Field surveys were conducted within the Project Study Area and determined that either the NWI features no longer exist or do not meet the EPA's definition of wetlands. Field surveys identified three potential wetlands that were not shown on the NWI. These potential wetlands are described in the Table 3.14-1 of the attached EA and shown in Exhibit 3.14-1 of the attached EA. No other wetland hydrology, vegetation, or soil was identified within the Project Study Area.

### 6.5.1  No-Action Alternative

Under the No Action Alternative, the Airport would not implement the Proposed Project. The Airport would continue to operate and serve forecasted aviation demands. Future Airport development would be subject to review and approval under the NEPA and is not assumed under the No Action Alternative. Therefore, there would be no effect on wetlands.

### 6.5.2  Proposed Action

The alignment for the new electrical lines, including new utility poles, (Project U-3) on the east side of the Project Study Area would not affect the Potential Wetlands A and B or their buffer areas because the new electrical lines would be installed overhead on the existing utility poles. Poles in need of upgrade or replacement would be installed along the existing utility pole alignment and installed in the same ground locations as the existing poles to avoid the potential wetland areas. No trenching would be required for installation of these new overhead electrical lines. The location for the construction of the new Austin Energy substation (Project U-2) was modified so that it would avoid Potential Wetland C its buffer area. Construction of the new electrical ductbanks west of the substation, which would be placed underground within the aircraft operations area (AOA) to avoid any safety issues with aircraft operations, would occur in areas where no potential wetlands occur. The Proposed Project would not cause any direct or indirect/secondary effects and would not alter the runoff to these potential wetlands. If detailed design and construction plans are modified to affect these potential wetlands, coordination and consultation with the U.S. Army Corps of Engineers would be required. Therefore, no impacts to wetlands are expected to occur as a result of the Proposed Project.

## 7.  PUBLIC INVOLVEMENT AND AGENCY COORDINATION

As NEPA and FAA Order 1050.1F recommend for an EA, an agency and public involvement process was conducted. This process provided the opportunity for agency, organization, and public input regarding the Proposed Project analyzed in the attached EA.

### 7.1  Agency Coordination

On October 12, 2021, the Department of Aviation (DOA) submitted, via email, invitations to comment on the scope of work for the EA. In total, six agencies and organizations were contacted and invited to provide comments on the proposed project, of which, two responded with comments. The comments provided from the two agencies were incorporated into the environmental studies where applicable. Appendix I of the attached EA includes the requests for comment sent to the agencies and organizations, confirmation of electronic delivery, and copies of responses received.

### 7.2  Public Involvement

The DOA published a public notice in the Austin-American Statesmen on August 8, 2021 announcing that it was holding a public scoping meeting on September 9, 2021 for the Proposed Action. Due to the COVID-19 pandemic, the public scoping meeting was held virtually via

Zoom and occurred on Thursday, September 9, 2021. The format of the public scoping meeting was a virtual presentation followed by a question and answer session. The virtual presentation covered a brief overview of the NEPA process, the purpose and need for the project, and the proposed scope of work for the environmental analysis of potentially affected resource categories, along with how to provide comments during the 30-day early consultation period. Members of the public had an opportunity to ask questions and converse with DOA staff and the EA consultant team. In addition, members of the public were given the opportunity to submit written comments during the scoping meeting. The DOA received three written comments during the public scoping meeting and five public comments during the 30-day comment period that ended on October 12, 2021. Appendix I of the attached EA includes the summary of the virtual public scoping meeting.

The DOA published a notice of availability for the Draft EA in the Austin-American Statesmen on February 22, 2022. As Table 4-1 of the attached EA shows, the Draft EA was made available to the public and agencies for a 45-day review period during normal business hours at DOA offices and on the DOA website.

During the 45-day public comment period, the DOA provided agencies and the public with the opportunity to attend two public meetings to learn more about the Draft EA, to ask questions of DOA staff regarding the Proposed Project and the contents of the Draft EA. The DOA utilized a variety of methods to inform agencies and the public about the public meetings. These methods were extensive and are identified in Appendix J of the attached EA. The first public meeting was a virtual meeting held on Zoom on Wednesday, March 23, 2022. Approximately 53 members of the public attended this virtual meeting. The second public meeting was an in-person at DOA offices on Saturday, March 26, 2022. Approximately 22 members of the public attended this in-person meeting.

Agencies and the public had the opportunity to provide comments on the Draft EA for the 45-day period between February 22, 2022 and April 7, 2022. Comments were submitted to the DOA using the following four methods:

- Online
- Project Open House
- By Mail
- By Email

A total of 23 comment individual submissions were received on the Draft EA. A copy of all comments and responses to those comments are provided in Appendix K of the attached EA.

## 8.    CONDITIONS AND MITIGATION

As prescribed by 40 CFR § 1505.3, the FAA shall take steps as appropriate to the action, such as through special conditions in grant agreements, property conveyance deeds, releases, airport layout plan approvals, and contract plans and specifications, and shall monitor these as necessary to assure that representations made in the EA and FONSI/ROD will be carried out. Specific conditions of approval associated with this project are listed below:

- The airport and the contractor shall comply with TCEQ's Texas Pollutant Discharge Elimination System Construction General Permit. A Notice of Intent will be required. A Stormwater Pollution Prevention Plan (SWPPP) will be prepared and implemented, and a construction site notice will be posted on the construction site. The SWPPP will include, among other items, identification of appropriate erosion and sediment controls and stormwater best management practices.

- The contractor shall be required to pay special attention to dust control when earthwork or hauling operations are in progress, and/or when wind or weather conditions cause excessive blowing of dust.

- Per consultation with the Texas SHPO, a construction monitoring strategy was approved for the safety-restricted area located around the Runway 18R-36L. If any archeological resources are discovered during construction, construction at that location will cease and any resources shall be reported to the FAA and Texas SHPO, evaluated for NRHP-eligibility, and assessed for possible effects under Section 106.

- Any hazardous materials that may be encountered during construction would be managed and disposed of in compliance with federal, state, and local hazardous materials management guidelines.

## 9. FINDINGS

Throughout the development of the airport, including the proposed improvements described above, the FAA has made every effort to adhere to the policies and purposes of NEPA, as stated in the NEPA implementing regulations. The FAA has concentrated on the truly significant issues related to the action in question. The FAA determined that the Proposed Action is in compliance with FAA Order 1050.1F 6-3.b(2), and is consistent with community planning as documented in the March 2020 Master Plan. In its determination on whether to prepare an Environmental Impact Statement (EIS) or process the EA as a FONSI, the FAA weighed its decision based on an examination of the EA, comments from Federal and state agencies, as well as all other information available to the FAA.

As required by 40 CFR 1506.5, the FAA has independently and objectively evaluated this proposed project. As described in the Final EA, the Proposed Action and the No Action Alternative were studied extensively to determine the potential impacts and appropriate mitigation for those impacts. The FAA provided input, advice, and expertise throughout the analysis, along with administrative and legal review of the project.

The following determinations are prescribed by the statutory provisions set forth in the Airport and Airway Improvement Act of 1982, as codified in 49 U.S.C. §§ 47106 and 47107. They are preconditions of FAA's approval of airport funding applications for Airport Improvement Program (AIP) eligible airport development.

   a. 49 U.S.C. § 47106(a)(1). The Proposed Action is reasonably consistent with existing plans of public agencies for the development of the area surrounding the airport.

b. 49 U.S.C. § 47106(b)(2). The interests of the communities in or near which the project may be located have been given fair consideration.

c. 49 U.S.C. § 47107(a)(10). Appropriate action, including the adoption of zoning laws, has been or will be taken to the extent reasonable to restrict the use of land next to or near the airport to uses that are compatible with normal airport operations.

After careful and thorough consideration of the facts contained herein, the undersigned finds that the proposed Federal action is consistent with existing national environmental policies and objectives of Section 101 of NEPA and other applicable environmental requirements and, with the required mitigation referenced above, and will not significantly affect the quality of the human environment or otherwise include any condition requiring any consultation pursuant to section 102(2)(C) of NEPA. As a result, FAA has determined that preparation of an EIS is not necessary for this proposed action and is therefore issuing this FONSI.

RECOMMENDED FOR APPROVAL: 

KIMBERLY M BROCKMAN  
Digitally signed by KIMBERLY M BROCKMAN  
Date: 2022.07.20 12:22:35 -05'00'

Date:_____

Kim Brockman  
Acting Manager  
Texas Airports District Office

APPROVED:

IGNACIO FLORES  
Digitally signed by IGNACIO FLORES  
Date: 2022.07.20 15:40:55 -05'00'

Date:_____

Ignacio Flores  
Director, Office of Airports  
Southwest Region

18

**DECISION AND ORDER**

Airport Expansion and Development Program
Austin Bergstrom International Airport
Travis County, Texas

July 2022

The FAA has identified the Proposed Action as the FAA's preferred alternative. FAA must now select one of the following courses of action:

    a.  Approve agency actions necessary to implement the Proposed Project, or

    b.  Disapprove agency actions to implement the Proposed Project.

Approval would signify that applicable Federal requirements relating to airport development and planning have been met and would permit AUS to proceed with implementation of the Proposed Action and associated mitigation measures. Not approving these agency actions would prevent the Proposed Action from being implemented.

I have carefully considered the FAA's goals and objectives in relation to the various aeronautical aspects of the Proposed Project as discussed in the EA. The review included the purpose and need that this project would serve; the alternative means of achieving the purpose and need; the environmental impacts of these alternatives; and mitigation of impacts. The review concluded that all practicable means to avoid or minimize environmental harm from the selected alternative have been adopted.

Under the authority delegated by the Administrator of the FAA, the undersigned finds that the Proposed Action, **Austin Expansion and Development Program**, is reasonably supported. Therefore, the following agency actions, discussed more fully in the FONSI, are directed to be taken including:

    1.  The FAA directs that actions be taken to:

        A.  Determinations under 49 U.S.C. §§ 47106 and 47107 relating to the eligibility of the Proposed Action for federal funding under the Airport Improvement Program;

        B.  Determinations under 49 U.S.C. § 40117, as implemented by 14 CFR 158.25, to impose and use passenger facility charges (PFC) collected at the airport to assist with construction of potentially eligible items shown on the ALP; and

        C.  Unconditional approval of the portion of the ALP depicting the Proposed Action as described in Chapter 1 of the EA, including the all proposed project components listed in Chapter 1.4 of the attached EA to 49 U.S.C. §§ 40103(b) and 47107(a)(16).

The FAA has carefully and thoroughly considered the facts contained in the attached EA. Based on that information, FAA finds the proposed Federal actions are consistent with existing national environmental policies and objectives of Section 101(a) of the National Environmental Policy Act of 1969 (NEPA) and other applicable environmental requirements. The FAA also finds the proposed Federal action will not significantly affect the quality of the human environment or include any condition requiring any consultation pursuant to section 102(2)(C) of NEPA. As a result, FAA will not require an EIS for this action.

The undersigned, therefore, now approve and direct action as needed, to carry out the agency action outlined above under Proposed FAA Actions required for the **Austin Expansion and Development Program** described under the Proposed Action in the attached EA and this FONSI/ROD. These actions are directed to be taken, and determinations and approvals are made, under the authority of 49 U.S.C. §§ 40101, 40113, 44502, 44701, 47101, 47105, 47106, 47107, 47120, and 47122.

# ROBERT R LOWE

Digitally signed by
ROBERT R LOWE
Date: 2022.07.21
11:38:48 -05'00'

_____          _____

Rob Lowe                                    Date
Regional Administrator
Southwest Region

**Right of Appeal**

This order (FONSI/ROD) constitutes final agency action and final order of the Administrator under 49 U.S.C. § 46110. Any party having a substantial interest in this order may appeal this order to the United States Court of Appeals for the District of Columbia Circuit or in the Circuit Court of Appeals of the United States for the circuit in which the person resides or has its principal place of business, upon petition, filed no later than 60 days after the order is issued in accordance with the provisions of 49 U.S.C. § 46110.