## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| LONESTAR AIRPORT HOLDINGS, LLC, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | CIVIL ACTION NO. 1:22-CV-00770-RP |
| v. | ) | |
| | ) | |
| CITY OF AUSTIN, TEXAS, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |
| | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Lonestar Airport Holdings, LLC, by and though its attorneys, files the following First Amended Complaint, pursuant to Fed. R. Civ. P. 15(a)(1)(b), against Defendant, the City of Austin, Texas, for declaratory and injunctive relief and damages based on the City's imminent unlawful taking of Lonestar's property and the City's ongoing breaches of its agreement with Lonestar. Amendment of the complaint is authorized by Fed. R. Civ. P. 15 without leave of Court because this pleading is being filed within 21 days of the City's "service of a motion under Rule 12(b)" directed at Lonestar's original complaint. As explained below, the City's actions have caused or threaten to cause Lonestar irreparable injury as well as hundreds of millions of dollars in damages.

## INTRODUCTION

1.      In 2016, the City of Austin sought private-sector investment in a new terminal at the Austin-Bergstrom International Airport. The City hoped to attract low-cost airlines, while shifting the significant cost of renovating and operating a then-defunct remote terminal to the private sector. In exchange for the significant up-front investment—and for taking the risk that

new tenants for the terminal might not materialize—the City was willing to grant its private-sector partner a 40-year lease and concession agreement. The investor would build and operate the terminal. The ultimate investor, Lonestar, agreed to make the needed investment in exchange for the long-term lease and concessions *and* a first right to participate in any expansion of the terminal or any new facilities at the airport. The long-term goal of both parties, reflected in the plain language of the agreement, was to build and operate an airport for the future.

2.      This lawsuit arises from the City's unlawful attempt to avoid the obligations of the contract it only recently entered, seize for itself the significant business Lonestar has successfully developed at the new terminal at the Austin Airport, and deprive Lonestar of all of its economic and other rights under the 40-year lease and concession agreement. The result is an unconstitutional taking in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution, and breaches of multiple express terms of the contract between the City and Lonestar. That contract provides for jurisdiction in this Court and for injunctive relief for any such breach.

3.      The City negotiated and, with the unanimous approval of the City Council, entered into the South Terminal Lease and Concession Agreement (the "Agreement") in March 2016. The City did so with the intent of inducing Lonestar to invest the tens of millions of dollars needed to renovate and operate the "South Terminal," which is owned by the City. The parties' shared vision was to turn the South Terminal into a profitable and efficient commercial airline terminal for ultra-low-cost air travel that could benefit Austin residents. By its express terms, the Agreement is not only a "lease"; it also grants a "concession" to Lonestar to operate a business on the property subject to the lease and grants enforceable rights to participate in future development and expansion of the Airport. The City's grant to Lonestar of the enforceable right to participate in

future development and expansion of the Airport was a central part of the bargain: absent the City's grant of such right as part of the parties' relationship, Lonestar would not have entered the deal.

4.      Lonestar has held up its end of the bargain.  In 2016 and 2017, in express reliance on the rights granted by the City in the agreement, it invested tens of millions of dollars, executed a gut remodel of the terminal, and negotiated and entered agreements with Allegiant, Frontier, and the myriad service providers necessary to run an airport terminal.  In short, it developed a thriving business, which currently serves more than 57,000 passengers a month under Lonestar's management.  In so doing, Lonestar conveyed substantial value to the City by adding substantial capacity to the Austin Airport at Lonestar's own expense.  Lonestar could serve even more passengers at the South Terminal but for the breaches of the Agreement by the City.

5.      Precisely because Lonestar has proven to be exactly the partner the City hoped for when it entered into the Agreement, the City is now attempting to seize Lonestar's successful business unlawfully and to deprive Lonestar of its rights under the Agreement by purporting to condemn the Agreement it induced Lonestar to enter into just a few years ago.  In the words of the City's current Executive Director of Aviation in a letter to Lonestar, the City wants to condemn Lonestar's rights under the Agreement in order to gain "control" over the South Terminal, *i.e.*, to take Lonestar's business.

6.      The City's Executive Director of Aviation's statement reveals that the City's current scheme is not motivated by legitimate City needs at the Austin airport, but instead is simply the product of an intentional decision by the City's current airport administration to reverse the City's earlier decision to enter into a public-private partnership with Lonestar.  Specifically, new leadership of the City's Department of Aviation wants out of the City's lawful contract with Lonestar, and the City is deliberately abusing the Texas condemnation process to advance its plan

to take over and operate the business Lonestar has built and operate it.  The City's officials, acting under the color of state law, are invoking Texas's "quick-take" statute, Tex. Prop. Code § 21.020, to assert immediate control over Lonestar's entire business at the South Terminal before the propriety of the taking can even be challenged, yet alone assessed.

7.      The City's unlawful actions are creating an immediate and tangible threat to Lonestar's constitutional rights secured under the Fifth and Fourteenth Amendments, and are breaching the City's contractual obligations. Both warrant immediate, and eventually permanent, injunctive and declaratory relief.  The City's unlawful campaign to deprive Lonestar of its rights under the parties' Agreement has already caused Lonestar to suffer substantial damages.

## OVERVIEW OF THE PARTIES' RELATIONSHIP

8.      Lonestar and the City entered the Agreement in March 2016.  Under the Agreement, Lonestar committed to make significant investments in renovating and operating the South Terminal.  In exchange, Lonestar negotiated for, and received, numerous commercial rights from the City.  These include:

(i)      a right to occupy and use the premises on which the South Terminal lies for a 40-year term without interference from the City;

(ii)      an exclusive first right to participate in any expansion at the South Terminal or construction of new facilities at the Airport; and

(iii)      an express obligation on the part of the City not to take "any action . . . the primary purpose of which is to avoid honoring any of its commitments and obligations under this Lease."

9.      The City also agreed to have any disputes between the parties heard in this Court and that any breach of the Agreement could be prevented with a request for injunctive relief.

10.     Lonestar honored—and continues to honor—its obligations under the Agreement. Its operation of the South Terminal has been an extraordinary success.

11.     After execution of the Agreement, Lonestar infused $12.5 million to overhaul the South Terminal, resulting in a completely remodeled interior, improved customer amenities, and additional parking.  Lonestar officially re-opened the improved South Terminal on April 13, 2017, with Allegiant Airlines serving as the first tenant.  Lonestar has continued to invest heavily in the South Terminal, spending more than $20 million.  To date, more than 10,000 ultra-low-cost carrier flights have departed from the South Terminal.  In the first six months of 2022 alone, Lonestar's airline tenants accommodated more than 257,000 passengers at the South Terminal (over 1,400 daily).

12.     Lonestar's rapid renovation of the South Terminal and development of a successful business there have been lauded by the City and by third parties.  The City's prior Executive Director of the Department of Aviation ("DOA"), Jim Smith, referred to the South Terminal partnership with Lonestar as "cutting edge," and a "test-case" for public-private partnership at airports.

13.     Industry and media sources also regularly refer to Austin's partnership with Lonestar as a model for how to efficiently improve airport operations.  Politico Magazine, for example, profiled Lonestar's renovation of the South Terminal as an example of "[p]rivate capital … driving long-overdue improvements."[1]  Separately, CAPA - Centre for Aviation—a leading

---

[1]     Politico Magazine, The Cure For America's 'Third-World' Airports (Feb. 16, 2017), *available at* https://www.politico.com/magazine/story/2017/02/america-airports-investment-improvement-infrastructure-214790/.

international industry publication—noted U.S. airports' funding crunch while observing that "public-private partnerships" such as the South Terminal "are (comparatively) thriving."[2]

14.     Despite the South Terminal's success, the City's approach to its partnership with Lonestar drastically changed in the summer of 2019—three years into the Agreement—when Jacqueline Yaft replaced Jim Smith as Executive Director of the DOA.  The new administration reversed the City's prior approach to its partnership with Lonestar, based on its stated desire to re-assert "local control" over the Airport.  Where the prior administration sought to have Lonestar take on the substantial risk needed to invest in, renovate, and operate the South Terminal and to participate in any expansion or new facilities at the Airport, once Lonestar's renovations and business model proved to be successful, the City's new administration embarked on a campaign to avoid its obligations under the Agreement, damage Lonestar's business, and oust Lonestar from the Airport.

15.     These efforts began with the City's sudden change of approach to the potential expansion of the South Terminal.  Before the change in administration, Lonestar and the City were in advanced discussions about a substantial expansion to the South Terminal, dubbed "South Terminal 2.0."

16.     But the new administration ceased good faith negotiations regarding "South Terminal 2.0," and deliberately interfered with Lonestar's efforts to raise funds with potential investors for that effort.  It did so by submitting—and simultaneously disseminating through Austin's media—an unsolicited offer to buy-out Lonestar's rights under the Agreement for a mere $10 million in November 2019.  That amount was significantly less than Lonestar had invested in

---

[2]     CAPA – Centre for Aviation, U.S. airports' funding crunch – are P3s the answer? (Feb. 23, 2021), *available at* https://centreforaviation.com/analysis/reports/us-airports-funding-crunch--are-p3s-the-answer-550179.

the South Terminal, and a mere fraction of the actual value of Lonestar's business and its rights under the Agreement.  This is not simply Lonestar's opinion: there were contemporaneous market bids for Lonestar's interest that suggested the City's offer bore no relation to the market value.

17.     In so doing, the DOA sought to cast doubt on Lonestar's continued right and ability to continue to operate the South Terminal, thereby deliberately undermining and damaging Lonestar's relationships with its present and prospective customers, employees, and business partners.

18.     This offer was a complete surprise to Lonestar, given that the Agreement does not contain any such mechanism for a buyout.  Lonestar rejected the City's offer but indicated willingness to meet with the City to understand any concerns.  After its $10 million offer was rejected, the City switched gears and pursued a strategy to cancel the Agreement and seize for itself the business Lonestar had developed at the South Terminal.

19.     To accomplish this objective, the City has purported to exercise its eminent domain powers to "condemn" Lonestar's rights and is attempting to exploit Texas's quick-take procedure to obtain immediate possession of the South Terminal.

20.     Lonestar recognizes the City's general eminent domain authority to take real estate, and such takings sometimes result in a business needing to relocate or otherwise adjust its operations.  Indeed, in the Agreement the parties recognized the City's general authority to condemn property as an exercise of sovereign authority, provided that Lonestar was paid fair market value for any interest taken and assuming the taking was lawful.  But nothing in the Agreement authorizes the City to use its eminent domain powers to serve an unlawful public objective and for the sole purpose of escaping its contractual obligations.  In fact, the Agreement's provisions prohibit the City from taking actions to interfere with Lonestar's ability to operate the

Terminal.  Nonetheless, the City is attempting to abuse its condemnation power to oust Lonestar from the Airport altogether, cancel the Agreement, take Lonestar's going concern business, and compensate Lonestar only for the value of the land on which Lonestar's business sits (which the City already owns).

21.     The City's actions, which are merely a stratagem to cancel its own valid contract, not only violate the express terms of the Agreement, but also are an unconstitutional use of the City's eminent domain powers.  Well-established precedent confirms that the government cannot "take" the entirety of a business under the guise of condemnation without paying just compensation.  Yet that is precisely what the City intends to do.  Lonestar's business at the Airport cannot be run anywhere else—*i.e.*, Lonestar cannot deliver low-cost air carrier services at any other location than the Airport.  The City intends to take Lonestar's business for itself under the guise of a real estate condemnation that would terminate without compensation the very contractual rights and business that were the heart of the Agreement.  If the City is allowed to proceed, it would effectively authorize the City—and any municipality in Texas—to use the power of eminent domain to take a business created by a private enterprise under a public-private partnership.  That is not a constitutional use of eminent domain.

22.     The City has made plain that it intends to take Lonestar's business and the entirety of its interests under the Agreement while only compensating Lonestar for the real estate on which the South Terminal sits.  The City has expressly—and unilaterally—ignored the value of Lonestar's commercial interests in the Agreement, asserting, without foundation, that the key rights granted to Lonestar in the Agreement are not enforceable.  These provisions were the fundamental inducement for Lonestar to enter into the Agreement less than seven years ago, and

for the City to attempt to take Lonestar's rights without assigning value to those rights demonstrates, in and of itself, the City's bad faith.

23.    The City's efforts to take Lonestar's entire business under the color of state condemnation proceedings violates Texas law, the U.S. Constitution, and the plain terms of the contract.  Moreover, because of how the City has chosen to proceed, absent action by this Court Lonestar will not have the opportunity to challenge the lawfulness of the City's taking until *after* the loss of Lonestar's entire business is complete.  That is irreparable injury as a matter of law, and it must be halted.

## PARTIES

24.    Plaintiff Lonestar Airport Holdings, LLC is a Delaware limited liability corporation, primarily engaged in the financing, development, management, and operation of the South Terminal at the Austin-Bergstrom International Airport.  It is a single-member LLC, with its sole member being Lonestar Airport Intermediate, Inc., a Delaware corporation.  Lonestar Airport Immediate, Inc.'s principal place of business is New York.

25.    Defendant the City of Austin, Texas is a Texas home rule municipality and corporate body politic with a principal place of business in Austin, Travis County, Texas.  It is acting by and through its Executive Director of the Department of Aviation in this case.

## JURISDICTION AND VENUE

26.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983 because Lonestar alleges an ongoing violation of its rights under the Constitution and laws of the United States.

27.    This Court also has jurisdiction over Lonestar's state-law claims pursuant to 28 U.S.C. § 1332.  Lonestar is a limited liability company, and none of the members of Lonestar who

are individuals or corporations are residents of the State of Texas.  The City is a citizen of Texas, and the amount in controversy far exceeds $75,000.

28.     This Court also has jurisdiction over Lonestar's state-law claims under 28 U.S.C. § 1367 because those claims arise from the same set of facts as Lonestar's federal claims and because those claims are so related to Lonestar's federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

29.     This Court may also declare the legal rights and obligations of the parties in this action pursuant to 28 U.S.C. § 2201 because the action presents an actual controversy within the Court's jurisdiction.

30.     This Court has personal jurisdiction over the City because it is domiciled in the state of Texas.

31.     Venue is proper in this Court because the City and Lonestar have agreed that "[v]enue for any action arising out of or concerning this Lease shall be proper and lie exclusively in the Austin Division of the United States District Court for the Western District of Texas."  *See* South Terminal Lease and Concession Agreement, ¶ 41.03, attached as Ex. A. Additionally, the facts and circumstances underlying the action arise from conduct occurring in Travis County, Texas. 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### A.     History of the South Terminal and Agreement

32.     The South Terminal is located at the Austin Bergstrom International Airport.  It is physically separated from the Airport's Barbara Jordan Terminal (the "Main Terminal") and sits on a tract of land south of the Main Terminal.  The South Terminal first opened for commercial operation in 2008 after being refurbished to accommodate flights for the Mexican airline

VivaAerobus.  VivaAerobus operated out of the South Terminal for only a year before vacating it. With no airline serving the Terminal, the empty building was fenced off, and the City left the terminal vacant for years.

33.     In 2015, the City began exploring options for alleviating capacity stress at the Airport.  The Executive Director of the DOA decided that reopening the South Terminal presented an attractive option for the growing needs of the Airport.  But having been vacant for over half a decade, the terminal needed significant work before it could be re-opened.  And, as the City's experience in 2008 showed, it was far from a foregone conclusion that this would be a successful and profitable enterprise.

34.     Shifting this financial and operational risk was a key part of the rationale for the City's decision to enter a public-private partnership with Lonestar: a public-private venture had the benefit of minimizing financial risk for the City, while providing the Airport the capacity it needed to keep up with the population growth in the Austin metropolitan area and corresponding increase in demand for air travel.

35.     Key City personnel—including the then-Executive Director of the DOA—were keen on the idea of public-private partnerships: a public-private partnership allowed the City to shoulder little to no risk but enjoy the opportunity for significant gain at the South Terminal, while Lonestar assumed significant risk of funding and ultimate success or failure.

36.     Lonestar presented a proposal to the City, including an initial investment of $12.5 million into renovating the South Terminal to get it up and running, as well as committing the operating capital and personnel to make it a success.  The City and Lonestar spent countless hours considering, negotiating, and reviewing the terms of a proposed 40-year lease that would include, among other things, a significant investment by Lonestar to bring the South Terminal back into

operation.  In August 2015, the DOA Executive Director praised the deal for relieving the City of all risk relating to the South Terminal, stating at an Austin City Council session: "So [Lonestar] is accepting the risk for all the long-term [of] what happens [with the South Terminal]."

37.     For Lonestar, the deal was about more than renovating the South Terminal; it was about operating a long-term business at the South Terminal and serving the Airport's long-term needs—which were only increasing as the City of Austin grew.  That goal was reflected in the express terms of the Agreement reached between Lonestar and the City and was an integral part of Lonestar's decision to enter into the Agreement.  And Lonestar relied on that Agreement in making the investments necessary to develop a successful business at the South Terminal.

38.     Specifically, the City and Lonestar expressly contemplated at the time that continued growth at the Airport would require further expansion of the Airport's facilities.  To induce Lonestar to fund the multi-million-dollar renovation and expansion of the South Terminal, the City granted Lonestar the exclusive first right to participate at its own option in any required expansion or new facilities at the Airport—further reinforcing Lonestar's ability to run a business at the Airport for the long-term.

39.     Lonestar insisted on, and the City agreed to, the inclusion of Article 15 in the Agreement as a necessary and material part of its agreement with the City.

40.     From the outset, both Lonestar and the City recognized that expansion of the South Terminal or the creation of a new terminal or other facilities would very likely be necessary over the 40-year term of the Agreement.

41.     Lonestar was not willing to make the substantial investments required to renovate and operate the South Terminal without the City's assurance that Lonestar would be afforded an exclusive opportunity to participate in later expansions or development at the Airport.

42.     Without the prospect of future involvement in such expansions, the economic appeal of the proposed arrangement to Lonestar would have been minimal.

43.     Lonestar considered the City's grant of such right to be a demonstration of the City's commitment to the long-term public-private partnership envisioned by and memorialized in the Agreement.

**B.     The South Terminal Lease and Concession Agreement**

44.     In March 2016, Lonestar and the City signed the Agreement.  *See* Ex. A.  The Austin City Council and its committees voted on the decision to enter into the Agreement with Lonestar three separate times, and the Agreement was approved unanimously with the full support of the Mayor and the City Council.  Specifically, the City Council voted in June 2015 to authorize contract negotiations; the audit and finance committee voted again in August 2015 to recommend execution of the Agreement; and—by unanimous vote on August 27, 2015—the City Council approved execution of the Agreement.

45.     The Agreement established a long-term partnership between Lonestar and the City, and, as with any contract, it conferred various rights and obligations on each party.  Among other things, Lonestar was required to rehabilitate the South Terminal and commence and maintain a specific degree of operations upon completion of the rehabilitation phase.  Upon rehabilitating the terminal, Lonestar was granted the 40-year right to operate the terminal "peaceably and quietly" and to "have, hold, occupy, use and enjoy the Premises during the Term … without ejection or interference by Owner."  Ex. A, ¶ 2.03.

46.     In addition, in consideration for its significant upfront investment, Lonestar was granted an exclusive first right to participate in any "Expansion" of the South Terminal or

construction of a "New Facility" at the Airport.  That right is memorialized in Article 15 of the

Agreement:

> 15.01 Expansion or New Facility.  If Tenant determines that the growth of operations of existing or new air carriers requires an Expansion or if Tenant or Owner determines that the growth of operations of existing or new air carriers requires a New Facility, either Tenant or Owner, as applicable, shall provide a written notice to the other Party of such determination.  If Tenant provides a written notice to Owner that it is interested in investing in such Expansion or New Facility, then, subject to Owner's agreement and in accordance with the Airport Master Plan, (a) in the event of an Expansion that does not require additional land or other material changes to this Lease, Owner and Tenant will amend this Lease to reflect such Expansion, and (b) in the event of an Expansion that requires additional land or the construction of a New Facility, **Owner will provide Tenant with the exclusive first right to, as applicable, develop, construct and operate such Expansion or New Facility**, and both Parties shall work together in good faith to enter into an agreement regarding such Expansion or New Facility on mutually agreeable terms.  Owner will coordinate with Tenant to seek FAA approval to update the Airport Layout Plan accordingly to identify the Tenant's Expansion or New Facility on the Airport Layout Plan.  In the event an update to the Airport Layout Plan is necessary due to Tenant's Expansion or New Facility as approved by Owner, Tenant shall be responsible for the cost of any environmental studies in connection with FAA and state approvals.

Ex. A (emphasis added).

47.     Both "Expansion" and "New Facility" are defined broadly under the Agreement.

"Expansion" is defined to mean "any expansion of the South Terminal for the Authorized Use,

including the development of any additional parking facilities serving the South Terminal, to

accommodate the growth of operations of Airlines (or other air carriers) at the Airport."  Ex. A,

Article 1.01.  "New Facility" is defined to include "the construction of any new passenger terminal

or concourse, including without limitation any new Limited Services Terminal, or other facilities

at the Airport, including any new or expanded parking facilities, to accommodate the growth of

operations of Airlines (or other air carriers) at the Airport." *Id.* And "Airport" is defined as the Austin-Bergstrom International Airport, located in the City of Austin, Travis County, Texas. *Id.*

48.     In sum, Article 15 grants Lonestar an exclusive first right to develop, construct, and operate any Expansion of the South Terminal or New Facility, and requires the City to "work together" with Lonestar "in good faith to enter into an agreement regarding such Expansion or New Facility."

49.     Significantly, Article 34 contemplates a possible use of eminent domain—preserving the City's sovereign right to exercise eminent domain when justified unconnected with its obligations under the Agreement—but expressly provides that the City must pay fair market value for *all* of Lonestar's interests taken.

50.     Article 41.13 of the Agreement prohibits the City from "taking any action the primary purpose of which is to avoid honoring any of its commitments and obligations" under the Agreement.

51.     Article 18.05 provides that the City "shall provide, at no cost to Tenant, Shuttle Bus Service for passengers and employees between the South Terminal and the North Terminal/CONRAC facility," and that "[o]peration of the Shuttle Bus Service shall be sufficiently coordinated with the arrival and departure of commercial airline flights at the South Terminal in accordance with Tenant's Airport Operational Manual as approved by Owner to accommodate actual passenger traffic levels and projected passenger traffic levels provided by Tenant to Owner."

**C.     Lonestar Invests Millions of Dollars in the South Terminal, Turning It into a Successful and Profitable Enterprise**

52.     Lonestar's and the City's deal regarding the South Terminal was touted by the City as a highly effective public-private partnership. The DOA Executive Director at the time gave an interview to POLITICO in February 2017—shortly before the South Terminal became

operational—as part of an article entitled: "The Cure For America's 'Third-World' Airports."  The

subheading of the article was "Private capital is driving long-overdue improvements."   The

executive director spoke glowingly about the public-private partnership with Lonestar, which had

been called "cutting-edge" and a "test-case" for public-private partnerships at airports.

53.     Pursuant to its obligations under the Agreement, Lonestar infused millions of

dollars into a complete overhaul of the South Terminal.  The interior was demolished and rebuilt.

This was not a cookie-cutter project; it was a bespoke design intended to appeal to the customers

the South Terminal would be serving.  The retro design theme throughout was specifically chosen

to provide a sense of place in the Austin market.  Windows were added, providing the building

with much needed natural light.  Food trucks, kiosks, an indoor and outdoor waiting area with a

stage and bar, and 1,000 parking spaces were added.  All of these investments and improvements

were made at Lonestar's expense and direction.

54.     Photographs of the South Terminal before and after Lonestar's renovation show the

South Terminal's transformation.

### Photos of South Terminal Before Renovation

 



**<u>Photos of South Terminal During Renovation</u>**





**Photos of South Terminal After Renovation**






55.     In addition to the physical renovations, Lonestar invested heavily in infrastructure, such as a new IT system, baggage handling, and other critical systems.

56.     Lonestar also committed the personnel and expertise to make the South Terminal a success.  It hired an exemplary CEO in Jeff Pearse; Mr. Pearse has over 30 years of experience managing airports and airport capital projects, having previously worked at Atlanta's Hartsfield-Jackson Airport, Hong Kong International Airport, and the Port Authority of New York and New Jersey—some of the largest and most complicated airports in the world.  Mr. Pearse relocated from New York City to spearhead the South Terminal construction and operations in August 2015.

Lonestar also took advantage of institutional prior experience within its funding sources with successful operation of airports around the world.  Mr. Pearse and his team spent thousands of hours preparing for the opening of the South Terminal, working with all stakeholders, customers, and vendors to make the South Terminal a success.  During this period, Lonestar also provided additional start-up capital to ensure that the South Terminal operations were well funded, regardless of the initial financial profitability of the enterprise.  Through this entire period, Lonestar strived to ensure that it was a good partner to the City and DOA, knowing that this was the start of a 40-year relationship.

57.     This significant investment built the foundation for Lonestar's success in running a business at the South Terminal delivering ultra-low-cost carrier services to the Austin community.

58.     On April 13, 2017, the South Terminal celebrated its opening with Allegiant Airlines as its first tenant.  The speed with which Lonestar was able to overhaul the South Terminal and acquire its first tenant airline demonstrates the efficiency of the public-private partnership recognized by the DOA at the time, and is a testament to Lonestar's unique strengths, experience, and dedication to performing under the Agreement.

59.     Lonestar has continued to invest tens of millions of dollars into developing and operating its business at the South Terminal since that date.

60.     With its significant capital expenditure, and with only Allegiant as a customer, Lonestar operated the South Terminal at a loss for the first 20 months.

61.     In November 2018, Frontier Airlines moved its operations to the South Terminal from the Main Terminal.  This move created much-needed space for additional flights to the Main Terminal.  With the addition of Frontier, by March 2019, the South Terminal became profitable.

62.     At this time, Lonestar continues to successfully operate the South Terminal, delivering ultra-low-cost-carrier service to the Airport.  It does so through several key contracts, including contracts between Lonestar and (1) airline tenants, Allegiant and Frontier; (2) a food and beverage provider; (3) a terminal management and maintenance provider; (4) media and advertising entities; and (5) ride share companies.

63.     Lonestar has invested significant time and resources into negotiating favorable contracts and building a successful business at the South Terminal.

64.     Each of the contracts Lonestar has negotiated for operation of the South Terminal is premised on Lonestar's ongoing right to occupy the South Terminal.

65.     The revitalization of the South Terminal has been crucial for the Airport's continuing operations more broadly.  The Main Terminal was originally built with an 11 million annual passenger capacity, but it handled 13.9 million passengers in 2017 and almost 16 million passengers in 2018—and in 2022, the Main Terminal is expected to handle more than 20 million passengers.  Those ever-increasing passenger numbers have created, since 2018, a clear need for further Expansion or a New Facility.

### D.     Lonestar and the City Begin Discussions Regarding Expansion of the South Terminal

66.     In Fall 2018, Lonestar began discussions with the City's DOA for an Expansion of the South Terminal to accommodate the future growth of its newest customer, Frontier Airlines. The City, through the DOA, agreed that an Expansion along the lines of what Lonestar proposed was needed.  In fact, the DOA asked Lonestar if it would be interested in an even more substantial Expansion of the South Terminal in a new location ("South Terminal 2.0" or "ST 2.0").  The plan was for South Terminal 2.0 to have an additional six to ten gates (expandable up to 12 gates in the future).

67.     In accordance with Article 15 of the Agreement, Lonestar communicated its interest in investing in and developing ST 2.0 and began developing plans for this new terminal. Discussions between Lonestar and the DOA continued on an almost monthly basis, including about a lease amendment and financial deal to accomplish the plans to develop ST 2.0.

68.     The City actively worked with Lonestar to develop ST 2.0 in recognition of the fact that Lonestar had an enforceable, exclusive right under Article 15 to participate in any expansion of the South Terminal.

69.     Throughout this process, Lonestar invested a significant amount of time and resources into the plans for ST 2.0, continually demonstrating its commitment to its partnership with the City.

70.     In connection with preparing to develop ST 2.0, which was initially on an expedited time frame, Lonestar sought a development partner to provide additional capital and received credible proposals sufficient to fund the proposed development that valued Lonestar's interest in the Agreement at amounts ranging from $135,000,000 to $305,000,000.

71.     Meanwhile, in February 2019 the long-time executive director of the DOA announced his intent to retire.  Discussions between Lonestar and the DOA to finalize the agreement regarding ST 2.0 were put on hold in March 2019 as the parties waited for the arrival of a new executive director.

**E.     The City Breaches Article 15**

72.     With the arrival of the new administration, the DOA's posture toward Lonestar—which had been an exemplary partner to the City and Airport—went from cooperative to adversarial.  With evidence that Lonestar's investments and efforts were successful, the DOA

sought to escape its contractual obligations to prevent Lonestar from expanding the South Terminal and to improperly take control of Lonestar's successful business for the City's own uses.

73.     Despite the DOA's new reluctance to work cooperatively with Lonestar, Lonestar continued to meet with the DOA in good faith to finalize the plans for ST 2.0.  This involved Lonestar explaining the prospective funding, deal structure, and expected timing, and Lonestar reinforcing that it was committed to remaining an integral part of the future of the South Terminal.

74.     Even after the City changed course, Lonestar continued to invest a significant amount of time and resources into the plans for ST 2.0.

75.     In November 2019, right around the time Lonestar was preparing the final bidding process, the City unexpectedly sent Lonestar a letter offering to buy Lonestar's interest in the South Terminal under the Agreement for just $10,000,000—which was far less than the amount that Lonestar had invested in remodeling and operating the South Terminal, and significantly less than the bids Lonestar had received from investors interested in purchasing Lonestar's interests.

76.     This buy-out offer, which was well below market value, not only had a chilling effect on Lonestar's capital raising process, but also came as a surprise given the Agreement did not contemplate or otherwise include a buy-out clause for the City.  Lonestar had been a great partner to the City, had fully complied with the terms of the Agreement (which had 36 years left on the lease), and was in the middle of good faith negotiations under Article 15 for Expansion of the South Terminal.

77.     The City's November 2019 letter stated that "the City is not inclined to approve any expansion of the South Terminal facility," and instead "***wishes to acquire the leasehold***

*interest of the South Terminal facility to regain local control*."  Letter from J. Yaft to J. Burchetta (dated Nov. 7, 2019), attached as Ex. B (emphasis added).

78.     Before Lonestar had a chance to respond, the City released an internal memorandum discussing the City's intention to buy out Lonestar's interest in the South Terminal and provided that memorandum to the press.  An article, published on ABC-affiliate KVUE's website and entitled "City offering $10M to buy Austin airport's South Terminal back," declared that the "airport wants to buy it [the South Terminal] back so that it can have more control over what happens with it in the future."[3]

79.     This press release destroyed real economic value that Lonestar had created, particularly given that Lonestar was in late-stage talks with prospective investors regarding funding for ST 2.0.  The City's actions effectively killed Lonestar's discussions with potential investors.

80.     In essence, the City cut off all "good faith" negotiations, breaching its obligations under the Agreement.  In fact, from this point forward the City's new administration engaged in ongoing course of conduct to deny Lonestar the benefit of its bargained-for rights in the Agreement.

81.     In addition, and unbeknownst to Lonestar, the City also sent a letter to Frontier Airlines (among others)—a key customer for the South Terminal—similarly communicating the City's desire to take over Lonestar's business and clients.

82.     Lonestar communicated to the City that it was not interested in selling its business to the City and reiterated its commitment to enforcing its rights under the Agreement and funding

---

[3]     City offering $10M to buy Austin airport's South Terminal back, KVUE (November 8, 2019), *available at* https://www.kvue.com/article/news/local/city-offering-10m-to-buy-austin-airports-south-terminal-back/269-1c97faed-26b7-487d-84f4-a4ef5d3460ed.

ST 2.0.

83.     The parties continued discussions over the next several months.  During this time, the City acknowledged that the Agreement as written would not allow the City to expand or construct at the airport without Lonestar's involvement, and proposed amending the agreement to limit Lonestar's rights.  In January 2020, the executive director of the DOA wrote: "I propose another meeting to discuss potential modifications to the South Terminal Lease [i.e., the Agreement].  Further dialogue, resulting in amendments to the South Terminal Lease, may allow the City to proceed, unencumbered, with the 2040 Airport Master Plan, while still allowing [Lonestar] to retain much of its interest in the South Terminal Lease." Letter from J. Yaft to J. Burchetta (dated Jan. 27, 2020), attached as Ex. C.

**F.     The City Plans a New Facility That Involves Demolishing the South Terminal**

84.     As negotiations continued, it became clear to Lonestar that the City had no interest in dealing in good faith with Lonestar or recognizing Lonestar's rights under the Agreement.

85.     Instead, in each communication, the City began laying the groundwork to permanently and unlawfully deny Lonestar's rights under the Agreement.  For example, on February 14, 2020, the City stated in writing, for the first time, that it believed Article 15 of the lease was limited to a "right to negotiate" a future expansion of the South Terminal.  Letter from J. Yaft to J. Burchetta (dated Feb. 14, 2020), attached as Ex. D.  This statement runs directly contrary to the clear language and parties' intent and understanding at the time the Agreement was negotiated and executed.  It also runs contrary to the parties' ongoing discussions to that point, in which the City had acknowledged Lonestar's exclusive first right under Article 15 as written.  Lonestar responded to the City's letter the same day, reiterating that Lonestar had a contractual

right to participate in the development of ST 2.0 under the Agreement. *See* Letter from J. Burchetta to J. Yaft (dated Feb. 14, 2020), attached as Ex. E.

86.     Just one month later, in March 2020, the City informed Lonestar that plans for ST 2.0 would not advance and that the City now purportedly intended to demolish the existing South Terminal to build a taxiway in its place.  The City also stated again that it believed Lonestar's Article 15 rights were limited to the mere "right to negotiate." Letter from J. Yaft to J. Burchetta (dated March 3, 2020), attached as Ex. F.

87.     Three days later, Lonestar responded to the City's letter.  Lonestar "reiterate[d] [its] disagreement with [the City's] statement that negotiation is the only right afforded [to Lonestar] under [the] current Lease."  Lonestar also continued to express its intent to invest in a new cost-efficient facility, per Article 15 of the Lease Agreement, and its "commit[ment] to working with… the City of Austin."  Letter from J. Burchetta to J. Yaft (dated March 6, 2020), attached as Ex. G.

88.     Discussions between Lonestar and the City related to airport expansion stalled for the next year as the City took time to re-evaluate the overall scope and timeline for expansion at the Airport in light of the COVID-19 health crisis.  Notably, during this difficult time, Lonestar continued to make timely rental payments to the City, did not lay off any employees, and maintained functional operations.  Lonestar achieved this despite having no material revenue and asking for no assistance from the federal or City government.   Instead, it invested more of its own capital to help the Airport and the City through the difficult time.

89.     On July 13, 2021, without warning or any prior direct communication to Lonestar, the City publicly announced its intention to demolish the South Terminal and build in its place a New Facility—specifically, a midfield concourse with at least 10 new gates and two new taxiways. This new "Airport Expansion Development Plan" or "AEDP" was concocted by the new

administration at the DOA—without any input from, or discussion with, Lonestar—solely for the purpose of taking over Lonestar's business and ousting Lonestar from the Airport.  Indeed, at the same time the City announced the Airport Expansion Development Plan, the City also announced its plan to both buy out Lonestar's interest in the South Terminal and exclude it from any plans for a New Facility going forward.

90.     In a July 13, 2021, letter, the DOA made its intentions clear: "[P]lease contact me within the next ten (10) days to discuss the scheduling of a meeting to begin to negotiate a mutually agreeable purchase price.  If LoneStar fails to respond timely, we will assume LoneStar has no intention to sell its South Terminal leasehold interest voluntarily to the City.  In that event, the City will pursue all other available legal remedies, including condemnation proceedings…." Letter from J. Yaft to S. Litman and T. Molz (dated July 13, 2021), attached as Ex. H.

91.     On July 28, 2021, Lonestar responded to the City's July 13 letter, writing "to confirm again that Lonestar is interested in investing in and exercising its rights under Article 15 of the [Agreement] to develop, construct, and/or operate any such New Facility."  Letter from J. Burchetta to J. Yaft (dated July 28, 2021), attached as Ex. I.  Indeed, Lonestar was "prepared to make a significant financial investment in exercising these rights." *Id*. But despite notifying the City that it was interested in investing in the New Facility, Lonestar made clear that such notification did "not obviate [its] position that there are several alternatives that can fully address the growth of operations at AUS" without removal of the South Terminal.  *Id*.

92.     The City did not engage with Lonestar's stated interest in investing in any Expansion or New Facility pursuant to its Article 15 rights.  Instead, the City has proceeded not only with the development of a New Facility without Lonestar, but has undertaken numerous other

significant development projects without affording Lonestar an opportunity to participate as required by Article 15 of the Agreement.

93.    The City's refusal to honor its obligations under Article 15 serves no legitimate governmental function.  Lonestar remains a willing and capable partner, fully qualified to develop any Expansion or New Facility pursuant to its Article 15 rights.  The City's refusal to honor its obligations under Article 15 is motivated by an improper interest in appropriating a successful business run by a private enterprise partner and in effecting the termination of a long-term agreement that the City no longer wants to perform.

94.    If the City is permitted to deny the enforceability of Article 15, it will result in a manifest injustice to Lonestar.  The Agreement, including the rights granted in Article 15, was unanimously approved just a few years ago by the Austin City Council and publicly hailed and promoted by the City as a model public-private partnership, reflecting the City's understanding, prior to the recent change of Airport administration, that the entirety of the Agreement—including the rights afforded by Article 15—is valid and enforceable.  It would be grossly unjust and inequitable to permit the City now to avoid its valid and enforceable obligations merely because it has changed its mind about the Agreement and wishes to "regain local control" over the Airport.  Allowing the City to "pick and choose" which provisions it wishes to be bound by in an otherwise valid contract fundamentally undermines the basis of the bargain upon which that Lonestar entered into the Agreement as well basic contract law.

### G.    The City Proceeds with Condemnation as a Pretext to Evade the City's Contractual Obligations and Take Lonestar's Business

95.    On March 29, 2022, the City informed Lonestar that the South Terminal was "under the imminence of condemnation" and that the City had valued Lonestar's leasehold interest in the South Terminal at a mere $1,954,000—less than 20% of what it had offered in 2019 and a fraction

of the business's true value.  *See* Letter from T. Forestier to J. Pearse (dated March 29, 2022), attached as Ex. J.  Despite purporting to condemn Lonestar's *entire* interest under the leasehold, including the value of Lonestar's going-concern business, and its forward-looking rights under Article 2 and Article 15, the City's offer valued only the real estate subject to the Agreement, and took the position that "***there are no enforceable rights pertaining to Article 15***," and therefore, Article 15 "was not part of [the] scope of the appraisal." *Id.*

96.     In other words, the City expressed its intent to pay only for the real estate itself, even though it seeks to take Lonestar's entire business and all of Lonestar's contractual rights under the Agreement, including its right to operate and expand its business and its right of first refusal under Article 15 with respect to investing in any New Facility.  The City's conduct violates the City's commitment not to engage in any act for the purpose of avoiding its obligations under the Agreement as set forth in Article 41.13 of the Agreement.  It also violates well-settled constitutional principles, which entitle Lonestar to just compensation.  And it runs directly contrary to Section 34 of the Agreement, which provides that, in the event of a lawful taking of Lonestar's Interest, the City must compensate Lonestar for the fair market value of any Lonestar Interest that is taken.

97.     On April 18, 2022, pursuant to Section 40.01 of the Agreement, Lonestar invoked the Agreement's dispute resolution process and requested a meeting with the City "to attempt in good faith to negotiate a resolution of the dispute." Letter from J. Pearse to J. Yaft (dated April 18, 2022), attached as Ex. K.

98.     Then, Lonestar sent a formal letter rejecting the City's offer and highlighting the City's "bad-faith attempt to wrongfully circumvent the terms of the concession agreement and

deprive Lonestar of the benefit of its bargain." Letter from C. Clough to T. Forrestier (dated April 27, 2022), attached as Ex. L.

99.     A month later, the City presented to Lonestar its "final offer" for the premises, in the amount of $1,954,000.  *See* Ex. M (May 16, 2022 Final Offer Letter and attached Appraisal Report).  The offer was based on a written appraisal that, among other things, fails to value Lonestar's going-concern business and expressly declined to value Lonestar's Article 15 rights. *Id.*

100.    On June 16, 2022, the City obtained approval from the City Council—including from members who had voted in favor of the Agreement just a few years earlier—to initiate condemnation proceedings without an opportunity for public debate.

101.    On June 17, 2022, the City filed its Petition for Condemnation.

102.    On July 13, 2022, the Travis County Probate Court appointed commissioners in the condemnation case.

103.    The condemnation proceeding remains in an administrative phase, with no judge or court exercising control over it.

104.    To date, despite Lonestar's providing its availability for a hearing before the commissioners, the City has made no effort to set such a hearing.

105.    The City is improperly weaponizing these proceedings to condemn Lonestar's business and interests in the Agreement—so it can operate Lonestar's business itself—while compensating Lonestar only for the value of the real estate. The City has no valid public purpose for condemning Lonestar's rights under the Agreement, but instead intends to abuse that procedure in bad faith for the sole purpose of avoiding contractual obligations that it freely entered.

### H.  Texas Eminent Domain Procedure

106.    Under the Texas Property Code, a condemning authority can acquire a right of possession before the condemnee is afforded the ability to contest the validity of the taking—commonly referred to as a "quick take" statute.  *See* Tex. Prop. Code § 21.001, *et. seq*.

107.    Specifically, under the Texas Property Code, once an eminent domain petition describing the property interests that the condemning authority wishes to condemn is filed, a panel of three special commissioners is appointed.  *Id.* § 21.014.

108.    The special commissioners consider the value of the property taken (and the damages to any property not taken) and issue an award.  *Id.* §§ 21.014, 21.015.  Once that award is issued, the condemnor may take possession of the property so long as it pays the amount set forth in the special commissioners' award.  *Id.* § 21.021.

109.    The property owner may contest the validity of the taking on appeal, but only after the filing of objections to the award, which can occur after the condemning authority has already entered and taken possession of the property.  *Id.* § 21.018.

110.    Further, in the typical eminent domain case, when the property owner's real estate is taken, his business can be relocated to a new location.  Thus, because the typical case assumes the potential relocation of any business displaced by a taking of real estate, the quick-take process does not provide a framework for ensuring just compensation for a taking of a going-concern value of a business.  *City of Blue Mound v. Sw. Water Co.*, 449 S.W.3d 678, 683-4 (Tex. App.—Fort Worth 2014, no pet.) (explaining that because usually "the property owner is free to move his business to another location," the "general rule is that the taking by the government of a fee simple in real property does not entitle a property owner to compensation for loss of the value of his

business as a going concern").  In this case, however, Lonestar obviously has no ability to relocate its business.

111.    Notwithstanding the well-settled requirement of just compensation, the City also made it abundantly clear that it intends to compensate Lonestar only for the value of the real estate through its state condemnation process.  The City has expressly stated its position that "lost business income, profits, capital investments and any alleged return on those investments are . . . not compensable" in the condemnation process.  Letter from T. Forestier to C. Clough (dated May 11, 2022), attached as Ex. N.  Moreover, the City's appraisal offer and condemnation Petition make plain that the City's valuation is based only on the real estate itself, excluding the value of Lonestar's business and its very significant rights and interests under the Agreement.  Ex. J (City's Appraisal); *see also* Plaintiff's Original Statement and Petition for Condemnation (dated June 17, 2022), attached as Ex. O.  The City has accordingly made clear that it intends to co-opt the Texas quick-take procedure to obtain immediate possession of Lonestar's business while only compensating Lonestar for the value of Lonestar's interest in the real estate on which Lonestar developed that business under an express contract with the City.

112.    The United States Supreme Court has held that a condemnation process cannot ignore going concern value where, as here, "the Government has condemned business property with the intention of carrying on the business, as where public-utility property has been taken over for continued operation by a governmental authority.  If, in such a case, the taker acquires going

concern value, it must pay for it." *Kimball Laundry Co. v. United States*, 338 U.S. 1 at 12, 69 S. Ct. 1434, 93 L. Ed. 1765 (1949).

113.    *Blue Mound*, the leading Texas case on this issue, recognized the fundamental shortcomings of the Texas eminent domain process for the valuation of a going concern when such is required under *Kimball Laundry*, and ultimately held that such a taking is void:

> Because as a matter of law the City is attempting to condemn Appellees' water and wastewater system as a going concern, because as a matter of law Appellees are entitled to compensation for going-concern value as an element of this purported taking, because the general Texas condemnation statutes provide no mechanism for the awarding of going-concern value as held in *Lone Star Gas Co.*, and because *Lone Star Gas Co.* remains binding precedent, we hold that Appellees conclusively established their entitlement to summary judgment on the ground that no statutory procedures exist authorizing the City's condemnation suit in this case in district court.

*Blue Mound*, 449 S.W.3d at 692–93.

114.    The situation here is even more problematic because the City is not attempting to condemn a fee simple or easement interest in land, but rather is condemning contractual rights arising under an agreement the City itself entered into, for land it already owns.  That agreement includes significant rights to not only run a business at the Airport but also to develop, construct, and operate any Expansion or New Facility at the Airport.  And, in reliance on that Agreement, Lonestar has developed a significant business that it can only operate at the South Terminal.

115.    The City's attempt to abuse the condemnation process and take unlawful advantage of the quick-take procedure to nullify Lonestar's rights under the Agreement and gain possession of Lonestar's business—without compensating for Lonestar's business or its valuable rights under

the Agreement—is a violation of Lonestar's constitutional entitlement to just compensation, Texas Law, and the Agreement.

116.    Quick take procedures are uniquely subject to abuse. *See Dep't of Pub. Works & Bldgs. v. Vogt*, 366 N.E.2d 310, 316 (Ill. App. 1977) ("[I]t is an abuse of power for a condemning authority to 'quick take' property under the pretense of imminent necessity when there exists only some possibility of need at an indefinite future date."); *Transwestern Pipeline Co. v. 17.19 Acres of Property Located in Maricopa County*, 550 F.3d 770, 774 (9th Cir. 2009) (recognizing that quick take procedures are an exception to the usual rule that government takes possession only after a determination of just compensation).   Indeed, courts have recognized that, when government entities coopt quick take procedures merely to avoid contractual obligations to third parties, it is nothing more than "municipal thuggery."   *See, e.g., Union Station Assocs. v. Rossi*, 862 A.2d 185, 187 (R.I. 2005).

**I.    The City's Unlawful Abuse of the Condemnation Process Will Cause Lonestar Irreparable Harm**

117.    While pressing forward with its improper attempt to condemn business without compensation, the City has breached the Agreement by moving forward with the AEDP without providing Lonestar any ability to participate in the development, construction, or operation of the New Facility contemplated by the AEDP.   The City never even presented the AEDP to Lonestar before announcing it as the City's official plan—nor did it provide Lonestar its contractually-guaranteed ability to provide input or comment on development of the plan for New Facilities at the Airport.

118.    Since categorically announcing the AEDP as the "best" option for the City, the City has moved forward with the AEDP—again, without Lonestar.   Specifically, the City has issued bonds for constructing the AEDP; put out RFPs for engineering, architecture, and other contractors

for the project; and engaged a project manager.  In other words, the New Facility contemplated by the AEDP—exactly the sort of facility Lonestar has a right to develop under Article 15—is well underway, and Lonestar was never provided any opportunity to participate in any way in the development, construction, or operation of the Facility.  Lonestar's exclusion from these processes causes Lonestar ongoing harm; Lonestar is contractually entitled to be involved in the ongoing development process but has instead been wrongfully excluded.  Further, the City is using the AEDP as an excuse to snuff out Lonestar's bargained-for contractual rights under the Agreement and seize its business at the South Terminal.

119.   In addition, upon information and belief, the City has engaged in other significant Capital Development projects at ABIA without including Lonestar.  These include development, construction, and operation of the Blue Parking Garage, the Department of Aviation Administration Building, the Remain-Overnight-Parking for aircraft, the Barbara-Jordan Terminal Concession Program, the landside travel plaza commercial development, and the West-side Aircraft Fuel Farm.  Engaging in these Expansions and New Facilities without affording Lonestar an opportunity to participate violated Lonestar's contractual rights.

120.   In addition to breaching its obligations to Lonestar—and refusing to compensate Lonestar for those rights in the condemnation proceeding—the City also has taken affirmative steps to take over Lonestar's business at the South Terminal.

121.   The City has reached out to Lonestar's business partners as well as its key customers, Allegiant and Frontier, about transitioning to contracts with the City.   The City

informed Allegiant and Frontier, Lonestar's airline tenants, that Lonestar will not be operating the South Terminal after November of 2022.

122.    The City has also contacted two of Lonestar's other primary business partners, ClearedDirect, LLC and Happy Goods, Inc., stating that it wishes to develop a "transition plan for the future" regarding the South Terminal

123.    In a bond prospectus it issued on April 26, 2022, the City stated that it expected the South Terminal to continue to operate through the end of 2023. Ex. P at p. 154, Airport System Revenue Bonds, Series 2022 (dated April 26, 2022).

124.    The City has also demanded meetings with Lonestar to discuss the "transition" of its business at the South Terminal to the City.

125.    The City's attempt to condemn Lonestar's leasehold interest and take Lonestar's business violates well-settled Texas law because the Texas Property Code does not authorize the City to take Lonestar's business so that it may operate that business itself.  The fact that the City has evinced an intent *not* to pay for Lonestar's business rights under the Agreement further supports the unlawfulness of the City's condemnation attempt, as well as the constitutional infirmity of the state eminent domain system which, as applied in these circumstances, will allow the City to take a going concern business prior to any challenge to that taking, and without providing any compensation for that business.

126.    Further, the City's attempt to pay only for Lonestar's interest in the physical real estate impacted by the Agreement disregards Lonestar's rights under the Agreement, including its right to operate the South Terminal and develop and operate New Facilities.  The City cannot re-write a contract that it voluntarily entered into merely because a new administration has a different view as to the desirability of public-private partnerships, especially after reaping the benefits of

that partnership. And it certainly cannot take Lonestar's business without honoring Lonestar's Fifth Amendment right to just compensation.

127. If the City's condemnation is allowed to proceed, Lonestar will be irreparably harmed because, by operation of the Texas quick-take procedure, the City will be allowed to take possession of Lonestar's business (including all of its contractual relationships with airlines, vendors, and service providers), terminate the Agreement, and potentially demolish the South Terminal without just compensation before Lonestar has the ability to challenge the legality of the City's condemnation. Where, as here, a going concern business is at issue, the harm that results from the City's conduct and the Texas procedure is irreparable. Moreover, if the City proceeds as planned, it would be impossible to restore Lonestar's current business at the South Terminal, even if Lonestar's challenge to the condemnation process ultimately prevails, further demonstrating the irreparable harm posed by the City's conduct.

128. Lonestar's ability under the Texas condemnation procedure to challenge the lawfulness of the City's action arises only after the taking has already occurred. The City's possession of the South Terminal, even if only temporary, will cause Lonestar significant and irreparable harm to its business. Immediately upon taking possession of the South Terminal, the City will either terminate or take over all of Lonestar's contracts. And Lonestar will be required to terminate key employees and executives who are instrumental to the success of the South Terminal. In the event Lonestar successfully challenges the condemnation and returns to the South Terminal (assuming it is able to do so before the City demolishes it) the damage to Lonestar's business will be done—including harm to Lonestar's relationships with its customers, as well as harm to Lonestar's ability to attract airline customers and renegotiate favorable contracts. Once

the taking has occurred, money damages will be insufficient to compensate Lonestar for the loss of its business.

### J. Lonestar Has Fulfilled its Obligations Under Article 40 and Is Entitled to Seek Damages

129.    Article 40 of the Agreement requires that "[s]hould any dispute arise between the Parties," then Lonestar and the City "agree to negotiate prior to prosecuting a suit for damages." Lonestar diligently pursued a resolution of this dispute pursuant to the requirements of Article 40.

130.    Specifically, Lonestar initiated the dispute resolution processes under Article 40 based on the existence of multiple disputes between the parties; served a "Notice of Mediation" required by Article 40; and participated in good faith in meetings between representatives of the parties as required by Article 40.

131.    Lonestar and the City participated in an initial mediation session on August 12, 2022 and a follow-up mediation session on August 28, 2022. The mediation sessions were conducted in Austin, Texas in accordance with Article 40.   The mediation efforts were unsuccessful.

132.    Because Lonestar has fully complied with its obligation to participate in good faith negotiations and mediation under Article 40, it is permitted to assert claims for damages against the City.

133.    Based on market valuations and other intrinsic and extrinsic evidence, the City's actions have damaged Lonestar and diminished the value of its business by hundreds of millions of dollars.  Lonestar also is entitled to damages for the lost opportunity to develop and operate any Expansion or New Facility that the City ultimately constructs in violation of Lonestar's contractual rights.  Prior to the City's actions, one market participant had valued Lonestar's business at over $300 million, and Lonestar expects to prove hundreds of millions in damages directly caused by

the City's unlawful actions taken in violation of the Agreement and the United States and Texas Constitutions. Even these monetary damages, however, will be inadequate to compensate Lonestar for the ongoing injury that the City is causing by depriving Lonestar of its contractual and constitutional rights.

## CLAIMS FOR RELIEF

**COUNT I:  Violation of the Fifth and Fourteenth Amendments of the U.S. Constitution, Pursuant to 42 U.S.C. § 1983 and the Court's Equitable Powers**

134.   Lonestar repeats and reiterates the allegations above as if fully set forth herein.

135.   The Fifth Amendment to the U.S. Constitution provides that "private property [shall not] be taken for public use, without just compensation." This requirement has been incorporated against the states via the Fourteenth Amendment.

136.   Acting under color of law, the City has proximately caused and is imminently threatening wrongful deprivation of Lonestar's constitutional rights secured under the Fifth and Fourteenth Amendments by pursuing a condemnation of Lonestar's going concern business at the South Terminal and all of Lonestar's rights and interests under the Agreement—including the value of its contractual rights under Article 15 to "develop, construct and operate" any "Expansion or New Facility"—without just compensation.

137.   Acting under color of law, the City has further proximately caused and is imminently threatening additional wrongful deprivation of Lonestar's constitutional rights secured under the Fifth and Fourteenth Amendments, by pursuing wrongful condemnation proceedings that are unsupported by a valid public purpose and impermissibly attempt to seize Lonestar's "going concern" business so that the City may operate that business itself.

138.   The City is using its condemnation authority for the purpose of avoiding its contractual obligations to Lonestar rather than for any valid public purpose.

139.     Lonestar cannot operate its business elsewhere.

140.     The City's decision to violate Lonestar's Fifth and Fourteenth Amendment rights was directed by, and the product of, an official decision, implemented by the City, the DOA, and the DOA's Executive Director.

141.     Under Texas's quick take procedure, the City has indicated its intent to take Lonestar's going concern business at the South Terminal and all of Lonestar's rights and interests under the Agreement before Lonestar has the ability to challenge the legality of the taking. Lonestar therefore cannot obtain just compensation in the state court condemnation proceeding.

142.     Lonestar seeks a preliminary and permanent injunction to prevent the City's ongoing violation of Lonestar's rights under the Fifth Amendment.

143.     Lonestar lacks an adequate remedy at law for the City's current and threatened unconstitutional actions, thus warranting such preliminary and permanent injunctive relief.

144.     In the alternative, to the extent the Court declares that Lonestar has an adequate remedy at law, Lonestar reserves the right to seek money damages for the harms caused by the City's violation of the Fifth and Fourteenth Amendments, in an amount to be determined at trial.

145.     The City does not have governmental immunity for actions that are unconstitutional.  *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009).

**COUNT II: Request for Declaratory Judgment as to the City's Unconstitutional Taking**

146.     Lonestar repeats and reiterates the allegations above as if fully set forth herein.

147.     The Declaratory Judgment Act, 28 U.S.C. § 2201, provides, "In a case of actual controversy within its jurisdiction … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration

shall have the force and effect of a final judgment or decree and shall be reviewable as such."
Courts are also empowered to provide "[f]urther necessary or proper relief based on a declaratory
judgment." *Id*. § 2202.

148.    As set forth herein, the City has violated Lonestar's constitutional rights secured
under the Fifth and Fourteenth Amendments by condemning Lonestar's rights and interests under
the Agreement, and by impermissibly attempting to seize Lonestar's "going concern" business,
without just compensation.

149.    Lonestar is entitled to a declaration that the City's actions constitute an unlawful
taking without just compensation, in violation of the Fifth and Fourteenth Amendments.

150.    Lonestar further requests a declaration that it must be paid business value for the
taking of its going concern business.

151.    The City does not have governmental immunity from declaratory judgment actions
seeking to determine or protect a party's rights.  *See Fed. Sign v. Texas S. Univ*., 951 S.W.2d 401,
404 (Tex. 1997).

### COUNT III:  Violation of Article I, Section 17 of the Texas Constitution

152.    Lonestar repeats and reiterates the allegations above as if fully set forth herein.

153.    Article I, Section 17 of the Texas Constitution provides that "[n]o person's property
shall be taken, damaged, or destroyed for or applied to public use without adequate compensation
being made."

154.    The City has violated Article I, Section 17 of the Texas Constitution by depriving
Lonestar of its rights and interests under the Agreement, by pursuing a condemnation of Lonestar's
going-concern business and all of its contractual rights under the Agreement—including the value

of its contractual rights under Article 15 to "develop, construct and operate" any "Expansion or New Facility"—without just compensation.

155.    The City has also violated Article I, Section 17 of the Texas Constitution by pursuing wrongful condemnation proceedings that are unsupported by a valid public purpose and impermissibly attempt to seize Lonestar's "going concern" business.

156.    The City is using its condemnation authority to shirk its contractual obligations to Lonestar, rather than for any valid public purpose.

157.    Lonestar cannot operate its business elsewhere.

158.    Under Texas's quick take procedure, the City intends to take Lonestar's going concern business at the South Terminal and all of Lonestar's rights and interests under the Agreement before Lonestar has the ability to challenge the legality of the taking. Lonestar therefore cannot obtain just compensation in the state court condemnation proceeding.

159.    Lonestar seeks a preliminary and permanent injunction to prevent the City's ongoing violation of Lonestar's rights under Article I, Section 17.

160.    Lonestar lacks an adequate remedy at law for the City's current and threatened unconstitutional actions, thus warranting such preliminary and permanent injunctive relief.

161.    Lonestar also seeks money damages for the harms caused by the City's violation of Article I, Section 17 of the Texas Constitution, in an amount to be determined at trial.

162.    The City does not have governmental immunity for claims alleging violation of Article I, Section 17. *Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex. 1980).

## COUNT IV:  Breaches of the Agreement

163.    Lonestar repeats and reiterates the allegations above as if fully set forth herein.

164.    The Agreement is a valid and enforceable contract between Lonestar and the City that contains all material terms.

165.    Lonestar has performed all of its obligations under the Agreement, including by investing millions of dollars into the renovation of the South Terminal and paying all rents and other sums owed to the City under the Agreement.

166.    As explained in more detail below, the City has and continues to breach multiple provisions of the Agreement.

167.    Lonestar seeks specific performance, and a preliminary and permanent injunction to prevent the City's ongoing breaches of the Agreement.

168.    Lonestar also seeks money damages for the City's violation of the Agreement, in an amount to be determined at trial, for the City's prior conduct and in the alternative, to the extent the Court deems that Lonestar has an adequate remedy at law, for damages arising from the City's future threatened and ongoing breaches of the Agreement.

169.    Lonestar has satisfied the requirements of Article 40 to the extent it establishes a condition precedent to Lonestar's initiating a suit for damages, as well as any other conditions precedent to asserting claims for damages against the City.

170.    The City has agreed to "waive[] its rights to assert sovereign or governmental immunity from suit or liability for contract claims asserted by [Lonestar]" set forth in section 29.02.

171.    The Texas legislature has waived governmental immunity where a municipality enters into a "written contract stating the essential terms of the agreement for providing goods and services to the local governmental entity." Tex. Loc. Gov't Code § 271.151(2)(A). The Agreement

is a written contract containing all essential terms, and it involves the provision of services to the City.

*Article 2.03*

172.    Article 2.03 of the Agreement contains a covenant of quiet enjoyment, which grants Lonestar the right to "peaceably and quietly have, hold, occupy, use and enjoy the Premises during the Term, and may exercise all of its rights hereunder, without ejection or interference by Owner or any person or entity claiming by, through or under Owner, subject to the provisions of this Lease and Applicable Law."

173.    Article 2.03 represents an enforceable agreement between the City and Lonestar. Despite the parties' initial commitment to the Agreement, the City has since adopted a course of conduct that repeatedly fails to recognize and uphold Lonestar's rights and has "interfere[d]" with Lonestar's ability to quietly occupy, use and enjoy the South Terminal for the purposes set out in the Agreement, including by the City's improper attempt to use condemnation to avoid the City's obligations under the Agreement and the City's actions to interfere with Lonestar's business relationships.

174.    The City's material actions substantially interfere with Lonestar's intended use and enjoyment of the Premises and threaten a permanent deprivation of Lonestar's use and enjoyment of the Premises.

175.    In particular, the City interfered with Lonestar's right of quiet enjoyment when it indicated that "the City is not inclined to approve any expansion of the South Terminal facility" and that it instead "wishe[d] to acquire the leasehold interest of the South Terminal facility to regain local control." Ex. B.  The City's communication was not just an offer to buy out Lonestar's lease but was a notification to Lonestar's airline customers, employees, vendors, and potential

investors of the City's intent to take control of the property and stop ST 2.0—which was a significant undertaking specifically designed to serve the City's needs and that Lonestar had devoted significant resources to for over a year.

176.    The City's communication in November 2019, and similar communications thereafter, effectively halted Lonestar's plans regarding ST 2.0 and interfered with its ability to exercise its right to "peaceably and quietly have, hold, occupy, use any enjoy" the property that it bargained for in the Agreement, including by thwarting efforts to raise capital and solicit bids.

177.    Similarly, the City interfered with Lonestar's right of quiet enjoyment when it—without notice to Lonestar—sent a letter to Frontier Airlines communicating the City's desire to buy-out Lonestar and regain control of the Terminal.

178.    The City also released an internal memorandum discussing the City's intention to buy out Lonestar's interest in the South Terminal under the Agreement, which was picked up by the press, published, and disseminated in a news article to third parties.

179.    This unilateral and unsolicited communication to a key customer for the South Terminal, as well as other airlines serving the Airport, coupled with the City's revelation of its position to the press, interfered with Lonestar's ability to attract new investors for ST 2.0, to obtain additional customers for the South Terminal, and to further develop ST 2.0.

180.    Additionally, the City violated Article 2.03 when it communicated its position in early 2020 that it intended to demolish the South Terminal and build a New Facility, purportedly requiring the City to pursue condemnation of Lonestar's rights to the South Terminal.

181.    Then, in its March 29, 2022 condemnation notice to Lonestar, the City formally made clear its position that it would not honor any of Lonestar's rights under Article 15.

182.     These communications, beginning in November 2019, have materially and negatively affected Lonestar's business.  The public nature of the DOA's threats to the South Terminal's existence put an immediate chilling effect on Lonestar's ability to obtain financing and operate its business—to attract new airline customers, attract and retain talent, and damages its relationship with its business partners.  This is evidenced in the relative passenger numbers at the two terminals.

183.     In 2019, the South Terminal served 1,077,912 passengers, while the Main Terminal served 16,266,637 million passengers.  To date in 2022, the South Terminal has served 256,660 passengers and the Main Terminal has served 9,738,825 passengers.  In other words, in 2019, the South Terminal represented 6.64% of the passenger traffic in Austin, but today the South Terminal represents just 2.64% of the traffic.  By publicly and privately calling into question the future viability of the South Terminal, the DOA has intentionally and severely damaged the business of Lonestar, and therefore has significantly impaired the value of Lonestar's business.  This targeted campaign has deprived Lonestar of the fundamental rights Lonestar signed up for in Section 2.03 of the Agreement.

184.     The City's conduct has permanently interfered with Lonestar's ability to operate its business as granted pursuant to the Agreement, and to develop, construct, and operate any Expansion or New Facility at the South Terminal, two essential aspects of the Agreement that form the basis of the bargain.

185.     These actions encapsulate the kind of improper interference with Lonestar's right of quiet enjoyment that Article 2.03 of the Agreement is designed to prevent.

186.    Lonestar is not required to abandon the premises to assert a claim that the City has breached its contractual promise of quiet enjoyment. *See Goldman v. Alkek*, 850 S.W.2d 568, 572 (Tex. App.—Corpus Christi 1993, no writ).

187.    Lonestar seeks specific performance, and a preliminary and permanent injunction to prevent the City's ongoing breaches of Article 2.03.

188.    Lonestar seeks money damages for the City's past breaches of Article 2.03.

*Article 15*

189.    Article 15 of the Agreement provides Lonestar "with the exclusive first right to, as applicable, develop, construct and operate" any "Expansion or New Facility" at the Airport.

190.    Article 15 contains all material terms and is sufficiently definite to enforce.

191.    Article 15 was heavily negotiated, approved by an Assistant City Attorney, and its essential terms were considered and approved three times by the Austin City Counsel.

192.    Article 15 was a material part of the Agreement.

193.    The City first breached Article 15 in the fall of 2019 when—after the parties agreed Expansion was necessary, Lonestar exercised its option under Article 15, and the parties were in active negotiations to reach an agreement with respect to ST 2.0—the City cut off all negotiations regarding ST 2.0.

194.    Specifically, Lonestar initially tendered performance under Article 15 when it began discussions with the City, through the DOA, in the fall of 2018 for a small Expansion of the South Terminal.  At that point, Lonestar had decided that an Expansion was needed and provided notice of such to the City.  The City agreed to the need for an Expansion when the DOA suggested developing something more substantial on a new location (what later became known as ST 2.0). Finally, Lonestar provided notice of its intent to invest in ST 2.0, began to develop plans for the

ST 2.0, and embarked on a process to raise funding for the development and construction of ST 2.0.

195.    At that point in time, the City was obligated to work with Lonestar in good faith to enter into an agreement regarding ST 2.0.  The City did so through late 2018 and the early months of 2019.

196.    The City breached its obligations under Article 15, however, when the DOA's new Executive Director notified Lonestar on November 7, 2019, that "[a]t this time, the City is not inclined to approve any expansion of the South Terminal facility." This statement was directly contrary to the DOA's prior express approval of ST 2.0 and constitutes a breach of the City's obligation to work in good faith to reach an agreement once the parties agree to the necessity of Expansion.

197.    In a clear demonstration that the City was declining to honor Lonestar's Article 15 rights, the November 7 letter also included "written notice . . . of [the City's] desire to acquire the South Terminal leasehold interest to regain local control of the facility." Ex. B.  In other words, the City was refusing to partner with Lonestar for future Expansion at the Airport in direct contravention of the express terms of the Agreement inked just a few years prior.

198.    The City again breached Article 15 when it announced the need for a New Facility and—despite Lonestar's express invocation of its Article 15 right with respect to the New Facility contemplated by the AEDP—denied Lonestar's right to participate in any way in the New Facility.

199.    Specifically, as early as February 2020, the City notified Lonestar of plans for a new cost-efficient facility at the Airport as part of the City's AEDP.  At the same time, the City denied that the Agreement "confer[s] any right of first refusal to Lonestar in any manner at AUS." Ex. F.

200.    Despite the City's express refutation of the terms of the Agreement, Lonestar—pursuant to Article 15—provided written notice to the City of its interest in working with the City in developing the new cost-efficient facility at the Airport.  *See* Ex. G.

201.    Then, in a July 13, 2021 press release, the City publicly announced the City's plan to add a new concourse (as well as two new taxiways).  According to the DOA, the City's plan for a New Facility would require the City to condemn Lonestar's rights to the South Terminal.  The City sent Lonestar a letter the same day confirming the City's plan for New Facilities at the Airport (July 13, 2021 letter).

202.    Lonestar tendered performance under Article 15 through a formal, written response confirming (again) Lonestar's interest in investing in and exercising its rights under Article 15 of the Agreement.  *See* Ex. I.   The City again breached its obligations under Article 15 by categorically denying Lonestar its exclusive first right to invest.

203.    Instead of proceeding with good faith negotiations with respect to plans for the New Facility—as required by Article 15—the City notified Lonestar of its intent to condemn the South Terminal to remove Lonestar from the Airport altogether.  At the same time, the City has moved forward with developing and constructing the AEDP, including by engaging contractors and project managers after a RFP process, without involving Lonestar, as Article 15 requires.

204.    In its March 29, 2022 condemnation notice to Lonestar, the City made clear its position that it would not honor any rights under Article 15 by refusing to value those rights as purportedly "unenforceable."  Ex. J.  In other words, the City is purporting to condemn the South Terminal in furtherance of the AEDP, while at the same time denying Lonestar's right to participate in the development of the New Facilities contemplated by the plan.

205.    Because the City both refused to compensate Lonestar for its Article 15 rights through the condemnation while also refusing to honor those rights with respect to the New Facility, the City has breached (and continues to breach) Article 15 and is liable to Lonestar for damages flowing from that breach.

206.    The City separately has breached the Agreement by developing, constructing, and operating Expansions and New Facilities at the Airport without affording Lonestar its contractual right of participation.

207.    The City remains in breach of the Agreement by proceeding with the AEDP without allowing Lonestar its contractually guaranteed participation.

208.    Having benefited from Lonestar's significant investment in the South Terminal, which was predicated on Lonestar's exclusive right to participate in any expansion, the City is estopped from denying the enforceability of Article 15.   Allowing the City to deny the enforceability of Article 15 would work severe prejudice to Lonestar and would be unconscionable.

209.    Estoppel is necessary to prevent manifest injustice to Lonestar and will not impair any governmental function. *See City of Hutchins v. Prasifka*, 450 S.W.2d 829, 836 (Tex. 1970).

210.    Lonestar seeks specific performance, and a preliminary and permanent injunction to prevent the City's ongoing breaches of Article 15.

211.    Lonestar seeks money damages for the City's past breaches of Article 15.

*Article 34*

212.    Nothing in the Agreement permits the City to exercise its general eminent domain authority for the primary purpose of breaching its contractual obligations or interfering with Lonestar's rights under the Agreement.

213.    The Agreement instead addresses a situation where a governmental entity exercises its general eminent domain authority for other lawful public purposes.  In those circumstances, Article 34.03 of the Agreement provides that "[i]f the condemning authority is the City, Tenant shall be entitled to compensation for the Fair Market Value of Tenant's Interest so taken."

214.    The Agreement further defines "Tenant" to be Lonestar and "Tenant's Interest" to mean "Tenant's right, title and interest in, to, under or derived from this Lease, including the rights of Tenant under Article 2 and Article 15, and the Trade Fixtures." Agreement, ¶ 1.01.

215.    Article 34 does not expand or otherwise modify the City's authority to use eminent domain beyond what is otherwise authorized by law.

216.    The express terms of Article 34.03 obligate the City to compensate Lonestar for its rights under Article 2 and 15 in the event of a taking of Lonestar's entire interest under the Agreement.  Despite these provisions in the Agreement, the City has breached its contractual obligations by condemning the South Terminal and Lonestar's rights without offering to provide compensation for Lonestar's "Interest," as defined in the Agreement.

217.    Instead, the City has offered to compensate Lonestar only for the value of the land itself, even though the Agreement explicitly requires "the Fair Market Value of Tenant's Interest so taken" to be included in any award.

218.    The City's breach deprived Lonestar of its rights and Interests negotiated for and memorialized in the Agreement.

219.    Having benefited from Lonestar's significant investment in the South Terminal, which was predicated on Lonestar's right to receive compensation for its entire interest under the Agreement in the event the City elected to condemn the South Terminal, the City is estopped from exercising its condemnation power without paying Lonestar the compensation it is owed under the

Agreement. Allowing the City to condemn the South Terminal without paying such full compensation would work severe prejudice to Lonestar and would be unconscionable.

220.    Estoppel is necessary to prevent manifest injustice to Lonestar and will not impair any governmental function. *See Prasifka*, 450 S.W.2d at 836.

221.    Lonestar seeks specific performance, and a preliminary and permanent injunction to prevent the City's ongoing breaches of Article 34.

222.    Lonestar seeks money damages for the City's past breaches of Article 34.

*Article 41*

223.    Article 41.13 prevents the City from "taking any action the primary purpose of which is to avoid honoring any of its commitments and obligations" under the Agreement.

224.    Article 41.13 represents an enforceable agreement between the City and Lonestar.

225.    The City breached Article 41.13 by taking actions that are specifically designed to prevent Lonestar from exercising its rights under the Agreement, including, but not limited to, Lonestar's Article 15 right as described above.

226.    In addition, the City's condemnation proceeding is a clear pretext for avoiding the City's obligations under the Agreement altogether, including the 40-year grant to Lonestar to operate facilities at the Airport, and instead, operate Lonestar's business itself.

227.    By preventing Lonestar from exercising such rights, the City took an action the primary purpose of which was to avoid honoring its commitments and obligations to Lonestar under the Agreement.

228.    Such improper interference constitutes a clear breach of Article 41.13.

229.    Lonestar seeks specific performance, and a preliminary and permanent injunction to prevent the City's ongoing breaches of Article 41.

230.    Lonestar seeks money damages for the City's past breaches of Article 41.

*Article 18*

231.    Article 18.05 provides that the City "shall provide, at no cost to Tenant, Shuttle Bus Service for passengers and employees between the South Terminal and the North Terminal/CONRAC facility." It further provides that "[o]peration of the Shuttle Bus Service shall be sufficiently coordinated with the arrival and departure of commercial airline flights at the South Terminal in accordance with Tenant's Airport Operational Manual as approved by Owner to accommodate actual passenger traffic levels and projected passenger traffic levels provided by Tenant to Owner."

232.    The City consistently has failed to provide reliable shuttle bus service contemplated by this provision.

233.    Their shuttle-bus service provider rarely has the staff resources necessary to operate the number of shuttles required to meet passenger demand.

234.    The problem is exacerbated by the poor signage the DOA provides to passengers flying Allegiant and Frontier from the South Terminal. In many cases, passengers erroneously park at the north terminal believing their Allegiant and Frontier flights depart there – only to find out once inside that such flights operate at the South Terminal. Hundreds of passengers have missed their flights from the South Terminal in the last five years due to poor signage and inadequate shuttle bus service.

235.    Lonestar has supplemented the City's shuttle service at its own cost. Since January 2022, alone, Lonestar has operated more than 1,000 trips to and from the Main Terminal. The direct, indirect, and opportunity costs associated with using Lonestar shuttles and staff has exceeded hundreds of thousands of dollars.

236.    Further, Lonestar took it upon itself to improve access roadways to the South Terminal that are not even on its leasehold because the City of Austin refused, and Lonestar was committed to the safety and efficiency of its passengers and operations.

237.    The City's failures amount to a clear breach of Article 18.

238.    Lonestar seeks specific performance, and a preliminary and permanent injunction to prevent the City's ongoing breaches of Article 18.

239.    Lonestar seeks money damages for the City's past breaches of Article 18.

### COUNT V: Promissory Estoppel – Article 34
### (In the Alternative)

240.    Lonestar repeats and reiterates the allegations above as if fully set forth herein.

241.    To the extent the City is not legally obligated under Texas law to compensate Lonestar for the full value of its business and Interests under the Agreement—including Articles 2 and 15—equity requires the City to provide such compensation to prevent a manifest injustice.

242.    In 2016, the City made a specific promise to Lonestar that it would value and provide compensation for Lonestar's entire "Interest" in the South Terminal under the Agreement upon any condemnation initiated by the City.

243.    The City reasonably expected that Lonestar would rely on such a promise when the parties discussed and agreed to form a public-private partnership for the development and operation of the South Terminal and any necessary future expansion of the Airport.

244.    Lonestar acted definitively and substantially in reliance on the promise that its Interests would be valued and compensated for in the event of condemnation and developed a valuable business operation at the South Terminal.  Indeed, Lonestar relied on the promise that it would have the right to construct and operate the South Terminal by immediately committing

millions of dollars, people, and thousands of hours to making the South Terminal a successful operation.

245.   Lonestar also actively pursued investment opportunities and development proposals in furtherance of its business at the South Terminal and Article 15 rights and the Airport's overall growth.

246.   Lonestar similarly communicated to the City its desire to participate in any of the City's plans for the Airport's future development and expansion—evidencing the value Lonestar placed in its Article 2 and Article 15 rights under the Agreement.

247.   Despite Lonestar's development of a successful business and active pursuit of opportunities to develop and expand the Airport in reliance on the City's assurances, the City disregarded its private commitments by turning around and threatening Lonestar with condemnation of the rights the City had just willingly contracted for.

248.   Worse still, the City offered Lonestar a meager compensation award for the value of the leasehold interest itself, rather than including the significant value of Lonestar's business and Interests under the Agreement, as expressly promised by the City.  The City's valuation did not include Lonestar's rights under Article 2 or Article 15 of the Agreement.

249.   The City has unfairly and unjustly reneged on the promise it made to Lonestar in its private capacity, and disregarded Lonestar's Interests entirely, by exercising its public eminent domain power.

250.   To the extent that the Court concludes that, as a result of Texas condemnation law, Article 34.03 of the Agreement is unenforceable as written, the Court should exercise its equitable powers to enforce the City's promises contained therein to prevent manifest injustice.

251.    Enforcing the promise would not interfere with the City's exercise of its governmental functions or condemnation powers because it will not operate to expand or change those powers as provided under Texas law.  Rather—while allowing the City to exercise its condemnation authority in connection with the real estate beneath the South Terminal—the Court would simultaneously require the City to provide Lonestar with compensation for the remainder of its rights under the Agreement not based on condemnation law, but based on the parties' mutual understanding and agreement.

252.    Because the City has disregarded the promises it made to Lonestar, Lonestar has suffered (and continues to suffer) damages, in an amount to be determined at trial.

253.    The City does not have governmental immunity from estoppel claims where estoppel is necessary to prevent injustice, and there is no interference with the exercise of its governmental functions. *See Prasifka*, 450 S.W.2d at 836.

### COUNT VI: Promissory Estoppel – Article 15
### (In the Alternative)

254.    Lonestar repeats and reiterates the allegations above as if fully set forth herein.

255.    To the extent the City is not legally obligated under Texas law to honor Lonestar's rights under Article 15, equity requires the City to provide Lonestar with such right to prevent a manifest injustice.

256.    In 2016, the City made a specific promise to Lonestar that Lonestar would have "the exclusive first right to, as applicable, develop, construct and operate" any "Expansion or New Facility" at the Airport.

257.    The City reasonably expected that Lonestar would rely on such a promise when the parties discussed and agreed to form a public-private partnership for the development and operation of the South Terminal and any necessary future expansion of the Airport.

258.    Lonestar acted definitively and substantially in reliance on the promise that it would have the exclusive right to participate in any future development at the Airport when it developed a valuable business operation at the South Terminal.  Indeed, Lonestar relied on the promise that it would have the right to construct and operate the South Terminal by immediately committing millions of dollars, people, and thousands of hours to making the South Terminal a successful operation.

259.    In further reliance on the City's promise that Lonestar would have the exclusive right to participate in any future development in the Airport, Lonestar also actively pursued investment opportunities and development proposals in furtherance of its business at the South Terminal and the Airport's overall growth.

260.    Lonestar has further relied on the City's promise by communicating to the City its desire to participate in any of the City's plans for the Airport's future development and expansion, and by investing a significant amount of time and resources in the plans for ST 2.0.

261.    Despite Lonestar's development of a successful business and active pursuit of opportunities to develop and expand the Airport in reliance on the City's assurances, the City has made clear that it does not intend to honor Lonestar's rights under Article 15 by attempting to extinguish those rights through condemnation and by arguing that those rights are not enforceable.

262.    The City has unfairly and unjustly reneged on the promise it made to Lonestar in its private capacity. Ordering the City to honor its contractual commitments to Lonestar is therefore necessary to prevent a manifest injustice.

263.    Moreover, ordering the City to honor its contractual commitments to Lonestar will not interfere with the exercise of any governmental function. Lonestar remains a willing and capable partner for developing any Expansion or New Facility pursuant to its Article 15 rights.

Rather than serving a governmental function, the City's refusal to honor its obligations under Article 15 is instead motivated by the improper purpose of forcing the termination of a long-term agreement that the City no longer wants to perform so the City can operate Lonestar's business itself.

264.    Because the City has disregarded the promises it made to Lonestar, Lonestar has suffered (and continues to suffer) damages, in an amount to be determined at trial.

265.    The City does not have governmental immunity from estoppel claims where estoppel is necessary to prevent injustice, and there is no interference with the exercise of its governmental functions. *See Prasifka*, 450 S.W.2d at 836.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Lonestar Airport Holdings, LLC prays for this Court to enter an order:

A.   Enjoining Defendant, as well as its officers, agents, employees, and attorneys as well as those persons acting in concert with them, from violating Lonestar's rights in its property by asserting control over Lonestar's business and/or rights and interests in the Agreement, including without limitation its right to occupy the South Terminal and operate its business there, without paying for the full value of the rights and property taken;

B.   Declaring that the City may not breach its obligations and attempt to take Lonestar's business and/or rights and interests in the Agreement without compensating Lonestar for the full value of the rights it seeks to take;

C.   Enjoining Defendant, as well as its officers, agents, employees, and attorneys as well as those persons acting in concert with them, from its ongoing breach of Article 15, by barring Defendant from "develop[ing]," "construct[ing]," or "operat[ing]" an Expansion or New Facility without honoring Lonestar's rights under Article 15;

D.  Enjoining Defendant, as well as its officers, agents, employees, and attorneys as well as those persons acting in concert with them, from its ongoing breach of Articles 34.03 and 41.13, by enjoining Defendant from further pursuing improper condemnation proceedings in which Defendant refuses to adequately compensate Lonestar as required by the Agreement;

E.  Enjoining Defendant, as well as its officers, agents, employees, and attorneys as well as those persons acting in concert with them, from its ongoing violation of Lonestar's Fifth and Fourteenth Amendment rights, by enjoining Defendant from further pursuing improper condemnation proceedings unsupported by a public purpose and aimed at impermissibly taking a "going concern" without compensation;

F.  Declaring that Defendant is in breach of Articles 2.03, 15, 34.03, and 41.13 of the Agreement;

G.  Awarding Plaintiff specific performance;

H.  Awarding Plaintiff the costs and expenses of this suit, including its reasonable attorneys' fees (including pursuant to 42 U.S.C. § 1988);

I.  Awarding Plaintiff damages, in an amount to be determined at trial;

J.  Awarding pre- and post-judgment interest at the statutory rate; and

K.  Granting such other further relief as the Court may deem just and proper.

Dated: October 12, 2022.

*/s/ Edward F. Fernandes*

**KING & SPALDING LLP**
Edward F. Fernandes (SBN 06932700)
Julia C. Barrett (SBN 24116075)
500 W 2nd St #1800
Austin, TX 78701
T: 512 457 2000
efernandes@kslaw.com
jbarrett@kslaw.com

Lawrence A. Slovensky (*pro hac vice*)
Mandi Goodman (*pro hac vice*)
1180 Peachtree St NE
Atlanta, GA 30309
T: 404 572 4600
lslovensky@kslaw.com
mgoodman@kslaw.com

**MUNGER, TOLLES & OLSON LLP**
Bethany Kristovich (*pro hac vice*)
Michael Doyen (*pro hac vice*)
John Major (*pro hac vice*)
350 South Grand Avenue
Los Angeles, CA 90071
T: 213 683 9292
Michael.doyen@mto.com
Bethany.kristovich@mto.com
John.major@mto.com

**BARRON, ADLER, CLOUGH & ODDO, LLP**
Christopher M. Clough (SBN 24044802)
Christopher J. Oddo (SBN 24013257)
Andrew York (SBN 24066318)
808 Nueces Street
Austin, TX 78701
T: 512 478 4995
clough@barronadler.com
oddo@barronadler.com

*Attorneys for Plaintiff Lonestar Airport Holdings, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 12, 2022, I electronically submitted the foregoing document with the clerk of the United States District Court for the Western District of Texas, using the CM/ECF system of the Court, which will send notification of such filing to all counsel of record who are deemed to have consented to electronic service.

<u>/s/ Edward F. Fernandes</u>

Edward F. Fernandes