# **EXHIBIT J**



Austin / Charlotte / Dallas / Fort Worth / Houston / New York / San Antonio / The Woodlands

600 Travis Street
Suite 5200
Houston, TX 77002

713.650.8400 *OFFICE*
713.650.2400 *FAX*
winstead.com

Thomas J. Forestier
(713) 650-2749
tforestier@winstead.com

March 29, 2022

<u>**Certified Mail/RRR 9314 7699 0430 0093 5119 47 and US Mail**</u>
Lonestar Airport Holdings, LLC
Attention: Jeff Pearse, Chief Executive Officer
10000 Logistics Lane
Austin, Texas 78719

Re:     **INITIAL OFFER**
        **Project:** AUS South Terminal

Dear Mr. Pearse:

I am writing on behalf of my client, the City of Austin ("City"), regarding its interest in acquiring the leasehold interest of LoneStar Airport Holdings, LLC in the South Terminal at AUS. Jacqueline Yaft, the AUS Executive Director, had previously corresponded with you about this topic by letter dated July 13, 2021.  As referenced in Ms. Yaft's letter, the City, in connection with the Airport Expansion and Development Program at AUS, needs to acquire the "Tenant's Interest" as that term is defined in the South Terminal Lease and Concession Agreement ("Lease") between the City of Austin and Highstar Capital IV, L.P., a limited partnership formed and existing under the laws of the State of Delaware ("Initial Tenant"), on or about March 24, 2016 ("Lease"). The Initial Tenant assigned the Lease to LoneStar Airport Holdings, LLC, a Delaware Limited Liability Company, ("Tenant") by the Assignment and Assumption Agreement by and between Highstar Capital IV LP and LoneStar Airport Holdings, LLC dated March 24, 2016.  The parties amended the Lease by Amendment No. One to the South Terminal Lease and Concession Agreement by and between the City of Austin and LoneStar Airport Holdings, LLC, effective July 1, 2019. A legal description and sketch of the "Premises", as that term is defined in the Lease, as amended, is enclosed as **Exhibit A**.

**An independent appraisal firm, Allen, Williford & Seale, Inc. ("AWS"), has determined the Fair Market Value of Tenant's Interest. The value or total just compensation shown in the AWS appraisal report is $1,954,000. A copy of that report is enclosed as Exhibit B.**

**This letter is a formal offer to purchase the entirety of Tenant's Interest for the total amount of $1,954,000.00. This compensation does not include any value for damages to any remainder property, as there is no remainder property. The amount offered is considered to be the Fair Market Value of Tenant's Interest based**

LoneStar Airport Holdings, LLC
March 29, 2022
Page 2

**on AWS' valuation analysis as of the date of valuation set forth in AWS's appraisal report.**

A Lease Termination Agreement offering the full-appraised value of the Tenant's Interest and a Right of Entry and Possession are also enclosed as **Exhibits C and D**, respectively, for your consideration. If the terms of the Lease Termination Agreement are acceptable, please sign the Lease Termination Agreement where indicated and return it to my attention within **30 days** from the date of your receipt of this letter. If the Tenant is willing to sign the Right of Entry and Possession, please return a signed copy of that document to me at your earliest convenience. Please understand that the City Council of the City of Austin must approve all contracts, and the amount of this offer can only be recommended for their approval.

**You are hereby advised that the property being sought by the City is under the imminence of condemnation, as that term is used in the United States Internal Revenue Code. This statement is being included to retain certain tax benefits that you should discuss with your attorney or accountant.**

You have the right to discuss with others any offer or agreement regarding the City's acquisition of the Tenant's Interest, or you may, but are not required to, keep the offer or agreement confidential from others, subject to the provisions of Chapter 552 of the Texas Government Code (the Public Records Act) as it applies to the City of Austin.

Enclosed as **Exhibit E** is a Notice of 10-Year Appraisal Search, which includes a flash drive with copies of all appraisal reports relating to the property interest being acquired, which were prepared in the ten years preceding the date of this offer and produced or acquired by the City, including the appraisal report on which this Initial Offer is based. **Exhibit F** is a copy of the Landowner's Bill of Rights, which contains additional information concerning eminent domain proceedings and was prepared by the Office of the Attorney General of the State of Texas.

As you are aware, the City and the Initial Tenant contemplated the City might eventually need to condemn Tenant's Interest by including a provision to this effect in the Lease. Specifically, Section 34.03 of the Lease states: "If the condemning authority is the City, Tenant shall be entitled to compensation for the Fair Market Value of Tenant's Interest so taken." This Initial Offer, which provides Tenant with the fair market value of Tenant's Interest as established by the AWS appraisal report, satisfies this provision in the Lease.

Finally, the City understands there are subtenants and other occupants at the South Terminal and considers them valuable partners of the City and AUS. The City will make every effort to relocate them at AUS. As you know, the City has retained an independent third-party relocation agent to assist the Tenant, subtenants and other occupants with their rights under the Uniform Relocation Act. You will receive more information about URA advisory services and benefits by separate correspondence.

Again, please inform me of your decision within **30 days** from the date of your receipt of this letter. Your cooperation in this matter is greatly appreciated. If you have any questions, please contact me at (713) 650-2749 or tforestier@winstead.com.

LoneStar Airport Holdings, LLC
March 29, 2022
Page 3

Sincerely,

*Thomas J. Forestier*

Thomas J. Forestier
Counsel for the City of Austin


ENCLOSURES:

Exhibit A: Legal Description, Plat and Sketch of the Premises
Exhibit B: Appraisal Report of the Leasehold Property Interest to be Acquired in Connection with the City of Austin's Department of Aviation's Airport Expansion and Development Program (AEDP) at AUS dated March 16, 2022
Exhibit C: Lease Termination Agreement
Exhibit D: Right of Entry and Possession
Exhibit E: Notice of 10-Year Appraisal Search (including a flash drive with appraisal reports bates-labeled AUS ST 000001 – AUS ST 000506
Exhibit F: Landowner's Bill of Rights

cc:     Lawrence A. Slovensky        (*via Certified Mail/Return Receipt Requested*)
        King & Spalding LLP
        1180 Peachtree Street, N.E.
        Atlanta, GA  30309-3521

        Christopher M. Clough        (*via Certified Mail/Return Receipt Requested*)
        Barron Adler Clough & Oddo, LLP
        808 Nueces Street
        Austin, TX  78701

# EXHIBIT B

# APPRAISAL REPORT
## OF THE LEASEHOLD PROPERTY INTEREST
## TO BE ACQUIRED IN CONNECTION WITH THE
## CITY OF AUSTIN'S DEPARTMENT OF AVIATION'S
## AIRPORT EXPANSION AND DEVELOPMENT PROGRAM (AEDP)
## AT
## AUSTIN-BERGSTROM INTERNATIONAL AIRPORT (AUS)

**PREPARED FOR:**

Thomas J. Forestier
Winstead PC
600 Travis Street, Suite 5200
Houston, Texas  77002

**PREPARED BY:**

Randy L. Seale, MAI
Allen, Williford & Seale, Inc.
11999 Katy Freeway, No. 400
Houston, Texas  77079

| | |
|---|---|
| **PROJECT NAME:** | AUS South Terminal |
| **TENANT:** | LoneStar Airport Holdings, LLC |

| | |
|---|---|
| **DATE OF VALUATION:** | March 1, 2022 |
| **DATE OF REPORT:** | March 16, 2022 |



AUS ST 000313



Allen, Williford & Seale, Inc.
Right of Way Valuations

March 16, 2022

Thomas J. Forestier
Winstead PC
600 Travis Street, Suite 5200
Houston, Texas 77002

Re:   Appraisal of the Leasehold Interest in the South Terminal Property at ABIA as
described in the Lease and Concession Agreement by and between City of Austin
(Owner) and LoneStar Airport Holdings, LLC. (Tenant) out of 25.14 acres (1,095,149.31
SF) being situated in the Santiago Del Valle Ten League Grant Survey, Abstract No. 24,
Travis County, Texas.

Address: The South Terminal at ABIA 10000 Logistics Lane, Austin, TX 78719

Mr. Forestier:

As requested, we have prepared the following Appraisal Report of the above referenced property
interest. The purpose of this appraisal is to provide an opinion of the fair market value for the
acquisition of the real property interest of the South Terminal Leasehold and the "unamortized cost" of
the Trade Fixtures. The date of our most recent inspection of the subject property is November 11,
2021.

This is a letter of transmittal of our appraisal. The analyses and opinions set forth in this appraisal were
performed in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP), the
Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended (42 U.S.C.
4601 et seq.) (Uniform Act), FAA's Land Acquisition and Relocation Assistance for Airport Improvement
Program (AIP) Assisted Projects (FAA Appraisal Requirements) and supplemental standards defined by
the City of Austin Supplemental Appraisal Standards. The use of this report is restricted to that of our
client. The appraisers are not responsible for unauthorized use of this report.

Based upon the data and analyses presented in the attached appraisal report, it is our opinion the just
compensation for acquisition of the South Terminal Leasehold Acquisition, is as follows:

| | |
|---|---|
| Leasehold | $1,307,000 |
| Trade Fixtures | $647,000 |
| Total Just Compensation: | $ 1,954,000 |

Your attention is invited to the attached definitions, data, discussion, analysis, certification, and limiting
conditions which are an integral part of this report.

Respectfully submitted,

ALLEN, WILLIFORD & SEALE, INC.

Randy L. Seale, MAI
Certified General Real Estate Appraiser
Certificate No. TX-1320302-G

Stephen D. Kovar, MAI
Certified General Real Estate Appraiser
Certificate No. TX-1338762-G

11999 Katy Freeway Ste 400, Houston, Texas 77079    (281) 493-4444    (800) 364-8568
E-Mail: info@appraiser.com    www.appraiser.com

AUS ST 000314

*Allen, Williford & Seale, Inc.*

## TABLE OF CONTENTS

Cover Page..........................................................................................................................1

Letter of Transmittal...........................................................................................................2

Table of Contents ................................................................................................................3

Executive Summary of Salient Facts and Conclusions.......................................................4

Scope of the Appraisal.........................................................................................................5

Aerials and Subject Photographs.......................................................................................11

Area Analysis and Neighborhood Analysis .......................................................................17

Statement of Ownership, Property History, and Property Tax Information ....................20

Leasehold Site Data ...........................................................................................................21

Leasehold Improvement Data ...........................................................................................23

Highest and Best Use..........................................................................................................26

Valuation Discussion..........................................................................................................27

Income Approach ...............................................................................................................28

Cost Approach ....................................................................................................................43

Reconciliation of Value......................................................................................................44

Summary of Just Compensation........................................................................................44

Certification .......................................................................................................................45

Assumptions and Limiting Conditions ..............................................................................47

Addenda

South Terminal Initial and Amendment Leases

Tax Records

Present Value Tables for Income Approach

Comparable Land Sales and Map

Comparable Rentals and Map

Qualifications

| EXECUTIVE SUMMARY OF SALIENT FACTS AND CONCLUSIONS | |
|---|---|
| **Property Address** | 10000 Logistics Lane, Austin, TX 78719 |
| **Property Location** | The South Terminal at ABIA |
| **Current Property Use** | Aviation Terminal and Parking |
| **Building Characteristics** | Airport Passenger Terminal |
| **Highest and Best Use - Before** | International Airport |
| **Highest and Best Use - After** | International Airport |
| **Property Rights Appraised** | Leasehold Interest |
| **Land Area** | Total:          25.14 Acres (1,095,149 SF)<br>Initial Lease:   22.66 Acres (987,129 SF)<br>Amendment:    2.48 Acres (108,020 SF) |
| **Effective Date of Value** | March 1, 2022 |
| **Date of Report** | March 16, 2022 |
| **Leasehold Values** | Total:          $1,307,000-Rounded<br>Initial Lease: $1,142,212<br>Amendment:  $164,317 |
| **Trade Fixture Value** | $647,000 |
| | |
| Just Compensation for Acquisition of the South Terminal Leasehold | |
| **Total Just Compensation** | $1,954,000 |

AUS ST 000316

*Allen, Williford & Seale, Inc.*

## SCOPE OF THE APPRAISAL

The scope of this assignment is to form an opinion of total compensation as a result of the South Terminal Leasehold Acquisition by the City of Austin.  The appropriate scope of work was applied to the appraisal problem with adherence to the FAA Appraisal Requirements. The problem to be solved is identified in the following pages of this appraisal report.  The following steps were implemented to determine and perform the Scope of Work necessary to develop a credible assignment result:

1.  The purpose and or function of the appraisal are to estimate the compensation for the Fair Market Value of the Tenant's Interest to be acquired subject to the South Terminal Lease and Concession Agreement and Amendment (Lease). The Lease is an integral part of the Scope of the Appraisal. The articles, definitions and lease term help to form the basis of the opinion of value.  The License Agreement between the City of Austin and LoneStar Airport Holdings, LLC is not in the scope of this appraisal.

2.  The size and shape of the subject property are based on the Lease (22.66 acres or 987,129.31 SF) and Amendment No. 1 of the Lease (Amendment) (additional 108,020 SF). The size of the land under the leasehold is 1,095,149 Square Feet or 25.14 acres (1,095,149.31 SF = 987,129.31 SF + 108,020 SF). The leasehold property has various structures and site improvements.  Additional information regarding the subject property was also obtained from other sources, including aerial photographs, surveys, "As Built" plans and documents.  Excerpts from this report can be found in the Addenda. The subject property is legally defined in the Site Data Section of this report.  Accordingly, this appraisal is based on the assumption that the information provided by the client and obtained by the appraiser regarding the subject property is correct.  We reserve the right to amend our analyses and conclusions if additional or updated information is provided at a later date.

3.  The appraiser provided an opportunity for the tenant to accompany the inspection of the property.  The subject property was physically inspected by the appraiser along with the tenant's representative and tenant's counsel.  Photographs of the subject property were taken at the time of inspection.  Aerial photographs were utilized in the inspection of the subject property.

4.  We have researched comparable lease data through aviation real estate related lessors.  All information has been verified with sources deemed reliable.

5.  There are three approaches by which the value of real estate may be estimated: the Sales Comparison, Cost, and Income Capitalization Approaches. Appendix A, 49 CFR § 24.103(a) (2)(ii) states *"All relevant and reliable approaches to value consistent with established Federal and federally-assisted program appraisal practices. If the appraiser uses more than one approach, there shall be an analysis and reconciliation of approaches to value used that is sufficient to support the appraiser's opinion of value."*  The acquisition in this appraisal consists of a leasehold estate.  This is only a partial interest in the property as the City of Austin already owns the fee interest.  The value of the leasehold is based on the difference in the contract rent paid by the tenant and economic rent or market rent of the remaining lease term.  Market rent was determined from comparable rentals and a capitalization approach to the land value. The rental amounts will be determined annually on a per square foot basis, payable in monthly installments.  The differences will be calculated to a present value. The measure of rent or income would dictate that the Income Approach to value would be the most credible approach. The Sales Comparison Approach and Cost Approach are not capable of measuring the different income levels over the lease term.  However, the Sales Comparison Approach was utilized to formulate the market value rental amount for the ground rent via a capitalization rate.  In addition to the rental income analysis, the leasehold interest also is entitled to the "unamortized cost" of "Trade Fixtures".  A modified Cost Approach was utilized for the trade fixtures associated with the Lease. Given the nature

AUS ST 000347

*Allen, Williford & Seale, Inc.*

of the take and appraisal assignment, this modified valuation technique is appropriate and provides an accurate and credible compensation for the property and trade fixtures to be acquired.

6.     The compensation encompasses the value of the ownership interest in the real property as this appraisal assignment pertains to the entire acquisition of the tenant's leasehold property interest.  The condition of this appraisal assignment encompasses any applicable laws and public policy regarding valuation and compensation in an eminent domain proceeding.

7.     This appraisal was performed during the novel Coronavirus (Covid-19) global pandemic. As a result of this pandemic, there are short-term effects occurring in the market that include fluctuating interest rates, increased volatility in financial markets, disruptions in global supply chains, higher unemployment figures, and higher financial risk levels. New requirements have been put in place by lenders, both nationally and locally. As of the date of this report, the long term effects of this pandemic on the real estate market are unknown and may affect assignment results that would include overall valuation conclusions, extended marketing time, and stringent mortgage loan requirements.

8.     Engineering studies, ADA determinations, surveys, and title reports are beyond the scope of this appraisal.

**Report Format**.  In accordance with the real property appraisal reporting requirements as set forth by Standard Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice (USPAP), this is an Appraisal Report.

This appraisal has been prepared in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP) as promulgated by the Appraisal Foundation, the Standards of Professional Practice, the Code of Professional Ethics of the Appraisal Institute and the Uniform Act, except as they may conflict with State and Federal regulations regarding the appraisal of properties involved with the power of eminent domain for property acquisitions as well as the FAA Appraisal Requirements. The report also follows the City of Austin Supplemental Appraisal Standards.  This opinion of value is subject to the Assumptions and Limiting Conditions that are included in the report.  There is additional supporting documentation contained within the appraisal files.

When valuing the subject property, the influence of the project cannot be considered according to 49 CFR 24.103(b) which states:

"To the extent permitted by applicable law, the appraiser shall disregard any decrease or increase in the fair market value of the real property caused by the project for which the property is to be acquired, or by the likelihood that the property would be acquired for the project, other than that due to physical deterioration within the reasonable control of the owner."

The proposed acquisition in this instance would include all of the tenant's leasehold interest.  There is no remaining property interest and no "Before and After Value" is required.  The lease which created the tenant's leasehold has a "condemnation clause" (Article 34 of the Lease) which forms the basis for this valuation. The lease clause states that in the case of the condemning authority being the City, the tenant shall be entitled to compensation for the Fair Market Value of the Tenant's interest so taken.

*Allen, Williford & Seale, Inc.*

## PROPERTY RIGHTS APPRAISED

Tenants Interest is defined in the Lease as being:

> "All Tenant's right, title and interest in, to, under or derived from this Lease, including the rights of Tenant under Article 2 and Article 15, and the Trade Fixtures."

I have been informed that there are no enforceable rights pertaining to Article 15. Therefore, Article 15 was not part of my scope of the appraisal.

Improvements and their ownership were also defined and addressed in the lease under Article 9.12. This article states:

> "Ownership.   All improvements or modifications Premises resulting from any Covered Improvements, excluding Trade Fixtures related thereto, shall become the property of Owner at the end of the Term, whether by expiration, termination or otherwise, free from any liens or claims whatsoever created by Tenant, without any compensation from Owner to Tenant or to any other person or entity (except as otherwise expressly provided herein)."

No compensation for improvements has been included for the tenant's interest.

Trade fixtures are defined in the Lease as being:

> "All furniture, equipment, fixtures, and furnishings installed or constructed by Tenant, at its expense, on the Premises, including baggage handling systems, ticket and check-in counters, signs, seating, display cabinets, communications equipment, special lighting fixtures and all other equipment, furniture, furnishings and supplies that can be removed from the Premises without material damage to the Premises, specifically excluding Owner's Shared Use Passenger Processing System equipment, hardware, software, and supplies."

The property rights being appraised in this report consist of the leasehold interest. Leasehold Interest is defined by *The Dictionary of Real Estate Appraisal*, Seventh Edition, copyright 2022, page 105, by the Appraisal Institute as being:

> "The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease"

Leasehold value for the purposes of this assignment is further defined by *State v. Parkey*, 295 S.W. 2d 457, 460 (Tex. Civ. App.-Waco 1958) as being:

> "where a complete leasehold is taken, as in this case, the measure of damages is the value of the use and occupancy of the leasehold for the remainder of the tenant's term, plus the value of the right to renew the lease, less the agreed rent which the tenant would pay for the use and occupancy, such values to be determined by the well established willing seller-buyer rule."

## MARKET VALUE DEFINED

Fair Market Value is defined in the Lease as being:

> "The amount that a willing and able buyer would offer, and a willing and able seller would accept, for the purchase and sale of Tenant's Interest, in an arm's length transaction, assuming: (a) neither Party is under economic compulsion or has special bargaining power; (b) the buyer possesses all information in the possession of Tenant relating to the Premises, the condition of the Premises and the revenues and expenses of Tenant; and (c) that the event giving rise to such determination (*e.g.*, a Taking or a termination of this Lease) had not occurred."

This definition is similar to accepted Texas court's definition of market value is defined by *City of Austin v. Cannizzo*, 267 S.W. 2d 808 (Tex. 1954) as being:

> "The price which the property would bring when it is offered for sale by one who desires, but is not obliged to sell, and is bought by one who is under no necessity of buying it, taking into consideration all of the uses to which it is reasonably adaptable and for which it either is or in all reasonable probability will become available within the reasonable future."

## INTENDED USE AND USERS OF THE APPRAISAL

This report is intended for use only by Winstead PC and the City of Austin for the acquisition of the leasehold interest in the South Terminal at Austin-Bergstrom International Airport for a Federally assisted airport project.

## IDENTITY OF CLIENT

Winstead PC is the client.

## DATE OF REPORT

The date of the report is March 16, 2022

## EFFECTIVE DATE OF THE APPRAISAL

The effective date of the appraisal is March 1, 2022.

## INSPECTION INFORMATION

The appraiser afforded the tenant an opportunity to accompany the appraiser during the inspection of the property.  A site inspection of the subject property was performed by Randy L. Seale, MAI on November 11, 2021, and the appraiser was accompanied by the Client, the tenant's representative and the tenant's counsel.  A brief walk through of the improvements was performed. The appraiser, Randy L. Seale, MAI, also made a limited site visit on January 28, 2022 without the tenant.

## COMPETENCY PROVISION

I am competent to accept this appraisal assignment based on my education and experience in appraising properties involving acquisitions for right of way purposes as well as my knowledge of the aviation real

estate market. Significant time has been spent in the collection and analysis of rents and capitalization rates in order to obtain the necessary understanding of the local market.

### ENVIRONMENTAL STATEMENT

A limited Phase 1 Environmental Site Assessment report dated December 28, 2021 was completed by Weston Solutions, Inc. The conclusions of this report are listed as follows:

This assessment has revealed no evidence of recognized environmental conditions (RECs) except the following:

- – The ongoing ABIA/AUS operations on the subject property and other areas of the airport.
- – The presence of an on-site oil/water separator (OWS).
- – The presence of arsenic and lead reported in site soil and groundwater above TCEQ Protective Concentration Levels (PCLs).

No controlled RECs (CRECs) were identified in connection with the subject property from 2017 to present. The following HREC in connection with the property was identified:

- – Closure of the Bergstrom AFB leaking petroleum storage tanks (LPST) site.

The following non-scope consideration was identified:

- – The presence of per-and polyfluoroalkyl substances (PFAS) in subject property soil.

The report was limited from 2017 to present as a result of the Phase I ESA of the subject property conducted. A baseline Phase 2 Environmental Site Assessment was conducted on January 27, 2016 by TRC. The dates reflect the occupancy of the leasehold.

In the 2016 TRC report, it was concluded that the existing concentrations of constituents of concern within the Lease Site Area of the South Terminal are below applicable human health exposure pathways. There findings are summarized below:

- – The soil sample analytical results that exceed the PCLs for arsenic and lead are specifically for the *Soil-to-Groundwater* human-health ingestion pathway. The current and projected future land use for the Lease Site Area is not likely to rely on the use of onsite water wells as a supply for potable water at the South Terminal; these services are provided by City of Austin Water Utilities.

- – Arsenic and lead concentrations detected in the groundwater sample collected at the southeast corner of the Terminal Building exceeded the Tier 1 Residential PCLs for groundwater for the human health ingestion exposure pathway. The detected arsenic and lead concentrations may be naturally occurring, may represent the fringe of a geochemical footprint from a groundwater contaminant plume upgradient of temporary monitoring well TMW-2 and downgradient of TMW-C-2 and TMW-BULK, or may be due to the residual geochemical footprint of a historic release.

- – The extent of the current metals impacts detected in the soil and groundwater media at the site are not likely to trigger a regulatory action requirement from the TCEQ. The site was part of multiple regulatory closures that were obtained with "No Further Action" letters from the Texas Natural Resources Conservation Commission during the 1990s, prior to the property deed transfer to the City of Austin. The regulatory records indicate that there are no outstanding site conditions under any of the Agency's remediation programs.

*Allen, Williford & Seale, Inc.*

- In the event that a new spill or release were to occur at the site in the future, confirmation soil samples and, if required, confirmation groundwater samples may be required after any emergency response cleanup or hazardous materials response team were to complete cleanup operations. If such releases in the future are the cause for the comingling of an area of impacted soil or groundwater with the historical/current constituent concentrations at the site, the data contained in this Baseline Phase II ESA may serve as evidence that the metals concentrations in soil and groundwater were an existing condition prior to assuming occupancy of the site. Such an event is not likely to trigger an environmental liability for remediation of soil and/or groundwater due to the currently known pre-existing site conditions. In the event that a response action would be required by the TCEQ to address metals concentrations that exceed the Tier 1 PCLs for groundwater ingestion, an institutional control may be used to restrict the use of shallow groundwater for human ingestion, consistent with the land use as commercial/industrial.

Based on these reports, the property use and the location within an operating airport, the environmental findings would not alter the opinions or affect the use of the property interest valued in this appraisal report.

## EXTRAORDINARY ASSUMPTIONS & HYPOTHETICAL CONDITIONS

*Hypothetical Condition* is defined by USPAP as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis."

This valuation involves a hypothetical condition. When appraising the property leasehold interest, the impact of the project is ignored. This hypothetical condition is accepted appraisal procedures when valuing eminent domain situations.

*Extraordinary assumption* is defined by USPAP as "an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions."

There are no extraordinary assumptions used in this report.

The use of extraordinary assumptions and hypothetical conditions might have affected the assignment results.

The maps and pictures on the following pages depict the property at the time of inspection.

*Allen, Williford & Seale, Inc.*

## AERIALS AND SUBJECT PHOTOGRAPHS



Subject Leasehold Property is outlined in Yellow and Green

Aerial Photograph obtained from Google Earth
Randy L. Seale, MAI

AUS ST 000323

*Allen, Williford & Seale, Inc.*

### Photo Number 1

| Photo Date: | November 11, 2021 |
|---|---|
| Taken By: | Randy L. Seale, MAI |
| Location Photo Taken | South Terminal at ABIA Parking Area |
| Direction of Camera Lens | Northwest at South Terminal Exterior |



### Photo Number 2

| Photo Date: | November 11, 2021 |
|---|---|
| Taken By: | Randy L. Seale, MAI |
| Location Photo Taken | Interior of South Terminal at ABIA |
| Direction of Camera Lens | Terminal Ticketing and Check In Area |



AUS ST 000324

*Allen, Williford & Seale, Inc.*

### Photo Number 3

| Photo Date: | November 11, 2021 |
| --- | --- |
| Taken By: | Randy L. Seale, MAI |
| Location Photo Taken | Interior of South Terminal at ABIA |
| Direction of Camera Lens | Departure/Waiting Area |



### Photo Number 4

| Photo Date: | November 11, 2021 |
| --- | --- |
| Taken By: | Randy L. Seale, MAI |
| Location Photo Taken | Exterior of South Terminal at ABIA |
| Direction of Camera Lens | Aircraft Apron Loading Area |



*Allen, Williford & Seale, Inc.*

**Photo Number 5**

| Photo Date: | November 11, 2021 |
|---|---|
| Taken By: | Randy L. Seale, MAI |
| Location Photo Taken | Interior of South Terminal at ABIA |
| Direction of Camera Lens | Baggage Claim Area |



**Photo Number 6**

| Photo Date: | November 11, 2021 |
|---|---|
| Taken By: | Randy L. Seale, MAI |
| Location Photo Taken | Exterior of South Terminal at ABIA |
| Direction of Camera Lens | South Terminal Pick-Up and Drop Off Area |



*Allen, Williford & Seale, Inc.*

### Photo Number 7

| | |
|---|---|
| **Photo Date:** | November 11, 2021 |
| **Taken By:** | Randy L. Seale, MAI |
| **Location Photo Taken** | Initial Lease Area Parking Area |
| **Direction of Camera Lens** | East at Parking Exit Area |



### Photo Number 8

| | |
|---|---|
| **Photo Date:** | November 11, 2021 |
| **Taken By:** | Randy L. Seale, MAI |
| **Location Photo Taken** | Initial Lease Area Parking Area |
| **Direction of Camera Lens** | West at Parking Area |



*Allen, Williford & Seale, Inc.*

### Photo Number 9

| | |
|---|---|
| **Photo Date:** | November 11, 2021 |
| **Taken By:** | Randy L. Seale, MAI |
| **Location Photo Taken** | Amendment Tract C from Outlaw Country Drive |
| **Direction of Camera Lens** | East at Parking Area |



### Photo Number 10

| | |
|---|---|
| **Photo Date:** | November 11, 2021 |
| **Taken By:** | Randy L. Seale, MAI |
| **Location Photo Taken** | Amendment Tract D from Fighter Drive |
| **Direction of Camera Lens** | North at Parking Area |



*Allen, Williford & Seale, Inc.*

## AREA ANALYSIS

The subject property is located in Travis County in Central Texas. Travis County is part of the Austin-Round Rock MSA and also referred to as (Greater Austin). The Austin-Round Rock MSA includes Bastrop County, Caldwell County, Hays County, Travis County, and Williamson County. The total area of the Austin-Round Rock MSA area is 4,279 square miles and the estimated 2020 population was approximately 2,228,371 persons.

The total area of Travis County is approximately 1,023 square miles. The 2020 population for Travis County was 1,290,188 residents, a 26% increase from the 2010 population of 1,024,444 residents. There were 545,693 housing units in Travis County in 2019 with an average household size of approximately 2.54 people. The 2019 median household income in Travis County was $75,887, which is approximately 23% higher that the state's median household income of $61,874. The per capita income of Travis County was $43,658 as of 2019. The county seat of Travis County is Austin with a 2020 population of 961,855 and a total size of 271.8 square miles. Other cities and communities in Travis County include Bee Cave, Jonestown, Lago Vista, Lakeway, Manor and West Lake Hills.

Total nonfarm employment in the Austin-Round Rock MSA was approximately 1,169,400 in October 2021, which is a 15 percent increase from October 2020. Total employment for Travis County in 2019 was 638,903, which is a 2.5 percent increase from 2017. As of October 2021, the total unemployment rate in the Austin-Round Rock MSA was 3.4 percent, 3.3 percent in Travis County, and 4.2 percent nationally. The top employers in Austin include Dell Inc., H.E.B, Seton Healthcare Network, Wal-Mart Stores and St. Davis's Healthcare Partnership.

The major highways in Travis County include the following: Interstate Highway 35, U.S. Highway 290, U.S. Highway 183, State Highway 1 (MoPac), State Highway 71, and State Highway 130. The major arterial of the area is Interstate Highway 35. This highway runs through the central portion of Austin in a generally north/south direction and connects three of Texas' four most heavily populated metropolitan areas, Dallas/Fort Worth, Austin, and San Antonio. Interstate Highway 35 also provides access to Laredo and the U.S./Mexico border. U.S. Highway 290 traverses the county in a generally east/west direction and connects Austin to Houston to the east and Johnson City/Fredericksburg to the west. U.S. Highway 183 traverses the county in a generally north/south direction and connects Austin to Cedar Park, Leander, and Liberty Hill to the north and Lockhart to the south. State Highway 130, which is located east of Austin, traverses the county in a generally north/south direction. Lastly, numerous FM roads, city roads, and county roads provide interior access throughout the county.

**NEIGHBORHOOD ANALYSIS**

Overall, the City of Austin encompasses approximately 305.1 square miles and had a 2019 population of 950,807 persons, which is an increase of approximately 22.1 percent above the 2010 population of 790,390 persons. The civilian labor force (population age 16+) in 2019 represented 73.8 percent of the population. There were 380,392 households in Austin as of 2019. The 2019 median household income for Austin was $71,576. The per capita income was reported to be $43,043 for 2019.

Major employers in Austin include the following: Apple, Austin Independent School District, City of Austin, Dell Technologies, the federal government, IBM Corporation, Samsung Austin Semiconductor, Seton Healthcare Family, St. David's Healthcare Partnership, the State of Texas, and the University of Texas at Austin.

The primary roadways in the Austin area include Interstate Highway 35, U.S. Highway 290, U.S. Highway 183, State Highway 1 (MoPac), State Highway 71, and State Highway 130. The major arterial of the area is Interstate Highway 35. This highway runs through the central portion of Austin in a generally north/south direction and connects three of Texas' four most heavily populated metropolitan areas, Dallas/Fort Worth, Austin, and San Antonio. Interstate Highway 35 also provides access to Laredo and the U.S./Mexico border. U.S. Highway 290 traverses the city in a generally east/west direction and connects Austin to Houston to the east and Johnson City/Fredericksburg to the west. U.S. Highway 183 traverses the city in a generally north/south direction and connects Austin to Cedar Park, Leander, and Liberty Hill to the north and Lockhart to the south. State Highway 130, which is located east of Austin, traverses the county in a generally north/south direction. Lastly, numerous FM roads, city roads, and county roads provide interior access throughout the city.

Education in Austin is served by the Austin Independent School District. Police protection and fire protection is provided through the City of Austin. The Police and Fire protection is considered adequate for the area. The Austin area has water and wastewater services provided by multiple MUDs and water service companies. Electricity and natural gas are provided by Atmos Energy, Pedernales Electric Cooperative, Austin Energy, Bluebonnet Electric, and One Gas – Texas Gas Services. Media services including telephone, cable, and internet are provided by multiple providers.

Recreational uses are significant in the area due to the location near the Colorado River, Lady Bird Lake and Lake Travis. Lake Travis is approximately 30 square miles in size with approximately 270 miles of shoreline. Marinas and boating activity facilities along Lake Travis in the Austin area include the Marshall Ford Marina, the Anderson Mill Marina, and the Cypress Creek Marina. Additionally, multiple resorts and golf courses are located in the Austin area.

The immediate vicinity of the subject neighborhood is considered to be the area of the City of Austin southeast of downtown Austin. A large land use in this area is the Austin-Bergstrom International Airport (AUS). AUS opened in 1999 at the site of the former Bergstrom Air Force Base, replacing Robert Mueller Municipal Airport. AUS occupies 4,240 acres approximately eight miles southeast of downtown. Airport access is provided by SH 71 and US 183. AUS has two parallel north-south runways, 9,000 and 12,250 feet in length and 150 feet wide, each. The main passenger terminal, the Barbara Jordan Terminal, is 736,000 square feet and spread out on four levels. In 2016, the City entered into an agreement with LoneStar Airport Holdings, LLC to operate the South Terminal at ABIA. According to FAA data, AUS had 3,141,505 Enplanements in 2020, down 63 percent from the 2019 Enplanements of 8,507,410. AUS ranked 32nd in the U.S. for enplanements in 2020 and in 2019. On a cargo basis, AUS ranks 46th in the U.S. for cargo weight.

A recent large project near the neighborhood is the Tesla Gigafactory. The manufacturing site and Tesla corporate headquarters will sit on over 1,600 acres along SH 130 and the Colorado River. When

*Allen, Williford & Seale, Inc.*

finished, the facility will manufacture the Cybertruck Model 2.

The subject neighborhood is considered to be in the growth stage of the life cycle.  Commercial/retail development is located along major roadways in many portions of the neighborhood including Interstate Highway 35. Portions of the subject's area are in a redevelopment stage where older or low density improvements are being demolished for newer, higher density developments. Many of the older and low density improvements in the area represent interim uses and their overall contributory value to the property is considered minimal.  Overall, the subject's neighborhood is expected to show continued growth with real estate values moderately increasing.

**Subject Location Map**



*Allen, Williford & Seale, Inc.*

**Statement of Ownership**. The subject's land is owned by the City of Austin. The tenant or leasehold interest is owned by LoneStar Airport Holdings, LLC. We have not been provided any title work for the subject and we have relied upon the Lease and Assignment for the tenant information.

**Property History**. The City of Austin (City) executed the Lease for 22.66 acres (987,129 square feet) and improvements with Highstar Capital IV, LP on March 24, 2016 (Initial Lease). This Initial Lease had a contract rental amount of $300,000 or $0.30 per square foot, annually for 30 years with two 5 year options. The Initial Lease was assigned to LoneStar Airport Holdings, LLC (LoneStar) by Highstar Capital IV, LP on March 24, 2016. LoneStar and the City signed an Amendment to the Initial Lease on June 17, 2019 (Amendment) for an additional 2.48 acres (108,020 square feet) listed as Parking Lots D and C. This Amendment is to run with the Initial lease and the rental amount is $0.30 per square foot annually. We requested but were not provided with any listing agreements or marketing plans for the leasehold interest. According to separate research[1], the tenant was soliciting interest from prospective suitors[2]. The City made an offer to purchase the leasehold interest in November 7, 2019 for the amount of $10,000,000 according to a Memorandum. There are no known arms-length transactions involving the subject property in the past five years. To the best of our knowledge the subject property is not currently listed for sale or lease. The City and LoneStar entered into a license agreement on August 1, 2021 for a nearby property. The license agreement is not part of this leasehold valuation analysis.

**Property Tax Information**. The underlying land is owned by the City of Austin and is not subject to property taxes. LoneStar is assessed by the county as personal property. The property is under the taxing authorities of the City of Austin, Del Valle ISD, Travis County, Travis County Healthcare District and the Austin Community College District. The subject property is listed under Travis County Appraisal District Property ID Number 903359. The 2021 assessed value for the subject property is $581,117. The description from the appraisal district lists the property as furniture, fixtures and equipment, vehicles, along with merchandise and supplies. Below is a summary of the appraisal district's valuation since 2018.

| Type | 2018 | | | 2019 | | | 2020 | | | 2021 | | |
|------|------|-----------|--------|------|-----------|--------|------|-----------|--------|------|-----------|--------|
| | Cost | Appraised | Market | Cost | Appraised | Market | Cost | Appraised | Market | Cost | Appraised | Market |
| FF&E | $913,382 | $817,040 | $782,615 | $913,382 | $827,040 | $712,644 | $913,382 | $827,040 | $648,281 | $913,382 | $827,040 | $575,149 |
| M/S | $0 | $1,500 | $1,500 | $0 | $1,500 | $1,500 | $0 | $1,500 | $1,500 | $0 | $1,500 | $1,500 |
| Vehicles | $0 | $0 | $0 | $0 | $0 | $0 | $6,982 | $0 | $5,586 | $6,982 | $0 | $4,468 |
| Total | $913,382 | $818,540 | $784,115 | $913,382 | $828,540 | $714,144 | $920,364 | $828,540 | $655,367 | $920,364 | $828,540 | $581,117 |

FF&E   Furniture, Fixtures & Equipment
M/S    Merchandise & Supplies

[1] https://www.airport-technology.com/news/oaktree-austin-bergstrom-airports/
[2] https://www.bloombergquint.com/business/oaktree-is-said-to-explore-options-for-texas-airport-terminal

*Allen, Williford & Seale, Inc.*

## LEASEHOLD SITE DATA

A survey plat was attached to the Initial Lease and an aerial plat was provided for the Amendment. Information regarding the subject property was also obtained from other sources, including public records and a physical inspection of the site. The Leasehold property is made up of 2 non-contiguous tracts of land with one tract being in the Initial Lease 22.66 acres and two more tracts in the Amendment (0.98-D-Tract acres and 1.50 acres-C-Tract) or a total of 2.48 acres.

**Legal Description**.  The subject property may be legally described as a total of 25.14 acres out of Santiago Del Valle Ten League Grant Survey, Abstract 24, Travis County, Texas.

**Location**.  The subject tracts are located on the southern end of AUS with the Initial Lease tract being at the southwestern corner of Emma Browning Avenue and Logistics Lane having an address of 10000 Logistics Lane.  Tract C is located contiguous to the south of the Initial Lease tract along the east line of Outlaw Country Drive. Tract D is located south of the Initial Lease tract on the north side of Fighter Drive, west of Outlaw Country Drive. Below is a sketch map showing the locations of the tracts along with the outparcel's location.  All tracts are within the boundaries of AUS.



**Access**.  The Initial Lease tract has access from Emma Browning Avenue.  Tract C has access from Outlaw Country Drive while Tract D has access from Fighter Drive.

**Physical Characteristics**.  The Initial Lease tract contains approximately 22.66 acres (987,129 square feet) of land.  Within the boundaries of the tract is a 0.34 acre outparcel.  The tract has approximately 280 linear feet of frontage along Emma Browning Avenue.  Tract C contains 1.5 acres (65,190 square feet) of land.   The tract has frontage on Outlaw Country Drive.  Tract D contains 0.98 acres (42,830 square feet) of land.   The tract has frontage on Fighter Drive.

**Off-Site Improvements**.  Within the boundaries of the Initial Lease tract includes the street right of ways of Logistics Lane, Outlaw Country Drive and Fighter Drive.  All are 2-lane, asphalt paved roadways with curbs and gutter drainage.

AUS ST 000333

**Adjacent Land Use**.  Land use adjacent to the subject property consists of vacant land, parking areas and buildings that were used in conjunction with the Air Force base in the past as well as the current use for AUS.

**Restrictions**.  The subject property is located within AUS which is listed as a controlled compatible land use area.  The property falls under height limits, overlay zones and airport hazard zones.  The zoning district from the City is AV or Aviation Services. This zoning district designation allows for an airport related use that requires direct access to airport facilities or that is compatible with or supports airport operations and services.  Also, the property falls under AUS Guidelines, other applicable Airport rules and regulations, Federal Aviation Regulations governing the height and location of structures affecting airspace at the Airport as set forth in 14 CFR Part 77, Chapter 25-13 of the Austin City Code (Airport Hazard and Compatible Land Use Regulations).  Additionally, any use or future use of the property would have to consider and adhere to the overall airport "Master Plan".  The master plan that the lease is subject to is defined as the Owner's Master Plan, dated as of December 2003, as amended.

**Flood Plain**.  According to Map No. 48453C0610L issued by the Federal Emergency Management Agency, as of January 22, 2020, the subject property is located in Zone X, an area outside of the 500-year flood plain.

**Easements**.  We were not provided with a title report and the existences of easements are not known.  The site sketch indicates that utility corridors cross the site.  The utility corridors are restricted by AUS for use for utility connections across the airport property.  Additionally, within the description of the subject site are various public rights of ways.

**Utilities**.  The subject property has access to public water, public sewer, electricity service, natural gas, and telecommunication services.

AUS ST 000334

*Allen, Williford & Seale, Inc.*

## LEASEHOLD IMPROVEMENT DATA

The leasehold land area is improved with a freestanding metal building used as the South Terminal being 27,872 gross square feet in size. The terminal building has an apron area with ramps for 3 (737-size) passenger sized planes, a loading and unloading area along with several parking lots.

South Terminal Building. According to the Phase 1 Environment Study, the building was constructed in 1984. The building was originally constructed and used by the U.S. Air Force as the Weapons and Release Systems Shop. After the Air Force left in 1993, the building was used by the Texas Army National Guard for aircraft avionics maintenance from 1998 until 2007. From August 2008 until May 2009, the building was operated as a passenger terminal. The building was unoccupied until 2016 when the current tenant (LoneStar) began renovations and started passenger terminal operations in Mid-2017. The terminal currently serves Frontier and Allegiant airlines.

The building is a single-story, metal walled structure approximately 24 feet in height. The subfloors throughout the building are concrete with certain areas covered with tiles or carpeting. The ceiling in the majority of the building is covered with ceiling tiles while backroom areas have open ceilings with exposed airducts and overhead piping. LED lights and some fluorescent lights are used throughout the building. The building currently has areas for restrooms, baggage handling, ticketing, security, office/employee areas, storage, mechanical, waiting and baggage claim. The exterior has curb-side pick-up covered fabric canopies, and an outdoor bar/food truck area. Below is an image of the floor plan for the terminal area from the "As-Built" plans.



Below are some interior pictures of the terminal ticketing and waiting areas.




*Allen, Williford & Seale, Inc.*

<u>Aircraft Apron and Ramps</u>.  The apron area is connected to the terminal building by a covered walkway to the plane loading areas.  The apron area is concrete paved while the ramp areas are asphalt and concreted paved. Below, is an image of the apron area from the "As-built" plans.



Below are some exterior pictures of the apron and ramp areas.

 

Parking.  The lease includes several parking areas.  The parking areas include active and inactive lots. The inactive lots are for overflow traffic when necessary.  Below is summary of the different parking areas.

| Parking Summary | | | |
|---|---|---|---|
| | | Parking Spaces | |
| Name | Type | # | H/C |
| South Terminal | Short -Term | 43 | 2 |
| Large Lot | Long-Term | 835 | 22 |
| Lot A | Cell Phone | 41 | 1 |
| Lot B | Overflow | 129 | 2 |
| Lot C | Overflow | 150 | 0 |
| Lot D | Employee | 85 | 5 |
| Modular Lot | Employee | 20 | 0 |
| Total | | 1,303 | 32 |

H/C - Handicapped

AUS ST 000336

The South Terminal and "Larger" Terminal Lots are the only monitored pay parking. These lots have credit card machines and gated entries. The cell phone modular and employee lots are not gated. The two overflow lots are fenced and access is only when necessary. The Modular lot is currently occupied by the airport manager's modular office. The lots are paved with concrete or asphalt with markings. Below is an image of the parking areas from the "Civil Set" plans, modified to include the Amendment areas.



The main terminal building was constructed in 1984 for a different use and the building has been renovated for the current use. While we observed no significant items of deferred maintenance, the property has experienced other forms of depreciation being external or economic obsolescence due to the structure not being a "typical" modern passenger terminal. In the lease, the terminal is defined as a "Limited Services Terminal" for supporting a lower cost operational structure with fewer operational amenities. The building and site improvements were originally constructed 38 years ago for another use. While, the renovation of the building for its current passenger terminal use is functional for an interim period, the overall economic life of the building for this use would be limited due to overall changes in the aviation industry. While the building is a large metal building that can be adaptable, the overall property is considered to be a special purpose property due to its location within AUS. Any use or future use of the property would have to consider the overall airport "Master Plan". The 2003 Master Plan maps depict that the building used for the existing south terminal will be removed in order for a "new" south terminal complex. This factor would support the opinion that the existing improvements' remaining economic life is interim in nature .

Again, as stated earlier and under Article 9.12 in the lease, no compensation for improvements has been included for the tenant's interest.

*Allen, Williford & Seale, Inc.*

## HIGHEST AND BEST USE

A property must be appraised in terms of its highest and best use. According to *The Dictionary of Real Estate Appraisal*, Sixth Edition, copyright 2022, page 88, by the Appraisal Institute, highest and best use is defined as:

> "The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity."

The procedure used in this report to determine the highest and best use of the subject. The valuation in this instance is limited to the Leasehold Estate. The analysis in scope of work was to consider, in sequence, the property's legal use, its possible use, its feasible use and, finally, the optimum or highest and best use.

**Legal Use.** Private (deed) restrictions, zoning regulations, building codes, historic district controls, and environmental regulations can often preclude many possible highest and best uses.

The subject property is located in the City of Austin and is zoned for Aviation Services. This use would conform to its location within AUS. Additionally, there are environmental regulations, height restrictions, building codes, noise codes as well as other restrictions, which would affect the use of the subject property. The property is under lease for 35± years for aviation uses. Therefore, legal use would be for aviation related uses.

**Possible Use.** The subject leasehold property contains 25.14 acres of land which is of sufficient size to accommodate a variety of possible legal uses.

The property is located within AUS, has adequate utilities, topography and access to accommodate many possible legal uses for aviation related services.

**Feasible Use.** The subject property is located within AUS and has access to runways and taxi ways. The legal uses only allow for aviation services. Based on the above-mentioned factors, we believe the most feasible use of the subject whole property, as vacant, is for aviation services uses.

**Highest and Best Use of Land Only.** After consideration of the legal, possible, and feasible uses, it is my opinion that the highest and best use of the subject whole property, as vacant, is for aviation services uses.

*Allen, Williford & Seale, Inc.*

## VALUATION DISCUSSION

The purpose of this appraisal is to estimate the fair market value of the subject leasehold interest as of the effective date of the appraisal. Typically, the three accepted approaches used to estimate the market value of real estate are the Cost Approach, the Sales Comparison Approach and the Income Approach. This section of the report provides a brief summary of the three approaches along with a description of their relevance to appraisal of the subject property.

Cost Approach. The Cost Approach is typically used to value improved properties. The subject is only a leasehold interest in the property being utilized for aviation purposes as a passenger terminal and parking. The property interest is only a leasehold interest and this approach is not a credible or reliable method of valuation. The tenant is entitled to the unamortized cost of the Trade Fixtures and the Cost Approach was used to value this portion of the tenant's interest.

Sales Comparison Approach. The Sales Comparison Approach leans heavily upon the principle of substitution. In essence, this principle states that a prudent purchaser will pay no more for any particular property than it would cost him to acquire an equally desirable alternate property. The Sales Comparison Approach utilizes the sales of properties similar to the subject as the basis for an indication of market value. Direct comparison is made between each sale and the subject on an item-by-item basis. Adjustments are then made to the sales price of the comparable property in order to arrive at an indication of what it would have sold for had it been essentially the same property.

The subject is a special purpose property and the property interest is a leasehold estate. Sales of special purpose leasehold interests are limited to non-existent. Therefore, this approach is not considered to be credible to value the subject property consisting of a leasehold interest.

However, the Sales Comparison Approach was utilized to value the land in order to determine market value and market rent via a land capitalization valuation method within the Income Approach.

Income Approach. The Income Approach to Value is typically utilized to value income producing properties. A leasehold interest property is dependent on the rental income stream associated with the contract rental amounts and market rent. The Income Approach accurately measures these income streams to produce credible results. The approach also sets out the criteria to determine the appropriate capitalization rates to determine the market value as a result the income to the leasehold estate. The subject is a leasehold estate and rental income streams are the basis of the value. Based on the property interest being various rental income streams over the remaining lease term, the Income Approach would be the most reliable and credible method to measure market value. Accordingly, we have only utilized the Income Approach to Value in this instance.

*Allen, Williford & Seale, Inc.*

## INCOME APPROACH

The Income Approach presumes that no prudent buyer will pay more for the right to receive the future income stream for the subject property than the amount for which they can obtain the rights to a substitute income stream, assuming the similar quality, quantity, and durability of the income stream. The property interest that is the subject of this appraisal is the Leasehold Interest only that is to be wholly or entirely acquired by the City of Austin. As a result the valuation methodology is limited to the leasehold interest alone. The proper valuation methodology has been laid out from the Texas courts.

A leasehold interest value is calculated as the present market value of the use and occupancy of the leasehold for the remainder of the lease, plus the market value of the right to renew, less the agreed rent the tenant must pay for the use and occupancy of the property. A leasehold interest may have a positive or negative value depending on whether the contract lease amount is under market rent or over the market rent.

In the valuation of the leasehold interest, the following are steps to be performed in the valuation:

1. Determine Market Rent
2. Determine Contract Rent
3. Subtract the Contract Rent from the Market Rent
4. Combine the Leasehold Monthly Bonus by the Number of remaining monthly installments
5. Apply a Rate to the Monthly Cash Flows
6. Calculate the Present Value of the Cash Flows to Determine the Leasehold Value

The discussion on the following pages will demonstrate this procedure as it applied to the subject property interest. First we used the following definitions in the analysis.

Market rent, as used in this report, is defined in <u>The Dictionary of Real Estate Appraisal</u>, Seventh Edition, copyright 2022, page 116, as follows:

> "The most probable rent that a property should bring in a competitive and open market under all conditions requisite to a fair lease transaction, the lessee and lessor each acting prudently and knowledgeably, and assuming the rent is not affected by undue stimulus. Implicit in this definition is the execution of a lease as of a specified date under conditions whereby
> - Lessee and lessor are typically motivated;
> - Both parties are well informed or well advised, and acting in what they consider their best interests;
> - Payment is made in terms of cash or in terms of financial arrangements comparable thereto; and
> - The rent reflects specified terms and conditions typically found in that market, such as permitted uses, use restrictions, expense obligations, duration, concessions, rental adjustments and revaluations, renewal and purchase options, frequency of payments (annual, monthly, etc.), and tenant improvements (Tis)."

Contract rent, as used in this report, is defined in The Dictionary of Real Estate Appraisal, Seventh Edition, copyright 2022, page 40, as follows.

> "The actual rental income specified in a lease."

Excess rent (Surplus), as used in this report, is defined in The Dictionary of Real Estate Appraisal, Seventh Edition, copyright 2022, page 66, as follows.

> "The amount by which contract rent exceeds market rent at the time of the appraisal; created by a lease favorable to the landlord (lessor) and may reflect unusual management, unknowledgeable or unusually motivated parties, a lease execution in an earlier, stronger rental market, or an agreement of the parties.

The subject property consists of a leasehold property interest consisting of a property used for aviation related uses for a passenger terminal, parking, apron and supporting land. The Initial Lease and Amendment were based on a ground rental amount of $0.30 per square foot. The leasehold is made up of two separate leases consisting of the Initial Lease and the Amendment. The areas under each lease are as follows:

| Leasehold Areas | | |
|---|---|---|
| Lease | Acres | Square Feet |
| Initial Lease | 22.66 | 987,129 |
| Amendment | 2.48 | 108,020 |
| Total | 25.14 | 1,095,149 |

The valuation of the leasehold follows the steps laid out earlier.

**Market Rent Analysis.** Determination of the Market Rent on a per square foot basis was performed via two methods. The first method is a land capitalization analysis. In this analysis, market rent is determined based on multiplying a market capitalization rent to the market value of the land. This methodology results in an annual market land rental rate. Additionally, a comparable rent analysis was performed. This analysis entails using actual rental rates from comparable properties in order to determine a market rental rate for the subject property. The following analysis explains the two methods in determining market rent to apply the leasehold valuation analysis.

**Sales Comparison Approach for Land Capitalization.** The method of market rent estimation, which has the highest degree of acceptance in the leasing of land for aviation use, is based on a rate of return on the land value. This method is popular in all types of land leasing situations, is market derived, and accounts for geographic location. It can be applied to any particular property, and reflects an adequate return to the value of the investment. The major component to this method is determining the market value for the land. In this case, we have utilized the Sales Comparison Approach. The Sales Comparison Approach utilizes the sales of properties similar to the subject as the basis for an indication of market value. Direct comparison is made between each sale and the subject on an item-by-item basis. Adjustments are then made to the sales price of the comparable property in order to arrive at an indication of what it would have sold for had it been essentially the same property. These adjusted prices are then reconciled into an indication of value for the subject.

We have researched land sales in the area in order to estimate a value for the subject to apply in this analysis for market rent for the land. The summary on the following page are the comparable sales land utilized to value the subject property. Full descriptions of these sales are included with this report. The land sales summary and map are on the following page.

*Allen, Williford & Seale, Inc.*

| LAND SALES SUMMARY | | | | |
|---|---|---|---|---|
| Sale No. | Sale Date | Size (Acres) | Price/SF | Location |
| 1 | 7/26/16 | 12.864 | $2.92 | SW/L of Burleson Rd., SE of Smith School Rd. |
| 2 | 9/9/16 | 93.789 | $1.17 | SWC U.S. Hwy. 183 & Burleson Rd. |
| 3 | 4/24/17 | 150.155 | $1.53 | SWC U.S. Hwy 183 & McKinney Falls Pkwy. |
| 4 | 5/21/18 | 50.365 | $4.11 | SE/L of FM 973, SW of SH 71 |
| 5 | 11/6/19 | 14.145 | $2.00 | NE/L of Burleson Rd., NW of Norwood Ln. |
| 6 | 4/7/21 | 60.050 | $2.30 | N/C of Old Bastrop Hwy. & Dalton Ln. |
| 7 | 9/14/21 | 27.610 | $2.30 | NW/L of Dalton Ln., NE of Old Bastrop Hwy. |



**Land Sales Analysis.** The land sales summarized above are considered comparable to the subject. When comparing these sales to the subject, the factors considered the most critical were: conditions of sale, time, location, size, utilities, and physical characteristics. Each sale was compared to the subject and adjusted based on these factors. The following is a discussion of the comparisons used in our analysis.

Conditions of Sale. This adjustment takes into consideration unusual features of the transaction, such as financing or whether or not the sale took place under open market conditions. All of the comparable sales were cash sales or financed at terms equivalent to cash. As such, no adjustments for conditions of sale were required.

Time. Generally, prices rise over time due to inflation and the decreasing supply of land. However, land

values in the subject area have increased over the past several years. The comparable land sales used in this report occurred between July 2016 and September 2021. Based on the review of market reports by CoStar for the different property types, land values have been increasing. We have applied an annual rate of 6 percent per year during this time period for appreciation.

Location. This, in our opinion, is an important factor affecting property values. Those properties having frontage along major or primary roadways, or a corner location are often superior to those properties located on secondary roadways or without corner locations. Proximity to major commercial areas, such as a business district, is also important in many instances.

The subject property is located within the AUS boundaries and a portion of the site has access to the taxiway. The tract's location in the southern area of the airport and the main access to this portion of the airport is Burleson Road. The area is made up of mixed aviation and support type uses.

The sales in proximity to the airport, including the subject are believed to be similar. Sale Nos. 1 and 4 are located in locations that are superior. These two sales were adjusted downward 20 percent as compared to the subject with respect to location.

Size. Larger tracts typically bring lesser unit prices than otherwise equally desirable smaller tracts. The primary reason for this is that the purchase of large acreage entails a much greater capital outlay, a factor which restricts the number of possible buyers as compared to the relatively larger market for smaller tracts.

The subject contains 25.14 acres of land, while the comparable sales range in size from 12.864 acres to 150.155 acres. Sale No. 7 (27.61 acres) is considered comparable with respect to size. Sale Nos. 2, 3, 4, and 6 range in size from 50.365 acres to 150.155 acres and are considered inferior with respect to size. These sales were adjusted upward on a range from 20 to 50 percent for size. Sale No. 1 (12.864 acres) and Sale No. 5 (14.145 acres) and are considered superior to the subject with respect to size. These sales have been adjusted downward 10 percent accordingly for this factor.

Frontage. Properties located on corners are typically considered superior to non-corner properties due to their increased visibility and accessibility. In order for corner influence to be significant, typically, the corner must be formed by the intersection of two primary roadways.

The subject location does not exhibit a corner influence. Sale Nos. 2 and 3 are located on corners fronting U.S. Highway 183 and are superior to the subject with respect to corner influence. These sales were adjusted downward 10 percent for this factor. Sale No. 5 has a low frontage to depth ratio and is believed to be inferior for this frontage factor as compared to the subject. This sale was adjusted upward 10 percent for this factor.

All of the remaining sales do not have corner influence and have similar frontage. As a result, no adjustment is necessary for this factor.

Zoning/Restrictions. Zoning ordinances can regulate land use and the density of development. It can be used to limit the types of development, the density of development, or the architectural character of the developments. In some instances, zoning can limit the development of a property from its highest and best use.

The subject property is zoned for Aviation Services which can be used for aviation related uses and also has height and noise restrictions (Airport Overlay). Sale Nos. 2, 3, 6 and 7 are subject to similar restrictions. None of the sales are located within the airport nor do they have the same zoning. For the purposes of this valuation, the subject is assumed to have zoning compatible with mixed use development. As a result these sales are considered similar for this factor.

Sale Nos. 1, 4 and 5 are not subject to similar restrictions, are considered superior, and have been adjusted downward 10 percent for this factor.

Physical Characteristics.  Other factors which can have an effect on values include drainage, shape in respect to development, hindering easements, location in respect to flood hazards, size, shape, frontage, and topography.  All of the sales were analyzed and adjusted for these factors.

> Floodplain.  The subject is not located within flood plain.  Sale Nos. 3, 6, and 7 have portions in the flood plain.  The sales were adjusted from 15 to 40 percent for the flood plain.  Sale No. 2 has portions in the flood plain, but a drainage easement overlaps the flood plain.  This sale will be adjusted for the drainage easement. The remaining sales do not have flood plain areas and did not require adjustment.

> Easements/Other.  The subject has various corridors/easements that cross the tract as well as public rights of way for streets.  The three utility corridors make up approximately 10 percent of the site.  The utility corridors affect the subsurface and no adjustment was made for these existing encumbrances.  Several of the sales have easements, Sale No. 2 has a 50 acre drainage easement, Sale No. 3 has HVTL easement, Sale No. 4 has a 9.6 acre drainage easement, and Sale No. 6 has an aviation easement. The sales were all adjusted accordingly.

Utilities.  The availability of utilities is a major factor in the development of any property.  If a site has no access to public utility service and cannot acquire access, it is virtually impossible to develop.  Therefore, the price paid for such a site would be affected due to the lack of or availability of utilities.

The subject tract has public water and sewer available.  All of the sales have public water and sewer available and are considered comparable to the subject with respect to this factor.

Please refer to the Land Sales Adjustment Grid below which displays the adjustments used to compare the sales to the subject tract.

| Land Sales Adjustment Grid | | | | | Adjustments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sale # | Sale Date | Price Per (Sq. Ft.) | Time & Conditions | T & C Adjusted Price/SF | Location | Size | Frontage | Zoning/ Restrict. | Flood Plain | Utilities | Other | Overall Adjustment | Adjusted Price/SF |
| 1 | 7/16/16 | $2.92 | 34% | $3.91 | -20% | -10% | 0% | -10% | 0% | 0% | 0% | -40% | $2.35 |
| 2 | 9/9/16 | $1.17 | 33% | $1.56 | 0% | 40% | -10% | 0% | 0% | 0% | 50% | 80% | $2.81 |
| 3 | 4/24/17 | $1.53 | 29% | $1.97 | 0% | 50% | -10% | 20% | 0% | 0% | 10% | 70% | $3.35 |
| 4 | 5/21/18 | $4.11 | 23% | $5.06 | -20% | 20% | 0% | -10% | 0% | 0% | 20% | 10% | $5.57 |
| 5 | 11/6/19 | $2.00 | 14% | $2.28 | 0% | -10% | 10% | -10% | 0% | 0% | 0% | -10% | $2.05 |
| 6 | 4/7/21 | $2.30 | 5% | $2.42 | 0% | 25% | 0% | 0% | 15% | 0% | 10% | 50% | $3.63 |
| 7 | 9/14/21 | $2.30 | 3% | $2.37 | 0% | 0% | 0% | 0% | 40% | 0% | 0% | 40% | $3.32 |

The comparable sales analyzed in the preceding chart reflect an adjusted sales price range of $2.05 to $5.57 per square foot with an average of the adjusted prices being $3.47 per square foot.  Sale No. 4 represents the highest adjusted price while the remaining sales fall well below.  Based on this information, other sales and offerings, it is our opinion that the subject property, land only, has a market value, of $3.60 per square foot.  As such, our estimate of the per unit market value, land only, is listed as follows:

### $3.60 Per Square Foot

**Improvements**.  The subject property is improved with the South Terminal Building and supporting parking, aprons, etc.  Again, as stated earlier and under Article 9.12 in the lease, no compensation or

consideration for improvements has been included for the tenant's interest.

**Market Rent Analysis from Land Capitalization.**  The purpose of this appraisal is to estimate the current market rent of the property described earlier.  As stated earlier in the highest and best use, the subject property is subject to a ground lease for aviation uses.  Therefore, the market rent rate of the land is valued in this report.

The methodology employed for estimating land lease rates is based on two sources.  One method is to compare land lease rates from other airports to the subject.  The second method is to determine the value of the land at the subject airport and then apply a rate of return to this land.  The rate of return is determined from comparison of lease rate returns from other airports as well as a rate of return from the real estate market.  This methodology is believed to be reasonable and is reflective of the market in determining land lease rates for airport properties.

Current Leasing Status.  The subject is under lease with a base ground rate of $0.30 per square foot annually.  The current contract rent for Initial Lease is $0.33 per square foot based on the CPI adjustments.

Unit of Comparison.  The comparable rents were analyzed using the rental rate per square foot of land area.  This unit of comparison is calculated by dividing the total annual rent by the total square footage.

Lease Rates.  The scope of our appraisal included the estimation of a market lease rate for the subject property.  The lease rate is applied as a rate of return to the value of the land determined earlier.  In determining the rate of return, we have utilized a market survey of airport properties along with a market study of all real estate properties for ground leases.

Airport Market Survey.  One of the steps in the process we used to estimate the lease rate for the subject was based on airports across the country.  Airports determine the rental amounts of their property via different methods.  One of these methods is based on a rate of return to the market value of the property.  We have performed an historic survey of airport lease terms.  That study found that lease terms ranged from 3 to 60 years, with the majority ranging from 20 to 30 years.  The rate of return on the land values ranged from 8 to 11 percent.

Real Estate Market Summary.  In this analysis, the rate of return is estimated from the overall real estate market.  In this scenario, the rate of return is determined by the forces of market supply and demand for investment funds.  The rate of return must be sufficient to compensate the investor or landowner for: 1) time; 2) liquidity; 3) management; and 4) risk.  The rate of return must be offered or paid to meet the competition of alternative investment returns or opportunity cost of funds.

We have referenced the chart on the following page, compiled by Realtyrates.com, details survey respondents' capitalization rates for land leased properties.  This chart is from the most recent 3rd Quarter of 2021.

*Allen, Williford & Seale, Inc.*

| RealtyRates.com INVESTOR SURVEY - 3rd Quarter 2021* | | | | | | |
|---|---|---|---|---|---|---|
| LAND LEASES | | | | | | |
| Property Type | Capitalization Rates | | | Discount Rates | | |
| | Min. | Max. | Avg. | Min. | Max. | Avg. |
| Apartments | 2.30% | 9.58% | 6.11% | 4.90% | 10.08% | 7.11% |
| Golf | 2.34% | 14.94% | 8.57% | 4.94% | 15.44% | 9.57% |
| Health Care/Senior Housing | 2.34% | 10.12% | 6.71% | 4.94% | 10.62% | 7.71% |
| Industrial | 2.34% | 9.48% | 6.46% | 4.94% | 9.98% | 7.46% |
| Lodging | 2.34% | 14.22% | 7.00% | 4.94% | 14.72% | 8.00% |
| Mobile Home/RV Park | 2.11% | 12.02% | 7.27% | 4.71% | 12.52% | 8.27% |
| Office | 2.32% | 9.34% | 6.13% | 4.92% | 9.84% | 7.13% |
| Restaurant | 3.25% | 14.62% | 8.15% | 5.85% | 15.12% | 9.15% |
| Retail | 2.34% | 10.54% | 6.64% | 4.94% | 11.04% | 7.64% |
| Self-Storage | 2.32% | 9.79% | 7.53% | 4.92% | 10.29% | 8.53% |
| Special Purpose | 3.04% | 16.26% | 8.57% | 6.10% | 17.64% | 8.81% |
| All Properties | 2.11% | 16.26% | 7.19% | 4.71% | 15.44% | 8.06% |

*2nd Quarter 2021 Data                                Copyright 2021 RealtyRates.com™

As can be seen, capitalization rates for land leases-"Special Purpose" properties ranged from 3.04% to 16.26% with an average of 8.57%. Overall, "All Property" types had a capitalization rate for land leases ranging from 2.11% to 16.26% with an average of 7.19%. The special purpose properties show a higher average capitalization rate than more typical property types. Overall, this publication indicates a capitalization rate for special purpose properties being slightly higher than 8.5 percent annually.

Therefore, based on market rates of return and the rates of returns from other airports, we believe the appropriate rate of return to the land value for the subject property is 8.5 percent. This rate is in the range of the airport survey from 8 to 11 percent as well.

The estimation of annual lease rental rate is as follows:

**Market Value per Unit X Rate of Return  =  Annual Lease Rental Rate**

**$3.60 per Sq. Ft. X 8.5%  =  $0.31 per Sq. Ft.**

**Comparable Rent Analysis.** The second method of determining market rent is based on comparable leases for the property within the AUS airport. The rentals included in this report are believed to accurately reflect the ground lease rental market within the market area of the subject property. This survey is also believed to reflect the competition with which the subject must compete. A summary and map of these rent comparables are also provided below and on the following page.

| AUS Ground Rental Comparables | | | | | | |
|---|---|---|---|---|---|---|
| Name | Location | Date | Term | Size | Rate | Escalation |
| AUS Fuel Co., LLC | 3324 Spirit of Texas | 10/1/2019 | 15 Years | 300,677 SF | $0.37 PSF | 5 Yr-Fixed, CPI/Yr |
| Austin FBO, LLC | 4800 Emma Browning | 6/1/2015 | 30 Years | 875,517 SF | $0.24 PSF | CPI Annually |
| LoneStar | 10000 Logistics | 3/24/2016 | 30 Years | 987,129 SF | $0.30 PSF | CPI Annually |
| LoneStar | 10000 Logistics | 7/1/2019 | 30 Years | 108,020 SF | $0.30 PSF | CPI- 5 Year |

*Allen, Williford & Seale, Inc.*



The rentals included in the previous summary are considered comparable to the subject. All the market rental comparables are long term ground leases located within AUS. Rental comparables are limited due to the special purpose type property. The comparables are made up of four ground leases signed between 2015 and 2019, two of which, make up the subject leasehold. These comparables are believed to be the most similar to market rent when comparing to other ground lease type transactions. In this analysis, the rentals were compared based on date of the lease, size of the area and length of the term. The data was sorted and graphically compared. These factors are illustrated graphically below:



*Allen, Williford & Seale, Inc.*





Below is a discussion of the important factors for the rental market as compared to the subject.

Rent No. 1-AUS Fuel.  This lease transaction occurred in 2019 and was the most recent lease at AUS. Rental rates are believed to increase since that time and this sale is considered inferior to the date of value with respect to market conditions. The land size 300,677 square feet (6.903 acres) of land and is considered superior to the subject with respect to land size.  The term of the lease is 15 years.  This is considered superior to the subject's 30 year term.  Overall, this rent comparable at $0.37 per square foot annually and is considered similar to the subject property.

Rent No. 2-Austin FBO.  This lease transaction occurred in 2015 and is the oldest lease from the rental data at AUS.  Rental rates are believed to increase since that time and this sale is considered inferior to the date of value with respect to market conditions.  The land size 875,517 square feet (20.1 acres) of land and is considered similar to the subject with respect to land size.  The term of the lease is 30 years. This is considered similar to the subject's 30 year term.  Overall, this rent comparable at $0.24 per square foot annually and is considered inferior to the subject property.

Rent No. 3-LoneStar.  This lease transaction occurred in 2016 and is the Initial Lease of the subject. Rental rates are believed to increase since that time and this sale is considered inferior to the date of value with respect to market conditions.  The comparable is similar for all other factors.  Overall, this rent comparable at $0.30 per square foot annually and is considered inferior to the subject property.

Rent No. 4-LoneStar.  This lease transaction occurred in 2019 and is the amendment lease of the subject. Rental rates are believed to increase since that time and this sale is considered inferior to the date of value with respect to market conditions.  The comparable is similar for all other factors.  Overall, this rent comparable at $0.30 per square foot annually and is considered inferior to the subject property.

The rental rates above range from $0.24 to $0.37 per square foot, annually.  The most recent lease occurred in 2019 and the rental rates have been increasing over time due to market conditions.  Based on this factor, the market rent for the subject is estimated to be slightly over the range of the comparable rental data.  Based on our analysis of the in-place and comparable rents, we have estimated market rent for the subject property to be $0.40 per square foot annually.

**1.   Determine Market Rent.**
The market rent findings from the land valuation and capitalization analysis and the comparable rental analysis ranged from $0.31 per square foot to $0.40 per square foot annually.  The range differential between the two methods is small and we have determined the market rental rate to be $0.40 per square foot annually.

**2.   Determine Contract Rent.**
Rent under the Initial Lease includes Fixed Rent and Variable rent as defined in Section 5.02, and Additional Rent. Additional Rent is defined as all fees, charges, and amounts payable by Tenant to Owner under this Lease other than Fixed Rent and Variable Rent.

Fixed rent is the Initial Lease original contract rent of $300,000 or $0.30 per square foot annually.  The Initial Lease is adjusted effective as of the first day of each lease year beginning with the second lease year commencing after the beginning of operations, based on any percentage increase in the averaged CPI of the prior 12-month period running from July 1st through June 30th over the immediately preceding July 1st through June 30th.  The first day of the lease year is October.  The rental increases for the last three escalations were 3.3 percent, 1.2 percent and 0.5 percent, respectively based on the historical records.  The current contract rent is $0.33 per square foot annually.

Variable Rent is based on a percentage of annual Lease Year Gross Revenues, pro-rated for any partial Lease Year, based on the actual Enplaned Passengers for the applicable Lease Year in accordance with the following schedule.

- 0 to 399,999 Enplaned Passengers, 0% of Gross Revenue;
- 400,000 to 699,999 Enplaned Passengers, 5% of Gross Revenue;
- 700,000 to 999,999 Enplaned Passengers, 10% of Gross Revenue;
- 1,000,000 to 1,299,999 Enplaned Passengers, 15% of Gross Revenue; and
- more than 1,299,999 Enplaned Passengers, 20% of Gross Revenue.

For the purposes of the lease, Gross Revenue is defined in Section 5.01 as, the total amount actually charged to all customers by Tenant arising from its operation of the Premises, including Owner's cash payments to Tenant under Section 18.06 (Rental Car Revenue Sharing), whether for cash, credit or exchange, regardless of when collected. It shall include all transactions, regardless of place or time of actual payment. For the avoidance of doubt, Gross Revenues will not be deemed to have been earned by Tenant until such time that Tenant is entitled to collect such revenues from the applicable counterparty under an installment sales contract.

Based on historic records, the variable rent was only paid in the Lease Year 3 from October 1, 2018 to September 30, 2019.  For the purposes of calculating contract and surplus rent, any contract variable rent will be offset with the market variable rent as required in the lease, as the amount would be same.

*Allen, Williford & Seale, Inc.*

In other words, there would not be any surplus income from the variable rent component that would contribute to the leasehold.

The Amendment lease original contract rent is $0.30 per square foot annually. This amount is described as "Additional Rent" in Paragraph 1.c. of the Amendment. The Amendment lease rates will be adjusted every 5 years based on the CPI with the revised rate going into effect starting in the month of July of each fifth anniversary year of the commencement date. No escalation has occurred as yet. The escalation for the Amendment is not outside its first 5-year period. The first escalation will occur in July 2024. No variable rent is associated with the Amendment.

Changes in the CPI are the determinant factor in estimating contract rent in the future. Therefore, we are required to analyze CPI in order to forecast the rent increases.

Below is a chart from the Bureau of Labor Statistics that reports the CPI levels since 2011.

**CPI for All Urban Consumers (CPI-U)**
**Series Title:** All items in U.S. city average, all urban consumers,
**Area:** U.S. city average
**Years:** 2011 to 2021

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | % Change July to June | Annual % Change |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|------|------|
| 2011 | 220.223 | 221.309 | 223.467 | 224.906 | 225.964 | 225.722 | 225.922 | 226.545 | 226.889 | 226.421 | 226.230 | 225.672 | | |
| 2012 | 226.665 | 227.663 | 229.392 | 230.085 | 229.815 | 229.478 | 229.104 | 230.379 | 231.407 | 231.317 | 230.221 | 229.601 | 1.7% | 1.7% |
| 2013 | 230.280 | 232.166 | 232.773 | 232.531 | 232.945 | 233.504 | 233.596 | 233.877 | 234.149 | 233.546 | 233.069 | 233.049 | 1.8% | 1.5% |
| 2014 | 233.916 | 234.781 | 236.293 | 237.072 | 237.900 | 238.343 | 238.250 | 237.852 | 238.031 | 237.433 | 236.151 | 234.812 | 2.1% | 0.8% |
| 2015 | 233.707 | 234.722 | 236.119 | 236.599 | 237.805 | 238.638 | 238.654 | 238.316 | 237.945 | 237.838 | 237.336 | 236.525 | 0.1% | 0.7% |
| 2016 | 236.916 | 237.111 | 238.132 | 239.261 | 240.229 | 241.018 | 240.628 | 240.849 | 241.428 | 241.729 | 241.353 | 241.432 | 1.0% | 2.1% |
| 2017 | 242.839 | 243.603 | 243.801 | 244.524 | 244.733 | 244.955 | 244.786 | 245.519 | 246.819 | 246.663 | 246.669 | 246.524 | 1.6% | 2.1% |
| 2018 | 247.867 | 248.991 | 249.554 | 250.546 | 251.588 | 251.989 | 252.006 | 252.146 | 252.439 | 252.885 | 252.038 | 251.233 | 2.9% | 1.9% |
| 2019 | 251.712 | 252.776 | 254.202 | 255.548 | 256.092 | 256.143 | 256.571 | 256.558 | 256.759 | 257.346 | 257.208 | 256.974 | 1.6% | 2.3% |
| 2020 | 257.971 | 258.678 | 258.115 | 256.389 | 256.394 | 257.797 | 259.101 | 259.918 | 260.280 | 260.388 | 260.229 | 260.474 | 0.6% | 1.4% |
| 2021 | 261.582 | 263.014 | 264.877 | 267.054 | 269.195 | 271.696 | 273.003 | 273.567 | 274.310 | 276.589 | 277.948 | 278.802 | 5.4% | 7.0% |
| Average 10 -Year | | | | | | | | | | | | | 1.9% | 2.2% |
| Average 5 -Year | | | | | | | | | | | | | 2.4% | 2.9% |

Source: Bureau of Labor Statistics

The average CPI for the last 5 years for the lease period is 2.4 percent. This average is well below the last year's CPI of 5.4 percent. Based on the current CPI levels the escalations will experience larger increases in the near future. The graph to the right depicts trend line analysis of over 3.5 percent in the near future while historically the rate is been much less. Based on the historic CPI, rent escalations applied in the discount flow analysis are applied at 3.5 percent annually for the term of the remaining leasehold analysis as it applies to contract rent and market rent.



**3. Subtract the Contract Rent from the Market Rent.**
The subtraction of the market rent from the contract rent will be applied in the discounted cash flow analysis later in the report. The monthly cash flows will be increased based on the escalation rate determined earlier and according to the lease terms. Based on the determination discussed earlier, there is a bonus to the leasehold. Again, no surplus was calculated for the variable rent component.

**4. Combine the Leasehold Monthly Bonus by the Number of remaining monthly installments.**
The bonus rent attributed to the leasehold will be applied in the discounted cash flow analysis later in

*Value of Leasehold Interest in the South Terminal Property at ABIA*

*Allen, Williford & Seale, Inc.*

the report. Based on the initial term and the option periods (2-5 year terms), a total of 409 months of remaining installments/payments were calculated.

### 5.   Apply a Rate to the Monthly Cash Flows.

This procedure involves converting an income into a determination of value via use of an appropriate rate or factor. There are numerous capitalization techniques, and any number of income estimates may be capitalized. For example, appraisers estimate and capitalize Gross Annual Rental Income, Effective Annual Income, Net Annual Income, Cash Flow, and After Tax Cash Flow. There are generally one or two techniques which are most appropriate for the problem at hand which can be derived from the market. Income capitalization techniques include direct capitalization and yield capitalization. In direct capitalization, changes in future property value are implicit in the rates exhibited by actual market transactions. Yield capitalization anticipates changes in property income and value over a holding period. Changes in the property's income stream or future value are reflected by specific inputs.[3]

Direct Capitalization.   This technique utilizes a procedure whereby the net annual income is divided by an overall rate. Leasehold capitalization rates are difficult to derive and can be affected by the various provisions and nuances in the lease. In this particular instance, the Direct Capitalization technique is not believed to be a credible method for the valuation of the leasehold due to the varying income streams.

In this scenario, the income to the leasehold tenant increases over the duration of the lease. As such, the Yield Capitalization technique is the most credible and reliable method to value the leasehold estate.

Yield Capitalization.   This technique is used to convert future benefits into present value by discounting each future benefit at an appropriate yield/discount rate. Below is a description of the valuation process.

Rental Income. For the Yield Capitalization process, the first period rental income and the income of the remaining periods must be forecasted (also known as Cash Flows). The forecasted monthly rental bonus or net rental incomes for the current month and the remaining months were calculated on the Present Value (PV) table as provided in the Addenda. These estimated income streams are believed to be appropriate to use in our discounted cash flow analysis.

Discount Rate.   The discount rate, as known as the yield rate, is a rate of return on capital, usually expressed as a compound annual percent rate. A discount rate considers all expected property benefits. The discount rate will be used to convert the remaining monthly payments of the initial and option terms into a present value. Most discount rates are based on a safe rate and adjusted for the risk of the income stream or reversion associated with the type of property. A safe rate, also called riskless rate or relatively riskless rate, represents the minimum rate of return on invested capital. Theoretically, the difference between the total rate of return and the safe rate is considered a premium to compensate the investor for risk, the burden of management, and the illiquidity of the capital invested. To support our opinion of an appropriate discount rate, we researched current market interest rates as published by the Research Division of the Federal Reserve Bank of St. Louis. The chart on the following page relates to weekly corporate bond interest rates based on their risk since 2017.

---

[3] The Appraisal of Real Estate, 15th Edition, 2020, Page 416



*Allen, Williford & Seale, Inc.*

The previous chart depicts the interest rate spreads of corporate bonds with the risk associated with the rated bond instrument.  The average risk associated with income streams in this instance ranges from 1.6 percent spread between BBB and 2.47 percent spread between AAA bonds as opposed to unrated bonds.

The initial term of the lease is 40 years and there are currently over 34 years left on lease. The 10-year treasury rate and 30-year treasury rate will be used as an appropriate benchmark for a "safe rate" of return for comparison purposes.  The chart below summarized the annual treasury rates as report by the Federal Reserve.  The 10-Year Treasury Rate has been ranging from 0.89% to 2.91% since 2015.  The 20-Year Treasury Rate has been ranging from 1.35% to 3.02% since 2015.  The 30-Year Treasury Rate has been ranging from 1.56% to 3.11% since 2015.  Planned rate hikes and the Covid impact have affected the recent levels of rates for forecasting purposes.  Based on these rates, an appropriate safe discount rate component is 3.00%.

| Long Term Treasury Rates | | | |
|---|---|---|---|
| Year | % Yield U.S. Treasury 10-year | % Yield on U.S. Treasury 20-year | % Yield U.S. Treasury 30-year |
| 2015 | 2.14 | 2.55 | 2.84 |
| 2016 | 1.84 | 2.22 | 2.59 |
| 2017 | 2.33 | 2.65 | 2.89 |
| 2018 | 2.91 | 3.02 | 3.11 |
| 2019 | 2.14 | 2.4 | 2.58 |
| 2020 | 0.89 | 1.35 | 1.56 |
| 2021 | 1.45 | 1.98 | 2.06 |

The chart on the following page is a survey of historic spread of yield rates from Real Estate Research Corp (RERC) Real Estate Report.  The yield spread depicts the difference in real estate yield rates and more rates with perceived safe returns.  The basis point spread measures the difference between the yield and an alternative investment with a comparable life (10-year treasuries, Moody's Baa, or Moody's Aaa).  The report analyzes the economic and structural changes driving the U.S. real estate space and capital markets, and discusses how these changes are affecting market dynamics, capital flows, and risk and return.  Below is a survey of historic yield rates from Real Estate Research Corp (RERC) Real Estate Report. The report analyzes the economic and structural changes driving the U.S. real estate space and capital markets, and discusses how these changes are affecting market dynamics, capital flows, and risk and return.

AUS ST 000352

Following is a summary of the findings of RERC's Real Estate Research Report for the third quarter of 2021.

| Required Real Estate Yields Vis-À-Vis Capital Market Returns | | | | | | |
|---|---|---|---|---|---|---|
| | 3Q 2021 | 2Q 2021 | 3Q 2020 | 3Q 2019 | 3Q 2018 | 3Q 2017 |
| Real Estate Yield (%) | 7.6 | 7.6 | 7.8 | 7.8 | 7.8 | 7.8 |
| Moody's Baa Corporate (%) | 3.2 | 3.6 | 3.3 | 4.0 | 4.8 | 4.3 |
| Moody's Aaa Corporate (%) | 2.5 | 2.9 | 2.2 | 3.1 | 3.9 | 3.7 |
| 10-Year Treasurys (%) | 1.3 | 1.6 | 0.7 | 1.8 | 2.9 | 2.2 |
| **Yield Spread (Percentage Points)** | | | | | | |
| Moody's Baa Corporate (%) | 4.4 | 4.0 | 4.5 | 3.8 | 3.0 | 3.5 |
| Moody's Aaa Corporate (%) | 5.1 | 4.7 | 5.6 | 4.7 | 3.9 | 4.1 |
| 10-Year Treasurys (%) | 6.3 | 6.0 | 7.2 | 6.0 | 4.9 | 5.6 |

Sources: RERC, Federal Reserve, Moody's, 3Q 2021

The basis point spread for real estate yields ranges from 4.9% to 7.2% as compared to 10-year treasuries. The yield spread for the Moody's Baa and Moody's Aaa is less with a range of 3.0% to 5.6% over the same period. The basis point spread measures the difference between the yield and an alternative investment with a comparable life (10-year treasuries, Moody's Baa, or Moody's Aaa). We have applied a 6.00 basis point premium to the 3.00 percent yield rate determined earlier. The resulting discount rate is 9.0% (3.0% + 6.0%).

We have also referenced the following chart, compiled by Realtyrates.com, details survey respondents' discount rates for land leased properties. This chart is from the most recent 3rd Quarter of 2021.

| RealtyRates.com INVESTOR SURVEY - 3rd Quarter 2021* | | | | | | |
|---|---|---|---|---|---|---|
| **LAND LEASES** | | | | | | |
| | **Capitalization Rates** | | | **Discount Rates** | | |
| **Property Type** | **Min.** | **Max.** | **Avg.** | **Min.** | **Max.** | **Avg.** |
| Apartments | 2.30% | 9.58% | 6.11% | 4.90% | 10.08% | 7.11% |
| Golf | 2.34% | 14.94% | 8.57% | 4.94% | 15.44% | 9.57% |
| Health Care/Senior Housing | 2.34% | 10.12% | 6.71% | 4.94% | 10.62% | 7.71% |
| Industrial | 2.34% | 9.48% | 6.46% | 4.94% | 9.98% | 7.46% |
| Lodging | 2.34% | 14.22% | 7.00% | 4.94% | 14.72% | 8.00% |
| Mobile Home/RV Park | 2.11% | 12.02% | 7.27% | 4.71% | 12.52% | 8.27% |
| Office | 2.32% | 9.34% | 6.13% | 4.92% | 9.84% | 7.13% |
| Restaurant | 3.25% | 14.62% | 8.15% | 5.85% | 15.12% | 9.15% |
| Retail | 2.34% | 10.54% | 6.64% | 4.94% | 11.04% | 7.64% |
| Self-Storage | 2.32% | 9.79% | 7.53% | 4.92% | 10.29% | 8.53% |
| Special Purpose | 3.04% | 16.26% | 8.57% | 6.10% | 17.64% | 8.81% |
| All Properties | 2.11% | 16.26% | 7.19% | 4.71% | 15.44% | 8.06% |

*2nd Quarter 2021 Data                                    Copyright 2021 RealtyRates.com™

As can be seen, discount rates for land leases-"Special Purpose" properties ranged from 6.10% to 17.64% with an average of 8.81%. Overall, "All Property" types had a discount rate for land leases ranging from 4.71% to 15.44% with an average of 8.06%. The special purpose properties show a higher average discount than more typical property types. Overall, this publication indicates a discount rate slightly over 8.00 percent with special purpose properties being higher than 8.8 percent annually.

Finally, we have provided the investor survey prepared by RERC's Real Estate Research Report for the third quarter of 2021 for First Tier Investment Properties in the Austin Market Area. First tier properties

*Allen, Williford & Seale, Inc.*

are defined as the best quality assets in prime to good locations.  The following chart depicts rates for the First Tier Properties in the Austin Market.

**Austin | First-Tier Investment Properties**

| | Pre-Tax Yield (IRR) (%) | | | Going-In Cap Rate (%) | | | Terminal Cap Rate (%) | | | Anticipated 1-Year Growth Rate | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | RERC Estimate | South Region | U.S. | RERC Estimate | South Region | U.S. | RERC Estimate | South Region | U.S. | National Value | South Value | National Rent | South Rent |
| CBD | 8.2 | 8.3 | 8.6 | 6.6 | 6.9 | 7.1 | 7.0 | 7.4 | 7.6 | -0.8 | 0.5 | -1.0 | -0.4 |
| Suburban | 8.6 | 8.7 | 8.8 | 7.0 | 7.2 | 7.3 | 7.6 | 7.6 | 7.8 | -0.2 | 0.3 | -0.2 | 0.0 |
| Warehouse | 7.9 | 7.7 | 7.7 | 6.2 | 6.3 | 6.2 | 6.8 | 6.8 | 6.7 | 4.1 | 3.6 | 3.5 | 3.1 |
| R&D | 8.7 | 8.3 | 8.3 | 6.6 | 7.0 | 7.0 | 7.2 | 7.6 | 7.6 | 2.2 | 1.8 | 2.1 | 1.7 |
| Flex | 8.1 | 8.3 | 8.4 | 6.7 | 6.9 | 7.0 | 7.1 | 7.5 | 7.6 | 2.8 | 2.6 | 2.6 | 3.3 |
| Regional Mall | 8.9 | 9.6 | 9.8 | 6.9 | 8.3 | 8.2 | 7.5 | 8.7 | 8.8 | -3.6 | -3.9 | -3.2 | -3.4 |
| Power Center | 8.6 | 8.6 | 8.8 | 7.4 | 7.4 | 7.6 | 7.5 | 7.9 | 8.1 | -0.9 | -0.6 | -1.0 | -0.4 |
| Neigh/Comm | 8.2 | 8.4 | 8.7 | 6.8 | 7.0 | 7.2 | 7.2 | 7.5 | 7.7 | 0.9 | 1.4 | 0.6 | 1.4 |
| Apartment | 6.6 | 7.1 | 7.2 | 4.8 | 5.2 | 5.3 | 5.3 | 5.8 | 6.0 | 3.5 | 4.1 | 3.1 | 3.5 |
| Hotel | 10.2 | 9.6 | 9.9 | 8.3 | 8.3 | 8.4 | 8.8 | 9.0 | 9.0 | 0.1 | -1.6 | 0.8 | -0.5 |
| Average | 8.4 | 8.5 | 8.6 | 6.7 | 7.1 | 7.1 | 7.2 | 7.6 | 7.7 | 0.8 | 0.8 | 0.7 | 0.8 |

First-tier investment properties are defined as the best quality assets in prime to good locations. Apartment RERC estimate data required back to 3Q 2021
Source: RERC, 3Q 2021

The RERC show IRR/discount rates that average 8.4 percent for all property types, with apartments being 6.6 percent and skewing the overall property average.  The subject's leasehold income stream would be higher than this average.

The analysis of discount rates as shown above range from 9 percent for the built-up method to over 8.5 percent from the investor surveys.  Based on this analysis, the indicated discount rate to apply the leasehold income streams over the remaining term is 8.5 percent.

Reversion.  There is no reversion in the leasehold analysis.

**6.  Calculate the Present Value of the Cash Flows to Determine the Leasehold Value.**
PV tables were prepared for the calculations of surplus rent, rent escalations and discounted monthly payments over the remaining rental term of the Initial Lease and the Amendment.  The PV tables are located in the Addenda.  The values reported from these tables are as follows:

| | |
|---|---|
| Initial Lease | $1,142,212 |
| Amendment | $164,317 |
| Total | $1,306,529 |

Final Value of the Leasehold Estate Via the Income Approach.  Based on the projected cash flows and discount rate, we have determined the value of the subject property using the Yield Capitalization Method (Discounted Cash Flow Analysis). The calculations for determining the value of the subject property are located in the Addenda of this report (PV Tables for the Initial Lease and Amendment). It is our opinion that the market value of the leasehold property interest via the Income Approach to Value is a follows:

| Leasehold Interest Value | |
|---|---|
| Initial Lease | $1,142,212 |
| Amendment | $164,317 |
| Total | $1,306,529 |

**Final Value Via the Income Approach.**  Based on the previous discussion, it is my opinion that the market value of the leasehold property via the Income Approach to Value is $1,306,529 or $1,307,000 rounded.

*Allen, Williford & Seale, Inc.*

**Cost Approach.**

**Trade Fixtures.**   As stated earlier, the tenant's interest includes the consideration of "Trade Fixtures". Under Section 29.02(d), in the event of the owner defaulting, tenant may cause the owner to purchase all Trade Fixtures at a cost equal to the greater of (i) Tenant's unamortized cost of such Trade Fixtures or (ii) the appraised value of such Trade Fixtures. Tenant shall provide notice of its election on or before the date the Lease will terminate. In such notice, Tenant shall provide Owner with its calculation of the purchase price of the Trade Fixtures, determined in accordance with this subsection. If the Parties are unable to agree upon such purchase price for the Trade Fixtures the Parties shall attempt to determine such purchase price pursuant to the process set forth in Article 40. If the process set forth in Article 40 is unsuccessful, and the Parties cannot agree on a subsequent process to resolve their differences, the remedies set forth in this Section 29.02(d) shall not be available to Tenant.

The tenant has provided the appraiser with the trade fixture items and the annual depreciation.  From this information, we can calculate the Tenant's unamortized cost of the trade fixtures.  The scope of this analysis only involves the Cost Approach for the trade fixtures as shown in Item (i) above.  We did not appraise the value of the trade fixtures as describe in Item (ii) above.  The analysis undertaken is summarized as follows.

Cost.  The tenant provided an itemized list of the trade fixtures.  The tenant has broken down the trade fixtures between two categories, Machinery & Equipment (M&E) and Furniture and Fixtures (F&F).  The cost schedule below shows the cost for each item and date placed in service.

Depreciation.  The tenant depreciates the M&E and F&F on a straight line of age-life basis.  The life of the M&E items are based on 15 years while the life of F&F items are based on 7 years. The calculated depreciation is based on the percentage of the age in relation to the life for each item.

The Cost Schedule for the Trade Fixtures is shown as follows:

| Trade Fixture Cost Schedule and Summary | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Machinery & Equipment** | | | | | | | | |
| Date | Name | Description | Amount | Age | Life | % Dep | $ Dep | Value |
| 9/22/2016 | JPT Aero Tech | GSE | $ 424,623.00 | 5.44 Years | 15 Years | 36% | $152,864.00 | $271,759.00 |
| 2/27/2017 | Echo Globe | Misc GSE-29721056-1 | $ 2,975.00 | 5.01 Years | 15 Years | 33% | $ 982.00 | $ 1,993.00 |
| 2/28/2017 | Echo Globe | Misc GSE-29721049-1 | $ 2,975.00 | 5.01 Years | 15 Years | 33% | $ 982.00 | $ 1,993.00 |
| 3/9/2017 | KCI GSE | Boarding Ramps | $ 96,350.00 | 4.98 Years | 15 Years | 33% | $ 31,796.00 | $ 64,554.00 |
| 3/9/2017 | KCI GSE | N/D | $ 96,350.00 | 4.98 Years | 15 Years | 33% | $ 31,796.00 | $ 64,554.00 |
| 3/27/2017 | JPT Aero Tech | N/D | $ 9,888.00 | 4.93 Years | 15 Years | 33% | $ 3,263.00 | $ 6,625.00 |
| 7/26/2017 | Tampa Vacuum | N/D | $ 6,102.70 | 4.60 Years | 15 Years | 31% | $ 1,892.00 | $ 4,211.00 |
| 7/4/2018 | N/D | 2 Damaged Ramps | $(128,466.66) | | | | | |
| 11/1/2018 | N/D | Ramps | $ 142,500.00 | 3.33 Years | 15 Years | 22% | $ 31,350.00 | $111,150.00 |
| 6/28/2019 | N/D | Golf Cart | $ 6,982.13 | 2.68 Years | 15 Years | 18% | $ 1,257.00 | $ 5,725.00 |
| 11/14/2019 | Meta Link | Passenger Ram Refurbish | $ 38,970.00 | 2.30 Years | 15 Years | 15% | $ 5,846.00 | $ 33,124.00 |
| Total | | | $ 699,249.17 | | | | $262,028.00 | $565,688.00 |

| **Furniture and Fixtures** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Name | Description | Amount | Age | Life | % Dep | $ Dep | Value |
| 10/4/2016 | Henricksen | Office Furniture | $ 8,000.00 | 5.41 Years | 7 Years | 77% | $ 6,160.00 | $ 1,840.00 |
| 12/6/2016 | Henricksen | Office Furniture | $ 9,029.89 | 5.24 Years | 7 Years | 75% | $ 6,772.00 | $ 2,258.00 |
| 12/6/2016 | Henricksen | Terminal Furniture | $ 88,500.00 | 5.24 Years | 7 Years | 75% | $ 66,375.00 | $ 22,125.00 |
| 1/7/2017 | Henricksen | Furniture | $ 2,101.13 | 5.15 Years | 7 Years | 74% | $ 1,555.00 | $ 546.00 |
| 1/30/2017 | Henricksen | 5th Desk Setup | $ 3,740.04 | 5.08 Years | 7 Years | 73% | $ 2,730.00 | $ 1,010.00 |
| 2/13/2017 | Henricksen | Terminal Furniture | $ 22,500.00 | 5.05 Years | 7 Years | 72% | $ 16,200.00 | $ 6,300.00 |
| 2/28/2017 | Division Weigh & Go | 8 Scales & SH | $ 19,157.00 | 5.01 Years | 7 Years | 72% | $ 13,793.00 | $ 5,364.00 |
| 3/20/2017 | Henricksen | Terminal Furniture | $ 90,142.54 | 4.95 Years | 7 Years | 71% | $ 64,001.00 | $ 26,142.00 |
| 3/20/2017 | Henricksen | 2 Benches | $ 10,300.00 | 4.95 Years | 7 Years | 71% | $ 7,313.00 | $ 2,987.00 |
| 3/30/2017 | Jeff Pearse | Outdoor | $ 17,606.00 | 4.92 Years | 7 Years | 70% | $ 12,324.00 | $ 5,282.00 |
| 4/16/2017 | Henricksen | Net of $10.3K Backorder | $ 12,898.82 | 4.88 Years | 7 Years | 70% | $ 9,029.00 | $ 3,870.00 |
| 4/18/2017 | Henricksen | Door panels | $ 6,069.31 | 4.87 Years | 7 Years | 70% | $ 4,249.00 | $ 1,820.00 |
| 7/4/2017 | Outside in Style | Patio Shades | $ 3,290.99 | 4.66 Years | 7 Years | 67% | $ 2,205.00 | $ 1,086.00 |
| 7/21/2017 | Outside in Style | Patio Shades | $ 3,079.71 | 4.61 Years | 7 Years | 66% | $ 2,033.00 | $ 1,047.00 |
| Total | | | $ 296,415.43 | | | | $214,739.00 | $ 81,677.00 |

| **Total Trade Fixtures** | | | | | | | | $647,365.00 |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Rounded | $647,000.00 |

The value of the trade fixtures has been calculated to be $647,000.

**Reconciliation of Value**:  The Income Approach was utilized to establish the value of the Leasehold Estate.  The Cost Approach was utilized for the Trade Fixtures.  The Sales Comparison Approach was not utilized as this approach is not credible for the valuation of a Leasehold Interest.  The values were previously developed and are reported as follows:

| | |
|---|---|
| Leasehold | **$1,307,000** |
| Trade Fixtures | **$647,000** |
| Total | **$ 1,954,000** |

**Opinion of Just Compensation**.  The acquisition in this instance is a "whole" taking of the leasehold interest in the South Terminal Property. This involves appraising the whole property consisting of a leasehold interest only.  The compensation includes the value of the entire tenant/leasehold ownership interest, as result there are no damages to the remainder.  The general steps of the compensation methodology are as follows:

1. Valuation of the property interest to be acquired shall disregard any decrease or increase in the fair market value of the real property caused by the project for which the property is to be acquired, or by the likelihood that the property would be acquired for the project, other than the physical deterioration with the reasonable control of the owner/tenant.

To summarize, the total compensation due the tenant is the value of the acquisition of the entire leasehold ownership interest and the unamortized cost of such Trade Fixtures.  Total compensation is computed as follows:

| Summary of Just Compensation | | |
|---|---|---|
| **Whole Property-Leasehold  (To Be Acquired)** | **$1,307,000** | |
| **Trade Fixtures** | **$647,000** | |
| **Total Compensation** | | **$1,954,000** |

AUS ST 000356

*Allen, Williford & Seale, Inc.*

**CERTIFICATION**

**Property:** Leasehold Interest in the South Terminal Property at ABIA

**Tenant:** LoneStar Airport Holdings, LLC.

**Address:** South Terminal at ABIA 10000 Logistics Lane, Austin, TX 78719

I certify that, to the best of my knowledge and belief:

-   the statements of the fact contained in this report are true and correct.

-   the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

-   we have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.

-   we have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

-   our engagement in this assignment was not contingent upon developing or reporting predetermined results.

-   our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

-   the reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, as promulgated by the Appraisal Foundation, and the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

-   I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three year period immediately preceding acceptance of this assignment.

-   I, Randy L. Seale, MAI on November 11, 2021 personally made a field inspection of the property herein appraised and that I have afforded the tenant the opportunity to accompany me at the time of inspection. I have also personally made a field inspection of the comparable rentals relied upon in making said appraisal on January 28, 2022. Stephen D. Kovar, Jr., MAI did not make a field inspection of the subject property.

-   I understand this market value appraisal is to be used in connection with the acquisition of land for an airport project by with the assistance of FAA funds or other Federal funds. That such appraisal has been made in conformity with the appropriate State laws, regulations, policies, and procedures applicable to appraisal of land for such purposes, and that to the best of my knowledge no portion of the value assigned to such property consists of items which are noncompensable under the established law of said State.

AUS ST 000357

*Allen, Williford & Seale, Inc.*

- That any decrease or increase in the fair market value of real property prior to the date of valuation caused by the public improvement for which such property is acquired, or by the likelihood that the property would be acquired for such improvement, other than that due to physical deterioration within reasonable control of the tenant has been disregarded in determining the compensation for the property.

- No others have provided significant real property appraisal assistance to the persons signing this certification by conducting research regarding the subject property and market data.

- the use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- as of the date of this report Randy L. Seale, MAI and Stephen D. Kovar, Jr., MAI have completed the continuing education program for Designated Members of the Appraisal Institute.

- Randy L. Seale, MAI and Stephen D. Kovar, Jr., MAI are state certified by the State of Texas as General Real Estate Appraisers.

I have not revealed the findings and results of such appraisal to anyone other than the proper officials of the acquiring agency of said Airport or officials of the Federal Aviation Administration and I will not do so until so authorized by said officials, or until I am required to do so by due process of law, or until I am released from this obligation by having publicly testified as to such findings.

That the conclusion set forth in this appraisal is my independent opinion of the value of the property as of the March 1,2022 and that such conclusion was reached without collaboration or direction as to value. It is my opinion that the fair market value of the above captioned real property is as follows:

**Total Just Compensation:**                                        **$ 1,954,000**


**ALLEN, WILLIFORD & SEALE, INC.**


Randy L. Seale, MAI
**Certified General Real Estate Appraiser**
**Certificate No. TX-1320302-G**

Stephen D. Kovar, Jr., MAI
**Certified General Real Estate Appraiser**
**Certificate No. TX-1338762-G**

*Allen, Williford & Seale, Inc.*

## ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal is subject to the following assumptions and limiting conditions:

The subject is considered a special purpose property and the data researched for the valuation was similar in location and use.

That the date of value to which the opinions expressed in this report apply is set forth in the Letter of Transmittal. The appraiser assumes no responsibility for economic or physical factors occurring at some later date which may affect the opinions herein stated.

That no opinions are intended to be expressed for legal matters or that would require specialized investigation or knowledge beyond that ordinarily employed by real estate appraisers, although such matters may be discussed in this report.

That no opinion as to title is rendered. Name of tenant and the legal description were obtained from sources generally considered reliable. Title is assumed to be marketable and free and clear of all liens, encumbrances, easements, and restrictions except those specifically discussed in this report. The property is appraised assuming it to be under responsible ownership and/or competent management and available for its highest and best use.

That no engineering survey has been made by the appraiser. Except as specifically stated, data relative to size and area were taken from sources considered reliable and no encroachment of real property improvement is assumed to exist.

That maps, plats, and exhibits included herein are for illustration only, as an aid in visualizing matters discussed within this report. They should not be considered as surveys or relied upon for any other purpose.

That no detailed soil studies covering the subject property were available to the appraiser. Therefore, premises as to soil qualities employed in this report are not conclusive, but have been considered consistent with information available to the appraiser.

The property is appraised as though free and clear, under responsible ownership and/or competent management. All existing liens have been disregarded.

Unless otherwise stated herein, all of the improvements previously described were considered operational and in good condition.

The valuation is made subject to the environmental factors stated in the report. Any contamination of the leasehold property is documented and reflective in the market data utilized.

Any information furnished to us by others is believed to be reliable, but I assume no responsibility for its accuracy.

Possession of this report, or a copy thereof, does not carry with it the right to publication, nor may it be used for any purpose, by any but the intended user, without the previous written consent of the appraiser or the intended user and, in any event, only in its entirety.

This appraisal does not require us to give testimony in court or attend on its behalf unless arrangements have been previously made therefore.

AUS ST 000359

*Allen, Williford & Seale, Inc.*

The value is reported in dollars on the basis of the currency prevailing at the date of this appraisal.

I have no present or contemplated interest in the property appraised.

My compensation for making this appraisal is in no manner contingent upon the value reported.

That my analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, as promulgated by the Appraisal Foundation and the Code of Professional Ethics and the Standards of Professional Practice of the Appraisal Institute.

The appraisal of the leasehold interest considered all factors willing, knowledgeable buyers and sellers would consider in negotiating the purchase price of the property except the influence of the proposed project. The exclusion of the project influence is a Departure from USPAP and is allowed through Jurisdictional Exception. This exception was made under the Jurisdictional Exception provision of the Uniform Standards of Professional Appraisal Practice.

A site plan, survey and various "As Built" plans were provided for the subject property by the client. This information is believed to be reliable.

Information received from the client pertaining to the size and description of the subject property are assumed to be correct. Additional information, which assisted me in the production of this appraisal, has been retained in my files.

The valuation considered trade fixtures. Various items within the trade fixtures are considered personal property or they are movable. This valuation only includes those trade fixture items that are part of the realty and placed on the property and designated by the tenant.

The valuation of the property is in "As Is" condition and no corrective actions have been determined.

There are no other limiting conditions contained in this report other than the ones listed above.

AUS ST 000360

*Allen, Williford & Seale, Inc.*

## SOUTH TERMINAL INITIAL AND AMENDMENT LEASES

Execution Version



## SOUTH TERMINAL LEASE AND CONCESSION AGREEMENT

by and between

### CITY OF AUSTIN

(Owner)

and

### HIGHSTAR CAPITAL IV, L.P.

(Tenant)

AUS ST 000362

**TABLE OF CONTENTS**

ARTICLE 1   DEFINITIONS AND INTERPRETATION ...............................................................1

   1.01   Definitions.........................................................................................................1

   1.02   Interpretations ................................................................................................10

ARTICLE 2   GRANT OF LEASE ..........................................................................................11

   2.01   Premises ..........................................................................................................11

   2.02   Existing Condition ..........................................................................................11

   2.03   Quiet Enjoyment .............................................................................................11

ARTICLE 3   TERM ................................................................................................................12

   3.01   Term ................................................................................................................12

   3.02   Early Termination ...........................................................................................12

   3.03   Transfer of Rights ...........................................................................................13

ARTICLE 4   USE OF PREMISES ..........................................................................................13

   4.01   Authorized Use ...............................................................................................13

   4.02   Prohibited Uses ...............................................................................................13

   4.03   Permits and Licenses.......................................................................................13

ARTICLE 5   RENT, REPORTS, AND AUDIT .......................................................................13

   5.01   Gross Revenue ................................................................................................13

   5.02   Rent.................................................................................................................14

   5.03   Payment of Pre-Commencement of Operations Date Rent ...............................15

   5.04   Payment of Post-Commencement of Operations Date Rent..............................15

   5.05   Rent Payment Delivery....................................................................................15

   5.06   Late Payment Penalty ......................................................................................15

   5.07   Security Deposit...............................................................................................15

   5.08   Disputes...........................................................................................................16

   5.09   No Abatement ..................................................................................................16

   5.10   Tenant Monthly Reports ..................................................................................17

   5.11   Tenant Annual Report......................................................................................17

   5.12   Tenant Audit Report ........................................................................................17

   5.13   Late Report Penalty.........................................................................................17

   5.14   Internal Control Structure ................................................................................17

   5.15   Records Retention ...........................................................................................18

   5.16   Audit ...............................................................................................................18

South Terminal Lease and Concession Agreement

AUS ST 000363

| 5.17 | Confidentiality | 18 |
|---|---|---|
| 5.18 | Certain Notices | 18 |
| ARTICLE 6 | TAXES AND LIENS | 19 |
| 6.01 | Payment of Taxes and Assessments | 19 |
| 6.02 | Liens | 19 |
| ARTICLE 7 | NET LEASE | 19 |
| 7.01 | Net Lease | 19 |
| ARTICLE 8 | UTILITIES | 19 |
| 8.01 | Utilities | 19 |
| ARTICLE 9 | CONSTRUCTION | 20 |
| 9.01 | Conditions to Commencement of the Rehabilitation Project | 20 |
| 9.02 | Demolition | 20 |
| 9.03 | Improvements | 21 |
| 9.04 | Design and Construction Review | 21 |
| 9.05 | Construction Plans | 22 |
| 9.06 | Limitation of Owner Responsibility | 23 |
| 9.07 | Construction Standards | 23 |
| 9.08 | Owner's Right of Inspection | 23 |
| 9.09 | Tenant's Representative | 24 |
| 9.10 | Construction Contract Close-Out | 24 |
| 9.11 | Amendment of Lease | 24 |
| 9.12 | Ownership | 24 |
| 9.13 | No Liens | 24 |
| 9.14 | Initial Capital Investment | 25 |
| ARTICLE 10 | TENANT OPERATIONS, MAINTENANCE, AND REPAIRS | 25 |
| 10.01 | Conditions to Commencement of Operations | 25 |
| 10.02 | Operations | 27 |
| 10.03 | Maintenance Capital Investment | 27 |
| 10.04 | Maintenance and Repair | 27 |
| 10.05 | Tenant Apron | 28 |
| 10.06 | Trash/Recycling | 28 |
| 10.07 | Owner's Right to Maintain | 28 |

South Terminal Lease and Concession Agreement

AUS ST 000364

ARTICLE 11  PARKING FACILITIES ........................................................................................28

    11.01   South Terminal Parking ............................................................................................28

    11.02   Additional Parking Development ..............................................................................29

ARTICLE 12  AIRLINE LEASING PROGRAM........................................................................29

    12.01   General........................................................................................................................29

    12.02   Airline Fees................................................................................................................29

ARTICLE 13  MARKETING SUPPORT AND INCENTIVES TO AIR CARRIERS ................30

    13.01   General........................................................................................................................30

    13.02   South Terminal Marketing Program .........................................................................30

    13.03   Implementation ..........................................................................................................30

    13.04   Cooperation ................................................................................................................30

ARTICLE 14  CONCESSION PROGRAM..................................................................................30

    14.01   General........................................................................................................................30

    14.02   Owner Review ............................................................................................................31

    14.03   ACDBE Goals.............................................................................................................31

    14.04   Local Concessionaires ...............................................................................................31

ARTICLE 15  EXPANSION OR NEW FACILITY .....................................................................31

    15.01   Expansion or New Facility.........................................................................................31

ARTICLE 16  FINANCING..........................................................................................................32

    16.01   Tenant's Right to Finance ..........................................................................................32

    16.02   Tenant's Lender Rights and Obligations ...................................................................32

    16.03   Owner's Right to Finance ..........................................................................................32

ARTICLE 17  OTHER TENANT OBLIGATIONS .....................................................................33

    17.01   Premises Security.......................................................................................................33

    17.02   Compliance with Airport Rules .................................................................................33

    17.03   Signs...........................................................................................................................33

    17.04   Customer Claims, Comments, and Complaints .........................................................33

    17.05   Maintenance of Legal Existence ................................................................................34

    17.06   Personnel....................................................................................................................34

    17.07   Meetings.....................................................................................................................34

    17.08   Addition of Certain Amenities...................................................................................34

ARTICLE 18  OTHER OWNER'S OBLIGATIONS ...................................................................34

    18.01   Operation as a Public Airport ....................................................................................34

South Terminal Lease and Concession Agreement

AUS ST 000365

18.02  Maintenance of Public Runways, Taxilanes, Taxiways, Ramps, and Aprons.......34

18.03  Use of Public Runways, Taxilanes, Taxiways, Ramps, and Aprons ...................34

18.04  Signage....................................................................................................................34

18.05  Shuttle Bus Service ................................................................................................35

18.06  Rental Car Revenue Sharing ..................................................................................35

18.07  Federal Compliance ...............................................................................................37

18.08  Passenger Facility Charge; Airport Improvement Program...................................37

18.09  Security ...................................................................................................................37

18.10  Lighting...................................................................................................................37

18.11  De-Icing .................................................................................................................37

18.12  Access to South Terminal ......................................................................................37

ARTICLE 19  SHARED USE AND COMMUNICATIONS SERVICES ...................................37

19.01  Shared Use ..............................................................................................................37

19.02  Wireless Service......................................................................................................38

19.03  Radio .......................................................................................................................38

19.04  Communications Services.......................................................................................38

19.05  Shared Telephone Service.......................................................................................39

19.06  Television Service....................................................................................................39

19.07  Computer Networks.................................................................................................39

ARTICLE 20  ENVIRONMENTAL CONDITION OF PREMISES .......................................40

20.01  Environmental Assessments ...................................................................................40

20.02  Acknowledgement of Hazardous Materials............................................................40

20.03  Tenant's Inspection Rights .....................................................................................40

ARTICLE 21  ENVIRONMENTAL COMPLIANCE...............................................................40

21.01  Definitions...............................................................................................................40

21.02  Compliance .............................................................................................................41

21.03  Responsibility .........................................................................................................41

21.04  Indemnity ................................................................................................................42

21.05  Stormwater Requirements.......................................................................................42

21.06  Sustainability...........................................................................................................42

21.07  Survival ...................................................................................................................42

21.08  Hazardous Materials ...............................................................................................42

21.09  Storm Water Pollution Prevention Plan .................................................................43

South Terminal Lease and Concession Agreement

AUS ST 000366

21.10   Spill Prevention, Control and Countermeasure Plan ..............................................43

21.11   Violation of Environmental Laws...........................................................................43

21.12   Inspection; Test Results .......................................................................................44

21.13   Removal of Hazardous Materials...........................................................................44

21.14   Remedies Not Exclusive .......................................................................................44

21.15   Environmental Indemnity .....................................................................................45

21.16   Tenant Environmental Parties................................................................................45

21.17   Survival ...............................................................................................................45

ARTICLE 22   INSURANCE.................................................................................................45

22.01   General ................................................................................................................45

22.02   Waiver..................................................................................................................45

22.03   Limits ..................................................................................................................46

22.04   Modification.........................................................................................................46

22.05   Amendment Required ...........................................................................................46

22.06   Owner's Right to Maintain ....................................................................................46

ARTICLE 23   INDEMNITY ................................................................................................47

23.01   General................................................................................................................47

23.02   Defense of Claims................................................................................................47

23.03   Maintenance of Insurance .....................................................................................47

23.04   Subcontractors......................................................................................................48

ARTICLE 24   DISADVANTAGED BUSINESS ENTERPRISES,
M/WBE PROCUREMENT PROGRAM AND WAGE RATES ...........................48

24.01   Disadvantaged Business Enterprise (DBE) Procurement Program ......................48

24.02   Minority and Women Business Enterprises.............................................................48

24.03   Worker Safety ......................................................................................................49

24.04   Wage Rates/Prevailing Wage ................................................................................49

24.05   Living Wage.........................................................................................................49

ARTICLE 25   CAPITAL RECOVERY PAYMENT.................................................................49

25.01   Capital Recovery Payment.....................................................................................49

25.02   Capital Recovery Event ........................................................................................50

ARTICLE 26   LAWS AND GRANT CONDITIONS ...............................................................50

26.01   Grant Assurances .................................................................................................50

26.02   National Emergencies ...........................................................................................50

26.03   Non-Discrimination and Affirmative Action..........................................................50

South Terminal Lease and Concession Agreement

AUS ST 000367

26.04   Public Accommodation Laws .................................................................................51

26.05   Compliance with Laws .........................................................................................51

26.06   Lighting, Electrical and Radio Interference.........................................................51

26.07   Amendment...........................................................................................................51

26.08   Airport Development ............................................................................................52

26.09   Economic Nondiscrimination ...............................................................................52

ARTICLE 27   AVIGATION RIGHTS................................................................................52

27.01   General..................................................................................................................52

27.02   Owner's Reservation of Rights.............................................................................52

27.03   Waiver...................................................................................................................52

ARTICLE 28   TENANT DEFAULT AND REMEDIES......................................................53

28.01   Default by Tenant.................................................................................................53

28.02   Remedies of Owner...............................................................................................54

28.03   Additional Rights of Owner..................................................................................55

ARTICLE 29   OWNER DEFAULT AND REMEDIES ......................................................55

29.01   Default by Owner..................................................................................................55

29.02   Tenant's Remedies................................................................................................56

ARTICLE 30   SURRENDER OF PREMISES .....................................................................57

30.01   Condition of Premises...........................................................................................57

30.02   Repossession and Holding Over ...........................................................................57

30.03   Tenant's Personal Property ...................................................................................58

ARTICLE 31   FORCE MAJEURE ......................................................................................58

31.01   General..................................................................................................................58

31.02   Impairment of Use ...............................................................................................58

ARTICLE 32   INSPECTION ...............................................................................................59

32.01   Owner's Right to Inspect ......................................................................................59

ARTICLE 33   CASUALTY LOSS .......................................................................................59

33.01   Restoration Upon Casualty Loss...........................................................................59

33.02   No Restoration Following Casualty Loss ..............................................................59

33.03   Abatement.............................................................................................................60

ARTICLE 34   CONDEMNATION AND BUSINESS INTERRUPTION ...................................60

34.01   Taking in Entirety ................................................................................................60

34.02   Partial Taking........................................................................................................60

South Terminal Lease and Concession Agreement

AUS ST 000368

34.03  Damage Award ...................................................................................................60

34.04  Definition of Taken; Taking ...............................................................................61

34.05  Contingent Business Interruption .......................................................................61

ARTICLE 35  ASSIGNMENT AND SUBLEASING ..........................................................61

35.01  By Tenant .............................................................................................................61

35.02  Transfer of Owner's Interest ...............................................................................62

ARTICLE 36  APPROVALS AND AUTHORITY ................................................................62

36.01  Owner ...................................................................................................................62

36.02  Tenant ..................................................................................................................63

ARTICLE 37  NOTICES AND CONTRACT ADMINISTRATION ........................................63

37.01  Contract Administrator ........................................................................................63

37.02  Notices .................................................................................................................63

ARTICLE 38  CONFIDENTIALITY/PROPRIETARY INFORMATION ................................64

38.01  Confidentiality .....................................................................................................64

38.02  Sensitive Security Information ............................................................................65

ARTICLE 39  BOND ORDINANCES ...............................................................................65

39.01  Bond Ordinance Provisions .................................................................................65

39.02  Certificate in Connection with Issuance of Bonds .............................................65

39.03  Tenant Tax Elections ...........................................................................................66

ARTICLE 40  ALTERNATIVE DISPUTE RESOLUTION ..................................................66

40.01  General .................................................................................................................66

40.02  Mediation .............................................................................................................66

ARTICLE 41  MISCELLANEOUS ...................................................................................67

41.01  Gratuities .............................................................................................................67

41.02  Modification and Non-Waiver .............................................................................67

41.03  Governing Law ....................................................................................................67

41.04  Severability ..........................................................................................................67

41.05  Relation of Parties ...............................................................................................67

41.06  Recordation ..........................................................................................................68

41.07  Successors and Assigns .......................................................................................68

41.08  Survival ................................................................................................................68

41.09  No Commissions ..................................................................................................68

41.10  Time of the Essence .............................................................................................68

South Terminal Lease and Concession Agreement

AUS ST 000369

41.11  Reservation of Immunities ................................................................................68

41.12  Special Damages ...............................................................................................68

41.13  Avoidance of Obligations ..................................................................................68

41.14  No Exclusive Rights ..........................................................................................68

41.15  Capacity of Owner .............................................................................................68

41.16  Counterparts ......................................................................................................69

41.17  Entire Agreement ...............................................................................................69

South Terminal Lease and Concession Agreement

AUS ST 000370

## SOUTH TERMINAL LEASE AND CONCESSION AGREEMENT

THIS SOUTH TERMINAL LEASE AND CONCESSION AGREEMENT (this "Lease") is entered into by and between CITY OF AUSTIN, a Texas home rule city and municipal corporation ("Owner") acting by and through the Executive Director of the Department of Aviation, and HIGHSTAR CAPITAL IV LP, a limited partnership formed and existing under the laws of the State of Delaware ("Tenant"). Owner and Tenant, collectively, shall be referred to in this Lease as the "Parties" and each as a "Party".

**WHEREAS:**

A.   Owner owns and operates Austin-Bergstrom International Airport, located in the City of Austin, Travis County, Texas (the "Airport"); and

B.   Owner desires to reopen the South Terminal at the Airport as a Limited Services Terminal to expand the air carrier service options available in the City of Austin; and

C.   Owner desires to outsource the rehabilitation, development and operation of the South Terminal in order to expedite the availability of a Limited Services Terminal to the City of Austin; and

D.   Tenant has engaged in the business of operating airport facilities and desires to provide such services; and

E.   Owner desires to lease to Tenant, and Tenant desires to lease from Owner, certain premises, and to provide and obtain from each other certain rights, services and privileges, in order to reactivate the South Terminal, and appurtenant parking and other related facilities, to serve air carriers that serve the Airport and passengers served by such air carriers, all on a financially self-sustaining basis.

Now, therefore, for and in consideration of mutual promises and covenants hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Tenant enter into this Lease and agree as follows:

## ARTICLE 1
### DEFINITIONS AND INTERPRETATION

1.01   Definitions.  As used in this Lease, the following terms shall be defined as follows:

ACDBE – has the meaning set forth in Section 14.03.

ADA – has the meaning set forth in Section 26.04.

Additional Rent – means all fees, charges, and amounts payable by Tenant to Owner under this Lease other than Fixed Rent and Variable Rent.

Affiliate – means an entity that directly or indirectly through one (1) or more intermediaries, controls, or is controlled by, or is under common control with, another entity. An entity "controls" any other entity in which it has the power to vote, directly or indirectly, five (5)% or more of the voting interests in such entity or, in the case of a partnership, if it is a

AUS ST 000371

general partner.  An entity may be a person, corporation, association, partnership or limited liability company of any type or kind.

Airfield Use Agreement – means an agreement between an Airline and Owner for use of the airfield at the Airport.

Airline Leasing Program – has the meaning set forth in Section 12.01.

Airlines – means commercial airlines providing Air Transportation at the Airport and/or the South Terminal.

Airport – has the meaning set forth in the Recitals.

Airport Enplaned Passengers – means all originating passengers departing from the Airport.

Airport Layout Plan – means Owner's Airport Layout Plan, approved by the FAA, attached hereto as Exhibit K, as the same may be modified, amended, and/or restated from time to time.

Airport Master Plan – means Owner's Airport Master Plan, dated as of December 2003, as the same may be updated, modified, amended, and/or restated, and as accepted by the FAA in conjunction with the approved Airport Layout Plan, from time to time, which, as of the Effective Date, may be found at http://www.austintexas.gov/page/airport-master-plan.

Air Transportation – means the carriage of persons, property, cargo and/or mail by aircraft.

Applicable Law – means all applicable federal, state and local laws, codes, ordinances, rules, regulations, judgments, decrees or directives of any Governmental Authority (but with respect to any of the foregoing of the City, only to the extent (i) generally applicable to the regulated community, (ii) not disproportionately affecting Tenant, and (iii) not enacted or issued in violation of Section 41.13 hereof) having jurisdiction over the Airport or the Premises, including all Environmental Laws as defined herein and FAA rules, regulations, and policies.

As Built Plans – has the meaning set forth in Section 9.10.

Assessment Report – has the meaning set forth in Section 20.03.

Authorized Use – has the meaning set forth in Section 4.01.

Building Permit Documents - means the documents consisting of structural drawings and specifications, required City permits, and plans including information technology infrastructure, security, ingress/egress, life safety systems, architectural, mechanical, electrical, and plumbing to be prepared or assembled by the Tenant as part of the design review process contemplated by Article 9 of this Lease.

Capital Recovery Event – has the meaning set forth in Section 25.02.

AUS ST 000372

Capital Recovery Factor – means the following percentage of capital invested by Tenant in the Premises and the South Terminal that Tenant may recover upon termination of this Agreement under Section 25.01, based on the date of the Capital Recovery Notice: 100% in the first three years after the Effective Date; 75% in the fourth year after the Effective Date; 50% in the fifth year after the Effective Date; and 25% in the sixth year after the Effective Date.

Capital Recovery Notice – has the meaning assigned to such term in Section 25.01.

Capital Recovery Payment – means an amount equal to the product of (a) the Capital Recovery Factor, multiplied by (b) the total of (i) the Initial Capital Investment, plus (ii) any remaining obligations under capital leases related to the South Terminal (unless assumed by Owner), less (iii) any cash distributions of South Terminal revenues made by Tenant to its investors from and after the Effective Date, but in no event to exceed ELEVEN MILLION AND NO/100 DOLLARS ($11,000,000.00). Notwithstanding the foregoing, no amount from the Initial Capital Investment shall be included in the Capital Recovery Payment unless such amount has been approved by Owner in accordance with Section 9.14.

Casualty – has the meaning set forth in Section 33.01.

Certificate of Occupancy Date – means the date on which a certificate of occupancy for the Covered Improvements is issued by the applicable Governmental Authority in order for the Premises and Covered Improvements to be open for business to the public.

CFC – has the meaning set forth in Section 18.06(a).

City - City of Austin, Travis County, Texas.

Claims – has the meaning set forth in Section 23.01.

Commencement of Operations Date – means the first date after the Effective Date on which a commercial airline flight arrives at or departs from the South Terminal, provided the conditions in Section 10.01 have then been met or have been waived by Tenant.

Concession Program – has the meaning set forth in Section 14.01.

Confidential Information – has the meaning set forth in Section 38.01.

CONRAC – means the Consolidated Rental Car Center at the Airport.

Construction Contract Close-Out – shall have occurred when: (i) Tenant and Owner have performed a final walkthrough and inspection and shall have reasonably determined that the Rehabilitation Project (inclusive of all punch list items) has, in all material respects, been completed in accordance with construction contract documents and (ii) Tenant and Owner have each received the following: (a) An affidavit from contractor stating that all subcontractors and material suppliers have been paid in full, subject to collection of final payment; (b) A complete waiver and release of any lien from each contractor, subcontractors or suppliers which has furnished material, goods or services in connection with the Rehabilitation Project or a conditional waiver and releases for any contractor, subcontractors or material suppliers entitled

AUS ST 000373

to receive any portion of the final payment; (c) Copies of all guarantees and warranties from the contractor, from subcontractors, and from suppliers; (d) Copies of all operating and maintenance data for equipment installed as part of the Rehabilitation Project; and (e) All other submittals required by the construction contract documents, including the SMBR's Compliance Plan Program final closeout.

Contract Rate – means the lesser of the rate of interest specified in Texas Government Code Section 2251.025, or the highest non-usurious rate permitted by law.

Covered Improvements – has the meaning set forth in Section 9.03.

CPI – means the Consumer Price Index for Urban Consumers published by the U.S. Department of Labor, Bureau of Labor Statistics. In the event that the CPI should cease to be published, the Parties shall use good faith efforts to agree upon a substitute index that most closely approximates the CPI in gauging changes in the cost of living for urban consumers. If the Parties are unable to agree upon a substitute index, Owner may select a reasonable substitute index published by the Bureau of Labor Statistics, or successor agency.

Deplaned Passengers – means all deplaning passengers arriving at the South Terminal.

Design Review Procedures – has the meaning set forth in Section 9.03.

DHS – has the meaning set forth in Section 17.01.

Director – means the Executive Director of the City of Austin Department of Aviation or his or her duly authorized designee.

DOT – has the meaning set forth in Section 17.01.

Effective Date – means the date stated on the signature page of this Lease.

Enplaned Passengers – means all originating passengers departing from the South Terminal.

Environmental Assessment – shall refer to and include any environmentally related study, report, analysis, investigation, site assessment, intrusive sampling or any results of the foregoing relating to the Environmental Condition of the Premises.

Environmental Claims – shall refer to, and include, without limitation, all claims, demands, suits, actions, judgments, and liability for: (a) removal, remediation, assessment, transportation, testing and disposal of Hazardous Materials as directed by any government agency, court order, or Environmental Law; (b) bodily injury or death; (c) damage to or loss of use of property of any person; (d) injury to natural resources; (e) fines, costs, fees, assessments, taxes, demands orders, directives or any other requirements imposed in any manner by any governmental agency under Environmental Laws; and (f) costs and expenses of cleanup, remediation, assessment testing, investigation, transportation and disposal of a Hazardous Material spill, release or discharge.

AUS ST 000374

Environmental Condition – shall mean any condition with respect to the soil, surface waters, groundwaters, surface or subsurface strata, ambient air or other environmental medium on or off the Premises, whether or not yet discovered, which could or does result in any Environmental Claim to or against Tenant or Owner by any third party (including any Governmental Authority), including any condition resulting from the activities, operation or business of any other property lessee, tenant, licensee, owner or operator on, off or in the vicinity of the Premises.

Environmental Laws – shall refer to and include, without limitation, all federal, state, and local statutes, laws, ordinances, rules and regulations, now or hereafter in effect, and as amended from time to time, that are intended for the protection of the environment, or that govern, control, restrict or regulate the use, handling, treatment, storage, discharge, disposal or transportation of Hazardous Materials.  Environmental Laws specifically include but are not limited to, the National Environmental Policy Act, the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Hazardous Materials Act, the Toxic Substances Control Act, the Clean Water Act, the Clean Air Act, the Superfund Authorization and Recovery Act, the Occupational Safety and Health Administration Hazard Communication Standards, the Texas Water Code, the Texas Hazardous Materials Act and the Texas Water Quality Control Act.

Expansion – means any expansion of the South Terminal for the Authorized Use, including the development of any additional parking facilities serving the South Terminal, to accommodate the growth of operations of Airlines (or other air carriers) at the Airport.

Extension Notice – has the meaning assigned to such term in Section 3.01(b).

Extension Term – has the meaning assigned to such term in Section 3.01(b).

FAA – means the Federal Aviation Administration or successor agency that regulates civil aviation, airports and airport operations.

Fair Market Value – the amount that a willing and able buyer would offer, and a willing and able seller would accept, for the purchase and sale of Tenant's Interest, in an arm's length transaction, assuming: (a) neither Party is under economic compulsion or has special bargaining power; (b) the buyer possesses all information in the possession of Tenant relating to the Premises, the condition of the Premises and the revenues and expenses of Tenant; and (c) that the event giving rise to such determination (*e.g.*, a Taking or a termination of this Lease) had not occurred.

FIDS Monitors – means flight information display monitors for the display of information on all departing and arriving flights at the South Terminal and the North Terminal.

Fixed Rent – has the meaning assigned to such in Section 5.02(b).

GAAP – means generally accepted accounting principles in the United States of America.

GASB – means the Government Accounting Standards Board.

AUS ST 000375

Governmental Approval – means any federal, state or local government agency approval, authorization, certification, consent, decision, exemption, filing, lease, license, permit, agreement, concession, grant, franchise, registration or ruling, required to be filed with, issued by or entered into with any Governmental Authority for the Premises.

Governmental Authority – means any governmental, judicial or administrative entity, body or authority

Gross Revenue – has the meaning assigned to such term in Section 5.01.

Hazardous Materials – shall refer to, and include, without limitation, all substances whose use, handling, treatment, storage, disposal, discharge or transportation is governed, controlled, restricted or regulated by Environmental Laws, that have been defined, designated or listed by any responsible regulatory agency as being hazardous, toxic, radioactive or that may present an actual or potential hazard to human health or the environment if improperly used, handled, treated, stored, disposed, discharged, generated or released. Hazardous Materials specifically include, without limitation, asbestos and asbestos-containing-materials, petroleum products, solvents and pesticides.

Indemnified Parties – has the meaning set forth in Section 23.01.

Initial Capital Investment – means the amount invested by Tenant for the rehabilitation, reactivation and initial working capital requirements of the South Terminal, which are estimated as of the Effective Date to be approximately $11.2 million. Notwithstanding the foregoing, no amount from the Initial Capital Investment shall be included in the Capital Recovery Payment unless such amount has been approved by Owner in accordance with Section 9.14.

Initial Term – means the period commencing on the Effective Date and expiring at 11:59 p.m., Austin, Texas time, on the last day of the three hundred sixtieth (360) full calendar month ending after the Effective Date.

Lease – has the meaning set forth in the Preamble.

Lease Year – means a period of twelve (12) calendar months commencing on October 1 of each calendar year during the Term, but (a) for the first Lease Year, the period from the Effective Date through the following September 30 and (b) for the final Lease Year, the period from October 1 of such Lease Year through the last day of the Term.

Limited Services Terminal – means an airport passenger terminal that is constructed and operated with fewer operational amenities than the North Terminal, such as a terminal without passenger loading bridges, which supports a lower cost structure.

MWBE – has the meaning set forth in Section 24.02.

MWBE Program – has the meaning set forth in Section 24.02.

New Facility – means the construction of any new passenger terminal or concourse, including without limitation any new Limited Services Terminal, or other facilities at the

Airport, including any new or expanded parking facilities, to accommodate the growth of operations of Airlines (or other air carriers) at the Airport.

North Terminal – means and refers to the Barbara Jordan Terminal at the Airport.

Notice to Proceed – has the meaning set forth in Section 9.04.

NPDES – has the meaning set forth in Section 21.05.

Outside Date – has the meaning set forth in Section 10.01(c).

Owner – has the meaning set forth in the Preamble.

Owner Annual Report – has the meaning set forth in Section 18.06(e).

Owner Default – has the meaning set forth in Section 29.01.

Owner Environmental Parties – shall include Owner and its elected and non-elected officials, officers, agents, employees and contractors and any other person or entity that is not a Tenant Environmental Party.

Owner Monthly Report – has the meaning set forth in Section 18.06(b).

PDS – has the meaning set forth in Section 19.04.

Permitted Liens – means any liens (a) related to current period Taxes or assessments imposed upon Seller that are not yet due and payable, (b) related to any financing of Tenant as permitted under Section 16.01, or (c) otherwise agreed to, in writing, by Owner.

PFCs – has the meaning set forth in Section 18.08.

Pre-Existing Environmental Claim – has the meaning set forth in Section 21.03.

Premises – means the South Terminal, the land described on Exhibit A attached hereto, and all improvements and other buildings therein and thereon leased to Tenant by Owner.

Public Owner – has the meaning set forth in Section 35.02(a).

Qualified Entity – means with respect to any of Tenant's rights and obligations hereunder any entity proposed by Tenant as assignee, sublessee, subcontractor, manager or transferee under Section 11.01 or a transferee under Section 35.01 which has (or with its contractors collectively have), in the reasonable determination of Owner, (a) the financial strength and integrity, (b) experience of the day-to-day team managing airports or other comparable or relevant businesses and (c) background and reputation to perform such obligations.

Qualifying Terminal Use Agreement – has the meaning set forth in Section 10.01(a).

Radio Communications Facilities – has the meaning set forth in Section 19.03.

AUS ST 000377

Rehabilitation Project – has the meaning set forth in Section 9.01(a).

Rent – has the meaning set forth in Section 5.02.  Rent includes Fixed Rent and Variable Rent, as defined in Section 5.01, and Additional Rent.

Rental Car Revenue Share – has the meaning set forth in Section 18.06(a).

Request for Mediation – has the meaning set forth in Section 40.01.

Revenue Sharing Rate – has the meaning set forth in Section 18.06(a).

Security Deposit – has the meaning set forth in Section 5.07(a).

Shuttle Bus Service – means the rental car shuttle bus service providing transportation between the South Terminal and the North Terminal/CONRAC facility.

Site Development Correction Documents – shall mean the overall site plan with all proposed changes to improvements made on the Premises to be prepared or assembled by the Tenant.

SMBR – has the meaning set forth in Section 14.03.

South Terminal – means the South Terminal of the Airport, including all existing fixtures and equipment therein; facilities for ground transportation staging; motor vehicle parking;; in-terminal food and beverages, retail, news and gift concessions; advertising; passenger services; storage; ground handling; and office, passenger, air carrier, user or ground handling accommodations.

South Terminal Marketing Program – has the meaning set forth in Section 13.02.

SPCC Plan – has the meaning set forth in Section 21.10.

Specified Event – shall mean (a) any transfer of Owner's rights and obligations under this Lease to any person or entity other than to a Public Owner in accordance with Section 35.02; (b) construction by any person or entity other than Tenant of a stand-alone Limited Services Terminal at the Airport; and (c) in the case of each of sub-clause (a) and (b) above), any action by the City Council of Austin, or any letter of intent, memorandum of understanding, solicitation for proposals or other written commitment by Owner to negotiate, implement or authorize any such transfer or construction.

SSI – has the meaning set forth in Section 38.02.

STS – has the meaning set forth in Section 19.05.

Substantial Completion – shall mean the stage in the progress of the construction of the Rehabilitation Project when the work is sufficiently complete so that Tenant can occupy or use the South Terminal and its Premises for its Authorized Use. Substantial Completion shall include, without limitation, all required permit sign-offs, regulatory inspections and structural

AUS ST 000378

components completed, equipment and systems installed and functional and all interior and exterior wall, ceiling and floor finish materials installed excluding only the completion of the Punch-List Items.  In no event shall Substantial Completion be later than two hundred seventy (270) days after the Airport's Notice to Proceed.

Survey – has the meaning set forth in Section 9.10.

SWPPP – has the meaning set forth in Section 21.02.

Taxes – has the meaning set forth in Section 6.01.

Tenant – has the meaning set forth in the Preamble.

Tenant Annual Report – has the meaning set forth in Section 5.11.

Tenant Apron – means the aircraft parking and maneuvering areas adjacent to the South Terminal included in Tenant's Premises as designated in Exhibit A.

Tenant Default – has the meaning set forth in Section 28.01.

Tenant Environmental Parties – shall mean Tenant and Tenant's directors, officers, agents, employees, contractors, subtenants, customers, invitees, , its and their Affiliates, and its and their successors and assigns, but shall specifically exclude any Owner Environmental Party.

Tenant's Airport Operational Manual – has the meaning set forth in Section 10.02.

Tenant's Interest – means all Tenant's right, title and interest in, to, under or derived from this Lease, including the rights of Tenant under Article 2 and Article 15, and the Trade Fixtures.

Tenant Monthly Reports – has the meaning set forth in Section 5.10(b).

Term – has the meaning set forth in Section 3.01(b).

Terminal Use Agreements – means the Terminal Use and Lease Agreements between Tenant and Airlines for the use of, or use of space in, the South Terminal.

TPDES – has the meaning set forth in Section 21.05.

Trade Fixtures – All furniture, equipment, fixtures, and furnishings installed or constructed by Tenant, at its expense, on the Premises, including baggage handling systems, ticket and check-in counters, signs, seating, display cabinets, communications equipment, special lighting fixtures and all other equipment, furniture, furnishings and supplies that can be removed from the Premises without material damage to the Premises, specifically excluding Owner's Shared Use Passenger Processing System equipment, hardware, software, and supplies.

TSA – the United States Transportation Security Administration or successor agency that regulates airport or aviation security.

Variable Rent – has the meaning assigned to such term in Section 5.02(b).

AUS ST 000379

1.02     Interpretations.   In this Lease and any certificate or other document delivered pursuant hereto, unless otherwise expressly provided herein or therein or unless the context requires another meaning, the following rules of interpretation shall apply:

(a)     Headings and underlinings are for convenience only and do not affect the interpretation of an agreement.

(b)     Words importing the singular include the plural and vice versa and the masculine, feminine or neuter gender shall include all genders.  The word "or" is not exclusive.

(c)     The words "hereof," "herein," and "hereunder" and words of similar import when used in any agreement shall refer to such agreement as a whole and not to any particular provision of such agreement.

(d)     Any reference to an agreement shall include a reference to each exhibit, annex, schedule and other attachment thereto.

(e)     Any reference in an agreement to a Section, Clause, subsection, sub-clause, paragraph, Party, Exhibit, Annex or Schedule is a reference to that Section, Clause, subsection, sub-clause or paragraph of, or that Party, Exhibit, Annex or Schedule to, such agreement unless otherwise specified.

(f)     Any reference to an agreement or document is to such agreement or document as amended, varied, supplemented, replaced, novated or modified from time to time in accordance with the terms of such agreement or document.

(g)     Any reference to any Applicable Law shall be construed so as to include such Applicable Laws as amended, modified, extended, reenacted, redesignated or replaced from time to time.

(h)     A reference to a person or entity includes that person's or entity's successors and permitted assigns.

(i)     The term "including" shall mean "including without limitation" and any list of examples following such term shall in no way restrict or limit the generality of the word or provision in respect of which such examples are provided.

(j)     Accounting terms shall have the respective meanings given to them under GAAP, or if specific to Owner, under GASB.

(k)     References to "days" shall mean calendar days and to "business days" shall mean any day except a Saturday, Sunday or other day on which commercial banks in New York, New York or Austin, Texas are authorized or required by law to close. Any action required to be taken on or by a day that is not a business day may be taken on or by the next succeeding business day.  References to a time of day or business day shall mean such time in Austin, Texas.

10

AUS ST 000380

(l)     This Lease is the result of negotiations among, and has been reviewed by each Party and its respective counsel.  Accordingly, this Lease shall be deemed to be the product of both Parties, and no ambiguity shall be construed in favor of or against either Party.

(m)     References to any condition or any representation by any Party being to the (i) best knowledge of such Party shall be deemed to be to the best knowledge of such Party after due inquiry, and (ii) knowledge of such Party shall be deemed to be to the actual knowledge of such Party.

## ARTICLE 2
## GRANT OF LEASE

2.01     Premises.  Owner hereby leases and demises to Tenant, and Tenant hereby leases and takes from Owner, the Premises; TO HAVE AND TO HOLD the Premises, together with all and singular the rights, privileges, and appurtenances thereto attaching or in anywise belonging, unto Tenant, its successors and permitted assigns, for the Term, and subject to and in accordance with (a) the covenants, agreements, terms, provisions and limitations of this Lease; (b) all rights, restrictions, encumbrances and matters of record; and (c) the present or future right of Owner to construct, install, establish, maintain, use, operate, renew, and connect with any existing public utility facilities, franchised public utilities, roadways, sidewalks, streets, or other public improvements on, under, above, or adjacent to the Premises.  For avoidance of doubt, this Lease shall include and cover all existing fixtures and equipment at the South Terminal and its adjacent airside and landside facilities on the Premises, including, but not limited to holdroom seating currently in storage in the South Terminal, baggage belt systems, baggage handling systems, mechanical, HVAC and plumbing, fire alarm and protection, security equipment, and spill containment controls, located at the South Terminal as of the Effective Date.

2.02     Existing Condition.  Except as provided in Article 20 or Article 21 or as otherwise expressly provided herein, Tenant shall take the Premises **AS IS, WITH ALL FAULTS**, and Tenant acknowledges that Owner has not made any representations, warranties, covenants or agreements, express or implied, regarding (a) the value, nature, quality or condition of the Premises, (b) the income to be derived from the Premises, (c) the suitability of the Premises for any activity or use which Tenant may conduct thereon, (d) the compliance of the Premises with any Applicable Laws, or (e) the habitability, marketability or fitness for a particular purpose of the Premises.   Tenant further acknowledges and agrees that any information which Owner procures from a third party and provides to Tenant with respect to the Premises may be delivered without any independent investigation or verification of such information by Owner, and Owner makes no representations as to the accuracy or completeness of such information.

2.03     Quiet Enjoyment.  Owner covenants that Tenant, upon paying the Rent and performing and observing the covenants and agreements herein required to be paid, performed or observed by it, may peaceably and quietly have, hold, occupy, use and enjoy the Premises during the Term, and may exercise all of its rights hereunder, without ejection or interference by Owner or any person or entity claiming by, through or under Owner, subject to the provisions of this Lease and Applicable Law.  Notwithstanding the foregoing,

11

AUS ST 000381

Tenant hereby grants to Owner the non-exclusive right of vehicular and pedestrian access across any roadways constructed on the Premises, which access shall not, at any time, materially and adversely impair or interfere with Tenant's use and enjoyment of the Premises.

## ARTICLE 3
## TERM

3.01   Term.

(a)   This Lease shall be and remain in effect for the Initial Term, subject to the Parties' rights of termination as specified in this Lease and extension under Section 3.01(b) below.

(b)   Tenant shall have the option to extend the Term for up to two (2) additional terms of five (5) years each (each, an "Extension Term", and the Initial Term, together with any Extension Term, being herein called the "Term") commencing at the expiration of the Initial Term or the first Extension Term, as applicable, upon the reasonable consent of Owner, provided (i) no Tenant Default has occurred and is then continuing under this Lease, (ii) Tenant provides Owner with notice (an "Extension Notice") of such extension on or before one hundred eighty (180) days prior to the expiration of the Initial Term or the first Extension Term, as applicable; (iii) more than 400,000 Enplaned Passengers (or such increased number of Enplaned Passengers as mutually agreed to by the Parties if Tenant operates additional gates as a result of Expansion) have passed through the South Terminal in the twelve (12) month period immediately preceding the delivery of the applicable Extension Notice; (iv) Tenant has operated as a Qualified Entity for the five (5) year period immediately preceding the delivery of the applicable Extension Notice; and (v) Tenant has received satisfactory scores under applicable customer service surveys, with such surveys to be reasonably mutually agreed to by the Parties, for the three (3) year period immediately preceding the delivery of the applicable Extension Notice. Notwithstanding the foregoing, in the event that an Owner Default has not been cured at the time required for delivery of an Extension Notice, Tenant may provide notice of such to Owner and the Term shall automatically be extended until such time as such Owner Default is cured. In such event, Tenant shall have an additional thirty (30) days after the cure of the Owner Default to provide an Extension Notice; provided that, any extension will not cause the overall Term of this Lease to exceed forty (40) years.

3.02   Early Termination. Owner shall submit this Lease to the FAA for review within ten (10) business days after the Effective Date. Owner shall promptly deliver to Tenant written notice of any written response by the FAA resulting from its review of this Lease. Within thirty (30) days after the date Tenant receives notice of FAA's response to Owner's submission of this Lease to the FAA, either Owner or Tenant may elect in its sole discretion to terminate this Lease pursuant to a written notice delivered to the other Party in the event that, as a result of the review of this Lease by the FAA, such Party will be materially and adversely affected by any amendments to this Lease that are required pursuant to Section 26.01 or Section 26.07 hereof.

AUS ST 000382

3.03     Transfer of Rights.   Upon termination or expiration of this Lease, Tenant shall transfer all right, title and interest in and to the Premises, to Owner without additional payment or cost; provided, however, that at all times during the Term, Tenant will retain all right, title and interest in and to any Trade Fixtures and Tenant shall be entitled (but not required) to remove and dispose of such Trade Fixtures, subject to Owner's rights under Section 28.02(f). If Tenant has failed to remove such Trade Fixtures from the Premises within sixty (60) days after termination or expiration of this Lease, such Trade Fixtures shall be conclusively presumed to have been abandoned by Tenant.

## ARTICLE 4
## USE OF PREMISES

4.01     Authorized Use.   The Premises shall be used for the rehabilitation, operation, and maintenance of the South Terminal as a stand-alone Limited Services Terminal to accommodate Air Transportation (an "Authorized Use"). It is the intent of both Owner and Tenant that the South Terminal be rehabilitated, operated, and maintained as a Limited Services Terminal. Tenant may not change the character of the South Terminal as a Limited Services Terminal without the prior written consent of Owner.

4.02     Prohibited Uses.   Tenant shall not use or occupy, permit the Premises to be used or occupied, or do or permit anything to be done in or on the Premises in a manner which (a) is not an Authorized Use, (b) would constitute a public or private nuisance, (c) would violate Airport rules or regulations or (d) would violate any Applicable Laws.

4.03     Permits and Licenses.   Tenant, at Tenant's expense, shall obtain and maintain in force and effect all Governmental Approvals, to the extent required for the reactivation and operation of the South Terminal. Owner will make commercially reasonable efforts to assist and support Tenant in securing the necessary Governmental Approvals for such reactivation and operation, but nothing herein shall be construed to require Owner to waive, release or modify any of its site development ordinances, rules or regulations, or requirements in connection with the granting of any such Governmental Approvals.

## ARTICLE 5
## RENT, REPORTS, AND AUDIT

5.01     Gross Revenue.

(a)     "Gross Revenue" shall mean the total amount actually charged to all customers by Tenant arising from its operation of the Premises, including Owner's cash payments to Tenant under Section 18.06 (Rental Car Revenue Sharing), whether for cash, credit or exchange, regardless of when collected. It shall include all transactions, regardless of place or time of actual payment. For the avoidance of doubt, Gross Revenues will not be deemed to have been earned by Tenant until such time that Tenant is entitled to collect such revenues from the applicable counterparty under an installment sales contract.

(b)     There shall be no reduction allowed from Gross Revenue for bad debts, personal property, or other ad valorem taxes, loss from theft, or any deduction except as expressly stated below. The following, to the extent properly documented and recorded, are the

13

AUS ST 000383

only amounts that Tenant may exclude or deduct, as the case may be, from the computation of Gross Revenue:

(i)      Federal, state, and local excise, sales and use taxes that are remitted to the taxing authorities by Tenant that have been either (A) passed through to and directly collected from the customer, or (B) remitted by the customer to, and collected by Tenant from, any of the Airlines, concessionaires or other users of the Premises;

(ii)      the amount of any refunds or adjustments (either cash or credit) granted by Tenant to any such Airlines, concessionaires, or users of the Premises because of returned or defective goods or dissatisfactory service; and

(iii)      incentives permitted under the South Terminal Marketing Program.

(c)      Tenant shall keep and maintain full and adequate documentation to support all claimed exclusions and deductions from Gross Revenue. Failure to adequately document any exclusion or deduction to the reasonable satisfaction of Owner shall result in denial of the exclusion or deduction.

(d)      Tenant may conduct all or part of its business on a credit basis, provided that the risk of collection shall be borne solely by Tenant. Tenant shall pay Variable Rent on such credit transactions, and report all sales, charges and receipts, both cash and credit, in its monthly statement to City.

5.02    <u>Rent</u>. Tenant shall pay Owner rent ("<u>Rent</u>") for the Premises and the South Terminal, which will be calculated on an annual basis, as follows:

(a)      From the Effective Date through the date immediately preceding the Commencement of Operations Date, the amount of EIGHTY THOUSAND AND NO/100 Dollars ($80,000.00) per Lease Year, pro-rated for any partial Lease Years; and

(b)      From and after the Commencement of Operations Date through the early termination or expiration of the Term, the greater of (i) THREE HUNDRED THOUSAND AND NO/100 DOLLARS ($300,000.00) per Lease Year, pro-rated for any partial Lease Years, and adjusted effective as of the first day of each Lease Year beginning with the second Lease Year commencing after the Commencement of Operations Date, based on any percentage increase in the averaged CPI of the prior 12-month period running from July 1st through June 30th over the immediately preceding July 1st through June 30th (the "<u>Fixed Rent</u>"), or (ii) a percentage of annual Lease Year Gross Revenues, pro-rated for any partial Lease Year, based on the actual Enplaned Passengers for the applicable Lease Year in accordance with the following schedule (the "<u>Variable Rent</u>"):

i.      0 to 399,999 Enplaned Passengers, 0% of Gross Revenue;

ii.      400,000 to 699,999 Enplaned Passengers, 5% of Gross Revenue;

iii.      700,000 to 999,999 Enplaned Passengers, 10% of Gross Revenue;

AUS ST 000384

iv.     1,000,000 to 1,299,999 Enplaned Passengers, 15% of Gross Revenue; and

v.      more than 1,299,999 Enplaned Passengers, 20% of Gross Revenue.

For the avoidance of doubt, for purposes of calculating Rent for the Lease Year in which the Commencement of Operations Date occurs, there will be deemed to be two partial Lease Years for which the Rent, as determined pursuant to Section 5.02(a) and Section 5.02(b), will be prorated. In the event Tenant operates additional gates as a result of an Expansion or a New Facility, both Parties shall work together in good faith to modify the Rent calculation on mutually agreeable terms.

5.03    Payment of Pre-Commencement of Operations Date Rent. Commencing on the Effective Date, and prior to the Commencement of Operations Date, Tenant shall pay to Owner on the first of each month, without notice, and free from any and all claims, deductions or set-offs against Owner except as expressly provided for in Section 29.02 with adequate documentation to support any claim, deduction, or set-off, an amount equal to the Rent payable under Section 5.02(a) multiplied by one-twelfth (pro-rated for any partial month).

5.04    Payment of Post-Commencement of Operations Date Rent.

(a)     Commencing on the Commencement of Operations Date and throughout the remaining Term, Tenant shall pay to Owner on the first of each month, without notice and free from any and all claims, deductions or set-offs against Owner except as expressly provided for in Section 29.02 with adequate documentation to support any claim, deduction, or set-off, an amount equal to the Fixed Rent multiplied by one-twelfth (pro-rated for any partial month).

(b)     If the Variable Rent reflected in the Tenant Annual Report provided in accordance with Section 5.11 exceeds the total amount of Fixed Rent paid by Tenant with respect to the applicable Lease Year, Tenant shall pay Owner the amount by which such Variable Rent exceeds the Fixed Rent previously paid by Tenant for such Lease Year, within thirty (30) days after the delivery of the Tenant Annual Report, free from any and all claims, deductions or set-offs against Owner except as expressly provided for in Section 29.02 with adequate documentation to support any claim, deduction, or set-off.

5.05    Rent Payment Delivery. Unless otherwise directed, in writing, by Owner, Tenant shall remit any payment of Rent and any other payment obligations of Tenant to Owner, through an Automated Clearing House (ACH) electronic transfer of funds.

5.06    Late Payment Penalty. If any payment required hereunder by Tenant under this Article 5 is not made within thirty (30) days after such payment is due, Tenant shall pay interest at the Contract Rate on the amount outstanding from the payment due date until paid in full.

5.07    Security Deposit.

(a)     Upon execution of this lease, Tenant shall deposit with Owner the sum of TWENTY THOUSAND DOLLARS ($20,000.00), being three months total Pre-Commencement rent due and payable by Tenant. Prior to Post-Commencement, Tenant shall deposit with Owner

AUS ST 000385

an incremental FIFTY-FIVE THOUSAND DOLLARS ($55,000.00) for a total security deposit amount of $75,000.00, being three months of total Post-Commencement rent due and payable by Tenant for under this Agreement, to be held by Owner as security for Tenant's full, faithful, and timely performance of its obligations under this Lease (the ''Security Deposit''). The Security Deposit shall be in the form of cash, certified check, or letter of credit. The letter of credit must be in a form, and drawn on a bank, reasonably acceptable to City, and must remain in effect throughout the term of this Lease and for a period of ninety (90) days thereafter. If a letter of credit expires in accordance with its terms prior to such time, Tenant must provide a replacement letter of credit to Owner at least thirty (30) days before its expiration date. The Security Deposit shall not be considered an advance payment of Rent or a measure of damages in the event of default by Tenant. Owner shall not be required to pay interest to Tenant on the Security Deposit, or to keep the Security Deposit in a separate fund apart from other Owner funds.

(b)     As the Rent adjusts during the Term, Owner shall periodically review the adequacy of the Security Deposit, and may, by written notice to Tenant, reasonably adjust the required amount of the Security Deposit. Such notice shall include a calculation of the revised Security Deposit, which shall not exceed three times the average monthly Rent for the immediately preceding completed Lease Year. Tenant shall within twenty (20) business days of receipt of such written notice from Owner increasing the Security Deposit, deposit the additional amount with Owner by cash, certified check or supplemental letter of credit.

(c)     Owner shall have the right, but not the obligation, to apply all or any part of the Security Deposit to cure any Tenant Default, including, but not limited to, (i) any arrearages of Rent, fees or charges, or (ii) any other amounts due to Owner from Tenant under this Lease. In such event, Tenant must deposit with Owner an amount equal to the amount so applied by Owner within twenty (20) business days of written notice from Owner of the nature and amount of the application.

(d)     Owner shall return the Security Deposit to Tenant, less any amounts applied by Owner under clause (c) above, within sixty (60) days after the later of the end of the Term or the date on which Tenant surrenders possession of the Premises to Owner.

5.08   Disputes.   If either Party disputes the amount or calculation of any payment obligation of such Party under this Lease, including under this Article 5 and under Section 18.06, such Party shall pay the other Party the undisputed amount, together with a written notice of protest. Such notice of protest shall state the amount in dispute and describe in detail the basis of the dispute. If the Parties are unable to resolve the dispute at a staff level, the matter shall be resolved pursuant to Article 40. The Party found to owe an amount to the other Party shall promptly pay such other Party the amount determined to be owed.

5.09   No Abatement.   Except as may otherwise be expressly provided in this Lease, no event or situation during the Term, whether foreseen or unforeseen, and however extraordinary, shall relieve a Party from its obligations hereunder or entitle a Party to an abatement or offset, and each Party waives any rights now or hereafter available at law or in equity to any abatement, diminution, reduction, offset or suspension for any reason.

AUS ST 000386

5.10    Tenant Monthly Reports.

(a)    Commencing with the month in which the Commencement of Operations Date occurs, no later than twenty (20) days after the end of each month during the Term, Tenant shall submit to Owner a reasonably detailed statement reflecting (i) the number of Enplaned Passengers and (ii) the number of Deplaned Passengers, for the applicable month and for the Lease Year to date; and

(b)    Commencing with the month in which the Commencement of Operations Date occurs, no later than thirty (30) days after the end of each month during the Term, Tenant shall submit to Owner a reasonably detailed statement reflecting the Gross Revenues for the applicable month and for the Lease Year to date (collectively, the "Tenant Monthly Reports"). The Tenant Monthly Reports shall be prepared on a consistent basis and shall be certified by a responsible financial officer of Tenant.   The Parties acknowledge that the Tenant Monthly Reports and Gross Revenue calculations are subject to year-end adjustments and true-ups based on annual reports provided to Tenant (i) by Owner with respect to Rental Car Revenue Share and (ii) Airlines regarding Enplaned Passengers and Deplaned Passengers.

5.11    Tenant Annual Report.   Within one hundred fifty (150) days after the close of each Lease Year, Tenant shall furnish Owner a reasonably detailed statement (the "Tenant Annual Report") reflecting (a) the Gross Revenues, (b) the number of Enplaned Passengers, (c) the number of Deplaned Passengers and (d) Variable Rent due for the Lease Year.  The Tenant Annual Report shall be prepared in accordance with GAAP and certified by a responsible financial officer of Tenant.

5.12    Tenant Audit Report.   Within one hundred twenty (120) days after the close of each Lease Year, Tenant shall furnish to Owner an audited annual accounting statement of Gross Revenues and the calculation of Variable Rent due for the Lease Year, prepared by an independent Certified Public Accountant, in accordance with GAAP.  The audit will express an opinion as to whether the reported Gross Revenues and Variable Rent due for the applicable Lease Year have been accurately calculated in accordance with the terms of this Lease.

5.13    Late Report Penalty.  If Tenant fails to timely submit any report or audit required under Sections 5.10, 5.11, or 5.12, Tenant shall pay Owner the following as liquidated damages.  For purposes of assessing damages under Sections 5.10, 5.11, or 5.12, a report shall be deemed late if it is not received by Owner within ten (10) days after the due date specified above.

(a)    Each late Tenant Monthly Report:  $100

(b)    Each late Tenant Annual Report:  $500

(c)    Each late Tenant Audit Report:  $500

5.14    Internal Control Structure.   Tenant shall maintain an internal control structure designed to provide reasonable assurance that South Terminal assets are safeguarded from loss or unauthorized use, transactions are executed in accordance with Tenant's authority, and financial records are reliable for the purposes of preparing the reports required under this Article 5.   The internal control structure shall be supported by the selection, training and

17

AUS ST 000387

development of qualified personnel, by an appropriate segregation of duties, and by the dissemination of written policies and procedures.

5.15   Records Retention.   Tenant shall maintain full and accurate records, accounts, books, and data with respect to business done by it hereunder which shall show all of the Gross Revenue, in sufficient detail to readily permit verification of Gross Revenues by Owner.   Such records shall include all books, records and documents generated or maintained by Tenant concerning or relating to Tenant's operations under this Lease, the collection of and calculation of Gross Revenue and the Rent or other rents, fees or charges payable under this Lease, such as general ledgers, sales journals, daily sales reports, detailed daily reports, cash register tapes, trial balances, sales tax reports, subsidiary ledgers, daily journals, original and closed rental agreements, corporate chart of accounts, and lists of all rental locations on the Airport, as applicable.   Tenant shall retain all such records, accounts, books, ledgers, journals, business reports, rental agreements, and all other pertinent data and supporting documentation ("books and records") for the longer of three (3) years after the end of the Lease Year to which they pertain or until completion of all pending audits or litigation between the Parties.

5.16   Audit.   Upon written notice at any time or times during the Term within three (3) years after the end of any Lease Year, Owner may inspect, reproduce and audit the books and records of Tenant relating to its operations at the Airport.   If, as a result of such inspection and audit, it is established that additional Rent is due to Owner, Tenant shall, upon written notice by Owner, pay such additional Rent, plus interest, calculated at the Contract Rate, within ten (10) days of written notice.   If, on the other hand, such audit determines that Tenant has overpaid Rent due Owner, Owner shall refund to Tenant the amount of such overpayment. If the results of such audit reveal an underpayment of more than five percent (5%) of Gross Revenue as reported by Tenant, the cost of the audit shall be paid by Tenant to Owner as Additional Rent within thirty (30) days from invoice date.   Tenant shall cooperate fully with any audit or examination initiated by Owner, and shall produce all books and records requested for audit to a designated location at the Airport, or in Austin, Texas, within thirty (30) days of the date of written request.   To facilitate the inspection of Tenant's books and records, documents provided for audit shall be made available in an electronically downloadable format acceptable to Owner whenever possible.   When electronic files do not exist, legible printed copies of books and records must be provided. Owner's rights and Tenant's obligations under this Section shall survive the expiration or earlier termination of this Lease.

5.17   Confidentiality.   Owner's obligations with respect to information provided by Tenant under this Article 5 include the confidentiality covenants under Article 38.

5.18   Certain Notices.   Notice is hereby given Tenant of Article VIII, Section 1 of the Austin City Charter which prohibits the payment of any money to any person, firm or corporation who is in arrears to the City for taxes, and of §2-8-3 of the Austin City Code of 1992, as amended, concerning the right of the City to offset indebtedness owed the City.

AUS ST 000388

## ARTICLE 6
## TAXES AND LIENS

6.01    Payment of Taxes and Assessments.  Tenant shall pay, or in good faith contest, on or before their respective due dates, to the appropriate collecting authority, all federal, state and local taxes, charges and fees ("Taxes"), which are now or may hereafter be levied upon the Premises, personal property of Tenant, or upon the business activities of Tenant on the Premises, except to the extent payable by any subtenant under Applicable Law.  Tenant shall give notice to Owner if it plans to contest such Taxes and provide to Owner all related documentation and information reasonably requested by Owner.  If the nonpayment of any such Taxes may result in a lien on the Premises, the Airport or personal property of Owner, Tenant shall timely pay or take such action as provided under Applicable Law to avoid or release any lien that may otherwise attach due to contesting the same.  If Tenant contests such Taxes, Owner may require Tenant to establish and sufficiently fund an escrow account or bond to cover payment of such Taxes, if determined to be due and owing, and Tenant shall diligently pursue any such contest to conclusion. For the avoidance of doubt, any payment of any Taxes assessed by Owner, that Tenant is contesting, shall not be deemed a waiver of any right of contest with respect to such Taxes or any waiver of an Owner Default related to such Taxes.

6.02    Liens.  Tenant agrees not to directly or indirectly create, permit or suffer any lien to be imposed upon the Premises or any part thereof as a result of Tenant's activities and operations on the Premises other than a Permitted Lien.  In the event any lien is created by or permitted by Tenant in violation of this Section 6.02, Tenant shall immediately: (a) give notice to Owner of such lien and provide to Owner all related documentation and information reasonably requested by Owner; (b) discharge such lien of record, by payment, bond or as otherwise allowed by Applicable Law; and (c) provide to Owner a copy of the recorded release or discharge of such lien and all related documentation and information reasonably requested by Owner.  TENANT SHALL ALSO DEFEND (WITH COUNSEL APPROVED (CONSENT NOT TO BE UNREASONABLY WITHHELD) BY OWNER), FULLY INDEMNIFY AND HOLD ENTIRELY FREE AND HARMLESS OWNER FROM ANY ACTION, SUIT OR PROCEEDING THAT MAY BE BROUGHT ON OR FOR THE ENFORCEMENT OF ANY SUCH LIEN.

## ARTICLE 7
## NET LEASE

7.01    Net Lease.  Except as expressly set forth in this Lease, Owner shall not be required hereunder to make any expenditure, incur any obligation, cost, expense or liability of any kind in connection with this Lease or the financing, ownership, construction, maintenance, operation or repair of the Premises, it being intended that this Lease be a completely net lease which assures Owner the Rent herein reserved on an absolute net basis.

## ARTICLE 8
## UTILITIES

8.01    Utilities.  Tenant shall pay or cause to be paid all fees and charges for all utility services to the Premises, including, gas, electricity, light, heat, water, wastewater (other

19

AUS ST 000389

than fees and charges for collection and disposal of de-icing run-off), cable television, telephone and other communication services, and drainage and transportation fees.  Owner, at Owner's expense, shall maintain all utility lines (*e.g.*, water, wastewater, electricity, communications and natural gas) within the utility corridors on Airport property.  Tenant, at Tenant's expense, shall extend utility lines, as applicable, (*e.g.*, water, wastewater, electricity, communications and natural gas) from the Airport's utility corridors as necessary to support the Premises.  Tenant shall establish separate utility accounts for the Premises and the South Terminal in Tenant's name.  Utilities for portions of the Premises subleased to an authorized subtenant may be separately metered and established in the names of the respective subtenant, if and to the extent permitted by Applicable Laws and utility regulations.

**ARTICLE 9**
**CONSTRUCTION**

9.01    <u>Conditions to Commencement of the Rehabilitation Project</u>.

(a)    Promptly after the Effective Date, Tenant will commence the rehabilitation of the South Terminal as described in <u>Exhibit B</u> attached hereto (the "<u>Rehabilitation Project</u>"), provided that (A) the obligations of Tenant to commence and complete the Rehabilitation Project and to reactivate the South Terminal are subject to the following terms and conditions:

(i)    no Specified Event having occurred;

(ii)    any necessary plan for remediation of Hazardous Materials or other Environmental Conditions having been agreed upon in accordance with <u>Article 20</u>; and

(iii)    Tenant having received Airport's Notice to Proceed as contemplated under <u>Section 9.04</u>;

and (B) the right of Tenant to commence and complete the Rehabilitation Project and to reactivate the South Terminal are subject to Tenant's compliance with <u>Sections 9.01</u> through <u>9.04</u> with respect to the Rehabilitation Project.

(b)    If on or prior to May 15, 2016, any of such conditions described in (i) <u>Section 9.01(a)(A)</u> have not been satisfied, or waived by Tenant, Tenant shall have the right, or (ii) <u>Section 9.01(a)(B)</u> have not been satisfied, or waived by Owner, Owner shall have the right, to terminate this Lease, without penalty, by notice to the non-terminating Party (such termination to take effect on the date specified by the terminating Party in such notice, which date shall be not earlier than thirty (30) days after the date of such notice and not later than ninety (90) days after the date of such notice), unless the terminating Party has taken any willful act or omission to cause such condition to not be satisfied, in which case such Party shall have no such right of termination under this <u>Section 9.01(b)</u>, and provided that nothing herein shall relieve any Party hereto from liability for willful acts or omissions, the purpose of which is to avoid honoring any of its commitments and obligations under this Lease.

9.02    <u>Demolition</u>.  All demolition of existing improvements within the South Terminal required for the Rehabilitation Project and reactivation of the South Terminal,

20

AUS ST 000390

excluding demolition of any non-structural improvements, shall be subject to the prior approval of Owner in accordance with this Article 9 and shall be undertaken by Tenant at Tenant's sole cost and expense; provided, however, that notwithstanding the foregoing, if any preexisting Hazardous Materials must be investigated, excluding building components containing Hazardous Materials, remediated, disposed of and/or otherwise addressed as a result of any such demolition, such investigation, remediation, disposal or other activity shall be the responsibility of Owner, in accordance with Article 20 and Article 21 hereof, and all of such activities shall be undertaken pursuant to a separate agreement between Owner and Tenant.

9.03    Improvements.    Any improvement, construction, alteration, import of material, export of material or any other alteration or addition to the Premises as described in this Lease shall be completed in accordance with the provisions of: (a) this Lease, (b) Applicable Law, (c) Design Review Procedures (as defined below), (d) the City codes and standards and (e) City building permit requirements.  Tenant may not construct or install any new improvements or infrastructure on the Premises, or materially modify or demolish any improvements or infrastructure on the Premises, without the prior written consent of the Director and, to the extent required, in accordance with the applicable provisions of the Airport Policies and Procedures for Design Review attached hereto as Exhibit C, as such policies and procedures may be amended from time to time (the "Design Review Procedures"), to the extent such policies and procedures are not in conflict with the express provisions of this Lease, any such improvements being referenced to herein as "Covered Improvements"; provided, however, that the Rehabilitation Project shall be completed in accordance with the Airport Policies and Procedures for Design Review in effect as of the date hereof and attached hereto as Exhibit C.

9.04    Design and Construction Review.    To obtain the consent of the Director to proceed with construction, modification or demolition of any Covered Improvements, including the Rehabilitation Project ("Notice to Proceed"), Tenant shall submit to Owner the following:

(a)    one (1) complete copy of all work product for the design and construction of the South Terminal in electronic file formats (9CD-R) and prepared with computer-aided design and drawing technology utilizing the Airport's current CADD standards;

(b)    at least three (3) sets of full-size printed drawings, plans and specifications (in hard copies and electronic format specified by Owner), which may be submitted in stages depending on the stages or phases of construction and which provide, in sufficient detail for Owner to evaluate the Covered Improvement and its scope, including, as applicable;

(c)    a site plan showing, with horizontal dimensions and elevations, proposed work to be performed and improvements to be constructed on the Premises, including the location of all proposed utility lines and connections, drainage, vehicle parking, landscaping, paths, drainage, roads and easements;

(d)    architectural drawings sufficiently complete for construction, showing front and side elevation views, floor plans for each floor, if applicable, and dimensions of any proposed structure and the materials, including colors and exterior finishes, to be used, finished floor elevation data for each level and maximum elevation (height) of the South Terminal;

21

AUS ST 000391

    (e) a survey of the Premises, incorporating any boundary changes previously approved by Owner;

    (f) a copy of the schedule for the completion of the construction of the Premises and a schedule of values composing the fixed price for the construction;

    (g) documentation showing that the plans and specifications for the scope of work to be undertaken have received any approvals required by Governmental Authorities having jurisdiction over the proposed Covered Improvement, including but not limited to the City, TSA and FAA;

    (h) certificates of insurance, in a form and for coverage amounts and with deductibles or self-insured retention amounts reasonably satisfactory to Owner, evidencing Tenant's construction contractor's "all risk" type Builder's Risk insurance coverage, Commercial General Liability Insurance coverage, Business Automobile Liability Insurance Coverage, and Workers' Compensation Insurance Coverage, as specified on Exhibit E. Tenant's contractor's insurance policies must be endorsed to name Owner as an additional insured, waive subrogation against Owner and provide Owner not less than thirty (30) days' prior written notice of cancellation;

    (i) valid performance bonds and payment bonds without expense to Owner. Such bonds shall be maintained and kept in full force and effect until all work required to construct, install, modify or demolish (as applicable) the Covered Improvement is complete.  The bonds shall be in a form, and issued by a surety licensed to transact business in the State of Texas, reasonably acceptable to Owner.  The bonds shall be in a penal amount equal to the full amount of all contract(s) required for the construction, installation, modification or demolition relating to the Covered Improvement.  The performance bond shall be for the protection of Owner, and ensure the full faithful and timely performance by Tenant or its contractors of the obligations to construct, install, modify or demolish the Covered Improvement in accordance with the plans, specifications and contract documents.  The payment bond shall guarantee the prompt payment by Tenant or its contractors to all persons supplying labor, materials, provisions, supplies and equipment, used directly or indirectly by any contractor, subcontractor(s) and suppliers in the construction, installation, modification or demolition of the Covered Improvement, and shall protect Owner from any liability, losses, or damages arising therefrom; and

    (j) any additional data or documents reasonably requested by City.

The Director will provide the Notice to Proceed within ten (10) business days of receiving the foregoing in form acceptable to Owner.

  9.05 Construction Plans.  Tenant shall provide interim construction plans for the Rehabilitation Project at (a) one hundred percent (100%) Building Permit Documents and (b) one hundred percent (100%) Site Development Correction Documents, respectively, to allow for comments by Owner before City issues any applicable permits to Tenant, and thereafter for approval of any proposed significant change.  The Building Permit Documents and the Site Development Correction Documents may be submitted in stages in advance of the construction

AUS ST 000392

of various elements of the Rehabilitation Project. Owner agrees to review all plans and specifications and comment within fourteen (14) days of the delivery so long as Tenant provides at least three (3) days advance written notice to Owner prior to delivery for review.

9.06    Limitation of Owner Responsibility.   The approval by Owner of any construction design or any other provision does not waive Tenant's legal responsibility or liability to comply with all Environmental Laws, Applicable Law and City codes and standards in accordance with this Agreement, including those concerning the construction and design of the South Terminal, all of which shall be Tenant's sole responsibility.  In addition, such review or approval shall not constitute a waiver by Owner of the right thereafter to require Tenant to correct any failure by Tenant to comply with any Environmental Laws, Applicable Law, or City codes and standards.  It is agreed and understood that the review of plans and specifications by Owner is only for compliance with this Lease, and not for architectural or engineering design; and that Owner assumes no liability or responsibility for the design or for any defect in the design or in any work performed pursuant to such plans and specifications.

9.07    Construction Standards.  Construction or modification of any Covered Improvements shall comply with the following requirements.

(a)    Improvements and modifications shall be constructed in a good and workmanlike manner, utilizing good industry practice for the type of work in question, and in compliance in all material respects with all Applicable Laws, including applicable building codes.

(b)    Improvements and modifications shall be designed and constructed in accordance with the applicable provisions of Austin-Bergstrom International Airport Design Guidelines, other applicable Airport rules and regulations, Federal Aviation Regulations governing the height and location of structures affecting airspace at the Airport as set forth in 14 CFR Part 77, Chapter 25-13 of the Austin City Code (Airport Hazard and Compatible Use Zoning Ordinance), and other Applicable Laws.

(c)    All plans, drawings and specifications, preliminary and final, shall be prepared by registered architects or engineers licensed to practice in the State of Texas.

(d)    After commencement, Tenant shall prosecute the authorized work with due diligence to meet Substantial Completion.

(e)    Owner shall designate a haul route and Tenant shall designate a staging area for Tenant's construction project for any Covered Improvements on Tenant's Premises. Tenant shall not use, or permit its contractors to use, any area for staging or parking on Airport property, other than on Tenant's Premises, without the prior written consent by Owner.

9.08    Owner's Right of Inspection.  During the course of the modification, construction or demolition necessitated by any Covered Improvements, Owner and its architects, engineers, agents and employees may enter upon and inspect the Premises for the purpose of inspecting the work for conformity with the requirements of this Lease and the plans and specifications approved by Owner, upon not less than two (2) business days prior notice to Tenant, except in the case of an emergency to public health or safety.

23

AUS ST 000393

9.09   Tenant's Representative.  Tenant shall designate an on-site representative who shall be available through final completion of any Covered Improvements to coordinate all design and construction activities, and to meet with Owner's representatives as necessary. Tenant shall submit written progress reports to the Director at least monthly.  The reports shall describe significant achievements and problems that could affect the construction schedule or cost.  The reports shall be sufficiently detailed to demonstrate compliance with approved plans and specifications, and this Lease.  Tenant shall also furnish (or cause its contractors to furnish) at Tenant's expense, qualified safety personnel to be present during any construction activity.

9.10   Construction Contract Close-Out.  Within ninety (90) days following Construction Contract Close-Out of any Covered Improvements, Tenant shall furnish Owner with (a) a certificate from Tenant's architect or engineer certifying that the work has been completed in accordance with the approved plans and specifications; (b) a complete set of electronic as-built drawings in Owner's current CADD standards of any Covered Improvements ("As Built Plans"); (c) to the extent not already provided to Owner by Tenant in accordance with Section 9.14 , a reasonably detailed itemization ask for the schedule of values of project costs including copies of invoices (addressed to, received by and directly paid by Tenant) and proof of payment to establish the verified cost of any Covered Improvements; (d) electronic PDF copies of all construction agreements, operation and maintenance manuals, and warranties on any Covered Improvements, including the Rehabilitation Project, and any component part thereof; (e) a list of all maintenance contractors and contracts for any Covered Improvements, or any part thereof; (f) a survey and metes and bounds description of the Premises by a professional land surveyor registered in the State of Texas using the then current professional survey standards as established by the Texas Society of Professional Surveyors ("Survey"); and (g) a copy of the certificate of occupancy for the Covered Improvements issued by the applicable Governmental Authority.  If Tenant does not provide any applicable As-Built Plans and Survey within the designated period, Tenant shall pay Owner liquidated damages in the amount of Fifty Thousand Dollars ($50,000.00) to cover Owner's cost of obtaining the same.  Tenant covenants that Owner may use all plans and specifications submitted by Tenant pursuant to this Lease without payment to Tenant or any other person, for purposes relevant to and consistent with this Lease.

9.11   Amendment of Lease.  After Owner's approval of the final as-built survey plat and metes and bounds description delivered to City in accordance with Section 9.10, Tenant and Owner shall execute an amendment to this Lease to identify the Premises.

9.12   Ownership.  All improvements or modifications Premises resulting from any Covered Improvements, excluding Trade Fixtures related thereto, shall become the property of Owner at the end of the Term, whether by expiration, termination or otherwise, free from any liens or claims whatsoever created by Tenant, without any compensation from Owner to Tenant or to any other person or entity (except as otherwise expressly provided herein).

9.13   No Liens.  Tenant shall be solely responsible for payment to all contractors and workers for all elements of construction, modification or demolition of any Covered Improvements, and shall keep the Premises and the South Terminal free and clear of all liens, other than Permitted Liens, resulting from any such work thereon, or the furnishing of labor or materials, by or on behalf of Tenant.  Tenant shall obtain and deliver to Landlord, promptly upon the completion of any work performed at the Premises, written and unconditional

AUS ST 000394

waivers of mechanic's liens upon the Premises and Covered Improvements for all work, labor, and services performed and materials furnished in connection with such work, signed by all contractors, subcontractors, material men, and laborers involved in such work. Notwithstanding the foregoing, any mechanic's lien filed against the Premises or the Covered Improvements for work claimed to have been done for or materials claimed to have been furnished to Tenant will be discharged by Tenant at its expense within thirty (30) calendar days after such filing, by payment or filing of the bond required by law. Tenant may contest the correctness or validity of any such lien, but shall indemnify, defend and hold harmless Owner from any and all such lien claims.

9.14    Initial Capital Investment. Within ninety (90) days after the Construction Contract Close-Out of the Rehabilitation Project, Tenant will provide Owner with a calculation of the actual Initial Capital Investment, together with invoices and cleared checks for payments made directly by Tenant to contractors, vendors and other third parties related to the Rehabilitation Project. Within ninety (90) days after Tenant's submission of its calculation of the actual Initial Capital Investment and such supporting documentation to Owner, Owner shall approve such calculation, in writing, such approval not to be unreasonably withheld, or else provide a notice to Tenant with any objections to Tenant's calculation of the Initial Capital Investment. Within thirty (30) days after any notice of objection by Owner, Owner and Tenant shall meet to negotiate in good faith and agree on the calculation of the amount of the Initial Capital Investment. If Owner fails to timely deliver a notice of objection to Tenant's calculation of the Initial Capital Investment, Owner shall be deemed to have approved Tenant's calculation of the Initial Capital Investment. The approved Initial Capital Investment shall be deemed final for purposes of any subsequent Capital Recovery Payment calculation.

## ARTICLE 10
## TENANT OPERATIONS, MAINTENANCE, AND REPAIRS

10.01    Conditions to Commencement of Operations.

(a)    The Commencement of Operations Date shall not occur until the following conditions have been fulfilled or waived:

(i)    no Specified Event shall have occurred upon the fulfillment or waiver of the items set forth in subsections (ii), (iii), (iv), (v), (vii), (viii), (ix), (x), (xi), (xii),(xiii), and (xiv) hereof;

(ii)    Owner shall have installed roadway lighting along Emma Browning Drive, the South Terminal entrance and its roadways and the surface parking lots surrounding the South Terminal (fulfilled as of December 1, 2015);

(iii)    the law enforcement and security activities contemplated under Section 18.09 shall commence;

(iv)    the signage contemplated under Section 18.04 shall have been installed;

(v)    Terminal Use Agreements between Tenant and air carriers that have an aggregate projected minimum of 200,000 Enplaned Passengers at the South Terminal for the twelve (12)-month period immediately following the Certificate of Occupancy Date satisfactory

25

AUS ST 000395

to each of the parties thereto, shall have been fully executed and be in full force and effect and no default shall have occurred or be continuing thereunder ("Qualifying Terminal Use Agreement");

(vi)     no material changes to this Lease or the form of Terminal Use Agreement have been required or recommended by the FAA upon the fulfillment or waiver of the items set forth in subsections (ii), (iii), (iv), (v), (vii), (viii), (ix), (x), (xi), (xii), (xiii), and (xiv) hereof;

(vii)    TSA screening activities at the South Terminal shall be ready and able to commence;

(viii)   installation of a passenger processing system in the South Terminal by Tenant;

(ix)     Substantial Completion has occurred;

(x)      Tenant has satisfied the requirements under Section 10.02 and Articles 12, 13 and 14;

(xi)     Tenant is ready to commence parking operations at the South Terminal as contemplated under Section 11.01;

(xii)    FIDS Monitors shall have been installed in in the South Terminal in accordance with Section 19.01, which show departing and arriving flights for the South Terminal and the North Terminal;

(xiii)   Certificate of Occupancy Date has occurred; and

(xiv)    Airfield Use Agreements between Owner and air carriers that have an aggregate projected minimum of 200,000 Enplaned Passengers at the South Terminal for the twelve (12)-month period immediately following the Certificate of Occupancy Date, satisfactory to each of the parties thereto, shall have been fully executed and be in full force and effect and no default shall have occurred or be continuing thereunder.

(b)     Notwithstanding anything to the contrary herein, Owner shall be deemed to have waived satisfaction of the conditions set forth in Section 10.01(a), and the Commencement of Operations Date shall be deemed to have occurred, solely for purposes of Section 25 hereof, thirty (30) days after receipt by Owner of written notice outlining Tenant's compliance with its obligations under this Lease related to such conditions, including, where applicable, reasonable back-up information such as copies of filings with Governmental Authorities, *provided* that Tenant has also diligently and in good faith pursued fulfillment of all of the requirements set forth in Section 10.01(a) that are not fulfilled for purposes of the limited waiver under this Section 10.01(b).

(c)     Notwithstanding anything to the contrary herein, if on or prior to March 31, 2017 (the "Outside Date"), (i) any of such conditions described in Section 10.01(a)(i) through (iv), or (xii) have not been fulfilled, waived, or firmly committed, then Tenant shall have the right, or (ii) any of such conditions described in Section 10.01(a), (viii), (ix), (x), (xi), or (xiii) have not been not fulfilled, waived, or firmly committed, then Owner shall have the right, to terminate this Lease, without penalty, by notice to the other Party (such termination to take

AUS ST 000396

effect on the date specified in such notice, which date shall be not earlier than thirty (30) days after the date of such notice and not later than ninety (90) days after the date of such notice), provided that (x) the Party terminating the Lease under this Section 10.01(c) has not taken any willful action or omitted or failed to take any action required or contemplated hereunder for the purpose of causing a condition hereunder to not be fulfilled or firmly committed, (y) nothing herein shall relieve any Party hereto from liability for willful acts or omissions or failures to act, the purpose of which is to avoid honoring any of its commitments and obligations under this Lease and (z) the Outside Date shall be extended by a number of days equal to the sum of the number of days from the receipt by Owner of any proper written notice under Section 10.01(b) until the effectiveness of the deemed waiver under Section 10.01(b), plus five (5) business days.

10.02    Operations.    Tenant shall develop (and periodically update) a comprehensive South Terminal operational manual detailing the standards and processes for operating and managing all facilities, passengers, concessions, parking, and aircraft operations on the Premises ("Tenant's Airport Operational Manual").    The draft Tenant's Airport Operational Manual shall be submitted to Owner for approval by Tenant within one hundred eighty (180) days after the Effective Date.  In accordance with Tenant's Airport Operational Manual and in compliance with the Owner's Airport Standards Manual, which shall be provided to Tenant within sixty (60) days after the Effective Date, Tenant shall be solely responsible for operating and managing the Premises including the South Terminal, South Terminal airside operations (*e.g.*, including Tenant Apron and operations within the security identification display area (SIDA) of the South Terminal, but excluding dry weather glycol recovery in conjunction with the three gates located on the maintenance ramp at the South Terminal) and South Terminal landside operations (*e.g.,* including South Terminal parking, food and beverage, retail, news and gift concessions, ground transportation, advertising and other passenger services).

10.03    Maintenance Capital Investment.    Tenant has budgeted approximately $3.9 million for maintenance capital for the ten (10) year period following the Commencement of Operations Date.  For each five (5) year period thereafter, during the Term, Owner and Tenant shall work in good faith to agree on the level of maintenance capital investment for each such five (5) year period, based upon (a) the maintenance capital investments made in the immediately preceding five years, (b) any reasonably anticipated necessary maintenance expenditures, (c) any industry standards for maintenance and repair of the terminal facilities comparable to the Premises, (d)  maintaining the South Terminal in the condition required for surrender of the Premises at the expiration or earlier termination of this Lease under Section 30.01, and (e) any other agreement between Owner and Tenant.  Owner and Tenant shall meet annually to discuss the next Lease Year's maintenance capital budget.  Failure to agree on such investment for any period shall not constitute a default under this Lease by either Owner or Tenant.

10.04    Maintenance and Repair.  Except as otherwise expressly provided for in this Lease, Tenant shall be solely responsible for the maintenance of the Premises, including the Tenant Apron and South Terminal, and shall, at Tenant's sole expense, (a) maintain and take good care of the Premises, including the buildings, storm water structural controls, fixtures, lighting, and vehicle parking lots, and (b) make or cause to be made all repairs thereto and replacements thereof which are necessary to maintain and keep the Premises in good order, repair and condition at all times, subject to normal wear and tear.  Tenant, shall maintain and

27

AUS ST 000397

repair all mechanical, electrical, plumbing, heating and cooling, communication lines, and security and fire-protection systems as well as the trench drainage system and spill containment system that are part of the storm water structural controls on the Premises. Subject to normal wear and tear, Tenant will not cause or permit any waste, damage, disfigurement or injury to or upon the Premises, or any part thereof. Tenant shall mow and maintain the grass and landscaping within the Premises. Tenant shall maintain and repair all utility lines, fixtures and equipment on the Premises, except to the extent maintenance and repair is the obligation of the utility serving the Premises. In the event de-icing drainage infrastructure is developed and constructed for the South Terminal, both Parties shall work together in good faith to determine the maintenance and repair of such de-icing drainage infrastructure on mutually agreeable terms.

10.05   Tenant Apron. Tenant shall have the exclusive right to designate or allocate use of the Tenant Apron and gate areas of the South Terminal at all times. Tenant, at its sole cost and expense, shall at all times provide and maintain the Tenant Apron with aircraft parking stands on the Premises. Owner shall provide and maintain, at its cost and expense, the taxilanes, taxiways, ramps, aprons, and runways not included in Tenant's Premises necessary for aircraft maneuvering to and from the South Terminal.

10.06   Trash/Recycling. Tenant shall provide, at its sole expense, all waste collection, handling and disposal services necessary or appropriate for the Premises, to keep the Premises free from trash, garbage and other refuse, and no such trash, garbage or other refuse shall be disposed of elsewhere on the Airport. In a manner consistent with other Airport terminal's then current operating standards, Tenant will provide recycling receptacles adjacent to each trash receptacle. Tenant will comply with the City's Universal Recycling Ordinance as defined in Title 15 of The Code of the City, as amended from time to time. Tenant shall provide, or cause to be provided, proper receptacles for trash, recycling, composting, garbage and other refuse generated on or from business operations on the Premises in a manner consistent with other Airport terminal's then current operating standards.

10.07   Owner's Right to Maintain. If Tenant fails to comply with its obligations to maintain or repair the Premises under this Article 10, and such failure is not cured within thirty (30) days of written notice from Owner, then in addition to any other rights or remedies Owner may have as a result of such failure, Owner shall have the right, but not the obligation, to perform such maintenance or repairs or other obligations at Tenant's expense provided that, if such failure is curable, but not capable of being cured within such thirty (30)-day period, Owner shall not be entitled to exercise such right unless Tenant fails to commence the cure of such failure during such thirty (30)-day period and thereafter fails to diligently and continuously pursue such cure to completion. The fully loaded cost, including a 20% administrative fee incurred by Owner to perform such maintenance or repair work or other obligations of Tenant shall be payable by Tenant to Owner within thirty (30) days from invoice date.

## ARTICLE 11
## PARKING FACILITIES

11.01   South Terminal Parking. Tenant shall operate and maintain the motor vehicle parking facilities to directly support the South Terminal. Tenant may not assign, subcontract, sublease or enter into a management agreement with respect to its rights and obligations under

28

AUS ST 000398

this Lease related to the operation and management of motor vehicle parking to a third party without Owner's prior written consent, which may not be withheld by Owner if Tenant demonstrates to the reasonable satisfaction of Owner that the third party is a Qualified Entity. For purposes of this Section 11.01, to be a Qualified Entity, the third party (a) must have not less than five years' experience in operating car parking facilities with a minimum of not less than 500 spaces, (b) may not operate an Off-Airport Parking Business (as described in City Code Chapter 13-1) in Austin, Texas, and (c) must not be de-barred from contracting with the United States, the State of Texas or the City.  The prior written consent of Owner will be required for construction of any multi-level parking facilities, in accordance with Article 15.

11.02    Additional Parking Development.  Owner shall have the ability to develop any new parking facilities south of the mid-field taxiway that either (a) is exclusively Airport employee parking or (b) subject to Owner's full compliance with Article 15 hereof, supports operations of an Expansion or any New Facility developed south of the mid-field taxiway.

## ARTICLE 12
## AIRLINE LEASING PROGRAM

12.01    General.  Tenant will maintain an airline leasing program for the South Terminal (the "Airline Leasing Program"), which shall include, but not be limited to, a Terminal Use Agreement containing rates and charges for terminal facilities that is in compliance with all applicable federal regulations.  In structuring such an Airline Leasing Program, Tenant will comply with applicable FAA rules and regulations, including the FAA's Policy on Rates and Charges.  Tenant shall submit to Owner for its review the Airline Leasing Program, including any modifications or amendments, and Owner shall review such Airline Leasing Program to verify that it (i) is FAA compliant, (ii) is fair and reasonable, (iii) is not unreasonably discriminatory, and (iv) does not violate any airport grant assurances or other regulations to which Owner is subject.  Tenant and Owner acknowledge that nothing herein shall restrict any air carrier operating at the Airport from seeking to operate at the South Terminal under the terms and conditions established herein.  Owner shall complete its review of the initial draft Airline Leasing Program for FAA compliance within thirty (30) days after submittal by Tenant. The draft Airline Leasing Program shall be submitted to Owner for review by Tenant within sixty (60) days after the Effective Date. For the avoidance of doubt, Owner has the sole right to charge the Airlines landing fees and other aircraft parking fees outside of Tenant's Premises.

12.02    Airline Fees.  Tenant may charge various usual and customary fees to air carriers using the Premises and the South Terminal (including, without limitation, administrative and staff costs; check-in facilities; common use equipment charges; installation and maintenance of FIDS Monitors; baggage handling facility charges, including the usage of the centralized baggage conveyor installation (if any) and a system for outbound and inbound baggage, including oversized baggage; baggage and passenger screening; common use boarding areas; baggage claim areas; utilities such as electricity, water, gas, heating and cooling, waste disposal, wastewater, light, cable television, telephone and other communication services; employee parking; exclusive use space charges; and any ground handling services provided by Tenant.  For the avoidance of doubt, Tenant has the right to charge the Airlines aircraft parking fees within the Tenant's Premises.

AUS ST 000399

## ARTICLE 13
## MARKETING SUPPORT AND INCENTIVES TO AIR CARRIERS

13.01     General.  Tenant and/or Owner may provide incentives to attract air carriers to the Airport including the South Terminal.  Such incentives may, to the extent permitted by Applicable Law, include waived or discounted airfield and terminal rates and charges to carriers meeting qualifying service commitments.  Only Owner may offer airfield incentives and only Tenant may offer Premises and South Terminal rate incentives.

13.02     South Terminal Marketing Program.  Tenant may, to the extent permitted by Applicable Law, provide marketing incentives to air carriers meeting qualifying service commitments to offset the documented marketing costs incurred by air carriers in accordance with a marketing program relating to the South Terminal developed by Tenant and approved by Owner (the "South Terminal Marketing Program"); provided, however, that Owner's review and approval of financial incentives in the South Terminal Marketing Program shall be limited to a determination, in accordance with Applicable Law, that such financial incentives are fair and reasonable, not unreasonably discriminatory, and do not otherwise violate any airport grant assurances or other regulations to which Owner is subject.  Notwithstanding the above, and to the extent permitted by Applicable Law, Tenant agrees that it will not initiate discussions with, or actively solicit, any air carrier operating at the Airport to relocate its operations to the South Terminal, provided that the foregoing prohibition will not preclude contacts (a) in the ordinary course of business of Tenant or any of its Affiliates or (b) permitted under the South Terminal Marketing Program guidelines not reasonably objected to by Owner. Owner may participate in the South Terminal Marketing Program as the Parties may agree in writing. Tenant shall submit a draft South Terminal Marketing Program to Owner for review (as contemplated above) within sixty (60) days after the Effective Date.

13.03     Implementation.  It is the intent of the Parties that funds expended in the South Terminal Marketing Program be recouped through incremental revenue (excluding passenger facility charges from the South Terminal benefitting Owner) generated from an increased volume of aircraft and passenger traffic at the South Terminal.  Tenant and Owner may, to the extent permitted by Applicable Law, enter into one or more agreements to adopt and implement marketing programs.   Such marketing agreements may address, among other things, the respective financial participation of Tenant and Owner in the marketing incentives, and the manner and order of priority in which various sources of incremental revenue shall be applied to reimburse each Party for its share of funds expended on marketing incentives.

13.04     Cooperation.  Tenant and Owner will use commercially reasonable efforts to maximize the marketing incentives from other Austin, Texas and regional stakeholders, including tourism, economic development, employment and business associations, to attract air carriers to operate services from the South Terminal.

## ARTICLE 14
## CONCESSION PROGRAM

14.01     General.  Tenant shall develop (and periodically update) a comprehensive terminal concession program (the "Concession Program") outlining desired concessionaires for

AUS ST 000400

all concessions related to the food and beverage, news and gifts and specialty retail operations, and advertising in the South Terminal and on the Premises. The draft Concession Program shall be submitted to Owner within sixty (60) days after the Effective Date and promptly finalized in good faith by Owner and Tenant.

14.02    Owner Review.    Tenant shall submit the Concession Program, and any subsequent modifications or revisions to the Concession Program, to Owner for its review and approval and will consult with Owner regarding its content.

14.03    ACDBE Goals.    Tenant shall take all necessary and reasonable steps to achieve the established goals under Owner's program under the U.S. Airport Concession Disadvantage Business Enterprise ("ACDBE") Rules (49 CFR Part 23).    Tenant shall, promptly after the Effective Date, provide the City's Department of Small and Minority Business Resources Department ("SMBR") a copy of its ACDBE Compliance Plan concerning the ACDBE firms that will participate in the South Terminal concessions.    Tenant shall provide Owner and SMBR each Lease Year with a copy of Tenant's ACDBE goals and results achieved, and with a copy of all ACDBE reports required to be submitted under Applicable Law to the DOT and other applicable Governmental Authorities.    Such report will include the name and address of each firm, the annual estimated gross receipts to be earned by each named firm, a description of the legal arrangements utilized, and the total overall estimated annual gross receipts to be earned by such concessionaires.

14.04    Local Concessionaries.    Tenant shall identify qualified local concessionaries and notify them of potential concession opportunities.    However, in accordance with 49 CFR §23.79, nothing in this Section shall be construed to require Tenant to give preference to local concessionaries.

### ARTICLE 15
### EXPANSION OR NEW FACILITY

15.01    Expansion or New Facility.    If Tenant determines that the growth of operations of existing or new air carriers requires an Expansion or if Tenant or Owner determines that the growth of operations of existing or new air carriers requires a New Facility, either Tenant or Owner, as applicable, shall provide a written notice to the other Party of such determination.    If Tenant provides a written notice to Owner that it is interested in investing in such Expansion or New Facility, then, subject to Owner's agreement and in accordance with the Airport Master Plan, (a) in the event of an Expansion that does not require additional land or other material changes to this Lease, Owner and Tenant will amend this Lease to reflect such Expansion, and (b) in the event of an Expansion that requires additional land or the construction of a New Facility, Owner will provide Tenant with the exclusive first right to, as applicable, develop, construct and operate such Expansion or New Facility, and both Parties shall work together in good faith to enter into an agreement regarding such Expansion or New Facility on mutually agreeable terms. Owner will coordinate with Tenant to seek FAA approval to update the Airport Layout Plan accordingly to identify the Tenant's Expansion or New Facility on the Airport Layout Plan. In the event an update to the Airport Layout Plan is necessary due to Tenant's Expansion or New Facility as approved by Owner, Tenant shall be responsible for the cost of any environmental studies in connection with FAA and state approvals.

31

AUS ST 000401

## ARTICLE 16
## FINANCING

16.01     Tenant's Right to Finance.  To secure financing, subject to compliance with the provisions of this Article 16, Tenant may encumber its leasehold interest in the Premises, including any improvements thereto, under this Lease with one or more deeds of trust or mortgages, and may collaterally assign to such lender Tenant's rights in Owner-authorized subleases, including Terminal Use Agreements and concessionaire agreements, entered into during the Term.  Tenant shall provide to Owner the name and notice address of the lender together with true copies of the loan documents, including, as applicable, deeds of trust, mortgages, security agreements and promissory notes, within ten (10) business days after execution by Tenant.  No lien upon, or assignment of, Tenant's leasehold estate or this Lease hereunder shall encumber, subordinate or affect in any way the interest of Owner under this Lease or in the Premises, including any improvements thereto, except as expressly provided herein.  The loan documents shall be consistent with this Lease.  Upon written request from Tenant, Owner agrees to reasonably subordinate its statutory and contractual landlord's liens on Tenant's personal property and Trade Fixtures, to the lien of a lender providing financing to Tenant consistent with the terms of this Lease.

16.02     Tenant's Lender Rights and Obligations.  Tenant's lender may, in case of default by Tenant, assume the rights and obligations of Tenant under this Lease, and become a substituted Tenant, with the further right to assign Tenant's interest to a Qualified Entity, subject to the approval of the Director, which shall not be unreasonably denied or delayed.  Tenant's lender's obligations under this Lease as substituted Tenant shall cease upon assignment to an Owner-approved third party.  Owner agrees to execute such non-disturbance and attornment agreements as Tenant's lender may reasonably request consistent with this Lease.  If Tenant has provided the name of any third party lender and a notice address for such lender, Owner agrees to give Tenant's lender a duplicate copy of any notice of a breach of this Lease or any Tenant Default that Owner gives Tenant.  The lender may then cure such breach or Tenant Default, for the account of Tenant or the lender (as the lender may elect), in the same manner and in the same period of time as allowed Tenant.  Tenant shall promptly provide to Owner a copy of any notice delivered by Tenant's lender of Tenant's default or the lender's intent to exercise a remedy in response to Tenant's default with respect to its loan documents.  Tenant's lender shall agree to provide copies of such notices directly to Owner, and to notify Owner if payments on such loans become delinquent for more than thirty (30) days.  In the event of any conflict between the rights granted Tenant's lender under its loan documents and the terms of this Lease, the terms of this Lease shall control.

16.03     Owner's Right to Finance.  Owner may, from time to time, without the consent or joinder of Tenant, encumber its interest in the Premises with one or more deeds of trust, mortgages or other lien instruments.   Tenant shall execute and deliver to Owner such subordination and attornment agreements as Owner or its lender shall reasonably require, provided that such lender shall execute and deliver to Tenant a nondisturbance agreement reasonably satisfactory to Tenant, which shall include, without limitation, an express acknowledgement of Tenant's right to quiet enjoyment set forth in Section 2.03.

AUS ST 000402

## ARTICLE 17
## OTHER TENANT OBLIGATIONS

17.01    Premises Security.  Tenant recognizes that Owner is required to comply with the security directives and other mandates of the United States Department of Transportation (the "DOT"), the FAA, the TSA and the United States Department of Homeland Security (the "DHS"), and with other governmental and administrative rules and regulations relating to airports.  Accordingly, Tenant shall operate and manage the Premises and the South Terminal in accordance with such security directives and other mandates of the DOT, the FAA, the TSA and the DHS, and other governmental and administrative rules and regulations relating to airports.  In addition to the security provided by Owner under Section 18.09, Tenant shall hire additional security as necessary and at its own cost to perform day-to-day security functions, including but not limited to, alarm response, exit lane monitoring, calls for assistance, and incident documentation.  Tenant shall purchase and install, at its expense, security equipment for the Premises, as mutually agreed to by Owner and Tenant and sufficient to ensure compliance with applicable security regulations.  Tenant shall ensure that the Premises' security system is connected to Owner's existing security system for the Airport and Tenant will pay for such connection and service.  The Premises' security system shall be monitored by Owner at no charge to Tenant.

17.02    Compliance with Airport Rules.  Owner may adopt and enforce reasonable rules, regulations and minimum standards, which Tenant agrees to observe and obey, with respect to the operation of the South Terminal and the use of the Airport and its appurtenances, together with all facilities, improvements, equipment and services of the Airport, for the purpose of providing for safety, good order, good conduct, sanitation and preservation of the Airport and its facilities, provided that such rules and regulations shall be consistent with Applicable Law and applied on a not unjustly discriminatory basis to any and all similarly situated ground lease tenants at the Airport.

17.03    Signs.  All signs displayed on exterior of the South Terminal or other improvements and all free standing signs on the Premises are subject to the prior written approval of the Director.  Approved signs shall be installed by Tenant at Tenant's expense.  Owner reserves the right to remove, without notice to Tenant, all unapproved signs.  Tenant shall not erect, maintain or display any advertising signs on the exterior of the South Terminal or other improvements on the Premises, except as authorized under this subsection.

17.04    Customer Claims, Comments, and Complaints.  Tenant shall maintain policies and procedures to address, and shall use good faith and commercially reasonable efforts to address, any claim, comment or complaint in respect of operations at the South Terminal made by Airlines, passengers or other users of the South Terminal.  Nothing herein shall require Tenant to pay any claim that Tenant, in its sole discretion, does not believe is valid or justified.  Without limiting the generality of the foregoing provision, if a claim, demand, suit, or other action is made or brought by any person against Tenant arising out of or concerning this Lease, Tenant shall give written notice thereof, to Owner within two (2) business days after being notified of such claim, demand, suit, or action.  Such notice shall enclose a true copy of all written claims.  If the claim is not written, or the information is not discernible from the written claim, Tenant shall state the date of notification of any such claim, demand, suit, or other action,

33

AUS ST 000403

the names and addresses of the person asserting such claim or that instituted or threatened to institute any type of action or proceeding, the basis of such claim, action, or proceeding, and the name of any person against whom such claim is being made. The notice shall be given to the Director as provided herein, and to the Austin City Attorney, City Hall, 301 West 2nd Street, Austin, Texas 78701.

17.05    Maintenance of Legal Existence. During the Term, Tenant shall at all times maintain its legal existence and good standing, and its legal authority to perform its obligations under this Lease.

17.06    Personnel. Tenant shall employ or contract with experienced and qualified personnel and consultants to oversee the rehabilitation, reactivation, operation and maintenance of the Premises and the South Terminal, and any improvements thereon.

17.07    Meetings. Owner and Tenant shall meet regularly, but no less often than quarterly, to discuss (a) the operation of the Airport, (b) capital projects necessary for the Airport and ongoing maintenance and repair expenses, (c) matters relevant to the operation of the South Terminal, (d) air service development and marketing plans for the Airport, (e) opportunities to enhance operations at the Airport, and (f) any other matters pertaining to this Lease or operations on the Premises and at the South Terminal.

17.08    Addition of Certain Amenities. Tenant must obtain Owner's written consent prior to initial installation at the South Terminal of any passenger boarding bridges and other operational amenities similarly offered at the North Terminal.

## ARTICLE 18
## OTHER OWNER'S OBLIGATIONS

18.01    Operation as a Public Airport. Owner shall operate and maintain the Airport as a public airport in accordance with the requirements of the Federal Aviation Act and all other Applicable Laws.

18.02    Maintenance of Public Runways, Taxilanes, Taxiways, Ramps, and Aprons. In accordance with Applicable Law, Owner shall keep, maintain, repair and replace all public access runways, taxilanes, taxiways, ramps and aprons not included in Tenant's Premises and specifically excluding the Tenant Apron and aircraft parking stands within the Premises.

18.03    Use of Public Runways, Taxilanes, Taxiways, Ramps, and Aprons. Owner shall provide Tenant and the Airlines such taxilanes, taxiways, ramps and apron space, as identified on Exhibit A hereto, reasonably necessary to provide for aircraft maneuvering and ingress and egress between the Airport airfield and the Premises.

18.04    Signage. Owner, at no cost or expense to Tenant, will (a) use reasonable good faith efforts to facilitate the provision and maintenance of adequate advance signage by applicable authorities, including the Texas Department of Transportation, on major national and local approach roads to direct passengers to the South Terminal, and (b) provide and maintain similar air carrier and terminal identifying signage on applicable Airport roadways and properties.

AUS ST 000404

18.05    Shuttle Bus Service.  Owner shall provide, at no cost to Tenant, Shuttle Bus Service for passengers and employees between the South Terminal and the North Terminal/CONRAC facility.    Operation of the Shuttle Bus Service shall be sufficiently coordinated with the arrival and departure of commercial airline flights at the South Terminal in accordance with Tenant's Airport Operational Manual as approved by Owner to accommodate actual passenger traffic levels and projected passenger traffic levels provided by Tenant to Owner.

18.06    Rental Car Revenue Sharing.

(a)    In lieu of allowing rental car companies to enter into specific agreements with Tenant for rental car operations at the South Terminal, Owner shall make payments to Tenant, on a monthly basis, based on Tenant's verified reported Enplaned Passengers for the given month multiplied by the revenue sharing rate (the "Revenue Sharing Rate") calculated for the same given month (such amount, the "Rental Car Revenue Share").  The Revenue Sharing Rate shall be determined by dividing the actual gross rental car revenues (excluding any customer facility charge ("CFC") revenues) received by Owner in a given month from all rental car companies providing service to the Airport (on-airport and off-airport companies) by the total number of Airport Enplaned Passengers for the same month. Tenant and Owner agree that this Section 18.06 and Owner's obligations with respect to payments of the Rental Car Revenue Share shall become null and void upon the commencement of rental car operations, by Tenant, at (i) the South Terminal, (ii) an Expansion or (iii) a New Facility.

(b)    Commencing with the month in which the Commencement of Operations Date occurs, no later than thirty  (30) days after the end of each month during a Lease Year, Owner shall submit to Tenant a detailed statement (the "Owner Monthly Report") reflecting (i) actual gross rental car revenues (excluding any CFC revenues) received by Owner from all rental car companies providing service to the Airport (on-airport and off-airport), (ii) the total number of Airport Enplaned Passengers, and (iii) the Rental Car Revenue Share, for the applicable month.  The Owner Monthly Report shall be prepared on a consistent basis and be certified by a responsible financial officer of Owner.

(c)    Not later than the fifteenth (15th) day after delivery of an Owner Monthly Report pursuant to Section 18.06(b), Owner shall pay to Tenant an amount equal to the Rental Car Revenue Share for such calendar month (pro-rated for any partial month), as reflected in such Owner Monthly Report.

(d)    If the Rental Car Revenue Share reflected in the Owner Annual Report provided in accordance with Section 18.06(e) exceeds the total amount of Rental Car Revenue Share paid by Owner with respect to the applicable Lease Year, Owner shall pay Tenant the amount by which such Rental Car Revenue Share for the Lease Year exceeds the total Rental Car Revenue Share payments previously paid by Owner to Tenant for such Lease Year, within thirty (30) days after the delivery to Tenant, of the Owner Annual Report.  If the Owner Annual Report reflects an overpayment by Owner of Rental Car Revenue Share for such Lease Year, Tenant shall pay Owner the amount of Owner's overpayment within thirty (30) days after the delivery of the Owner Annual Report.

AUS ST 000405

(e)     Within ninety (90) days after the close of each Lease Year, Owner shall furnish Tenant with a detailed statement (the "Owner Annual Report") reflecting (i) actual gross rental car revenues (excluding any CFC revenues) received by Owner from all rental car companies providing service to the Airport (on-airport and off-airport), (ii) the total number of Airport Enplaned Passengers, and (iii) the Rental Car Revenue Share, for the Lease Year. The Owner Annual Report shall be prepared in accordance with GAAP and be certified by a responsible financial officer of Owner.

(f)     Within one hundred twenty (120) days after the close of each Lease Year, Owner shall furnish to Tenant an audited annual accounting statement of (i) actual gross rental car revenues (excluding any CFC revenues) received by Owner from all rental car companies providing service to the Airport (on-airport and off-airport) and (ii) the Rental Car Revenue Share, for the Lease Year, prepared by an independent Certified Public Accountant, in accordance with GAAP. The audit will express an opinion as to whether the reported gross rental car revenues and Rental Car Revenue Share, for the applicable Lease Year, have been accurately calculated in accordance with the terms of this Lease.

(g)     Unless otherwise directed, in writing, by Tenant, Owner shall remit payment of any payment obligations of Owner to Tenant, through an Automated Clearing House (ACH) electronic transfer of funds.

(h)     If any payment required hereunder by Owner under this Section 18.06 is not made within thirty (30) days after such payment is due, Owner shall pay interest at the Contract Rate on the amount outstanding from the payment due date until paid in full.

(i)     Upon written notice at any time or times during the Term within three (3) years after the end of the any Lease Year, Tenant may inspect, reproduce and audit the books and records of Owner relating to the Rental Car Revenue Share. If, as a result of such inspection and audit, it is established that additional Rental Car Revenue Share is due Tenant, Owner shall, upon written notice by Tenant, pay such additional fees, plus interest, calculated at the Contract Rate, within thirty (30) days of written notice. If, on the other hand, such audit determines that Owner has overpaid the Rental Car Revenue Share due Tenant, Tenant shall refund to Owner the amount of such overpayment in cash. If the results of such audit reveal an underpayment of more than five percent (5%) of Rental Car Revenue Shares as reported by Owner, the cost of the audit shall be paid by Owner to Tenant as additional Rental Car Revenue Share, but such additional Rental Car Revenue Share shall not be included in Gross Revenues for purposes of this Lease.

(j)     Tenant's obligations with respect to information provided by Owner under this Section 18.06 include the confidentiality covenants under Article 38.

(k)     Owner shall maintain all material books and records related to Rental Car Revenue Share in accordance with its record retention policy as required by Applicable Law. Owner shall cooperate fully with any audit or examination initiated by Tenant, and shall produce all books and records requested for audit to a designated location at the Airport, or in Austin, Texas, within thirty (30) days of the date of written request. To facilitate the inspection of Owner's books and records, documents provided for audit shall be made available in an

AUS ST 000406

electronically downloadable format acceptable to Tenant whenever possible. When electronic files do not exist, legible printed copies of books and records must be provided.

18.07   Federal Compliance. Owner will maintain Part 139 Certification and all compliance responsibilities vis-à-vis the FAA and the TSA.

18.08   Passenger Facility Charge; Airport Improvement Program. Owner shall be responsible during the Term for its Passenger Facility Charges ("PFCs") collection authority and its Airport Improvement Program sponsor status.

18.09   Security. Owner shall provide uniformed law enforcement officers as required to meet and comply with the Airport Security Plan approved by TSA and other applicable regulatory requirements, at no cost to Tenant, as well as one (1) security manager to oversee the security program developed and implemented at the Premises. Owner's security manager shall act as the liaison among Owner, Tenant, law enforcement and the TSA.

18.10   Lighting. As of the Effective Date, Owner has installed roadway lighting along the current Emma Browning Drive, the initial South Terminal entrance, exit roadways, and South Terminal parking. Throughout the Term, Owner shall maintain the lighting at all Airport locations, except for the Premises. Unless otherwise agreed to by Owner in writing, Owner is not responsible for the installation of any additional lighting upon Expansion or construction of a New Facility, additional parking facilities or other improvements by Tenant.

18.11   De-Icing. Owner will, at no cost to Tenant, provide the dry weather de-icing recovery for three aircraft positions located on the maintenance ramp at the South Terminal gates. Wet weather de-icing operations shall be performed within the area in proximity to the North Terminal and cargo ramp. The Airlines will be responsible for the cost of the de-icing fluid used and its application.

18.12   Access to South Terminal. Owner will maintain all access roadways to the South Terminal and at any time construction impairs such access for an extended period will provide alternative access routes, at Owner's cost, to the South Terminal, which do not result in any delays for, or congestion of, traffic to or from the South Terminal.

## ARTICLE 19
## SHARED USE AND COMMUNICATIONS SERVICES

19.01   Shared Use.

(a)      Tenant may elect to utilize Owner's Shared Use Passenger Processing System (SUPPS). Tenant shall not make any modifications or improvements to the SUPPS nor allow any Airline to make any modifications or improvements to the SUPPS without the prior written approval of the Director. As of the Effective Date, Tenant has elected to utilize Owner's SUPPS. To the extent that Tenant elects to discontinue its use of SUPPS, Tenant shall provide Owner not less than one hundred eighty (180) days' prior written notice of such election and shall provide Owner access to the Premises for removal of any SUPPS equipment located at the Premises.

AUS ST 000407

(b)      If Tenant elects to participate in Owner's SUPPS, Owner shall provide FIDS Monitors in the South Terminal, which shall display departures and arrivals for the South Terminal and the North Terminal.  Tenant shall pay Owner for Owner's actual and documented costs of initially installed equipment, the initial installation costs, and the annual support and maintenance costs of the equipment and service, which include replacements as necessary, within thirty (30) days from invoice date.

(c)      If Tenant does not elect to participate in Owner's SUPPS, Owner shall provide the feed to display on the South Terminal monitors for the departing and arriving flights at the South Terminal and North Terminal, provided that Tenant shall pay an annual cost to supply the feed to the South Terminal monitors within thirty (30) days from invoice date.

(d)      Tenant shall not install any proprietary terminal equipment in the South Terminal without the prior written approval of the Director.  Tenant shall not allow any Airline to install any proprietary terminal equipment in the South Terminal without the prior written approval of the Director.

19.02   Wireless Service.  In order for Tenant to receive approval from Owner's Manager of Information Technology for the installation of any wireless networks, including unlicensed and licensed networks and services, at the South Terminal, Tenant's use of a wireless service and equipment shall be in compliance with the Airport's Operator's Wireless Policy attached hereto as Exhibit G.  Owner shall, at Tenant's request, extend Owner's existing public wireless service to the South Terminal, at no cost to Tenant, provided that Owner retains all rights to revenues generated from the extension of Owner's wireless service to the South Terminal.  In no event shall Tenant enter into direct agreements with cellular carriers, their representatives or a third party provider to install a distributed antenna system, or any other system, for the purposes of augmenting cellular licensed frequency signal within the Premises. Furthermore, Tenant shall not cause or allow any installations that cause interference with Owner's frequency, wireless service or FAA infrastructure on the airfield.

19.03   Radio.  Tenant shall have the right to install, maintain and operate radio communications and meteorological and aerial navigation equipment and facilities ("Radio Communications Facilities") as may be necessary for operations at the South Terminal in accordance with the Owner's Tenant Radio Installation Guidelines attached hereto as Exhibit H. Tenant shall notify and coordinate installations or modifications of equipment with Owner's Manager of Information Systems prior to installation or modification. Radio communications shall not interfere with other radio communications systems and facilities at the Airport, other air carriers or commercial licensed telecommunications providers. If the Radio Communications Facilities are causing radio interference, Tenant shall modify or cease its use of such Radio Communications Facilities to eliminate the interference.

19.04   Communications Services.  Owner has installed a Premises Distribution System ("PDS"), consisting of copper and fiber optic cables, that spans the Airport.  All external telecommunications providers will terminate at the demarcation point located in the Owner's Communications Center. Tenant shall use Owner's fiber optic and copper PDS to connect to the demarcation point. Tenant, at Tenant's expense, must provide all equipment necessary to connect to the PDS.  All data transmission and switching equipment used shall comply with Owner's

AUS ST 000408

PDS specifications.  Tenant shall pay the fees established by Owner for the use of the PDS for data transmission within thirty (30) days from invoice date.  Tenant may participate in Owner's shared tenant service telephone system ("STS") (as described in Section 19.05 below) that includes data transmission lines (Frame Relay, ISDN and TI) or choose to use the PDS to connect to an alternate provider at the demarcation point.  All data communication service charges, including installation, maintenance, moves, additions and changes for the Premises shall be at the sole cost of Tenant and paid within thirty (30) days from invoice date.  Tenant shall, at its sole expense, procure and install all equipment, conduit and other hardware necessary to connect the Premises to the PDS.  Wiring installed by Owner shall be at Tenant's expense and paid within thirty (30) days from invoice date.  Tenant and all persons occupying the Premises shall use the PDS and pay applicable fees for the PDS connections within thirty (30) days from invoice date.  Fees for communication services are subject to change at any time. Owner shall give Tenant at least thirty (30) days advance written notice prior to the effective date of any estimated fee change.

19.05   Shared Telephone Service.  Owner has installed an STS to serve the Airport. Tenant may either use the STS or select another telephone service provider.  If Tenant chooses to participate in the STS, Tenant and subtenants occupying the Premises shall agree, subject to the express provisions of this Lease, to the Airport's STS Terms of Usage attached hereto as Exhibit D, and pay for its STS charges, as applicable. Payment and the required security deposit for PDS and STS charges are not included in the Rent or Security Deposit for the Premises under this Lease and must be paid as provided in the STS Terms of Usage. Non-payment by Tenant of telephone service charges shall be grounds for discontinuance of service and an event of default under this Lease.  If Tenant and subtenants elect to install their own telephone services, Tenant shall provide its own telephone switches, instruments and other equipment necessary to interface via the PDS to the Airport telecommunications demarcation point.  A monthly fee for use of the PDS shall be charged by Owner and paid by Tenant within thirty (30) days from invoice date.  Furthermore, all telephone service charges, including installation, maintenance, moves, additions, changes, long distance and local provider service for the Premises shall be Tenant's sole responsibility.  Tenant shall not enter into any telephone agreement that conflicts with the Owner's Minimum Point of Entry (MPOE), the telephone demarcation point or, if a party thereto, the STS Terms of Usage.

19.06   Television Service.   Cable access television services are contracted through third party providers.  A monthly fee for use of the PDS shall be charged by Owner and paid by Tenant and subtenants as applicable to connect cable television services from the demarcation point to the South Terminal.  Alternatively, Tenant may install satellite dishes, antennae or similar receiving devices on the Premises upon Owner's prior written approval and subject to the service not interfering with other radio communications systems and frequencies at the Airport. All television service charges, including installation, maintenance, moves, additions and changes, and cable channel charges, shall be at Tenant's sole cost.

19.07   Computer Networks.  Tenant shall, at its sole expense, procure, install and maintain all necessary or desired computer networks on the Premises.

AUS ST 000409

## ARTICLE 20
## ENVIRONMENTAL CONDITION OF PREMISES

20.01    Environmental Assessments.  The Airport is a former United States Air Force base that Owner acquired from the United States and has converted to a civilian airport. Owner may provide, upon request, Tenant with any available copies of Environmental Assessments it has in its possession, as of the Effective Date, relating to the Premises.

20.02    Acknowledgement of Hazardous Materials.  A portion of the South Terminal was previously leased to the Texas National Guard and the South Terminal has been used by Owner as a storage facility.  As such, the Premises may contain Hazardous Materials.

20.03    Tenant's Inspection Rights.  Tenant shall have the right to inspect and conduct one or more Environmental Assessments of the Premises, including subsurface investigation of soil and groundwater conditions, subject to reasonable conditions established by Owner (an "Assessment Report").  Tenant shall provide Owner with a copy of the proposed location and scope of work for the Assessment Report, and Owner will provide Tenant with such information within its possession regarding the potential presence of underground utilities or structures or any other information regarding Environmental Conditions not otherwise conveyed in any Environmental Assessment.  Tenant is responsible for coordinating with all utility providers to confirm the presence or absence of buried utilities.  Tenant shall promptly provide Owner a copy of the Assessment Report upon its completion.  If the Assessment Report determines the presence or threatened release of Hazardous Materials or other Environmental Conditions that require remediation under Applicable Law, Tenant, at its option, may (a) submit a written plan for remediation of the Premises, as applicable, which may include an allocation proposal to Owner regarding the cost of remediation and the responsibility for remediation of such Hazardous Materials or Environmental Conditions to the extent required under Applicable Law, or (b) if the cost to remediate Hazardous Materials or Environmental Conditions is unacceptable to Tenant in its sole discretion and the Parties are unable to agree upon a sharing of remediation costs, (i) terminate this Lease in whole or (ii) with the written consent of the Director, amend this Lease to delete the contaminated areas from the Premises, and adjust the Rent proportionally.  Owner agrees to reasonably consider a proposal for sharing remediation costs and shall respond to a proposal from Tenant within forty-five (45) days from receipt, but nothing herein shall require Owner to agree to a remediation cost sharing.  Owner's failure to respond within forty-five (45) days shall be deemed to be a rejection of Tenant's remediation cost allocation proposal.  If Owner and Tenant are unable to agree upon a sharing of the costs of such remediation, Tenant shall retain its remaining options under this Section 20.03.  Tenant may elect to place monitoring wells and stations on the Premises to detect or monitor any existing or potential Hazardous Materials or Environmental Conditions identified in any Assessment Report.

## ARTICLE 21
## ENVIRONMENTAL COMPLIANCE

21.01    Definitions.  For the purpose of this Article 21, "Tenant" shall include Tenant Environmental Parties.

AUS ST 000410

21.02   Compliance.  In its operations on the Premises and at the Airport, Tenant shall strictly comply with all applicable Environmental Laws, the Airport Environmental Policies and Procedures (including without limitation, the Storm Water Pollution Prevention Plan ("SWPPP") and Spill Response Plan), which are incorporated by reference, and as of the Effective Date of this Lease are located on the Airport's website at: http://content.abia.org/environmental/storm_water.html.  Without limiting the generality of the foregoing provision, Tenant shall not use or store Hazardous Materials on or at the Premises or Airport except as reasonably necessary in the ordinary course of its permitted activities at the Premises and Airport, and then only if such Hazardous Materials are properly labeled and contained as required pursuant to Applicable Laws, and notice of and a copy of the current material safety data sheet is provided to Owner for each such Hazardous Material.  Prior to commencing operations at the Premises or Airport, Tenant will complete an Airport baseline environmental questionnaire form attached as Exhibit I. The Parties agree that certain Baseline Phase II Environmental Site Assessment, dated as of January 27, 2016, prepared for Tenant by TRC Environmental Corporation, attached hereto as Exhibit J, shall establish the baseline environmental condition of the Premises as of the Effective Date.  Tenant shall not discharge, release or dispose of any Hazardous Materials on the Premises or Airport or surrounding air, lands or waters in violation of Applicable Laws.  Tenant shall promptly notify Owner of any Hazardous Material spills, releases or other discharges by Tenant at the Airport in accordance with Owner's Spill Response Plan and promptly abate, remediate and remove any the same to the extent required under Applicable Laws.   Tenant shall provide Owner with copies of all written reports, complaints, claims, citations, demands, inquiries or notices relating to the environmental condition of the Airport, or any alleged material noncompliance with Environmental Laws by Tenant or, if known by Tenant, any Airline, within ten (10) days after such documents are generated by or received by Tenant.  If Tenant uses, handles, treats or stores Hazardous Materials at the Premises or Airport, and it is necessary for Tenant to arrange for the disposal of the Hazardous Materials, Tenant shall comply with any applicable requirement under Applicable Laws to have a contract in place with an EPA or TCEQ approved waste transport or disposal company, and to identify and retain spill response contractors to assist with spill response and facilitate waste characterization, transport and disposal.  Complete records of all disposal manifests, receipts and other documentation required by Applicable Laws shall be retained by Tenant and made available to Owner for review upon request. Owner shall have the right at any time to enter the Premises to inspect, take samples for testing and otherwise investigate the Premises for the presence of Hazardous Materials.  In exercising its right of access, Owner shall use reasonable efforts to minimize disruption of or interfere with Tenant's operations or use of the Premises and shall give Tenant reasonable notice with respect to Owner's intention to take samples for testing to allow Tenant to split samples of such testing with the Owner as mutually agreed upon by Owner and Tenant.

21.03   Responsibility.  Tenant's Hazardous Materials shall be the responsibility of Tenant.  Tenant shall be liable for and responsible to pay all Environmental Claims that arise out of or are caused in whole or in part from Tenant's use, handling, treatment, storage, disposal, discharge or transportation of Hazardous Materials that Tenant brought on to or at the Premises or Airport, the violation of any Environmental Law by Tenant or the failure of Tenant to comply with the terms, conditions and covenants of this Article 21.

AUS ST 000411

If Owner incurs any costs or expenses (including reasonable attorney, consultant and expert witness fees) arising from Tenant's use, handling, treatment, storage, discharge, disposal or transportation of Hazardous Materials that the Tenant brought on to the Premises or at the Airport, Tenant shall promptly reimburse Owner for such costs upon demand. All reporting requirements under Environmental Laws with respect to spills, releases or discharges of Hazardous Materials by Tenant at the Premises or Airport shall be the responsibility of Tenant. Tenant is not responsible for any Environmental Claims that arise out of or were caused in whole or in part from the use, handling, treatment, storage, disposal, discharge, or transportation of Hazardous Materials on or at the Premises or Airport, or the violation of any Environmental Law, prior to the Effective Date ("Pre-Existing Environmental Claim") to the extent Tenant did not cause in whole or in part the disturbance or aggravation of such Pre-Existing Environmental Claim.

21.04   Indemnity.  IN ADDITION TO ANY OTHER INDEMNITIES IN THIS LEASE, TENANT SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS OWNER FROM ANY AND ALL ENVIRONMENTAL CLAIMS (INCLUDING REASONABLE ATTORNEY'S FEES, LITIGATION AND INVESTIGATION EXPENSES, AND COURT COSTS) ARISING OUT OF OR RESULTING IN WHOLE OR IN PART FROM TENANT'S USE, HANDLING, TREATMENT, STORAGE, DISPOSAL, DISCHARGE OR TRANSPORTATION OF HAZARDOUS MATERIALS ON OR AT THE PREMISES OR AIRPORT, THE VIOLATION OF ANY ENVIRONMENTAL LAW BY TENANT OR THE FAILURE OF TENANT  TO COMPLY WITH THE TERMS, CONDITIONS AND COVENANTS OF THIS ARTICLE 21 OR THIS LEASE.

21.05   Stormwater Requirements.   Tenant acknowledges that the Airport is subject to the National Pollution Discharge Elimination System Program ("NPDES"), federal Stormwater Regulations (40 C.F.R. Part 122) and the Texas Pollution Discharge Elimination System Program ("TPDES").  In its operations at the Premises and Airport, Tenant shall comply with Applicable Law, including NPDES, TPDES, federal and state Stormwater Regulations, including any permits thereunder, and the applicable SWPPP.

21.06   Sustainability.  Tenant shall comply with Applicable Laws pertaining to recycling, energy and natural resource conservation and management.  Owner's Universal Recycling Ordinance (Ordinance No. 20130425-007), as it will be implemented, and all City ordinances and rules that pertain to recycling, energy and natural resource conservation, as such ordinances and rules are currently established, or as may be amended or developed and implemented, shall apply to the Premises and Tenant shall comply with such ordinances and rules.  Tenant shall comply with all Airport rules, regulations, policies and operating procedures, as approved by the Director, that pertain to recycling, energy and natural resource conservation, and management at the Airport, as currently established, or as may be amended or developed and implemented.

21.07   Survival.  The covenants, conditions and indemnities in this Article 21 shall survive the expiration or earlier termination of this Lease.

21.08   Hazardous Materials.  Tenant shall not allow the release, spill, discharge, leak, emission, injection, escape, migration or dumping in, on, about, from or adjacent to

AUS ST 000412

the Premises (including storm drains, sanitary sewer system, surface waters, soils, underground waters or air) of any Hazardous Material or other deleterious substance in any manner by any Tenant Environmental Party in violation of the Pollution Prevention Plan, the SPCC Plan, any City codes and standards, any City environmental permit or any of the Environmental Laws. Tenant shall make available to Owner upon request copies of all material safety data sheets for all Hazardous Materials used or stored on the Premises by any Tenant Environmental Party and Tenant's U.S. Environmental Protection Agency waste generator number and generator annual hazardous waste reports. Tenant shall provide Owner with copies of any environmentally related regulatory permits or approvals (including revisions or renewals) and any material written report or notice Tenant receives from, or provides to, any Governmental Authority in connection with the handling of Hazardous Materials on the Premises by any Tenant Environmental Party or the presence, or possible presence, of any Hazardous Material in, on, about, from or adjacent to the Premises. Tenant is responsible to report to Owner any spills or emissions of Hazardous Materials resulting from the acts or omissions of any Tenant Environmental Party in accordance with City's Spill Response Plan and to report to the appropriate governmental authorities any spills or emissions of Hazardous Materials by any Tenant Environmental Party that are above reportable quantities as defined by applicable Environmental Laws.

21.09   Storm Water Pollution Prevention Plan. Tenant shall either join the Airport's Storm Water Pollution Prevention Plan, or prepare and implement a SWPPP that addresses measures in effect by Tenant to prevent pollution (specifically including storm water) through appropriate pollution prevention and good housekeeping practices and to control and perform immediate removal, investigation, remediation and restoration action in the event of a release of a Hazardous Material or other deleterious material in connection with the operation of the Premises during the Lease. Owner reserves the right to approve or deny the Tenant prepared SWPPP. If applicable, Tenant's SWPPP shall be (a) provided to Owner not more than thirty (30) days after the Effective Date, and (b) updated to address future changes in its activities upon the Premises. Such SWPPP shall be updated as needed to address the operations and practices of Tenant. Tenant is responsible for ensuring Airline compliance with storm water regulations at the South Terminal.

21.10   Spill Prevention, Control and Countermeasure Plan. Tenant shall determine whether Section 112.7 of Title 40 of the Code of Federal Regulations is applicable to the Premises and its operations, and whether Tenant is required to prepare a Spill Prevention, Control and Countermeasure Plan ("SPCC Plan"). This determination must be submitted to Owner for approval. Preparation of an SPCC Plan shall be the responsibility of Tenant. Any SPCC Plan must be certified by a licensed professional engineer in accordance with all Applicable Laws (specifically including any applicable Environmental Laws).

21.11   Violation of Environmental Laws. If Tenant, or the Premises as a result of an act or omission of a Tenant Environmental Party, is in violation of any Environmental Law concerning the presence or use of Hazardous Materials or the handling or storing of hazardous wastes, Tenant shall promptly take such action as is necessary to mitigate and correct the violation. If Tenant does not act in such a manner, Owner reserves the right, but not the obligation, to come onto the Premises, to act in place of Tenant (and Tenant hereby

43

AUS ST 000413

appoints Owner as its agent for such purposes) and to take such action as Owner deems necessary to ensure compliance or to mitigate the violation.  If Owner has a reasonable belief that a Tenant Environmental Party is in violation of any of the Environmental Laws, or that a Tenant Environmental Party's acts or omissions present a threat of violation or a threat of damage to the Premises, Owner reserves the right to enter onto the Premises and take such corrective or mitigating action as it deems necessary.  Interest shall accrue on all unpaid sums at the Contract Rate.

21.12    Inspection; Test Results.  Owner shall have access to the Premises to conduct (but shall have no obligation to conduct) environmental inspections, including an Environmental Audit, and Tenant shall permit Owner access to the Premises for the purpose of conducting environmental testing; provided, however, except in the event of any real or threatened emergency, (a) such environmental testing by Owner shall occur only during normal business hours, or at such other times as Tenant shall reasonably approve; (b) Owner must provide notice to Tenant of its intention to conduct such tests at least five (5) Business Days prior to such date of testing; (c) such testing shall not unreasonably interfere with Tenant' normal business operations; and (d) any damages to the Premises caused by the environmental testing conducted by Owner shall be repaired by Owner at its sole cost and expense.  Unless required by Applicable Law, Tenant shall not conduct or permit others to conduct environmental media testing on the Premises without first obtaining City's prior consent.  Tenant shall promptly inform Owner of the existence of any environmental study, evaluation, investigation or results of any environmental testing conducted on the Premises whenever the same becomes known to Tenant, and Tenant shall provide copies thereof to City.

21.13    Removal of Hazardous Materials.  Prior to its vacation of the Premises, and in addition to all other requirements under this Lease, Tenant shall remove and remediate any Hazardous Materials stored, released, spilled, discharged, leaked, emitted, injected, escaped or dumped in, on or about or adjacent to, or that has migrated from, the Premises by a Tenant Environmental Party during the Term or Tenant' possession of the Premises as a result of any act or omission of any Tenant Environmental Party if such Hazardous Material creates an Environmental Condition and shall demonstrate such removal to the reasonable satisfaction of Owner.  Owner shall specifically have the right to insist on appropriate subsurface environmental investigations as part of any such demonstration.  With respect to the removal and remediation of any Hazardous Materials on the Premises, Owner agrees that it will reasonably approve remediation criteria and investigation, monitoring and remediation activities which comply with Environmental Laws.  To the extent that any remediation activities approved by Owner will occur after the expiration or termination of this Lease, Owner will grant to Tenant a non-exclusive, revocable license to access the Premises solely for the purpose of performing any such removals or investigations required by this Section 21.13.

21.14    Remedies Not Exclusive.  No remedy provided herein shall be deemed exclusive.  In addition to any remedy provided above, Owner shall be entitled to full reimbursement from Tenant whenever Owner incurs any costs resulting from the use or management of Hazardous Materials on the Premises by a Tenant Environmental Party, including costs of remedial activities, fines or penalties assessed directly against Owner,

AUS ST 000414

injuries to third persons or other properties, and loss of revenues resulting from an inability to re-lease or market property due to its environmental condition, even if such loss of revenue occurs after the expiration or earlier termination of the Term.

21.15   Environmental Indemnity.   IN ADDITION TO ALL OTHER INDEMNITIES PROVIDED IN THIS LEASE, TENANT AGREES TO DEFEND, INDEMNIFY AND HOLD OWNER AND ITS ELECTED AND NON-ELECTED OFFICIALS, MEMBERS, MANAGERS, OFFICERS, AGENTS AND EMPLOYEES, FREE AND HARMLESS FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, REGULATORY DEMANDS, LIABILITIES, FINES, PENALTIES, LOSSES, AND EXPENSES, INCLUDING REMEDIAL COSTS (AND INCLUDING REASONABLE ATTORNEYS' FEES, COSTS AND ALL OTHER REASONABLE LITIGATION EXPENSES WHEN INCURRED AND WHETHER INCURRED IN DEFENSE OF ACTUAL LITIGATION OR IN REASONABLE ANTICIPATION OF LITIGATION), ARISING FROM THE EXISTENCE OR DISCOVERY OF ANY HAZARDOUS MATERIAL ON THE PREMISES, OR THE MIGRATION OF ANY HAZARDOUS MATERIAL FROM THE PREMISES TO OTHER PROPERTIES OR INTO THE SURROUNDING ENVIRONMENT, TO THE EXTENT ARISING OR RESULTING FROM ANY ACT OR OMISSION OF A TENANT PARTY, WHETHER (A) MADE, COMMENCED OR INCURRED DURING THE TERM, OR (B) MADE, COMMENCED OR INCURRED AFTER THE EXPIRATION OR TERMINATION OF THE TERM IF ARISING OUT OF EVENTS OCCURRING DURING THE TERM.   TENANT'S OBLIGATIONS UNDER THIS SECTION SHALL SURVIVE THE TERM.

21.16   Tenant Environmental Parties.   Tenant shall include obligations corresponding to those in this Article 21 in any written agreements with any Tenant Environmental Party and expressly include Owner as a third party beneficiary of such provisions, but nothing provided herein shall be deemed to make Tenant the principal, employer or operator of any such party for purposes of any Applicable Law. Notwithstanding the foregoing, Tenant is responsible for compliance with all applicable Environmental Laws on the Premises.

21.17   Survival.   The covenants, conditions and indemnities in this Article 21 shall survive termination of this Lease.

## ARTICLE 22
## INSURANCE

22.01   General.   Tenant will, at its cost and expense, throughout the Term obtain and maintain in full force and effect the policies of insurance applicable to Tenant's use of the Premises as described on Exhibit E, attached hereto.   Insurance provided by Tenant shall be primary coverage for all covered losses.

22.02   Waiver.   Notwithstanding the provisions of Section 22.01, if Tenant has used diligent efforts to procure, or cause to be procured, the insurance policies that are required hereunder and if, despite such diligent efforts and through no fault of Tenant or its principal subcontractor, coverage under any of the insurance policies or any of the required

45

AUS ST 000415

terms of such policies, including policy limits, are or become unavailable, or are available, but not on commercially reasonable terms, Tenant shall give Owner written notice as soon as possible. Owner shall grant Tenant an interim written variance from such requirements under which Tenant shall procure and maintain alternative insurance packages and programs that provide risk coverage as comparable to that which would have been provided under such insurance policies as is available under then-existing insurance market conditions and on commercially reasonable terms. Any reference herein to insurance policies shall include a reference to any interim written variance therefrom granted to Tenant hereunder. To establish that the insurance policies, or any of the required terms of such policies, including policy limits, are not available on commercially reasonable terms, Tenant shall bear the burden of proving to Owner's reasonable satisfaction either that

     (a)    the same is unavailable in the global insurance and reinsurance markets; or

     (b)    the premiums for the same have so materially increased over those previously paid for the same coverage that such increased premiums are not justified by the risk protection afforded.

     22.03   Limits. The limits of insurance coverage specified in Exhibit E are stated in 2015 dollars. No more often than once in any five (5) year period, Owner may, by written notice to Tenant, increase the policy limits to offset the impact of inflation based upon percentage changes in the CPI in order to maintain substantially the same level of coverage as existed on the Effective Date of this Lease. Upon receipt of such written notice from Owner under this Article 22, Tenant shall, subject to this Article 22, obtain the increased insurance coverage within sixty (60) days, and provide Owner updated insurance certificates.

     22.04   Modification. Owner may at any time when it deems it to be reasonably necessary and prudent, upon written request to Tenant, propose to delete or revise or modify particular policy terms, coverages, conditions, limitations or exclusions, except where policy terms, coverages, conditions, limitations or exclusions are established by Applicable Law binding upon either of the Parties hereto or the underwriter of any such policies. If Owner proposes such changes to the insurance requirements of this Lease, the Parties agree to meet and negotiate in good faith mutually acceptable modifications to the insurance requirements. Failure to agree on such changes shall not be deemed to be an Owner Default or Tenant Default under this Lease.

     22.05   Amendment Required. No changes to the insurance requirements of this Article 22 shall be effective unless made in a duly authorized and executed amendment to this Lease, except for (a) any interim variance referred to in Section 22.02, and (b) the increased coverage limits referred to in Section 22.03.

     22.06   Owner's Right to Maintain. In the event that Tenant fails to obtain or cause to be obtained or to maintain or cause to be maintained the insurance coverage required by this Article 22, Owner, upon thirty (30) days prior notice to Tenant may (but shall not be obligated to) obtain or maintain or cause to be obtained or maintained the required insurance policies and pay or caused to be paid the premiums on the same. All

AUS ST 000416

amounts so advanced by Owner on Tenant's behalf shall be reimbursed to Owner by Tenant.

## ARTICLE 23
## INDEMNITY

23.01   General.   TENANT SHALL INDEMNIFY AND HOLD HARMLESS OWNER, ITS OFFICERS AND EMPLOYEES, AND REPRESENTATIVES, SUCCESSORS AND ASSIGNS (THE "INDEMNIFIED PARTIES"), FROM ALL LIABILITY, LOSS, CLAIMS, SUITS, ACTIONS AND PROCEEDINGS WHATSOEVER ("CLAIMS") THAT MAY BE BROUGHT OR INSTITUTED ON ACCOUNT OF OR GROWING OUT OF ANY AND ALL INJURIES OR DAMAGES, INCLUDING DEATH, TO PERSONS OR PROPERTY RELATING TO THE USE OR OCCUPANCY OF THE PREMISES DURING THE TERM INCLUDING CLAIMS THAT ARISE OUT OF OR RESULT FROM THE ACTIVE OR PASSIVE NEGLIGENCE, OR SOLE, JOINT, CONCURRENT OR COMPARATIVE NEGLIGENCE OF ANY OF THE INDEMNIFIED PARTIES AND REGARDLESS OF WHETHER LIABILITY WITHOUT FAULT OR STRICT LIABILITY IS IMPOSED OR ALLEGED AGAINST SUCH INDEMNIFIED PARTIES, AND ALL LOSSES, LIABILITIES, JUDGMENTS, SETTLEMENTS, COSTS, PENALTIES, DAMAGES, AND EXPENSES RELATING THERETO, INCLUDING, BUT NOT LIMITED TO, ATTORNEYS' FEES AND OTHER ACTUAL OUT OF POCKET COSTS OF DEFENDING AGAINST, INVESTIGATING, AND SETTLING THE CLAIMS. NOTWITHSTANDING THE FOREGOING, TENANT'S OBLIGATIONS UNDER THIS SECTION SHALL BE LIMITED TO THE PROPORTIONATE EXTENT ATTRIBUTABLE TO TENANT, AND EXCLUDE CLAIMS TO THE PROPORTIONATE EXTENT CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF INDEMNIFIED PARTIES, TO THE EXTENT THAT THE CLAIMS ARE FINALLY JUDICIALLY DETERMINED TO BE AT LEAST 51% ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNIFIED PARTIES.

23.02   Defense of Claims.   TENANT SHALL ASSUME ON BEHALF OF THE INDEMNIFIED PARTIES AND CONDUCT WITH DUE DILIGENCE AND IN GOOD FAITH THE DEFENSE OF ALL CLAIMS AGAINST ANY OF THE INDEMNIFIED PARTIES.   THE INDEMNIFIED PARTIES SHALL HAVE THE RIGHT (BUT NOT THE OBLIGATION) TO PARTICIPATE, AT THEIR OWN EXPENSE, IN THE DEFENSE OF ANY CLAIM OR LITIGATION WITH ATTORNEYS OF THEIR OWN SELECTION WITHOUT RELIEVING TENANT OF ANY OBLIGATIONS IN THIS Article 23 OR COMPROMISING TENANT'S RIGHT CONDUCT SUCH DEFENSE.   IN NO EVENT MAY TENANT ADMIT LIABILITY ON THE PART OF AN INDEMNIFIED PARTY WITHOUT THE WRITTEN CONSENT OF THE CITY ATTORNEY.

23.03   Maintenance of Insurance.   MAINTENANCE OF THE INSURANCE REFERRED TO IN THIS LEASE DOES NOT AFFECT TENANT'S OBLIGATIONS UNDER THIS Article 23.

47

AUS ST 000417

23.04   Subcontractors. TENANT SHALL REQUIRE ITS SUBCONTRACTORS TO INDEMNIFY OWNER, AS PROVIDED IN THIS SECTION AND AS PERMITTED UNDER APPLICABLE LAW.

## ARTICLE 24
## DISADVANTAGED BUSINESS ENTERPRISES,
## M/WBE PROCUREMENT PROGRAM AND WAGE RATES

24.01   Disadvantaged Business Enterprise (DBE) Procurement Program. Tenant shall develop and implement a disadvantaged enterprise program for any Covered Improvements including the Rehabilitation Project. In connection therewith, Tenant and its prime contractor(s) will work with the SMBR to identify qualified DBE subcontractors and notify such subcontractors of potential contracting opportunities, and to track and report DBE participation in such contracts to SMBR. Tenant shall provide Owner with a copy of Tenant's DBE program. Tenant shall provide Owner with a simultaneous copy of all DBE reports submitted by Tenant to the SMBR and other applicable Governmental Authorities.

24.02   Minority and Women Business Enterprises. Tenant shall substantially comply with the requirements of the City Code Chapters 2-9(A), 2-9(B), 2-9(C), and 2-9(D) (Minority-Owned and Female-Owned Business Enterprise Procurement Program). It is Owner's policy to ensure that Minority-owned and Women-owned Business Enterprises ("MWBE") have the full opportunity to compete for and participate in Owner contracts. The policies and objectives of City Code Chapters 2-9(A), 2-9(B), 2-9(C), and 2-9(D) are incorporated into this Lease. Tenant shall develop and implement a MWBE Procurement Program ("MWBE Program"), which shall substantially comply with City Code Chapters 2-9(A) and 2-9(B) in the design and construction of the South Terminal. The current annual gender, ethnic-specific design and construction goals contained in City Code Chapters 2-9(A) and 2-9(B) are set forth on Exhibit F attached hereto and made a part hereof. The MWBE Program shall be incorporated into and made a part of this Lease for all purposes. If Tenant receives a notice of any violation of the MWBE Program, Tenant shall diligently work to cure such violation as is required and cooperate with Owner to correct such violations.

(a)   MWBE Reporting. Within forty-five (45) days from the Effective Date of this Lease, Tenant shall provide Owner with a copy of Tenant's MWBE Program, and thereafter, Tenant shall provide monthly reports on progress toward meeting the MWBE participation goals on forms to be provided by Owner. Tenant may also be required to provide periodic reports to SMBR Citizen Advisory Committee regarding MWBE participation. Tenant shall maintain records showing (a) construction contracts and agreements with MWBEs, and (b) specific efforts to identify and award construction contracts and agreements to MWBEs.

(b)   Outreach. In an effort to meet the gender and ethnic-specific MWBE utilization goals, Tenant shall implement an outreach program designed to solicit participation of MWBEs. These outreach efforts should also target small businesses generally. Tenant may seek the assistance of SMBR in these outreach efforts.

48

AUS ST 000418

(c)     Supplier Diversity Policy.  Within ninety (90) days after the Effective Date, Tenant shall submit to Owner a reasonable supplier diversity policy which will not conflict with the MWBE Program regarding Tenant's procurement of materials and services to be used exclusively at the Premises which may be reasonably modified from time to time by the Tenant, provided the policy and all modifications are approved by SMBR.

24.03     Worker Safety.  Tenant shall also comply with, and require its contractors and subcontractors to comply with, "Third Party Resolution" Worker Safety requirements pursuant to City Ordinance No. 20110728-106 throughout the construction, improvement, renovation, restoration, replacement and/or alteration of the South Terminal.

24.04     Wage Rates/Prevailing Wage.  Tenant shall comply with, and require its contractors supplying construction labor or materials to the South Terminal to comply with, the City's prevailing wage requirements throughout solicitation of any construction contract or procurement of services for the construction of the South Terminal as described in this Lease. Owner has adopted the general prevailing rate of per diem wages established by the U.S. Department of Labor for work of similar character in the locality in which the work is performed as the minimum per diem wages to be paid in connection with a city public improvement project for the construction of public buildings.  The rates Owner pays are the rates in effect for Travis County at the time Owner advertises these projects for bid. Resolution No. 20080605-047 adopts these same wage rates for public-private projects, such as the project contemplated by this Lease in which Owner is a participant.

24.05     Living Wage.  Tenant shall ensure all personnel are paid the City's Living Wage in accordance with the policy set forth in City Council Resolution No. 20141016-035, or as may subsequently be amended.  Tenant shall pay the City's current living wage rate for all of its workers at the South Terminal and such living wage rate shall be adjusted annually to reflect the City's new living wage rate that results from applying the cost of living index in accordance with City Council Resolution No. 20141016-035 or as may subsequently be amended.

## ARTICLE 25
## CAPITAL RECOVERY PAYMENT

25.01     Capital Recovery Payment.  If at any time within the first six (6) years after the Effective Date, a Capital Recovery Event (as hereinafter defined) occurs, Tenant will notify Owner within six (6) months of the date any such Capital Recovery Event occurs (any such notice, a "Capital Recovery Notice").  If following delivery of any such Capital Recovery Notice, Owner and Tenant are unable to cure the Capital Recovery Event within six (6) months after receipt by Owner of such Capital Recovery Notice, Tenant may terminate this Lease upon one hundred twenty (120) days advance written notice to Owner, after which Owner will commence making the Capital Recovery Payment to Tenant in the following manner:  the Capital Recovery Payment, which shall not in any event exceed ELEVEN MILLION AND NO/100 DOLLARS ($11,000,000.00), shall be paid in four equal installments at each quarter-end of Owner's fiscal year following the termination of this Lease, commencing on the March 31, June 30, September 30 or December 31 immediately following the date this Lease is terminated, and such amounts,

49

AUS ST 000419

to the extent of available funds, shall be paid out of lawfully available City of Austin Department of Aviation revenues, provided, that available Department of Aviation revenues shall not include funds raised or to be raised by taxation. For the avoidance of doubt, the payment of the Capital Recovery Payment is subject to the prior payment of any obligations then due and payable under any Bonds now or hereafter outstanding which are the subject of Article 39. For the avoidance of doubt, the four installment payments may straddle more than one fiscal year. Upon termination of this Lease, Owner will either assume operations of the South Terminal or Owner will close the South Terminal and the Airlines operating out of the South Terminal will be allowed to operate at the North Terminal. This Article 25 and Tenant's right to demand or make a claim against Owner based on this Article 25 for the Capital Recovery Payment shall expire on the sixth anniversary of the Effective Date. The City Council of Owner approved the potential Capital Recovery Payment set forth in this Section at its August 27, 2015 meeting.

25.02   Capital Recovery Event.  A "Capital Recovery Event" shall occur if the Enplaned Passenger level at the South Terminal falls below, for any preceding twelve (12)-month period, with the first such period ending on the first anniversary of the Commencement of Operations Date, or is projected to fall below for a succeeding twelve (12)-month period, 200,000 Enplaned Passengers because any or all of the Airlines: (a) have failed to achieve such service levels; (b) have reduced service or provided notification of a reduction in service at the South Terminal; (c) have failed to have a fully executed Terminal Use Agreement(s) with Tenant, in full force and effect, and without default; or (d) have failed to have a fully executed Airfield Use Agreement with Owner, in full force and effect, and without default.

## ARTICLE 26
## LAWS AND GRANT CONDITIONS

26.01   Grant Assurances.  This Lease is subject to the provisions of any agreement made between Owner and the United States Government relative to the operation or maintenance of the Airport, the execution of which has been required as a condition precedent to the transfer of federal rights or property to Owner for Airport purposes, or the expenditure of federal funds for the development of the Airport, including the expenditure of federal funds for the development of the Airport in accordance with the provisions of the FAA's Airport Improvement Program, or in order to impose and use passenger facilities charges under 49 U.S.C. Section 40117 or any successor thereto.

26.02   National Emergencies.  This Lease shall be subject to whatever right the United States Government now has or in the future may have or acquire, affecting the control, operation, regulation and taking over of said Airport or the exclusive or nonexclusive use of the Airport by the United States during a time of war or national emergency.

26.03   Non-Discrimination and Affirmative Action.  Tenant, for itself, its successors and assigns, as a part of the consideration of this Lease, does hereby covenant and agree that: (a) no person on the grounds of race, color, religion, sex, national origin or ancestry, or age, shall be excluded from participation in, denied the benefits of, or

AUS ST 000420

otherwise be subjected to discrimination in the use of the Premises; (b) in the construction of any improvements on, over or under such land and the furnishing of services thereon, no person on the grounds of race, color, religion, sex, national origin or ancestry or age, shall be excluded from participation in, denied the benefits of, or otherwise be subjected to unlawful discrimination; (c) Tenant shall use the Airport facilities in compliance with all other requirements imposed by, or pursuant to, 49 CFR Part 21 (Non-discrimination in Federally Assisted Programs of the Department of Transportation), as said regulations may be amended; and (d) Tenant assures that it will undertake an affirmative action program as required by 14 CFR Part 152, Subpart E (Non-discrimination Airport in Aid Program), to ensure that no person shall on the grounds of race, color, religion, national origin or ancestry, sex, age or physical or mental handicap be excluded from participating in any employment activities covered in 14 CFR Part 152, Subpart E, or such employment activities covered in Chapter 5-3 of the Austin City Code. Tenant assures that no person shall be excluded on these grounds from participating in or receiving the services or benefits of any program or activity covered by this Section 26.03. Tenant assures that it will require that any covered subtenant similarly will undertake affirmative action programs and that the subtenant will require assurance from the subtenant's sub-subtenants, as required by 14 CFR Part 152, Subpart E, to the same effect. Tenant agrees to post, in conspicuous places available to employees and applicants for employment notices to be provided setting forth the provisions of this nondiscrimination clause.

26.04   Public Accommodation Laws.  Tenant covenants that it shall comply with Applicable Laws governing non-discrimination in public accommodations and commercial facilities, including the requirements of the Americans with Disabilities Act of 1990, as amended (the "ADA") and all regulations thereunder, and that the Premises shall remain in compliance with such Applicable Laws throughout the Term.

26.05   Compliance with Laws.  In its use and occupancy of the Premises, Tenant shall comply with all Applicable Laws and all Airport rules and regulations. Tenant shall not do or permit anything to be done in, on or at the Premises that would constitute a public or private nuisance.

26.06   Lighting, Electrical and Radio Interference.  Tenant shall not permit or create any electrical or other interference with radio communications between the Airport and aircraft. Tenant may not install any lighting on the Premises that would make it difficult for pilots to distinguish between Airport lights and those of Tenant, impair visibility in the vicinity of the Airport or otherwise endanger landing, taking off or maneuvering of aircraft. Tenant shall coordinate the use of radio frequencies by Tenant, or any Airline, ground handler or other person occupying the South Terminal, with Owner prior to implementation to avoid interference with existing radio communications at the Airport.

26.07   Amendment.  In the event that the FAA, the TSA or any other Governmental Authority of competent jurisdiction other than Owner shall require any modifications or changes in this Lease as a condition precedent to the granting of funds for the improvement of the Airport to use or impose PFCs, or if it is necessary to modify this Lease to comply with the requirements of Applicable Law, including regulations, orders

AUS ST 000421

and decisions of the FAA, the TSA or such other Governmental Authority, Owner shall notify Tenant in writing. If the Parties are unable to agree upon and execute a suitable amendment within the time frame required by the Governmental Authority, Tenant agrees that Owner may unilaterally modify this Lease, upon advice of its legal counsel, as may reasonably be required to obtain such funds, to use or impose PFCs or comply with Applicable Law. Nothing herein shall preclude Tenant from contesting such orders or decisions, but Tenant shall abide by the unilateral modification by Owner until such time, if any, as such Governmental Authority's requirement is stayed, rescinded or invalidated as long as such stay, rescission or invalidation remains in effect. In no event will Tenant be required, pursuant to this Section 26.07, to pay Rent greater than specified herein.

26.08   Airport Development.  Owner reserves the right to develop and improve the Airport and all roadways, terminal facilities, land areas and taxiways and any other facilities at the Airport for aviation or aeronautical purposes as it deems necessary or appropriate in its absolute discretion, subject only to Applicable Law and the express provisions of this Lease, including in Section 2.03 and Article 15.

26.09   Economic Nondiscrimination.  Tenant shall make the South Terminal available to all users thereof on reasonable, and not unjustly discriminatory basis, and shall charge reasonable, and not unjustly discriminatory, rates and charges for the use of the South Terminal, provided that Tenant may make available reasonable and nondiscriminatory discounts, rebates or similar types of price reductions or modifications for volume users.

## ARTICLE 27
## AVIGATION RIGHTS

27.01   General.  Tenant understands and acknowledges that the Premises are located between two active airport runways, that the Premises are subject to overflights of aircraft taking off or landing at the Airport, and that the Premises are currently, and will in the future, be subject to aircraft noise levels of DNL 65dB or greater, as well as vibration, air pollution and other effects from the flight of aircraft near or over the Premises.

27.02   Owner's Reservation of Rights.  Owner reserves the right of flight for the passage of aircraft above the surface of the Premises, and such right of flight shall include the right to cause in such airspace such noises as may be inherent to the operation of aircraft now known or hereafter used for navigation of or flight in the air; and Owner reserves the right to use said airspace for landing at, taking off from or operating aircraft on or over said Airport.

27.03   Waiver.  Tenant agrees that Owner shall not be liable for any damage to the Premises arising out of the operation of aircraft in air space above the Premises or other property in the vicinity of the Premises.

AUS ST 000422

## ARTICLE 28
## TENANT DEFAULT AND REMEDIES

28.01   Default by Tenant.  Each of the following shall be deemed a default by Tenant ("Tenant Default") hereunder and a material breach of this Lease:

(a)   Tenant shall fail to pay the amount of any installment of Rent or other sum payable by Tenant under this Lease when due, in accordance with the terms of this Lease, and such failure shall continue for twenty (20) days after delivery by Owner to Tenant of written notice specifying such failure;

(b)   Tenant shall fail to commence or complete the Rehabilitation Project and the reactivation of the South Terminal in accordance with, and subject to the conditions set forth in, Article 10, and Tenant shall fail to cure such failure within thirty (30) days after delivery by Owner to Tenant of written notice specifying the failure; provided, however, if the failure is curable, but not capable of being cured within such thirty (30)-day period, Tenant Default shall not occur under this subsection unless Tenant fails to commence such cure of during such thirty (30)-day period and thereafter fails to diligently and continuously pursue the cure to its completion;

(c)   Tenant shall abandon, desert or vacate the Premises, after the commencement of the Rehabilitation Project, for a period of thirty (30) days, for any reason excluding, for the avoidance of any doubt, an event of Force Majeure or Owner Default or authorized construction, repairs or maintenance, and the Premises remain abandoned, deserted or vacant for a period of thirty (30) days after delivery by Owner to Tenant of written notice thereof;

(d)   Tenant shall fail to keep, perform or observe any other non-monetary material covenant, agreement, term or provision contained in this Lease to be kept or performed by Tenant hereunder or thereunder, and Tenant shall fail to cure such failure within thirty (30) days after delivery by Owner to Tenant of written notice specifying the failure; provided, however, if the failure is curable, but not capable of being cured within such thirty (30)-day period, Tenant Default shall not occur under this subsection unless Tenant fails to commence such cure of during such thirty (30)-day period and thereafter fails to diligently and continuously pursue the cure to its completion;

(e)   An involuntary petition shall be filed against Tenant under applicable bankruptcy law, or a receiver of Tenant, or of all or substantially all of the property of Tenant, shall be appointed without acquiescence, and such petition or appointment shall not discharged or stayed within sixty (60) days after the happening of such event;

(f)   Tenant shall make an assignment of its interest in the Premises for the benefit of creditors or shall file a voluntary petition under applicable bankruptcy law, or seek relief under any other law for the benefit of debtors; or

(g)   Any representation or warranty made by Tenant in Section 36.02 of this Lease shall be materially false, misleading or inaccurate when made, except where such incorrect representation or warranty is capable of being cured and is in fact remedied within thirty (30)

53

AUS ST 000423

days after notice thereof is given by Owner to Tenant; provided, however, if the failure is curable, but not capable of being cured within such thirty (30)-day period, Tenant Default shall not occur under this subsection (g) unless Tenant fails to commence such cure during such thirty (30)-day period and thereafter fails to diligently and continuously pursue the cure to its completion.

28.02  Remedies of Owner.  If a Tenant Default occurs, Owner may at any time thereafter and without waiving any other rights hereunder or available to Owner at law or in equity (Owner's rights being cumulative), do any one or more of the following, subject to all defenses, counterclaims, and set offs available to Tenant under Applicable Law:

(a)  Owner may terminate this Lease by giving Tenant written notice thereof, in which event this Lease and the leasehold estate hereby created and all interest of Tenant and all parties claiming by, through or under Tenant shall automatically terminate upon the effective date of such notice; and Owner, its agents or its representatives may, without further demand or notice, reenter and take possession of the Premises and remove all persons and property therefrom with or without process of law, without being deemed guilty of any manner of trespass and without prejudice to any remedies for arrears of Rent or existing breaches hereof.

(b)  Owner may terminate Tenant's right to possession of the Premises and enjoyment of the rents, issues and profits therefrom without terminating this Lease or the estate created hereby, reenter and take possession of the Premises, change the locks, and remove all persons and property therefrom (except for subtenants or users permitted by the terms of this Lease, including Airlines operating under Terminal Use Agreements), with or without process of law, without being deemed guilty of any manner of trespass and without prejudice to any remedies for arrears of Rent or existing breaches hereof. If Owner retakes possession of the Premises as provided herein, Owner shall have no obligation to tender to Tenant new keys or other entry devices to any new locks installed in the Premises, and Owner may lease, manage and operate the Premises and collect the rents, issues and profits therefrom for the account of Tenant, and credit to the satisfaction of Tenant's obligations hereunder such amounts thus received, after deducting therefrom all reasonable actual out of pocket third party costs and expenses of repossessing, leasing, managing and operating the Premises. If such net amounts so received by Owner exceed the amounts necessary to satisfy all of Tenant's obligations under this Lease, Owner shall nevertheless retain such excess.  In no event shall Owner be liable for failure to so lease, manage or operate the Premises or collect the rentals due under any subleases, and any such failure shall not reduce Tenant's liability hereunder. If Owner elects to proceed under this Section 28.02, it may at any time thereafter elect to terminate this Lease.

(c)  Owner shall have the right, but not the obligation, without judicial process and without incurring any liability therefor, to enter upon the Premises and perform any obligation under this Lease that Tenant has failed to perform.  Performance by Owner shall not cure a Tenant Default, and all costs and expenses incurred by Owner in performing such obligations of Tenant shall be payable by Tenant to Owner as Additional Rent within thirty (30) days from invoice date, provided that such costs and expenses shall not exceed the actual out-of-pocket costs to complete such obligation, plus a twenty (20)% administrative fee.

54

AUS ST 000424

(d)     Owner may exercise any other right or remedy available to Owner under this Lease or at law or in equity.

(e)     All Rent and other sums not paid on or before the date due shall bear interest at the Contract Rate from and after the date due; provided, however, that nothing herein shall operate or be construed to obligate Tenant to pay sums which are subject to applicable usury law which, taken together, exceed the maximum non-usurious amount or rate.

(f)     Owner may, at Owner's election, either (i) purchase all Trade Fixtures at a cost equal to Tenant's unamortized cost of such Trade Fixtures, depreciated on a straight line basis over the lesser of the original Term or the useful life of such Trade Fixtures, or (ii) lease such Trade Fixtures at a fair market rental for such Trade Fixtures for a period of up to a maximum of three (3) years.  Owner shall provide notice of its election to either purchase or lease such Trade Fixtures on or before the date the Lease will terminate.  Within twenty (20) days after receipt of Owner's notice of intent to purchase or lease the Trade Fixtures, Tenant shall respond in writing with, as applicable, its calculation of the purchase price of the Trade Fixtures determined in accordance with this subsection, or its calculation of the fair market rental value of the Trade Fixtures.  Tenant may not include any rent for the land or for any Trade Fixtures owned, installed or otherwise paid for or provided by Owner.  If the Parties are unable to agree upon such purchase price or fair market rental for the Trade Fixtures, the Parties shall attempt to determine such purchase price or fair market rental pursuant to the process set forth in Article 40.  If the process set forth in Article 40 is unsuccessful, and the Parties cannot agree on a subsequent process to resolve their differences, the remedies set forth in this Section 28.02(f) shall not be available to Owner.

28.03     Additional Rights of Owner.  To the extent that Tenant fails to keep, perform or observe any covenant, agreement, term or provision of this Lease, whether or not such failure is excused by any applicable cure periods, and such failure continues for a period of thirty (30) days after delivery by Owner to Tenant of written notice specifying such failure, or upon repeated failure of Tenant to keep, perform or observe any covenant, term or provision of this Lease, Tenant shall, upon written request by Owner, cause a senior representative (Senior Vice President or higher) of Tenant to meet and confer with Owner, either in person or via teleconference, within ten (10) business days after receipt of such written request, to address such failure and, where necessary, formulate an action plan to ensure future compliance under the Lease.

## ARTICLE 29
## OWNER DEFAULT AND REMEDIES

29.01     Default by Owner.  The following shall be deemed a default by Owner ("Owner Default") and a material breach of this Lease:

(a)     Owner shall fail to pay the amount of any sum payable by Owner under this Lease, including under Section 18.06, when due in accordance with the terms of this Lease, and such failure shall continue for twenty (20) days after delivery by Tenant to Owner of written notice specifying such failure;

AUS ST 000425

(b)     Owner shall fail to keep, perform or observe any other non-monetary material covenant, agreement, term or provision contained in this Lease to be kept or performed by Owner hereunder or thereunder, and Owner shall fail to cure such failure within thirty (30) days after delivery by Tenant to Owner of written notice specifying the failure; provided, however, if the failure is curable, but not curable within such thirty (30)-day period, an Owner Default shall not occur unless Owner fails to commence the cure of the failure during such thirty (30)-day period and thereafter fails to diligently and continuously pursue the cure to its completion; or

(c)     Any representation or warranty made by Owner in Section 36.01 of this Lease shall be false or materially misleading or inaccurate when made in any material respect, except where such incorrect representation or warranty is capable of being cured and is in fact cured within thirty (30) days after notice thereof is given by Tenant to Owner; provided, however, if the failure is curable, but not curable within such thirty (30)-day period, an Owner Default shall not occur unless Owner fails to commence the cure of the failure during such thirty (30)-day period and thereafter fails to diligently and continuously pursue the cure to its completion.

29.02    Tenant's Remedies.  If an Owner Default occurs, Tenant may at any time thereafter and without waiving any other rights hereunder or available to Tenant at law or in equity (Tenant's rights being cumulative), do any one or more of the following, subject to all defenses, counterclaims, and set offs available to Owner under Applicable Law:

(a)     Tenant may terminate this Lease by giving Owner written notice thereof, in which event this Lease and the leasehold estate hereby created and all interest of Tenant and all parties claiming by, through or under Tenant shall automatically terminate upon the effective date of such notice; and Tenant shall thereafter be released of all other duties, obligations and responsibilities with respect to this Lease.

(b)     If Tenant exercises its right to termination under clause (a) above, Tenant may pursue a cause of action against Owner for its actual damages, which will be deemed to be equal the Fair Market Value of its Tenant's Interest.

(c)     Tenant shall have the right, but not the obligation, without judicial process and without incurring any liability therefor, to perform any obligation under this Lease that Owner has failed to perform, upon ten (10) business days advance written notice, or prompt notice after incurrence in the case of any action necessary to protect public health or safety, to Owner.  Performance by Tenant shall not cure the Owner Default, and all actual and verifiable costs and expenses incurred by Tenant in performing such obligations of Owner shall be payable by Owner to Tenant.

(d)     Tenant may, at Tenant's election, cause Owner to purchase all Trade Fixtures at a cost equal to the greater of (i) Tenant's unamortized cost of such Trade Fixtures or (ii) the appraised value of such Trade Fixtures.  Tenant shall provide notice of its election on or before the date the Lease will terminate.  In such notice, Tenant shall provide Owner with its calculation of the purchase price of the Trade Fixtures, determined in accordance with this subsection.  If the Parties are unable to agree upon such purchase price for the Trade Fixtures,

AUS ST 000426

the Parties shall attempt to determine such purchase price pursuant to the process set forth in Article 40. If the process set forth in Article 40 is unsuccessful, and the Parties cannot agree on a subsequent process to resolve their differences, the remedies set forth in this Section 29.02(d) shall not be available to Tenant.

      (e)     Tenant may exercise any other right or remedy available to Tenant under this Lease or at law or in equity.

      (f)     Tenant may deduct and set off against the Rent owed by Tenant under this Lease the amount of any damages for any Owner Default.

      (g)     Tenant may seek specific performance and injunctive relief from a court of competent jurisdiction as a remedy for any Owner Default.

## ARTICLE 30
## SURRENDER OF PREMISES

      30.01   Condition of Premises.

      (a)     Upon the expiration or earlier termination of this Lease, or of any renewal or extension hereof, Tenant shall peaceably quit, deliver up and surrender the Premises, in good order, repair and condition, subject to the provisions of Article 32 and Article 33 below. Tenant shall restore the Premises (including all improvements to the Premises) and make such repairs as may be necessary to restore the Premises to (i) at least substantially the same condition as the Premises were in on the Commencement of Operations Date, (ii) the condition of the Premises maintained by Tenant under Section 10.04 above and (iii) minimum standards adopted by Owner under Section 17.02 above, reasonable wear and tear and Owner-authorized improvements excepted. At Owner's written request, Tenant shall remove all goods, equipment or personal property owned by Tenant on the Premises; subject, however, to any valid lien that Owner may have thereon for unpaid Rent, fees or charges.

      (b)     Upon termination or expiration of this Lease, Tenant shall transfer all right, title and interest in and to the Premises, including all improvements, to Owner without additional payment or cost; provided, however, that Tenant will retain all right, title and interest in and to any Trade Fixtures and Tenant shall be entitled to remove and dispose of such Trade Fixtures, subject to Owner's rights under Section 28.02(f). In the event of a termination of this Lease by Tenant as the result of an Owner Default, Tenant shall retain Tenant's Interest until all amounts, if any, agreed or adjudicated to be payable by Owner on such termination are paid in full, or Owner has posted a bond sufficient to pay such amounts; provided, however Tenant may not conduct any business on the Premises after termination. For the avoidance of doubt, Tenant shall not be required to conduct any investigation, remediation, corrective action or other activities in connection with any Environmental Conditions on the Premises, except to the extent required under Article 20 or Article 21 above.

      30.02   Repossession and Holding Over. Upon such expiration or termination, Owner may, without further notice, enter upon, reenter, possess and repossess itself of the Premises by summary proceedings, ejectment or otherwise, and may have, hold, and enjoy the Premises and all rental and other income therefrom, free of any claim by Tenant with

AUS ST 000427

respect thereto.  If Tenant does not surrender possession of the Premises at the end of the Term, such action shall not extend the Term, Tenant shall be a tenant at sufferance, and during such time of occupancy Tenant shall pay to Owner, as damages, an amount equal to one hundred fifty percent (150%) of the then current Rent.  Owner shall not be deemed to have extended the Term, other than by execution of a written agreement specifically so stating.

     30.03   <u>Tenant's Personal Property</u>.  Except as otherwise expressly provided in this Lease, Tenant's Trade Fixtures, furnishings, signs, temporary buildings and equipment located on, in or at the Premises, shall remain Tenant's property for all purposes and, subject to <u>Section 28.02(f)</u>, shall be removed by Tenant upon expiration or earlier termination of the Term.  Tenant shall repair, at its sole expense, all damage to the Premises caused by such removal.

**ARTICLE 31**
**FORCE MAJEURE**

     31.01   <u>General</u>.  The failure of Tenant or Owner to perform its obligations hereunder shall be excused, to the extent, and for the period of time, such failure is caused by the occurrence of an event of Force Majeure.  Force Majeure shall mean acts and events not within the control of the Party claiming suspension, and which that Party has been unable to avoid or prevent by the exercise of due diligence.  Events of Force Majeure include: Acts of God; strikes, lockouts or other industrial disputes; inability to obtain material, equipment or labor; epidemics, civil disturbances, acts of domestic or foreign terrorism, wars, riots or insurrections; landslides, lightning, earthquakes, fires, storms, floods or washouts; arrests and restraint of rulers and people; interruptions by government or court orders; present or future orders of any Governmental Authority having proper jurisdiction and authority (unless arising out of a breach of Applicable Law by the Party asserting Force Majeure); failure to obtain or delay in obtaining any Governmental Approval from any Governmental Authority; explosions; breakage or accident to machinery; and the exercise of any rights of the United States Government affecting the control, operation, regulation and taking over of the Airport or the exclusive or nonexclusive use of the Airport by the United States during a time of war or national emergency as set forth in <u>Section 26.02</u>.  Force Majeure does not include economic or market conditions which affect a Party's cost, but not its ability, to perform.  The Party invoking Force Majeure shall give prompt, timely and adequate notice to the other Party, by electronic mail or telephone confirmed promptly thereafter in writing, and shall use due diligence to remedy the event of Force Majeure, as soon as reasonably possible.  Nothing contained herein shall be construed to require a Party to settle a strike or other labor dispute against its will.

     31.02   <u>Impairment of Use</u>.  To the extent a Force Majeure impairs Tenant's use of the Premises, in whole or in part, Tenant's and Owner's obligations to make payments to each other in accordance with this Lease shall be proportionately reduced, in whole or in part, respectively, during the term of such Force Majeure.  In addition, to the extent a Force Majeure's duration is in excess of ninety (90) days, the Term will be extended by the length of such Force Majeure in excess of ninety (90) days.  Any right of either Party to terminate

58

AUS ST 000428

this Lease shall be suspended for so long as the act, omission or other event or circumstance giving rise to such right is excused by an event of Force Majeure, provided that such Force Majeure does not continue for more than six (6) months. To the extent that any Force Majeure's duration is in excess of six (6) months, Tenant may elect to terminate this Lease.

**ARTICLE 32**
**INSPECTION**

32.01   <u>Owner's Right to Inspect</u>. When no state of emergency exists, after two (2) business days' notice to Tenant, Owner may enter upon the non-public areas of the Premises during normal operating hours in order to inspect same. Owner may enter upon all public areas of the Premises at any time without notice during normal business hours. In an emergency, Owner may enter upon the Premises at any time and without notice to Tenant. Owner will use reasonable efforts to minimize the disruption to Tenant resulting from any such inspections.

**ARTICLE 33**
**CASUALTY LOSS**

33.01   <u>Restoration Upon Casualty Loss</u>. If the South Terminal, or any buildings, terminals or leasehold improvements are wholly or partially destroyed or damaged by fire or any other casualty ("<u>Casualty</u>"), Tenant shall cause the same to be restored and reconstructed to the extent of available insurance proceeds (and such other proceeds, if any, as are made available to Tenant by or through Owner), unless otherwise agreed by Owner, in writing, and the following provisions shall apply:

(a)   The design of all portions of the South Terminal to be restored and reconstructed shall meet the requirements of this Lease (including those set forth in <u>Article 9</u> hereof) and Owner shall have the same rights of review, comment and approval with respect to such design as it has hereunder for Covered Improvements;

(b)   Restoration and reconstruction shall commence as soon as reasonably feasible, but no later than six (6) months after the receipt of insurance proceeds available therefor, and shall be pursued thereafter with all due diligence to completion;

(c)   Tenant shall use all available proceeds of Tenant's casualty insurance for the restoration and reconstruction of the South Terminal; and

(d)   All proceeds from Tenant's rental insurance or business interruption insurance policies shall be the property of Tenant.

33.02   <u>No Restoration Following Casualty Loss</u>. If Tenant and Owner agree not to restore and reconstruct the South Terminal, then either Party may elect to terminate this Lease as to the portion of the Premises affected by the Casualty (as reasonably determined by the Parties) upon thirty (30) days' written notice to the other Party, and the following provisions shall apply:

59

AUS ST 000429

(a)     with available insurance proceeds, Tenant shall establish reasonable security for the Premises and, as soon as practicable, remove all debris resulting from the Casualty and bring the Premises to a clean and safe condition;

(b)     the insurance proceeds received under Tenant's property insurance policies as a result of the Casualty shall be applied, first in accordance with sub-clause (a) above, and then to Tenant, to the extent of any remaining proceeds;

(c)     all proceeds from Tenant's business interruption insurance policies shall be paid to Tenant;

(d)     Tenant shall reasonably cooperate with Owner to cause Tenant's insurance company to apply the insurance proceeds as provided in this Section 33.02;

(e)     If this Lease is terminated as to a portion of the Premises, Rent shall be reduced proportionately; and

(f)     Notwithstanding anything to the contrary herein, if this Lease is terminated as a result of a casualty described in this Section 33.02, the provisions of Article 15 will remain in force and effect for a period of three (3) years from the date of such termination.

33.03    Abatement.  Each Party's payment obligations shall abate following any Casualty, such abatement to expire on completion of restoration or reconstruction of the South Terminal with any period of abatement to be added to the Term.

## ARTICLE 34
## CONDEMNATION AND BUSINESS INTERRUPTION

34.01    Taking in Entirety.  If the entire Premises and/or the entire Tenant's Interest are Taken by any public or governmental body by right of eminent domain or otherwise, this Lease shall terminate as of the date the condemning authority takes possession.

34.02    Partial Taking.  If less than all of the Premises and/or Tenant's Interest (including a material right of use hereunder) is Taken by any Governmental Authority by right of eminent domain or otherwise, and in Tenant's reasonable judgment, the remainder lacks adequate area, location, configuration, improvements or other capacity or potential to use the Premises for their authorized uses, Tenant shall have the right to (a) terminate the Lease in its entirety, by giving Owner written notice within thirty (30) days after the date the condemning authority takes possession or (b) receive a damages award pursuant to Section 34.03 equal to the proportion of the Tenant's Interest that is impaired.  If Tenant does not terminate the Lease, the Lease shall continue in full force and effect as to the remainder of the Premises, but with a proportionate reduction in Rent commensurate with the portion taken.

34.03    Damage Award.  If the condemning authority is not the City, the Parties agree to apportion the damage award as follows: first, Tenant shall be entitled to receive compensation for the Fair Market Value of Tenant's Interest so taken, and Owner shall be

60

AUS ST 000430

entitled to receive compensation for the residual value of the real estate taken, and for any improvements to the Premises that are owned or paid for by Owner to the extent not constituting a part of Tenant's Interest. If the condemning authority is the City, Tenant shall be entitled to compensation for the Fair Market Value of Tenant's Interest so taken. Payment by the City of the compensation due Tenant hereunder, and Tenant's acceptance of such compensation, shall not constitute a waiver by Tenant of any other rights and remedies that it has under Section 29.02. In the event that the damage award is not apportioned in a manner that is consistent with this Section 34.03, then the Parties shall re-apportion such damage award so as to be so consistent. Each Party shall be responsible to bear all costs, and take all action necessary or appropriate to assert its respective interests in the condemnation action, including hiring its respective legal counsel, appraisers and other experts.

34.04    Definition of Taken; Taking. As used in this Article, "Taken" or "Taking" shall mean any taking of the Premises in or by condemnation or other eminent domain proceedings pursuant to any law, general or special, or by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceedings or by any other means, or any *de facto* condemnation. Tenant shall have no right to voluntarily devote or dedicate any portion of the Premises to public use without Owner's prior written consent.

34.05    Contingent Business Interruption. In the event that Tenant's access to the Premises or the portion of the Airport of which the Premises are a part is materially impaired at no fault of Tenant for a period exceeding forty-five (45) consecutive days, Owner agrees that the Rent shall be abated in the same proportion that Tenant's access to or use of the Premises is impaired, for the period from the date of impairment to the substantial restoration of access and use.

## ARTICLE 35
## ASSIGNMENT AND SUBLEASING

35.01    By Tenant.

(a)    Prior to the issuance of the Notice to Proceed, Tenant may not assign this Lease, other than to an Affiliate, without the prior written consent of Owner. After issuance of the Notice to Proceed, Tenant may not assign this Lease without Owner's prior written consent, which shall not be unreasonably denied or delayed if Tenant (i) is not at the time of assignment in default under this Lease and (ii) demonstrates to the reasonable satisfaction of Owner that the proposed assignee is a Qualified Entity capable of performing the obligations and covenants under this Lease. In the event of any permitted assignment, the transferor shall be relieved of all obligations of Tenant incurred under this Lease, and transferee shall be Tenant, after the effective date of such assignment, provided that the transferee agrees in writing to be bound by the provisions hereof. Any assignment that is not permitted by this Section 35.01(a) shall be void.

(b)    For the avoidance of doubt, Owner and Tenant recognize that Tenant plans to enter into subleases or other agreements with design and construction contractors, air carriers, concessionaires, ground handlers and other service providers for use or occupancy of the

61

AUS ST 000431

Premises.  The prior written consent of Owner to any such sublease or occupancy agreement shall not be required provided that such Tenant's sublease or occupancy agreement with each such subtenant or occupant is consistent with and references and incorporates this Lease by reference, and is consistent with Tenant's Concession Program or Airline Lease Program. Notwithstanding any sublease or occupancy agreement, unless otherwise agreed to by Owner, Tenant shall remain primarily liable under this Lease for all of its obligations hereunder.

        35.02    Transfer of Owner's Interest.

        (a)    Owner may freely transfer its interest in the Premises and under this Lease from time to time to any Government Authority which has comparable or greater financial resources, qualifications, experience and legal capacity and authority to perform the obligations of Owner under this Lease (a "Public Owner").

        (b)    In the event of any permitted transfer, the transferor shall be relieved of all obligations of Owner accruing under this Lease after the date such transfer is consummated provided that (i) any such transfer is expressly made subject to the terms, provisions and conditions of this Lease, and (ii) the transferee agrees in writing to be bound by the provisions hereof.  Tenant agrees to attorn to any such transferee.  Any transfer by Owner other than in accordance with this Section 35.02 shall be void.

### ARTICLE 36
### APPROVALS AND AUTHORITY

        36.01    Owner.  Owner represents, warrants and covenants that, as of the Effective Date (a) Owner is a home rule municipal corporation organized and existing under the laws of the state of Texas with full power and authority to enter into and be bound by this Lease; (b) the execution, delivery and performance of this Lease by Owner have been duly authorized by all required actions; (c) this Lease has been duly and validly executed and delivered by Owner, and constitutes the valid and binding obligation of Owner, enforceable against Owner in accordance with its terms, except as may be limited by governmental immunity under the Constitution and laws of the State of Texas, or applicable bankruptcy, insolvency or similar laws affecting creditor's rights; (d) no consent or approval of any third party is required in connection with the execution, delivery or performance by Owner of this Lease, except for such consents or approvals that are not required to be obtained as of the Effective Date and that will be obtained in due course; (e) neither the execution and delivery by Owner of this Lease, nor the consummation of the transactions contemplated hereby, is or at the time of execution will be in conflict with or will result in a default under or violation of any Applicable Law or any other agreement or instrument to which it is a Party or by which properties and assets may be bound or affected; (f) there is no action, suit, proceeding, investigation or litigation pending or threatened against Owner which challenges Owner's authority to execute, deliver or perform, or the validity or enforceability of, this Lease; and (g) Owner owns and has good, legal, valid and beneficial title to, or has all rights to use, the Premises, subject to rights, restrictions and encumbrances of record to the extent valid and in existence.

AUS ST 000432

36.02   Tenant.  Tenant represents, warrants and covenants that as of the Effective Date (a) Tenant is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, with full power and authority to enter into and be bound by its obligations under this Lease; (b) the execution, delivery and performance of this Lease by Tenant have been duly authorized by all requisite corporate action; (c) this Lease has been duly and validly executed and delivered by Tenant, and constitutes the valid and binding obligation of Tenant, enforceable against Tenant in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency or similar laws affecting creditor's rights; (d) no consent or approval of any third party is required in connection with the execution, delivery or performance by Tenant of this Lease, except for such consents or approvals that are not required to be obtained as of the Effective Date and that will be obtained in due course; (e) neither the execution and delivery by Tenant of this Lease, nor the consummation of the transactions contemplated hereby, is or at the time of execution will be in conflict with or will result in a default under or violation of any Applicable Law or any other agreement or instrument to which it is a Party or by which its properties and assets may be bound or affected; and (f) there is no action, suit, proceeding, investigation or litigation pending or threatened against Tenant which challenges Tenant's authority to execute, deliver or perform, or the validity or enforceability of, this Lease.

## ARTICLE 37
## NOTICES AND CONTRACT ADMINISTRATION

37.01   Contract Administrator.  The Department of Aviation Director of Facilities and Operations is Owner's designated representative for matters relating to the Rehabilitation Project and reactivation of the South Terminal.  The Department of Aviation Manager of Administration and Business Development is Owner's designated contract administrator for this Lease, and is authorized to act on behalf of the Director to organize, schedule and coordinate matters related to this Lease and the Premises, and to review and approve requests by Tenant under this Lease.  Owner may change its contract administrator by written notice to Tenant.

37.02   Notices.  Any notice provided for or permitted to be given hereunder must be in writing and may be given by (a) depositing same in the United States Mail, postage prepaid, registered or certified, with return receipt requested, addressed as set forth in this Article 37; (b) hand delivering the same to the Party to be notified; or (c) overnight courier of general use in the business community of Austin, Texas.  Notice given by United States Mail in accordance herewith shall be deemed delivered and effective on the earlier of actual receipt or three (3) calendar days next following deposit thereof in the United States Mail in accordance with the requirements above.  Notices to Owner shall be sent to:

AUS ST 000433

Executive Director
Department of Aviation
Austin-Bergstrom International Airport
3600 Presidential Blvd., Suite 411
Austin, Texas 78719

Telephone:     512-530-2242


Notices to Tenant shall be sent to:

Highstar Capital IV, L.P.
277 Park Avenue, 45th Floor
New York, New York 10172
Attention:      General Counsel

Telephone:     646-857-8000


The Parties hereto may from time to time change their respective addresses for purposes of notice hereunder by giving a notice in accordance with the provisions of this Section 37.02.

## ARTICLE 38
## CONFIDENTIALITY/PROPRIETARY INFORMATION

38.01   Confidentiality.   Certain information related to this Lease may be proprietary or confidential information, including financial reports, audits, key cost and revenue assumptions, including staff costs, non-staff costs, capital costs, interfaces with Airport systems, aeronautical and non-aeronautical revenue streams, any applicable taxes and charges and any other information that would have a material impact on the South Terminal's financial performance (collectively "Confidential Information").  Each Party agrees to label or mark its Confidential Information as confidential or proprietary.  Tenant further acknowledges that Owner is a political subdivision of the State of Texas, and as such is subject to the Texas Public Information Act.  To the extent permitted by Applicable Law, each Party agrees it shall not distribute or disclose any Confidential Information supplied to it by the other Party without the prior written consent of the other Party.  However, the foregoing sentence shall not preclude a Party from disclosing Confidential Information to its officials, officers, employees and representatives who have a need to know such information.   If a Party is requested or required (by oral question, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) to disclose any Confidential Information, it shall promptly notify the other Party in writing of such request or requirement so that the other Party may seek an appropriate protective order, opinion of the Attorney General of the State of Texas or other applicable authority, or waive compliance with provisions of this Agreement.  The Party seeking to assert the confidentiality of information shall, at its sole expense, prepare and submit all necessary information, briefs and/or legal memoranda to support its position with the appropriate authority.

AUS ST 000434

38.02   <u>Sensitive Security Information</u>.  Owner and Tenant also acknowledge that the Parties may be provided from time to time with "Sensitive Security Information" ("SSI"), as defined under 49 CFR Parts 15 and 1520, and Owner and Tenant agree to use and maintain such SSI as required by Applicable Law.

## ARTICLE 39
## BOND ORDINANCES

39.01   <u>Bond Ordinance Provisions</u>.  If and to the extent that the lien and other provisions of any Bond Ordinance are applicable to this Lease, this Lease and all rights granted to Tenant hereunder are expressly subject to the lien and provisions of the pledges, transfer, hypothecation or assignment made by Owner in any Bond Ordinance executed by Owner to issue Bonds.  Owner expressly reserves the right to make such pledges and grant such liens and enter into covenants as it may deem necessary or desirable to secure and provide for the payment of Bonds, including the creation of reserves therefor, provided that Owner shall not take any actions that would be inconsistent with the terms and conditions of this Lease, including the grant by Owner of any mortgage or other lien on the Premises that is superior to or on a parity with the leasehold granted to Tenant by this Lease.  Tenant understands that Owner is and will be the issuer of Bonds.  With respect to Bonds on which the interest is intended to be excludable from gross income for federal income tax purposes under the Internal Revenue Code of 1986 as amended or superseded, Tenant shall:

(a)   not use, without the prior written consent of Owner, any portion of the Premises for any purpose other than as an airport facility serving common passenger or freight carriers or charter carriers that serve members of the general public, and facilities functionally related and subordinate to such airport facility that are of a character and size commensurate with the character and size of such airport facility, including facilities that are directly related and essential to servicing aircraft or enabling aircraft to take off and land, or transferring passengers or cargo to or from aircraft, restaurants, retail stores and ground transportation and parking areas located on the Premises, but excluding any lodging facility or any retail business (including food and beverage facilities) in excess of a size necessary to serve passengers and employees at the South Terminal in accordance with Tenant's projections, any office building (excluding office space in the South Terminal for use by Tenant or its subtenants), any industrial park or manufacturing facility, any health club facility; any facility primarily used for gambling, or any store the principal business of which is the sale of alcoholic beverages for consumption off premises (excluding a "<u>duty free</u>" airport concession); and

(b)   immediately cease and desist from any action, other than as permitted in Section 39.01(a) above, with respect to the use of the Airport, to the extent such action is described in a written notice delivered by Owner as an action that, pursuant to the written advice of Owner's bond counsel or the Internal Revenue Service, may adversely affect the treatment of interest on any Bond as excludable from gross income for federal income tax purposes.

39.02   <u>Certificate in Connection with Issuance of Bonds</u>.  Tenant agrees that in connection with any issuance of Bonds by Owner, upon not less than twenty (20) days' prior written request by Owner, Tenant will deliver to Owner a statement in writing certifying:

AUS ST 000435

(a)     that this Lease is unmodified and in full force and effect (or if there have been modifications, a description of such modifications and that the Agreement as modified is in full force and effect);

(b)     to Tenant's knowledge, that Owner is not in default under any provision of this Lease, or if in default, the nature thereof in reasonable detail; and

(c)     such further matters as may be reasonably requested by Owner.

In each case, subject to Tenant's receipt of evidence reasonably satisfactory to it in respect of the truth and accuracy of such statements.

39.03   <u>Tenant Tax Elections</u>.  Tenant hereby elects and makes an irrevocable election not to claim depreciation or investment tax credit for purposes of federal income taxation with respect to property financed in whole or in part with proceeds of Bonds (which such election binds Tenant and all successors in interest under any lease). Tenant represents, covenants and agrees that it will not sublease, assign or otherwise transfer the leasehold interest in the Premises unless as a condition to the effectiveness of the subletting, transfer or assignment in question the sublessee or assignee shall agree, in writing, with Tenant (which agreement shall be binding upon the sublessee or assignee and shall be for the joint benefit of Tenant and the issuer) that the sublessee or assignee, as applicable, shall not claim depreciation or an investment tax credit with such property for purposes of federal income taxation.

## ARTICLE 40
## ALTERNATIVE DISPUTE RESOLUTION

40.01   <u>General</u>.  Should any dispute arise between the Parties to this Lease, (other than any dispute referred to in <u>Section 35.02</u>), then Owner and Tenant agree to negotiate prior to prosecuting a suit for damages.  However, this <u>Article 40</u> does not prohibit the filing of a lawsuit to toll the running of a statute of limitations or to seek injunctive relief. Either Party may make a written request for a meeting between representatives of each Party within ten (10) days after receipt of the request or such later period as agreed by the Parties.  Each Party shall include, at a minimum, one (1) senior level individual with decision-making authority regarding the dispute.  The purpose of such a meeting and any subsequent meeting with respect to such a dispute shall be to attempt in good faith to negotiate a resolution of the dispute.  If, within twenty (20) days after such meeting, the Parties have not succeeded in negotiating a resolution of the dispute, the Parties will, upon written notice of one Party to the other Party, given within ten (10) days following the expiration of such twenty (20) day period (a "<u>Request for Mediation</u>"), proceed directly to non-binding mediation as described below.

40.02   <u>Mediation</u>.  If the efforts to resolve such dispute through negotiation fail within the period set forth in <u>Section 40.01</u>, or Owner and Tenant each waive the negotiation process, the Parties may select, within twenty (20) days after the date of the Request for Mediation or mutual waiver of negotiation, as applicable, a mediator trained in mediation skills to assist with resolution of the dispute.  The Parties agree to act in good

AUS ST 000436

faith in the selection of the mediator and to give consideration to qualified individuals nominated to act as mediator. Nothing in this Lease prevents the Parties from relying on the skills of a person who is trained in the subject matter of the dispute or a contract interpretation expert. If the Parties fail to agree on a mediator within twenty (20) days of initiation of the mediation process, the mediator shall be selected by the Travis County Dispute Resolution Center. The mediation shall take place in Austin, Texas. The Parties agree to participate in mediation in good faith for up to thirty (30) days from the date of the first mediation session. The Parties shall share the costs of the mediator equally. In the absence of a separate written agreement of the Parties to the contrary, the results of this mediation shall not be binding on either of the Parties.

**ARTICLE 41**
**MISCELLANEOUS**

41.01   Gratuities.   The offering or giving of gratuities in the form of entertainment, gifts or otherwise by Tenant or any agent or representative of Tenant to any official or employee of Owner with a view toward securing favorable treatment with respect to the performance of this Lease is a material breach of this Lease, for which Owner may immediately terminate this Lease upon written notice, in the absence of remedial action reasonably satisfactory to Owner, in its sole discretion.

41.02   Modification and Non-Waiver.   No variations, modifications or changes to this Lease shall be binding unless in writing and executed by both Parties. No waiver by either Party of any breach or default of any term, condition or provision hereof, including the acceptance by Owner of any Rent or Tenant of Rental Car Revenue Share, at any time or in any manner other than as herein provided, shall be deemed a waiver of any other or subsequent breaches or defaults of any kind under any circumstance. No waiver of any breach or default of any term, condition or provision hereof shall be implied from any action of any Party, and any such waiver, to be effective, shall be set out in a written instrument signed by the waiving Party.

41.03   Governing Law.   This Lease shall be construed and enforced in accordance with the laws of the State of Texas, without regard to any conflicts-of-law principle that would apply the law of another jurisdiction. Venue for any action arising out of or concerning this Lease shall be proper and lie exclusively in the Austin Division of the United States District Court for the Western District of Texas.

41.04   Severability.   If any provision of this Lease or the application thereof to any or entity or circumstance shall, at any time or to any extent, be invalid or unenforceable, and the basis of the bargain between the Parties hereto is not destroyed or rendered ineffective thereby, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby.

41.05   Relation of Parties.   It is the intention of Owner and Tenant to hereby create the relationship of landlord and tenant and no other relationship is created. Nothing

67

AUS ST 000437

in this Lease is intended or shall be construed to make Owner and Tenant partners or joint venturers or to render either Party hereto liable for any obligation of the other.

41.06   Recordation.  Owner and Tenant will, at the request of the other, promptly execute a memorandum of lease in recordable form, which may be filed for record in the Office of the County Clerk of Travis County, Texas.  This Lease itself shall not be filed of record unless required by Applicable Law.

41.07   Successors and Assigns.  This Lease shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns. Whenever a reference is made herein to either Party, such reference shall include the Party's successors and permitted assigns.

41.08   Survival.  Any terms and provisions of this Lease pertaining to rights, duties or liabilities extending beyond the expiration or termination of this Lease shall survive the end of the Term.

41.09   No Commissions.  Owner and Tenant represent and warrant to one another that there are no broker's, finder's or similar fees payable in connection with this Lease transaction.

41.10   Time of the Essence.  Time is of the essence in this Lease and in each and all of the provisions hereof.

41.11   Reservation of Immunities.  To the extent permitted by Applicable Law, Owner waives its rights to assert sovereign or governmental immunity from suit or liability for contract claims asserted by Tenant seeking only the remedies set forth in Section 29.02 of this Lease.  Except as provided in the preceding sentence, Owner does not waive, and expressly reserves, all immunities existing under Applicable Law available to Owner as a Texas home-rule municipal corporation.  It is expressly agreed and understood that the foregoing waiver is a limited and not a general waiver, and that its effect is limited to specific contract claims under this Lease.

41.12   Special Damages.  Each Party hereby waives all rights to recover consequential, incidental, exemplary or punitive damages from the other Party, including under Article 23 hereof.

41.13   Avoidance of Obligations.  Each Party covenants and agrees that it shall not take any action or omit to take any action the primary purpose of which is to avoid honoring any of its commitments and obligations under this Lease.

41.14   No Exclusive Rights.  Except for the specific rights provided for in Article 15, no provision of this Lease is intended or shall be construed as the grant of an exclusive right by Owner for the design, construction, or operation of a terminal at the Airport, other than the South Terminal.

41.15   Capacity of Owner.  Owner is executing this Lease solely in its capacity as the owner of the Premises and not in its capacity as a regulatory body, and Owner does not

68

AUS ST 000438

waive any obligation of Tenant to comply with any law or regulation of Owner, provided that this Section 41.15 does not modify, in any respect, Owner's obligations and Tenant's rights under Section 41.13.

    41.16   Counterparts. This Lease may be executed in any number of counterparts and by different Parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same instrument. The Parties shall accept executed counterparts delivered by facsimile transmission or electronic mail as of equal effect as original signatures. Each Party shall deliver its signed original counterpart to the other Party within three (3) business days.

    41.17   Entire Agreement.

    (a)   This Lease, together with its exhibits and attachments, contains the entire understanding and agreement between the Parties hereto with respect to the subject matter of this Lease. It is the intent of the both Parties that all provisions be construed in a manner that is fair to both Parties; interpreting no provision more strictly against one Party than the other. It is further understood and agreed that neither Party has made any representations or promises with respect to this Lease, except as expressly set forth herein, and that no claim or liability or cause for termination shall be asserted by either Party against the other Party, and a Party shall not be liable to the other Party by reason of the breach of any representations or promises not expressly stated in this Lease. Owner and Tenant are the only parties to this Lease and as such are the only parties to enforce its terms. Nothing in this Lease gives, or shall be construed to give or provide, any benefit, direct or indirect, to third parties unless a third party is expressly described as an intended beneficiary of its terms. The Parties hereto acknowledge that they have thoroughly read this Lease, including any exhibits hereto, and have sought and received whatever advice needed for them to form a full and complete understanding of all rights and obligations herein. If any provision of an exhibit conflicts with a provision of the Lease, the provision in the Lease shall control.

    (b)   The exhibits to this Lease are as follows:

| | |
|---|---|
| **Exhibit A** | Premises |
| **Exhibit B** | Tenant's Rehabilitation Responsibilities |
| **Exhibit C** | Design Review Procedures |
| **Exhibit D** | Airport Shared Telephone System Terms of Usage |
| **Exhibit E** | Insurance Requirements |
| **Exhibit F** | MWBE Goals |
| **Exhibit G** | Airport's Operator's Wireless Policy |
| **Exhibit H** | Owner's Tenant Radio Installation Guidelines |

69

AUS ST 000439

**Exhibit I**     Environmental Questionnaire

**Exhibit J**     Baseline Site Assessment

**Exhibit K**     Airport Layout Plan

AUS ST 000440

**IN WITNESS WHEREOF**, Owner and Tenant have executed this Lease through their duly authorized representatives to be effective as of March 24, 2016.

**OWNER:**                                  **CITY OF AUSTIN**

_____      By:_____

Approved as to form                         Name:_____

Assistant City Attorney                      Title:  Executive Director of Aviation

**TENANT:**                                 **HIGHSTAR CAPITAL IV, L.P.**

                                            By:     _____
                                            Name:   _____
                                            Title:  Authorized Signatory

                                            By:     _____
                                            Name:   _____
                                            Title:  Authorized Signatory

Signature Page to Lease Agreement

AUS ST 000441

**IN WITNESS WHEREOF**, Owner and Tenant have executed this Lease through their duly authorized representatives to be effective as of March 24, 2016.

**OWNER:**                                      **CITY OF AUSTIN**

_____               By: _____

Approved as to form                     Name: _J. SMITH_____

Assistant City Attorney                 Title:  Executive Director of Aviation

**TENANT:**                                     **HIGHSTAR CAPITAL IV, L.P.**

                                        By:   _____
                                        Name: _____
                                        Title:  Authorized Signatory

                                        By:   _____
                                        Name: _____
                                        Title:  Authorized Signatory

AUS ST 000442

**IN WITNESS WHEREOF**, Owner and Tenant have executed this Lease through their duly authorized representatives to be effective as of March 24, 2016.

**OWNER:**                                    **CITY OF AUSTIN**

_____        By:_____

Approved as to form                          Name:_____

Assistant City Attorney                      Title:   Executive Director of Aviation

**TENANT:**                                  **HIGHSTAR CAPITAL IV, L.P.**

By:_____
Name:  ~~BRETT TALBOT~~
Title:   Authorized Signatory

By:_____
Name:  ~~EMMETT MCCANN~~
Title:   Authorized Signatory

**Signature Page to Lease Agreement**

83

AUS ST 000443

# EXHIBIT A
Premises

AUS ST 000444

**EXHIBIT B**
Tenant's Rehabilitation Responsibilities

AUS ST 000445

**EXHIBIT C**
Design Review Procedures

AUS ST 000446

**EXHIBIT D**
Airport Shared Telephone System Terms of Usage

AUS ST 000447

**EXHIBIT E**
Lease – Insurance Requirements

AUS ST 000448

**EXHIBIT F**
MWBE Goals

AUS ST 000449

**EXHIBIT G**
Airport's Operator's Wireless Policy

AUS ST 000450

**EXHIBIT H**
Owner's Tenant Radio Installation Guidelines

AUS ST 000451

**EXHIBIT I**
Environmental Questionnaire

AUS ST 000452

**EXHIBIT J**
Baseline Site Assessment

AUS ST 000453

**EXHIBIT K**
Airport Layout Plan

AUS ST 000454



EXHIBIT 'A'
~ AREA WITHIN LEASE BOUNDARY ~
22.66 ACRES
987,129.31 S.F.

03 / 23 / 2016

AUS SOUTH TERMINAL RENOVATION
OVERALL LEASE BOUNDARY EXHIBIT



**AMENDMENT NO. ONE TO THE SOUTH TERMINAL LEASE
AND CONCESSION AGREEMENT BY AND BETWEEN THE
CITY OF AUSTIN AND LONESTAR AIRPORT HOLDINGS, LLC.**

**THIS FIRST AMENDMENT** ("First Amendment") to the South Terminal Lease and Concession Agreement is made and entered into as of the date specified on the signature page by and between the City of Austin, a Texas home rule city and municipal corporation, acting by and through its Executive Director of Aviation (the "City") and LoneStar Airport Holdings, LLC, a Delaware Limited Liability Company (the "LoneStar").

## RECITALS

1. City and Highstar Capital IV, L.P. ("Highstar") entered into the South Terminal Lease and Concession Agreement at Austin- Bergstrom International Airport (the "Airport"), dated March 24, 2016 (the "Lease").
2. Highstar assigned the Lease and all of its interest therein to Lonestar with the consent of City.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties agree as follows:

## AGREEMENT

1. The Lease is amended as follows:

   a. Exhibit A-1.2 hereto is added as an Exhibit to the Lease;

   b. The definition of Premises set forth in section 1.01 of the Lease is revised to add Item C –Parking Lot (65,190 sq. ft.) and Item D – Parking Lot (42,830 sq. ft.) thereto; and

   c. Notwithstanding the inclusion of the two parking lots in the Premises definition, Lone Star shall pay as Additional Rent for the added square footage (108,020 sq. ft.) at a rate of $.30 per sq. ft. per annum. Said Additional Rent payment shall be due with the Fixed Rent payment on the first of each month. During the Term, the added parking lot rates will be adjusted every 5 years based on the CPI with the revised rate going into effect starting in the month of July of each fifth anniversary year of this Amendment.

2. The Term of this First Amendment and the Lease shall be coterminous. Except as expressly amended by this First Amendment, the Lease shall remain unchanged, and in full force and effect in accordance with its terms. The recitals are incorporated into the Lease. Terms defined in the Lease are used consistently in the First Amendment. If a conflict exists between the First Amendment and the Lease, the terms of the First Amendment shall prevail.

[SIGNATURES ON NEXT PAGE]

Page **1** of **3**

AUS ST 000456

**IN WITNESS WHEREOF,** this First Amendment has been executed by the parties through their duly authorized representatives in Austin, Texas on June 17, 2019, to be effective on July 1, 2019.



CITY OF AUSTIN

LONESTAR AIRPORT HOLDINGS, LLC.

*Jeff Pearse*

Jacqueline Yaft Executive Director
Department of Aviation

**Jeff Pearse, Chief Executive Officer
LoneStar Airport Holdings, LLC**

APPROVED AS TO FORM:

Shelby C. Reed
Assistant City Attorney

Page **2** of **4**

97

AUS ST 000457

**IN WITNESS WHEREOF,** this First Amendment has been executed by the parties through their duly authorized representatives in Austin, Texas on _____ 2019, to be effective on _____, 2019.

CITY OF AUSTIN                                LONESTAR AIRPORT HOLDINGS, LLC.


_____              _____
Jacqueline Yaft
Executive Director
Department of Aviation


APPROVED AS TO FORM:

_____
Shelby C. Reed
Assistant City Attorney


Page 2 of 3

AUS ST 000458

# EXHIBIT A 1.2



Page **4** of **4**

99

AUS ST 000459

*Allen, Williford & Seale, Inc.*

## TAX RECORDS

AUS ST 000460

**This is NOT a Tax Statement**

## 2021 Notice Of Appraised Value

**Do Not Pay From This Notice**

TRAVIS CENTRAL APPRAISAL DISTRICT
850 E ANDERSON LANE
P O BOX 149012
AUSTIN, TX 78714-9012

Phone: (512) 834-9138
DATE OF NOTICE: June 4, 2021

Property ID: 903359
Ref ID2: 00009033590000
DBA: SOUTH TERMINAL THE
Legal: PERSONAL PROPERTY COMMERCIAL SOUTH
     TERMINAL THE

Situs: 10000 LOGISTICS LN  AUSTIN,
     TX 78719
Owner ID: 1752807

LONESTAR AIRPORT HOLDINGS LLC
SOUTH TERMINAL THE
ATTN BROOKE DORRIEN
10000 LOGISTICS LN
AUSTIN, TX 78719-9812

### THIS IS NOT A BILL

Dear Property Owner,
    We have appraised the property listed above for the tax year 2021.  As of January 1, our appraisal is outlined below:

| Market Value | Assessed Value (Includes Homestead Limitation if Applicable) |
|---|---|
| 581,117 | 581,117 |

| Taxing Unit | Exemptions | 2020 Exemption Amount | 2021 Exemption Amount | Exemption Amount Change | 2020 Taxable | 2021 Taxable | Freeze Year and Ceiling |
|---|---|---|---|---|---|---|---|
| **CITY OF AUSTIN** | | 0 | 0 | 0 | 655,367 | 581,117 | |
| | Total | 0 | 0 | 0 | | | |
| **TRAVIS COUNTY** | | 0 | 0 | 0 | 655,367 | 581,117 | |
| | Total | 0 | 0 | 0 | | | |
| **DEL VALLE ISD** | | 0 | 0 | 0 | 655,367 | 581,117 | |
| | Total | 0 | 0 | 0 | | | |
| **TRAVIS COUNTY HEALTHCAR** | | 0 | 0 | 0 | 655,367 | 581,117 | |
| | Total | 0 | 0 | 0 | | | |
| **AUSTIN COMM COLL DIST** | | 0 | 0 | 0 | 655,367 | 581,117 | |
| | Total | 0 | 0 | 0 | | | |

If you qualified your home for a 65 and older or disabled person exemption for school taxes, the school taxes on that home cannot increase as long as you own and live in that home. The tax ceiling is the amount that you pay in the year that you qualified for the 65 and older or disabled person exemption. The school taxes on your home may not go above the amount of the ceiling, unless you improve the home (other than normal repairs and maintenance).

Enclosed are copies of the following documents published by the Texas Comptroller of Public Accounts: (1) Property Tax Remedies; and (2) notice of protest.

AUS ST 000461

The chart below is the 2020 Taxpayer Impact Statement based on the Effective, Rollback and Adopted tax rates set by each taxing unit.

**Effective Tax Rate-** A calculated rate that would provide the taxing unit with approximately the same amount of revenue it received in the previous year on properties taxed in both years. This rate calculation does not include the impact of additional tax revenue resulting from new construction.

**Rollback Tax Rate-** Tax rate level that allows the taxing jurisdiction to collect 8% more taxes, not including debt repayment, than the previous year.  This is the maximum tax increase allowed by law without triggering an election to "rollback" the taxes.

**Adopted Tax Rate-** This is the tax rate that was adopted by the taxing unit for 2020.

| 2020 Taxpayer Impact Statement | | | | | | | |
|---|---|---|---|---|---|---|---|
| Taxing Unit | 2020 Taxable Value | 2020 Effective Rate | 2020 Effective Taxes | 2020 Rollback Rate | 2020 Rollback Taxes | 2020 Adopted Rate | 2020 Adopted (Actual) Taxes |
| CITY OF AUSTIN | 655,367 | 0.4284 | 2,807.59 | 0.4460 | 2,922.94 | 0.5335 | 3,496.38 |
| TRAVIS COUNTY | 655,367 | 0.3579 | 2,345.81 | 0.3878 | 2,541.53 | 0.3744 | 2,453.43 |
| DEL VALLE ISD | 655,367 | 1.2621 | 8,271.39 | 1.2570 | 8,237.96 | 1.2570 | 8,237.96 |
| TRAVIS COUNTY HEALTH | 655,367 | 0.1023 | 670.25 | 0.1114 | 730.31 | 0.1103 | 722.91 |
| AUSTIN COMM COLL DIS | 655,367 | 0.1017 | 666.51 | 0.1105 | 724.18 | 0.1058 | 693.38 |

The chart below is an estimate of taxes based on 2021 taxable value and the 2020 adopted tax rate.  This is **NOT** the 2021 effective tax rate. If property values rise, the effective rate will go down and vice versa.

| Taxing Unit | 2021 Taxable Value | 2020 Adopted Tax Rate | Estimate (See below) |
|---|---|---|---|
| CITY OF AUSTIN | 581,117 | 0.5335 | 3,100.26 |
| TRAVIS COUNTY | 581,117 | 0.3744 | 2,175.46 |
| DEL VALLE ISD | 581,117 | 1.2570 | 7,304.64 |
| TRAVIS COUNTY HEALTH | 581,117 | 0.1103 | 641.01 |
| AUSTIN COMM COLL DIS | 581,117 | 0.1058 | 614.82 |

***"The Texas Legislature does not set the tax amount of your local taxes. Your property tax burden is decided by your locally elected officials, and all inquiries concerning your taxes should be directed to those officials."***
**The appraisal district only determines the value of the property. If taxing unit budgets increase then a tax rate higher than the effective rate may be adopted by the taxing unit. The governing body of each taxing unit decides whether or not taxes on property will increase.**

Truth-in-Taxation laws give taxpayers a voice in decisions that affect their property tax rates.  Beginning in early August, taxing units take the first step toward adopting a tax rate by calculating and publishing the effective and rollback tax rates.  If a governing body proposes to adopt a tax rate that exceeds the effective rate, it must publish a quarter-page notice in a local newspaper to announce two public hearings.  The hearings give taxpayers an opportunity to voice their opinions about the proposed tax increase.

**Information on taxing unit contacts, exemptions and tax rates is available on the appraisal district website at: http://www.traviscad.org/taxinfo.html**

| Appraisal Information | Last Year - 2020 | Proposed - 2021 |
|---|---|---|
| Market Value of Building & Other Structures | 0 | 0 |
| Market Value of Non Ag/Timber Land | 0 | 0 |
| Market Value of Ag/Timber Land | 0 | 0 |
| Market Value of Personal Property/Minerals | 655,367 | 581,117 |
| Total Market Value | 655,367 | 581,117 |
| Productivity Value of Ag/Timber Land | 0 | 0 |
| Assessed Value | 655,367 | 581,117 |
| Homestead Cap Value excluding Non-Homesite Value (i.e. Ag, Commercial) | 0 | 0 |
| Exemptions (DV - Disabled Vet; DP - Disabled Person; HS- Homestead; OV65 - Over 65) | | |

If you have any questions or need more information, please contact the appraisal district at (512) 834-9138.

AUS ST 000462

*Allen, Williford & Seale, Inc.*

## PRESENT VALUE TABLES FOR INCOME APPROACH

## Present Value Table for South Terminal Initial Leasehold

| Inputs | |
|---|---|
| CPI/ Rent Increase Annual | 3.5% |
| Discount Rate | 8.5% |
| Lease Area | 987,129 SF |

| Leasehold Value | $1,142,212 |
|---|---|

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| **Leasehold – Initial Lease** | | | | | | | | | |
| Lease Yr. | Val. Yr. | Date | Month | Contract Rent/SF | Market Rent/SF | Surplus/ Difference | Monthly Amount | PV Factor | Present Value |
| | | 3/1/2022 | 1 | $ 0.33 | $ 0.40 | $ 0.07 | $5,349.92 | 1.000000 | $5,350 |
| | | 4/1/2022 | 2 | $ 0.33 | $ 0.40 | $ 0.07 | $5,349.92 | 0.992966 | $5,312 |
| | | 5/1/2022 | 3 | $ 0.33 | $ 0.40 | $ 0.07 | $5,349.92 | 0.985982 | $5,275 |
| 6 | | 6/1/2022 | 4 | $ 0.33 | $ 0.40 | $ 0.07 | $5,349.92 | 0.979048 | $5,238 |
| | | 7/1/2022 | 5 | $ 0.33 | $ 0.40 | $ 0.07 | $5,349.92 | 0.972161 | $5,201 |
| | 1 | 8/1/2022 | 6 | $ 0.33 | $ 0.40 | $ 0.07 | $5,349.92 | 0.965324 | $5,164 |
| | | 9/1/2022 | 7 | $ 0.33 | $ 0.40 | $ 0.07 | $5,349.92 | 0.958534 | $5,128 |
| | | 10/1/2022 | 8 | $ 0.33 | $ 0.40 | $ 0.07 | $5,349.92 | 0.951792 | $5,092 |
| | | 11/1/2022 | 9 | $ 0.35 | $ 0.41 | $ 0.06 | $4,935.65 | 0.945098 | $4,665 |
| | | 12/1/2022 | 10 | $ 0.35 | $ 0.41 | $ 0.06 | $4,935.65 | 0.938450 | $4,632 |
| | | 1/1/2023 | 11 | $ 0.35 | $ 0.41 | $ 0.06 | $4,935.65 | 0.931850 | $4,599 |
| | | 2/1/2023 | 12 | $ 0.35 | $ 0.41 | $ 0.06 | $4,935.65 | 0.925296 | $4,567 |
| 7 | | 3/1/2023 | 13 | $ 0.35 | $ 0.41 | $ 0.06 | $4,935.65 | 0.918788 | $4,535 |
| | | 4/1/2023 | 14 | $ 0.35 | $ 0.41 | $ 0.06 | $4,935.65 | 0.912325 | $4,503 |
| | | 5/1/2023 | 15 | $ 0.35 | $ 0.41 | $ 0.06 | $4,935.65 | 0.905908 | $4,471 |
| | | 6/1/2023 | 16 | $ 0.35 | $ 0.41 | $ 0.06 | $4,935.65 | 0.899537 | $4,440 |
| | | 7/1/2023 | 17 | $ 0.35 | $ 0.41 | $ 0.06 | $4,935.65 | 0.893210 | $4,409 |
| | 2 | 8/1/2023 | 18 | $ 0.35 | $ 0.41 | $ 0.06 | $4,935.65 | 0.886927 | $4,378 |
| | | 9/1/2023 | 19 | $ 0.35 | $ 0.41 | $ 0.06 | $4,935.65 | 0.880689 | $4,347 |
| | | 10/1/2023 | 20 | $ 0.35 | $ 0.41 | $ 0.06 | $4,935.65 | 0.874495 | $4,316 |
| | | 11/1/2023 | 21 | $ 0.36 | $ 0.42 | $ 0.06 | $4,935.65 | 0.868344 | $4,286 |
| | | 12/1/2023 | 22 | $ 0.36 | $ 0.42 | $ 0.06 | $4,935.65 | 0.862237 | $4,256 |
| | | 1/1/2024 | 23 | $ 0.36 | $ 0.42 | $ 0.06 | $4,935.65 | 0.856172 | $4,226 |
| | | 2/1/2024 | 24 | $ 0.36 | $ 0.42 | $ 0.06 | $4,935.65 | 0.850150 | $4,196 |
| 8 | | 3/1/2024 | 25 | $ 0.36 | $ 0.42 | $ 0.06 | $4,935.65 | 0.844171 | $4,167 |
| | | 4/1/2024 | 26 | $ 0.36 | $ 0.42 | $ 0.06 | $4,935.65 | 0.838233 | $4,137 |
| | | 5/1/2024 | 27 | $ 0.36 | $ 0.42 | $ 0.06 | $4,935.65 | 0.832337 | $4,108 |
| | | 6/1/2024 | 28 | $ 0.36 | $ 0.42 | $ 0.06 | $4,935.65 | 0.826483 | $4,079 |
| | | 7/1/2024 | 29 | $ 0.36 | $ 0.42 | $ 0.06 | $4,935.65 | 0.820670 | $4,051 |
| | 3 | 8/1/2024 | 30 | $ 0.36 | $ 0.42 | $ 0.06 | $4,935.65 | 0.814898 | $4,022 |
| | | 9/1/2024 | 31 | $ 0.36 | $ 0.42 | $ 0.06 | $4,935.65 | 0.809166 | $3,994 |
| | | 10/1/2024 | 32 | $ 0.36 | $ 0.42 | $ 0.06 | $4,935.65 | 0.803475 | $3,966 |
| | | 11/1/2024 | 33 | $ 0.37 | $ 0.43 | $ 0.06 | $4,935.65 | 0.797824 | $3,938 |
| | | 12/1/2024 | 34 | $ 0.37 | $ 0.43 | $ 0.06 | $4,935.65 | 0.792212 | $3,910 |

AUS ST 000464

| Lease Yr. | Val. Yr. | Date | Month | Contract Rent/SF | Market Rent/SF | Surplus/ Difference | Monthly Amount | PV Factor | Present Value |
|---|---|---|---|---|---|---|---|---|---|
| 9 | | 1/1/2025 | 35 | $ 0.37 | $ 0.43 | $ 0.06 | $4,935.65 | 0.786640 | $3,883 |
| | | 2/1/2025 | 36 | $ 0.37 | $ 0.43 | $ 0.06 | $4,935.65 | 0.781107 | $3,855 |
| | 4 | 3/1/2025 | 37 | $ 0.37 | $ 0.43 | $ 0.06 | $4,935.65 | 0.775613 | $3,828 |
| | | 4/1/2025 | 38 | $ 0.37 | $ 0.43 | $ 0.06 | $4,935.65 | 0.770158 | $3,801 |
| | | 5/1/2025 | 39 | $ 0.37 | $ 0.43 | $ 0.06 | $4,935.65 | 0.764741 | $3,774 |
| | | 6/1/2025 | 40 | $ 0.37 | $ 0.43 | $ 0.06 | $4,935.65 | 0.759362 | $3,748 |
| | | 7/1/2025 | 41 | $ 0.37 | $ 0.43 | $ 0.06 | $4,935.65 | 0.754021 | $3,722 |
| | | 8/1/2025 | 42 | $ 0.37 | $ 0.43 | $ 0.06 | $4,935.65 | 0.748718 | $3,695 |
| | | 9/1/2025 | 43 | $ 0.37 | $ 0.43 | $ 0.06 | $4,935.65 | 0.743452 | $3,669 |
| | | 10/1/2025 | 44 | $ 0.37 | $ 0.43 | $ 0.06 | $4,935.65 | 0.738223 | $3,644 |
| 10 | | 11/1/2025 | 45 | $ 0.38 | $ 0.45 | $ 0.07 | $5,758.25 | 0.733030 | $4,221 |
| | | 12/1/2025 | 46 | $ 0.38 | $ 0.45 | $ 0.07 | $5,758.25 | 0.727875 | $4,191 |
| | | 1/1/2026 | 47 | $ 0.38 | $ 0.45 | $ 0.07 | $5,758.25 | 0.722755 | $4,162 |
| | | 2/1/2026 | 48 | $ 0.38 | $ 0.45 | $ 0.07 | $5,758.25 | 0.717672 | $4,133 |
| | 5 | 3/1/2026 | 49 | $ 0.38 | $ 0.45 | $ 0.07 | $5,758.25 | 0.712624 | $4,103 |
| | | 4/1/2026 | 50 | $ 0.38 | $ 0.45 | $ 0.07 | $5,758.25 | 0.707612 | $4,075 |
| | | 5/1/2026 | 51 | $ 0.38 | $ 0.45 | $ 0.07 | $5,758.25 | 0.702635 | $4,046 |
| | | 6/1/2026 | 52 | $ 0.38 | $ 0.45 | $ 0.07 | $5,758.25 | 0.697693 | $4,017 |
| | | 7/1/2026 | 53 | $ 0.38 | $ 0.45 | $ 0.07 | $5,758.25 | 0.692785 | $3,989 |
| | | 8/1/2026 | 54 | $ 0.38 | $ 0.45 | $ 0.07 | $5,758.25 | 0.687913 | $3,961 |
| | | 9/1/2026 | 55 | $ 0.38 | $ 0.45 | $ 0.07 | $5,758.25 | 0.683074 | $3,933 |
| | | 10/1/2026 | 56 | $ 0.38 | $ 0.45 | $ 0.07 | $5,758.25 | 0.678270 | $3,906 |
| 11 | | 11/1/2026 | 57 | $ 0.39 | $ 0.47 | $ 0.08 | $6,580.86 | 0.673499 | $4,432 |
| | | 12/1/2026 | 58 | $ 0.39 | $ 0.47 | $ 0.08 | $6,580.86 | 0.668762 | $4,401 |
| | | 1/1/2027 | 59 | $ 0.39 | $ 0.47 | $ 0.08 | $6,580.86 | 0.664058 | $4,370 |
| | | 2/1/2027 | 60 | $ 0.39 | $ 0.47 | $ 0.08 | $6,580.86 | 0.659388 | $4,339 |
| | 6 | 3/1/2027 | 61 | $ 0.39 | $ 0.47 | $ 0.08 | $6,580.86 | 0.654750 | $4,309 |
| | | 4/1/2027 | 62 | $ 0.39 | $ 0.47 | $ 0.08 | $6,580.86 | 0.650145 | $4,279 |
| | | 5/1/2027 | 63 | $ 0.39 | $ 0.47 | $ 0.08 | $6,580.86 | 0.645572 | $4,248 |
| | | 6/1/2027 | 64 | $ 0.39 | $ 0.47 | $ 0.08 | $6,580.86 | 0.641031 | $4,219 |
| | | 7/1/2027 | 65 | $ 0.39 | $ 0.47 | $ 0.08 | $6,580.86 | 0.636523 | $4,189 |
| | | 8/1/2027 | 66 | $ 0.39 | $ 0.47 | $ 0.08 | $6,580.86 | 0.632046 | $4,159 |
| | | 9/1/2027 | 67 | $ 0.39 | $ 0.47 | $ 0.08 | $6,580.86 | 0.627600 | $4,130 |
| | | 10/1/2027 | 68 | $ 0.39 | $ 0.47 | $ 0.08 | $6,580.86 | 0.623186 | $4,101 |
| 12 | | 11/1/2027 | 69 | $ 0.40 | $ 0.49 | $ 0.09 | $7,403.47 | 0.618803 | $4,581 |
| | | 12/1/2027 | 70 | $ 0.40 | $ 0.49 | $ 0.09 | $7,403.47 | 0.614450 | $4,549 |
| | | 1/1/2028 | 71 | $ 0.40 | $ 0.49 | $ 0.09 | $7,403.47 | 0.610129 | $4,517 |
| | | 2/1/2028 | 72 | $ 0.40 | $ 0.49 | $ 0.09 | $7,403.47 | 0.605837 | $4,485 |
| | 7 | 3/1/2028 | 73 | $ 0.40 | $ 0.49 | $ 0.09 | $7,403.47 | 0.601576 | $4,454 |
| | | 4/1/2028 | 74 | $ 0.40 | $ 0.49 | $ 0.09 | $7,403.47 | 0.597345 | $4,422 |
| | | 5/1/2028 | 75 | $ 0.40 | $ 0.49 | $ 0.09 | $7,403.47 | 0.593143 | $4,391 |
| | | 6/1/2028 | 76 | $ 0.40 | $ 0.49 | $ 0.09 | $7,403.47 | 0.588972 | $4,360 |
| | | 7/1/2028 | 77 | $ 0.40 | $ 0.49 | $ 0.09 | $7,403.47 | 0.584829 | $4,330 |
| | | 8/1/2028 | 78 | $ 0.40 | $ 0.49 | $ 0.09 | $7,403.47 | 0.580716 | $4,299 |
| | | 9/1/2028 | 79 | $ 0.40 | $ 0.49 | $ 0.09 | $7,403.47 | 0.576631 | $4,269 |

AUS ST 000465

| Lease Yr. | Val. Yr. | Date | Month | Contract Rent/SF | Market Rent/SF | Surplus/ Difference | Monthly Amount | PV Factor | Present Value |
|---|---|---|---|---|---|---|---|---|---|
|  |  | 10/1/2028 | 80 | $ 0.40 | $ 0.49 | $ 0.09 | $7,403.47 | 0.572575 | $4,239 |
|  |  | 11/1/2028 | 81 | $ 0.41 | $ 0.51 | $ 0.10 | $8,226.08 | 0.568548 | $4,677 |
|  |  | 12/1/2028 | 82 | $ 0.41 | $ 0.51 | $ 0.10 | $8,226.08 | 0.564549 | $4,644 |
|  |  | 1/1/2029 | 83 | $ 0.41 | $ 0.51 | $ 0.10 | $8,226.08 | 0.560579 | $4,611 |
|  |  | 2/1/2029 | 84 | $ 0.41 | $ 0.51 | $ 0.10 | $8,226.08 | 0.556636 | $4,579 |
| 13 |  | 3/1/2029 | 85 | $ 0.41 | $ 0.51 | $ 0.10 | $8,226.08 | 0.552721 | $4,547 |
|  |  | 4/1/2029 | 86 | $ 0.41 | $ 0.51 | $ 0.10 | $8,226.08 | 0.548833 | $4,515 |
|  |  | 5/1/2029 | 87 | $ 0.41 | $ 0.51 | $ 0.10 | $8,226.08 | 0.544973 | $4,483 |
|  |  | 6/1/2029 | 88 | $ 0.41 | $ 0.51 | $ 0.10 | $8,226.08 | 0.541140 | $4,451 |
|  |  | 7/1/2029 | 89 | $ 0.41 | $ 0.51 | $ 0.10 | $8,226.08 | 0.537334 | $4,420 |
|  | 8 | 8/1/2029 | 90 | $ 0.41 | $ 0.51 | $ 0.10 | $8,226.08 | 0.533554 | $4,389 |
|  |  | 9/1/2029 | 91 | $ 0.41 | $ 0.51 | $ 0.10 | $8,226.08 | 0.529802 | $4,358 |
|  |  | 10/1/2029 | 92 | $ 0.41 | $ 0.51 | $ 0.10 | $8,226.08 | 0.526075 | $4,328 |
|  |  | 11/1/2029 | 93 | $ 0.42 | $ 0.53 | $ 0.11 | $9,048.68 | 0.522375 | $4,727 |
|  |  | 12/1/2029 | 94 | $ 0.42 | $ 0.53 | $ 0.11 | $9,048.68 | 0.518701 | $4,694 |
|  |  | 1/1/2030 | 95 | $ 0.42 | $ 0.53 | $ 0.11 | $9,048.68 | 0.515053 | $4,661 |
|  |  | 2/1/2030 | 96 | $ 0.42 | $ 0.53 | $ 0.11 | $9,048.68 | 0.511430 | $4,628 |
| 14 |  | 3/1/2030 | 97 | $ 0.42 | $ 0.53 | $ 0.11 | $9,048.68 | 0.507833 | $4,595 |
|  |  | 4/1/2030 | 98 | $ 0.42 | $ 0.53 | $ 0.11 | $9,048.68 | 0.504261 | $4,563 |
|  |  | 5/1/2030 | 99 | $ 0.42 | $ 0.53 | $ 0.11 | $9,048.68 | 0.500714 | $4,531 |
|  |  | 6/1/2030 | 100 | $ 0.42 | $ 0.53 | $ 0.11 | $9,048.68 | 0.497192 | $4,499 |
|  |  | 7/1/2030 | 101 | $ 0.42 | $ 0.53 | $ 0.11 | $9,048.68 | 0.493695 | $4,467 |
|  | 9 | 8/1/2030 | 102 | $ 0.42 | $ 0.53 | $ 0.11 | $9,048.68 | 0.490223 | $4,436 |
|  |  | 9/1/2030 | 103 | $ 0.42 | $ 0.53 | $ 0.11 | $9,048.68 | 0.486775 | $4,405 |
|  |  | 10/1/2030 | 104 | $ 0.42 | $ 0.53 | $ 0.11 | $9,048.68 | 0.483351 | $4,374 |
|  |  | 11/1/2030 | 105 | $ 0.43 | $ 0.55 | $ 0.12 | $9,871.29 | 0.479952 | $4,738 |
|  |  | 12/1/2030 | 106 | $ 0.43 | $ 0.55 | $ 0.12 | $9,871.29 | 0.476576 | $4,704 |
|  |  | 1/1/2031 | 107 | $ 0.43 | $ 0.55 | $ 0.12 | $9,871.29 | 0.473224 | $4,671 |
|  |  | 2/1/2031 | 108 | $ 0.43 | $ 0.55 | $ 0.12 | $9,871.29 | 0.469895 | $4,638 |
| 15 |  | 3/1/2031 | 109 | $ 0.43 | $ 0.55 | $ 0.12 | $9,871.29 | 0.466590 | $4,606 |
|  |  | 4/1/2031 | 110 | $ 0.43 | $ 0.55 | $ 0.12 | $9,871.29 | 0.463309 | $4,573 |
|  |  | 5/1/2031 | 111 | $ 0.43 | $ 0.55 | $ 0.12 | $9,871.29 | 0.460050 | $4,541 |
|  |  | 6/1/2031 | 112 | $ 0.43 | $ 0.55 | $ 0.12 | $9,871.29 | 0.456814 | $4,509 |
|  |  | 7/1/2031 | 113 | $ 0.43 | $ 0.55 | $ 0.12 | $9,871.29 | 0.453601 | $4,478 |
|  | 10 | 8/1/2031 | 114 | $ 0.43 | $ 0.55 | $ 0.12 | $9,871.29 | 0.450411 | $4,446 |
|  |  | 9/1/2031 | 115 | $ 0.43 | $ 0.55 | $ 0.12 | $9,871.29 | 0.447243 | $4,415 |
|  |  | 10/1/2031 | 116 | $ 0.43 | $ 0.55 | $ 0.12 | $9,871.29 | 0.444097 | $4,384 |
|  |  | 11/1/2031 | 117 | $ 0.45 | $ 0.57 | $ 0.12 | $9,871.29 | 0.440974 | $4,353 |
|  |  | 12/1/2031 | 118 | $ 0.45 | $ 0.57 | $ 0.12 | $9,871.29 | 0.437872 | $4,322 |
|  |  | 1/1/2032 | 119 | $ 0.45 | $ 0.57 | $ 0.12 | $9,871.29 | 0.434792 | $4,292 |
|  |  | 2/1/2032 | 120 | $ 0.45 | $ 0.57 | $ 0.12 | $9,871.29 | 0.431734 | $4,262 |
| 16 |  | 3/1/2032 | 121 | $ 0.45 | $ 0.57 | $ 0.12 | $9,871.29 | 0.428698 | $4,232 |
|  |  | 4/1/2032 | 122 | $ 0.45 | $ 0.57 | $ 0.12 | $9,871.29 | 0.425682 | $4,202 |
|  |  | 5/1/2032 | 123 | $ 0.45 | $ 0.57 | $ 0.12 | $9,871.29 | 0.422688 | $4,172 |
|  |  | 6/1/2032 | 124 | $ 0.45 | $ 0.57 | $ 0.12 | $9,871.29 | 0.419715 | $4,143 |

AUS ST 000466

| Lease Yr. | Val. Yr. | Date | Month | Contract Rent/SF | Market Rent/SF | Surplus/ Difference | Monthly Amount | PV Factor | Present Value |
|---|---|---|---|---|---|---|---|---|---|
| | | 7/1/2032 | 125 | $ 0.45 | $ 0.57 | $ 0.12 | $9,871.29 | 0.416763 | $4,114 |
| | 11 | 8/1/2032 | 126 | $ 0.45 | $ 0.57 | $ 0.12 | $9,871.29 | 0.413832 | $4,085 |
| | | 9/1/2032 | 127 | $ 0.45 | $ 0.57 | $ 0.12 | $9,871.29 | 0.410921 | $4,056 |
| | | 10/1/2032 | 128 | $ 0.45 | $ 0.57 | $ 0.12 | $9,871.29 | 0.408031 | $4,028 |
| 17 | | 11/1/2032 | 129 | $ 0.47 | $ 0.59 | $ 0.12 | $9,871.29 | 0.405161 | $3,999 |
| | | 12/1/2032 | 130 | $ 0.47 | $ 0.59 | $ 0.12 | $9,871.29 | 0.402311 | $3,971 |
| | | 1/1/2033 | 131 | $ 0.47 | $ 0.59 | $ 0.12 | $9,871.29 | 0.399482 | $3,943 |
| | | 2/1/2033 | 132 | $ 0.47 | $ 0.59 | $ 0.12 | $9,871.29 | 0.396672 | $3,916 |
| | 12 | 3/1/2033 | 133 | $ 0.47 | $ 0.59 | $ 0.12 | $9,871.29 | 0.393882 | $3,888 |
| | | 4/1/2033 | 134 | $ 0.47 | $ 0.59 | $ 0.12 | $9,871.29 | 0.391112 | $3,861 |
| | | 5/1/2033 | 135 | $ 0.47 | $ 0.59 | $ 0.12 | $9,871.29 | 0.388361 | $3,834 |
| | | 6/1/2033 | 136 | $ 0.47 | $ 0.59 | $ 0.12 | $9,871.29 | 0.385629 | $3,807 |
| | | 7/1/2033 | 137 | $ 0.47 | $ 0.59 | $ 0.12 | $9,871.29 | 0.382917 | $3,780 |
| | | 8/1/2033 | 138 | $ 0.47 | $ 0.59 | $ 0.12 | $9,871.29 | 0.380224 | $3,753 |
| | | 9/1/2033 | 139 | $ 0.47 | $ 0.59 | $ 0.12 | $9,871.29 | 0.377549 | $3,727 |
| | | 10/1/2033 | 140 | $ 0.47 | $ 0.59 | $ 0.12 | $9,871.29 | 0.374894 | $3,701 |
| | | 11/1/2033 | 141 | $ 0.49 | $ 0.61 | $ 0.12 | $9,871.29 | 0.372257 | $3,675 |
| | | 12/1/2033 | 142 | $ 0.49 | $ 0.61 | $ 0.12 | $9,871.29 | 0.369639 | $3,649 |
| | | 1/1/2034 | 143 | $ 0.49 | $ 0.61 | $ 0.12 | $9,871.29 | 0.367039 | $3,623 |
| | | 2/1/2034 | 144 | $ 0.49 | $ 0.61 | $ 0.12 | $9,871.29 | 0.364457 | $3,598 |
| 18 | | 3/1/2034 | 145 | $ 0.49 | $ 0.61 | $ 0.12 | $9,871.29 | 0.361894 | $3,572 |
| | | 4/1/2034 | 146 | $ 0.49 | $ 0.61 | $ 0.12 | $9,871.29 | 0.359348 | $3,547 |
| | | 5/1/2034 | 147 | $ 0.49 | $ 0.61 | $ 0.12 | $9,871.29 | 0.356821 | $3,522 |
| | | 6/1/2034 | 148 | $ 0.49 | $ 0.61 | $ 0.12 | $9,871.29 | 0.354311 | $3,498 |
| | | 7/1/2034 | 149 | $ 0.49 | $ 0.61 | $ 0.12 | $9,871.29 | 0.351819 | $3,473 |
| | 13 | 8/1/2034 | 150 | $ 0.49 | $ 0.61 | $ 0.12 | $9,871.29 | 0.349345 | $3,448 |
| | | 9/1/2034 | 151 | $ 0.49 | $ 0.61 | $ 0.12 | $9,871.29 | 0.346888 | $3,424 |
| | | 10/1/2034 | 152 | $ 0.49 | $ 0.61 | $ 0.12 | $9,871.29 | 0.344448 | $3,400 |
| | | 11/1/2034 | 153 | $ 0.51 | $ 0.63 | $ 0.12 | $9,871.29 | 0.342025 | $3,376 |
| | | 12/1/2034 | 154 | $ 0.51 | $ 0.63 | $ 0.12 | $9,871.29 | 0.339619 | $3,352 |
| | | 1/1/2035 | 155 | $ 0.51 | $ 0.63 | $ 0.12 | $9,871.29 | 0.337231 | $3,329 |
| | | 2/1/2035 | 156 | $ 0.51 | $ 0.63 | $ 0.12 | $9,871.29 | 0.334859 | $3,305 |
| 19 | | 3/1/2035 | 157 | $ 0.51 | $ 0.63 | $ 0.12 | $9,871.29 | 0.332504 | $3,282 |
| | | 4/1/2035 | 158 | $ 0.51 | $ 0.63 | $ 0.12 | $9,871.29 | 0.330165 | $3,259 |
| | | 5/1/2035 | 159 | $ 0.51 | $ 0.63 | $ 0.12 | $9,871.29 | 0.327843 | $3,236 |
| | | 6/1/2035 | 160 | $ 0.51 | $ 0.63 | $ 0.12 | $9,871.29 | 0.325537 | $3,213 |
| | | 7/1/2035 | 161 | $ 0.51 | $ 0.63 | $ 0.12 | $9,871.29 | 0.323247 | $3,191 |
| | 14 | 8/1/2035 | 162 | $ 0.51 | $ 0.63 | $ 0.12 | $9,871.29 | 0.320974 | $3,168 |
| | | 9/1/2035 | 163 | $ 0.51 | $ 0.63 | $ 0.12 | $9,871.29 | 0.318716 | $3,146 |
| | | 10/1/2035 | 164 | $ 0.51 | $ 0.63 | $ 0.12 | $9,871.29 | 0.316474 | $3,124 |
| | | 11/1/2035 | 165 | $ 0.53 | $ 0.65 | $ 0.12 | $9,871.29 | 0.314248 | $3,102 |
| | | 12/1/2035 | 166 | $ 0.53 | $ 0.65 | $ 0.12 | $9,871.29 | 0.312038 | $3,080 |
| | | 1/1/2036 | 167 | $ 0.53 | $ 0.65 | $ 0.12 | $9,871.29 | 0.309843 | $3,059 |
| | | 2/1/2036 | 168 | $ 0.53 | $ 0.65 | $ 0.12 | $9,871.29 | 0.307664 | $3,037 |
| | | 3/1/2036 | 169 | $ 0.53 | $ 0.65 | $ 0.12 | $9,871.29 | 0.305500 | $3,016 |

AUS ST 000467

| Lease Yr. | Val. Yr. | Date | Month | Contract Rent/SF | Market Rent/SF | Surplus/ Difference | Monthly Amount | PV Factor | Present Value |
|---|---|---|---|---|---|---|---|---|---|
| 20 |  | 4/1/2036 | 170 | $ 0.53 | $ 0.65 | $ 0.12 | $9,871.29 | 0.303351 | $2,994 |
|  |  | 5/1/2036 | 171 | $ 0.53 | $ 0.65 | $ 0.12 | $9,871.29 | 0.301218 | $2,973 |
|  |  | 6/1/2036 | 172 | $ 0.53 | $ 0.65 | $ 0.12 | $9,871.29 | 0.299099 | $2,952 |
|  | 15 | 7/1/2036 | 173 | $ 0.53 | $ 0.65 | $ 0.12 | $9,871.29 | 0.296995 | $2,932 |
|  |  | 8/1/2036 | 174 | $ 0.53 | $ 0.65 | $ 0.12 | $9,871.29 | 0.294906 | $2,911 |
|  |  | 9/1/2036 | 175 | $ 0.53 | $ 0.65 | $ 0.12 | $9,871.29 | 0.292832 | $2,891 |
|  |  | 10/1/2036 | 176 | $ 0.53 | $ 0.65 | $ 0.12 | $9,871.29 | 0.290773 | $2,870 |
| 21 |  | 11/1/2036 | 177 | $ 0.55 | $ 0.67 | $ 0.12 | $9,871.29 | 0.288727 | $2,850 |
|  |  | 12/1/2036 | 178 | $ 0.55 | $ 0.67 | $ 0.12 | $9,871.29 | 0.286697 | $2,830 |
|  |  | 1/1/2037 | 179 | $ 0.55 | $ 0.67 | $ 0.12 | $9,871.29 | 0.284680 | $2,810 |
|  |  | 2/1/2037 | 180 | $ 0.55 | $ 0.67 | $ 0.12 | $9,871.29 | 0.282678 | $2,790 |
|  |  | 3/1/2037 | 181 | $ 0.55 | $ 0.67 | $ 0.12 | $9,871.29 | 0.280690 | $2,771 |
|  |  | 4/1/2037 | 182 | $ 0.55 | $ 0.67 | $ 0.12 | $9,871.29 | 0.278715 | $2,751 |
|  |  | 5/1/2037 | 183 | $ 0.55 | $ 0.67 | $ 0.12 | $9,871.29 | 0.276755 | $2,732 |
|  |  | 6/1/2037 | 184 | $ 0.55 | $ 0.67 | $ 0.12 | $9,871.29 | 0.274809 | $2,713 |
|  | 16 | 7/1/2037 | 185 | $ 0.55 | $ 0.67 | $ 0.12 | $9,871.29 | 0.272876 | $2,694 |
|  |  | 8/1/2037 | 186 | $ 0.55 | $ 0.67 | $ 0.12 | $9,871.29 | 0.270956 | $2,675 |
|  |  | 9/1/2037 | 187 | $ 0.55 | $ 0.67 | $ 0.12 | $9,871.29 | 0.269051 | $2,656 |
|  |  | 10/1/2037 | 188 | $ 0.55 | $ 0.67 | $ 0.12 | $9,871.29 | 0.267158 | $2,637 |
| 22 |  | 11/1/2037 | 189 | $ 0.57 | $ 0.69 | $ 0.12 | $9,871.29 | 0.265279 | $2,619 |
|  |  | 12/1/2037 | 190 | $ 0.57 | $ 0.69 | $ 0.12 | $9,871.29 | 0.263413 | $2,600 |
|  |  | 1/1/2038 | 191 | $ 0.57 | $ 0.69 | $ 0.12 | $9,871.29 | 0.261561 | $2,582 |
|  |  | 2/1/2038 | 192 | $ 0.57 | $ 0.69 | $ 0.12 | $9,871.29 | 0.259721 | $2,564 |
|  |  | 3/1/2038 | 193 | $ 0.57 | $ 0.69 | $ 0.12 | $9,871.29 | 0.257894 | $2,546 |
|  |  | 4/1/2038 | 194 | $ 0.57 | $ 0.69 | $ 0.12 | $9,871.29 | 0.256080 | $2,528 |
|  |  | 5/1/2038 | 195 | $ 0.57 | $ 0.69 | $ 0.12 | $9,871.29 | 0.254279 | $2,510 |
|  |  | 6/1/2038 | 196 | $ 0.57 | $ 0.69 | $ 0.12 | $9,871.29 | 0.252491 | $2,492 |
|  | 17 | 7/1/2038 | 197 | $ 0.57 | $ 0.69 | $ 0.12 | $9,871.29 | 0.250715 | $2,475 |
|  |  | 8/1/2038 | 198 | $ 0.57 | $ 0.69 | $ 0.12 | $9,871.29 | 0.248951 | $2,457 |
|  |  | 9/1/2038 | 199 | $ 0.57 | $ 0.69 | $ 0.12 | $9,871.29 | 0.247200 | $2,440 |
|  |  | 10/1/2038 | 200 | $ 0.57 | $ 0.69 | $ 0.12 | $9,871.29 | 0.245462 | $2,423 |
| 23 |  | 11/1/2038 | 201 | $ 0.59 | $ 0.71 | $ 0.12 | $9,871.29 | 0.243735 | $2,406 |
|  |  | 12/1/2038 | 202 | $ 0.59 | $ 0.71 | $ 0.12 | $9,871.29 | 0.242021 | $2,389 |
|  |  | 1/1/2039 | 203 | $ 0.59 | $ 0.71 | $ 0.12 | $9,871.29 | 0.240319 | $2,372 |
|  |  | 2/1/2039 | 204 | $ 0.59 | $ 0.71 | $ 0.12 | $9,871.29 | 0.238628 | $2,356 |
|  |  | 3/1/2039 | 205 | $ 0.59 | $ 0.71 | $ 0.12 | $9,871.29 | 0.236950 | $2,339 |
|  |  | 4/1/2039 | 206 | $ 0.59 | $ 0.71 | $ 0.12 | $9,871.29 | 0.235283 | $2,323 |
|  |  | 5/1/2039 | 207 | $ 0.59 | $ 0.71 | $ 0.12 | $9,871.29 | 0.233628 | $2,306 |
|  |  | 6/1/2039 | 208 | $ 0.59 | $ 0.71 | $ 0.12 | $9,871.29 | 0.231985 | $2,290 |
|  |  | 7/1/2039 | 209 | $ 0.59 | $ 0.71 | $ 0.12 | $9,871.29 | 0.230354 | $2,274 |
|  | 18 | 8/1/2039 | 210 | $ 0.59 | $ 0.71 | $ 0.12 | $9,871.29 | 0.228733 | $2,258 |
|  |  | 9/1/2039 | 211 | $ 0.59 | $ 0.71 | $ 0.12 | $9,871.29 | 0.227125 | $2,242 |
|  |  | 10/1/2039 | 212 | $ 0.59 | $ 0.71 | $ 0.12 | $9,871.29 | 0.225527 | $2,226 |
|  |  | 11/1/2039 | 213 | $ 0.61 | $ 0.73 | $ 0.12 | $9,871.29 | 0.223941 | $2,211 |
|  |  | 12/1/2039 | 214 | $ 0.61 | $ 0.73 | $ 0.12 | $9,871.29 | 0.222366 | $2,195 |

AUS ST 000468

| Lease Yr. | Val. Yr. | Date | Month | Contract Rent/SF | Market Rent/SF | Surplus/ Difference | Monthly Amount | PV Factor | Present Value |
|---|---|---|---|---|---|---|---|---|---|
| 24 | | 1/1/2040 | 215 | $ 0.61 | $ 0.73 | $ 0.12 | $9,871.29 | 0.220802 | $2,180 |
| | | 2/1/2040 | 216 | $ 0.61 | $ 0.73 | $ 0.12 | $9,871.29 | 0.219249 | $2,164 |
| | | 3/1/2040 | 217 | $ 0.61 | $ 0.73 | $ 0.12 | $9,871.29 | 0.217707 | $2,149 |
| | | 4/1/2040 | 218 | $ 0.61 | $ 0.73 | $ 0.12 | $9,871.29 | 0.216175 | $2,134 |
| | | 5/1/2040 | 219 | $ 0.61 | $ 0.73 | $ 0.12 | $9,871.29 | 0.214655 | $2,119 |
| | | 6/1/2040 | 220 | $ 0.61 | $ 0.73 | $ 0.12 | $9,871.29 | 0.213145 | $2,104 |
| | | 7/1/2040 | 221 | $ 0.61 | $ 0.73 | $ 0.12 | $9,871.29 | 0.211646 | $2,089 |
| | 19 | 8/1/2040 | 222 | $ 0.61 | $ 0.73 | $ 0.12 | $9,871.29 | 0.210157 | $2,075 |
| | | 9/1/2040 | 223 | $ 0.61 | $ 0.73 | $ 0.12 | $9,871.29 | 0.208679 | $2,060 |
| | | 10/1/2040 | 224 | $ 0.61 | $ 0.73 | $ 0.12 | $9,871.29 | 0.207212 | $2,045 |
| 25 | | 11/1/2040 | 225 | $ 0.63 | $ 0.76 | $ 0.13 | $10,693.90 | 0.205754 | $2,200 |
| | | 12/1/2040 | 226 | $ 0.63 | $ 0.76 | $ 0.13 | $10,693.90 | 0.204307 | $2,185 |
| | | 1/1/2041 | 227 | $ 0.63 | $ 0.76 | $ 0.13 | $10,693.90 | 0.202870 | $2,169 |
| | | 2/1/2041 | 228 | $ 0.63 | $ 0.76 | $ 0.13 | $10,693.90 | 0.201443 | $2,154 |
| | | 3/1/2041 | 229 | $ 0.63 | $ 0.76 | $ 0.13 | $10,693.90 | 0.200026 | $2,139 |
| | | 4/1/2041 | 230 | $ 0.63 | $ 0.76 | $ 0.13 | $10,693.90 | 0.198619 | $2,124 |
| | | 5/1/2041 | 231 | $ 0.63 | $ 0.76 | $ 0.13 | $10,693.90 | 0.197222 | $2,109 |
| | | 6/1/2041 | 232 | $ 0.63 | $ 0.76 | $ 0.13 | $10,693.90 | 0.195835 | $2,094 |
| | | 7/1/2041 | 233 | $ 0.63 | $ 0.76 | $ 0.13 | $10,693.90 | 0.194458 | $2,080 |
| | 20 | 8/1/2041 | 234 | $ 0.63 | $ 0.76 | $ 0.13 | $10,693.90 | 0.193090 | $2,065 |
| | | 9/1/2041 | 235 | $ 0.63 | $ 0.76 | $ 0.13 | $10,693.90 | 0.191732 | $2,050 |
| | | 10/1/2041 | 236 | $ 0.63 | $ 0.76 | $ 0.13 | $10,693.90 | 0.190383 | $2,036 |
| 26 | | 11/1/2041 | 237 | $ 0.65 | $ 0.79 | $ 0.14 | $11,516.51 | 0.189044 | $2,177 |
| | | 12/1/2041 | 238 | $ 0.65 | $ 0.79 | $ 0.14 | $11,516.51 | 0.187715 | $2,162 |
| | | 1/1/2042 | 239 | $ 0.65 | $ 0.79 | $ 0.14 | $11,516.51 | 0.186394 | $2,147 |
| | | 2/1/2042 | 240 | $ 0.65 | $ 0.79 | $ 0.14 | $11,516.51 | 0.185083 | $2,132 |
| | | 3/1/2042 | 241 | $ 0.65 | $ 0.79 | $ 0.14 | $11,516.51 | 0.183782 | $2,117 |
| | | 4/1/2042 | 242 | $ 0.65 | $ 0.79 | $ 0.14 | $11,516.51 | 0.182489 | $2,102 |
| | | 5/1/2042 | 243 | $ 0.65 | $ 0.79 | $ 0.14 | $11,516.51 | 0.181205 | $2,087 |
| | | 6/1/2042 | 244 | $ 0.65 | $ 0.79 | $ 0.14 | $11,516.51 | 0.179931 | $2,072 |
| | | 7/1/2042 | 245 | $ 0.65 | $ 0.79 | $ 0.14 | $11,516.51 | 0.178665 | $2,058 |
| | 21 | 8/1/2042 | 246 | $ 0.65 | $ 0.79 | $ 0.14 | $11,516.51 | 0.177409 | $2,043 |
| | | 9/1/2042 | 247 | $ 0.65 | $ 0.79 | $ 0.14 | $11,516.51 | 0.176161 | $2,029 |
| | | 10/1/2042 | 248 | $ 0.65 | $ 0.79 | $ 0.14 | $11,516.51 | 0.174922 | $2,014 |
| 27 | | 11/1/2042 | 249 | $ 0.67 | $ 0.82 | $ 0.15 | $12,339.11 | 0.173692 | $2,143 |
| | | 12/1/2042 | 250 | $ 0.67 | $ 0.82 | $ 0.15 | $12,339.11 | 0.172470 | $2,128 |
| | | 1/1/2043 | 251 | $ 0.67 | $ 0.82 | $ 0.15 | $12,339.11 | 0.171257 | $2,113 |
| | | 2/1/2043 | 252 | $ 0.67 | $ 0.82 | $ 0.15 | $12,339.11 | 0.170052 | $2,098 |
| | | 3/1/2043 | 253 | $ 0.67 | $ 0.82 | $ 0.15 | $12,339.11 | 0.168856 | $2,084 |
| | | 4/1/2043 | 254 | $ 0.67 | $ 0.82 | $ 0.15 | $12,339.11 | 0.167669 | $2,069 |
| | | 5/1/2043 | 255 | $ 0.67 | $ 0.82 | $ 0.15 | $12,339.11 | 0.166489 | $2,054 |
| | | 6/1/2043 | 256 | $ 0.67 | $ 0.82 | $ 0.15 | $12,339.11 | 0.165318 | $2,040 |
| | | 7/1/2043 | 257 | $ 0.67 | $ 0.82 | $ 0.15 | $12,339.11 | 0.164155 | $2,026 |
| | 22 | 8/1/2043 | 258 | $ 0.67 | $ 0.82 | $ 0.15 | $12,339.11 | 0.163001 | $2,011 |
| | | 9/1/2043 | 259 | $ 0.67 | $ 0.82 | $ 0.15 | $12,339.11 | 0.161854 | $1,997 |

AUS ST 000469

| Lease Yr. | Val. Yr. | Date | Month | Contract Rent/SF | Market Rent/SF | Surplus/ Difference | Monthly Amount | PV Factor | Present Value |
|---|---|---|---|---|---|---|---|---|---|
| | | 10/1/2043 | 260 | $ 0.67 | $ 0.82 | $ 0.15 | $12,339.11 | 0.160716 | $1,983 |
| | | 11/1/2043 | 261 | $ 0.69 | $ 0.85 | $ 0.16 | $13,161.72 | 0.159586 | $2,100 |
| | | 12/1/2043 | 262 | $ 0.69 | $ 0.85 | $ 0.16 | $13,161.72 | 0.158463 | $2,086 |
| | | 1/1/2044 | 263 | $ 0.69 | $ 0.85 | $ 0.16 | $13,161.72 | 0.157349 | $2,071 |
| | | 2/1/2044 | 264 | $ 0.69 | $ 0.85 | $ 0.16 | $13,161.72 | 0.156242 | $2,056 |
| 28 | | 3/1/2044 | 265 | $ 0.69 | $ 0.85 | $ 0.16 | $13,161.72 | 0.155143 | $2,042 |
| | | 4/1/2044 | 266 | $ 0.69 | $ 0.85 | $ 0.16 | $13,161.72 | 0.154052 | $2,028 |
| | | 5/1/2044 | 267 | $ 0.69 | $ 0.85 | $ 0.16 | $13,161.72 | 0.152968 | $2,013 |
| | | 6/1/2044 | 268 | $ 0.69 | $ 0.85 | $ 0.16 | $13,161.72 | 0.151892 | $1,999 |
| | | 7/1/2044 | 269 | $ 0.69 | $ 0.85 | $ 0.16 | $13,161.72 | 0.150824 | $1,985 |
| | 23 | 8/1/2044 | 270 | $ 0.69 | $ 0.85 | $ 0.16 | $13,161.72 | 0.149763 | $1,971 |
| | | 9/1/2044 | 271 | $ 0.69 | $ 0.85 | $ 0.16 | $13,161.72 | 0.148710 | $1,957 |
| | | 10/1/2044 | 272 | $ 0.69 | $ 0.85 | $ 0.16 | $13,161.72 | 0.147664 | $1,944 |
| | | 11/1/2044 | 273 | $ 0.71 | $ 0.88 | $ 0.17 | $13,984.33 | 0.146625 | $2,050 |
| | | 12/1/2044 | 274 | $ 0.71 | $ 0.88 | $ 0.17 | $13,984.33 | 0.145594 | $2,036 |
| | | 1/1/2045 | 275 | $ 0.71 | $ 0.88 | $ 0.17 | $13,984.33 | 0.144570 | $2,022 |
| | | 2/1/2045 | 276 | $ 0.71 | $ 0.88 | $ 0.17 | $13,984.33 | 0.143553 | $2,007 |
| 29 | | 3/1/2045 | 277 | $ 0.71 | $ 0.88 | $ 0.17 | $13,984.33 | 0.142543 | $1,993 |
| | | 4/1/2045 | 278 | $ 0.71 | $ 0.88 | $ 0.17 | $13,984.33 | 0.141541 | $1,979 |
| | | 5/1/2045 | 279 | $ 0.71 | $ 0.88 | $ 0.17 | $13,984.33 | 0.140545 | $1,965 |
| | | 6/1/2045 | 280 | $ 0.71 | $ 0.88 | $ 0.17 | $13,984.33 | 0.139557 | $1,952 |
| | | 7/1/2045 | 281 | $ 0.71 | $ 0.88 | $ 0.17 | $13,984.33 | 0.138575 | $1,938 |
| | 24 | 8/1/2045 | 282 | $ 0.71 | $ 0.88 | $ 0.17 | $13,984.33 | 0.137601 | $1,924 |
| | | 9/1/2045 | 283 | $ 0.71 | $ 0.88 | $ 0.17 | $13,984.33 | 0.136633 | $1,911 |
| | | 10/1/2045 | 284 | $ 0.71 | $ 0.88 | $ 0.17 | $13,984.33 | 0.135672 | $1,897 |
| | | 11/1/2045 | 285 | $ 0.73 | $ 0.91 | $ 0.18 | $14,806.94 | 0.134717 | $1,995 |
| | | 12/1/2045 | 286 | $ 0.73 | $ 0.91 | $ 0.18 | $14,806.94 | 0.133770 | $1,981 |
| | | 1/1/2046 | 287 | $ 0.73 | $ 0.91 | $ 0.18 | $14,806.94 | 0.132829 | $1,967 |
| | | 2/1/2046 | 288 | $ 0.73 | $ 0.91 | $ 0.18 | $14,806.94 | 0.131895 | $1,953 |
| 30 | | 3/1/2046 | 289 | $ 0.73 | $ 0.91 | $ 0.18 | $14,806.94 | 0.130967 | $1,939 |
| | | 4/1/2046 | 290 | $ 0.73 | $ 0.91 | $ 0.18 | $14,806.94 | 0.130046 | $1,926 |
| | | 5/1/2046 | 291 | $ 0.73 | $ 0.91 | $ 0.18 | $14,806.94 | 0.129131 | $1,912 |
| | | 6/1/2046 | 292 | $ 0.73 | $ 0.91 | $ 0.18 | $14,806.94 | 0.128223 | $1,899 |
| | | 7/1/2046 | 293 | $ 0.73 | $ 0.91 | $ 0.18 | $14,806.94 | 0.127321 | $1,885 |
| | 25 | 8/1/2046 | 294 | $ 0.73 | $ 0.91 | $ 0.18 | $14,806.94 | 0.126426 | $1,872 |
| | | 9/1/2046 | 295 | $ 0.73 | $ 0.91 | $ 0.18 | $14,806.94 | 0.125536 | $1,859 |
| | | 10/1/2046 | 296 | $ 0.73 | $ 0.91 | $ 0.18 | $14,806.94 | 0.124653 | $1,846 |
| | | 11/1/2046 | 297 | $ 0.76 | $ 0.94 | $ 0.18 | $14,806.94 | 0.123777 | $1,833 |
| | | 12/1/2046 | 298 | $ 0.76 | $ 0.94 | $ 0.18 | $14,806.94 | 0.122906 | $1,820 |
| | | 1/1/2047 | 299 | $ 0.76 | $ 0.94 | $ 0.18 | $14,806.94 | 0.122042 | $1,807 |
| | | 2/1/2047 | 300 | $ 0.76 | $ 0.94 | $ 0.18 | $14,806.94 | 0.121183 | $1,794 |
| 31 | | 3/1/2047 | 301 | $ 0.76 | $ 0.94 | $ 0.18 | $14,806.94 | 0.120331 | $1,782 |
| | | 4/1/2047 | 302 | $ 0.76 | $ 0.94 | $ 0.18 | $14,806.94 | 0.119485 | $1,769 |
| | | 5/1/2047 | 303 | $ 0.76 | $ 0.94 | $ 0.18 | $14,806.94 | 0.118644 | $1,757 |
| | | 6/1/2047 | 304 | $ 0.76 | $ 0.94 | $ 0.18 | $14,806.94 | 0.117810 | $1,744 |

AUS ST 000470

| Lease Yr. | Val. Yr. | Date | Month | Contract Rent/SF | Market Rent/SF | Surplus/ Difference | Monthly Amount | PV Factor | Present Value |
|---|---|---|---|---|---|---|---|---|---|
| | | 7/1/2047 | 305 | $ 0.76 | $ 0.94 | $ 0.18 | $14,806.94 | 0.116981 | $1,732 |
| | 26 | 8/1/2047 | 306 | $ 0.76 | $ 0.94 | $ 0.18 | $14,806.94 | 0.116158 | $1,720 |
| | | 9/1/2047 | 307 | $ 0.76 | $ 0.94 | $ 0.18 | $14,806.94 | 0.115341 | $1,708 |
| | | 10/1/2047 | 308 | $ 0.76 | $ 0.94 | $ 0.18 | $14,806.94 | 0.114530 | $1,696 |
| | | 11/1/2047 | 309 | $ 0.76 | $ 0.94 | $ 0.18 | $14,806.94 | 0.113725 | $1,684 |
| | | 12/1/2047 | 310 | $ 0.79 | $ 0.97 | $ 0.18 | $14,806.94 | 0.112925 | $1,672 |
| | | 1/1/2048 | 311 | $ 0.79 | $ 0.97 | $ 0.18 | $14,806.94 | 0.112130 | $1,660 |
| | | 2/1/2048 | 312 | $ 0.79 | $ 0.97 | $ 0.18 | $14,806.94 | 0.111342 | $1,649 |
| 32 | | 3/1/2048 | 313 | $ 0.79 | $ 0.97 | $ 0.18 | $14,806.94 | 0.110559 | $1,637 |
| | | 4/1/2048 | 314 | $ 0.79 | $ 0.97 | $ 0.18 | $14,806.94 | 0.109781 | $1,626 |
| | | 5/1/2048 | 315 | $ 0.79 | $ 0.97 | $ 0.18 | $14,806.94 | 0.109009 | $1,614 |
| | | 6/1/2048 | 316 | $ 0.79 | $ 0.97 | $ 0.18 | $14,806.94 | 0.108242 | $1,603 |
| | | 7/1/2048 | 317 | $ 0.79 | $ 0.97 | $ 0.18 | $14,806.94 | 0.107481 | $1,591 |
| | 27 | 8/1/2048 | 318 | $ 0.79 | $ 0.97 | $ 0.18 | $14,806.94 | 0.106725 | $1,580 |
| | | 9/1/2048 | 319 | $ 0.79 | $ 0.97 | $ 0.18 | $14,806.94 | 0.105974 | $1,569 |
| | | 10/1/2048 | 320 | $ 0.79 | $ 0.97 | $ 0.18 | $14,806.94 | 0.105229 | $1,558 |
| | | 11/1/2048 | 321 | $ 0.82 | $ 1.00 | $ 0.18 | $14,806.94 | 0.104489 | $1,547 |
| | | 12/1/2048 | 322 | $ 0.82 | $ 1.00 | $ 0.18 | $14,806.94 | 0.103754 | $1,536 |
| | | 1/1/2049 | 323 | $ 0.82 | $ 1.00 | $ 0.18 | $14,806.94 | 0.103024 | $1,525 |
| | | 2/1/2049 | 324 | $ 0.82 | $ 1.00 | $ 0.18 | $14,806.94 | 0.102299 | $1,515 |
| 33 | | 3/1/2049 | 325 | $ 0.82 | $ 1.00 | $ 0.18 | $14,806.94 | 0.101580 | $1,504 |
| | | 4/1/2049 | 326 | $ 0.82 | $ 1.00 | $ 0.18 | $14,806.94 | 0.100865 | $1,494 |
| | | 5/1/2049 | 327 | $ 0.82 | $ 1.00 | $ 0.18 | $14,806.94 | 0.100156 | $1,483 |
| | | 6/1/2049 | 328 | $ 0.82 | $ 1.00 | $ 0.18 | $14,806.94 | 0.099452 | $1,473 |
| | | 7/1/2049 | 329 | $ 0.82 | $ 1.00 | $ 0.18 | $14,806.94 | 0.098752 | $1,462 |
| | 28 | 8/1/2049 | 330 | $ 0.82 | $ 1.00 | $ 0.18 | $14,806.94 | 0.098057 | $1,452 |
| | | 9/1/2049 | 331 | $ 0.82 | $ 1.00 | $ 0.18 | $14,806.94 | 0.097368 | $1,442 |
| | | 10/1/2049 | 332 | $ 0.82 | $ 1.00 | $ 0.18 | $14,806.94 | 0.096683 | $1,432 |
| | | 11/1/2049 | 333 | $ 0.85 | $ 1.04 | $ 0.19 | $15,629.54 | 0.096003 | $1,500 |
| | | 12/1/2049 | 334 | $ 0.85 | $ 1.04 | $ 0.19 | $15,629.54 | 0.095328 | $1,490 |
| | | 1/1/2050 | 335 | $ 0.85 | $ 1.04 | $ 0.19 | $15,629.54 | 0.094657 | $1,479 |
| | | 2/1/2050 | 336 | $ 0.85 | $ 1.04 | $ 0.19 | $15,629.54 | 0.093991 | $1,469 |
| 34 | | 3/1/2050 | 337 | $ 0.85 | $ 1.04 | $ 0.19 | $15,629.54 | 0.093330 | $1,459 |
| | | 4/1/2050 | 338 | $ 0.85 | $ 1.04 | $ 0.19 | $15,629.54 | 0.092674 | $1,448 |
| | | 5/1/2050 | 339 | $ 0.85 | $ 1.04 | $ 0.19 | $15,629.54 | 0.092022 | $1,438 |
| | | 6/1/2050 | 340 | $ 0.85 | $ 1.04 | $ 0.19 | $15,629.54 | 0.091375 | $1,428 |
| | | 7/1/2050 | 341 | $ 0.85 | $ 1.04 | $ 0.19 | $15,629.54 | 0.090732 | $1,418 |
| | 29 | 8/1/2050 | 342 | $ 0.85 | $ 1.04 | $ 0.19 | $15,629.54 | 0.090094 | $1,408 |
| | | 9/1/2050 | 343 | $ 0.85 | $ 1.04 | $ 0.19 | $15,629.54 | 0.089460 | $1,398 |
| | | 10/1/2050 | 344 | $ 0.85 | $ 1.04 | $ 0.19 | $15,629.54 | 0.088831 | $1,388 |
| | | 11/1/2050 | 345 | $ 0.88 | $ 1.08 | $ 0.20 | $16,452.15 | 0.088206 | $1,451 |
| | | 12/1/2050 | 346 | $ 0.88 | $ 1.08 | $ 0.20 | $16,452.15 | 0.087586 | $1,441 |
| | | 1/1/2051 | 347 | $ 0.88 | $ 1.08 | $ 0.20 | $16,452.15 | 0.086970 | $1,431 |
| | | 2/1/2051 | 348 | $ 0.88 | $ 1.08 | $ 0.20 | $16,452.15 | 0.086358 | $1,421 |
| | | 3/1/2051 | 349 | $ 0.88 | $ 1.08 | $ 0.20 | $16,452.15 | 0.085751 | $1,411 |

AUS ST 000471

| Lease Yr. | Val. Yr. | Date | Month | Contract Rent/SF | Market Rent/SF | Surplus/ Difference | Monthly Amount | PV Factor | Present Value |
|---|---|---|---|---|---|---|---|---|---|
| 35 | | 4/1/2051 | 350 | $ 0.88 | $ 1.08 | $ 0.20 | $16,452.15 | 0.085148 | $1,401 |
| | | 5/1/2051 | 351 | $ 0.88 | $ 1.08 | $ 0.20 | $16,452.15 | 0.084549 | $1,391 |
| | | 6/1/2051 | 352 | $ 0.88 | $ 1.08 | $ 0.20 | $16,452.15 | 0.083954 | $1,381 |
| | | 7/1/2051 | 353 | $ 0.88 | $ 1.08 | $ 0.20 | $16,452.15 | 0.083364 | $1,372 |
| | 30 | 8/1/2051 | 354 | $ 0.88 | $ 1.08 | $ 0.20 | $16,452.15 | 0.082777 | $1,362 |
| | | 9/1/2051 | 355 | $ 0.88 | $ 1.08 | $ 0.20 | $16,452.15 | 0.082195 | $1,352 |
| | | 10/1/2051 | 356 | $ 0.88 | $ 1.08 | $ 0.20 | $16,452.15 | 0.081617 | $1,343 |
| | | 11/1/2051 | 357 | $ 0.91 | $ 1.12 | $ 0.21 | $17,274.76 | 0.081043 | $1,400 |
| | | 12/1/2051 | 358 | $ 0.91 | $ 1.12 | $ 0.21 | $17,274.76 | 0.080473 | $1,390 |
| | | 1/1/2052 | 359 | $ 0.91 | $ 1.12 | $ 0.21 | $17,274.76 | 0.079907 | $1,380 |
| | | 2/1/2052 | 360 | $ 0.91 | $ 1.12 | $ 0.21 | $17,274.76 | 0.079345 | $1,371 |
| 36 | | 3/1/2052 | 361 | $ 0.91 | $ 1.12 | $ 0.21 | $17,274.76 | 0.078787 | $1,361 |
| | | 4/1/2052 | 362 | $ 0.91 | $ 1.12 | $ 0.21 | $17,274.76 | 0.078233 | $1,351 |
| | | 5/1/2052 | 363 | $ 0.91 | $ 1.12 | $ 0.21 | $17,274.76 | 0.077682 | $1,342 |
| | | 6/1/2052 | 364 | $ 0.91 | $ 1.12 | $ 0.21 | $17,274.76 | 0.077136 | $1,333 |
| | | 7/1/2052 | 365 | $ 0.91 | $ 1.12 | $ 0.21 | $17,274.76 | 0.076593 | $1,323 |
| | 31 | 8/1/2052 | 366 | $ 0.91 | $ 1.12 | $ 0.21 | $17,274.76 | 0.076055 | $1,314 |
| | | 9/1/2052 | 367 | $ 0.91 | $ 1.12 | $ 0.21 | $17,274.76 | 0.075520 | $1,305 |
| | | 10/1/2052 | 368 | $ 0.91 | $ 1.12 | $ 0.21 | $17,274.76 | 0.074989 | $1,295 |
| | | 11/1/2052 | 369 | $ 0.94 | $ 1.16 | $ 0.22 | $18,097.37 | 0.074461 | $1,348 |
| | | 12/1/2052 | 370 | $ 0.94 | $ 1.16 | $ 0.22 | $18,097.37 | 0.073937 | $1,338 |
| | | 1/1/2053 | 371 | $ 0.94 | $ 1.16 | $ 0.22 | $18,097.37 | 0.073417 | $1,329 |
| | | 2/1/2053 | 372 | $ 0.94 | $ 1.16 | $ 0.22 | $18,097.37 | 0.072901 | $1,319 |
| 37 | | 3/1/2053 | 373 | $ 0.94 | $ 1.16 | $ 0.22 | $18,097.37 | 0.072388 | $1,310 |
| | | 4/1/2053 | 374 | $ 0.94 | $ 1.16 | $ 0.22 | $18,097.37 | 0.071879 | $1,301 |
| | | 5/1/2053 | 375 | $ 0.94 | $ 1.16 | $ 0.22 | $18,097.37 | 0.071374 | $1,292 |
| | | 6/1/2053 | 376 | $ 0.94 | $ 1.16 | $ 0.22 | $18,097.37 | 0.070872 | $1,283 |
| | | 7/1/2053 | 377 | $ 0.94 | $ 1.16 | $ 0.22 | $18,097.37 | 0.070373 | $1,274 |
| | 32 | 8/1/2053 | 378 | $ 0.94 | $ 1.16 | $ 0.22 | $18,097.37 | 0.069878 | $1,265 |
| | | 9/1/2053 | 379 | $ 0.94 | $ 1.16 | $ 0.22 | $18,097.37 | 0.069387 | $1,256 |
| | | 10/1/2053 | 380 | $ 0.94 | $ 1.16 | $ 0.22 | $18,097.37 | 0.068899 | $1,247 |
| | | 11/1/2053 | 381 | $ 0.97 | $ 1.20 | $ 0.23 | $18,919.97 | 0.068414 | $1,294 |
| | | 12/1/2053 | 382 | $ 0.97 | $ 1.20 | $ 0.23 | $18,919.97 | 0.067933 | $1,285 |
| | | 1/1/2054 | 383 | $ 0.97 | $ 1.20 | $ 0.23 | $18,919.97 | 0.067455 | $1,276 |
| | | 2/1/2054 | 384 | $ 0.97 | $ 1.20 | $ 0.23 | $18,919.97 | 0.066981 | $1,267 |
| 38 | | 3/1/2054 | 385 | $ 0.97 | $ 1.20 | $ 0.23 | $18,919.97 | 0.066509 | $1,258 |
| | | 4/1/2054 | 386 | $ 0.97 | $ 1.20 | $ 0.23 | $18,919.97 | 0.066042 | $1,250 |
| | | 5/1/2054 | 387 | $ 0.97 | $ 1.20 | $ 0.23 | $18,919.97 | 0.065577 | $1,241 |
| | | 6/1/2054 | 388 | $ 0.97 | $ 1.20 | $ 0.23 | $18,919.97 | 0.065116 | $1,232 |
| | | 7/1/2054 | 389 | $ 0.97 | $ 1.20 | $ 0.23 | $18,919.97 | 0.064658 | $1,223 |
| | 33 | 8/1/2054 | 390 | $ 0.97 | $ 1.20 | $ 0.23 | $18,919.97 | 0.064203 | $1,215 |
| | | 9/1/2054 | 391 | $ 0.97 | $ 1.20 | $ 0.23 | $18,919.97 | 0.063752 | $1,206 |
| | | 10/1/2054 | 392 | $ 0.97 | $ 1.20 | $ 0.23 | $18,919.97 | 0.063303 | $1,198 |
| | | 11/1/2054 | 393 | $ 1.00 | $ 1.24 | $ 0.24 | $19,742.58 | 0.062858 | $1,241 |
| | | 12/1/2054 | 394 | $ 1.00 | $ 1.24 | $ 0.24 | $19,742.58 | 0.062416 | $1,232 |

AUS ST 000472

| Lease Yr. | Val. Yr. | Date | Month | Contract Rent/SF | Market Rent/SF | Surplus/ Difference | Monthly Amount | PV Factor | Present Value |
|---|---|---|---|---|---|---|---|---|---|
| 39 |  | 1/1/2055 | 395 | $ 1.00 | $ 1.24 | $ 0.24 | $19,742.58 | 0.061977 | $1,224 |
|  |  | 2/1/2055 | 396 | $ 1.00 | $ 1.24 | $ 0.24 | $19,742.58 | 0.061541 | $1,215 |
|  | 34 | 3/1/2055 | 397 | $ 1.00 | $ 1.24 | $ 0.24 | $19,742.58 | 0.061108 | $1,206 |
|  |  | 4/1/2055 | 398 | $ 1.00 | $ 1.24 | $ 0.24 | $19,742.58 | 0.060678 | $1,198 |
|  |  | 5/1/2055 | 399 | $ 1.00 | $ 1.24 | $ 0.24 | $19,742.58 | 0.060251 | $1,190 |
|  |  | 6/1/2055 | 400 | $ 1.00 | $ 1.24 | $ 0.24 | $19,742.58 | 0.059828 | $1,181 |
|  |  | 7/1/2055 | 401 | $ 1.00 | $ 1.24 | $ 0.24 | $19,742.58 | 0.059407 | $1,173 |
|  |  | 8/1/2055 | 402 | $ 1.00 | $ 1.24 | $ 0.24 | $19,742.58 | 0.058989 | $1,165 |
|  |  | 9/1/2055 | 403 | $ 1.00 | $ 1.24 | $ 0.24 | $19,742.58 | 0.058574 | $1,156 |
|  |  | 10/1/2055 | 404 | $ 1.00 | $ 1.24 | $ 0.24 | $19,742.58 | 0.058162 | $1,148 |
| 40 |  | 11/1/2055 | 405 | $ 1.04 | $ 1.28 | $ 0.24 | $19,742.58 | 0.057753 | $1,140 |
|  |  | 12/1/2055 | 406 | $ 1.04 | $ 1.28 | $ 0.24 | $19,742.58 | 0.057347 | $1,132 |
|  |  | 1/1/2056 | 407 | $ 1.04 | $ 1.28 | $ 0.24 | $19,742.58 | 0.056943 | $1,124 |
|  |  | 2/1/2056 | 408 | $ 1.04 | $ 1.28 | $ 0.24 | $19,742.58 | 0.056543 | $1,116 |
|  | 35 | 3/1/2056 | 409 | $ 1.04 | $ 1.28 | $ 0.24 | $19,742.58 | 0.056145 | $1,108 |
| Total |  |  |  |  |  |  |  |  | $1,142,212 |

AUS ST 000473

## Present Value Table for South Terminal Leasehold-Amendment

| Inputs | |
|---|---|
| CPI/ Rent Increase Annual | 3.5% |
| Discount Rate | 8.5% |
| Lease Area | 108,020 SF |

| Leasehold Value | $164,317 |
|---|---|

| Leasehold - Lease Amendment | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Lease Yr. | Val. Yr. | Date | Month | Contract Rent/SF | Market Rent/SF | Surplus/ Difference | Monthly Amount | PV Factor | Present Value |
| 3 | 1 | 3/1/2022 | 1 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 1.000000 | $900 |
| | | 4/1/2022 | 2 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.992966 | $894 |
| | | 5/1/2022 | 3 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.985982 | $888 |
| | | 6/1/2022 | 4 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.979048 | $881 |
| | | 7/1/2022 | 5 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.972161 | $875 |
| | | 8/1/2022 | 6 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.965324 | $869 |
| | | 9/1/2022 | 7 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.958534 | $863 |
| | | 10/1/2022 | 8 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.951792 | $857 |
| | | 11/1/2022 | 9 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.945098 | $851 |
| | | 12/1/2022 | 10 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.938450 | $845 |
| | | 1/1/2023 | 11 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.931850 | $839 |
| | | 2/1/2023 | 12 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.925296 | $833 |
| 4 | 2 | 3/1/2023 | 13 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.918788 | $827 |
| | | 4/1/2023 | 14 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.912325 | $821 |
| | | 5/1/2023 | 15 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.905908 | $815 |
| | | 6/1/2023 | 16 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.899537 | $810 |
| | | 7/1/2023 | 17 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.893210 | $804 |
| | | 8/1/2023 | 18 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.886927 | $798 |
| | | 9/1/2023 | 19 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.880689 | $793 |
| | | 10/1/2023 | 20 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.874495 | $787 |
| | | 11/1/2023 | 21 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.868344 | $782 |
| | | 12/1/2023 | 22 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.862237 | $776 |
| | | 1/1/2024 | 23 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.856172 | $771 |
| | | 2/1/2024 | 24 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.850150 | $765 |
| 5 | 3 | 3/1/2024 | 25 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.844171 | $760 |
| | | 4/1/2024 | 26 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.838233 | $755 |
| | | 5/1/2024 | 27 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.832337 | $749 |
| | | 6/1/2024 | 28 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.826483 | $744 |
| | | 7/1/2024 | 29 | $ 0.30 | $ 0.40 | $ 0.10 | $900.17 | 0.820670 | $739 |
| | | 8/1/2024 | 30 | $ 0.35 | $ 0.47 | $ 0.12 | $1,080.20 | 0.814898 | $880 |
| | | 9/1/2024 | 31 | $ 0.35 | $ 0.47 | $ 0.12 | $1,080.20 | 0.809166 | $874 |
| | | 10/1/2024 | 32 | $ 0.35 | $ 0.47 | $ 0.12 | $1,080.20 | 0.803475 | $868 |
| | | 11/1/2024 | 33 | $ 0.35 | $ 0.47 | $ 0.12 | $1,080.20 | 0.797824 | $862 |

AUS ST 000474

| Lease Yr. | Val. Yr. | Date | Month | Contract Rent/SF | | Market Rent/SF | | Surplus/ Difference | | Monthly Amount | PV Factor | Present Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 12/1/2024 | 34 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.792212 | $856 |
| | | 1/1/2025 | 35 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.786640 | $850 |
| | | 2/1/2025 | 36 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.781107 | $844 |
| 6 | | 3/1/2025 | 37 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.775613 | $838 |
| | | 4/1/2025 | 38 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.770158 | $832 |
| | | 5/1/2025 | 39 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.764741 | $826 |
| | | 6/1/2025 | 40 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.759362 | $820 |
| | | 7/1/2025 | 41 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.754021 | $814 |
| | 4 | 8/1/2025 | 42 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.748718 | $809 |
| | | 9/1/2025 | 43 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.743452 | $803 |
| | | 10/1/2025 | 44 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.738223 | $797 |
| | | 11/1/2025 | 45 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.733030 | $792 |
| | | 12/1/2025 | 46 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.727875 | $786 |
| | | 1/1/2026 | 47 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.722755 | $781 |
| | | 2/1/2026 | 48 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.717672 | $775 |
| 7 | | 3/1/2026 | 49 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.712624 | $770 |
| | | 4/1/2026 | 50 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.707612 | $764 |
| | | 5/1/2026 | 51 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.702635 | $759 |
| | | 6/1/2026 | 52 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.697693 | $754 |
| | | 7/1/2026 | 53 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.692785 | $748 |
| | 5 | 8/1/2026 | 54 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.687913 | $743 |
| | | 9/1/2026 | 55 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.683074 | $738 |
| | | 10/1/2026 | 56 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.678270 | $733 |
| | | 11/1/2026 | 57 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.673499 | $728 |
| | | 12/1/2026 | 58 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.668762 | $722 |
| | | 1/1/2027 | 59 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.664058 | $717 |
| | | 2/1/2027 | 60 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.659388 | $712 |
| 8 | | 3/1/2027 | 61 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.654750 | $707 |
| | | 4/1/2027 | 62 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.650145 | $702 |
| | | 5/1/2027 | 63 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.645572 | $697 |
| | | 6/1/2027 | 64 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.641031 | $692 |
| | | 7/1/2027 | 65 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.636523 | $688 |
| | 6 | 8/1/2027 | 66 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.632046 | $683 |
| | | 9/1/2027 | 67 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.627600 | $678 |
| | | 10/1/2027 | 68 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.623186 | $673 |
| | | 11/1/2027 | 69 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.618803 | $668 |
| | | 12/1/2027 | 70 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.614450 | $664 |
| | | 1/1/2028 | 71 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.610129 | $659 |
| | | 2/1/2028 | 72 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.605837 | $654 |
| 9 | | 3/1/2028 | 73 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.601576 | $650 |
| | | 4/1/2028 | 74 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.597345 | $645 |
| | | 5/1/2028 | 75 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.593143 | $641 |
| | | 6/1/2028 | 76 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.588972 | $636 |
| | | 7/1/2028 | 77 | $ | 0.35 | $ | 0.47 | $ | 0.12 | $1,080.20 | 0.584829 | $632 |

AUS ST 000475

| Lease Yr. | Val. Yr. | Date | Month | Contract Rent/SF | Market Rent/SF | Surplus/ Difference | Monthly Amount | PV Factor | Present Value |
|---|---|---|---|---|---|---|---|---|---|
| | 7 | 8/1/2028 | 78 | $ 0.35 | $ 0.47 | $ 0.12 | $1,080.20 | 0.580716 | $627 |
| | | 9/1/2028 | 79 | $ 0.35 | $ 0.47 | $ 0.12 | $1,080.20 | 0.576631 | $623 |
| | | 10/1/2028 | 80 | $ 0.35 | $ 0.47 | $ 0.12 | $1,080.20 | 0.572575 | $618 |
| | | 11/1/2028 | 81 | $ 0.35 | $ 0.47 | $ 0.12 | $1,080.20 | 0.568548 | $614 |
| | | 12/1/2028 | 82 | $ 0.35 | $ 0.47 | $ 0.12 | $1,080.20 | 0.564549 | $610 |
| | | 1/1/2029 | 83 | $ 0.35 | $ 0.47 | $ 0.12 | $1,080.20 | 0.560579 | $606 |
| | | 2/1/2029 | 84 | $ 0.35 | $ 0.47 | $ 0.12 | $1,080.20 | 0.556636 | $601 |
| 10 | | 3/1/2029 | 85 | $ 0.35 | $ 0.47 | $ 0.12 | $1,080.20 | 0.552721 | $597 |
| | | 4/1/2029 | 86 | $ 0.35 | $ 0.47 | $ 0.12 | $1,080.20 | 0.548833 | $593 |
| | | 5/1/2029 | 87 | $ 0.35 | $ 0.47 | $ 0.12 | $1,080.20 | 0.544973 | $589 |
| | | 6/1/2029 | 88 | $ 0.35 | $ 0.47 | $ 0.12 | $1,080.20 | 0.541140 | $585 |
| | | 7/1/2029 | 89 | $ 0.35 | $ 0.47 | $ 0.12 | $1,080.20 | 0.537334 | $580 |
| | 8 | 8/1/2029 | 90 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.533554 | $683 |
| | | 9/1/2029 | 91 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.529802 | $678 |
| | | 10/1/2029 | 92 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.526075 | $674 |
| | | 11/1/2029 | 93 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.522375 | $669 |
| | | 12/1/2029 | 94 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.518701 | $664 |
| | | 1/1/2030 | 95 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.515053 | $660 |
| | | 2/1/2030 | 96 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.511430 | $655 |
| 11 | | 3/1/2030 | 97 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.507833 | $650 |
| | | 4/1/2030 | 98 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.504261 | $646 |
| | | 5/1/2030 | 99 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.500714 | $641 |
| | | 6/1/2030 | 100 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.497192 | $637 |
| | | 7/1/2030 | 101 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.493695 | $632 |
| | 9 | 8/1/2030 | 102 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.490223 | $628 |
| | | 9/1/2030 | 103 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.486775 | $623 |
| | | 10/1/2030 | 104 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.483351 | $619 |
| | | 11/1/2030 | 105 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.479952 | $615 |
| | | 12/1/2030 | 106 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.476576 | $610 |
| | | 1/1/2031 | 107 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.473224 | $606 |
| | | 2/1/2031 | 108 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.469895 | $602 |
| 12 | | 3/1/2031 | 109 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.466590 | $597 |
| | | 4/1/2031 | 110 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.463309 | $593 |
| | | 5/1/2031 | 111 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.460050 | $589 |
| | | 6/1/2031 | 112 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.456814 | $585 |
| | | 7/1/2031 | 113 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.453601 | $581 |
| | 10 | 8/1/2031 | 114 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.450411 | $577 |
| | | 9/1/2031 | 115 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.447243 | $573 |
| | | 10/1/2031 | 116 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.444097 | $569 |
| | | 11/1/2031 | 117 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.440974 | $565 |
| | | 12/1/2031 | 118 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.437872 | $561 |
| | | 1/1/2032 | 119 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.434792 | $557 |
| | | 2/1/2032 | 120 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.431734 | $553 |
| | | 3/1/2032 | 121 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.428698 | $549 |
| | | 4/1/2032 | 122 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.425682 | $545 |

AUS ST 000476

| Lease Yr. | Val. Yr. | Date | Month | Contract Rent/SF | Market Rent/SF | Surplus/ Difference | Monthly Amount | PV Factor | Present Value |
|---|---|---|---|---|---|---|---|---|---|
| 13 | 11 | 5/1/2032 | 123 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.422688 | $541 |
| | | 6/1/2032 | 124 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.419715 | $537 |
| | | 7/1/2032 | 125 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.416763 | $534 |
| | | 8/1/2032 | 126 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.413832 | $530 |
| | | 9/1/2032 | 127 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.410921 | $526 |
| | | 10/1/2032 | 128 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.408031 | $522 |
| | | 11/1/2032 | 129 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.405161 | $519 |
| | | 12/1/2032 | 130 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.402311 | $515 |
| | | 1/1/2033 | 131 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.399482 | $512 |
| | | 2/1/2033 | 132 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.396672 | $508 |
| 14 | 12 | 3/1/2033 | 133 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.393882 | $504 |
| | | 4/1/2033 | 134 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.391112 | $501 |
| | | 5/1/2033 | 135 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.388361 | $497 |
| | | 6/1/2033 | 136 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.385629 | $494 |
| | | 7/1/2033 | 137 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.382917 | $490 |
| | | 8/1/2033 | 138 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.380224 | $487 |
| | | 9/1/2033 | 139 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.377549 | $483 |
| | | 10/1/2033 | 140 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.374894 | $480 |
| | | 11/1/2033 | 141 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.372257 | $477 |
| | | 12/1/2033 | 142 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.369639 | $473 |
| | | 1/1/2034 | 143 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.367039 | $470 |
| | | 2/1/2034 | 144 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.364457 | $467 |
| 15 | 13 | 3/1/2034 | 145 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.361894 | $463 |
| | | 4/1/2034 | 146 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.359348 | $460 |
| | | 5/1/2034 | 147 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.356821 | $457 |
| | | 6/1/2034 | 148 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.354311 | $454 |
| | | 7/1/2034 | 149 | $ 0.41 | $ 0.55 | $ 0.14 | $1,280.49 | 0.351819 | $450 |
| | | 8/1/2034 | 150 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.349345 | $535 |
| | | 9/1/2034 | 151 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.346888 | $531 |
| | | 10/1/2034 | 152 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.344448 | $527 |
| | | 11/1/2034 | 153 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.342025 | $523 |
| | | 12/1/2034 | 154 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.339619 | $520 |
| | | 1/1/2035 | 155 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.337231 | $516 |
| | | 2/1/2035 | 156 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.334859 | $512 |
| 16 | 14 | 3/1/2035 | 157 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.332504 | $509 |
| | | 4/1/2035 | 158 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.330165 | $505 |
| | | 5/1/2035 | 159 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.327843 | $502 |
| | | 6/1/2035 | 160 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.325537 | $498 |
| | | 7/1/2035 | 161 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.323247 | $495 |
| | | 8/1/2035 | 162 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.320974 | $491 |
| | | 9/1/2035 | 163 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.318716 | $488 |
| | | 10/1/2035 | 164 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.316474 | $484 |
| | | 11/1/2035 | 165 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.314248 | $481 |
| | | 12/1/2035 | 166 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.312038 | $478 |
| | | 1/1/2036 | 167 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.309843 | $474 |

AUS ST 000477

| Lease Yr. | Val. Yr. | Date | Month | Contract Rent/SF | Market Rent/SF | Surplus/ Difference | Monthly Amount | PV Factor | Present Value |
|---|---|---|---|---|---|---|---|---|---|
| | | 2/1/2036 | 168 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.307664 | $471 |
| | | 3/1/2036 | 169 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.305500 | $468 |
| | | 4/1/2036 | 170 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.303351 | $464 |
| 17 | | 5/1/2036 | 171 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.301218 | $461 |
| | | 6/1/2036 | 172 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.299099 | $458 |
| | | 7/1/2036 | 173 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.296995 | $454 |
| | 15 | 8/1/2036 | 174 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.294906 | $451 |
| | | 9/1/2036 | 175 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.292832 | $448 |
| | | 10/1/2036 | 176 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.290773 | $445 |
| | | 11/1/2036 | 177 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.288727 | $442 |
| | | 12/1/2036 | 178 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.286697 | $439 |
| | | 1/1/2037 | 179 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.284680 | $436 |
| | | 2/1/2037 | 180 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.282678 | $433 |
| | | 3/1/2037 | 181 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.280690 | $430 |
| | | 4/1/2037 | 182 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.278715 | $427 |
| 18 | | 5/1/2037 | 183 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.276755 | $424 |
| | | 6/1/2037 | 184 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.274809 | $421 |
| | | 7/1/2037 | 185 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.272876 | $418 |
| | 16 | 8/1/2037 | 186 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.270956 | $415 |
| | | 9/1/2037 | 187 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.269051 | $412 |
| | | 10/1/2037 | 188 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.267158 | $409 |
| | | 11/1/2037 | 189 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.265279 | $406 |
| | | 12/1/2037 | 190 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.263413 | $403 |
| | | 1/1/2038 | 191 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.261561 | $400 |
| | | 2/1/2038 | 192 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.259721 | $397 |
| | | 3/1/2038 | 193 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.257894 | $395 |
| | | 4/1/2038 | 194 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.256080 | $392 |
| 19 | | 5/1/2038 | 195 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.254279 | $389 |
| | | 6/1/2038 | 196 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.252491 | $386 |
| | | 7/1/2038 | 197 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.250715 | $384 |
| | 17 | 8/1/2038 | 198 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.248951 | $381 |
| | | 9/1/2038 | 199 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.247200 | $378 |
| | | 10/1/2038 | 200 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.245462 | $376 |
| | | 11/1/2038 | 201 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.243735 | $373 |
| | | 12/1/2038 | 202 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.242021 | $370 |
| | | 1/1/2039 | 203 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.240319 | $368 |
| | | 2/1/2039 | 204 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.238628 | $365 |
| | | 3/1/2039 | 205 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.236950 | $363 |
| | | 4/1/2039 | 206 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.235283 | $360 |
| 20 | | 5/1/2039 | 207 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.233628 | $358 |
| | | 6/1/2039 | 208 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.231985 | $355 |
| | | 7/1/2039 | 209 | $ 0.48 | $ 0.65 | $ 0.17 | $1,530.28 | 0.230354 | $353 |
| | 18 | 8/1/2039 | 210 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.228733 | $350 |
| | | 9/1/2039 | 211 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.227125 | $348 |
| | | 10/1/2039 | 212 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.225527 | $345 |

AUS ST 000478

| Lease Yr. | Val. Yr. | Date | Month | Contract Rent/SF | Market Rent/SF | Surplus/ Difference | Monthly Amount | PV Factor | Present Value |
|---|---|---|---|---|---|---|---|---|---|
| | | 11/1/2039 | 213 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.223941 | $343 |
| | | 12/1/2039 | 214 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.222366 | $340 |
| | | 1/1/2040 | 215 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.220802 | $338 |
| | | 2/1/2040 | 216 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.219249 | $336 |
| 21 | | 3/1/2040 | 217 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.217707 | $333 |
| | | 4/1/2040 | 218 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.216175 | $331 |
| | | 5/1/2040 | 219 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.214655 | $328 |
| | | 6/1/2040 | 220 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.213145 | $326 |
| | | 7/1/2040 | 221 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.211646 | $324 |
| | 19 | 8/1/2040 | 222 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.210157 | $322 |
| | | 9/1/2040 | 223 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.208679 | $319 |
| | | 10/1/2040 | 224 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.207212 | $317 |
| | | 11/1/2040 | 225 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.205754 | $315 |
| | | 12/1/2040 | 226 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.204307 | $313 |
| | | 1/1/2041 | 227 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.202870 | $310 |
| | | 2/1/2041 | 228 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.201443 | $308 |
| 22 | | 3/1/2041 | 229 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.200026 | $306 |
| | | 4/1/2041 | 230 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.198619 | $304 |
| | | 5/1/2041 | 231 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.197222 | $302 |
| | | 6/1/2041 | 232 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.195835 | $300 |
| | | 7/1/2041 | 233 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.194458 | $298 |
| | 20 | 8/1/2041 | 234 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.193090 | $295 |
| | | 9/1/2041 | 235 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.191732 | $293 |
| | | 10/1/2041 | 236 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.190383 | $291 |
| | | 11/1/2041 | 237 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.189044 | $289 |
| | | 12/1/2041 | 238 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.187715 | $287 |
| | | 1/1/2042 | 239 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.186394 | $285 |
| | | 2/1/2042 | 240 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.185083 | $283 |
| 23 | | 3/1/2042 | 241 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.183782 | $281 |
| | | 4/1/2042 | 242 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.182489 | $279 |
| | | 5/1/2042 | 243 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.181205 | $277 |
| | | 6/1/2042 | 244 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.179931 | $275 |
| | | 7/1/2042 | 245 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.178665 | $273 |
| | 21 | 8/1/2042 | 246 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.177409 | $271 |
| | | 9/1/2042 | 247 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.176161 | $270 |
| | | 10/1/2042 | 248 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.174922 | $268 |
| | | 11/1/2042 | 249 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.173692 | $266 |
| | | 12/1/2042 | 250 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.172470 | $264 |
| | | 1/1/2043 | 251 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.171257 | $262 |
| | | 2/1/2043 | 252 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.170052 | $260 |
| 24 | | 3/1/2043 | 253 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.168856 | $258 |
| | | 4/1/2043 | 254 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.167669 | $257 |
| | | 5/1/2043 | 255 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.166489 | $255 |
| | | 6/1/2043 | 256 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.165318 | $253 |
| | | 7/1/2043 | 257 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.164155 | $251 |

AUS ST 000479

| Lease Yr. | Val. Yr. | Date | Month | Contract Rent/SF | Market Rent/SF | Surplus/ Difference | Monthly Amount | PV Factor | Present Value |
|---|---|---|---|---|---|---|---|---|---|
| | 22 | 8/1/2043 | 258 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.163001 | $249 |
| | | 9/1/2043 | 259 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.161854 | $248 |
| | | 10/1/2043 | 260 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.160716 | $246 |
| | | 11/1/2043 | 261 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.159586 | $244 |
| | | 12/1/2043 | 262 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.158463 | $242 |
| | | 1/1/2044 | 263 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.157349 | $241 |
| | | 2/1/2044 | 264 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.156242 | $239 |
| 25 | | 3/1/2044 | 265 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.155143 | $237 |
| | | 4/1/2044 | 266 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.154052 | $236 |
| | | 5/1/2044 | 267 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.152968 | $234 |
| | | 6/1/2044 | 268 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.151892 | $232 |
| | | 7/1/2044 | 269 | $ 0.50 | $ 0.67 | $ 0.17 | $1,530.28 | 0.150824 | $231 |
| | 23 | 8/1/2044 | 270 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.149763 | $229 |
| | | 9/1/2044 | 271 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.148710 | $228 |
| | | 10/1/2044 | 272 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.147664 | $226 |
| | | 11/1/2044 | 273 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.146625 | $224 |
| | | 12/1/2044 | 274 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.145594 | $223 |
| | | 1/1/2045 | 275 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.144570 | $221 |
| | | 2/1/2045 | 276 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.143553 | $220 |
| 26 | | 3/1/2045 | 277 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.142543 | $218 |
| | | 4/1/2045 | 278 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.141541 | $217 |
| | | 5/1/2045 | 279 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.140545 | $215 |
| | | 6/1/2045 | 280 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.139557 | $214 |
| | | 7/1/2045 | 281 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.138575 | $212 |
| | 24 | 8/1/2045 | 282 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.137601 | $211 |
| | | 9/1/2045 | 283 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.136633 | $209 |
| | | 10/1/2045 | 284 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.135672 | $208 |
| | | 11/1/2045 | 285 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.134717 | $206 |
| | | 12/1/2045 | 286 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.133770 | $205 |
| | | 1/1/2046 | 287 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.132829 | $203 |
| | | 2/1/2046 | 288 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.131895 | $202 |
| 27 | | 3/1/2046 | 289 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.130967 | $200 |
| | | 4/1/2046 | 290 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.130046 | $199 |
| | | 5/1/2046 | 291 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.129131 | $198 |
| | | 6/1/2046 | 292 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.128223 | $196 |
| | | 7/1/2046 | 293 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.127321 | $195 |
| | 25 | 8/1/2046 | 294 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.126426 | $193 |
| | | 9/1/2046 | 295 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.125536 | $192 |
| | | 10/1/2046 | 296 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.124653 | $191 |
| | | 11/1/2046 | 297 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.123777 | $189 |
| | | 12/1/2046 | 298 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.122906 | $188 |
| | | 1/1/2047 | 299 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.122042 | $187 |
| | | 2/1/2047 | 300 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.121183 | $185 |
| | | 3/1/2047 | 301 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.120331 | $184 |
| | | 4/1/2047 | 302 | $ 0.52 | $ 0.69 | $ 0.17 | $1,530.28 | 0.119485 | $183 |

AUS ST 000480

| Lease Yr. | Val. Yr. | Date | Month | Contract Rent/SF | | Market Rent/SF | | Surplus/ Difference | | Monthly Amount | PV Factor | Present Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 28 | 26 | 5/1/2047 | 303 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.118644 | $182 |
| | | 6/1/2047 | 304 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.117810 | $180 |
| | | 7/1/2047 | 305 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.116981 | $179 |
| | | 8/1/2047 | 306 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.116158 | $178 |
| | | 9/1/2047 | 307 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.115341 | $177 |
| | | 10/1/2047 | 308 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.114530 | $175 |
| | | 11/1/2047 | 309 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.113725 | $174 |
| | | 12/1/2047 | 310 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.112925 | $173 |
| | | 1/1/2048 | 311 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.112130 | $172 |
| | | 2/1/2048 | 312 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.111342 | $170 |
| 29 | 27 | 3/1/2048 | 313 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.110559 | $169 |
| | | 4/1/2048 | 314 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.109781 | $168 |
| | | 5/1/2048 | 315 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.109009 | $167 |
| | | 6/1/2048 | 316 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.108242 | $166 |
| | | 7/1/2048 | 317 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.107481 | $164 |
| | | 8/1/2048 | 318 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.106725 | $163 |
| | | 9/1/2048 | 319 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.105974 | $162 |
| | | 10/1/2048 | 320 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.105229 | $161 |
| | | 11/1/2048 | 321 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.104489 | $160 |
| | | 12/1/2048 | 322 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.103754 | $159 |
| | | 1/1/2049 | 323 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.103024 | $158 |
| | | 2/1/2049 | 324 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.102299 | $157 |
| 30 | 28 | 3/1/2049 | 325 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.101580 | $155 |
| | | 4/1/2049 | 326 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.100865 | $154 |
| | | 5/1/2049 | 327 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.100156 | $153 |
| | | 6/1/2049 | 328 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.099452 | $152 |
| | | 7/1/2049 | 329 | $ | 0.52 | $ | 0.69 | $ | 0.17 | $1,530.28 | 0.098752 | $151 |
| | | 8/1/2049 | 330 | $ | 0.54 | $ | 0.71 | $ | 0.17 | $1,530.28 | 0.098057 | $150 |
| | | 9/1/2049 | 331 | $ | 0.54 | $ | 0.71 | $ | 0.17 | $1,530.28 | 0.097368 | $149 |
| | | 10/1/2049 | 332 | $ | 0.54 | $ | 0.71 | $ | 0.17 | $1,530.28 | 0.096683 | $148 |
| | | 11/1/2049 | 333 | $ | 0.54 | $ | 0.71 | $ | 0.17 | $1,530.28 | 0.096003 | $147 |
| | | 12/1/2049 | 334 | $ | 0.54 | $ | 0.71 | $ | 0.17 | $1,530.28 | 0.095328 | $146 |
| | | 1/1/2050 | 335 | $ | 0.54 | $ | 0.71 | $ | 0.17 | $1,530.28 | 0.094657 | $145 |
| | | 2/1/2050 | 336 | $ | 0.54 | $ | 0.71 | $ | 0.17 | $1,530.28 | 0.093991 | $144 |
| 31 | 29 | 3/1/2050 | 337 | $ | 0.54 | $ | 0.71 | $ | 0.17 | $1,530.28 | 0.093330 | $143 |
| | | 4/1/2050 | 338 | $ | 0.54 | $ | 0.71 | $ | 0.17 | $1,530.28 | 0.092674 | $142 |
| | | 5/1/2050 | 339 | $ | 0.54 | $ | 0.71 | $ | 0.17 | $1,530.28 | 0.092022 | $141 |
| | | 6/1/2050 | 340 | $ | 0.54 | $ | 0.71 | $ | 0.17 | $1,530.28 | 0.091375 | $140 |
| | | 7/1/2050 | 341 | $ | 0.54 | $ | 0.71 | $ | 0.17 | $1,530.28 | 0.090732 | $139 |
| | | 8/1/2050 | 342 | $ | 0.54 | $ | 0.71 | $ | 0.17 | $1,530.28 | 0.090094 | $138 |
| | | 9/1/2050 | 343 | $ | 0.54 | $ | 0.71 | $ | 0.17 | $1,530.28 | 0.089460 | $137 |
| | | 10/1/2050 | 344 | $ | 0.54 | $ | 0.71 | $ | 0.17 | $1,530.28 | 0.088831 | $136 |
| | | 11/1/2050 | 345 | $ | 0.54 | $ | 0.71 | $ | 0.17 | $1,530.28 | 0.088206 | $135 |
| | | 12/1/2050 | 346 | $ | 0.54 | $ | 0.71 | $ | 0.17 | $1,530.28 | 0.087586 | $134 |
| | | 1/1/2051 | 347 | $ | 0.54 | $ | 0.71 | $ | 0.17 | $1,530.28 | 0.086970 | $133 |

AUS ST 000481

| Lease Yr. | Val. Yr. | Date | Month | Contract Rent/SF | Market Rent/SF | Surplus/ Difference | Monthly Amount | PV Factor | Present Value |
|---|---|---|---|---|---|---|---|---|---|
| 32 | 30 | 2/1/2051 | 348 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.086358 | $132 |
| | | 3/1/2051 | 349 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.085751 | $131 |
| | | 4/1/2051 | 350 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.085148 | $130 |
| | | 5/1/2051 | 351 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.084549 | $129 |
| | | 6/1/2051 | 352 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.083954 | $128 |
| | | 7/1/2051 | 353 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.083364 | $128 |
| | | 8/1/2051 | 354 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.082777 | $127 |
| | | 9/1/2051 | 355 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.082195 | $126 |
| | | 10/1/2051 | 356 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.081617 | $125 |
| | | 11/1/2051 | 357 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.081043 | $124 |
| 33 | 31 | 12/1/2051 | 358 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.080473 | $123 |
| | | 1/1/2052 | 359 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.079907 | $122 |
| | | 2/1/2052 | 360 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.079345 | $121 |
| | | 3/1/2052 | 361 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.078787 | $121 |
| | | 4/1/2052 | 362 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.078233 | $120 |
| | | 5/1/2052 | 363 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.077682 | $119 |
| | | 6/1/2052 | 364 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.077136 | $118 |
| | | 7/1/2052 | 365 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.076593 | $117 |
| | | 8/1/2052 | 366 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.076055 | $116 |
| | | 9/1/2052 | 367 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.075520 | $116 |
| | | 10/1/2052 | 368 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.074989 | $115 |
| | | 11/1/2052 | 369 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.074461 | $114 |
| 34 | 32 | 12/1/2052 | 370 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.073937 | $113 |
| | | 1/1/2053 | 371 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.073417 | $112 |
| | | 2/1/2053 | 372 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.072901 | $112 |
| | | 3/1/2053 | 373 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.072388 | $111 |
| | | 4/1/2053 | 374 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.071879 | $110 |
| | | 5/1/2053 | 375 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.071374 | $109 |
| | | 6/1/2053 | 376 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.070872 | $108 |
| | | 7/1/2053 | 377 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.070373 | $108 |
| | | 8/1/2053 | 378 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.069878 | $107 |
| | | 9/1/2053 | 379 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.069387 | $106 |
| | | 10/1/2053 | 380 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.068899 | $105 |
| | | 11/1/2053 | 381 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.068414 | $105 |
| 35 | 33 | 12/1/2053 | 382 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.067933 | $104 |
| | | 1/1/2054 | 383 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.067455 | $103 |
| | | 2/1/2054 | 384 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.066981 | $102 |
| | | 3/1/2054 | 385 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.066509 | $102 |
| | | 4/1/2054 | 386 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.066042 | $101 |
| | | 5/1/2054 | 387 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.065577 | $100 |
| | | 6/1/2054 | 388 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.065116 | $100 |
| | | 7/1/2054 | 389 | $ 0.54 | $ 0.71 | $ 0.17 | $1,530.28 | 0.064658 | $99 |
| | | 8/1/2054 | 390 | $ 0.56 | $ 0.73 | $ 0.17 | $1,530.28 | 0.064203 | $98 |
| | | 9/1/2054 | 391 | $ 0.56 | $ 0.73 | $ 0.17 | $1,530.28 | 0.063752 | $98 |
| | | 10/1/2054 | 392 | $ 0.56 | $ 0.73 | $ 0.17 | $1,530.28 | 0.063303 | $97 |

AUS ST 000482

| Lease Yr. | Val. Yr. | Date | Month | Contract Rent/SF | | Market Rent/SF | | Surplus/ Difference | | Monthly Amount | PV Factor | Present Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 11/1/2054 | 393 | $ | 0.56 | $ | 0.73 | $ | 0.17 | $1,530.28 | 0.062858 | $96 |
| | | 12/1/2054 | 394 | $ | 0.56 | $ | 0.73 | $ | 0.17 | $1,530.28 | 0.062416 | $96 |
| | | 1/1/2055 | 395 | $ | 0.56 | $ | 0.73 | $ | 0.17 | $1,530.28 | 0.061977 | $95 |
| | | 2/1/2055 | 396 | $ | 0.56 | $ | 0.73 | $ | 0.17 | $1,530.28 | 0.061541 | $94 |
| 36 | | 3/1/2055 | 397 | $ | 0.56 | $ | 0.73 | $ | 0.17 | $1,530.28 | 0.061108 | $94 |
| | | 4/1/2055 | 398 | $ | 0.56 | $ | 0.73 | $ | 0.17 | $1,530.28 | 0.060678 | $93 |
| | | 5/1/2055 | 399 | $ | 0.56 | $ | 0.73 | $ | 0.17 | $1,530.28 | 0.060251 | $92 |
| | | 6/1/2055 | 400 | $ | 0.56 | $ | 0.73 | $ | 0.17 | $1,530.28 | 0.059828 | $92 |
| | | 7/1/2055 | 401 | $ | 0.56 | $ | 0.73 | $ | 0.17 | $1,530.28 | 0.059407 | $91 |
| | 34 | 8/1/2055 | 402 | $ | 0.56 | $ | 0.73 | $ | 0.17 | $1,530.28 | 0.058989 | $90 |
| | | 9/1/2055 | 403 | $ | 0.56 | $ | 0.73 | $ | 0.17 | $1,530.28 | 0.058574 | $90 |
| | | 10/1/2055 | 404 | $ | 0.56 | $ | 0.73 | $ | 0.17 | $1,530.28 | 0.058162 | $89 |
| | | 11/1/2055 | 405 | $ | 0.56 | $ | 0.73 | $ | 0.17 | $1,530.28 | 0.057753 | $88 |
| 37 | | 12/1/2055 | 406 | $ | 0.56 | $ | 0.73 | $ | 0.17 | $1,530.28 | 0.057347 | $88 |
| | | 1/1/2056 | 407 | $ | 0.56 | $ | 0.73 | $ | 0.17 | $1,530.28 | 0.056943 | $87 |
| | | 2/1/2056 | 408 | $ | 0.56 | $ | 0.73 | $ | 0.17 | $1,530.28 | 0.056543 | $87 |
| | 35 | 3/1/2056 | 409 | $ | 0.56 | $ | 0.73 | $ | 0.17 | $1,530.28 | 0.056145 | $86 |
| Total | | | | | | | | | | | | $164,317 |

AUS ST 000483

*Alien, Williford & Seale, Inc.*

## COMPARABLE LAND SALES AND MAP



## Land Sale - 07/26/2016-Sale No. 1



**County** TRAVIS **State** TX **AWS No.** 00048978

| | | | | | |
|---|---|---|---|---|---|
| **Sale Date** | 07/26/2016 | **Size (Acres)** | 12.864 | **Price/Ac** | $127,195 |
| **Price** | $1,636,239 | **Size (SF)** | 560,356 | **Price/SF** | $2.92 |

| | |
|---|---|
| **Location** | Southwest line of Burleson Road, southeast of Smith School Road |
| **Grantor** | BUR13, Ltd. |
| **Grantee** | Liquid Environmental Solutions of Texas, LLC |
| **Recording Data** | Document No. 2016121285 |
| **Legal Description** | Being 12.864 acres of land known as Lots 1, 2, and 3, 7005 Burleson Industrial Subdivision, City of Austin, Travis County, Texas |
| **Financing** | Cash to seller |
| **Frontage** | ±534 FF: Burleson Road |
| **Flood Plain** | No - Zone X | **Zoning** | LI-CO (Limited Industrial Services - Conditional Overlay) |
| **Water** | Public | **Sewer** | Public |
| **Use at Date of Sale** | Vacant land |
| **Easements** | Typical utility easement |
| **Confirmation** | City of Austin Files |
| **Comments** | The property consists of a heavily wooded vacant tract of land. The property is located in the City of Austin and is zoned LI-CO (Limited Industrial Services - Conditional Overlay). The property is located in Del Valle ISD. |

AUS ST 000486

## Land Sale - 09/09/2016- Sale No. 2

**County** TRAVIS **State** TX **AWS No.** 00048976



| **Sale Date** | 09/09/2016 | **Size (Acres)** | 93.789 | **Price/Ac** | $51,179 |
|---|---|---|---|---|---|
| **Price** | $4,800,000 | **Size (SF)** | 4,085,449 | **Price/SF** | $1.17 |

| | |
|---|---|
| **Location** | Southwest corner of U.S. Highway 183 and Burleson Road |
| **Grantor** | Sundberg Farm Limited Partnership, et al |
| **Grantee** | Park 183 Land, LLC |
| **Recording Data** | Document No. 2016152172 |
| **Legal Description** | Being 93.789 acres of land and being a portion of Lot 1, Block A, Sundberg Estates, City of Austin, Travis County, Texas |
| **Financing** | Cash to seller |
| **Frontage** | ±1,275 FF: U.S. Highway 183, ±2,235 FF: Burleson Road |
| **Flood Plain** | Yes - ±5% Zone A;±10% Shaded Zone X | **Zoning** LI-CO & I-RR & Airport Overlay AO-3(Portion) |
| **Water** | Public | **Sewer** Public |
| **Use at Date of Sale** | Agricultural/Recreational |
| **Easements** | Two pipelines, Drainage easement (0.824 Ac & 50.391 Ac) and typical utility easements |
| **Confirmation** | City of Austin Files |
| **Comments** | The tract consists of pasture with scattered trees. The property is located in the City of Austin and is zoned LI-CO (Limited Industrial Services-Conditional Overlay) and I-RR (Interim - Rural Residence). The eastern portion of the tract is located in ABIA Airport Overlay Zone AO-3 due to the proximity to the airport. A portion of the property lies within Zone A of the 100-year flood plain and Shaded Zone X of the 500-year flood plain. The property was improved with some old barns/sheds that had no value. The drainage easement over a portion of the tract was reduced by vacation after the sale in 2017. The property is located in Del Valle ISD. |

AUS ST 000487

## Land Sale - 04/24/2017-Sale No. 3

**County** TRAVIS **State** TX **AWS No.** 00034993



| **Sale Date** 04/24/2017 | **Size (Acres) 150.155** | **Price/Ac** $66,598 |
|---|---|---|
| **Price** $10,000,000 | **Size (SF) 6,540,752** | **Price/SF** $1.53 |

| | |
|---|---|
| **Location** | Southwest Corner of U.S. Highway 183 and McKinney Falls Parkway |
| **Grantor** | Bradsher Family Trust |
| **Grantee** | CCI-McKinney Falls I LP |
| **Recording Data** | Document No. 2017066156 |
| **Legal Description** | 150.155 acres of land, more or less, situated in the Santiago Del Valle Grant, Abstract No. 24, Travis County, Texas |
| **Financing** | Cash to Seller |
| **Frontage** | ±3,100 FF: McKinney Falls Parkway; ±2,323 FF: Lockhart Highway (183) 450 FF McCall Lane |
| **Flood Plain** | Yes - 40% Zone A        **Zoning** Commercial, Light Industrial -Airport Overlay AO-3 |
| **Water** | Yes-City-See Comments        **Sewer** Yes-City-See Comments |
| **Use at Date of Sale** | Vacant land |
| **Easements** | 2 pipelines and the City of Austin electric transmission line traverses the 19-acre and 124-acre tracts in a general north to south direction. |
| **Confirmation** | Jack Bradsher, CBRE, City of Austin |
| **Comments** | The property is generally flat and is cleared of trees and made up of three |

AUS ST 000488

separate tracts totaling 150.155 acres (Tract 1-19.66 ac. 2-5.639 ac, 3-124.856 ac). The property is zoned as commercial and is Airport Overlay Zone AO-3 due to its proximity to the airport across Highway 183. A Citgo Products Pipeline Company pipeline carrying gasoline traverses the property and an ExxonMobil Pipeline Company pipeline carrying gasoline parallels the Citgo pipeline. Approximately 40% of the property is located in Zone A, an area inside the 100-year flood plain. Due to the flood plain(approximately 61 acres), and electric transmission line (approximately 4.54 acres) only about 84 acres are buildable according to the current listing. The city at the time of the sale had no utilities; however, utilities have been installed.

AUS ST 000489

## Land Sale - 05/21/2018-Sale No. 4

**County** TRAVIS **State** TX **AWS No.** 00048981



| | | | | | |
|---|---|---|---|---|---|
| **Sale Date** | 05/21/2018 | **Size (Acres)** | 50.365 | **Price/Ac** | $179,030 |
| **Price** | $9,016,867 | **Size (SF)** | 2,193,899 | **Price/SF** | $4.11 |

| | |
|---|---|
| **Location** | Southeast line of FM 973, southwest of State Highway 71 |
| **Grantor** | SH 71-130 Holdings, LP |
| **Grantee** | TMINE, Inc. |
| **Recording Data** | Document No. 2018078302 |
| **Legal Description** | Being 50.365 acres of land known as Lot 1 of Velocity Technology Center, City of Austin, Travis County, Texas |
| **Financing** | Cash to seller |
| **Frontage** | ±983 FF: FM 973 |
| **Flood Plain** | No - Zone X    **Zoning** LI-PDA |
| **Water** | Public    **Sewer** Public |
| **Use at Date of Sale** | Cropland |
| **Easements** | City of Austin Drainage Easements (2.081 Ac & 7.514 Ac) |
| **Confirmation** | City of Austin Records |
| **Comments** | The property consists of cropland at the time of sale. The property is located in the City of Austin and is zoned LI-PDA (Limited Industrial Services - Planned Development Area). The property is located in Del Valle ISD. |

AUS ST 000490

## Land Sale - 11/06/2019-Sale No. 5

**County** TRAVIS **State** TX **AWS No.** 00048980



| | | | | | |
|---|---|---|---|---|---|
| **Sale Date** | 11/06/2019 | **Size (Acres)** | 14.145 | **Price/Ac** | $87,169 |
| **Price** | $1,233,000 | **Size (SF)** | 616,156 | **Price/SF** | $2.00 |

| | |
|---|---|
| **Location** | Northeast line of Burleson Road, northwest of Norwood Lane |
| **Grantor** | Jimmie L. McComb and spouse, Shirlene A. McComb |
| **Grantee** | Hey Burl, LLC |
| **Recording Data** | Document No. 2019175433 |
| **Legal Description** | Being 14.145 acres of land situated in the Santiago Del Valle Grant, Abstract No. 24, City of Austin, Travis County, Texas |
| **Financing** | Cash to seller |
| **Frontage** | ±205 FF: Burleson Road |
| **Flood Plain** | Yes - ±10% Zone A; minimal Shaded Zone X     **Zoning** CS-CO-NP |
| **Water** | Public     **Sewer** Public |
| **Use at Date of Sale** | Commercial |
| **Easements** | Typical utility easements |
| **Confirmation** | City of Austin Files |
| **Comments** | The property consists of open pastureland with scattered trees. The property is located in the City of Austin and is zoned CS-CO-NP (Commercial Services-Conditional Overlay-Neighborhood Plan). A portion of the property lies within Zone A of the 100-year flood plain and Shaded Zone X of the 500-year flood plain. At the time of sale, the property was improved with an office building (2,232 SF, built 1980) and some outbuildings. According to the confirmation source, the improvements had a contributory value of $167,000. This transaction had an initial sales price of $1,400,000. We have deducted the contributory value of the improvements utilized a land only sales price of $1,233,000. The property is located in Del Valle ISD. |

AUS ST 000491

## Land Sale - 04/07/2021-Sale No. 6

| | County | TRAVIS | State | TX | AWS No. | 00048974 |



| | | | | | | |
|---|---|---|---|---|---|---|
| **Sale Date** | 04/07/2021 | **Size (Acres)** | 60.050 | **Price/Ac** | $100,000 |
| **Price** | $6,005,000 | **Size (SF)** | 2,615,778 | **Price/SF** | $2.30 |

| | |
|---|---|
| **Location** | North corner of Old Bastrop Highway and Dalton Lane |
| **Grantor** | Cumberland & Western Resources, LLC |
| **Grantee** | SRPF C/Dalton Lane, L.P. |
| **Recording Data** | Document No. 2021076478 |
| **Legal Description** | Being 60.05 acres of land situated in the Santiago Del Valle Grant, City of Austin, Travis County, Texas |
| **Financing** | Cash to seller |
| **Frontage** | ±935 FF: Old Bastrop Highway; ±2,085 FF: Dalton Lane |
| **Flood Plain** | Yes - ±25% Zone A; ±5% Shaded Zone X — **Zoning** CH-CO - Airport Overlay AO-2 & AO-3 |
| **Water** | Public — **Sewer** Public |
| **Use at Date of Sale** | Vacant land |
| **Easements** | Typical utility easement and Aviation Easement. |
| **Confirmation** | Jamison Stewart |
| **Comments** | The property consists of a densely wooded vacant tract of land. The property is located in the city limits of Austin and is zoned CH-CO (Commercial Highway - Conditional Overlay). The tract has Aiport Overlay AO-2 and AO-3 due to the proximity to the ABIA runway. Carson Creek traverses the northern portion of the property. Carson Creek traverses the northern portion of the property. Areas along Carson Creek lie within Zone A of the flood plain and Shaded Zone X of the 500 year flood plain. The property is located in Del Valle ISD. |

AUS ST 000492

## Land Sale - 09/14/2021-Sale No. 7

**County** TRAVIS **State** TX **AWS No.** 00048975



| | | | | | |
|---|---|---|---|---|---|
| **Sale Date** | 09/14/2021 | **Size (Acres)** | 27.610 | **Price/Ac** | $100,000 |
| **Price** | $2,761,000 | **Size (SF)** | 1,202,692 | **Price/SF** | $2.30 |

| | |
|---|---|
| **Location** | Northwest line of Dalton lane, northeast of Old Bastrop Highway |
| **Grantor** | Cumberland & Western Resources, LLC |
| **Grantee** | Ranger Excavating, L.P. |
| **Recording Data** | Document No. 2021205143 |
| **Legal Description** | Being 27.610 acres of land situated in the Santiago Del Valle Grant, City of Austin, Travis County, Texas |
| **Financing** | Cash to seller |
| **Frontage** | ±1,025 FF: Dalton Lane |
| **Flood Plain** | Yes - ±65% Zone A; ±5% Shaded Zone X  **Zoning** LI-CO & RR- ABIA Airport Overlay A-3 |
| **Water** | Public  **Sewer** Public |
| **Use at Date of Sale** | Vacant land |
| **Easements** | Typical utility easement |
| **Confirmation** | Jamison Stewart |
| **Comments** | The property consists of a vacant tract of land with scattered trees/brush. The property is located in the City of Austin and is zoned LI-CO (Limited Industrial Services - Conditional Overlay) and RR (Rural Residence). The tract is also in the ABIA Overlay A-3 due to its proximity to the airport. The majority of the property lies within Zone A of the flood plain and Shaded Zone X of the 500 year flood plain. The property is located in Del Valle ISD. |

AUS ST 000493

*Allen, Williford & Seale, Inc.*

## COMPARABLE RENTALS AND MAP



ABIA Ground Lease Comparables

AUS Fuel - No. 1

LoneStar Initial Lease - No. 3

LoneStar Amendment - No. 4

Austin FBO - No. 2

DeLorme Street Atlas USA® 2010

Data use subject to license.
© DeLorme. DeLorme Street Atlas USA® 2010.
www.delorme.com

Scale 1 : 19,200

1" = 1,600.0 ft    Data Zoom 13-4

AUS ST 000495

## COMPARABLE DATA – AUS Fuel Co., LLC-RENTAL 1

State: _____ Texas _____    County: _____ Travis _____    City Limits/ETJ: _____ City of Austin _____




Grantor/Lessor: _____ City of Austin _____    Grantee/Lessee: _____ AUS Fuel Company, LLC. _____

Beginning Date: _____ October 1, 2019 _____   **Expiration Date:** _____ September 30, 2034 _____    Address: _____ 3324 Spirit of Texas Dr. _____

Recording Information: _____ None-Lease _____    Zip Code: _____ 78719 _____

Legal
Description: _____ AUS-North Site _____

Verified with: _____ Lease Document _____

The Lease executed on October 10, 2019 and expires on September 30, 2034 with a term of 15 years with one five year renewal option. The leased area consists of 300,677 SF and the contract rent is $0.37 per SF called ground rent with an increase every year based on CPI years after July 1, 2024. The confirmation source has indicated the current contract rent in December 2021 was $0.37 per SF.

Rental Data: _____ The lease also calls for "Finance Rent" which is equal to the City's debt service on the fuel facility. _____

Type Street: Spirit of Texas Dr. two lane asphalt paved roadway with curb and gutter drainage    Utilities: _____ All Available –City of Austin _____

Land Size: _____ 6.903 Acres (300,677 SF) _____

Improvement(s) Description: Fuel Facility Consists of 2 storage tanks, five loading positions, 2 off-load rack, a waste fuel tank, a 25,000 gallon oil water separator, an operations building along with a pumping lift station and 50 Kw generator. The fueling tanks consist of 2 above ground tanks having a volume of 480,000 and 691,000 gallons. There is also a plane refueling position for 15 vehicles. The site has parking lot with driveways and supporting site improvements. The fuel facility was built in 1998.

Improvement(s) Size: _____ See Above _____ (GBA) Not Applicable (NRA)

Condition and Functional Design: _____ Good condition; Functional in design _____

Current Use: _____ Aviation Service _____    Highest & Best Use: _____ Aviation Service _____

Date of Inspection: _____ January 28, 2022 _____   Zoning: _____ AV-Airport _____   Flood Plain: _____ No – Zone X _____

Attach Additional Information: _____ The leased property consists of a site used for the current ABIA Fuel Service. The parties anticipate that the fuel site may move in the future. The lease can be assigned by agreement with the City. _____

AUS ST 000496

EXECUTION COPY



AUS/ST 004107

AUS ST 000497

## COMPARABLE DATA – Austin FBO, LLC-RENTAL 2

State: _____ Texas _____     County: _____ Travis _____     City Limits/ETJ: _____ City of Austin _____




Grantor/Lessor: _____ City of Austin _____     Grantee/Lessee: _____ Austin FBO, LLC. _____

Beginning Date: _____ June 1, 2015 _____     Expiration Date: _____ October 31, 2046 _____     Address: _____ 4801 Emma Browning Ave. _____

Recording Information: _____ None-Lease _____     Zip Code: _____ 78719 _____

Legal Description: _____ AUS Site _____

Verified with: _____ Lease Document _____

Rental Data: The Lease is a second amendment to an earlier lease. This amendment was executed in December 21, 2015 and expires no later than October 31, 2046 with a term of 30 years with no renewal options. The leased area consists of 875,517 SF and the contract rent is $0.24 per SF called ground rent with an increase every year based on CPI. The confirmation source has indicated the current contract rent in December 2021 was $0.25 per SF.

The lease had a ground rent prior to completion of the FBO improvements at $0.08 per SF.

Type Street: Emma Browning Ave. is a two lane asphalt paved roadway with open ditch drainage     Utilities: _____ All Available –City of Austin _____

Land Size: _____ 20.1 Acres (875,517 SF) _____

Improvement(s) Description: _____ Property was vacant at time of lease. Lease called for building FBO facility. _____

Improvement(s) Size: _____ None _____ (GBA) _____ Not Applicable _____ (NRA)

Condition and Functional Design: _____ Not Applicable _____

Current Use: _____ Aviation Service _____     Highest & Best Use: _____ Aviation Service _____

Date of Inspection: _____ January 28, 2022 _____     Zoning: _____ AV-Airport _____     Flood Plain: _____ No – Zone X _____

Attach Additional Information: _____ The leased property consists of a site used for the current FBO. The parties have executed amendments to expand the operation in the future. The lease can be assigned by agreement with the City. _____

AUS ST 000498



AUS ST 000499

## COMPARABLE DATA – LoneStar -RENTAL 3

| State: | Texas | County: | Travis | City Limits/ETJ: | City of Austin |
|---|---|---|---|---|---|

 

| | | | |
|---|---|---|---|
| Grantor/Lessor: | City of Austin | Grantee/Lessee: | LoneStar Airport Holdings, LLC. |
| Beginning Date: | March 24, 2016   Expiration Date:   March 23, 2046 | Address: | 10000 Logistics Lane |
| Recording Information: | None-Lease | Zip Code: | 78719 |

Legal
Description: AUS Site

Verified with: Lease Document

This lease was executed in March 2016 and expires on March 23, 2046 with an initial term of 30 years with two 5-year renewal options. The leased area consists of 987,129 SF and the contract rent is $0.30 per SF with an increase every year based on CPI. The lease also has a variable rent based on achieving over 400,000 enplaned passengers. The confirmation source has indicated the current contract rent in December 2021 was $0.33 per SF.

Rental Data: The lease ground rent prior to completion of the terminal improvements at $0.08 per square foot.

Type Street: Logistics Lane is a two lane asphalt paved roadway with curbs and gutters.    Utilities: All Available –City of Austin

Land Size: 22.66 Acres (987,129 SF)

Improvement(s) Description: Property had a shell building at time of lease. Lease called for building South Terminal facility. The site had various parking areas.

Improvement(s) Size: 27,872 SF   (GBA)   Not Applicable   (NRA)

Condition and Functional Design: Shell building to be renovated for South Terminal.

| | | | | |
|---|---|---|---|---|
| Current Use: | Aviation Service | Highest & Best Use: | Aviation Service | |
| Date of Inspection: | January 28, 2022 | Zoning: AV-Airport | Flood Plain: | No – Zone X |

Attach Additional Information: The leased property consists of a site used for the current South Terminal . This lease is referred to in the report as the Initial Lease. The lease can be assigned by agreement with the City.

AUS ST 000500



EXHIBIT 'A'
~ AREA WITHIN LEASE BOUNDARY ~
22.66 ACRES
987,129.31 S.F.

03 / 23 / 2016

AUS SOUTH TERMINAL RENOVATION
OVERALL LEASE BOUNDARY EXHIBIT



DAYCAR
ENGINEERING
1010 Land Creek Cove, Ste 200
Austin, Texas 78746
p: (512) 339-4428
f: (512) 306-5320

AUS ST 000521

## COMPARABLE DATA – LoneStar -RENTAL 4

State: _____Texas_____   County: _____Travis_____   City Limits/ETJ: _City of Austin_

 

Grantor/Lessor: _City of Austin_   Grantee/Lessee: _LoneStar Airport Holdings, LLC._

Beginning Date: _July 1, 2019_   Expiration Date: _March 23, 2046_   Address: _10000 Logistics Lane_

Recording Information: _None-Lease_   Zip Code: _78719_

Legal Description: _AUS Site_

Verified with: _Lease Document_

This amendment was executed in June 17, 2019 and expires on March 23, 2046 with a term coterminous with the original lease. The leased area consists of two tracts containing 108,020 SF and the contract rent is $0.30 per SF with an increase every 5 years year based on CPI. The confirmation source has indicated the current contract rent in December 2021 was $0.30 per SF.

Rental Data: _The two separate tracts are 42,830 SF and 65,190 SF in size._

Type Street: _Outlaw Country and Fighter Drive is a two lane asphalt paved roadway with curbs and gutters._   Utilities: _All Available –City of Austin_

Land Size: _2.48 Acres (108,020 SF)_

Improvement(s) Description: _The improvements consist of two parking areas one used as an economy lot and the other for employees._

Improvement(s) Size: _None_ (GBA) _Not Applicable_ (NRA)

Condition and Functional Design: _Parking lots._

Current Use: _Aviation Service_   Highest & Best Use: _Aviation Service_

Date of Inspection: _January 28, 2022_   Zoning: _AV-Airport_   Flood Plain: _No – Zone X_

Attach Additional Information: _The leased property consists of two paved parking lots containing 235 spaces. This amendment runs with Initial Lease and is referred to as the Amendment in the report._

# EXHIBIT A 1.2



Page **4** of **4**

AUS/ST 000952
AUS ST 000503

## QUALIFICATIONS

## QUALIFICATIONS OF RANDY L. SEALE, MAI

Randy L. Seale is a principal associated with Allen, Williford & Seale, Inc.  AWS is a real estate appraisal firm with a national right of way valuation and litigation support practice.  AWS maintains corporate offices in Houston, Texas and project offices throughout the country.  Mr. Seale's responsibilities include appraisal of all types of right of way and commercial properties and he has testified as an expert witness regarding real property value on numerous occasions in local, state, and federal courts of law.  Mr. Seale has also edited articles and co-authored an article for the International Right of Way Association's Right of Way Magazine.

### BIOGRAPHICAL DATA

Mr. Seale was born in Pittsburg, Texas, in 1962.  He attended public schools in Pittsburg, Texas, prior to attending Texas A & M University.  Mr. Seale is married and has three children.

### EDUCATION

Bachelor of Science Degree (Agricultural Economics):
   Texas A & M University (1984)
Appraisal Institute:   Various Course Work
International Right of Way Association:   Various Course Work

### PROFESSIONAL AFFILIATIONS

Appraisal Institute (MAI No. 8445)
International Right of Way Association (Member)
State Certified General Real Estate Appraiser:
Texas Certificate No. TX-1320302-G
California Appraiser I.D. No. AG017798
Louisiana Certificate No. G0972
Pennsylvania Certificate No. GA001396L
Washington Certificate No. 1100314
New Jersey Certificate No. 42RG00259400
Utah Certificate No. 5460038-CG00
Florida License No. RZ4242

### ACTIVITIES

International Right of Way Association
   International Valuation Committee (Past Chairman)
   Past President and Director - Chapter 8
   Right of Way Professional of the Year- Chapter 8
Appraisal Institute Chapter 33
Houston Livestock Show & Rodeo (Committeeman)

1/22

AUS ST 000505

**QUALIFICATIONS OF STEPHEN D. KOVAR, JR., MAI**

Stephen Kovar is a real estate appraiser with Allen, Williford & Seale Inc.  AWS is a real estate appraisal firm with corporate offices in Houston, Texas.  Field offices are maintained throughout the nation.  Mr. Kovar's responsibilities include appraisal and appraisal review of all types of right of way and commercial properties.

**BIOGRAPHICAL DATA**

Mr. Kovar was born in Wharton, Texas.  He grew up in Houston and attended public schools in Cypress Fairbanks ISD prior to attending Texas A & M University in College Station, Texas where he earned a Bachelor of Science Degree in Agribusiness.  Mr. Kovar is married and has two children.

**EDUCATION**

Bachelor of Science (Agribusiness)
    Texas A&M University

Appraisal Institute:
    Appraisal Principles
    Appraisal Procedures
    Uniform Standards of Professional Practice
    Basic Income Capitalization
    General Report Writing
    Advanced Income Capitalization
    Advanced Sales Comparison and Cost Approaches
    Advanced Concepts and Case Studies
    Advanced Market Analysis and Highest and Best Use
    Real Estate Finance, Statistics, and Valuating Modeling
    Eminent Domain and Condemnation

**PROFESSIONAL AFFILIATIONS**

Appraisal Institute – MAI
State Certified General Real Estate Appraiser:
    Texas Certificate No. TX-1338762-G
    Mississippi Certificate No. GA-982
    Idaho Certificate No. CGA-5383
    Oregon Certificate No. C001441

International Right of Way Association (Member)

**ACTIVITIES**

Young Professionals group of the International Right of Way Association

AUS ST 000506