# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| **LONESTAR AIRPORT HOLDINGS, LLC,** §<br>§<br>*Plaintiff* §<br>§<br>v. §<br>§<br>**CITY OF AUSTIN, TEXAS,** §<br>*Defendant* § | **CIVIL NO. 1:22-CV-00770-RP** |

### REPORT AND RECOMMENDATION
### OF THE UNITED STATES MAGISTRATE JUDGE

TO:   THE HONORABLE ROBERT PITMAN
      UNITED STATES DISTRICT JUDGE

Before the Court are Defendant's Motion for Abstention, filed September 22, 2022 (Dkt. 29); Lonestar Airport Holdings, LLC's Opposition to Defendant's Motion for Abstention, filed October 6, 2022 (Dkt. 34); and Defendant's Reply in Support of Motion for Abstention, filed October 13, 2022 (Dkt. 39). By Text Order entered October 14, 2022, the District Court referred Defendant's Motion to Dismiss to the undersigned Magistrate Judge for a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72, and Rule 1(d) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas.[1]

## I. Background

Plaintiff Lonestar Airport Holdings, LLC ("Lonestar") is a Delaware limited liability corporation "primarily engaged in the financing, development, management, and operation of the South Terminal at the Austin-Bergstrom International Airport." Dkt. 38 (First Amended

---

[1] Plaintiff Lonestar Airport Holdings, LLC's Opposed Motion for Limited Expedited Discovery, filed September 30, 2022 (Dkt. 32), and Defendant's Motion to Dismiss First Amended Complaint, filed October 25, 2022 (Dkt. 43), also are referred to the undersigned Magistrate Judge and will be addressed in due course.

1

Complaint) ¶ 24. In March 2016, Lonestar and Defendant the City of Austin (the "City") entered into the South Terminal Lease and Concession Agreement (the "Agreement") to renovate and operate the then-defunct South Terminal. *Id.* ¶¶ 1, 3. Lonestar alleges that it spent $12.5 million overhauling the terminal, and that the City granted it a 40-year lease and "a first right to participate in any expansion of the terminal or any new facilities at the airport" under Article 15 of the Agreement. *Id.* ¶¶ 1, 46 & Dkt. 38-1 Art. 15.01 (Exh. A) ("in the event of an Expansion that requires additional land or the construction of a New Facility, Owner will provide Tenant with the exclusive first right to, as applicable, develop, construct and operate such Expansion or New Facility"). Lonestar alleges that it has invested more than $20 million in the South Terminal to date. Dkt. 38 ¶ 11.

In the fall of 2018, Lonestar began discussions with the City's longtime Director of the Department of Aviation to expand the South Terminal in a new location. *Id.* ¶ 66. Lonestar alleges that it received proposals to fund the proposed development valuing its interest in the Agreement at $135 million to $305 million. *Id.* ¶ 70. The discussions with the City allegedly were put on hold in March 2019 after the aviation director announced his intent to retire. *Id.* ¶ 71. With his successor's arrival in the summer of 2019, Lonestar alleges, the Department of Aviation's posture "went from cooperative to adversarial." *Id.* ¶ 72. That November,

> the City unexpectedly sent Lonestar a letter offering to buy Lonestar's interest in the South Terminal under the Agreement for just $10,000,000—which was far less than the amount that Lonestar had invested in remodeling and operating the South Terminal, and significantly less than the bids Lonestar had received from investors interested in purchasing Lonestar's interests.

*Id.* ¶ 75. The City stated that it "is not inclined to approve any expansion of the South Terminal facility" and instead "wishes to acquire the leasehold interest of the South Terminal facility to

regain local control of the facility." *Id.* ¶ 77& Dkt. 38-2 at 1 (Exh. B). Lonestar alleges that it "communicated to the City that it was not interested in selling its business to the City." *Id.* ¶ 82.

In March 2020, the City informed Lonestar that it "intended to demolish the existing South Terminal to build a taxiway in its place." *Id.* ¶ 86; *see also* Dkt. 38-6 (Exh. F). On July 13, 2021, the City publicly announced its intention to remove the terminal, "buy out Lonestar's interest in the South Terminal and exclude it from any plans for a New Facility going forward." Dkt. 38 ¶ 89. The City later "informed Lonestar that the South Terminal was 'under the imminence of condemnation' and that the City had valued Lonestar's leasehold interest in the South Terminal at a mere $1,954,000." *Id.* ¶ 95. The City characterized any development rights under Article 15 of the Agreement as "unenforceable." Dkt. 38 ¶¶ 22, 204 & Dkt. 38-14 at 3 (Exh. N). Lonestar rejected the offer, calling it "a bad-faith attempt to wrongfully circumvent the terms of the concession agreement and deprive Lonestar of the benefit of its bargain." Dkt. 38 ¶ 98 & Dkt. 38-12 at 2 (Exh. L).

Lonestar continues to operate the terminal, but alleges that the City "has taken affirmative steps to take over Lonestar's business at the South Terminal," including by approaching its business partners. Dkt. 38 ¶ 120. Lonestar further alleges that the City "informed Allegiant and Frontier, Lonestar's airline tenants, that Lonestar will not be operating the South Terminal after November of 2022." *Id.* ¶ 121.

On June 17, 2022, the City filed a Petition for Condemnation in Probate Court in Travis County, Texas. *City of Austin, Texas v. LoneStar Airport Holdings, LLC and Texas Capital Bank*, No. C-1-PB-22-001462 (Probate Court No. 1, Travis Cnty., Tex. June 17, 2022). Dkt. 38-15. A Special Commissioners' Hearing pursuant to Texas Property Code § 21.015 is set for January 31 and February 1, 2023. Dkt. 44.

Lonestar filed this lawsuit against the City on August 1, 2022, alleging violations of the Fifth and Fourteenth Amendments to the United States Constitution (Count I) and Article I, Section 17 of the Texas Constitution (Count III), as well as breach of contract (Count IV) and, in the alternative, promissory estoppel (Counts V and VI). Lonestar also seeks a declaratory judgment that the City's actions constitute an unlawful taking without just compensation (Count II). Relief Lonestar seeks in this lawsuit includes, *inter alia*, enjoining the City from:

> A. asserting control over Lonestar's "right to occupy the South Terminal and operate its business there, without paying for the full value of the rights and property taken";
>
> B. developing, constructing, or operating an expansion of the South Terminal or new facility "without honoring Lonestar's rights" under the Agreement;
>
> C. "further pursuing improper condemnation proceedings in which [the City] refuses to adequately compensate Lonestar as required by the Agreement"; and
>
> D. "further pursuing improper condemnation proceedings unsupported by a public purpose and aimed at impermissibly taking a 'going concern' without compensation."

*Id.* at 57-58. Lonestar seeks a declaration that the City is in breach of the Agreement, specific performance, damages, costs, and attorneys' fees. *Id.* at 58.

The City now moves the Court to abstain from exercising subject-matter jurisdiction over Lonestar's claims under *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976). The City argues that *Colorado River* abstention is warranted because the federal and state actions are parallel proceedings arising out of the City's condemnation of Lonestar's leasehold interest in the South Terminal, and that the relevant factors weigh in favor of abstention. The City contends that: "All of Plaintiff's claims arise out of and can be fully adjudicated in the Condemnation Lawsuit." Dkt. 29 at 1. Lonestar opposes the City's motion.

## II.  Legal Standards

The Court begins by reviewing the standards for abstention pursuant to *Colorado River* and the statutory framework for condemnation proceedings under Texas law.

**A. Colorado River Abstention**

The *Colorado River* abstention doctrine is based on principles of federalism, comity, and conservation of judicial resources. *Black Sea Inv., Ltd. v. United Heritage Corp.*, 204 F.3d 647, 650 (5th Cir. 2000). "A *Colorado River* abstention analysis begins with a heavy thumb on the scale in favor or exercising federal jurisdiction, and that presumption is overcome only by 'exceptional circumstances.'" *Aptim Corp. v. McCall*, 888 F.3d 129, 135 (5th Cir. 2018) (quoting *Stewart v. W. Heritage Ins. Co.*, 438 F.3d 488, 491 (5th Cir. 2006)). Indeed, federal courts have a "virtually unflagging duty" to exercise the jurisdiction given them. *African Methodist Episcopal Church v. Lucien,* 756 F.3d 788, 797 (5th Cir. 2014). The doctrine of abstention, under which a court may decline to exercise or postpone the exercise of its jurisdiction,

> is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest.

*Colorado River*, 424 U.S. at 813 (quoting *Cnty. of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188-89 (1959)).

In *Colorado River*, 424 U.S. at 805, the United States filed suit in federal court against some 1,000 water users in a state water district, seeking a declaratory judgment of its water rights in that region and appointment of a master to administer any waters decreed to it. One of the federal defendants subsequently filed an action in state court and sought to join the United States as a party under the McCarran Amendment, which allows such joinder in water rights cases, and asked the federal court to abstain. *Id.* at 806.

In upholding the district court's decision to dismiss the federal action, the Supreme Court determined that the federal district court should have abstained in favor of the state proceeding.

The Court concluded that the state proceeding provided a comprehensive framework for the determination of water rights, while the federal proceeding raised the possibility that resolution would be inconsistent with the more comprehensive state determination. *Id.* at 819. The Court further relied on the nature of the McCarran Amendment, 43 U.S.C. § 666, which evinced a clear federal policy that state court systems were the preferred means for avoiding piecemeal adjudication of water disputes. *Id.* The Court concluded that the decision to abstain under this doctrine must be based on considerations of "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Id.* at 818.

The Fifth Circuit Court of Appeals instructs that, to abstain under *Colorado River*, a court must determine as an initial matter that the state and federal actions are "sufficiently parallel to make consideration of abstention proper." *African Methodist*, 756 F.3d at 797 (stating that consideration of parallelism is "an initial step prior to application of the *Colorado River* factors"); *see also Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 395 n.7 (5th Cir. 2006) ("This doctrine only applies when there are parallel proceedings pending in federal and state court."). It is well-established that *Colorado River* abstention cannot be invoked where suits are not parallel. *Brown*, 462 F.3d at 395 n.7.

Parallel actions are those "involving the same parties and the same issues," but "precise identity" of parties and issues is not required. *African Methodist*, 756 F.3d at 797. "In light of our duty to consider wise judicial administration, conservation of judicial resources, and comprehensive disposition of litigation, we look both to the named parties and to the substance of the claims asserted in each proceeding." *Id.* Courts find "parallelism" for purposes of *Colorado River* abstention where "substantially the same parties" are litigating "substantially the same issues." *Boccard USA Corp. v. TigPro, Inc.*, No. H-07-0177, 2007 WL 1894154, at *3 (S.D. Tex. July 2, 2007). The central inquiry is whether there is a substantial likelihood that the state litigation

6

will dispose of all claims presented in the federal case. *Id.*; *see also Roberts v. Metzinger*, No. 18-9423, 2019 WL 7558177, at *11 (E.D. La. Apr. 3, 2019) (holding that actions were not parallel where state litigation was not dispositive of federal claims).

If the court determines the actions are parallel, it must balance six factors to determine whether exceptional circumstances warrant abstention:

> 1) assumption by either court of jurisdiction over a res, 2) relative inconvenience of the forums, 3) avoidance of piecemeal litigation, 4) the order in which jurisdiction was obtained by the concurrent forums, 5) to what extent federal law provides the rules of decision on the merits, and 6) the adequacy of the state proceedings in protecting the rights of the party invoking federal jurisdiction.

*African Methodist*, 756 F.3d at 798. No single factor is determinative. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 15 (1983); *Nationstar Mortg. LLC v. Knox*, 351 F. App'x 844, 851 (5th Cir. 2009).

"Any doubt regarding the parallel nature of the state-court suit should be resolved in favor of exercising jurisdiction." *Rimkus Consulting Grp., Inc. v. Cammarata*, No. H-07-0405, 2007 WL 4223434, at *5 (S.D. Tex. Nov. 29, 2007) (Rosenthal, J.) (quoting *TruServ Corp. v. Flegles, Inc.*, 419 F.3d 584, 592 (7th Cir. 2005)).

**B. Condemnation Proceedings Under Texas Law**

Lonestar alleges that the city has invoked the Texas "quick-take" statute, Texas Property Code § 21.020, "to assert immediate control over Lonestar's entire business at the South Terminal." Dkt. 38 ¶ 6. Under the Texas Property Code, a condemnation proceeding begins as an administrative proceeding, which is followed, if necessary, by a judicial proceeding. *In re State*, 629 S.W.3d 462, 466 (Tex. App.—Austin 2020, no pet.) (citing *Amason v. Natural Gas Pipeline Co.*, 682 S.W.2d 240, 241 (Tex. 1984)). When a party with eminent domain authority seeks to condemn land for public use but cannot agree on settlement terms with the property owner, the

condemning party must file a petition in a proper court in the county where the land is located. *Id.* (citing TEX. PROP. CODE § 21.012). After a petition is filed, the trial court appoints three special commissioners, who assess the damages of the owner of the property being condemned after a properly noticed evidentiary hearing. *Id.* (citing TEX. PROP. CODE §§ 21.014-.016, .042). During this stage, the trial court has jurisdiction only "to appoint the commissioners, receive their opinion as to value, and render judgment based upon the commissioners' award." *Id.* (citing *Gulf Energy Pipeline Co. v. Garcia*, 884 S.W.2d 821, 822 (Tex. App.—San Antonio 1994, no writ)). During the administrative proceeding, an injunction is outside the scope of the trial court's jurisdiction. *Gulf Energy Pipeline Co. v. Garcia*, 884 S.W.2d 821, 823 (Tex. App.—San Antonio, 1994, no writ); *City of Carrollton v. OHBA Corp.*, 809 S.W.2d 587, 589 (Tex. App.—Dallas 1991, no writ).

The special commissioners' power is limited to "filing in the proper court an award of fair compensation for the condemnation"; they have no authority to determine other issues, including whether the "condemnor possesses the right to condemn the property in the first place." *Amason*, 682 S.W.2d at 242. After the special commissioners make an award,

> the condemnor may take possession of the condemned property pending the results of further litigation if the condemnor: (1) pays to the property owner the amount of damages and costs awarded by the special commissioners or deposits that amount of money with the court subject to the order of the property owner.

TEX. PROP. CODE § 21.021(a).

A party dissatisfied with the commissioners' award may file objections to the commissioners' findings in the trial court, invoking the trial court's jurisdiction and initiating the judicial phase of the condemnation proceeding. *In re State*, 629 S.W.3d at 466 (citing TEX. PROP. CODE § 21.018). At that stage, the trial court has jurisdiction to determine all issues in a trial de novo.[2] *Id.* If no

---

[2] Here, if a party objects to the award, the case will proceed in a Travis County Court at Law. Dkt. 29 at 2 n.1 (citing TRAVIS (TEX.) CCL LOC. R. 2.15).

party timely files an objection to the award, the trial court adopts the commissioners' findings as its judgment. *In re Lazy W Dist. No. 1*, 493 S.W.3d 538, 542 (Tex. 2016) (citing TEX. PROP. CODE § 21.061).

### III.     Analysis

The Court's analysis begins and ends with a determination that the state and federal actions are insufficiently parallel to recommend abstention.

### A. Application of *Colorado River* Abstention to Administrative Proceedings

Whether the Texas eminent domain scheme is one proceeding with two phases or two separate proceedings presents a "difficult question given the unusual nature of the Texas scheme in which an 'administrative proceeding converts into a judicial proceeding.'" *Boerschig v. Trans-Pecos Pipeline, L.L.C.*, 872 F.3d 701, 704 (5th Cir. 2017) (quoting *City of Tyler v. Beck*, 196 S.W.3d 784, 786 (Tex. 2006)). Neither party cites authority construing whether *Colorado River* abstention applies where a judicial proceeding, or the judicial phase of a proceeding, has not begun, but other courts have assumed that *Colorado River* applies to administrative proceedings. *See, e.g.*, *United States v. Toyota Motor Corp.*, 117 F. Supp. 2d 34, 45 (D.D.C. 2000) ("Assuming that the *Colorado River* doctrine is not limited to state court litigation, and extends to state administrative proceedings, the relevant factors in this case militate against abstention."). The Court similarly assumes without deciding that *Colorado River* abstention applies to the state proceeding.

### B. The Parties

As stated above, under *Colorado River*, the parties in the two proceedings must be the same, but "precise identity" of parties and issues is not required. *African Methodist*, 756 F.3d at 797. The condemnation proceeding includes a party not present in this lawsuit: Texas Capital Bank, a non-diverse lienholder that filed a disclaimer of interest. Dkt. 29 at 4. Nonetheless, Lonestar does not

dispute that the parties in the two proceedings are substantially the same, and the Court finds that the first requirement to abstain under *Colorado River* is satisfied.

## C. The Issues

The undersigned Magistrate Judge reaches a different conclusion with respect to the second parallelism consideration, the issues involved. The Court finds that there is not a substantial likelihood that the state proceeding will dispose of all claims presented in the federal case.

It is undisputed that the administrative phase of the Texas condemnation proceeding will not resolve all of Lonestar's claims in the federal lawsuit. The only issue currently being determined in the state action is "the damages of the owner of the property being condemned." TEX. PROP. CODE § 21.014. Lonestar submits that the only issue in the state action is the amount of "just compensation" to which it is entitled because the special commissioners have no authority to rule on questions of law. *Id.* (citing TEX. PROP. CODE § 21.014). Thus, Lonestar alleges, the condemnation proceeding will compensate it "only for the value of the real estate." Dkt. 38 ¶¶ 105, 111. After the special commissioners determine the award, the City "may take possession of the condemned property pending the results of further litigation" if it pays Lonestar or deposits the amount of damages with the court. *Id.* § 21.021(a).

Once the state action reaches the judicial phase, the City contends, the state court will have "the right to try and decide all questions that may fairly arise out of, or in connection with, the Condemnation Lawsuit." Dkt. 29 at 6. The City asserts that all of Lonestar's claims may be brought as counterclaims in the judicial phase of the state action. The City argues that Lonestar's breach of contract and promissory estoppel claims are directly related to the condemnation because Lonestar's rights and interests in Article 2 (covenant of quiet enjoyment) and Article 15 (first right to develop, construct, and operate any airport expansion or new facility) are included in the definition of "Tenant's Interest," which are the interests the parties agreed would be subject to

10

condemnation under Article 34, the Agreement's condemnation clause. Dkt. 39 at 2. Because the condemnation proceeding will decide whether condemnation was proper and the amount of compensation Lonestar is owed, the City asserts, the state action "will necessarily dispose of Plaintiff's breach of contract, estoppel, and constitutional takings claims asserted in this lawsuit." Dkt. 39 at 2.

Lonestar responds that the state and federal actions are "significantly different." Dkt. 34 at 2. Lonestar argues that the actions are not parallel because (1) even in the judicial phase of the state action, its breach of contract claims cannot be asserted due to the Agreement's forum selection clause,[3] and (2) the state and federal actions do not afford the same relief. Lonestar argues that the injunctive and declaratory remedies it seeks for breach of the Agreement are unavailable in the state proceeding:

> By the time the state trial court assumes jurisdiction over the State Proceeding, Lonestar's requested injunctive and declaratory relief would be at least practically, if not legally, rendered moot because the irreparable harm will have already ensued. For those reasons, Lonestar necessarily seeks injunctive and declaratory relief in this Court—which is the Parties' bargained for venue—because that relief cannot be sought in the State Proceeding until after Lonestar is already irreparably harmed and its requested relief rendered moot.

Dkt. 34 at 8. In addition to specific performance and a preliminary and permanent injunction, Lonestar "seeks money damages for the City's past breaches of Article 15." Dkt. 38 ¶¶ 210-11. Thus, the state action, even in its judicial phase, is unlikely to resolve all of Lonestar's claims concerning disposition of the parties' rights and obligations under the Agreement.

---

[3] The parties designated the Western District of Texas, Austin Division, as the forum in which they must bring claims arising out of the Agreement. *See* Dkt. No. 1-2 at 77 ("Venue for any action arising out of or concerning this Lease shall be proper and lie exclusively in the Austin Division of the United States District Court for the Western District of Texas."). The City asserts that there was no basis for federal jurisdiction when the condemnation lawsuit was filed because complete diversity did not exist. Dkt. 39 at 5-6. The Court agrees with the parties that the forum selection clause is not dispositive of the *Colorado River* analysis. *See* Dkt. 34 at 8; Dkt. 39 at 5.

11

In support of its argument that all of Lonestar's claims may be brought as counterclaims in the judicial phase of the state action, the City relies on *In re Breviloba, LLC*, 650 S.W.3d 508, 512 (Tex. 2022) (per curiam), in which the Texas Supreme Court held that the trial court in an eminent domain case had jurisdiction over the defendant's counterclaims of trespass, fraud, and that the plaintiff lacked the power to condemn, stating: "Courts of this state have long held that jurisdiction over eminent domain cases includes jurisdiction to adjudicate the condemnor's eminent domain authority." *Breviloba* is distinguishable in that the condemnee asserted in its counterclaims that the condemnor lacked condemnation authority because it was a "sham entity" and not a common carrier. Lonestar does not challenge the City's condemnation authority, but rather seeks to enjoin it from allegedly violating terms of the Agreement by its exercise of eminent domain:

> Lonestar recognizes the City's general eminent domain authority to take real estate, and such takings sometimes result in a business needing to relocate or otherwise adjust its operations. Indeed, in the Agreement the parties recognized the City's general authority to condemn property as an exercise of sovereign authority, provided that Lonestar was paid fair market value for any interest taken and assuming the taking was lawful. But nothing in the Agreement authorizes the City to use its eminent domain powers to serve an unlawful public objective and for the sole purpose of escaping its contractual obligations. In fact, the Agreement's provisions prohibit the City from taking actions to interfere with Lonestar's ability to operate the Terminal. Nonetheless, the City is attempting to abuse its condemnation power to oust Lonestar from the Airport altogether, cancel the Agreement, take Lonestar's going concern business, and compensate Lonestar only for the value of the land on which Lonestar's business sits (which the City already owns).

Dkt. 38 ¶ 20.

Similarly, the City relies on *African Methodist*, 756 F.3d at 797, in which the Fifth Circuit held that the federal and state actions at issue were parallel. The court determined that the federal action focused exclusively on the ownership of disputed property and whether the federal defendants had a legal right to represent the entity holding title to the property. *Id.* at 798. Because the state action,

an eviction proceeding, would "undoubtedly require" determination of who held title to the property and whether the federal defendants were "occupants," the state proceeding would "necessarily dispose of all claims" asserted by the plaintiff in the federal action. *Id.*

Here, the state proceeding will not "necessarily dispose of" all Lonestar's claims or requests for relief in this action. Resolution of Lonestar's claims in this litigation likely will require a legal determination whether Article 15 of the Agreement is unenforceable, as the City has asserted. Lonestar also asserts breach of contract claims arising out of events that predate the condemnation proceeding. For example, Lonestar asserts that the City breached Articles 2 and 15 of the Agreement by communicating with Lonestar's customers, business partners, and the press in a manner that interfered with its ability to attract new customers and investors and by failing to work in good faith with Lonestar on the expansion beginning in November 2019. Dkt. 38 ¶¶ 174-79, 196. Lonestar's claim that the City breached its obligation to provide shuttle bus services under Article 18 also is unrelated to the state proceedings. Dkt. 38 ¶ 232. As stated above, furthermore, the state proceeding will not dispose of Lonestar's claims for injunctive relief for its breach of contract and promissory estoppel claims.

**D. Conclusion**

Mindful of "the heavy obligation to exercise jurisdiction" acknowledged in *Colorado River*, 424 U.S. at 820, the Court finds that the federal and state actions are not sufficiently parallel for abstention under *Colorado River* because there is not a substantial likelihood that the state action will encompass all of the issues raised in this case. *See Am. Guarantee & Liab. Ins. Co. v. Anco Insulations, Inc.*, 408 F.3d 248, 252 (5th Cir. 2005) (holding that district court abused its discretion by abstaining where "two suits share[d] some issues" but the state action did not include party to federal action or plaintiff's claim for restitution); *Washington Int'l Ins. Co. v. Keeney*, No. 4:19-CV-00632, 2020 WL 4335789, at *4 (E.D. Tex. July 28, 2020) (holding that actions were not

parallel where plaintiff was not pursuing the same causes of action in state court and "a decision in the state suit would not dispose of the claims before this Court").

Having made the threshold determination that the state and federal proceedings are not parallel, the Court need not consider the *Colorado River* factors. *Apogee Telecom, Inc. v. Univ. Video Servs., Inc.*, No. A-17-CA-00672-SS, 2018 WL 6220177, at *2 (W.D. Tex. Mar. 26, 2018).

## IV. Recommendation

For the foregoing reasons, the undersigned Magistrate Judge **RECOMMENDS** that the District Court **DENY** Defendant's Motion for Abstention (Dkt. 29).

## V. Warnings

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except on grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**SIGNED** on November 4, 2022.

_____
SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE