# **EXHIBIT A**



U.S. Department
of Transportation

**Federal Aviation
Administration**

# Advisory Circular

---

**Subject:** EXCLUSIVE RIGHTS AT FEDERALLY-OBLIGATED AIRPORTS | **Date:** January 4, 2007  **Initiated by:** AAS-400 | **AC No:** 150/5190-6  **Change:**

**1. PURPOSE.** This advisory circular (AC) provides basic information pertaining to the Federal Aviation Administration's (FAA's) prohibition on the granting of exclusive rights at federally-obligated airports. The prohibition on the granting of exclusive rights is one of the obligations assumed by the airport sponsors of public airports that have accepted federal assistance, either in the form of grants or property conveyances. This AC provides guidance on how an airport sponsor can comply with the statutory prohibition on the granting of exclusive rights. Section 1 explains FAA's policy on exclusive rights, the statutory basis for the policy, and exceptions to the policy. Section 2 provides an overview of how the FAA ensures compliance with applicable Federal obligations.

**2. CANCELLATION.** AC 150/5190-5, *Exclusive Rights and Minimum Standards for Commercial Aeronautical Activities* (Change 1), dated June 10, 2002, is cancelled.

**3. DEFINITIONS.** Definitions for some of the terms used in this AC are found in Appendix 1.

**4. BACKGROUND.** In accordance with the FAA Airport and Airway Improvement Act of l982, 49 U.S.C. § 47101, et seq., 49 U.S.C. § 40103(e), and the Airport Improvement Program (AIP) grant assurances, the owner or operator of any airport that has been developed or improved with Federal grant assistance is required to operate the airport for the use and benefit of the public and to make it available for all types, kinds, and classes of aeronautical activity and without granting an exclusive right.[1] The Surplus Property Act of l944 (as amended by 49 U.S.C., §§ 47151-47153) contains parallel obligations under its terms for the conveyance of Federal property for airport purposes.

Similar obligations exist for airports that have received non-surplus government property under 49 U.S.C. § 47125 and previous corresponding statutes. Airports that have received real property under AP-4 agreements remain obligated by the exclusive rights prohibition even though all other obligations are considered expired by the FAA.[2]

It is FAA policy that the sponsor of a federally obligated airport will not grant an exclusive right for the use of the airport to any person providing, or intending to provide, aeronautical services or commodities to the public and will not, either directly or indirectly, grant or permit any person, firm, or corporation, the exclusive right at the airport to conduct aeronautical activities. The exclusive rights

---

[1] The legislative background for the exclusive rights provisions discussed in this AC began as early as l938 and evolved under the Federal-Aid Airport Program (FAAP), Airport Development Aid Program (ADAP), and Airport Improvement Program (AIP) and was also adopted in land conveyances.

[2] See FAA Order 5190.6A (Section 2-18) for additional information.

prohibition applies to both commercial entities engaging in providing aeronautical services and individual aeronautical users of the airport. The intent of the prohibition on exclusive rights is to promote fair competition at federally-obligated, public use airports for the benefit of aeronautical users. The exclusive rights prohibition remains in effect as long as the airport is operated as an airport, even if the original period for which an airport sponsor was obligated has expired.

The granting of an exclusive right for the conduct of any aeronautical activity on a federally-obligated airport is generally regarded as contrary to the requirements of the applicable Federal obligations, whether such exclusive right results from an express agreement, from the imposition of unreasonable standards or requirements, or by any other means. Existence of an exclusive right at an airport limits the usefulness of the airport and deprives the public of the benefits that flow from competition.

**5. RELATED READING MATERIALS.**

a. *Federal Aviation Agency Policy Statement, Exclusive Rights at Airports*, Order 5190.1A, as published in the Federal Register (30 FR 13661), October 27, l965.

b. *Rules of Practice for Federally Assisted Airport Proceedings*, as published in the Federal Register (61 FR 53998), October 16, l996.

c. *FAA Airport Compliance Requirements*, Order 5190.6A, October 1, 1989.

d. Further information can be obtained at the Airports District Office (ADO) in your area. A listing of ADOs can be found at http://www.faa.gov/airports_airtraffic/airports/regional_guidance/.

DAVID L. BENNETT
Director, Office of Airport Safety
  and Standards

# SECTION 1 - EXCLUSIVE RIGHTS

**1.1. OBLIGATION AGAINST GRANTING EXCLUSIVE RIGHTS.** Most exclusive rights agreements violate the grant assurances contained in FAA grant agreements or similar obligations in surplus property conveyances. With few exceptions, an airport sponsor is prohibited from granting a right to a single operator for the provision of an aeronautical activity to the exclusion of others. See definition of exclusive right in Appendix 1. Accordingly, FAA policy prohibits the creation or continuance of exclusive rights agreements at obligated airports where the airport sponsor has received Federal airport development assistance for the airport's improvement or development. This prohibition applies regardless of how the exclusive right was created, whether by express agreement or the imposition of unreasonable minimum standards and/or requirements (inadvertent or otherwise).

**1.2. AGENCY POLICY.** The existence of an exclusive right to conduct any aeronautical activity at an airport limits the usefulness of the airport and deprives the public of the benefits that flow from competitive enterprise. The purpose of the exclusive rights provision as applied to civil aeronautics is to prevent monopolies and combinations in restraint of trade and to promote competition at federally-obligated airports. An exclusive rights violation occurs when the airport sponsor excludes others, either intentionally or unintentionally, from participating in an on-airport aeronautical activity. A prohibited exclusive right can be manifested by an express agreement, unreasonable minimum standards, or by any other means. Significant to understanding the exclusive rights policy, is the recognition that it is the impact of the activity, and not necessarily the airport sponsor's intent, that constitutes an exclusive rights violation.

**1.3. EXCLUSIVE RIGHTS VIOLATIONS AND EXCEPTIONS TO THE GENERAL RULE.** The following paragraphs address exclusive rights violations and certain exceptions to the exclusive rights policy due to circumstances that make an exception necessary.

**a. Exclusive Rights Violations**

**1. Restrictions Based on Safety and Efficiency.** An airport sponsor can deny a prospective aeronautical service provider the right to engage in an on-airport aeronautical activity for reasons of safety and efficiency. A denial based on safety must be based on evidence demonstrating that airport safety will be compromised if the applicant is allowed to engage in the proposed aeronautical activity. Airport sponsors should carefully scrutinize the safety reasons for denying an aeronautical service provider the opportunity to engage in an aeronautical activity if the denial has the possible effect of limiting competition.

The FAA is the final authority in determining what, in fact, constitutes a compromise of safety. As such, an airport sponsor that is contemplating the denial of a proposed on-airport aeronautical activity is encouraged to contact the local Airports District Office (ADO) or the Regional Airports Office. Those offices will then seek assistance from FAA Flight Standards (FS) and Air Traffic (AT) to assess the reasonableness of the proposed action and whether unjust discrimination results from the proposed restrictions on aeronautical activities because of safety and efficiency. [3]

---

[3] Here the word efficiency refers to the efficient use of navigable airspace, an inherent FAA Air Traffic Control function. That is the reason why FAA Air Traffic (AT) is to be consulted in such cases. It is not meant to be an interpretation that could be construed as protecting the "efficient'' operation of an existing aeronautical service provider for example.

AC 150/5190-6                                                                                                                          1/4/2007

**2. Restrictions on Self-Service.** An aircraft owner or operator[4] may tie down, adjust, repair, refuel, clean, and otherwise service his/her own aircraft, provided the service is performed by the aircraft owner/operator or his/her employees with resources supplied by the aircraft owner or operator. Moreover, the service must be conducted in accordance with reasonable rules, regulations or standards established by the airport sponsor. Any unreasonable restriction imposed on the owners or operators of aircraft regarding the servicing of their own aircraft may be construed as an exclusive rights violation. In accordance with the FAA grant assurances:

**(1)** An airport sponsor may not prevent an owner or operator of an aircraft from performing services on his/her own aircraft with his/her own employees and equipment. Restrictions imposed by an airport sponsor that have the effect of channeling self-service activities to a commercial aeronautical service provider may be an exclusive rights violation.

**(2)** An airport sponsor must reasonably provide for self-servicing activity but is not obligated to lease airport facilities and land for such activity. That is, the airport sponsor is not required to encumber the airport with leases and facilities for self-servicing activity, and

**(3)** An airport sponsor is under no obligation to permit aircraft owners or operators to introduce equipment, personnel, or practices on the airport that would be unsafe, unsightly, or detrimental to the public welfare or that would affect the efficient use of airport facilities by the public.

**NOTE:** Fueling from a pull up commercial fuel pump is not considered self-fueling under the FAA grant assurances since it involves fueling from a self-service pump made available by the airport or a commercial aeronautical service provider. For the actual definition, see definition "e" Commercial Self-Service Fueling in Appendix 1.

Safety concerns are not limited to aeronautical activities but may include Occupational Safety and Health Administration (OSHA) standards, fire safety standards, building codes, or sanitation considerations. Restrictions by airport sponsors for safety must be reasonable. Examples of reasonable restrictions include restrictions placed on the handling of aviation fuel and other flammable products, including aircraft paint and thinners; requirements to keep fire lanes open; weight limitations placed on vehicles and aircraft to protect pavement from damage; and other similar safety based restrictions.

**b. Exceptions to the General Rule**

**1. Aeronautical Activities Provided by the Airport Sponsor (Proprietary Exclusive Right).** The owner of a public-use airport (public or private owner) may elect to provide any or all of the aeronautical services needed by the public at the airport. The airport sponsor may exercise, but not grant, an exclusive right to provide aeronautical services to the public. If the airport sponsor opts to provide an aeronautical service exclusively, it must use its own employees and resources. Thus, an airport owner or sponsor cannot exercise a proprietary exclusive right through a management contract.

---

[4] For many purposes, the FAA has for a long time interpreted an aircraft owner's right to self-service to include operators. For example, a significant number of aircraft operated by airlines are not owned but leased under terms that give the operator airline owner-like powers. This includes operational control, exclusive use and long-term lease terms. The same is true for other aeronautical operators such as charter companies, flight schools and flying clubs, all of which may very well lease aircraft under terms that result in owner-like powers. If in a particular case, a doubt exists on whether a particular "operator" can be considered as the owner for the purpose of this guidance, please contact the Airports District Office (ADO) in your area. A listing of ADOs can be found at http://www.faa.gov/airports_airtraffic/airports/regional_guidance/.

As a practical matter, most airport sponsors recognize that aeronautical services are best provided by profit-motivated, private enterprises. However, there may be situations that the airport sponsor believes would support the airport providing aeronautical services. Examples include situations where the revenue potential is insufficient to attract private enterprises and it is necessary for the airport sponsor to provide the aeronautical service, or situations where the revenue potential is so significant that the airport sponsor chooses to perform the aeronautical activity itself in order to become more financially self-sustaining. An example of an airport sponsor choosing to provide an aeronautical service would be aircraft fueling. While the airport sponsor may exercise its proprietary exclusive to provide fueling services, aircraft owners may assert the right to obtain their own fuel and bring it onto the airport to service their own aircraft, but only with their own employees and equipment and in conformance with reasonable airport rules, regulations and standards.

**2. Single Activity.** The fact that a single business or enterprise may provide most or all of the on-airport aeronautical services is not, in itself, evidence of an exclusive rights violation. What is an exclusive rights violation is the denial by the airport sponsor to afford other qualified parties an opportunity to be an on-airport aeronautical service provider. The airport sponsor may issue a competitive offering for all qualified parties to compete for the right to be an on-airport service provider.[5] The airport sponsor is not required to accept all qualified service providers without limitation. The fact that only one qualified party pursued an opportunity in a competitive offering would not subject the airport sponsor to an exclusive rights violation. However, the airport sponsor cannot as a matter of convenience choose to have only one FBO provide services at the airport regardless of the circumstances at the airport.

> **(A) Statutory Requirement Relating to Single Activities.** Since 1938, there has been a statutory prohibition on exclusive rights, 49 U.S.C. § 40103(e), independent of the parallel grant assurance requirement at 49 U.S.C. § 47107(a)(4). This statutory prohibition currently states, "A person does not have an exclusive right to use an air navigation facility on which Government money has been expended." (An "air navigation facility" includes, among other things, an airport. See "Definitions" at 49 U.S.C. § 40102.) The statutory prohibition, however, contains an exception relating to single activities. Specifically, providing services at an airport by only one fixed base operator (FBO) is not an exclusive right if it is unreasonably costly, burdensome, or impractical for more than one FBO to provide the services, and allowing more than one FBO to provide the services requires a reduction in space leased under an existing agreement between one FBO and the airport sponsor. Both conditions must be met. See 49 U.S.C. § 47107(a)(4) (A and B).
>
> **(B)** The grant assurance relating to exclusive rights contains similar language.

**3. Space Limitation.** A single enterprise may expand as needed, even if its growth ultimately results in the occupancy of all available space. However, an exclusive rights violation occurs when an airport sponsor unreasonably excludes a qualified applicant from engaging in an on-airport aeronautical activity without just cause or fails to provide an opportunity for qualified applicants to be an aeronautical service provider. An exclusive rights violation can occur through the use of leases where, for example, all the available airport land and/or facilities suitable for aeronautical activities are leased to a single aeronautical service provider who cannot put it into productive use within a reasonable period of time, thereby denying other qualified parties the opportunity to compete to be an

---

[5] The grant assurances do not prohibit an airport sponsor from entering into long-term leases with commercial entities, by negotiation, solicitation, or other means. An airport sponsor may choose to select FBOs or other aeronautical service providers through an RPF process, and, if it chooses to do so, it can do it each time a new applicant is considered. This in and by itself is not unreasonable or contrary to the Federal obligations.

aeronautical service provider at the airport. An airport sponsor's refusal to permit a single FBO to expand based on the sponsor's desire to open the airport to competition is not a violation of the grant assurances. Additionally, an airport sponsor may exclude an incumbent FBO from participating under a competitive solicitation in order to bring a second FBO onto the airport to create a more competitive environment.

A lease that confers an exclusive right will be construed as having the intent to do so and, therefore, be an exclusive rights violation. Airport sponsors are better served by requiring that leases to a single aeronautical service provider be limited to the amount of land the service provider can demonstrate it actually needs and can be put to immediate productive use.  In the event that additional space is required later, the airport sponsor may require the incumbent service provider to compete along with all other qualified service providers for the available airport land. The grant of options or preferences on future airport lease sites to a single service provider may be construed as intent to grant an exclusive right and therefore, the use of leases with options or future preferences, such as rights-of-first refusal, must generally be avoided.  This is because a right of first refusal can allow an existing tenant, at little or no cost, to hold a claim on airport land that could be used for a second FBO, then lease that land when there is a prospect of competition.

**4. Monopolies Beyond the Airport Sponsor's Control.** Certain exclusive franchises exist on public airports that are sanctioned by local or Federal law and do not contravene the FAA's policy against exclusive rights agreements.  One such franchise that exists at most public airports is UNICOM, which provides frequencies for air-to-ground communications at airports.  The Federal Communications Commission (FCC), which regulates and authorizes the use of UNICOM frequencies, will not issue more than one ground station license at the same airport. Thus, an exclusive franchise is created.  A legally supported franchise, such as UNICOM, grants the recipient licensee an advantage over competitors, but does not result in a violation of the agency's prohibition against exclusive rights.  In cases such as this, the FAA recommends that the airport sponsor obtain the subject license in its own name.  Using droplines, the airport sponsor can then make the facility available to all fixed base operations on an as needed basis.  Regardless of which method the airport sponsor uses, control over the facility must be held by the individual or entity that holds the license.

**1.5. THROUGH 1.8. RESERVED.**

## SECTION 2.  THE ENFORCEMENT PROCESS

**2.1. AIRPORT COMPLIANCE PROGRAM.**  The FAA ensures airport sponsor compliance with Federal grant obligations through its Airport Compliance Program.  The Airport Compliance Program arises from requirements in the Airport and Airway Improvement Act of l982, as amended, 49 U.S.C. § 47101, *et seq*., and the airport sponsor's agreement to comply with the assurances contained in the grant agreement in exchange for Federal airport development assistance. The Airport Compliance Program is designed to maintain a system of safe and properly maintained airports that are operated in a manner that protects the public's interest and investment in a national airport system.

**a**.   Under the Airport Compliance Program, any person who believes that an airport sponsor may be in noncompliance with a grant assurance may register their concerns with the local FAA Airport District Office (ADO).  ADO personnel may investigate informally under 14 C.F.R. 13.1 the allegations of noncompliance and, in the event that the allegations are confirmed, attempt to persuade the airport sponsor to come back into compliance.  Should this measure prove unsatisfactory, the concerned party may file a formal complaint under 14 C.F.R. Part 16, Rules of Practice for Federally-

Assisted Airport Proceedings. In addition, as described in §16.29(b), the FAA may initiate its own investigation.

**b.** Complaints filed with the FAA under 14 C.F.R. Part 16 are subject to an administrative review, which entails consideration of the complainant's allegations and the airport sponsor's response to the allegations. The FAA will make a formal written determination on the complaint. A determination against the airport sponsor can result in an FAA action to withhold current and future grant funding for the airport. The FAA's final determination under 14 CFR Part 16 may be appealed to the U.S. Court of Appeals.

**2.2. THROUGH 2.5. RESERVED.**

**APPENDIX 1.  DEFINITIONS**

**1.1.**   The following are definitions for the specific purpose of this AC.

**a.  Aeronautical Activity.** Any activity that involves, makes possible, or is required for the operation of aircraft or that contributes to or is required for the safety of such operations.  Activities within this definition, commonly conducted on airports, include, but are not limited to, the following: general and corporate aviation, air taxi and charter operations, scheduled and nonscheduled air carrier operations, pilot training, aircraft rental and sightseeing, aerial photography, crop dusting, aerial advertising and surveying, aircraft sales and services, aircraft storage, sale of aviation petroleum products, repair and maintenance of aircraft, sale of aircraft parts, parachute or ultralight activities, and any other activities that, because of their direct relationship to the operation of aircraft, can appropriately be regarded as aeronautical activities. Activities, such as model aircraft and model rocket operations, are not aeronautical activities.

**b.  Airport District Office (ADO)**. These FAA offices are outlying units or extensions of regional airport divisions.  They advise and assist airport sponsors with funding requests to improve and develop public airports. They also provide advisory services to the owners and operators of both public and private airports in the operation and maintenance of airports.  See the FAA Web site for a complete listing of all ADO offices at http://www.faa.gov/airports_airtraffic/airports/regional_guidance/.

**c. Airport.** An area of land or water which is used, or intended to be used, for the aircraft takeoff and landing.  It includes any appurtenant areas used, or intended to be used, for airport buildings or other airport facilities or rights-of-way, together with all airport buildings and facilities located thereon.  It also includes any heliport.

**d.  Airport Sponsor**. The airport sponsor is the entity that is legally, financially, and otherwise able to assume and carry out the certifications, representations, warranties, assurances, covenants and other obligations required of sponsors, which are contained in the AIP grant agreement and  property conveyances.

**e.   Commercial Self-Service Fueling.**  A fueling concept that enables a pilot to fuel an aircraft from a commercial fuel pump installed for that purpose by an FBO or the airport sponsor.  The fueling facility may or may not be attended.

**f.   Exclusive Right.**   A power, privilege, or other right excluding or debarring another from enjoying or exercising a like power, privilege, or right.  An exclusive right can be conferred either by express agreement, by the imposition of unreasonable standards or requirements, or by any other means.  Such a right conferred on one or more parties, but excluding others from enjoying or exercising a similar right or rights, would be an exclusive right.

**g.  Federal Airport Obligations.** All references to a Federal grant program, Federal airport development assistance, or Federal aid contained in this AC are intended to address obligations arising from the conveyance of land or from grant agreements entered under one of the following acts:

> **(1)  Surplus Property Act of l944 (SPA), as amended, 49 U.S.C. §§ 47151-47153.** Surplus property instruments of transfer were issued by the War Assets Administration (WAA) and are now issued by its successor, the General Services Administration (GSA). However, the law imposes upon the FAA (delegated to FAA from The Department of Transportation) the sole responsibility for determining and enforcing compliance with the terms and conditions of all instruments of transfer by which surplus airport property is or has been conveyed to non-Federal public agencies pursuant to the SPA. 49 U.S.C. § 47151(b).

    **(2) Federal-Aid Airport Program (FAAP).** This grant-in-aid program administered by the agency under the authority of the Federal Airport Act of 1946, as amended, assisted public agencies in the development of a nationwide system of public airports. The Federal Airport Act of 1946 was repealed and superseded by the Airport Development Aid Program (ADAP) of 1970.

    **(3) Airport Development Aid Program (ADAP).** This grant-in-aid program administered by the FAA under the authority of the Airport and Airway Development Act of 1970, as amended, assisted public agencies in the expansion and substantial improvement of the Nation's airport system. The l970 act was repealed and superseded by the Airport and Airway Improvement Act of l982 (AAIA).

    **(4) Airport Improvement Program (AIP).** This grant-in-aid program administered by the FAA under the authority of the Airport and Airway Improvement Act of l982, 49 U.S.C. § 47101, *et seq.*, assists in maintaining a safe and efficient nationwide system of public-use airports that meet the present and future needs of civil aeronautics.

**h. Federal Grant Assurance.** A Federal grant assurance is a provision within a Federal grant agreement to which the recipient of Federal airport development assistance has agreed to comply in consideration of the assistance provided.

**i. Fixed Base Operator (FBO).** A business granted the right by the airport sponsor to operate on an airport and provide aeronautical services such as fueling, hangaring, tie-down and parking, aircraft rental, aircraft maintenance, and flight instruction.

**j. Grant Agreement.** A Federal grant agreement represents an agreement made between the FAA (on behalf of the United States) and an airport sponsor for the grant of Federal funding.

**k. Proprietary Exclusive.** The owner of a public-use airport (public or private owner) may elect to provide any or all of the aeronautical services needed by the public at the airport. In fact, the statutory prohibition against exclusive rights does not apply to these owners. However, while they may exercise the exclusive right to provide aeronautical services, they may not grant or convey this exclusive right to another party. The airport sponsor that elects to engage in a proprietary exclusive must use its own employees and resources to carry out its venture. An independent commercial enterprise that has been designated as an agent of the airport sponsor may not exercise nor be granted such an exclusive right.

**l. Public Airport.** Means an airport open for public use and that is publicly owned and controlled by a public agency.

**m. Public-Use Airport**. Means either a public airport or a privately owned airport open for public use.

**n. Specialized Aviation Service Operations** (**SASO).** SASOs are sometimes known as single-service providers or special FBOs performing less than full services. These types of companies differ from a full service FBO in that they typically offer only a specialized aeronautical service such as aircraft sales, flight training, aircraft maintenance and avionics services for example.

**o. Self-Fueling and Self-Service.** Self-fueling means the fueling or servicing of an aircraft (i.e. changing the oil, washing) by the owner of the aircraft with his or her own employees and using his or her own equipment. Self-fueling and other self-services cannot be contracted out to another party. Self-fueling implies using fuel obtained by the aircraft owner from the source of his/her preference. As one of many self-service activities that can be conducted by the aircraft owner or operator by his or her own employees using his or her own equipment, self-fueling, differs from using a self-service fueling pump made available by the airport, an FBO or an aeronautical service provider. The use of a self-service fueling pump is a commercial activity and is not considered self-fueling as defined herein

and can be subject to minimum standards. In addition to self-fueling, other self-service activities that can be performed by the aircraft owner with his or her own employees includes activities such as maintaining, repairing, cleaning, and otherwise providing service to an aircraft, provided the service is performed by the aircraft owner or his/her employees with resources supplied by the aircraft owner.  Title 14 CFR Part 43 permits the holder of a pilot certificate to perform specific types of preventative maintenance on any aircraft owned or operated by the pilot.