# EXHIBIT E

| **From**: | Burchetta, James [/O=OAKTREECAP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=BURCHETTA, JAMES712] |
|---|---|
| **Sent**: | 9/22/2015 10:32:17 AM |
| **To**: | Smith, Jim [Jim.Smith@austintexas.gov]; Carbajal, Susana [Susana.Carbajal@austintexas.gov] |
| **CC**: | McCann, Emmett [emccann@oaktreecapital.com]; Tasugi, Brent [btasugi@oaktreecapital.com]; Andrew Vasey <avasey@vaseyaviation.com> (avasey@vaseyaviation.com) [avasey@vaseyaviation.com]; Jeff Pearse [pearse.jeff@gmail.com]; Lewis, Dawson [dlewis@oaktreecapital.com] |
| **Subject**: | AUS - South Terminal Lease Agreement |
| **Attachments**: | AUS South Terminal Lease Agreement (DRAFT - 9.22.15).DOCX |

**Importance**: High

Jim and Susana,

As we discussed, attached is an initial draft of the South Terminal Lease and Concession Agreement.  We look forward to discussing this draft with you at your convenience.

Regards,
Jim

**James D. Burchetta**
*Senior Vice President*
*Infrastructure Investing*

Oaktree Capital Management, L.P.
277 Park Avenue, 45th Floor
New York, NY 10172

*p* +1 (646) 857-8705  *f* +1 (646) 857-8848
www.oaktreecapital.com
jburchetta@oaktreecapital.com

LNSTR-000213



**SOUTH TERMINAL LEASE AND CONCESSION AGREEMENT**

by and between

**CITY OF AUSTIN**

(Owner)

and

**LONESTAR AIRPORT HOLDINGS, LLC[1]**

(Tenant)

---

[1] NTD: To be a newly formed wholly-owned subsidiary of Highstar Capital IV, L.P.
South Terminal Lease and Concession Agreement

3680839v.14 HIG339/10002

LNSTR-000214

# TABLE OF CONTENTS

I.   DEFINITIONS AND INTERPRETATION .................................................................1
   A.   Definitions .............................................................................................1
   B.   Interpretations .......................................................................................8
II.  GRANT OF LEASE ..........................................................................................9
   A.   Premises ................................................................................................9
   B.   Existing Condition ................................................................................9
   C.   Quiet Enjoyment ................................................................................10
III. TERM ..............................................................................................................10
   A.   Term ....................................................................................................10
   B.   Early Termination ...............................................................................10
   C.   Transfer of Rights ..............................................................................10
   D.   Capital Recovery Payment .................................................................11
IV.  USE OF PREMISES .........................................................................................11
   A.   Authorized Use ...................................................................................11
   B.   Prohibited Uses ...................................................................................11
   C.   Permits and Licenses ..........................................................................11
V.   RENT ..............................................................................................................12
   A.   Rent .....................................................................................................12
   B.   Payment of Pre-Commencement Rent ...............................................12
   C.   Payment of Post-Commencement Rent ..............................................12
   D.   Quarterly and Annual Reports ...........................................................13
   E.   Variable Rent True-Up .......................................................................13
   F.   Payment Delivery ...............................................................................13
   G.   Late Payment Penalty .........................................................................13
   H.   Disputes ...............................................................................................13
   I.   No Abatement ......................................................................................13
   J.   Internal Control Structure ..................................................................14
   K.   Records and Audit ..............................................................................14
   L.   Compensation Events .........................................................................15
   M.   Certain Notices ...................................................................................16
   N.   Appropriations ....................................................................................16
VI.  TAXES ............................................................................................................17

| | | | |
|---|---|---|---|
| | A. | Paid by Tenant | 17 |
| | B. | Paid by Owner | 17 |
| VII. | | NET LEASE | 17 |
| VIII. | | UTILITIES | 17 |
| IX. | | REHABILITATION OF SOUTH TERMINAL; COMMENCEMENT OF OPERATIONS DATE | 17 |
| | A. | Rehabilitation of the South Terminal | 17 |
| | B. | Maintenance Capital Investment | 20 |
| | C. | Demolition | 18 |
| | D. | Conditions to Commencement of Operations | 19 |
| X. | | PARKING FACILITIES | 20 |
| | A. | South Terminal Parking | 20 |
| | B. | Additional Parking Development | 20 |
| XI. | | AIRLINE LEASING PROGRAM | 20 |
| XII. | | MARKETING SUPPORT AND INCENTIVES TO AIR CARRIERS | 21 |
| XIII. | | CONCESSION PROGRAM | 22 |
| XIV. | | TENANT OPERATIONS, MAINTENANCE AND REPAIRS | 22 |
| | A. | Operations | 22 |
| | B. | Maintenance and Repair | 22 |
| | C. | Trash | 23 |
| | D. | Owner's Right to Maintain | 23 |
| XV. | | IMPROVEMENTS, EXPANSION OR NEW FACILITY | 23 |
| | A. | Improvements | 23 |
| | B. | Design/Construction Review | 23 |
| | C. | Owner's Right of Inspection | 24 |
| | D. | Tenant's Representative | 24 |
| | E. | As Built Plans | 24 |
| | F. | Construction Standards | 25 |
| | G. | Permits and Insurance | 25 |
| | H. | Ownership | 26 |
| | I. | Construction Parking and Staging Areas | 26 |
| | J. | No Liens | 26 |
| | K. | Disadvantaged Business Enterprise (DBE) Procurement Program | 26 |
| | L. | Expansion or New Facility | 26 |

LNSTR-000216

XVI.     FINANCING ................................................................................................27
     A.    Tenant's Right to Finance ...........................................................27
     B.    Tenant's Lender Rights and Obligations ....................................27
     C.    Owner's Right to Finance ...........................................................27
XVII.    OTHER TENANT OBLIGATIONS ........................................................28
     A.    Premises Security ........................................................................28
     B.    Compliance with Airport Rules ..................................................28
     C.    Signs............................................................................................28
     D.    Customer Claims, Comments and Complaints ...........................28
     E.    Maintenance of Legal Existence .................................................28
     F.    Personnel ....................................................................................29
     G.    Security ........................................................................................29
XVIII.   OTHER OWNER'S OBLIGATIONS ......................................................29
     A.    Operation as a Public Airport ....................................................29
     B.    Runway and Taxiway Maintenance ............................................29
     C.    Taxiways, Ramps and Apron Space ............................................29
     D.    Signage........................................................................................29
     E.    Shuttle Bus Service .....................................................................29
     F.    Rental Car Revenue Sharing .......................................................30
     G.    Federal Compliance ....................................................................30
     H.    SWPPP .......................................................................................30
     I.    Passenger Facility Charge; Airport Improvement Program.................30
     J.    Security ........................................................................................30
     K.    FIDS ...........................................................................................31
     L.    Lighting ......................................................................................31
XIX.    COMMUNICATIONS SERVICES .........................................................31
     A.    [Voice, Data and Video Cabling.................................................31
     B.    Telephone and Wireless Services ...............................................31
     C.    Data Communications Service ....................................................31
     D.    Television Service .......................................................................32
     E.    Invoicing and Payment ...............................................................32
     F.    Computer Networks ....................................................................32
XX.    ENVIRONMENTAL CONDITION OF PREMISES .................................32
XXI.    ENVIRONMENTAL COMPLIANCE ....................................................33

LNSTR-000217

| | | |
|---|---|---|
| A. | Compliance | 33 |
| B. | Responsibility | 34 |
| C. | Tenant's Indemnity of Owner | 35 |
| D. | Owner's Obligation | 35 |
| E. | Discussions and Dispute Resolution | 36 |
| F. | Removal | 37 |
| G. | Compliance with Federal and State Stormwater Requirements | 37 |
| H. | Tenant Environmental Parties | 37 |
| I. | Survival | 38 |
| XXII. | INSURANCE | 38 |
| XXIII. | INDEMNITY | 39 |
| A. | Tenant's Indemnity | 39 |
| B. | Owner's Obligation | 40 |
| C. | Notice | 40 |
| D. | Defense | 40 |
| E. | Waiver of Consequential Damages | 40 |
| F. | Claims | 40 |
| XXIV. | MEETINGS | 41 |
| XXV. | LAWS, AGREEMENTS AND GRANT CONDITIONS | 41 |
| A. | Grant Assurances | 41 |
| B. | National Emergencies | 41 |
| C. | Non-Discrimination and Affirmative Action | 41 |
| D. | Public Accommodation Laws | 42 |
| E. | Compliance with Laws | 42 |
| F. | Lighting, Electrical and Radio Interference | 42 |
| G. | Amendment | 42 |
| H. | Airport Development | 43 |
| I. | Economic Nondiscrimination | 43 |
| J. | Minority and Women-Owned Business Enterprises | 43 |
| K. | Wage Initiatives | 43 |
| XXVI. | AVIGATION RIGHTS | 43 |
| XXVII. | TENANT DEFAULT AND REMEDIES | 44 |
| A. | Default by Tenant | 44 |
| B. | Remedies of Owner | 45 |

LNSTR-000218

      C.      Additional Rights of Owner ........................................................................46
XXVIII.   OWNER DEFAULT AND REMEDIES ...............................................................46
      A.      Default by Owner ..........................................................................46
      B.      Tenant's Remedies .........................................................................47
XXIX.     SURRENDER OF PREMISES ...........................................................................48
      A.      Condition of Premises ....................................................................48
      B.      Repossession and Holding Over .....................................................48
      C.      Tenant's Personal Property .............................................................48
XXX.      FORCE MAJEURE .........................................................................................49
XXXI.     INSPECTION ..................................................................................................49
XXXII.    CASUALTY LOSS ...........................................................................................50
      A.      Restoration Upon Casualty Loss .....................................................50
      B.      No Restoration Following Casualty Loss .........................................50
      C.      Abatement ....................................................................................51
XXXIII.   CONDEMNATION ..........................................................................................51
      A.      Taking in Entirety .........................................................................51
      B.      Partial Taking ...............................................................................51
      C.      Damage Award ..............................................................................51
      D.      Definition of Taking ......................................................................51
XXXIV.   ASSIGNMENT AND SUBLEASING ..................................................................51
      A.      By Tenant .....................................................................................51
      B.      Transfer of Owner's Interest ..........................................................52
XXXV.    APPROVALS AND AUTHORITY ......................................................................52
      A.      Owner ..........................................................................................52
      B.      Tenant .........................................................................................53
XXXVI.   NOTICES AND CONTRACT ADMINISTRATION................................................53
      A.      Contract Administrator ..................................................................53
      B.      Notices .........................................................................................54
XXXVII.  CONFIDENTIALITY/PROPRIETARY INFORMATION .......................................54
XXXVIII. BOND ORDINANCES .....................................................................................55
      A.      Bond Ordinance Provisions ...........................................................55
      B.      Certificate in Connection with Issuance of Bonds..............................56
XXXIX.   ALTERNATIVE DISPUTE RESOLUTION ..........................................................56
XL.       MISCELLANEOUS .........................................................................................57

LNSTR-000219

A.   Gratuities .................................................................................................................57

B.   Modification and Non-Waiver ...................................................................................57

C.   Governing Law ...........................................................................................................57

D.   Severability .................................................................................................................57

E.   Relation of Parties......................................................................................................58

F.   Recordation .................................................................................................................58

G.   Successors and Assigns...............................................................................................58

H.   Survival .......................................................................................................................58

I.   No Commissions .........................................................................................................58

J.   Time of the Essence ...................................................................................................58

K.   Reservation of Immunities .........................................................................................58

L.   Counterparts ................................................................................................................58

M.   Entire Agreement .......................................................................................................58

LNSTR-000220

# SOUTH TERMINAL LEASE AND CONCESSION AGREEMENT

THIS SOUTH TERMINAL LEASE AND CONCESSION AGREEMENT (this "<u>Lease</u>") is entered into by and between CITY OF AUSTIN, a Texas home rule city and municipal corporation ("<u>Owner</u>") acting by and through the Executive Director of the Department of Aviation, and LoneStar Airport Holdings, LLC, a limited liability company formed and existing under the laws of the State of Delaware ("<u>Tenant</u>"). Owner and Tenant, collectively, shall be referred to in this Lease as the "<u>Parties</u>" and each as a "<u>Party</u>".

**WHEREAS:**

A.  Owner owns and operates Austin-Bergstrom International Airport, located in the City of Austin, Travis County, Texas; and

B.  Highstar Capital IV, L.P., the parent of Tenant, has engaged in the business of operating airport facilities; and

C.  Tenant desires to lease certain premises, obtain certain rights, services and privileges to reactivate an airport terminal and appurtenant parking and other related facilities intended to serve airlines that serve the Austin-Bergstrom International Airport and passengers served by such airlines, all on a financially self-sustaining basis; and

D.  Owner is willing to grant and lease the same to Tenant upon the terms and conditions hereinafter stated.

Now, therefore, for and in consideration of mutual promises and covenants hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Tenant enter into this Lease and agree as follows:

## I.  DEFINITIONS AND INTERPRETATION

A.  <u>Definitions</u>.  As used in this Lease, the following terms shall be defined as follows:

1)  <u>Affiliate</u> – means an entity that directly or indirectly through one (1) or more intermediaries, controls, or is controlled by, or is under common control with, another entity.  An entity "controls" any other entity in which it has the power to vote, directly or indirectly, [●]%[2] or more of the voting interests in such entity or, in the case of a partnership, if it is a general partner.  An entity may be a person, corporation, association, or partnership of any type or kind.

2)  <u>Air Transportation</u> – means the carriage of persons, property, cargo and/or mail by aircraft.

3)  <u>Airline Leasing Program</u> – has the meaning set forth in <u>Section XI</u>.

---

[2] NTD:  To be discussed.  Percentage agreed to should not be tripped by passive minority interest investments of Oaktree and Highstar.

LNSTR-000221

4) <u>Airlines</u> – means commercial airlines enplaning passengers at the Airport and/or the South Terminal.

5) <u>Airport</u> – means Austin-Bergstrom International Airport, a municipal airport in the City of Austin, Travis County, Texas, owned and operated by Owner.

6) <u>Airport Enplaned Passengers</u> – means all originating and outgoing on-line transfer and off-line transfer passengers departing from the Airport.

7) <u>Airport Rental Car Revenues</u> – has the meaning set forth in <u>Section XVIII.F.</u>

8) <u>Applicable Law</u> – means all applicable federal, state and local laws, codes, ordinances, rules, regulations, judgments, decrees or directives of any Governmental Authority (but with respect to any such directives of the City of Austin, only to the extent generally applicable to the regulated community) having jurisdiction over the Airport or the Premises, including all Environmental Laws as defined herein.

9) <u>Capital Recovery Factor</u> – means the following percentage of capital invested by Tenant in the Premises and the South Terminal that Tenant may recover on a termination of this Agreement under <u>Section III.D</u>: 100% in the first three years after the Commencement of Operations Date; 75% in the fourth year after the Commencement of Operations Date; 50% in the fifth year after the Commencement of Operations Date; and 25% in the sixth year after the Commencement of Operations Date.

10) <u>Capital Recovery Notice</u> – has the meaning assigned to such term in <u>Section III.D</u>.

11) <u>Capital Recovery Payment</u> – means an amount equal to the product of (a) the Capital Recovery Factor, multiplied by (b) the total of (i) the Initial Capital Investment, plus (ii) any remaining obligations under capital leases related to the South Terminal (unless assumed by Owner), less (iii) any cash distributions of South Terminal revenues received by Tenant from and after the Commencement of Operations Date, but in no event to exceed ELEVEN MILLION AND NO/100 DOLLARS ($11,000,000.00).

12) <u>CONRAC</u> – means the Consolidated Rental Car Center at the Airport.

13) <u>Commencement of Operations Date</u> – means the first date after the Effective Date on which a commercial airline flight arrives at or departs from the South Terminal, provided the conditions in <u>Section IX.C</u> have then been met or have been waived by Tenant and in the case of obligations which continue after the Commencement of Operations Date, have been satisfied through the Commencement of Operations Date.

14) <u>Concession Program</u> – has the meaning set forth in <u>Section XIII.A</u>.

LNSTR-000222

15) <u>Confidential Information</u> – has the meaning set forth in <u>Section XXXVII</u>.

16) <u>Contract Rate</u> – means the lesser of the rate of interest specified in Texas Government Code Section 2251.025, or the highest non-usurious rate permitted by law.

17) <u>CPI</u> – means the Consumer Price Index for Urban Consumers published by the U.S. Department of Labor, Bureau of Labor Statistics. In the event that the CPI should cease to be published, the Parties shall use good faith efforts to agree upon a substitute index that most closely approximates the CPI in gauging changes in the cost of living for urban consumers. If the Parties are unable to agree upon a substitute index, Owner may select a reasonable substitute index published by the Bureau of Labor Statistics, or successor agency.

18) <u>Director</u> – means the Executive Director of the City of Austin Department of Aviation or his or her duly authorized designee.

19) <u>Effective Date</u> – means the date on which the early termination right under <u>Section III.B</u> has expired for both Owner and Tenant.

20) <u>Execution Date</u> – means the date stated on the signature page of this Lease.

21) <u>Enplaned Passengers</u> – means all originating and outgoing on-line transfer and off-line transfer passengers departing from the South Terminal.

22) <u>Environmental Assessment</u> – shall refer to and include any environmentally related study, report, analysis, investigation, site assessment, intrusive sampling or any results of the foregoing relating to the Environmental Condition of the Premises.

23) <u>Environmental Claims</u> – shall refer to and include all losses, claims, demands, suits, actions, judgments and liabilities for: (a) cleanup, removal, remediation, investigation, assessment, transportation, testing and disposal of Hazardous Materials, including their release, spill or discharge, as required to comply with applicable Environmental Laws; (b) bodily injury or death resulting from Hazardous Materials; (c) damage to or loss of use of property of any person or entity resulting from Hazardous Materials; (d) injury to natural resources; (e) fines, costs, fees, assessments, taxes, demands, orders, directives or any other requirements imposed in any manner by any Governmental Authority under applicable Environmental Laws; and (f) costs and expenses of cleanup, remediation, assessment, testing, investigation, transportation and disposal of a Hazardous Material spill, release, or discharge required under Environmental Laws.

24) <u>Environmental Condition</u> – shall mean any condition with respect to the soil, surface waters, groundwaters, surface or subsurface strata, ambient air or other environmental medium on or off the Premises, whether or not yet discovered,

LNSTR-000223

which could or does result in any Environmental Claim to or against Tenant or Owner by any third party (including any Governmental Authority), including any condition resulting from the activities, operation or business of any other property lessee, tenant, licensee, owner or operator on, off or in the vicinity of the Premises.

25) <u>Environmental Laws</u> – shall refer to and include all Federal, State, Travis County, City of Austin and local statutes, laws, ordinances, rules and regulations, now or hereafter in effect, and as amended from time to time, including judicial interpretations thereof, related to pollution or the protection of the environment, including those related to emissions, discharges, releases or threatened releases of or the use, handling, treatment, storage, disposal, or transportation of Hazardous Materials. Environmental Laws specifically include the Comprehensive Environmental Response, Compensation, and Liability Act, the Resource Conservation and Recovery Act, the Hazardous Substances Act, the Toxic Substances Control Act, the Clean Water Act, the Superfund Amendments and Reauthorization Act, the Clean Air Act, the Occupational Safety and Health Administration Hazard Communication Standards, the Texas Hazardous Substances Act, and the Texas Water Quality Control Act.

26) <u>Expansion</u> – means any expansion of the South Terminal, including the development of any additional parking facilities serving the South Terminal, to accommodate the growth of operations of Airlines (or other air carriers) at the Airport.

27) <u>Extension Term</u> – has the meaning assigned to such term in <u>Section III.A.2)</u>.

28) <u>FAA</u> – means the Federal Aviation Administration or successor agency that regulates civil aviation, airports and airport operations.

29) <u>Fair Market Value</u> – the amount that a willing and able buyer would offer, and a willing and able seller would accept, for the purchase and sale of Tenant's Interest, in an arm's length transaction, assuming: (a) neither Party is under economic compulsion or has special bargaining power; (b) the buyer possesses all information in the possession of Tenant relating to the Premises, the condition of the Premises and the revenues and expenses of Tenant; and (c) that the event giving rise to such determination had not occurred.

30) <u>FIDS Monitors</u> – means flight information display monitors for the display of information on all departing and arriving flights at the South Terminal and the North Terminal.

31) <u>Fixed Rent</u> – has the meaning assigned to such in <u>Section V.A</u>.

32) <u>GAAP</u> – means generally accepted accounting principles in the United States of America.

LNSTR-000224

33) <u>GASB</u> – means the Government Accounting Standards Board.

34) <u>Governmental Authority</u> – means any governmental, judicial or administrative entity, body or authority

35) <u>Governmental Approval</u> – means any approval, authorization, certification, consent, decision, exemption, filing, lease, license, permit, agreement, concession, grant, franchise, registration or ruling, required to be issued by or entered into with any Governmental Authority for the Premises.

36) <u>Gross Revenue</u> – means all cash collected by Tenant arising from its operation of the Premises, after deducting, to the extent properly documented and recorded, (a) federal, state and local excise, sales and use taxes that are passed through to, and collected from, any of the Airlines, concessionaires at the Premises or any other users of the Premises, and remitted to the taxing authorities by Tenant, and (b) the amount of any refunds or adjustments (either cash or credit) granted by Tenant to any such Airlines concessionaires or users of the Premises.

37) <u>Hazardous Materials</u> – shall refer to and include all substances whose use, handling, treatment, storage, disposal, discharge or transportation is governed, controlled, restricted or regulated by Environmental Laws, that have been defined, designated or listed by any responsible regulatory agency as being hazardous, toxic, radioactive or that present an actual or potential hazard to human health or the environment if improperly used, handled, treated, stored, disposed, discharged, generated or released. Hazardous Materials specifically include asbestos and asbestos-containing-materials, petroleum products, solvents and pesticides.

38) <u>Initial Capital Investment</u> – means the amount invested by Tenant for the rehabilitation, reactivation and initial working capital requirements of the South Terminal, which are estimated as of the Effective Date to be approximately $11.2 million.

39) <u>Initial Term</u> – means the period commencing on the Effective Date and expiring at 11:59 p.m., Austin, Texas time, on the last day of the three hundred sixtieth (360) full calendar month ending after the Effective Date.

40) <u>Lease</u> – has the meaning set forth in the Preamble.

41) <u>Lease Year</u> – means a period of twelve (12) calendar months commencing on January 1 of each calendar year during the Term, but (a) for the first Lease Year, the period from the Effective Date through December 31, 2015, and (b) for the final Lease Year, the period from January 1 of such Lease Year through the last day of the Term.

LNSTR-000225

42) <u>Material Adverse Effect</u> – means a material adverse effect on the:

    a)    financial condition, results of operations or prospects of Tenant;

    b)    ability of Tenant to perform its material obligations under this Lease; or

    c)    the Fair Market Value of the Premises.

43) <u>New Facility</u> – means the construction of any new terminal or other facilities at the Airport to accommodate the growth of operations of Airlines (or other air carriers) at the Airport.

44) <u>North Terminal</u> – means and refers to the Barbara Jordan Terminal at the Airport.

45) <u>Owner</u> – has the meaning set forth in the Preamble.

46) <u>Owner Default</u> – had the meaning set forth in <u>Section XXVIII.A</u>.

47) <u>Owner Environmental Parties</u> – shall include Owner and its elected and non-elected officials, officers, agents, employees and contractors and any other person or entity that is not a Tenant Environmental Party.

48) <u>Premises</u> – means the South Terminal, the land described on **Exhibit A** attached hereto, and all improvements and other buildings therein and thereon.[3]

49) <u>Public Owner</u> – has the meaning set forth in <u>Section XXXIV.B</u>.

50) <u>Qualified Entity</u> – means with respect to any of Tenant's rights and obligations hereunder any entity proposed by Tenant as assignee, sublessee, subcontractor, manager or transferee under <u>Section XXXIV.A</u> or a transferee under <u>Section XXXIV.A</u> which has (or with its contractors collectively have), in the reasonable determination of the Owner, (a) the financial strength and integrity, (b) experience in airports or other comparable or relevant businesses and (c) reputation, to perform such obligations.

51) <u>Rehabilitation Project</u> – has the meaning set forth in <u>Section IX.A.1)</u>.

52) <u>Rent</u> – has the meaning set forth in <u>Section V.A</u>. Rent includes Fixed Rent or Variable Rent, as applicable, as defined in <u>Section V.A</u>.

53) <u>Revenue Sharing Rate</u> – has the meaning set forth in <u>Section XVIII.F</u>.

54) <u>Shuttle Bus Service</u> – means the rental car shuttle bus service providing transportation between the South Terminal and each of CONRAC and the North Terminal.

---

[3] NTD: Premises to include three aircraft parking spots adjacent to South Terminal.

LNSTR-000226

55) <u>South Terminal</u> – means the South Terminal of the Airport, including all existing fixtures and equipment therein; facilities for ground transportation staging; motor vehicle parking; rental car parking, staging and ready return; in-terminal food and beverages, retail, news and gift concessions; in-terminal advertising; passenger services; storage; ground handling; and office, passenger, air carrier, user or ground handling accommodations.

56) <u>South Terminal Marketing Program</u> – has the meaning set forth in <u>Section XII.B</u>.

57) <u>Specified Event</u> – shall mean (a) any transfer of Owner's rights and obligations under this Lease to any person or entity other than to a Public Owner in accordance with <u>Section XXXIV.B</u>; (b) construction by any person or entity other than Tenant of a terminal at the Airport; or (c) construction by any person or entity other than Tenant of motor vehicle parking facilities at the Airport south of the mid-field taxiway (or in the case of each of sub-clause (a), (b) and (c) above, any action by the City Council of Austin, or any letter of intent, memorandum of understanding, solicitation for proposals or other written commitment by Owner to negotiate, implement or authorize any such transfer or construction).

58) <u>SWPPP</u> – Owner's Storm Water Pollution Protection Plan for the Airport as in effect from time to time.

59) <u>Tenant</u> – has the meaning set forth in the Preamble.

60) <u>Tenant Default</u> – has the meaning set forth in <u>Section XXVII.A</u>.

61) <u>Tenant Environmental Parties</u> – shall include Tenant's directors, officers, agents, employees, contractors, subtenants and other contractually permitted occupants of the Premises, its and their Affiliates, and its and their successors and assigns, but shall specifically exclude (a) any contractor, subtenant or other permitted occupant, or any Owner Environmental Party, to the extent that any Environmental Claim arises from any acts or omissions of such Party occurring outside the Premises and (b) Owner, including its elected and non-elected officials, officers and employees.

62) <u>Tenant's Interest</u> – means all Tenant's right, title and interest in, to, under or derived from this Lease and the Trade Fixtures.

63) <u>Term</u> – has the meaning set forth in <u>Section III.A</u>.

64) <u>Tenant Apron</u> – means the aircraft parking and maneuvering areas adjacent to the South Terminal as designated in **<u>Exhibit A</u>**.

65) <u>Terminal Use Agreements</u> – means the Terminal Use and Lease Agreements between Tenant and Airlines for the use of, or use of space in, the South Terminal.

LNSTR-000227

66) <u>Trade Fixtures</u> – All furniture, equipment, fixtures, and furnishings installed or constructed by Tenant, at its expense, on the Premises, including baggage handling systems, flight information display systems and FIDS Monitors, ticket and check-in counters, signs, seating, display cabinets, communications equipment, special lighting fixtures and all other equipment, furniture, furnishings and supplies that can be removed from the Premises without material damage to the Premises.

67) <u>TSA</u> – the United States Transportation Security Administration or successor agency that regulates airport or aviation security.

68) <u>Variable Rent</u> – has the meaning assigned to such term in <u>Section V.A.</u>

B.  <u>Interpretations</u>.  In this Lease and any certificate or other document delivered pursuant hereto, unless otherwise expressly provided herein or therein or unless the context requires another meaning, the following rules of interpretation shall apply:

1) Headings and underlinings are for convenience only and do not affect the interpretation of an agreement.

2) Words importing the singular include the plural and vice versa and the masculine, feminine or neuter gender shall include all genders.  The word "or" is not exclusive.

3) The words "hereof," "herein," and "hereunder" and words of similar import when used in any agreement shall refer to such agreement as a whole and not to any particular provision of such agreement.

4) Any reference to an agreement shall include a reference to each exhibit, annex, schedule and other attachment thereto.

5) Any reference in an agreement to a Section, Clause, subsection, sub-clause, paragraph, Party, Exhibit, Annex or Schedule is a reference to that Section, Clause, subsection, sub-clause or paragraph of, or that Party, Exhibit, Annex or Schedule to, such agreement unless otherwise specified.

6) Any reference to an agreement or document is to such agreement or document as amended, varied, supplemented, replaced, novated or modified from time to time in accordance with the terms of such agreement or document.

7) Any reference to any Applicable Law shall be construed so as to include such Applicable Laws as amended, modified, extended, reenacted, redesignated or replaced from time to time.

8) A reference to a person or entity includes that person's or entity's successors and permitted assigns.

3680839v.14 HIG339/10002

LNSTR-000228

9) The term "including" shall mean "including without limitation" and any list of examples following such term shall in no way restrict or limit the generality of the word or provision in respect of which such examples are provided.

10) Accounting terms shall have the respective meanings given to them under GAAP, or if specific to Owner, under GASB.

11) References to "days" shall mean calendar days and references to a time of day shall mean such time in Austin, Texas.

12) The Lease is the result of negotiations among, and have been reviewed by each Party and their respective counsel. Accordingly, the Lease shall be deemed to be the product of all Parties thereto, and no ambiguity shall be construed in favor of or against any of them.

13) References to any condition or any representation by any Party being to the (a) best knowledge of such Party shall be deemed to be to the best knowledge of such Party after due inquiry, and (b) knowledge of such Party shall be deemed to be to the actual knowledge of such Party.

## II.  GRANT OF LEASE

A. <u>Premises</u>.  Owner hereby leases and demises to Tenant, and Tenant hereby leases and takes from Owner, the Premises; TO HAVE AND TO HOLD the Premises, together with all and singular the rights, privileges, and appurtenances thereto attaching or in anywise belonging, unto Tenant, its successors and permitted assigns, for the Term, and subject to and in accordance with (1) the covenants, agreements, terms, provisions and limitations of this Lease; and (2) all rights, restrictions, encumbrances and matters of record to the extent the same are valid and enforceable.  For avoidance of doubt, this Lease shall include and cover all existing fixtures and equipment at the South Terminal and its adjacent landside facilities, including, but not limited to holdroom seating currently in storage in the South Terminal, baggage belt systems, baggage handling systems, mechanical, HVAC and plumbing, fire alarm and protection, and security equipment located at the South Terminal as of the Execution Date.

B. <u>Existing Condition</u>.  Except as provided in <u>Section XX</u> or <u>Section XXI</u> or as otherwise expressly provided herein, Tenant shall take the Premises **AS IS, WITH ALL FAULTS**, and Tenant acknowledges that Owner has not made any representations, warranties, covenants or agreements, express or implied, regarding (1) the value, nature, quality or condition of the Premises, (2) the income to be derived from the Premises, (3) the suitability of the Premises for any activity or use which Tenant may conduct thereon, (4) the compliance of the Premises with any Applicable Laws, or (5) the habitability, marketability or fitness for a particular purpose of the Premises.  Tenant further acknowledges and agrees that any information which Owner procures from a third party and provides to Tenant with respect to the Premises may be delivered without any independent investigation or verification of such information by Owner, and Owner makes no representations as to the accuracy or completeness of such information.

LNSTR-000229

C.    Quiet Enjoyment.  Owner covenants that Tenant, upon paying the Rent and performing and observing the covenants and agreements herein required to be paid, performed or observed by it, may peaceably and quietly have, hold, occupy, use and enjoy the Premises during the term of this Lease, and may exercise all of its rights hereunder, without ejection or interference by Owner or any person or entity claiming by, through or under Owner, subject to the provisions of this Lease and Applicable Law.

### III.    TERM

A.    Term.

1)    This Lease Agreement shall be and remain in effect for the Initial Term, subject to the right to extend the Lease under Section III.A.2) below.

2)    Tenant shall have the option to extend the term of this Agreement for up to two (2) additional terms of five (5) years each (each, an "Extension Term", and the Initial Term, together with any Extension Term, being herein called the "Term") commencing at the expiration of the Initial Term or the first Extension Term, as applicable, provided (a) no material Tenant Default has occurred and is then continuing under this Lease, (b) Tenant provides Owner with notice of such extension on or before one hundred eighty (180) days prior to the expiration of the Initial Term or the first Extension Term, as applicable, and (c) **[insert economic and performance requirement contemplated under LOI]**.[4]

B.    Early Termination.  Owner shall submit this Lease to the FAA for review within ten (10) days after the Execution Date.  Owner shall promptly deliver to Tenant written notice of any written response by the FAA resulting from its review of this Lease.  Within thirty (30) days after the date Tenant receives notice of FAA's response to Owner's request that the FAA review this Lease, either Owner or Tenant may elect in its sole discretion to terminate this Lease pursuant to a written notice delivered to the other Party in the event that, as a result of the review of this Lease by the FAA, such Party will be materially and adversely affected by any amendments to this Lease that are required pursuant to Section XXV.A or Section XXV.G hereof.  In the event of such foregoing termination, Owner shall reimburse Tenant for an amount equal to (1) the Initial Capital Investment, plus (2) any remaining obligations under any capital leases related to the South Terminal (except to the extent such capital leases are assumed by Owner) incurred with respect to the Premises since the Execution Date.

C.    Transfer of Rights.  Upon termination or expiration of this Lease, Tenant shall transfer all right, title and interest in and to the Premises, to Owner without additional payment or cost (except as otherwise provided herein including under Section III.B); provided, however, that at all times during the Term, Tenant will retain all right, fide and interest in and to any Trade Fixtures and Tenant shall be entitled (but not required) to remove and dispose of such Trade Fixtures, subject to Owner's rights under Section IX.D.  If Tenant has failed to remove such Trade Fixtures from the Premises within sixty (60) days after

---

[4] NTD:  Owner to propose a reasonably achievable requirement.

LNSTR-000230

termination or expiration of this Lease, such Trade Fixtures shall be conclusively presumed to have been abandoned by Tenant.

D.  <u>Capital Recovery Payment</u>.  If at any time within the first six (6) years after the Commencement of Operations Date, the Enplaned Passenger level at the South Terminal falls below, for the preceding 12-month period, or is projected to fall below, for the succeeding 12-month period, 200,000 Enplaned Passengers because any or all of the Airlines either fail to (i) achieve such service levels, or (ii) reduce service or provide notification of a reduction in service, at the South Terminal, Tenant may notify Owner, within six (6) months thereafter of such event (such notice, a "<u>Capital Recovery Notice</u>"). If following delivery of such a Capital Recovery Notice, Owner and Tenant are unable to correct such shortfall of Enplaned Passengers within six (6) months after receipt by Owner of such Capital Recovery Notice, Tenant may terminate this Lease upon sixty (60) days advance written notice to Owner, after which Owner will make the Capital Recovery Payment to Tenant.  The Capital Recovery Payment, which shall not in any event exceed ELEVEN MILLION AND NO/100 DOLLARS ($11,000,000.00), will be paid in equal installments at each of the four calendar quarter ends (i.e., March 31, June 30, September 30 and December 31) following the termination of this Lease.  Upon termination of this Lease, Owner will either assume operations of the South Terminal or Owner will close the South Terminal and the Airlines operating out of the South Terminal will be allowed to operate at the North Terminal.  Tenant's right to demand any Capital Recovery Payment shall expire at the end of the sixth full year after the Commencement of Operations Date.

## IV.    USE OF PREMISES

A.  <u>Authorized Use</u>.  The Premises shall be used for the operation and maintenance of the South Terminal as an airport terminal to accommodate Air Transportation (an "<u>Authorized Use</u>").

B.  <u>Prohibited Uses</u>.  Tenant shall not use or occupy, permit the Premises to be used or occupied, or do or permit anything to be done in or on the Premises in a manner which (1) is not an Authorized Use, (2) would constitute a public or private nuisance, (3) would violate Airport rules or regulations or (4) would violate any Applicable Laws.

C.  <u>Permits and Licenses</u>.  Tenant, at Tenant's expense, shall obtain and maintain in force and effect all Governmental Approvals (except for storm water permits and any permits issuable by Owner), to the extent required for the reactivation and operation of the South Terminal.  Owner will make commercially reasonable efforts to assist and support Tenant in securing the necessary Governmental Approvals for such reactivation and operation, but nothing herein shall be construed to require Owner to waive, release or modify any of its site development ordinances, rules or regulations, or requirements in connection with the granting of any such Governmental Approvals.

LNSTR-000231

# V.    RENT

A.    <u>Rent</u>.  Tenant shall pay Owner rent for the Premises and the South Terminal which will be calculated on an annual basis, as follows:

    1)    From the Effective Date through the date immediately preceding the Commencement of Operations Date, the amount of EIGHTY THOUSAND AND NO/100 Dollars ($80,000.00) per Lease Year, pro-rated for any partial Lease Years; and

    2)    From and after the Commencement of Operations Date through the expiration of the Term, the greater of (a) THREE HUNDRED THOUSAND AND NO/100 DOLLARS ($300,000.00) per Lease Year, pro-rated for any partial Lease Years, adjusted effective on January 1 of each Lease Year, commencing on January 1, 2017, based on any percentage increase in the CPI for the immediately prior Lease Year over the next immediately preceding Lease Year (the "<u>Fixed Rent</u>"), and (b) a percentage of annual Lease Year Gross Revenues, pro-rated for any partial Lease Year, based on the actual Enplaned Passengers for the applicable Lease Year in accordance with the following schedule (the "<u>Variable Rent</u>"):

        a)    0 to 399,999 Enplaned Passengers, 0% of Gross Revenue

        b)    400,000 to 699,999 Enplaned Passengers, 5% of Gross Revenue

        c)    700,000 to 999,999 Enplaned Passengers, 10% of Gross Revenue

        d)    1,000,000 to 1,299,999 Enplaned Passengers, 15% of Gross Revenue

        e)    more than 1,299,999 Enplaned Passengers, 20% of Gross Revenue;

    For the avoidance of doubt, for purposes of calculating Rent for the Lease Year in which the Commencement of Operations Date occurs, there will be deemed to be two partial Lease Years for which the Rent, as determined pursuant to <u>Section V.A.1)</u> and <u>Section V.A.2)</u>, will be prorated.

B.    <u>Payment of Pre-Commencement Rent</u>.  On the Effective Date, and not later than the tenth business day of each calendar month commencing after the Effective Date and prior to the Commencement of Operations Date, Tenant shall pay Owner an amount equal to the then current Rent under <u>Section V.A.1)</u>, multiplied by one-twelfth (prorated for any partial month).

C.    <u>Payment of Post-Commencement Rent</u>.  On the Commencement of Operations Date, and not later than the tenth business day of each calendar month commencing after the Commencement of Operations Date through the Term of this Lease, Tenant shall pay Owner an amount equal to then current Fixed Rent multiplied by one-twelfth (prorated for any partial month).

LNSTR-000232

D.   Quarterly and Annual Reports.  For each full or partial calendar quarter and Lease Year during the Term, commencing with the month in which the Commencement of Operations Date occurs, not later than forty-five (45) days after the end of each such quarter and one hundred-twenty (120) days after the end of each Lease Year, Tenant shall submit to Owner information regarding its actual operations (the "Tenant Report"), certified and signed by an authorized representative of Tenant, on the form prescribed by Owner, attached as **Exhibit B** hereto, which shall include for such quarter and Lease Year, as applicable:  (1) the total Gross Revenues, (2) the number of Enplaned Passengers and (3) in the case of each report for a Lease Year, Tenant's calculation of Variable Rent for such Lease Year.

E.   Variable Rent True-Up.  If the Variable Rent reflected in any Lease-Year report provided in accordance with Section V.D exceeds the amount of Fixed Rent paid by Tenant for such Lease Year, Tenant shall pay Owner the amount by which such Variable Rent exceeds the Fixed Rent paid by Tenant for such Lease year, concurrently with the delivery to Owner of such report.

F.   Payment Delivery.  (1) Unless otherwise directed, in writing, by Owner, Tenant shall remit any payment of Rent, and any other payment obligations of Tenant to Owner, through an Automated Clearing House (ACH) electronic transfer of funds as follows:

> ACH instructions:
> ABA: 111000025
> Account Number: 488005759350
> Account Name: City of Austin Investment Pool Receiving

(1) Unless otherwise directed, in writing, by Tenant, Owner shall remit payment of any payment obligations of Owner to Tenant, including under Section XVIII.F, through an Automated Clearing House (ACH) electronic transfer of funds as follows:

**[Tenant Account Information – To Come]**

G.   Late Payment Penalty.  If any payment required hereunder by either Party under this Section V is not made within thirty (30) days after such payment is due, such Party shall pay interest at the Contract Rate on the amount outstanding from the payment due date until paid in full.

H.   Disputes.  If either Party disputes the amount or calculation of any payment obligation of such Party under this Lease, such Party shall pay the other Party the undisputed amount, together with a written notice of protest.  Such notice of protest shall state the amount in dispute and describe in detail the basis of the dispute.  If the Parties are unable to resolve the dispute at a staff level, the matter shall be resolved pursuant to Section XXXIX.  The Party found to owe an amount to the other Party shall promptly pay such other Party the amount determined to be owed.

I.   No Abatement.  Except as may otherwise be expressly provided in this Lease, no event or situation during the term of this Lease, whether foreseen or unforeseen, and however

LNSTR-000233

extraordinary, shall relieve a Party from its obligations hereunder or entitle a Party to an abatement or offset, and each Party waives any rights now or hereafter available at law or in equity to any abatement, diminution, reduction, offset or suspension for any reason.

J.   Internal Control Structure.  Tenant shall maintain an internal control structure designed to provide reasonable assurance that South Terminal assets are safeguarded from loss or unauthorized use, transactions are executed in accordance with Tenant's authority, and financial records are reliable for the purposes of preparing the reports required under Section V.D.  The internal control structure shall be supported by the selection, training and development of qualified personnel, by an appropriate segregation of duties, and by the dissemination of written policies and procedures.

K.   Records and Audit.

   1)   Tenant shall keep and maintain complete and accurate records of its operations related to or concerning the South Terminal in accordance with the requirements of GAAP.  Upon not less than ten (10) business days' prior written notice, Owner's auditors or other authorized representatives shall, at any time or times during the Term of this Lease or within three (3) years after the end of any Lease Year, have access to, and the right to audit, examine or reproduce any and all records of Tenant related to performance under this Lease, including, calculation of Gross Revenues and Rent.  Tenant shall retain such books and records for the longer of three (3) years after the Lease terminates or until completion of all pending litigation between the Parties.  Tenant shall either keep and maintain all such records at a mutually acceptable location in Austin, Texas, or make such books and records available to Owner in Austin, Texas, within twenty (20) business days of receipt of written demand.

   2)   Owner shall keep and maintain complete and accurate records of its operations related to or concerning this Lease in accordance with the requirements of GASB.  Upon not less than ten (10) business days' prior written notice, Tenant's auditors or other authorized representatives shall, at any time during the Term of this Lease or within three years after the end of any Lease Year, have access to, and the right to audit, examine or reproduce any and all records of Owner related to performance under this Lease, including, calculation of annual Airport Rental Car Revenues, Airport Enplaned Passengers and any other expenses of Owner that are reimbursable by Tenant under this Lease.  Owner shall retain such books and records for the longer of three (3) years after the Lease terminates or until completion of all pending litigation between the Parties.  Owner shall either keep and maintain all such records at a mutually acceptable location in Austin, Texas, or make such books and records available to Tenant in Austin, Texas within twenty (20) business days of receipt of written demand.

   3)   If, as a result of any inspection and audit, it is established that a payment or refund is due to a Party, the other Party shall promptly pay such amount within ten (10)

3680839v.14 HIG339/10002

LNSTR-000234

days of the Party owing such payment either becoming aware, or receiving written notice, of such payment obligation.

4) A Party's obligations with respect to information provided by the other Party under this Section V.K, include the confidentiality covenants under Section XXXVII.

L. Compensation Events.

1) Tenant shall be entitled to a means of compensation determined in accordance with sub-clause 3) below for increased costs, losses in revenues or diminution in value of Tenant's Interest suffered or incurred in connection with the South Terminal to the extent such costs, losses or diminution are (a) not de minimis, (b) not completely recovered from Tenant's subtenants or other contractually permitted occupants of the South Terminal in accordance with sub-clause 2) below, and (c) caused by any of the following events (each a "Compensation Event"):

　　　i) a change or modification after the Execution Date to the Airport Design Guidelines, the Airport Policies and Procedures for Design Reviews, the Airport Environmental Policies/Procedures, any Airport rules or regulations or any other rules, regulations or minimum standards of Owner applicable to the use of the Airport and its appurtenances;

　　　ii) any change or modification after the Execution Date in any rule, regulation, ordinance or other law of Owner borne by the Premises or Tenant;

　　　iii) the cost of any Environmental Claim for which Owner is responsible as determined in accordance with Section XXI, to the extent that Tenant has incurred losses, liabilities or costs (including reasonable attorneys' fees, litigation and investigation expenses and court costs) associated with such Environmental Claim and such losses, liabilities or costs have not been otherwise reimbursed by Owner;

　　　iv) any change in the FAA Regulations, Code of Federal Regulations, TSA regulations and circulars applicable to the Airport and the Terminal, or any applicable local, state or federal law, rule or regulation that would result in material additional costs (including taxes, tolls and other assessments) to Tenant;

　　　v) any unilateral amendment of this Lease pursuant to Section XXV.G;

LNSTR-000235

<blockquote>

vi)  any activities of Owner on the Premises, such as construction activities, but excluding activities contemplated under <u>Section XXVII.B.2)</u> not involving negligence on the part of Owner or any of its employees, contractors, representatives or agents; or

vii)  any Owner Default.

2)  Tenant shall be entitled to means of compensation in its subleases or use and occupancy agreements with subtenants or other contractually permitted occupants of the Premises, including subleases and agreements which permit Tenant to (a) pass on to such subtenants or occupants increased costs or loss of revenue arising out of Compensation Events, and (b) enforce such provisions.

3)  Tenant shall promptly provide Owner with written notice of the occurrence of a Compensation Event, including a description of such Compensation Event and the estimate of cost or loss attributable to such Compensation Event within thirty (30) days after Tenant becomes aware of the occurrence of such Compensation Event. Within fifteen (15) days after Owner's receipt of such notice, Owner and Tenant shall commence good faith negotiations to determine the amount due to Tenant on account of such Compensation Event, and the means by which Tenant shall be compensated (which will consist of a cash payment or, if otherwise agreed to by Tenant, an adjustment of Rent or an off-set against Rent). If Owner and Tenant are unable to agree on such amount and means of compensation within thirty (30) days after such notice, Owner shall prepare and deliver to Tenant a good faith estimate of such amount and any remaining dispute related to such compensation amount shall be resolved in accordance with the dispute resolution procedures set forth in <u>Section XXXIX</u> or, in the case of Environmental Claims, <u>Section XXI</u>.

4)  Following the determination of any compensation amount and the means of compensation under this <u>Section V.L</u>, by mutual agreement or dispute resolution, the Parties shall amend this Lease to the extent required to give effect thereto.

</blockquote>

M.  <u>Certain Notices</u>. Notice is hereby given Tenant of Article VIII, Section 1 of the Austin City Charter which prohibits the payment of any money to any person, firm or corporation who is in arrears to the City of Austin for taxes, and of §2-8-3 of the Austin City Code of 1992, as amended, concerning the right of the City of Austin to offset indebtedness owed the City of Austin.

N.  **[Appropriations.  Owner's payment obligations hereunder (other than any payment due for Trade Fixtures pursuant to <u>Section XXVII.B.5)</u>, and any amount due from Owner to the extent Tenant is entitled hereunder to offset against amounts due from it to Owner) are payable only and solely from funds appropriated or available for the purpose of this Lease.  The absence of appropriated or other lawfully available funds shall render the Lease null and void to the extent funds are not appropriated or available to pay such obligations.  Owner shall promptly provide Tenant written notice of the failure of Owner to make an adequate appropriation for any fiscal year**

LNSTR-000236

**to pay the amounts due under the Lease, or the reduction of any appropriation to an amount insufficient to permit Owner to pay its obligations under the Lease.]**[5]

## VI.    TAXES

A.    <u>Paid by Tenant</u>.  Tenant will pay, or cause to be paid, all ad valorem, use and occupancy, and occupation taxes, excises, levies, assessments and other charges, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind which are assessed, levied or imposed from and after the Effective Date by any public or quasi-public authority (collectively "Taxes") upon or with respect to the rent and income received by or for the account of Tenant from any subleases or for any use or occupation of the Premises as and when they become due.

B.    <u>Paid by Owner</u>.  Owner will pay, or cause to be paid, all Taxes upon or with respect to the Premises or any part thereof.

## VII.    NET LEASE

Except as expressly set forth in this Lease, Owner shall not be required hereunder to make any expenditure, incur any obligation, cost, expense or liability of any kind in connection with this Lease or the financing, ownership, construction, maintenance, operation or repair of the Premises, it being intended that this Lease be a completely net lease which assures Owner the Rent herein reserved on an absolute net basis.

## VIII.    UTILITIES

Tenant shall pay or cause to be paid all fees and charges for all utility services to the Premises, including, gas, electricity, light, heat, water, wastewater (other than fees and charges for collection and disposal of de-icing run-off), cable television, telephone and other communication services, and drainage and transportation fees.  Owner, at Owner's expense, shall extend utility lines (e.g. water, wastewater, electricity, communications and natural gas) from their current points of termination to the master meter, transformer or other point of demarcation established by the utility provider on the Premises.  Tenant shall establish separate utility accounts for the Premises and the South Terminal in Tenant's name.  Utilities for portions of the Premises subleased to an authorized subtenant may be separately metered and established in the names of the respective subtenant, if and to the extent permitted by Applicable Laws and utility regulations.

## IX.    REHABILITATION OF SOUTH TERMINAL; COMMENCEMENT OF OPERATIONS DATE

A.    <u>Rehabilitation of the South Terminal</u>.

1)    Promptly after the Effective Date, Tenant will commence the rehabilitation of the South Terminal described in **Exhibit C** attached hereto (the "Rehabilitation

---

[5] NTD:  Parties to discuss practical implications of this provision.

LNSTR-000237

Project"). The obligations of Tenant to commence and complete the rehabilitation of, and to reactivate, the South Terminal are subject to fulfillment or waiver of the following conditions:

a)  no Specified Event shall have occurred;

b)  no other event or circumstance shall have occurred which could reasonably be expected to have a Material Adverse Effect;

c)  the Airline Leasing Program and Concession Program shall have each been adopted as appropriate to suit the needs of the South Terminal and all Governmental Approvals required under Applicable Law to commence and complete the rehabilitation and reactivation of the South Terminal (including those required by the Airport Design Guidelines) shall have been obtained and be in effect;

d)  any necessary plan for remediation of Hazardous Materials or other Environmental Conditions shall have been agreed upon in accordance with Section XX;

e)  the TSA shall have committed in writing, at no cost to Tenant, to provide pre-boarding security and checkpoint screening and checked bag screening for all enplaning passengers and other Tenant, sub-tenant and Air Transportation personnel at the South Terminal, including equipment and TSA personnel;

f)  TXDOT or Owner shall have committed, in writing, at no cost to Tenant, to provide additional advance signage on major national and local approach roads and on airport roadways and properties required to direct passengers to the South Terminal and the Airlines using the South Terminal;

g)  Terminal Use Agreements between Tenant and air carriers that have an aggregate projected minimum of 200,000 Enplaned Passengers for the twelve (12)-month period immediately following the Commencement of Operations Date, satisfactory to each of the parties thereto, shall have been fully executed and be in full force and effect and no default shall have occurred or be continuing thereunder; and

h)  Owner shall have made arrangements for (i) commencement of the shuttle bus service contemplated under Section XVIII.F and (ii) provision of de-icing services contemplated under Section XVIII.H, that are reasonably satisfactory to Tenant.

B.  Demolition.  All demolition of existing improvements within the South Terminal required for the Rehabilitation Project and reactivation of the South Terminal, excluding demolition of any non-structural improvements, shall be subject to the prior approval of

LNSTR-000238

Owner in accordance with <u>Section XV</u> hereof and shall be undertaken by Tenant at Tenant's sole cost and expense; provided, however, that notwithstanding the foregoing, if any Hazardous Materials must be investigated, remediated, disposed of and/or otherwise addressed as a result of any such demolition, such investigation, remediation, disposal or other activity shall be the responsibility of Owner, in accordance with <u>Section XX</u> and <u>Section XXI</u> hereof, and all of such activities shall be undertaken pursuant to a separate agreement between Owner and Tenant.

C.    <u>Conditions to Commencement of Operations.</u>

    1)    The Commencement of Operations Date shall not occur until the following conditions have been fulfilled or waived:

        a)    no Specified Event shall have occurred;

        b)    no other event or circumstance shall have occurred which could reasonably be expected to have a Material Adverse Effect;

        c)    the Airline Leasing Program and Concession Program contemplated under <u>Section IX.A.1)c)</u> shall be in full force and effect;

        d)    Owner shall have installed, to Tenant's reasonable satisfaction, roadway lighting along Emma Browning Drive, the South Terminal entrance and its roadways and the surface parking lots surrounding the South Terminal;

        e)    The law enforcement and security activities contemplated under <u>Section XVIII.J</u> shall commence;

        f)    The signage contemplated under <u>Section IX.A.1)f)</u> shall have been installed;

        g)    The TSA screening contemplated under <u>Section IX.A.1)e)</u> shall have commenced;

        h)    Terminal Use Agreements provided for under <u>Section IX.A.1)g)</u> shall remain in full force and effect; and

        i)    FIDS Monitors shall have been installed by Owner in the South Terminal, which show departing and arriving flights for the South Terminal and the North Terminal.

    2)    Promptly after the Commencement of Operations Date, Tenant will provide Owner with a reasonably detailed calculation of the actual Initial Capital Investment amount, along with reasonably documented support for such calculation.

LNSTR-000239

3)      If any of such conditions described in <u>Section IX.C.1)</u> are not fulfilled or firmly committed, on or prior to [●], then Tenant shall have the right to terminate this Lease without penalty by notice to Owner (such termination to take effect on the date specified by Tenant in such notice, which date shall be not earlier than thirty (30) days after the date of such notice and not later than ninety (90) days after the date of such notice.

4)      **[If this Lease is terminated pursuant to <u>Section IX.C.3)</u>, such termination will be deemed to have triggered a Capital Recovery Payment obligation and Owner shall make the Capital Recovery Payment in the same manner as contemplated under <u>Section III.D.</u>]**[6]

D.     <u>Maintenance Capital Investment</u>.  Tenant has budgeted approximately $3.9 million for maintenance capital for the ten (10) year period following the Commencement of Operations Date.  For each five (5) year period thereafter, during the Term, Owner and Tenant shall work in good faith to agree on the level of maintenance capital investment for each such period.  Failure to agree on such investment for any period shall not constitute a default under this Lease by either Owner or Tenant.

## X.      PARKING FACILITIES

A.     <u>South Terminal Parking</u>.  Tenant shall operate and maintain the motor vehicle parking facilities to directly support the South Terminal.  Tenant may not assign, subcontract, sublease or enter into a management agreement with respect to its rights and obligations under this Lease related to the operation and management of motor vehicle parking to a third party without Owner's prior written consent, which may not be withheld by Owner if Tenant demonstrates to the reasonable satisfaction of Owner that the third party is a Qualified Entity.  For purposes of this <u>Section X.A</u>, to be a Qualified Entity, the third party (1) must have not less than five years' experience in operating car parking facilities with a minimum of not less than 500 spaces, (2) may not operate an Off-Airport Parking Business (as described in City Code Chapter 13-1) in Austin, Texas, and (3) must not be de-barred from contracting with the United States, the State of Texas or the City of Austin.  The prior written consent of Owner will be required for construction of any multi-level parking facilities, in accordance with <u>Section XV</u>.

B.     <u>Additional Parking Development</u>.  Owner agrees that it will not develop or allow any third party to develop additional motor vehicle parking facilities on the Airport south of the mid-field taxiway.

## XI.     AIRLINE LEASING PROGRAM

A.     Tenant will develop an airline leasing program for the South Terminal (the "<u>Airline Leasing Program</u>") which shall include, but not be limited to, rates and charges for terminal facilities, airline marketing programs and incentive programs to attract airlines. In structuring such rates and charges, Tenant will comply with applicable FAA rules and

---

[6] NTD: To be discussed.

LNSTR-000240

regulations, including the FAA's Policy on Rates and Charges. Owner will review the leasing program, including any modifications or amendments, to determine that it is fair and reasonable, not unreasonably discriminatory and does not otherwise violate any airport grant assurances or other regulations to which Owner is subject. Tenant and Owner acknowledge that nothing herein shall restrict any air carrier operating at the Airport from seeking to operate at the South Terminal under the terms and conditions established herein.

B.    Tenant may charge various fees to Airlines to cover, without limitation, check-in facilities; FIDS Monitors, baggage handling facility charges, including the usage of the centralized baggage conveyor installation (if any) and a system for outbound and inbound baggage, including oversized baggage; baggage and passenger screening; common use boarding areas; baggage claim areas; aircraft parking on Tenant Apron; utilities such as electricity, water, gas, heating and cooling, wastewater, light, cable television, telephone and other communication services; and any ground handling services provided by Tenant.

## XII.    MARKETING SUPPORT AND INCENTIVES TO AIR CARRIERS

A.    Tenant and/or Owner may provide incentives to attract air carriers to the Airport and the South Terminal. Such incentives may, to the extent permitted by Applicable Law, include discounted airfield and terminal rates and charges to carriers meeting qualifying service commitments. Only Owner may offer airfield incentives and only Tenant may offer South Terminal rate incentives. Tenant's air carrier incentive programs will be included in its comprehensive Airline Leasing Program.

B.    Tenant may, to the extent permitted by Applicable Law, provide marketing incentives to air carriers meeting qualifying service commitments to offset the documented marketing costs incurred by air carriers in accordance with a marketing program relating to the South Terminal (the "South Terminal Marketing Program") developed by Tenant and approved by Owner; provided however, that Owner's review and approval of financial incentives in the South Terminal Marketing Program shall be limited to a determination, in consultation with the FAA, that such financial incentives are fair and reasonable, not unreasonably discriminatory and do not otherwise violate any airport grant assurances or other regulations to which Owner is subject. Owner may participate in the South Terminal Marketing Program as the Parties may agree in writing.

C.    It is the intent of the Parties that funds expended in the South Terminal Marketing Program be recouped through incremental revenue (including passenger facility charges from the South Terminal benefitting the DoA) generated from an increased volume of aircraft and passenger traffic at the South Terminal. Tenant and Owner may, to the extent permitted by Applicable Law, enter into one or more agreements to adopt and implement marketing programs. Such marketing agreements will address, among other things, the respective financial participation of Tenant and Owner in the marketing incentives, and the manner and order of priority in which various sources of incremental revenue shall be applied to reimburse each Party for its share of funds expended on marketing incentives.

LNSTR-000241

D.   Tenant and Owner will use commercially reasonable efforts to maximize the marketing incentives from other Austin, Texas and regional stakeholders, including tourism, economic development, employment and business associations, to attract air carriers to operate services from the South Terminal.

## XIII.   CONCESSION PROGRAM

A.   Tenant shall develop (and periodically update) a comprehensive concession program (the "Concession Program") to select concessionaires for all concessions related to the operation or provision of services in the South Terminal.

B.   Tenant shall submit the Concession Program, and any subsequent modifications or revisions to the Concession Program, to Owner for its review and will consult with Owner regarding its content.

C.   Tenant shall (1) use commercially reasonable efforts to achieve Owner's established goals under Owner's program under the U.S. Airport Concession Disadvantage Enterprise ("ACDBE") Rules (49 CFR Part 23), and (2) develop and implement an ACDBE program. Tenant shall, promptly after the Effective Date, provide Owner a copy of its ACDBE program, shall make any commercially reasonable changes requested by Owner to conform such ACDBE program to Owner's ACDBE program as approved by the FAA. Tenant shall provide Owner each Lease Year with a copy of Tenant's ACDBE goals and results achieved, and with a copy of all ACDBE reports required to be submitted under Applicable Law to the U.S. Department of Transportation and other applicable Governmental Authorities. Such report will include the name and address of each firm, the annual estimated gross receipts to be earned by each named firm, a description of the legal arrangements utilized, and the total overall estimated annual gross receipts to be earned by such concessionaires.

D.   Tenant shall identify qualified local concessionaries and notify them of potential concession opportunities. However, in accordance with 49 CFR §23.79, nothing in this subsection shall be construed to require Tenant to give preference to local concessionaries.

## XIV.   TENANT OPERATIONS, MAINTENANCE AND REPAIRS

A.   Operations.  Tenant shall be solely responsible for operating and managing the South Terminal, South Terminal airside operations (e.g., operations within the security identification display area (SIDA) of the South Terminal), excluding glycol recovery or separation of pollutants from wastewater), and adjacent landside operations at the South Terminal, including South Terminal parking, rental car operations (excluding the Shuttle Bus), food and beverage, retail, news and gift concessions at the South Terminal, ground transportation, advertising and other passenger services.

B.   Maintenance and Repair.  Except as otherwise expressly provided for in this Lease, Tenant shall be solely responsible for the maintenance of the Premises and shall, at Tenant's sole expense, shall (1) maintain and take good care of the Premises, including

LNSTR-000242

the buildings, fixtures and parking lots, and (2) make or cause to be made all repairs thereto and replacements thereof which are necessary to maintain and keep the Premises in good order, repair and condition at all times. Tenant, shall maintain and repair all mechanical, electrical, plumbing, heating and cooling and fire-protection systems in the South Terminal. Subject to normal wear and tear, Tenant will not cause or permit any waste, damage, disfigurement or injury to or upon the Premises, or any part thereof. Tenant shall mow and maintain the grass and landscaping within the Premises. Tenant shall maintain and repair all utility lines, fixtures and equipment on the Premises, except to the extent maintenance and repair is the obligation of the utility serving the Premises.

C. <u>Trash</u>. Tenant shall provide, at its sole expense, all waste collection, handling and disposal services necessary or appropriate for the Premises, to keep the Premises free from trash, garbage and other refuse, and no such trash, garbage or other refuse shall be disposed of elsewhere on the Airport. Tenant shall provide, or cause to be provided, proper receptacles for trash, garbage and other refuse generated on or from business operations on the Premises.

D. <u>Owner's Right to Maintain</u>. If Tenant fails to comply with its obligations to maintain or repair the Premises under this <u>Section XIV</u>, and such failure is not cured within thirty (30) days of written notice from Owner, then in addition to any other rights or remedies Owner may have as a result of such failure, Owner shall have the right, but not the obligation, to perform such maintenance or repairs or other obligations at Tenant's expense provided that, if such failure is curable, but not capable of being cured within such thirty (30)-day period, Owner shall not be entitled to exercise such right unless Tenant fails to commence the cure of such failure during such thirty (30)-day period and thereafter fails to diligently and continuously pursue such cure to completion. The fully loaded cost, including overhead expense, incurred by Owner to perform such maintenance or repair work or other obligations of Tenant shall be payable by Tenant to Owner promptly following receipt by Tenant of an invoice.

## XV. IMPROVEMENTS, EXPANSION OR NEW FACILITY

A. <u>Improvements</u>. Tenant may not construct or install any new improvements or infrastructure on the Premises, or materially modify or demolish any improvements or infrastructure on the Premises, other than improvements or infrastructure for or in connection with the Rehabilitation Project, without the prior written consent of the Director, to the extent required in accordance with the applicable provisions of the Airport Policies and Procedures for Design Review attached hereto as **Exhibit D**, as such policies and procedures may be amended from time to time in accordance with Austin City Code Section 1-2 <u>Adoption of Rules</u> (the "<u>Design Review Procedures</u>"), excluding <u>Section VI</u> thereof (any such improvements being referenced to herein as "<u>Covered Improvements</u>").

B. <u>Design/Construction Review</u>. To obtain the consent of the Director to construction, modification or demolition of Covered Improvements, Tenant shall submit plans and specifications for such work to the Director for the Director's approval in accordance

3680839v.14 HIG339/10002

LNSTR-000243

with the applicable provisions of the Design Review Procedures, as in effect at the time of such submittal. If the Director approves Tenant's preliminary plans and specifications, Tenant may proceed to finalizing the design, consistent with such approved plans and specifications, with such changes as may have been required as a condition of the Director's approval. The Director shall reasonably consider plans and specifications submitted by Tenant and shall respond in writing (within two weeks of submission of any plans and specifications for work involving Tenant expenditures by Tenant of less than $1.0 million and within four weeks of submission of any plans and specifications for work involving expenditures by Tenant of $1.0 million or more), approving, rejecting or approving subject to conditions such plans and specifications as provided in the applicable provisions of the Design Review Procedures. It is agreed and understood that the review of plans and specifications by the Director is only for compliance with this Lease, and not for architectural or engineering design; and that Owner assumes no liability or responsibility for the design, for any defect in the design or in any work performed pursuant to such plans and specifications.

C.   Owner's Right of Inspection.  During the course of the modification, construction or demolition necessitated by the Rehabilitation Project or any Covered Improvements, Owner and its architects, engineers, agents and employees may enter upon and inspect the Premises for the purpose of inspecting the work for conformity with the requirements of this Lease and the plans and specifications approved by Owner, upon not less than two (2) business days prior notice to Tenant, except in the case of an emergency to public health or safety.

D.   Tenant's Representative.  Tenant shall designate an on-site representative who shall be available through final completion of the Rehabilitation Project or any Covered Improvements to coordinate all design and construction activities, and to meet with Owner's representatives as necessary. Tenant shall submit written progress reports to the Director at least monthly. The reports shall describe significant achievements and problems that could affect the construction schedule or cost. The reports shall be sufficiently detailed to demonstrate compliance with approved plans and specifications, and this Lease.

E.   As Built Plans.  Within one hundred eighty (180) days following substantial completion of the Rehabilitation Project or any Covered Improvements, Tenant shall furnish Owner with (1) a certificate from Tenant's architect or engineer certifying that the work has been completed in accordance with the approved plans and specifications; (2) if applicable, a complete set of electronic as-built drawings in AutoCAD (current release) or equivalent program format acceptable to Owner of the Rehabilitation Project or any Covered Improvements ("As Built Plans"); (3) a reasonably detailed itemization of project costs including copies of invoices (addressed to, received by and directly paid by Tenant) and proof of payment to establish the verified cost of the Rehabilitation Project or any Covered Improvements; (4) copies of all operation and maintenance manuals and warranties on the Rehabilitation Project or any Covered Improvements or any component part thereof; and (5) a list of all maintenance contractors and contracts for the Rehabilitation Project or any Covered Improvements, or any part thereof. If Tenant does

LNSTR-000244

not provide any applicable As-Built Plans within the designated period, Tenant shall pay Owner liquidated damages in the amount of Fifty Thousand Dollars ($50,000.00) to cover Owner's cost of obtaining the same. Tenant covenants that Owner may use all plans and specifications submitted by Tenant pursuant to this Lease without payment to Tenant or any other person, for purposes relevant to and consistent with this Lease.

F. <u>Construction Standards</u>. Construction or modification of the Rehabilitation Project or any Covered Improvements must comply with the following requirements.

    1) Improvements and modifications shall be constructed in a good and workmanlike manner, utilizing good industry practice for the type of work in question, and in compliance in all material respects with all Applicable Laws, including applicable building codes.

    2) Improvements and modifications shall be designed and constructed in accordance with the applicable provisions of Austin-Bergstrom International Airport Design Guidelines, other applicable Airport rules and regulations, Federal Aviation Regulations governing the height and location of structures affecting airspace at the Airport as set forth in 14 CFR Part 77, Chapter 25-13 of the Austin City Code (Airport Hazard and Compatible Use Zoning Ordinance), and other Applicable Laws. For avoidance of doubt, Volume II of the Airport Design Guidelines which sets standards for the North Terminal is not applicable to the South Terminal.

    3) All plans, drawings and specifications, preliminary and final, shall be prepared by registered architects or engineers licensed to practice in the State of Texas.

    4) After commencement, Tenant shall prosecute the authorized work with due diligence to its completion.

G. <u>Permits and Insurance</u>. Tenant may not commence construction, installation or modification of the Rehabilitation Project or any Covered Improvements or any part thereof until:

    1) All Governmental Approvals (except for storm water permits and any permits issuable by Owner) have been obtained.

    2) Tenant has delivered to Owner for approval and Owner has approved certificates of insurance, in a form and for coverage amounts and with deductibles or self-insured retention amounts reasonably satisfactory to Owner, evidencing Tenant's construction contractor's "all risk" type Builder's Risk insurance coverage, Commercial General Liability Insurance coverage, Business Automobile Liability Insurance Coverage, and Workers' Compensation Insurance Coverage, as specified in **Exhibit E**. Tenant's contractor's insurance policies must be endorsed to name Owner as an additional insured, waive subrogation against Owner and provide Owner not less than thirty (30) days' prior written notice of cancellation.

LNSTR-000245

H.   Ownership.   All improvements or modifications to the Rehabilitation Project or any Covered Improvements, excluding Trade Fixtures related thereto, shall become the property of Owner at the end of the Term of this Lease, whether by expiration, termination or otherwise, free from any liens or claims whatsoever created by Tenant, without any compensation from Owner to Tenant or to any other person or entity (except as otherwise expressly provided herein).

I.   Construction Parking and Staging Areas.   Owner shall designate a haul route and staging area for Tenant's construction project for the Rehabilitation Project or any Covered Improvements.   Tenant shall not use, or permit its contractors to use, any area for staging or parking other than that designated by Owner.

J.   No Liens.   Tenant shall be solely responsible for payment to all contractors and workers for all elements of construction, modification, or demolition of the Rehabilitation Project or any Covered Improvements, and shall keep the Premises and the South Terminal free and clear of all liens resulting from any such work thereon, or the furnishing of labor or materials, by or on behalf of Tenant.   If any such lien is filed or asserted, Tenant shall promptly cause the same to be released within thirty (30) days, or shall post a surety bond for payment of such lien claims that causes the lien to be removed as an encumbrance on the Premises, the South Terminal or any portion thereof.   Tenant may contest the correctness or validity of any such lien, but shall indemnify, defend, and hold harmless Owner from any and all such lien claims.

K.   Disadvantaged Business Enterprise (DBE) Procurement Program.   Tenant shall develop and implement a disadvantaged enterprise program for the Rehabilitation Project or any Covered Improvements.   In connection therewith, Tenant and its prime contractor(s) will work with the City of Austin Small and Minority Business Resource Department ("DSMBR") to identify qualified DBE subcontractors and notify such subcontractors of potential contracting opportunities, and to track and report DBE participation in such contracts to DSMBR.   Further, in connection therewith, Tenant shall substantially comply with the requirements of the City of Austin Code Chapters 2-9, 2-9A, 2-9B and 2-9C (Minority-Owned and Female-Owned Business Enterprise Procurement Program). Tenant shall provide Owner with a copy of Tenant's DBE program.   Tenant shall provide Owner with a simultaneous copy of all DBE reports submitted by Tenant to the DSMBR and other applicable Governmental Authorities.

L.   Expansion or New Facility.   If Tenant determines that the growth of operations of existing or new air carriers at the Airport requires an Expansion or a New Facility, and Tenant provides a notice to the Owner that it is interested in investing in such Expansion or New Facility, then, subject to Owner's agreement, (1) in the event of an Expansion that does not require additional land or other material changes to this Lease, Owner and Tenant will amend this Lease to reflect such Expansion, (2) in the event of an Expansion that requires additional land or other material changes to this Lease, Owner will lease to Tenant any additional land at the Airport required for such Expansion, and Owner and Tenant will enter into an amendment of this Lease reflecting such Expansion on substantially the same terms as this Lease, and (3) in the event that a New Facility is

LNSTR-000246

required, Owner will provide Tenant with the exclusive first right to work together in good faith to develop such New Facility on mutually agreeable terms, including a lease to Tenant of any additional land at the Airport required for such New Facility.

## XVI.  FINANCING

A.  <u>Tenant's Right to Finance</u>.  To secure financing, subject to compliance with the provisions of this <u>Section XVI</u>, Tenant may encumber its leasehold interest in the Premises, including any improvements thereto, under this Lease with one or more deeds of trust or mortgages, and may collaterally assign to such lender Tenant's rights in Owner-authorized subleases, including Terminal Use Agreements entered into during the term of this Lease.  Tenant shall provide to Owner the name and notice address of the lender together with true copies of the loan documents, including, as applicable, deeds of trust, mortgages, security agreements and promissory notes, within ten (10) business days after execution by Tenant.  No lien upon, or assignment of, Tenant's leasehold estate or this Lease hereunder shall encumber, subordinate or affect in any way the interest of Owner under this Lease or in the Premises, including any improvements thereto, except as expressly provided herein.  The loan documents shall be consistent with this Lease. Upon written request from Tenant, Owner agrees to reasonably subordinate its statutory and contractual landlord's liens on the Premises and Tenant's personal property and Trade Fixtures, to the lien of a lender providing financing to Tenant, consistent with the terms of this Lease.

B.  <u>Tenant's Lender Rights and Obligations</u>.  Tenant's lender may, in case of default by Tenant, assume the rights and obligations of Tenant under this Lease, and become a substituted Tenant, with the further right to assign Tenant's interest to a third party, subject to the approval of the Director, which shall not be unreasonably denied or delayed.  Tenant's lender's obligations under this Lease as substituted Tenant shall cease upon assignment to an Owner-approved third party.  Owner agrees to execute such non-disturbance and attornment agreements as Tenant's lender may reasonably request consistent with this Lease.  If Tenant has provided the name of any third party lender and a notice address for such lender, Owner agrees to give Tenant's lender a duplicate copy of any notice of a breach of this Lease or any Tenant Default that Owner gives Tenant. The lender may then cure such breach or Tenant Default, for the account of Tenant or the lender (as the lender may elect), in the same manner and in the same period of time as allowed Tenant.  Tenant shall promptly provide to Owner a copy of any notice delivered by a Tenant's lender of Tenant's default or the lender's intent to exercise a remedy in response to Tenant's default with respect to its loan documents executed in connection therewith.  Tenant's lender shall agree to provide copies of such notices directly to Owner, and to notify Owner if payments on such loans become delinquent for more than thirty (30) days.  In the event of any conflict between the rights granted Tenant's lender under its loan documents and the terms of this Lease, the terms of this Lease shall control.

C.  <u>Owner's Right to Finance</u>.  Owner may, from time to time, without the consent or joinder of Tenant, encumber its interest in the Premises with one or more deeds of trust,

3680839v.14 HIG339/10002

LNSTR-000247

mortgages or other lien instruments. Tenant shall execute and deliver to Owner such subordination and attornment agreements as Owner or its lender shall reasonably require, provided that such lender shall execute and deliver to Tenant a nondisturbance agreement reasonably satisfactory to Tenant, which shall include, without limitation, an express acknowledgement of Tenant's right to quiet enjoyment set forth in Section II.C.

## XVII.     OTHER TENANT OBLIGATIONS

A.    Premises Security.  In addition to the security provided for under Section XVIII.J, Tenant shall hire additional security as necessary and at its own cost to perform day-to-day security functions, including but not limited to, alarm response, exit lane monitoring, calls for assistance, and incident documentation.  Tenant shall purchase and install, at its expense, security equipment for the Premises, as mutually agreed to by Owner and Tenant and sufficient to ensure compliance with applicable security regulations. Tenant shall ensure that the Premises' security system is connected to Owner's existing security system for the Airport and will pay for such connection.  The Premises' security system shall be monitored by Owner, at no charge to Tenant.

B.    Compliance with Airport Rules.   Owner may adopt and enforce reasonable rules, regulations and minimum standards, which Tenant agrees to observe and obey, with respect to the use of the Airport and its appurtenances, together with all facilities, improvements, equipment and services of the Airport, for the purpose of providing for safety, good order, good conduct, sanitation and preservation of the Airport and its facilities, provided that such rules and regulations shall be consistent with Applicable Law and applied on a not unjustly discriminatory basis to any and all similarly situated ground lease tenants at the Airport.

C.    Signs.  All signs displayed on exterior of the South Terminal or other improvements and all free standing signs on the Premises are subject to the prior written approval of the Director.   Approved signs shall be installed by Tenant at Tenant's expense.  Owner reserves the right to remove, without notice to Tenant, all unapproved signs.  Tenant shall not erect, maintain or display any advertising signs on the exterior of the South Terminal or other improvements on the Premises, except as authorized under this subsection.

D.    Customer Claims, Comments and Complaints.   Tenant shall maintain policies and procedures to address, and shall use good faith and commercially reasonable efforts to address, any claim, comment or complaint in respect of operations at the South Terminal made by Airlines, passengers or other users of the South Terminal.  Nothing herein shall require Tenant to pay any claim that Tenant, in its sole discretion, does not believe is valid or justified.

E.    Maintenance of Legal Existence.  During the Term of this Lease, Tenant shall at all times maintain its legal existence and good standing, with legal authority to perform its obligations under this Lease.

3680839v.14 HIG339/10002

LNSTR-000248

F. Personnel. Tenant shall employ or contract with experienced and qualified personnel and consultants to oversee the rehabilitation, reactivation, operation and maintenance of the Premises and the South Terminal, and any improvements thereon.

G. Security. Tenant recognizes that Owner is required to comply with the security directives and other mandates of the Department of Transportation, the FAA, the TSA and the Department of Homeland Security, and with other governmental and administrative rules and regulations relating to airports.

## XVIII. OTHER OWNER'S OBLIGATIONS

A. Operation as a Public Airport. Owner shall operate and maintain the Airport as a public airport in accordance with the requirements of the Federal Aviation Act and all other Applicable Laws.

B. Runway and Taxiway Maintenance. Owner shall keep, maintain and repair all public access runways, taxiways, ramps and aprons at the Airport in accordance with applicable Federal Aviation Regulations.

C. Taxiways, Ramps and Apron Space. Owner shall provide, at its cost and expense, such taxiways and ramps reasonably necessary to access the Airport airfield from the South Terminal. Owner shall provide and maintain, at its cost and expense, aircraft apron space and aircraft parking stands (including the Tenant Apron and Tenant's aircraft parking stands) at the South Terminal to provide passengers access from the South Terminal to the aircraft in a manner which facilitates reasonably speedy and efficient turnaround times for the Airlines. Without limiting the generality of the foregoing, Owner shall at all times provide and maintain aircraft parking stands in a number at least equal to the authorized number of gates at the South Terminal. There will be no cost to Tenant for the Airlines' use of airside facilities, including apron areas, but Owner reserves the right to charge the Airlines landing fees and other fees to recover such Airlines' allocable share of Owner's actual direct and indirect costs associated with providing the airside and apron facilities. Notwithstanding anything to the contrary herein, and for the avoidance of doubt, Tenant may collect and retain certain Tenant Apron use fees from the Airlines.

D. Signage. Owner, at no cost or expense to Tenant, will (1) use commercially reasonable efforts to facilitate the provision and maintenance of adequate advance signage by applicable authorities, including the Texas Department of Transportation, on major national and local approach roads to direct passengers to the South Terminal, and (2) provide and maintain similar air carrier and terminal identifying signage on applicable Airport roadways and properties.

E. Shuttle Bus Service. Owner shall provide, at no cost to Tenant, Shuttle Bus Service for passengers and others between the South Terminal and the CONRAC and between the South Terminal and the North Terminal. Operation of the Shuttle Bus Service shall be coordinated with the arrival and departure of commercial airline flights at the South Terminal and be sufficient (both in number of buses and bus capacity) to accommodate

LNSTR-000249

actual passenger traffic levels and projected passenger traffic levels provided by Tenant to Owner.

F.    <u>Rental Car Revenue Sharing</u>.  In lieu of allowing rental car companies to enter into specific agreements with Tenant for rental car operations at the South Terminal, Owner shall make payments to Tenant, on a monthly basis, based on Tenant's reported Enplaned Passengers, at a rate (the "<u>Revenue Sharing Rate</u>") equal to the actual net revenue (without reduction for any expenses) per Airport Enplaned Passenger generated by rental car transactions at the Airport, including at the CONRAC (the "<u>Airport Rental Car Revenues</u>"), multiplied by the number of Enplaned Passengers.  Each monthly payment will be made within fifteen (15) days after the end of each calendar month, commencing with the month in which the Commencement of Operations Date occurs.  Owner's payments for each Lease Year will be subject to a year-end true-up, which shall be paid by the applicable owing Party no later than one hundred twenty (120) days after the end of each applicable Lease Year, based on that Lease Year's actual net revenues generated by rental car transactions at the Airport and actual Airport Enplaned Passenger and Enplaned Passenger numbers.  Owner shall provide Tenant, within ten (10) days after each month end and within ninety (90) days after each Lease Year end, a statement, certified by the Director, of the actual net revenues generated by rental car transactions at the Airport, Airport Enplaned Passengers and net revenue per Airport Enplaned Passenger for such month and Lease Year respectively, (using information provided by Tenant with respect to Enplaned Passengers), and Owner shall also provide reasonable back-up information supporting the information in such statement.

G.    <u>Federal Compliance</u>.  Owner will maintain Part 139 Certification and all compliance responsibilities vis-à-vis the FAA and the TSA.

H.    <u>SWPPP</u>.  Owner will, at no cost to Tenant, provide the de-icing infrastructure to the Airlines (and other air carriers) using the South Terminal necessary for compliance with any Airport SWPPP permits, as in effect from time to time during the Term.  The Airlines will be responsible for the cost of the de-icing fluid used and its application.  Owner shall be solely responsible for the proper collection and disposal of any de-icing run-off.

I.    <u>Passenger Facility Charge; Airport Improvement Program</u>.  Owner shall be responsible during the Term for its Passenger Facility Charge ("<u>PFC</u>") collection authority and its Airport Improvement Program ("<u>AIP</u>") sponsor status.

J.    <u>Security</u>.  Owner shall provide uniformed law enforcement officers ("<u>LEOs</u>") as required to meet and comply with the Airport's Security Plan and TSA and other applicable regulatory requirements, at no cost to Tenant, as well as (1) one (1) security manager to oversee the security program developed and implemented at the Premises and (2) LEOs to provide security for South Terminal access roadways and extension locations at or on the Premises, in each case at no cost to Tenant.  Owner's security manager shall act as the liaison among the Owner, Tenant, law enforcement and the TSA.

LNSTR-000250

K.     FIDS. Throughout the Term, Owner shall provide FIDS Monitors in the South Terminal, which show departing and arriving flights for the South Terminal and the North Terminal, provided that Tenant shall reimburse Owner for Owner's actual and documented costs of equipment, installation and ongoing annual support costs for such FIDS Monitors.

L.     Lighting. Owner shall install, and throughout the Term, maintain roadway lighting along Emma Browning Drive, the South Terminal entrance and exit roadways and the South Terminal parking, in similar fashion to the North Terminal.

## XIX.     COMMUNICATIONS SERVICES

A.     **[Voice, Data and Video Cabling. Owner has installed a Premises Distribution System ("PDS"), consisting of copper and fiber optic cables, that spans the Airport campus. Tenant shall, at its sole expense, procure and install all equipment, conduit and other hardware necessary to connect the Premises and the South Terminal to the PDS. Wiring will be installed by Owner at Tenant's expense. All external telecommunications providers shall terminate at the demarcation point located in the Airport's Communications Center. Tenant, and all persons occupying the Premises and the South Terminal under Tenant, shall use the PDS. Tenant shall pay reasonable fees comparable to those levied for similar installations at the Airport for its PDS connection(s).**

B.     **Telephone and Wireless Services. Owner has installed a Shared Tenant Service ("STS") telephone system to serve the Airport campus. Telephone service is available through the STS to Tenant and its subtenants. Tenants may elect to install their own telephone and wireless services but to do so, Tenant must provide its own switches, instruments and other equipment necessary to interface via the PDS to the Airport telecommunications demarcation point located in the Airport Communications Center. A monthly fee for use of the PDS will be charged by Owner and paid by Tenant. All telephone service charges, including installation, maintenance, moves, additions, changes, long distance and local provider service for the Premises and the South Terminal, shall be Tenant's sole responsibility.**

C.     **Data Communications Service. The PDS carries data transmission services throughout the Airport campus. Tenant, at Tenant's expense, must provide all equipment necessary to connect to the PDS. All data transmission and switching equipment used must comply with Owner's PDS specifications. Tenant shall pay the fees established by Owner for the use of the PDS for data transmission. STS shall include data transmission lines (Frame Relay, ISDN, and Tl) or Tenant may choose to use the PDS to connect to an alternate provider at the demarcation point. All data communication service charges, including installation, maintenance, moves, additions and changes for the Premises and the South Terminal, shall be borne by Tenant.**

LNSTR-000251

D.   **Television Service.  Cable access television service is available through the STS for additional fees.  Tenant may not install satellite dishes, antennae or similar receiving devices on the Premises.  All television service charges, including installation, maintenance, moves, additions and changes, and cable channel charges, shall be borne by Tenant.**

E.   **Invoicing and Payment.  Tenant must apply for and sign the Airport Shared Telephone System Terms of Usage, attached hereto as Exhibit F.  Tenant understands that it will be billed monthly for its PDS and STS charges.  Payment for PDS and STS charges is not included in the Rent, but must be paid by Tenant to Owner as provided in the Airport Shared Telephone Systems Terms of Usage.**

F.   **Computer Networks.  Tenant shall, at its sole expense, procure, install and maintain all necessary or desired computer networks on the Premises and at the South Terminal.][7]**

## XX.   ENVIRONMENTAL CONDITION OF PREMISES

A.   The Airport is a former United States Air Force base that Owner acquired from the United States and has converted to a civilian airport.  An Environmental Assessment of the Premises was prepared on behalf of the U.S. Air Force Base Conversion Agency (the "USAF Report").  Owner has provided Tenant with a complete copy of the USAF Report and any other Environmental Assessments it has in its possession, as of the Execution Date, relating to the Premises.

B.   A portion of the South Terminal was previously leased to the Texas National Guard and the South Terminal has been used by Owner as a storage facility.  As such, the Premises may be contaminated with Hazardous Materials.

C.   Tenant shall have the right to inspect and conduct one or more Environmental Assessments of the Premises, including subsurface investigation of soil and groundwater conditions, subject to reasonable conditions established by Owner (an "Assessment Report").[8]  Tenant shall provide Owner with a copy of the proposed location and scope of work for the Assessment Report, and Owner will provide Tenant with such information within its possession regarding the potential presence of underground utilities or structures or any other information regarding Environmental Conditions not otherwise conveyed in any Environmental Assessment.  Tenant shall promptly provide Owner a copy of the Assessment Report upon its completion.  If the Assessment Report determines the presence or threatened release of Hazardous Materials or other Environmental Conditions that require remediation under Applicable Law in order to

---

[7] NTD:  Tenant reserves its comments on this Section until IT review is completed.  Parties to discuss current state of communications services and revise Section XIX as appropriate to reflect the current state of such services and to comply with LOI requirements under Section 5(b)(iv).  Because the Lease is of such long tenure, discuss deleting this Section from Lease and instead having standards of operation with regard to communications matters.

[8] NTD:  Tenant will conduct a Phase 1 prior to the Execution Date and, depending on Phase 1 results, additional pre-Execution Date procedures may be appropriate.

South Terminal Lease and Concession Agreement          32

LNSTR-000252

permit construction or commercial occupancy, Tenant, at its option, may (1) submit a written plan for remediation of the Premises, as applicable, which may include an allocation proposal to Owner regarding the cost of remediation and the responsibility for remediation of such Hazardous Materials or Environmental Conditions to the extent required under Applicable Law to use the Premises for the use and operation of the South Terminal as contemplated hereunder, or (2) if the cost to remediate Hazardous Materials or Environmental Conditions is unacceptable to Tenant in its sole discretion and the Parties are unable to agree upon a sharing of remediation costs, terminate this Lease in whole or with the written consent of the Director, amend this Lease to delete the contaminated areas from the Premises, and adjust the Rent proportionately. Owner agrees to reasonably consider a proposal for sharing remediation costs and shall respond to a proposal from Tenant within forty-five (45) days from receipt, but nothing herein shall require Owner to agree to a remediation cost sharing. Owner's failure to respond within forty-five (45) days shall be deemed to be a rejection of Tenant's remediation cost allocation proposal. If Owner and Tenant are unable to agree upon a sharing of the costs of remediation, Tenant shall retain its remaining options under this subsection if such Hazardous Materials or other Environmental Conditions are found. Tenant may elect to place monitoring wells and stations on the Premises to detect or monitor any existing or potential Hazardous Materials or Environmental Conditions identified in any Assessment Report.

## XXI.     ENVIRONMENTAL COMPLIANCE

A.    Compliance.

1)    General.  In its operations at the Airport, Tenant shall comply with all applicable Environmental Laws, and the applicable Airport Environmental Policies/Procedures provided to Tenant, including the SWPPP.  Without limiting the generality of the foregoing provision, Tenant shall not use or store Hazardous Materials on or at the Airport except as reasonably necessary in the ordinary course of Tenant's permitted activities at the Airport, and then only if, as required by applicable Environmental Law, such Hazardous Materials are properly labeled and contained and notice of and a copy of the current material safety data sheet is provided to Owner for each such Hazardous Material.  All such storage and usage shall also be in compliance with all applicable Environmental Laws.  Tenant shall not use, store, discharge, release or dispose of any Hazardous Materials on the Airport or surrounding air, lands or waters, except as allowed under applicable Environmental Laws.  Tenant shall promptly notify Owner of any Hazardous Material spills, releases or other discharges by any Tenant Environmental Party at the Airport of which Tenant has knowledge.  Tenant shall promptly abate, remediate and remove any Hazardous Material spills, releases or other discharges by Tenant at the Airport as required and in accordance with applicable Environmental Laws.  Tenant shall provide Owner with copies of all nonprivileged written reports, complaints, claims, citations, demands, inquiries or notices relating to the Environmental Condition of the Airport, or any alleged material noncompliance with Environmental Laws by Tenant at the Airport within

LNSTR-000253

**[twenty (20)]** business days after such documents are generated by or received by Tenant. If Tenant uses, handles, treats or stores Hazardous Materials at the Airport, then, to the extent required by applicable Environmental Law, Tenant (a) shall have a contract or contracts in place with a disposal company or other contractors in compliance with the rules and regulations of the U.S. Environmental Protection Agency or the Texas Commission on Environmental Quality ("TCEQ") for approved waste transport and disposal and (b) shall identify and retain spill response contractors to assist with spill response and to facilitate waste characterization, transport and disposal. Complete records of all disposal manifests, receipts and other documentation relating to disposal of Hazardous Material shall be retained by Tenant as required under applicable Environmental Laws and made available to Owner for review upon reasonable request. Owner shall have the right, at any time, upon reasonable written notice to Tenant, to enter the Premises to inspect, take samples for testing and otherwise investigate the Premises for the presence of Hazardous Materials. In the event that Owner takes samples or generates any reports regarding the presence of Hazardous Materials on the Premises, it shall provide Tenant with copies and an opportunity to take split samples. Tenant shall adopt and implement an environmental management system for the Premises to the extent requested to do so by Owner, which shall be reasonably compatible with Owner's environmental management system.

2) <u>NEPA</u>. To the extent required under Applicable Law, Owner shall comply with applicable requirements of the National Environmental Policy Act ("NEPA"). To the extent reasonably requested by Owner, Tenant shall cooperate in providing any information required to facilitate Owner's compliance with NEPA.

B. <u>Responsibility</u>.

1) Hazardous Materials that are generated, used, handled, treated, stored, disposed, discharged or transported on the Premises, by Tenant during the Term of this Lease, shall be the responsibility of Tenant.

2) Tenant shall not be responsible for Hazardous Materials that (a) exist on or existed on the Premises on or prior to the Effective Date, (b) are generated, used, handled, treated, stored, disposed, discharged or transported by Owner or (c) are generated, used, handled, treated, stored, disposed, discharged or transported by any person other than a Tenant Environmental Party. For purposes of determining the presence, or threatened release, of Hazardous Materials on the Premises on or prior to the Effective Date, the most recent Assessment Report, undertaken by Tenant pursuant to <u>Section XX</u>, after the Effective Date, shall presumptively establish a baseline Environmental Condition, provided that such Assessment Report is completed within six (6) months after the Effective Date, with such period to be extended by the period, if any, after the Effective Date, required to obtain any Governmental Approvals to conduct such Environmental Assessment and prepare such Assessment Report. Owner agrees to release Tenant from any Environmental Claim it may have against Tenant arising out of

LNSTR-000254

or related to the presence of Hazardous Materials that existed on or prior to the Effective Date, or which were caused by or are otherwise the responsibility of Owner.

C.    Tenant's Indemnity of Owner.  IN ADDITION TO ANY OTHER INDEMNITIES IN THIS LEASE, BUT EXCEPT AS OTHERWISE PROVIDED HEREIN, TENANT SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS OWNER FROM ANY AND ALL ENVIRONMENTAL CLAIMS (INCLUDING OWNER'S REASONABLE ATTORNEYS' FEES, LITIGATION AND INVESTIGATION EXPENSES AND COURT COSTS) TO THE EXTENT ARISING OUT OF OR RESULTING FROM (I) ANY TENANT ENVIRONMENTAL PARTY'S GENERATION, USE, HANDLING, TREATMENT, STORAGE, DISPOSAL, DISCHARGE OR TRANSPORTATION OF HAZARDOUS MATERIALS ON OR AT THE PREMISES, DURING THE TERM OF THIS LEASE, AND NOT DEEMED TO BE EXISTING ON OR AT THE PREMISES, ON OR PRIOR TO THE EFFECTIVE DATE PURSUANT TO SECTION XXI.B HEREOF, (II) THE VIOLATION OF ANY ENVIRONMENTAL LAW BY ANY TENANT ENVIRONMENTAL PARTY PERTAINING TO SUCH TENANT ENVIRONMENTAL PARTY'S USE OR OCCUPANCY OF THE PREMISES OR (III) THE FAILURE OF ANY TENANT ENVIRONMENTAL PARTY TO COMPLY WITH THE TERMS, CONDITIONS AND COVENANTS OF THIS SECTION XXI; PROVIDED, HOWEVER, THAT IN THE EVENT THAT ANY ENVIRONMENTAL CLAIM IS ASSERTED AGAINST A TENANT ENVIRONMENTAL PARTY OTHER THAN TENANT ITSELF, OWNER SHALL FIRST PROCEED AGAINST SUCH TENANT ENVIRONMENTAL PARTY.  TO THE EXTENT THAT SUCH TENANT ENVIRONMENTAL PARTY IS INCAPABLE OF SATISFYING SUCH ENVIRONMENTAL CLAIM OR OTHERWISE PERFORMING ITS OBLIGATIONS WITH RESPECT THERETO, OWNER MAY PROCEED TO ENFORCE THIS INDEMNITY AGAINST TENANT WITH RESPECT TO SUCH ENVIRONMENTAL CLAIM.

D.    Owner's Obligation.  OWNER AGREES AS BETWEEN THE PARTIES TO BE RESPONSIBLE FOR ANY AND ALL ENVIRONMENTAL CLAIMS (INCLUDING TENANT'S REASONABLE ATTORNEYS' FEES, LITIGATION AND INVESTIGATION EXPENSES AND COURT COSTS) TO THE EXTENT ARISING OUT OF OR RESULTING FROM (I) AN OWNER ENVIRONMENTAL PARTY'S GENERATION, USE, HANDLING, TREATMENT, STORAGE, DISPOSAL, DISCHARGE OR TRANSPORTATION OF HAZARDOUS MATERIALS IN, ON, AT, UNDER OR FROM THE AIRPORT, INCLUDING ON THE PREMISES, (II) THE VIOLATION OF ANY ENVIRONMENTAL LAW BY ANY OWNER ENVIRONMENTAL PARTY PERTAINING TO SUCH OWNER ENVIRONMENTAL PARTY'S OPERATIONS AT THE AIRPORT, INCLUDING ON THE PREMISES, OR (III) ANY HAZARDOUS MATERIALS THAT EXIST OR EXISTED ON THE PREMISES ON OR PRIOR TO THE EFFECTIVE DATE.

3680839v.14 HIG339/10002

LNSTR-000255

E.  Discussions and Dispute Resolution.

1)  If one Party asserts an Environmental Claim against the other Party, or if one Party is the recipient of an Environmental Claim asserted by a third party which it reasonably believes is the responsibility of the other Party, such Party may request a meeting to discuss responsibility for the Environmental Claim, and Owner and Tenant shall negotiate in good faith to reach agreement regarding responsibility for such Environmental Claim as soon as practicable.

2)  In the event that Owner and Tenant are unable to agree in writing within thirty (30) days as to (a) which of them or the extent to which each of them is responsible for such Environmental Claim for purposes of Section XXI.C and Section XXI.D, or (b) any other factual dispute relating to such Environmental Claim as mutually agreed in writing by the Parties, then the following provisions of this Section XXI.E shall apply:

   i)  Each of Owner and Tenant shall appoint a representative (the "Owner Representative" and the "Tenant Representative", respectively). In accordance with the rules of the American Arbitration Association, one arbitrator (the "Arbitrator") who has recognized experience in Environmental Law shall be appointed by mutual agreement of the Owner Representative and the Tenant Representative.

   ii)  The Arbitrator shall be instructed to resolve the matters raised as provided in Section XXI.E.2)(a) and Section XXI.E.2)(b) above, but (unless otherwise expressly instructed to do so by both the Owner Representative and the Tenant Representative) shall not make any conclusions regarding the amount of either Party's financial liability for the underlying Environmental Claim or regarding any interpretations of laws or regulations as they apply to such matters;

   iii)  The said Arbitrator shall only be dismissed by mutual agreement of the Owner Representative and the Tenant Representative. The Owner Representative and the Tenant Representative may be dismissed by Owner and Tenant, respectively, in its sole discretion.

   iv)  Both the Owner Representative and the Tenant Representative shall, promptly and simultaneously, exchange with each other and submit to the Arbitrator, and in any event in accordance with the Arbitrator's written instructions, their arguments and submissions in connection with any matter referred to such Arbitrator in accordance with this Section XXI.E.2);

   v)  Following receipt by the Arbitrator of the written arguments and other submissions of the Parties pursuant to sub-clause iv) above, the Owner Representative and the Tenant Representative shall each instruct the Arbitrator to issue, as soon as reasonably practicable, a formal written

LNSTR-000256

opinion pertaining to the matter referred to them. In any event the Arbitrator shall be instructed to present the said opinion within thirty (30) days of receiving the written arguments and other submissions pursuant to sub-clause iv) above;

vi)  The formal written opinion of the Arbitrator issued pursuant to sub-clause v) above shall be conclusive in any proceedings between the Parties hereto as to the matters submitted to the Arbitrator;

vii)  The fees and expenses of the Arbitrator shall be borne equally by Owner and Tenant. The fees and expenses of the Owner Representative and the Tenant Representative shall be borne by Owner and Tenant, respectively; and

viii)  To the extent permitted by Applicable Law, all submissions, correspondence and decisions associated with or issued in connection with such matters submitted to the Arbitrator shall be kept strictly confidential, except to the extent required to enforce any arbitration award or decision.

3)  Upon resolution of any Environmental Claim pursuant to this Section XXI.E, the Party responsible for such Environmental Claim shall promptly reimburse the other Party for all losses, liabilities and costs (including reasonable attorneys' fees, litigation and investigation expenses and court costs) incurred by such other Party related to such Environmental Claim (or each Party to the extent of such Party's responsibility, if the Parties shall share responsibility).

F.  Removal.  Prior to the expiration or earlier termination of this Lease, Tenant shall, in accordance with applicable Environmental Laws and the applicable Airport Environmental Policies/Procedures, remove from the Premises all Hazardous Materials stored or used by Tenant on the Premises.  Prior to vacating the Premises, unless instructed otherwise by Owner, Tenant shall also, in accordance with all applicable Environmental Laws and the applicable Airport Environmental Rules/Procedures, remove all tanks, piping and other equipment used by Tenant to store Hazardous Materials on the Premises.

G.  Compliance with Federal and State Stormwater Requirements.  Tenant acknowledges that the Airport is subject to the National Pollution Discharge Elimination System Program ("NPDES") and Federal Stormwater Regulations (40 CFR Part 122) and the Texas Pollution Discharge Elimination Program ("TPDES").  In its operations, on the Premises, Tenant shall comply with all applicable provisions of NPDES, TPDES, Federal and State Stormwater Regulations and the SWPPP, as each may be amended from time to time.

H.  Tenant Environmental Parties.  Tenant shall use its commercially reasonable efforts to include obligations corresponding to those in Section XXI.A.1)), Section XXI.B.1)), Section XXI.C, Section XXI.F and Section XXI.G in any written agreements with any Tenant Environmental Party and expressly include Owner as a third party beneficiary of

LNSTR-000257

such provisions, but nothing provided herein shall be deemed to make Tenant the principal, employer or operator of any such Party for purposes of any Applicable Law.

I.    Survival.  The covenants, conditions, and indemnities in this Section XXI shall survive termination of this Lease.

## XXII.    INSURANCE

A.    Tenant will, at its cost and expense, throughout the Term obtain and maintain in full force and effect the policies of insurance applicable to Tenant's use of the Premises as described on **Exhibit G**, attached hereto and incorporated herein for all purposes. Insurance provided by Tenant shall be primary coverage for all covered losses.

B.    Notwithstanding the provisions of Section XXII.A, if Tenant has used diligent efforts to procure, or cause to be procured, the insurance policies that are required hereunder and if, despite such diligent efforts and through no fault of Tenant or its principal subcontractor, coverage under any of the insurance policies or any of the required terms of such policies, including policy limits, are or become completely unavailable, or are unavailable on commercially reasonable terms, Tenant shall give Owner written notice as soon as possible.  Owner shall grant Tenant an interim written variance from such requirements under which Tenant shall procure and maintain alternative insurance packages and programs that provide risk coverage as comparable to that which would have been provided under such insurance policies as is available under then-existing insurance market conditions.  Any reference herein to insurance policies shall include a reference to any interim written variance therefrom granted to Tenant hereunder.  To establish that the insurance policies, or any of the required terms of such policies, including policy limits, are not available on commercially reasonable terms, Tenant shall bear the burden of proving to Owner's reasonable satisfaction either that:

1)    the same is completely unavailable in the global insurance and reinsurance markets; or

2)    the premiums for the same have so materially increased over those previously paid for the same coverage that such increased premiums are not justified by the risk protection afforded.

C.    The limits of insurance coverage specified in **Exhibit G** are stated in 2015 dollars.  No more often than once in any five (5) year period, Owner may, by written notice to Tenant, increase the policy limits to offset the impact of inflation based upon percentage changes in the CPI in order to maintain substantially the same level of coverage as existed on the Effective Date of this Lease.  Upon receipt of such written notice from Owner under this Section XXII, Tenant shall, subject to this Section XXII, obtain the increased insurance coverage within sixty (60) days, and provide Owner updated insurance certificates.

D.    Owner may at any time when it deems necessary and prudent, upon written request to Tenant, propose to delete or revise or modify particular policy terms, coverages, conditions, limitations or exclusions, except where policy provisions are established by

LNSTR-000258

Applicable Law binding upon either of the Parties hereto or the underwriter of any such policies. If Owner proposes such changes to the insurance requirements of this Lease, the Parties agree to meet and negotiate in good faith mutually acceptable modifications to the insurance requirements.

E.    No changes to the insurance requirements of this Section XXII shall be effective unless made in a duly authorized and executed amendment to this Lease, except for (1) the interim variance referred to in Section XXII.B, and (2) the increased coverage limits referred to in Section XXII.C.

F.    In the event that Tenant fails to obtain or cause to be obtained or to maintain or cause to be maintained the insurance coverage required by this Section XXII, Owner, upon thirty (30) days prior notice to Tenant may (but shall not be obligated to) obtain or maintain or cause to be obtained or maintained the required insurance policies and pay or caused to be paid the premiums on the same. All amounts so advanced by Owner on Tenant's behalf shall be reimbursed to Owner by Tenant.

## XXIII.    INDEMNITY

A.    <u>Tenant's Indemnity</u>.    TENANT SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS OWNER, AND ITS OFFICERS, APPOINTED OR ELECTED OFFICIALS, EMPLOYEES, AGENTS, REPRESENTATIVES, SUCCESSORS AND ASSIGNS (COLLECTIVELY, THE "<u>INDEMNIFIED PARTIES</u>"), FROM AND AGAINST ANY AND ALL COSTS, EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES, EXPENSES AND COURT COSTS), LIABILITIES, DAMAGES, CLAIMS, SUITS, ACTIONS, AND CAUSES OF ACTIONS WHATSOEVER ("<u>CLAIMS</u>"), TO THE EXTENT ARISING OUT OF (1) THE NEGLIGENCE, WILLFUL MISCONDUCT OR VIOLATION OF APPLICABLE LAW BY TENANT, ITS OFFICERS, EMPLOYEES, AGENTS, REPRESENTATIVES, SUBTENANTS, CONTRACTORS, SUCCESSORS OR ASSIGNS, (COLLECTIVELY THE "<u>TENANT PARTIES</u>") IN CONNECTION WITH THIS LEASE OR THE OPERATION OF THE PREMISES, OR (2) THE USE OF THE AIRPORT BY TENANT OR USE OF THE PREMISES OR THE SOUTH TERMINAL BY A TENANT PARTY IN CONNECTION WITH THIS LEASE. CLAIMS TO BE INDEMNIFIED UNDER THIS SECTION XXIII INCLUDE CLAIMS FOR BODILY INJURY OR DEATH, OCCUPATIONAL ILLNESS OR DISEASE, LOSS OF SERVICES, WAGES OR INCOME, DAMAGE, DESTRUCTION OR LOSS OF USE OF PROPERTY AND WORKER'S COMPENSATION CLAIMS. TENANT'S OBLIGATIONS UNDER THIS SECTION XXIII.A EXPRESSLY INCLUDE CLAIMS CAUSED BY THE CONCURRENT NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNIFIED PARTIES TO THE FULL PROPORTIONATE EXTENT ATTRIBUTABLE TO THE TENANT PARTIES, EXCLUDING CLAIMS ONLY TO THE PROPORTIONATE EXTENT CAUSED BY THE NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNIFIED PARTIES. TENANT'S OBLIGATIONS UNDER THIS SECTION EXPRESSLY EXCLUDE ENVIRONMENTAL CLAIMS, WHICH ARE THE SUBJECT OF SECTION XX AND SECTION XXI ABOVE.

3680839v.14 HIG339/10002

LNSTR-000259

B.   Owner's Obligation.   OWNER AGREES AS BETWEEN THE PARTIES TO BE RESPONSIBLE FOR ALL CLAIMS (AS DEFINED IN SECTION XXIII.A ABOVE) TO THE EXTENT ARISING OUT OF THE NEGLIGENCE, WILLFUL MISCONDUCT OR VIOLATION OF APPLICABLE LAW BY OWNER, ITS OFFICERS, AGENTS, EMPLOYEES, SUBTENANTS, CONTRACTORS, SUCCESSORS OR ASSIGNS (COLLECTIVELY, THE "OWNER PARTIES") IN CONNECTION WITH THE OWNERSHIP OR OPERATION OF THE AIRPORT. CLAIMS COVERED UNDER THIS SECTION XXIII.B INCLUDE CLAIMS FOR BODILY INJURY OR DEATH, OCCUPATIONAL ILLNESS OR DISEASE, LOSS OF SERVICES, WAGES OR INCOME, DAMAGE, DESTRUCTION OR LOSS OF USE OF PROPERTY AND WORKER'S COMPENSATION CLAIMS.   OWNER'S OBLIGATIONS UNDER THIS SECTION XXIII.B EXPRESSLY INCLUDE CLAIMS CAUSED BY THE CONCURRENT NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY OF THE TENANT PARTIES TO THE FULL PROPORTIONATE EXTENT ATTRIBUTABLE TO THE OWNER PARTIES, EXCLUDING ANY CLAIMS ONLY TO THE PROPORTIONATE EXTENT CAUSED BY THE NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY OF THE TENANT PARTIES.   OWNER'S OBLIGATIONS UNDER THIS SECTION XXIII.B EXPRESSLY EXCLUDE ENVIRONMENTAL CLAIMS, WHICH ARE THE SUBJECT OF SECTION XX AND SECTION XXI ABOVE.

C.   Notice.   Owner or Tenant, as the case may be, shall give the other Party written notice of any Claim asserted against an Indemnified Party or a Tenant Party, respectively.

D.   Defense.   Tenant shall assume on behalf of the Indemnified Parties and conduct with due diligence and in good faith the defense of all Claims against the Indemnified Parties. The Indemnified Parties shall have the right, but not the obligation, to participate in the defense of any claim or litigation with attorneys of their own selection, at such Indemnified Parties' expense, without relieving Tenant of any obligations hereunder.  In no event may Tenant admit liability on the part of an Indemnified Party without the prior written consent of the Austin City Attorney.   Maintenance of the insurance required under this Lease shall not limit Tenant's obligations under this Section XXIII.

E.   Waiver of Consequential Damages.   Each Party hereby waives all rights to recover consequential, incidental, exemplary or punitive damages from the other Party, including lost profits or income, claims of the other Party's customers, subtenants and contractors, and other similar claims or damages.  For the avoidance of doubt, any payment of Fair Market Value hereunder shall not be deemed to be consequential damages for purposes of this waiver.

F.   Claims.   If a claim, demand, suit or other action is made or brought by any person or entity against either Party arising out of or concerning this Lease or the Premises, such Party shall give written notice thereof to the other Party within ten (10) business days after being notified of such claim, demand, suit, or action.  Such notice shall enclose a true copy of all written claims.  If the claim is not written, or the information is not discernable from the written claim, such Party shall state the date of notification of any

LNSTR-000260

such claim, demand, suit or other action, the names and addresses of the person or entity asserting such claim or that instituted or threatened to institute any type of action or proceeding, the basis of such claim, action or proceeding, and the name of any person or entity against whom such claim is being made. Any notice to Owner shall be given to the Director as provided herein, and to the Austin City Attorney, at City Hall, 301 West 2nd Street, Austin, Texas 78701. Any notices to Tenant shall be given to [●].

## XXIV.    MEETINGS

Owner and Tenant shall meet regularly, but no less often than quarterly, to discuss (A) the operation of the Airport, (B) capital projects necessary for the Airport and ongoing maintenance and repair expenses, (C) matters relevant to the operation of the South Terminal, (D) mutually agreeable air service development and marketing plans for the Airport, and (E) opportunities to enhance operations at the Airport.

## XXV.    LAWS, AGREEMENTS AND GRANT CONDITIONS

A.    <u>Grant Assurances</u>.  This Lease is subject to the provisions of any agreement made between Owner and the United States Government relative to the operation or maintenance of the Airport, the execution of which has been required as a condition precedent to the transfer of federal rights or property to Owner for Airport purposes, or the expenditure of federal funds for the development of the Airport, including the expenditure of federal funds for the development of the Airport in accordance with the provisions of the FAA's Airport Improvement Program, or in order to impose and use passenger facilities charges under 49 U.S.C. Section 40117 or any successor thereto.

B.    <u>National Emergencies</u>.  This Lease shall be subject to whatever right the United States Government now has or in the future may have or acquire, affecting the control, operation, regulation and taking over of said Airport or the exclusive or nonexclusive use of the Airport by the United States during a time of war or national emergency.

C.    <u>Non-Discrimination and Affirmative Action</u>.  Tenant, for itself, its successors and assigns, as a part of the consideration of this Lease, does hereby covenant and agree that: (1) no person on the grounds of race, color, religion, sex, national origin or ancestry, or age, shall be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination in the use of the Premises; (2) in the construction of any improvements on, over or under such land and the furnishing of services thereon, no person on the grounds of race, color, religion, sex, national origin or ancestry or age, shall be excluded from participation in, denied the benefits of, or otherwise be subjected to unlawful discrimination; (3) Tenant shall use the Airport facilities in compliance with all other requirements imposed by, or pursuant to, 49 CFR Part 21 (Non-discrimination in Federally Assisted Programs of the Department of Transportation), as said regulations may be amended; and (4) Tenant assures that it will undertake an affirmative action program as required by 14 CFR Part 152, Subpart E (Non-discrimination Airport in Aid Program), to ensure that no person shall on the grounds of race, color, religion, national origin or ancestry, sex, age or physical or mental handicap be excluded from participating in any employment activities covered in 14 CFR Part 152, Subpart E, or such

LNSTR-000261

employment activities covered in Chapter 5-3 of the Austin City Code. Tenant assures that no person shall be excluded on these grounds from participating in or receiving the services or benefits of any program or activity covered by this Section XXV. Tenant assures that it will require that any covered subtenant similarly will undertake affirmative action programs and that the subtenant will require assurance from the subtenant's sub-subtenants, as required by 14 CFR Part 152, Subpart E, to the same effect. Tenant agrees to post, in conspicuous places available to employees and applicants for employment notices to be provided setting forth the provisions of this nondiscrimination clause.

D.    Public Accommodation Laws. Tenant covenants that it shall comply with Applicable Laws governing non-discrimination in public accommodations and commercial facilities, including the requirements of the Americans with Disabilities Act of 1990, as amended (the "ADA") and all regulations thereunder, and that the Premises shall remain in compliance with such Applicable Laws throughout the Term.

E.    Compliance with Laws. In its use and occupancy of the Premises, Tenant shall comply with all Applicable Laws and all Airport rules and regulations. Tenant shall not do or permit anything to be done in, on or at the Premises that would constitute a public or private nuisance.

F.    Lighting, Electrical and Radio Interference. Tenant shall not permit or create any electrical or other interference with radio communications between the Airport and aircraft. Tenant may not install any lighting on the Premises that would make it difficult for pilots to distinguish between Airport lights and those of Tenant, impair visibility in the vicinity of the Airport or otherwise endanger landing, taking off or maneuvering of aircraft. Tenant shall coordinate the use of radio frequencies by Tenant, or any Airline, ground handler or other person occupying the South Terminal, with Owner prior to implementation to avoid interference with existing radio communications at the Airport.

G.    Amendment. In the event that the FAA, the TSA or any other Governmental Authority of competent jurisdiction shall require any modifications or changes in this Lease as a condition precedent to the granting of funds for the improvement of the Airport to use or impose passenger facility charges ("PFCs"), or if it is necessary to modify this Lease to comply with the requirements of Applicable Law, including regulations, orders and decisions of the FAA or the TSA, Owner shall notify Tenant in writing. If the Parties are unable to agree upon and execute a suitable amendment within the time frame required by the Governmental Authority, Tenant agrees that Owner may unilaterally modify this Lease, upon advice of its legal counsel, as may reasonably be required to obtain such funds, to use or impose PFCs or comply with Applicable Law. Nothing herein shall preclude Tenant from contesting such orders or decisions, but Tenant shall abide by the unilateral modification by Owner until such time, if any, as such Governmental Authority's requirement is stayed, rescinded or invalidated as long as such stay, rescission or invalidation remains in effect. In no event will Tenant be required, pursuant to this subsection G, to pay Rent greater than specified herein.

LNSTR-000262

H.  Airport Development.  Owner reserves the right to develop and improve the Airport and all roadways, terminal facilities, land areas and taxiways and any other facilities at the Airport for aviation or aeronautical purposes as it deems necessary or appropriate in its absolute discretion, subject only to Applicable Law and the express provisions of this Lease, including in Section II.C and Section XV.L.

I.  Economic Nondiscrimination.  Tenant shall make the South Terminal available to all users thereof on reasonable, and not unjustly discriminatory basis, and shall charge reasonable, and not unjustly discriminatory, rates and charges for the use of the South Terminal, provided that Tenant may make available reasonable and nondiscriminatory discounts, rebates or similar types of price reductions or modifications for volume users.

J.  Minority and Women-Owned Business Enterprises.  Tenant will work with Owner's Department of Small Business and Minority Business Resources to establish a community outreach plan and goals for minority and women-owned business enterprises (MWBE's) for the South Terminal in accordance with Owner's ordinances.

K.  Wage Initiatives.  Tenant shall, and shall use commercially reasonable efforts to cause its contractors to, pay prevailing wages, in accordance with Owner's ordinances, for construction-related projects at the South Terminal, and shall pay its workforce for ongoing operations of the South Terminal, the living wage rate adopted by Owner in accordance with Owner's ordinances.

## XXVI.  AVIGATION RIGHTS

A.  Tenant understands and acknowledges that the Premises are located between two active airport runways, that the Premises are subject to overflights of aircraft taking off or landing at the Airport, and that the Premises are currently, and will in the future, be subject to aircraft noise levels of DNL 65dB or greater, as well as vibration, air pollution and other effects from the flight of aircraft near or over the Premises.

B.  Owner reserves the right of flight for the passage of aircraft above the surface of the Premises hereunder, and such right of flight shall include the right to cause in such airspace such noises as may be inherent to the operation of aircraft now known or hereafter used for navigation of or flight in the air; and Owner reserves the right to use said airspace for landing at, taking off from or operating aircraft on or over said Airport.

C.  Tenant agrees that Owner shall not be liable for any damage to the Premises arising out of the operation of aircraft in air space above the Premises or other property in the vicinity of the Premises.

LNSTR-000263

## XXVII.   TENANT DEFAULT AND REMEDIES

A.   <u>Default by Tenant</u>.  Each of the following shall be deemed a default by Tenant ("<u>Tenant Default</u>") hereunder and a material breach of this Lease:

1)   Tenant shall fail to pay the amount of any installment of Rent or other sum payable by Tenant under this Lease when due, in accordance with the terms of this Lease, and such failure shall continue for twenty (20) days after delivery by Owner to Tenant of written notice specifying such failure;

2)   Tenant shall fail to commence and complete the Rehabilitation Project and the reactivation of the South Terminal in accordance with, and subject to the conditions set forth in, <u>Section IX</u>, and Tenant shall fail to cure such failure within sixty (60) days after delivery by Owner to Tenant of written notice specifying the failure; provided, however, if the failure is curable, but not capable of being cured within such sixty (60)-day period, Tenant Default shall not occur under this subsection unless Tenant fails to commence such cure of during such sixty (60)-day period and thereafter fails to diligently and continuously pursue the cure to its completion;

3)   Tenant shall abandon, desert or vacate the Premises, after the commencement of the Rehabilitation Project, for a period of sixty (60) days, for any reason excluding, for the avoidance of any doubt, an event of Force Majeure or Owner Default or authorized construction, repairs or maintenance, and the Premises remain abandoned, deserted or vacant for a period of thirty (30) days after delivery by Owner to Tenant of written notice thereof;

4)   Tenant shall fail to keep, perform or observe any other non-monetary material covenant, agreement, term or provision contained in this Lease to be kept or performed by Tenant hereunder or thereunder, and Tenant shall fail to cure such failure within sixty (60) days after delivery by Owner to Tenant of written notice specifying the failure; provided, however, if the failure is curable, but not capable of being cured within such sixty (60)-day period, Tenant Default shall not occur under this subsection unless Tenant fails to commence such cure of during such sixty (60)-day period and thereafter fails to diligently and continuously pursue the cure to its completion;

5)   An involuntary petition shall be filed against Tenant under applicable bankruptcy law, or a receiver of Tenant, or of all or substantially all of the property of Tenant, shall be appointed without acquiescence, and such petition or appointment shall not discharged or stayed within sixty (60) days after the happening of such event;

6)   Tenant shall make an assignment of its interest in the Premises for the benefit of creditors or shall file a voluntary petition under applicable bankruptcy law, or seek relief under any other law for the benefit of debtors; or

3680839v.14 HIG339/10002

LNSTR-000264

7)      Any representation or warranty made by Tenant in <u>Section XXXV.B</u> of this Lease shall be materially false, misleading or inaccurate when made, except where such incorrect representation or warranty is capable of being cured and is in fact remedied within thirty (30) days after notice thereof is given by Owner to Tenant; provided, however, if the failure is curable, but not capable of being cured within such 30-day period, Tenant Default shall not occur under this subsection unless Tenant fails to commence such cure during such 30-day period and thereafter fails to diligently and continuously pursue the cure to its completion.

B.      <u>Remedies of Owner</u>.  If a Tenant Default occurs, Owner may at any time thereafter and without waiving any other rights hereunder or available to Owner at law or in equity (Owner's rights being cumulative), do any one or more of the following:

1)      Owner may terminate this Lease by giving Tenant written notice thereof, in which event this Lease and the leasehold estate hereby created and all interest of Tenant and all parties claiming by, through or under Tenant shall automatically terminate upon the effective date of such notice; and Owner, its agents or its representatives may, without further demand or notice, reenter and take possession of the Premises and remove all persons and property therefrom with or without process of law, without being deemed guilty of any manner of trespass and without prejudice to any remedies for arrears of Rent or existing breaches hereof.

2)      Owner shall have the right, but not the obligation, without judicial process and without incurring any liability therefor, to enter upon the Premises and perform any obligation under this Lease that Tenant has failed to perform.  Performance by Owner shall not cure Tenant default, and all reasonable costs and expenses incurred by Owner in performing such obligations of Tenant shall be payable by Tenant to Owner, provided that such costs and expenses shall not exceed $[●][9] without Tenant's advance written consent.

3)      Owner may exercise any other right or remedy available to Owner under this Lease or at law or in equity.

4)      All Rent and other sums not paid on or before the date due shall bear interest at the Contract Rate from and after the date due; provided, however, that nothing herein shall operate or be construed to obligate Tenant to pay sums which are subject to applicable usury law which, taken together, exceed the maximum non-usurious amount or rate.

5)      Owner may, at Owner's election, either (a) purchase all Trade Fixtures at a cost equal to Tenant's unamortized cost of such Trade Fixtures, depreciated on a straight line basis over the lesser of the original Term of this Lease or the useful life of such Trade Fixtures, or (b) lease such Trade Fixtures at a fair market rental for such Trade Fixtures for a period of up to a maximum of three (3) years. Owner shall provide notice of its election to either purchase or lease such Trade

---

[9] NTD: Appropriate amount to be discussed.

3680839v.14 HIG339/10002

LNSTR-000265

Fixtures on or before the date the Lease will terminate. Within twenty (20) days after receipt of Owner's notice of intent to purchase or lease the Trade Fixtures, Tenant shall respond in writing with, as applicable, its calculation of the purchase price of the Trade Fixtures determined in accordance with this subsection, or its calculation of the fair market rental value of the Trade Fixtures. Tenant may not include any rent for the land or for any Trade Fixtures owned, installed or otherwise paid for or provided by Owner. If the Parties are unable to agree upon such purchase price or fair market rental for the Trade Fixtures, such purchase price or fair market rental shall be determined in accordance with the process set forth in Section XXXIX.

C.   Additional Rights of Owner. To the extent that Tenant fails to keep, perform or observe any covenant, agreement, term or provision of this Lease, whether or not such failure is excused by any applicable cure periods, and such failure continues for a period of thirty (30) days after delivery by Owner to Tenant of written notice specifying such failure, or upon repeated failure of Tenant to keep, perform or observe any covenant, term or provision of this Lease, Tenant shall, upon written request by Owner, cause a senior representative (SVP or higher) of Tenant to meet and confer with Owner, either in person or via teleconference, within ten (10) business days after receipt of such written request, to address such failure and, where necessary, formulate an action plan to ensure future compliance under the Lease.

## XXVIII.   OWNER DEFAULT AND REMEDIES

A.   Default by Owner. The following shall be deemed a default by Owner ("Owner Default") and a material breach of this Lease:

1)   Owner shall fail to pay the amount of any sum payable by Owner under this Lease, including under Section XVIII.F, when due in accordance with the terms of this Lease, and such failure shall continue for twenty (20) days after delivery by Tenant to Owner of written notice specifying such failure;

2)   Owner shall fail to keep, perform or observe any other non-monetary material covenant, agreement, term or provision in this Lease to be kept or performed by Owner hereunder or thereunder, and Owner shall fail to cure such failure within sixty (60) days after delivery by Tenant to Owner of written notice specifying the failure; provided, however, if the failure is curable, but not curable within such sixty (60)-day period, an Owner Default shall not occur unless Owner fails to commence the cure of the failure during such sixty (60)-day period and thereafter fails to diligently and continuously pursue the cure to its completion; or

3)   Any representation or warranty made by Owner in Section XXV of this Lease shall be false or materially misleading or inaccurate when made in any material respect, except where such incorrect representation or warranty is capable of being cured and is in fact cured within sixty (60) days after notice thereof is given by Tenant to Owner; provided, however, if the failure is curable, but not curable

3680839v.14 HIG339/10002

LNSTR-000266

within such sixty (60)-day period, an Owner Default shall not occur unless Owner fails to commence the cure of the failure during such sixty (60)-day period and thereafter fails to diligently and continuously pursue the cure to its completion.

B.    Tenant's Remedies.  If an Owner Default occurs, Tenant may at any time thereafter and without waiving any other rights hereunder or available to Tenant at law or in equity (Tenant's rights being cumulative), do any one or more of the following:

1)    Tenant may terminate this Lease by giving Owner written notice thereof, in which event this Lease and the leasehold estate hereby created and all interest of Tenant and all parties claiming by, through or under Tenant shall automatically terminate upon the effective date of such notice; and Tenant shall thereafter be released of all other duties, obligations and responsibilities with respect to this Lease.

2)    If Tenant exercises its right to termination under sub-clause 1) above, Tenant may pursue a cause of action against Owner for its actual damages, subject to all defenses, counterclaims and set-offs available to Owner under Applicable Law, except as provided in Section XL.K.

3)    Tenant shall have the right, but not the obligation, without judicial process and without incurring any liability therefor, to perform any obligation under this Lease that Owner has failed to perform.  Performance by Tenant shall not cure the Owner Default, and all costs and expenses incurred by Tenant in performing such obligations of Owner shall be payable by Owner to Tenant.

4)    Tenant may, at Tenant's election, cause Owner to purchase all Trade Fixtures at a cost equal to the greater of (a) Tenant's unamortized cost of such Trade Fixtures or (b) the fair market value of such Trade Fixtures.  The fair market value shall be determined assuming (i) neither Party is under economic compulsion or has special bargaining power and that (ii) the event giving rise to such determination has not occurred.  Tenant shall provide notice of its election on or before the date the Lease will terminate.  In such notice, Tenant shall provide Owner with its calculation of the purchase price of the Trade Fixtures, determined in accordance with this subsection.  If the Parties are unable to agree upon such purchase price for the Trade Fixtures, such purchase price shall be determined in accordance with the process set forth in Section XXXIX.

5)    Tenant may exercise any other right or remedy available to Tenant under this Lease or at law or in equity.

6)    Tenant may deduct and set off against the Rent owed by Tenant under this Lease the amount of any damages for any Owner Default, subject to all defenses, counterclaims and set-offs available to Owner under Applicable Law, except as provided in Section XL.K.

3680839v.14 HIG339/10002

LNSTR-000267

# XXIX.    SURRENDER OF PREMISES

A.    <u>Condition of Premises</u>.  Upon the expiration or earlier termination of this Lease, or of any renewal or extension hereof, Tenant shall peaceably quit, deliver up and surrender the Premises, in good order, repair and condition, subject to the provisions of <u>Section XXXII</u> and <u>Section XXXIII</u> below.  Tenant shall restore the Premises and make such repairs as may be necessary to restore the Premises to at least substantially the same condition as the Premises were in upon inception of this Lease, reasonable wear and tear and Owner-authorized improvements excepted.  At Owner's written request, Tenant shall remove all goods, equipment or personal property owned by Tenant on the Premises; subject, however, to any valid lien that Owner may have thereon for unpaid Rent, fees or charges.

Upon termination or expiration of this Lease, Tenant shall transfer all right, title and interest in and to the Premises, including all improvements, to Owner without additional payment or cost; provided, however, that Tenant will retain all right, title and interest in and to any Trade Fixtures and Tenant shall be entitled to remove and dispose of such Trade Fixtures, subject to Owner's rights under <u>Section XXVII.B.5)</u>.  In the event of a termination of this Lease by Tenant pursuant to <u>Section XXVIII.B</u>, Tenant shall retain Tenant's Interest until all amounts, if any, agreed or adjudicated to be payable by Owner on such termination are paid in full, or Owner has posted a bond sufficient to pay such amounts; provided, however Tenant may not conduct any business on the Premises after termination.  For the avoidance of doubt, Tenant shall not be required to conduct any investigation, remediation, corrective action or other activities in connection with any Environmental Conditions on the Premises, except to the extent required under <u>Section XX</u> or <u>Section XXI</u> above.

B.    <u>Repossession and Holding Over</u>.  Upon such expiration or termination, Owner may, without further notice, enter upon, reenter, possess and repossess itself of the Premises by summary proceedings, ejectment or otherwise, and may have, hold, and enjoy the Premises and all rental and other income therefrom, free of any claim by Tenant with respect thereto.  If Tenant does not surrender possession of the Premises at the end of the Term, such action shall not extend the Term of this Lease, Tenant shall be a tenant at sufferance, and during such time of occupancy Tenant shall pay to Owner, as damages, an amount equal to one hundred fifty percent (150%) of the then current Rent.  Owner shall not be deemed to have extended the Term, other than by execution of a written agreement specifically so stating.

C.    <u>Tenant's Personal Property</u>.  Except as otherwise expressly provided in this Lease, Tenant's Trade Fixtures, furnishings, signs, temporary buildings and equipment located on, in or at the Premises, shall remain Tenant's property for all purposes and, subject to <u>Section XXVII.B.5)</u>, shall be removed by Tenant upon expiration or earlier termination of the Term of this Lease.  Tenant shall repair, at its sole expense, all damage to the Premises caused by such removal.

LNSTR-000268

## XXX. FORCE MAJEURE

The failure of Tenant or Owner to perform its obligations hereunder shall be excused, to the extent, and for the period of time, such failure is caused by the occurrence of an event of Force Majeure. Force Majeure shall mean acts and events not within the control of the Party claiming suspension, and which that Party has been unable to avoid or prevent by the exercise of due diligence. Events of Force Majeure include: Acts of God; strikes, lockouts or other industrial disputes; inability to obtain material, equipment or labor; epidemics, civil disturbances, acts of domestic or foreign terrorism, wars, riots or insurrections; landslides, lightning, earthquakes, fires, storms, floods or washouts; arrests and restraint of rulers and people; interruptions by government or court orders; present or future orders of any Governmental Authority having proper jurisdiction and authority (unless arising out of a breach of Applicable Law by the Party asserting Force Majeure); failure to obtain or delay in obtaining any Governmental Approval from any Governmental Authority; explosions; breakage or accident to machinery; and the exercise of any rights of the United States Government affecting the control, operation, regulation and taking over of the Airport or the exclusive or nonexclusive use of the Airport by the United States during a time of war or national emergency as set forth in Section XXV.B. Force Majeure does not include economic or market conditions which affect a Party's cost, but not its ability, to perform. The Party invoking Force Majeure shall give prompt, timely and adequate notice to the other Party, by facsimile transmission or telephone confirmed promptly thereafter in writing, and shall use due diligence to remedy the event of Force Majeure, as soon as reasonably possible. Nothing contained herein shall be construed to require a Party to settle a strike or other labor dispute against its will.

To the extent a Force Majeure impairs Tenant's use of the Premises, Tenant's obligations to pay Rent hereunder shall be proportionately or fully reduced during the term of such Force Majeure. In addition to extent a Force Majeure's duration is in excess of ninety (90) days, the term of this Lease will be extended by the length of such Force Majeure in excess of ninety (90) days. Any right of either Party to terminate this Lease shall be suspended for so long as the act, omission or other event or circumstance giving rise to such right is excused by an event of Force Majeure, provided that such Force Majeure does not continue for more than six (6) months. To the extent that any Force Majeure's duration is in excess of six (6) months, Tenant may elect to terminate this Lease.

## XXXI. INSPECTION

When no state of emergency exists, after two (2) business days' notice to Tenant, Owner may enter upon the non-public areas of the Premises during normal operating hours in order to inspect same. Owner may enter upon all public areas of the Premises at any time without notice during normal business hours. In an emergency, Owner may enter upon the Premises at any time and without notice to Tenant. Owner will use reasonable efforts to minimize the disruption to Tenant resulting from any such inspections.

3680839v.14 HIG339/10002

LNSTR-000269

# XXXII.  CASUALTY LOSS

A.  <u>Restoration Upon Casualty Loss</u>.  If the South Terminal, or any buildings, terminals or leasehold improvements are wholly or partially destroyed or damaged by fire or any other casualty ("<u>Casualty</u>"), Tenant shall cause the same to be restored and reconstructed to the extent of available insurance proceeds (and such other proceeds, if any, as are made available to Tenant by or through Owner), unless otherwise agreed by Owner, in writing, and the following provisions shall apply:

    1)    The design of all portions of the South Terminal to be restored and reconstructed shall meet the requirements of this Lease (including those set forth in <u>Section XV</u> hereof) and Owner shall have the same rights of review, comment and approval with respect to such design as it has hereunder for Covered Improvements;

    2)    Restoration and reconstruction shall commence as soon as reasonably feasible, but no later than six (6) months after the receipt of insurance proceeds available therefor, and shall be pursued thereafter with all due diligence to completion;

    3)    Tenant shall use all available proceeds of Tenant's casualty insurance for the restoration and reconstruction of the South Terminal; and

    4)    All proceeds from Tenant's rental insurance or business interruption insurance policies shall be the property of Tenant.

B.  <u>No Restoration Following Casualty Loss</u>.  If Tenant and Owner agree not to restore and reconstruct the South Terminal, then either Party may elect to terminate this Lease as to the portion of the Premises affected by the Casualty (as reasonably determined by the Parties) upon thirty (30) days' written notice to the other Party, and the following provisions shall apply:

    1)    With available insurance proceeds, Tenant shall establish reasonable security for the Premises and, as soon as practicable, remove all debris resulting from the Casualty and bring the Premises to a clean and safe condition;

    2)    The insurance proceeds received under Tenant's property insurance policies as a result of the Casualty shall be applied, first in accordance with sub-clause 1) above, and then to Tenant, to the extent of any remaining proceeds;

    3)    All proceeds from Tenant's business interruption insurance policies shall be paid to Tenant;

    4)    Tenant shall reasonably cooperate with Owner to cause Tenant's insurance company to apply the insurance proceeds as provided in this <u>Section XXXII.B</u>; and

    5)    If this Lease is terminated as to a portion of the Premises, Rent shall be reduced proportionately

LNSTR-000270

C.    <u>Abatement</u>.  Rent shall abate following any Casualty, such abatement to expire on completion of restoration or reconstruction of the South Terminal with any period of abatement to be added to the Term of this Lease.

## XXXIII.   CONDEMNATION

A.    <u>Taking in Entirety</u>.  If the entire Premises and/or the entire Tenant's Interest are taken by any public or governmental body by right of eminent domain or otherwise, this Lease shall terminate as of the date the condemning authority takes possession.

B.    <u>Partial Taking</u>.  If less than all of the Premises and/or Tenant's Interest (including a material right of use hereunder) is taken by any Governmental Authority by right of eminent domain or otherwise, and in Tenant's reasonable judgment, the remainder lacks adequate area, location, configuration, improvements or other capacity or potential to use the Premises for their authorized uses, Tenant shall have the right to terminate the Lease in its entirety, by giving Owner written notice within thirty (30) days after the date the condemning authority takes possession.  If Tenant does not terminate the Lease, the Lease shall continue in full force and effect as to the remainder of the Premises, but with a proportionate reduction in Rent commensurate with the portion taken.

C.    <u>Damage Award</u>.  If the condemning authority is not the City of Austin, the Parties agree to apportion the damage award as follows: first, Tenant shall be entitled to receive compensation for the Fair Market Value of Tenant's Interest so taken, and thereafter, out of any remaining portion of the damage award, Owner shall be entitled to receive compensation for the residual value of the real estate taken, and for any improvements to the Premises that are owned or paid for by Owner to the extent not constituting a part of Tenant's Interest.  If the condemning authority is the City of Austin, Tenant shall be entitled to compensation for the Fair Market Value of Tenant's Interest so taken.  In the event that the damage award is not apportioned in a manner that is consistent with this <u>Section XXXIII.C</u>, then the Parties shall re-apportion such damage award so as to be so consistent.  Each Party shall be responsible to bear all costs, and take all action necessary or appropriate to assert its respective interests in the condemnation action, including hiring its respective legal counsel, appraisers and other experts.

D.    <u>Definition of Taking</u>.  As used in this <u>Section XXXIII</u>, a taking shall include a sale, transfer or conveyance in avoidance or in settlement of condemnation or similar proceedings.  Tenant shall have no right to voluntarily devote or dedicate any portion of the Premises to public use without Owner's prior written consent.

## XXXIV.   ASSIGNMENT AND SUBLEASING

A.    <u>By Tenant</u>.

    1)    Except as otherwise provided in <u>Section XVI</u> or in this <u>Section XXXIV</u>, prior to the Commencement of Operations Date, Tenant may not assign this Lease, other than to an Affiliate, without the prior written consent of Owner, which may be granted, withheld or conditioned in Owner's sole and absolute discretion.  After

LNSTR-000271

Commencement of Operations Date, except as otherwise provided in <u>Section XVI</u> or in this <u>Section XXXIV</u>, Tenant may not assign this Lease, other than to an Affiliate, without the Owner's prior written consent, which shall not be unreasonably denied or delayed if Tenant demonstrates to the reasonable satisfaction of Owner that the proposed assignee is a Qualified Entity.  In the event of any permitted assignment, the transferor shall be relieved of all obligations of Tenant incurred under this Lease after the effective date of such assignment provided that the transferee agrees in writing to be bound by the provisions hereof.  Any assignment that is not permitted by this <u>Section XXXIV.A.1)</u> shall be void.

2) For the avoidance of doubt, Owner and Tenant recognize that Tenant plans to enter into subleases or other agreements with design and construction contractors, air carriers, concessionaires, ground handlers and other service providers for use or occupancy of the Premises.  The prior written consent of Owner to any such sublease or occupancy agreement shall not be required provided that such Tenant's sublease or occupancy agreement with each such subtenant or occupant is consistent with and references and incorporates this Lease by reference, and is consistent with Tenant's Concession Program or Airline Lease Program.  Notwithstanding any sublease or occupancy agreement, unless otherwise agreed to by Owner, Tenant shall remain primarily liable under this Lease for all of its obligations hereunder.

B. <u>Transfer of Owner's Interest</u>.

1) Owner may freely transfer its interest in the Premises and under this Lease from time to time to any Government Authority which has comparable or greater financial resources, qualifications, experience and legal capacity and authority to perform the obligations of Owner under this Lease (a "<u>Public Owner</u>").

2) In the event of any permitted transfer, the transferor shall be relieved of all obligations of Owner accruing under this Lease after the date such transfer is consummated provided that (a) any such transfer is expressly made subject to the terms, provisions and conditions of this Lease, and (a) the transferee agrees in writing to be bound by the provisions hereof.  Tenant agrees to attorn to any such transferee.  Any transfer by Owner other than in accordance with this <u>Section XXXIV.B</u> shall be void.

## XXXV.  APPROVALS AND AUTHORITY

A. <u>Owner</u>.  Owner represents, warrants and covenants that, as of the Effective Date (1) Owner is a home rule municipal corporation organized and existing under the laws of the state of Texas with full power and authority to enter into and be bound by this Lease; (2) the execution, delivery and performance of this Lease by Owner have been duly authorized by all required actions; (3) this Lease has been duly and validly executed and delivered by Owner, and constitutes the valid and binding obligation of Owner,

LNSTR-000272

enforceable against Owner in accordance with its terms, except as may be limited by governmental immunity under the Constitution and laws of the State of Texas, or applicable bankruptcy, insolvency or similar laws affecting creditor's rights; (4) no consent or approval of any third party is required in connection with the execution, delivery or performance by Owner of this Lease, except for such consents or approvals that are not required to be obtained as of the Effective Date and that will be obtained in due course; (5) neither the execution and delivery by Owner of this Lease, nor the consummation of the transactions contemplated hereby, is or at the time of execution will be in conflict with or will result in a default under or violation of any Applicable Law or any other agreement or instrument to which it is a Party or by which properties and assets may be bound or affected; (6) there is no action, suit, proceeding, investigation or litigation pending or threatened against Owner which challenges Owner's authority to execute, deliver or perform, or the validity or enforceability of, this Lease; and (7) Owner owns and has good, legal, valid and beneficial title to, or has all rights to use, the Premises, subject to rights, restrictions and encumbrances of record to the extent valid and in existence.

B.　　Tenant.　Tenant represents, warrants and covenants that as of the Effective Date (1) Tenant is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, with full power and authority to enter into and be bound by its obligations under this Lease; (2) the execution, delivery and performance of this Lease by Tenant have been duly authorized by all requisite corporate action; (3) this Lease has been duly and validly executed and delivered by Tenant, and constitutes the valid and binding obligation of Tenant, enforceable against Tenant in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency or similar laws affecting creditor's rights; (4) no consent or approval of any third party is required in connection with the execution, delivery or performance by Tenant of this Lease, except for such consents or approvals that are not required to be obtained as of the Effective Date and that will be obtained in due course; (5) neither the execution and delivery by Tenant of this Lease, nor the consummation of the transactions contemplated hereby, is or at the time of execution will be in conflict with or will result in a default under or violation of any Applicable Law or any other agreement or instrument to which it is a Party or by which its properties and assets may be bound or affected; and (6) there is no action, suit, proceeding, investigation or litigation pending or threatened against Tenant which challenges Tenant's authority to execute, deliver or perform, or the validity or enforceability of, this Lease.

## XXXVI.　NOTICES AND CONTRACT ADMINISTRATION

A.　　Contract Administrator.　The Department of Aviation Director of Facilities and Operations is Owner's designated representative for matters relating to the Rehabilitation Project and reactivation of the South Terminal. The Department of Aviation Manager of Administration and Business Development is Owner's designated contract administrator for this Lease, and is authorized to act on behalf of the Director to organize, schedule and coordinate matters related to this Lease and the Premises, and to review and approve

3680839v.14 HIG339/10002

LNSTR-000273

requests by Tenant under this Lease. Owner may change its contract administrator by written notice to Tenant.

B. <u>Notices</u>. Any notice provided for or permitted to be given hereunder must be in writing and may be given by (1) depositing same in the United States Mail, postage prepaid, registered or certified, with return receipt requested, addressed as set forth in this <u>Section XXXVI</u>; (2) hand delivering the same to the Party to be notified; or (3) overnight courier of general use in the business community of Austin, Texas. Notice given by United States Mail in accordance herewith shall be deemed delivered and effective on the earlier of actual receipt or three (3) calendar days next following deposit thereof in the United States Mail in accordance with the requirements above. Notices to Owner shall be sent to:

> Executive Director
> Department of Aviation
> Austin-Bergstrom International Airport
> 3600 Presidential Blvd., Suite 411
> Austin, Texas 78719
>
> Telephone:   512-530-2242
> Facsimile:   512-530-7686

Notices to Tenant shall be sent to:

> [●]
> c/o Highstar Capital IV, L.P.
> 277 Park Avenue, 45th Floor
> New York, New York  10172
> Attention:  [●]
>
> Telephone:     [●]
> Facsimile:      [●]

The Parties hereto may from time to time change their respective addresses for purposes of notice hereunder by giving a notice in accordance with the provisions of this <u>Section XXXVI.B.</u>

## XXXVII. CONFIDENTIALITY/PROPRIETARY INFORMATION

Certain information related to this Lease may be proprietary or confidential information, including financial reports, audits, key cost and revenue assumptions, including staff costs, non-staff costs, capital costs, interfaces with Airport systems, aeronautical and non-aeronautical revenue streams, any applicable taxes and charges and any other information that would have a material impact on the South Terminal's financial performance (collectively "<u>Confidential Information</u>"). Each Party agrees to label or mark its Confidential Information as confidential or proprietary. Tenant further acknowledges that Owner is a political subdivision of the State of Texas, and as such is subject to the Texas Public Information Act. To the extent permitted by

3680839v.14 HIG339/10002

LNSTR-000274

Applicable Law, each Party agrees it shall not distribute or disclose any Confidential Information supplied to it by the other Party without the prior written consent of the other Party. However, the foregoing sentence shall not preclude a Party from disclosing Confidential Information to its officials, officers, employees and representatives who have a need to know such information. If a Party is requested or required (by oral question, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) to disclose any Confidential Information, it shall promptly notify the other Party in writing of such request or requirement so that the other Party may seek an appropriate protective order, opinion of the Attorney General of the State of Texas or other applicable authority, or waive compliance with provisions of this Agreement. The Party seeking to assert the confidentiality of information shall, at its sole expense, prepare and submit all necessary information, briefs and/or legal memoranda to support its position with the appropriate authority.

Owner and Tenant also acknowledge that the Parties may be provided from time to time with "Sensitive Security Information" ("SSI"), as defined under 49 CFR Parts 15 and 1520, and Owner and Tenant agree to use and maintain such SSI as required by Applicable Law.

## XXXVIII. BOND ORDINANCES[10]

A.  Bond Ordinance Provisions. If and to the extent that the lien and other provisions of any Bond Ordinance are applicable to this Lease, this Lease and all rights granted to Tenant hereunder are expressly subject to the lien and provisions of the pledges, transfer, hypothecation or assignment made by Owner in any Bond Ordinance executed by Owner to issue Bonds. Owner expressly reserves the right to make such pledges and grant such liens and enter into covenants as it may deem necessary or desirable to secure and provide for the payment of Bonds, including the creation of reserves therefor, provided that Owner shall not take any actions that would be inconsistent with the terms and conditions of this Lease, including the grant by Owner of any mortgage or other lien on the Premises that is superior to or on a parity with the leasehold granted to Tenant by this Lease. Tenant understands that Owner is and will be the issuer of Bonds. With respect to Bonds on which the interest is intended to be excludable from gross income for Federal income tax purposes under the Internal Revenue Code of 1986 as amended or superseded, Tenant shall:

   1)  not use, without the prior written consent of Owner, any portion of the Premises for any purpose other than as an airport facility serving common passenger or freight carriers or charter carriers that serve members of the general public, and facilities functionally related and subordinate to such airport facility that are of a character and size commensurate with the character and size of such airport facility, including facilities that are directly related and essential to servicing aircraft or enabling aircraft to take off and land, or transferring passengers or cargo to or from aircraft, restaurants, retail stores and ground transportation and parking areas located on the Premises, but excluding any lodging facility or any retail business (including food and beverage facilities) in excess of a size

---

[10] NTD: To be discussed. Are there any existing liens in place?

LNSTR-000275

necessary to serve passengers and employees at the South Terminal in accordance with Tenant's projections, any office building (excluding office space in the South Terminal for use by Tenant or its subtenants), any industrial park or manufacturing facility, any health club facility; any facility primarily used for gambling, or any store the principal business of which is the sale of alcoholic beverages for consumption off premises (excluding a "<u>duty free</u>" airport concession); and

2)      immediately cease and desist from any action, other than as permitted in <u>Section XXXVIII.A.1)</u> above, with respect to the use of the Airport, to the extent such action is described in a written notice delivered by Owner as an action that, pursuant to the written advice of Owner's bond counsel or the Internal Revenue Service, may adversely affect the treatment of interest on any Bond as excludable from gross income for federal income tax purposes.

B.      <u>Certificate in Connection with Issuance of Bonds</u>. Tenant agrees that in connection with any issuance of Bonds by Owner, upon not less than twenty (20) days' prior written request by Owner, Tenant will deliver to Owner a statement in writing certifying:

1)      that this Lease is unmodified and in full force and effect (or if there have been modifications, a description of such modifications and that the Agreement as modified is in full force and effect);

2)      to Tenant's knowledge, that Owner is not in default under any provision of this Lease, or if in default, the nature thereof in reasonable detail; and

3)      such further matters as may be reasonably requested by Owner.

In each case, subject to Tenant's receipt of evidence reasonably satisfactory to it in respect of the truth and accuracy of such statements.

## XXXIX.   ALTERNATIVE DISPUTE RESOLUTION

A.      Should any dispute arise between the Parties to this Lease, (other than any dispute referred to in <u>Section XXXIV.B</u>, then Owner and Tenant agree to negotiate prior to prosecuting a suit for damages. However, this <u>Section XXXIX</u> does not prohibit the filing of a lawsuit to toll the running of a statute of limitations or to seek injunctive relief. Either Party may make a written request for a meeting between representatives of each Party within ten (10) days after receipt of the request or such later period as agreed by the Parties. Each Party shall include, at a minimum, one (1) senior level individual with decision-making authority regarding the dispute. The purpose of such a meeting and any subsequent meeting with respect to such a dispute shall be to attempt in good faith to negotiate a resolution of the dispute. If, within twenty (20) days after such meeting, the Parties have not succeeded in negotiating a resolution of the dispute, the Parties will, upon written notice of one Party to the other Party, given within ten (10) days following the expiration of such twenty (20) day period (a "<u>Request for Mediation</u>"), proceed directly to non-binding mediation as described below.

LNSTR-000276

B.     If the efforts to resolve such dispute through negotiation fail within the period set forth in Section XXXIX.A, or Owner and Tenant each waive the negotiation process, the Parties may select, within twenty (20) days after the date of the Request for Mediation or mutual waiver of negotiation, as applicable, a mediator trained in mediation skills to assist with resolution of the dispute.  The Parties agree to act in good faith in the selection of the mediator and to give consideration to qualified individuals nominated to act as mediator.  Nothing in this Lease prevents the Parties from relying on the skills of a person who is trained in the subject matter of the dispute or a contract interpretation expert.  If the Parties fail to agree on a mediator within twenty (20) days of initiation of the mediation process, the mediator shall be selected by the American Arbitration Association.  The mediation shall take place in Austin, Texas.  The Parties agree to participate in mediation in good faith for up to thirty (30) days from the date of the first mediation session.  The Parties shall share the costs of the mediator equally.  In the absence of a separate written agreement to the contrary, the results of this mediation shall not be binding on either of the Parties.

## XL.     MISCELLANEOUS

A.     Gratuities.  The offering or giving of gratuities in the form of entertainment, gifts or otherwise by Tenant or any agent or representative of Tenant to any official or employee of Owner with a view toward securing favorable treatment with respect to the performance of this Lease is a material breach of this Lease, for which Owner may immediately terminate this Lease upon written notice, in the absence of remedial action reasonably satisfactory to Owner, in its sole discretion.

B.     Modification and Non-Waiver.  No variations, modifications or changes to this Lease shall be binding unless in writing and executed by both Parties.  No waiver by either Party of any breach or default of any term, condition or provision hereof, including the acceptance by Owner of any Rent or Tenant of rental car revenue sharing, at any time or in any manner other than as herein provided, shall be deemed a waiver of any other or subsequent breaches or defaults of any kind under any circumstance.  No waiver of any breach or default of any term, condition or provision hereof shall be implied from any action of any Party, and any such waiver, to be effective, shall be set out in a written instrument signed by the waiving Party.

C.     Governing Law.  This Lease shall be construed and enforced in accordance with the laws of the State of Texas, without regard to any conflicts-of-law principle that would apply the law of another jurisdiction.  Venue for any action arising out of or concerning this Lease shall be proper and lie exclusively in Travis County, Texas.

D.     Severability.  If any provision of this Lease or the application thereof to any or entity or circumstance shall, at any time or to any extent, be invalid or unenforceable, and the basis of the bargain between the Parties hereto is not destroyed or rendered ineffective thereby, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby.

LNSTR-000277

E.     Relation of Parties.  It is the intention of Owner and Tenant to hereby create the relationship of landlord and tenant, and no other relationship is created.  Nothing in this Lease is intended or shall be construed to make Owner and Tenant partners or joint venturers or to render either Party hereto liable for any obligation of the other.

F.     Recordation.  Owner and Tenant will, at the request of the other, promptly execute a memorandum of lease in recordable form, which may be filed for record in the Office of the County Clerk of Travis County, Texas.  This Lease itself shall not be filed of record unless required by applicable law.

G.     Successors and Assigns.  This Lease shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.  Whenever a reference is made herein to either Party, such reference shall include the Party's successors and permitted assigns.

H.     Survival.  Any terms and provisions of this Lease pertaining to rights, duties or liabilities extending beyond the expiration or termination of this Lease shall survive the end of the Term of this Lease.

I.     No Commissions.  Owner and Tenant represent and warrant to one another that there are no broker's, finder's or similar fees payable in connection with this Lease transaction.

J.     Time of the Essence.  Time is of the essence in this Lease and in each and all of the provisions hereof.

K.     Reservation of Immunities.  To the extent permitted by Applicable Law, Owner waives its rights to assert sovereign or governmental immunity from suit or liability for contract claims asserted by Tenant seeking the remedies set forth in Section XXIII.B of this Lease.  Except as provided in the preceding sentence, Owner does not waive, and expressly reserves, all immunities existing under Applicable Law available to Owner as a Texas home-rule municipal corporation.  It is expressly agreed and understood that the foregoing waiver is a limited and not a general waiver, and that its effect is limited to specific contract claims under this Lease.

L.     Counterparts.  This Lease may be executed in any number of counterparts and by different Parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.  The Parties shall accept executed counterparts delivered by facsimile transmission or electronic mail as of equal effect as original signatures.  Each Party shall deliver its signed original counterpart to the other Party within three business days.

M.     Entire Agreement.

       1)     This Lease, together with its exhibits and attachments, contains the entire understanding and agreement between the Parties hereto with respect to the subject matter of this Lease.  It is the intent of the both Parties that all provisions be construed in a manner that is fair to both Parties; interpreting no provision

LNSTR-000278

more strictly against one Party than the other. It is further understood and agreed that neither Party has made any representations or promises with respect to this Lease, except as expressly set forth herein, and that no claim or liability or cause for termination shall be asserted by either Party against the other Party, and a Party shall not be liable to the other Party by reason of the breach of any representations or promises not expressly stated in this Lease. Owner and Tenant are the only parties to this Lease and as such are the only parties to enforce its terms. Nothing in this Lease gives, or shall be construed to give or provide, any benefit, direct or indirect, to third parties unless a third party is expressly described as an intended beneficiary of its terms. The Parties hereto acknowledge that they have thoroughly read this Lease, including any exhibits hereto, and have sought and received whatever advice needed for them to form a full and complete understanding of all rights and obligations herein.

2) The exhibits to this Lease are as follows:

**Exhibit A**    Premises

**Exhibit B**    Tenant Report Form

**Exhibit C**    Tenant's Rehabilitation Responsibilities

**Exhibit D**    Design Review Procedures

**Exhibit E**    Covered Improvements – Insurance Requirements

**Exhibit F**    Airport Shared Telephone System Terms of Usage

**Exhibit G**    Lease – Insurance Requirements

LNSTR-000279

**IN WITNESS WHEREOF,** Owner and Tenant have executed this Lease through their duly authorized representatives to be effective as of _____, 2015.

**OWNER:**                                    CITY OF AUSTIN


_____          By:_____

Approved as to form                         Name:_____

Assistant City Attorney                      Title:   Executive Director of Aviation


**TENANT:**                                   **LONESTAR AIRPORT HOLDINGS, LLC**


                                              By:_____

                                              Name:_____

                                              Title: _____

3680839v.14 HIG339/10002

LNSTR-000280

**EXHIBIT A**
Premises

LNSTR-000281

**EXHIBIT B**
Tenant Report Form

3680839v.14 HIG339/10002

**EXHIBIT C**
Tenant's Rehabilitation Responsibilities

3680839v.14 HIG339/10002

**EXHIBIT D**
Design Review Procedures

LNSTR-000284

**EXHIBIT E**
Covered Improvements – Insurance Requirements

LNSTR-000285

**EXHIBIT F**
Airport Shared Telephone System Terms of Usage

LNSTR-000286

**EXHIBIT G**
Lease – Insurance Requirements

LNSTR-000287