IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| LONESTAR AIRPORT HOLDINGS, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:22-CV-770-RP |
| | § | |
| CITY OF AUSTIN, TEXAS, | § | |
| | § | |
| Defendant. | § | |

**ORDER**

Before the Court is Plaintiff Lonestar Airport Holdings, LLC's ("Lonestar") Motion for Preliminary Injunction. (Dkt. 20). The parties filed responsive briefing and supporting documents, (Dkts. 30, 62, 72), and the Court held a hearing, (Dkt. 71). Having considered the briefing, the arguments made at the hearing, the evidence, and the relevant law, the Court will deny the motion.

**I. BACKGROUND**

One fact not in dispute in this case is that Austin is a fast-growing city in need of more capacity at Austin-Bergstrom International Airport ("ABIA"). How the airport will expand to meet the ever-increasing demand for air travel is the central dispute between Lonestar and Defendant City of Austin (the "City"). Lonestar operates the South Terminal at ABIA, a smaller terminal dedicated to low-cost carrier service. (*See* Am. Compl., Dkt. 38, at 20). In March 2016, Lonestar and the City entered into a 40-year South Terminal Lease and Concession Agreement (the "Agreement") under which Lonestar alleges that it spent $12.5 million renovating the terminal which reopened in 2017. (*Id.* at 2, 5). Since 2016, Lonestar alleges to have spent almost $20 million in total on the South Terminal, which contains 3 gates, food trucks, and an indoor and outdoor waiting area with a stage and bar. (*See id.* at 5, 16).

1

In the context of Lonestar's motion for preliminary injunction, Lonestar focuses its argument on Article 15 of the Agreement. Pursuant to Article 15, Lonestar argues that it has an exclusive first right to develop, construct, and operate the South Terminal if the parties agree it needs to be expanded or replaced with a larger facility. The City disagrees, characterizing Article 15 as creating a condition precedent: only with the City's agreement, Lonestar has that first exclusive right. Given Article 15's prominence in the parties' negotiations and eventual dispute, the Court provides it here:

> **ARTICLE 15**
> **EXPANSION OR NEW FACILITY**
>
> 15.01   *Expansion or New Facility.* If Tenant determines that the growth of operations of existing or new air carriers requires an Expansion or if Tenant or Owner determines that the growth of operations of existing or new air carriers requires a New Facility, either Tenant or Owner, as applicable, shall provide a written notice to the other Party of such determination. If Tenant provides a written notice to Owner that it is interested in investing in such Expansion or New Facility, then, subject to Owner's agreement and in accordance with the Airport Master Plan, (a) in the event of an Expansion that does not require additional land or other material changes to this Lease, Owner and Tenant will amend this Lease to reflect such Expansion, and (b) in the event of an Expansion that requires additional land or the construction of a New Facility, Owner will provide Tenant with the exclusive first right to, as applicable, develop, construct and operate such Expansion or New Facility, and both Parties shall work together in good faith to enter into an agreement regarding such Expansion or New Facility on mutually agreeable terms. Owner will coordinate with Tenant to seek FAA approval to update the Airport Layout Plan accordingly to identify the Tenant's Expansion or New Facility on the Airport Layout Plan. In the event an update to the Airport Layout Plan is necessary due to Tenant's Expansion or New Facility as approved by Owner, Tenant shall be responsible for the cost of any environmental studies in connection with FAA and state approvals.

In 2018, Lonestar and the City began discussing expanding the terminal to 6-10 gates. (*Id.* at 20). Negotiations were put on hold in 2019 when the long-time executive director of the City's Department of Aviation announced his intent to retire. (*Id.* at 21). Then in November 2019, the City sent Lonestar a letter offering to buy Lonestar's interest in the South Terminal for $10 million, and the offer was reported by local news outlets. (*Id.* at 22). The City's letter stated it was "not inclined to approve any expansion of the South Terminal" and instead wished to acquire the leasehold interest. (*Id.* at 23). Lonestar rejected the offer. (*Id.*). In March 2020, the City informed Lonestar that

it would demolish the South Terminal. (*Id.* at 25). Discussions stalled shortly after because of the Covid-19 pandemic. (*Id.*).

In July 2021, the City announced it would demolish the South Terminal under the Airport Expansion Development Program ("AEDP") and build a new facility with at least 10 gates. (*Id.*). Lonestar responded to "confirm again that Lonestar is interested in investing in and exercising its rights under Article 15 of the [Agreement} to develop, construct, and/or operate" the new facility. (*Id.* at 26). The City proceeded with the AEDP without Lonestar's involvement. (*Id.*; 26(f) Report, Dkt. 76, at 3).

In March 2022, the City informed Lonestar that the South Terminal was "under the imminence of condemnation" and valued Lonestar's interest at about $2 million. (Am. Compl., Dkt. 38, at 27). The City filed a Petition for Condemnation of Lonestar's leasehold estate in Probate Court in Travis County, Texas on June 17, 2022, and a Special Commissioners' Hearing pursuant to Texas Property Code § 21.015 is set for January 31 and February 1, 2023. (*Id.* at 29).

Lonestar filed this lawsuit against the City on August 1, 2022. (Compl., Dkt. 1). In its First Amended Complaint, Lonestar alleges claims for takings under 42 U.S.C. § 1983 (Count I), the Declaratory Judgment Act (Count II), and the Texas Constitution (Count III), as well as breach of contract (Count IV), and, in the alternative, promissory estoppel (Counts V and VI). (*See* Am. Compl., Dkt. 38). On January 11, this Court granted the City's motion to dismiss, in part, and dismissed without prejudice Lonestar's takings claims (Counts I-III) and dismissed with prejudice Lonestar's promissory estoppel claims (Counts V-VI) pursuant to Rule 12(b)(1). (Order, Dkt. 64). The only claims remaining are breach of contract claims (Count IV).

## II. LEGAL STANDARD

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047,

1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005). A movant cannot be granted a preliminary injunction unless it can establish that it will suffer irreparable harm without an injunction. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

### III. DISCUSSION

The Court finds that Lonestar has not met its burden to show that it will be irreparably harmed in the absence of a preliminary injunction. The party seeking a preliminary injunction must prove that irreparable harm is likely, not merely possible. *Winter*, 555 U.S. at 22. In the Fifth Circuit, irreparable harm exists "where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2010). In this case, monetary damages could remedy Lonestar's alleged injury.

Lonestar contends it is suffering irreparable harm and will continue to suffer irreparable harm. Lonestar claims the City breached the Agreement causing Lonestar to be excluded from the City's efforts to expand the South Terminal which deprives Lonestar of its right to participate under the Agreement. Assuming the City breached the Agreement, Lonestar could calculate the damage to its business and the value of its interest in the South Terminal pursuant to the Agreement. In fact, in its amended complaint, Lonestar states that the City has damaged and diminished the value of its business "by hundreds of millions of dollars" based on "market valuations and other intrinsic and extrinsic evidence." (Am. Compl., Dkt. 38, at 37). Lonestar explains that "one market participant had valued Lonestar's business at over $300 million, and Lonestar expects to prove hundreds of

millions in damages directly caused by the City's unlawful actions taken in violation of the Agreement." (*Id.* at 37–38). At another point, Lonestar says that it received proposals valuing its interest in the Agreement in amounts ranging from $135 million to $305 million. (*Id.* at 21). Finally, Lonestar balked at the City's valuation of Lonestar's interest in the South Terminal at "a mere $1,954,000—less than 20% of what it had offered in 2019 and a fraction of the business's true value." (*Id.* at 27–28). Lonestar appears able to estimate the value of its business and has not claimed it cannot do so. Given that Lonestar's injury could be remedied by monetary damages, which Lonestar's own allegations demonstrate are ascertainable, Lonestar has not shown that the absence of an injunction would impair a damages remedy in this case.

During the preliminary injunction hearing, Lonestar argued that the City's actions will harm Lonestar's reputation as a reliable partner with vendors and tenants. "[W]hile reputational injury can be used to establish irreparable harm in certain circumstances, the showing of reputational harm must be concrete and corroborated, not merely speculative." *Pruvit Ventures, Inc. v. Forevergreen Int'l LLC*, No. 4:15-CV-571-ALM-CAN, 2015 WL 9876952, at *5 (E.D. Tex. Dec. 23, 2015), *report and recommendation adopted*, No. 4:15-CV-571, 2016 WL 231160 (E.D. Tex. Jan. 19, 2016); *see also Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013) ("[S]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant."). Lonestar has failed to produce evidence to establish that any purported reputational injury is sufficiently concrete to sustain a finding of irreparable harm.

The difficulty for Lonestar at this stage of litigation is that Lonestar's case for irreparable harm was substantially weakened when this Court dismissed its takings claims, leaving Lonestar with only its Article 15 breach of contract claim for the purposes of its motion for preliminary injunction. Lonestar devotes most of its preliminary injunction briefing and argument at the hearing to establishing that it likely will succeed on the merits of its breach of contract claim. And Lonestar

may show that the City breached the Agreement and even that the City acted in bad faith. But to obtain a preliminary injunction, Lonestar has not carried its burden of showing that it is likely to be irreparably harmed in the absence of a preliminary injunction. A preliminary injunction is therefore not warranted. *See Amazon.com*, 239 F.3d at 1350.

## IV. CONCLUSION

For these reasons, **IT IS ORDERED** that Lonestar's motion for preliminary injunction, (Dkt. 20), is **DENIED**.

**SIGNED** on January 31, 2023.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE